# Exhibit A




GROUP A, B, & C LANDS
VERNON PARISH, LOUISIANA

# Exhibit B

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
FILED

JUL 28 2000

ROBERT H. SHEMWELL, CLERK
BY ______ DEPUTY

CENTRAL PINES LAND COMPANY,
TOWER MINERALS COMPANY, INC.,
JACK E. LAWTON, JR., EVELYN
GAY LAWTON DUHON, LINDA LEW
LAWTON DROST, D,S&T, INC.,
DROST & BRAME, INC.

CIVIL ACTION NO. 2:96-2000

-vs-

SECTION "A" (JUDGE LITTLE)

UNITED STATES OF AMERICA,

and

TEXACO EXPLORATION AND PRODUCTION, INC.,
SONAT EXPLORATION COMPANY, HELMERICH &
PAYNE, INC., CHESAPEAKE OPERATING, INC.

## RULING

Before this court is the United States of America's motion for summary judgment and the plaintiffs' motion to strike two declarations submitted by the government in support of its summary judgment motion. For the reasons that follow the plaintiffs' motion is DENIED and the United States' motion is GRANTED.

### I. Background

This case has a long, protracted history. In 1929, pursuant to a warranty mineral deed, the Gulf Lumber Company conveyed to S.H. Fullerton all oil, gas, and minerals in, on,

181

**Exhibit 1**

and under a 100,000 acre tract in Vernon Parish, Louisiana. The original transaction created a mineral servitude that allowed S.H. Fullerton to conduct oil, gas, and mineral exploratory and extraction operations on the land. S. H. Fullerton transferred his interest in the servitude to Fullerton Minerals Company on 7 May 1930. On 26 April 1937, Fullerton Minerals Company in turn conveyed the mineral servitude to William T. Burton by mineral deed. Through a series of later transfers, plaintiffs Central Land Company, Tower Mineral Company, Inc., Jack E. Lawton, Jr., Evelyn Gay Lawton Duhon; Linda Lew Lawton Drost, D, S, & T, Inc., and Drost & Brame, Inc. (hereinafter collectively referred to as plaintiffs)[1] acquired all the rights of Wm. T. Burton Industries through mesne conveyances.

[1] The ownership of plaintiffs in the subject servitude is as follows: Central Pines Land Company owns an undivided fifty percent of all the oil, gas, and minerals subject to the following royalties: one-half of one percent in favor of Jack E. Lawton, Jr., one-fourth of once percent in favor of Evelyn Gay Lawton Duhon, one-fourth of one percent in favor of Linda Lew Lawton Drost. Tower Minerals Company also owns an undivided fifty percent of all of the oil, gas, and minerals subject to the following royalties: one-half of one percent in favor of Jack E. Lawton, Jr., one-fourth of once percent in favor of Evelyn Gay Lawton Duhon, one-fourth of one percent in favor of Linda Lew Lawton Drost, four and two-tenths percent in favor of D,S & T, Inc., and two and eight-tenths in favor of Drost & Brame, Inc.

The plaintiffs have delineated three parcels of land, denoted as Groups A,[2] B,[3] and C[4] to describe the property subject to the servitude. We adopt these designations in our discussion. In a series of four separate transactions between 1933 and 1938, the United States Forest Service acquired the Group A and B lands for the Kisatchie National Forest, pursuant to conventional deeds and expropriation under the Weeks Forestry Act, 16 U.S.C. § 515. By a series of letters, Memoranda of Understanding, and special use permits between 1941 and 1952, the Forest Service granted to the Army all of the Forest Service lands within Vernon Ranger District of the Kisatchie National Forest for unrestricted military training purposes. These lands, comprising approximately 36,236 acres, remained subject to the mineral servitude created by mineral deed in 1929 that existed when the United States acquired the land.

From 1950 until 1978, through a series of condemnation proceedings, the United States instituted a mineral moratorium

---

[2] The parties dispute the precise acreage of Group A lands. The United States asserts that Group A lands comprise approximately 31,086.01 acres. See United States' Statement of Material Facts as to Which There is No Genuine Dispute [hereinafter United States' Statement of Material Facts], Statement 4. The plaintiffs contend that Group A lands include 25,074.96 acres. See Pls.' Resp. to United States' Statement of Material Facts, Resp. to Statement 4, at 3.

[3] According to the United States, Group B include approximately 5,106 acres. See United States' Statement of Material Facts, Statement 4. The plaintiffs assert that Group B covers 11,000 acres. See Pls.' Resp. to United States' Statement of Material Facts, Resp. to Statement 4, at 3.

[4] This court's ruling on the prior motion for summary judgment presented to the court established that the Group C lands could not prescribe to the government. The mineral ownership of these lands are no longer at issue in this case.

that expropriated the servitude owners' rights of ingress and egress over the surface for the purpose of mineral development. The parties seem to agree that the moratorium affected all of Group B and C lands, but dispute whether ingress and egress was originally prevented over Group A lands. In 1967 in an attempt to clarify the extent of the mineral moratorium, the Army and the National Forest Service entered into a Memorandum of Understanding, that divided the land burdened by the servitude into two areas, the "Intensive Use Area" and the "Limited Use Area." The Intensive Use Area, comprising Fort Polk artillery range, was used as a military training ground and bombing range and included most of Group B lands and approximately half of Group A lands. The Army denied any access to the Intensive Use Area that was incompatible with the military's mission. The parties dispute whether the government allowed any drilling or preparatory seismic activities in the Limited Use Area, which remained under the administrative control of the Forest Service, between 1967 and 1978. See discussion infra section III[C](1).

During the moratorium, Wm. T. Burton Industries was paid a small fee by the government on a per acre basis for the portion of its servitude that was inaccessible as a result of the government's restrictions. The impediment to exploration created by the government's moratorium ended officially on 31

March 1978. See United States' Mot. for Summ. J., Ex. 48 (letter dated 31 March 1977 from John Camp, attorney for Wm. T. Burton Industries, to Michael Drost, employee for Wm. T. Burton Industries, acknowledging that Army's moratorium was to end on 31 March 1978); Ex. 55 (letter from Major General William B. Steele to Commander, US Army FORSCOM dated 6 June 1977 explaining that moratorium over Fort Polk was to end on 31 March 1978). Plaintiffs assert, however, that the moratorium effectively continued after this date.

Between 1933 and 1956, Wm. T. Burton Industries drilled six wells on the lands burdened by the mineral servitude. Each of these endeavors produced a dry well. Wm. T. Burton Industries abandoned its last well located within Group A lands on 4 January 1956. In 1961, Wm. T. Burton Industries leased the mineral rights underlying the 1929 mineral servitude to Pan American Corporation. The lease agreement between the two companies noted the existence of the government's use restrictions on part of the lands subject to the lease. In 1964, Pan American drilled a well, in Section 4, Township 1 South, Range 5 West which proved to be non-productive. Pan American released the lease to Wm. T. Burton Industries on 30 June 1964.

In 1992, the United States' Bureau of Land Management began granting a series of oil and gas leases to the minerals underlying the surface to Group A and B lands. In 1995, the

plaintiffs learned that the United States was claiming ownership to the minerals underlying the Kisatchie National Forest. Plaintiffs filed the instant lawsuit to quiet title to the 1929 mineral servitude on 22 August 1996, seeking a declaration that they still own the servitude and that any leases to the minerals granted by the United States of American are null and void. Subsequently, both parties moved for summary judgment on the issue of whether the servitude lands could have prescribed to the government. On 7 April 1999, this court ruled that Louisiana Act 315 of 1940, which provides that a mineral servitude may not prescribe to the government, does not apply to the Group A and B lands because they were acquired by the United States prior to 1940. We determined that the ten-year liberative prescription period applicable to mineral servitudes would govern the Group A and B lands and reserved judgment on the question of whether the prescriptive period had been interrupted or suspended by the actions of either party. See 7 April 1999 Ruling, at 15-19.

On 25 April 2000, the United States filed a motion for summary judgment arguing that the plaintiffs' servitude prescribed for nonuse sometime between 1956 and 1996 and asking the court to find that plaintiffs' servitude had reverted to the ownership of the government. The plaintiffs respond that their right to explore for and capture the minerals underlying the lands owned by the United States is

extant and argue that summary judgment is inappropriate because genuine issues of material fact remain as to whether the prescriptive period was tolled by the government's moratorium on mining operations.

## II. MOTION TO STRIKE

Subsequent to the filing of the United States' motion for summary judgment, the plaintiffs' submitted a motion to strike the declarations of Gretchen Hunt ("Hunt"), the Zone Forest Geologist on the Kisatchie National Forest, and Delia Jaquette ("Jaquette"), the Leasing Program Manager and Mineral Title Specialist for the Southern Region of the United States Forest Service. In her declaration, Hunt provides a seismic map and accompanying explanatory chart detailing the location of seismic lines shot over the servitude between 1961 and 1985 by various companies. Jaquette's statement gives the exact parameters of the 1929 mineral servitude and describes what part of the servitude lay within the Limited and Intensive Use Areas. The plaintiffs object to Jaquette's declaration because it was not included in the preliminary witness list submitted by the United States on 31 July 1999 and was filed after the 21 April 2000 discovery deadline. The plaintiffs therefore insist that Jaquette's declaration is inadmissible. The plaintiffs also protest the admission of Gretchen Hunt's declaration on the basis that she is testifying as an expert

despite the fact that she never filed an expert report as required by the local discovery rules in effect in the Western District of Louisiana.

The district court has the inherent power to manage discovery in cases pending before the court. See Degen v. United States, 517 U.S. 820, 826, 116 S. Ct. 1777, 1782, 517 U.S. 820, 135 L. Ed. 2d 102; Williams v. New Orleans Public Serv., Inc. 728 F.2d 730, 732 n. 4 (5th Cir. 1984). This court therefore has discretion in determining whether to permit the United States to rely on the declarations of Hunt and Jaquette. The United States opposes the motion to strike on the grounds that both witnesses' declarations meet the standards of Rule 56(e) of the Federal Rule of Civil Procedure and therefore should be considered by this court. Rule 56(e) provides in relevant part: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

Although Jaquette was not named as a witness in a timely manner, her statements are otherwise admissible under Rule 56(e) because they are made on the basis of her personal knowledge, set forth admissible evidence, and demonstrate that she is competent to testify to the matters stated in her declaration. We therefore find no reason to exclude her

declaration. Similarly, contrary to plaintiffs' contentions, Hunt's statements are not based on her opinions as an expert, but instead grounded in her own experience, gleaned from her own research or from her personal review of information given to her by her Forest Service employees, or derived from evidence submitted by plaintiffs own witnesses.[5] This is shown by the portion of her declaration in which she details the step-by-step method by which she developed a map of the survey lines that had been shot over the servitude. See Hunt Decl. ¶ 7. We do not agree, as urged by plaintiffs, that Hunt's declaration is barred by the Civil Justice Expense and Delay Reduction Plan adopted by the U.S. District Court for the Western District of Louisiana, Section III, Para 2(b), which requires that "expert witnesses shall be available for deposition during the two-week period following the discovery cutoff" unless otherwise agreed by the parties. The provision cited by plaintiffs deals with experts to be presented at trial. Hunt's declaration is being used for summary judgment purposes only.

Both Hunt's and Jaquette's declarations enlighten the court about the nature of the land subject to the servitude and enable it to make a more informed decision on the United States' motion for summary judgment. The plaintiffs fail to

---

[5] We offer no opinion as to whether Hunt would be qualified as an expert witness at trial.

provide us with a legal reason that prevents us from considering these declarations. We therefore DENY plaintiffs' motion to strike and proceed to determine the merits of the summary judgment motion.

## III. MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the nonmovant, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2509-10, 91 L. Ed. 2d 202 (1986). Where, as here,[6] the nonmovant bears the burden of proof at trial, the moving party may meet its burden by setting forth proof that disproves an essential element of the nonmovants' case. See Fontenot v. Upjohn Co., 780 F.2d 1190, 1195 (5th Cir. 1986). "'A fact is material if it might affect the outcome of the suit under the governing substantive law.'" H.B. Zachry Co. v. Quinones, 206 F.3d 474, 480 (5th Cir. 2000)(quoting United States v. Arron, 954 F.2d 249, 251 (5th

---

[6] "When plaintiff's petition shows on its face that the prescriptive period has run, burden is on the plaintiff to prove an interruption or suspension of prescription." Salvex, Inc. v. Lewis, 546 So. 2d 1309, 1315 (La. Ct. App. 3d Cir. 1989).

Cir. 1992)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson, 477 U.S. at 248; 106 S. Ct. at 2510.

If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the nonmoving party to produce evidence of the existence of a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 321, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The nonmovant must go beyond the pleadings and designate specific facts showing the existence of a genuine issue of fact for trial. See Edwards v. Your Credit, Inc., 148 F.3d 427, 431 (5th Cir. 1998). "The nonmovant cannot satisfy his summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." See Wilson Indus., Inc. v. Aviva America Inc., 185 F.3d 492, 494 (5th Cir. 1999); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc). In making its determination as to whether summary judgment is appropriate, the court must draw all justifiable inferences in favor of the nonmoving party. See Anderson, 477 U.S. at 255; 106 S. Ct. at 2513.

B. **Prescription of Mineral Servitudes Generally**

Many states allow for an estate in mineral rights that is separate and distinct from the estate of the surface owner. See, e.g., Central Oil Co. v. S.H. Shows, 149 So. 2d 306, 309 (Miss. 1961); Humphreys-Mexia Co. v. Gammon, 254 S.W. 296, 299 (Tex. 1923). In contrast, in Louisiana,

> [a] conveyance by a landowner to another of the oil, gas and other minerals on, in and under the land, together with rights of ingress, egress and occupancy for purposes of exploitation, is not a grant or alienation of a title to such minerals in place, but simply creates in the grantee a servitude or right of exploitation or development, prescribable in ten years for non-use, of such minerals and the right to appropriate such minerals as may be discovered and reduced to physical possession.

Frost Lumber Indus. v. Republic Prod. Co., 112 F.2d 462, 465 (5th Cir. 1940)(interpreting Louisiana law on mineral servitudes).

1. Statutory Provisions Governing Prescription of Mineral Servitudes

Under the Mineral Code, a mineral servitude is extinguished by "prescription resulting from nonuse for ten years." La. Rev. Stat. Ann. § 31:27(1)(West 2000). Likewise, the pre-Code law provided that a mineral servitude prescribes if it is not used for ten years. See Louisiana Petroleum Co. v. Broussard, 135 So. 1, 2 (La. 1931); see also Leiter Minerals, Inc. v. California Co., 132 So. 2d. 845, 931 (La. 1961)("The mineral servitude established either by sale or by

reservation is extinguished by the prescription resulting from non-user of the servitude for 10 years following its creation.").[7] Under both the Mineral Code and the law previously in effect, the prescriptive period can be interrupted when the holder of the mineral servitude engages in good faith operations with the reasonable expectation of discovering and producing minerals in paying quantities. See La. Rev. Stat. Ann. § 31:29(1)(West 2000); Mire v. Hawkins, 186 So. 2d 591, 595-96 (La. 1966); McMurrey v. Gray, 45 So. 2d 73, 77-78 (La. 1949). If interrupted, prescription starts to run anew from the last day on which mining or drilling operation are conducted. See La. Rev. Stat. Ann. § 31:30 (West 2000). When seeking to show that the prescriptive period has been interrupted, the owner of the servitude has the burden of establishing that he or someone in his name has made timely use of the servitude to prevent the accrual of prescription. See Scott v. Hunt Oil Co., 160 So. 2d 433, 435 (La. Ct. App. 2d Cir. 1964).

In addition, the prescriptive period may be suspended, or tolled, if an obstacle prevents the owner from using the

---

[7] The mineral servitude in this case was created in 1929 and actively drilled until 4 January 1956. The parties dispute the appropriate law to apply in this case. The Mineral Code did not take effect until 1975 after the creation of the servitude at issue in this case. The Mineral Code is to be applied retroactively unless it would "apply to divest already vested rights, or to impair the obligations of contracts." La. Rev. Stat. Ann. § 31:214 (West 2000). The plaintiffs have not argued that the application of the Mineral Code would impair pre-existing vested rights or the obligation of contracts. Accordingly, we see no reason not to apply the Mineral Code to this case. Regardless, the parties agree that the provisions of the Mineral Code relevant to this case are identical to the corresponding law in the Civil Code. As such, the parties arguments on this issue are inconsequential to the outcome of this case.

servitude. See La. Rev. Stat. Ann. § 31:59 (West 2000); see also La. Civ. Code art 792 (1870)("If the owner of the estate to whom the servitude is due, is prevented from using it by any obstacle which he can neither prevent nor remove, the prescription of non-usage does not run against him as long as this obstacle remains.").[8] The servitude owner must actually attempt to use the servitude and be denied access before an obstacle is deemed to exist. See Perkins v. Long-Bell Petroleum Co., 81 So. 2d 389, 393-94 (La. 1955). When a servitude is extinguished by prescription, the mineral interest passes to the owner of the surface of the subject property at the time the servitude prescribes. See McDonald v. Richard, 13 So. 2d 712, 714-15 (La. 1943).

2. Case Law Interpretation of Statutory Provisions Governing Prescription

According to the plaintiffs, the government's moratorium on use of the Fort Polk artillery range created an obstacle that suspended the prescriptive period over the entire servitude between 1956 and 1996. They argue that under the maxim *contra non valentem agere nulla cirrut praescriptio,*[9] prescription is suspended if the servitude owner is

[8] Interruption and suspension are distinct concepts. When prescription is interrupted, the ten-year prescriptive period starts to run anew on the last day on which good faith operations are undertaken to secure or restore production. See La. Rev. Stat. Ann. § 31:41 (West 2000). In contrast, where the prescriptive period is merely suspended, the period that had accrued prior to the creation of the obstacle continues to run once the obstacle is removed. See id. § 31:59.

[9] "Prescription does not run against one unable to act." Cartwright v. Chrysler Corp., 232 So. 2d 285 (La. 1970).

"effectually prevented" from accessing the servitude by actions of the defendant that "hinder" or "impede" the plaintiffs' access even a portion of the servitude. The United States protests the plaintiffs' interpretation of Louisiana law and argues that according to case law precedent, the prescriptive period was not suspended in this case because at all times a section of the servitude remained available for drilling operations. We agree.

*Contra non valentem* is a judicially-created exception to the general rule of prescription.[10] The cases cited by plaintiff in support of the application of *contra non valentem* in this case do not lead to the conclusion urged in their brief. In Plaquemines Parish Comm'n Council v. Delta Dev. Co., 502 So. 2d 1034, 1054 (La. 1987), Plaquemines Parish attempted to regain title to certain mineral interests on the basis that the interests were wrongfully secured by public officials for their own personal gain. See id. at 1036. The defendants, successors to the public officials, argued that any claim by the Parish to the mineral interests had prescribed under the ten-year prescriptive period applicable to claims for breach of fiduciary duty, La. Civ. Code Ann.

[10] Contra non valentem applies in four situations: (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; (4) where the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant. See Fontenot v. ABC Ins. Co., 674 So. 2d 960 (La. 1996); Taylor v. Giddens, 618 So. 2d 834 (La. 1993).

art. 3499. The court applied *contra non valentem* and determined that where the defendants' acts of concealment "effectually prevented" the plaintiffs from discovering that they had a claim against the defendants, an obstacle existed that suspended the prescriptive period. See id. at 1037.

Similarly, in Nathan v. Carter, 372 So. 2d 560 (La. 1979), the Louisiana Supreme Court applied *contra non valentem* to find an obstacle where the defendants' threats, fraud, and misrepresentation prevented plaintiff from discovering the right to pursue a cause of action for wrongful death. See id. at 563. Neither of these cases dealt with a situation where the defendants' actions created an obstacle to drilling on a mineral servitude. We consider the facts of Delta Development and Nathan too remote to those presented in the instant matter to provide any support for plaintiffs' argument that the court should find that, pursuant to *contra non valentem*, the government's restrictions on access to a portion of the servitude had the effect of preventing them from acting, thereby creating an obstacle that suspended prescription as to the entire servitude.

The concept of *contra non valentem* is not irrelevant to prescription of mineral servitudes, however. Indeed, the Louisiana Supreme Court has explained that Article 792, the predecessor to Mineral Code Section 59, is an example of *contra non valentem*. See McDonald v. Richard, 13 So. 2d 712,

715 (La. 1943). Further, in Clark v. Tensas Delta Land Co., 136 So. 1, 2 (La. 1931), the Louisiana Supreme Court considered applying *contra non valentem* to a mineral servitude, but ultimately concluded that the concept was irrelevant given that the servitude owner never made any request "to enter upon the land, and that no objection to such entry upon the land was ever expressed by the owner of the land, previous to the filing of this suit." Id. The court did not consider whether mere hindering or impeding physical access to the land is sufficient to constitute an obstacle.[11]

Despite ample opportunity, the Louisiana courts have yet to apply *contra non valentem* to enunciate the broad interpretation of an obstacle urged by plaintiffs. In the context of use of a mineral servitude, Louisiana courts have found an obstacle to user only in cases where the servitude owner has been prevented from entering the entire servitude. In Boddie v. Drewett, 87 So. 2d 516 (La. 1956), a servitude underlying a twelve acre tract of land was pooled with other tracts by the Commissioner of Conservation. The Commissioner issued a conservation order that restricted drilling on the entire twelve acre servitude, but allowed drilling on other

[11] The plaintiffs also briefly mention a Fifth Circuit case applying *contra non valentem*. See Frey v. Amoco Production Co., 943 F.2d 578 (5th Cir. 1991). That case does not apply *contra non valentem* to instances where the servitude owner is prevented from using his servitude by actions of the surface owner. Rather, the court recognized that "Louisiana courts apply the contra non valentem doctrine to suspend the period's beginning while the cause of action is not knowable by the plaintiff through the exercise of reasonable diligence." Id. at 586. Obviously, that is not the issue in the instant matter. We are unpersuaded that Frey has any relevance to this case.

portions of the unit. See id. at 518-19. The court declined to hold that good faith drilling of a dry hole on the drilling unit, but outside the subject servitude constituted user of the subject servitude. See id. at 518. Instead, the court found that there was an obstacle to user of the servitude that suspended prescription because the Commissioner's order effectively prevented all drilling operations on the twelve acre tract. See id. at 518-19.

The Louisiana Supreme Court revisited similar issues later in Mire v. Hawkins. There, part of the lands burdened by a servitude were pooled with other tracts into a drilling unit by the Department of Conservation. A portion of the servitude remained outside the drilling unit available for drilling at all times. See Mire, 186 So. 2d at 594. The court ruled that where user could be had on any part of the drilling unit, there was no obstacle that suspended prescription. See id. at 596-97. It also found that user of any portion of the unit could be considered user of any servitude incorporated into the unit even where the subject servitude was not open for drilling, thereby explicitly overruling its prior contrary determination in Boddie. See id. at 595. The court was guided by the premise that public policy did not favor unwarranted extensions of the prescriptive period, but rather supported the timely return of unused mineral servitudes to the landowner. See id. at 597.

As the plaintiffs aptly point out, the reason behind the Mire court's decision to overrule Boddie is not entirely clear given that in Boddie the servitude owner was effectively prevented from drilling on the entire servitude, whereas in Mire part of the servitude was not subject to the nondrilling order. Contrary to plaintiffs interpretation of Boddie, we do not believe that the court ruled sub silentio that a partial obstacle would result in complete suspension of prescription. Boddie is not squarely on all fours with the facts presented in the instant matter. There, the court based its decision on the fact that the servitude owner was prevented from effectively using his entire servitude. See Boddie, 87 So. 2d at 519. Here, in contrast, a portion of Group A lands remained available for drilling, even where the government denied access to certain areas of the servitude. See discussion infra section III[C]. Also Boddie must now must be read against the backdrop of the court's later decision in Mire. See Mire, 186 So. 2d at 289 ("After a further study of the opinion [in Boddie] we have concluded that it was error to say that prescription was suspended due to the existence of an obstacle."). Mire instructs that where any part of the lands burdened by a servitude are open to drilling, no obstacle exists and the prescriptive period continues to run.

Our interpretation of Mire and Boddie is supported by the decision of an intermediate state court in Hanszen v. Cocke,

246 So. 2d 200, 205 (La. Ct. App. 1st Cir. 1971). In Hanszen, pending litigation regarding the validity of a mineral lease prevented the servitude owner from drilling on a portion of his servitude. See id. at 206. The court ruled "that where any part of the servitude can be used . . . even though some part may not, as a result of an obstacle, prescription is not suspended, but to the contrary, runs against the entire servitude." Id. at 206.[12] It also noted that drilling on one portion of the land would suspend prescription for the entire servitude. See id. Unlike Mire and Boddie, Hanszen did not deal with a drilling unit, but with a single servitude. Hanszen is therefore more directly applicable to the facts presented in the instant case than the two Louisiana Supreme Court cases that focused on the ramifications to an individual servitude where the servitude land had been pooled with other tracts.

The plaintiffs also rely on Corley v. Craft, 501 So. 2d 1049, 1050-52 (La. Ct. App. 2d Cir. 1987), and Hall v. Dixon, 401 So. 2d 473, 474 (La. Ct. App. 2d Cir. 1981), for the proposition that an obstacle to user on a portion of the

[12] The plaintiffs urge that we are not compelled to follow this decision under the principle that federal courts must rule according to the law of the highest court of the state in which it encompasses. We do not agree, as suggested by plaintiffs, that Hanszen was wrongly decided. As a federal court, we are bound to determine state law as we believe the state's highest court would. See Hulin v. Fibreboard Corp., 178 F.3d 316, 328 (5th Cir. 1999). We view the Hanszen court's ruling as an accurate interpretation of Louisiana law governing suspension of prescription of a mineral servitude. We do not share the plaintiffs' concern that Hanszen is unsound because it would interfere with mineral owners' rights where only a small area is allowed for drilling. Plaintiffs have not demonstrated that only a small portion of the servitude was available for drilling when the moratorium was in effect such that we should find that the government's moratorium "effectively prevented" all access to the servitude. See infra, section III(C).

servitude effectuates suspension of the prescriptive period for the entire servitude.[13] The key distinction between those cases and the matter sub judice, which the plaintiffs fail to recognize, is that Corley and Hall dealt with instances where the servitude owner could not access any portion of the servitude. In Hall "[a]ccess [to the servitude] was only available through a locked gate" which created an obstacle that the court noted could not have been removed any legal way other than by instituting a lawsuit. Hall, 401 So. 2d at 474-76. Likewise, in Corley, the land owner had cut and excavated "the only suitable road into the tract" and obstructed the entry of the servitude owner's drilling equipment. Corley, 501 So. 2d at 1051.[14] In contrast to Hall and Corley, in the instant case, entire sections of the servitude remained open to use at all times and were in fact accessed by other companies.

Plaintiffs also argue the government's restrictions on their use constituted an obstacle under Article 777 of the Civil Code, which prohibits the owner of a tract of land

[13] Contrary to the unprofessional assertions of counsel for the plaintiffs, we find that the position of the defendant is based neither on "falsehoods" nor on a "total misunderstanding of Louisiana mineral law." In fact, the defendant's positions are well reasoned, well defended, and, in our judgment, reflective of the applicable law on the subject as discussed in the preceding text. The plaintiffs' legal and factual analysis, on the other hand, is procrustean at best.

[14] The plaintiffs cite Perkins for the proposition that anything short of "free access" to the servitude constitutes an obstacle. Plaintiffs took this quote from Perkins out of context. In fact, the court declined to find an obstacle because the surface owner "did not at any time deny to defendant [servitude owner] free access to the land for exploration purposes." Perkins, 81 So. 2d at 393. The court simply did not indicate that a hindrance to "free access" resulted in suspension of the prescriptive period. We reject the interpretation proposed by plaintiffs.

burdened by a servitude from doing anything to lessen the value of the servitude owner without his consent. See La. Civ. Code Ann. art. 777. The plaintiffs have not, however, cited any case law that supports their argument that the surface owner's act of lessening the value of the servitude results in an obstacle that suspends prescription.

The plaintiffs may not take shelter under their strained and overly broad conception of *contra non valentem*, Boddie, and the Louisiana Civil Code. After reviewing both parties' arguments concerning the proper legal standards to apply to this case, we conclude that the cases most factually similar to the instant matter, Mire and Hanszen, supra, are the appropriate guiding sources of law. These cases instruct that even if an obstacle defeats the plaintiffs use of part of their servitude, the availability of a portion of the servitude for drilling would preclude a finding that an obstacle suspended prescription for the entire servitude.[15]

### C. Suspension of the Prescriptive Period Based on Thwarted Access to the Servitude

The ten-year prescriptive period applicable to mineral servitudes is interrupted only if the servitude owner engages

[15] We reject the plaintiffs' argument that they could not have removed the obstructions created by the government because an individual is powerless to remove an obstacle created by the United States. See Duncan Energy Co. v. United States Forest Service, 50 F.3d 584 (8th Cir. 1984). In Duncan, the Eighth Circuit discussed whether the Forest Service could regulate surface access to outstanding mineral rights. The court concluded that the Forest Service may not prevent a mineral owner from exercising his rights to use the servitude. This is not a problem in this case because, as discussed infra, here there is evidence that Wm. T. Burton Industries could have accessed a portion of the Group A lands not burdened by the moratorium. The plaintiffs do not adequately develop how Duncan has any application to the instant matter.

in good-faith drilling operations. "Preparations for the commencement of actual drilling or mining operations, such as geological or geophysical exploration, surveying, clearing of a site, and the hauling and erection of materials and structures necessary to conduct operations do not interrupt prescription." La. Rev. Stat. Ann. § 31:30; see Goldsmith v. McCoy, 182 So. 2d 519, 523 (1938); see also La. Rev. Stat. Ann. § 31:29, cmt. (incorporating Goldsmith into the Mineral Code). The only way that plaintiffs may prevail, therefore, is if they can show that they engaged in actual drilling, or that due to an obstacle created by the government, their access to the Group A and B lands was completely obstructed, such that the ten-year prescriptive period was suspended for over forty years between 1956, when Wm. T. Burton Industries abandoned its last well, and 1996, when the plaintiffs filed the instant lawsuit. See La. Rev. Stat. Ann. § 31:59; Hanszen, 246 So. 2d 106. Obviously, if the government prevented even preparatory drilling actions on the servitude, we would have to find that an obstruction prevented user of the servitude. See, e.g. Corley, 501 So. 2d at 1052.

1. Activities between 1956-1978

The United States argues that the plaintiffs have failed to raise genuine issues of material fact to refute their assertion that no obstacle suspended prescription between 1956 and 1966. There is evidence that Wm. T. Burton Industries'

lessee, Pan American, drilled a well, in Section 4, Township 1 South, Range 5 West, an area that fell within the Fort Polk artillery range in 1964. See United States' Statement of Material Facts as to Which There is No Genuine Dispute, Statement 21d [hereinafter United States' Statement of Material Facts], Ex. 20; Pls.' Resp. to United States' Statement of Material Facts, Resp. to Statement 21d, at 33.[16] Although Pan American's well was dry, even drilling of a dry well is sufficient user to interrupt prescription. See La. Rev. Stat. Ann. § 31:29, cmt.; Barnwell v. Carter, 220 So.2d 741, 745 (La. App. 1st Cir. 1969). A lessee's user of the servitude inures to the servitude owner. See Dupree v. Oil, Gas & Other Minerals, 731 So. 2d 1067, 1070 (La. Ct. App. 2d Cir. 1999). The user of the servitude by Pan American therefore would have interrupted prescription over the 1929 mineral servitude. The prescriptive period would have began to run anew 20 March 1964, the date that Pan American plugged its well. See La. Rev. Stat. Ann. § 31:29.[17]

Incorrect Pan Am's 1964 well was not on the servitude

As stated previously, the parties generally agree that as of 1967, a moratorium on mineral operations was in effect in the Intensive Use Area that covered most of Group B lands and

[16] Plaintiffs' Answers to United States First Set of Interrogatories indicates that this well was spudded on 30 September 1963. See United States' Mot. for Summ. J., Ex. 59.

[17] Pan American ultimately did release its lease to Wm. T. Burton Industries because it was having trouble accessing the artillery range. See Pls.' Resp. to United States' Statement of Material Facts, Ex. 10c. This does not supplant the fact that Pan American's activities show that at least part of the servitude was available for drilling.

about forty to fifty percent of Group A lands. There is ample evidence in the record demonstrating that Wm. T. Burton Industries and several other companies were prevented from accessing the artillery range during the moratorium. For instance, the plaintiffs reference two letters sent by the Army to Senator Allen Ellender dated 16 September 1968 and 8 January 1969 indicating that no access would be allowed to the Fort Polk artillery range. See Pls.' Resp. to United States' Statement of Material Facts, Exs. 10r, 10t. In 1969, Major General John C. Dalrymple sent a letter to Senator Allen Ellender informing him that "authorization for seismographic operations under the entire [artillery] range area [at Fort Polk] is incompatible with the training mission" of the Army. See id., Ex. 10w. The plaintiffs also provide a letter dated 29 May 1968 from Wm. T. Burton Industries to the Army regarding the pending expiration of the government's lease to the land. In this letter, John Camp, the attorney for Wm. T. Burton Industries, explained that the government had denied entry permits to the artillery range to its lessee, Pan American, but suggested that several companies would be interested in mineral exploration should access be permitted. See id., Ex. 8c ("Pan American reported that it was unable to obtain entry permits onto the adjacent Fort Polk artillery range for the purpose of conducting mineral exploration activities thereon.").

The moratorium continued during the 1970s. Plaintiffs have submitted correspondence sent by the Army to Representative Speedy O. Long in 1970 informing him that Chevron Oil would not be able to obtain a lease to Fort Polk both because the United States did not own the mineral rights, and because the government had imposed a moratorium on minerals underlying the Fort Polk artillery range. See id., Ex. 10y. Wm. T. Burton Industries again expressed an interest in drilling on Fort Polk in a meeting with the Army on 27 November 1973. See id., Ex. 10dd (Disposition Form Re: Trip Report to Negotiate Settlement of Annual Payment for Moratorium in Minerals, Fort Polk, La.). According to Camp, the Army continually indicated to Wm. T. Burton Industries that "there ain't going to be no drilling on this reservation." Camp Dep. at 91.[18] Teledyne Exploration Company, acting on behalf of Atlantic Richfield Oil Company, likewise was denied access to the artillery range through a letter from the Army for similar reasons in February 1973. See id.; Ex. 10cc.

The plaintiffs' submissions demonstrate that Wm. T. Burton Industries and other companies did indeed express an interest in drilling on Fort Polk throughout the 1960s and 1970s, but were repeatedly denied access by the government due

[18] The vague nature of Camp's statements are outweighed by the overwhelming evidence that the government did allow entry onto portions of the servitude throughout the 1970s. So overwhelming in fact and in law that no reasonable trier of fact could find otherwise. See discussion infra.

to military operations in the area that would potentially prove dangerous to companies engaging in geophysical exploration. See also Exs. 10ee-mm (detailing extent of government's moratorium).[19] Regardless, the plaintiffs' evidence deals only with the area subject to the moratorium and not the portion of the servitude that lies outside of the area restricted by the Army. Even when the moratorium was in place, the plaintiffs admit that about forty-percent of the total acreage of the servitude was outside the Intensive Use Area and not covered by the government's moratorium. See United States' Statement of Material Facts, Ex. 13; Pls.' Resp. to United States' Statement of Material Facts, Statement 8h, at 10.[20] Again, if portions of the servitude remained open to drilling, the government's moratorium would not be considered an obstruction that would have suspended prescription. See Hanszen, 246 So. 2d at 206.

The plaintiffs have not presented any proof that Wm. T. Burton Industries' was denied access to the portion of Group A lands that remained outside the artillery range and exempt from the government's moratorium. They also do not explain why they did not attempt to access the servitude when other

---

[19] Plaintiffs provide extensive documentary evidence regarding the Army's continuing moratorium on the Fort Polk artillery range, only a small portion of which are referenced here. We find it unnecessary to detail every piece of evidence given that Fort Polk did not comprise the full area of the servitude and that other parts of the servitude were available for drilling activity.

[20] Plaintiffs then contradict themselves in baldly asserting that the entirety of Group A and B lands were subject to intensive use by the military, but provide no summary judgment evidence to support this proposition. See Pls.' Resp. to United States' Statement of Material Facts, Resp. to Statement 23, at 41.

companies clearly were granted permission to do so by the United States. There is considerable evidence that indicates that Wm. T. Burton Industries should have been on notice that they were able to enter portions of its servitude during the 1960s and 1970s. The plaintiffs' argument that the prescriptive period was suspended by the creation of an obstacle by the government during the early 1960s is undermined by the fact that Wm. T. Burton Industries' own lessee, Pan American, was able to access a portion of the servitude to engage in drilling so as to interrupt prescription in 1964. Moreover, it is apparent that numerous seismic surveys were shot over the 1929 servitude between 1966 to 1984. According to the seismic line map compiled by Gretchen Hunt of the Forest Service, lines were shot over the servitude by CGG and Chevron in 1970, by Arco from 1971-73, and by Shell in 1976. See Hunt Decl., Attachments (relying, in part, on information obtained by plaintiffs' land man Val Miller).

If companies were able to access the Limited Use Area during the 1970s, the court is inclined to conclude that Wm. T. Burton Industries also could have entered the land. In its reply to the government's motion for summary judgment, the plaintiffs state that they were "prevented from crossing the lands subject to the condemnation proceedings to reach those lands which were not." They fail to provide any summary

judgment evidence to support this statement. Further, although the plaintiffs dispute the accuracy of the information provided by the government, they fail to present summary judgment evidence to directly refute the evidence that lines were shot by CGG, Chevron, Arco, and Hess during the 1970s. The information that the Army allowed access for geophysical operations during this period vitiates plaintiffs' arguments that the government denied access to the servitude during the 1970s so as to create an obstacle to plaintiffs' use of the land. Again, the availability of even part of the servitude for drilling would have caused the servitude to lapse for nonuse. See Mire, 186 So. 2d at 595-97; Hanszen, 246 So. 2d at 206. Although the evidence of access detailed above defeats a finding that an obstacle existed, it is not sufficient to show that the prescriptive period was interrupted. Even if the companies that conducted seismic surveys were acting at the behest of Wm. T. Burton Industries, as the plaintiffs imply,[21] since no drilling actually occurred, prescription would not have been interrupted. See La. Rev. Stat. Ann. § 31:30.

---

[21] [U]se of a mineral servitude must be by the owner of the servitude, his representative or employee, or some other person acting in his behalf." La. Rev. Stat. Ann. § 31:42 (West 2000); see also id. cmts. (explaining the comparable law under the pre-existing Civil Code). "A person is acting on behalf of a servitude owner only when there is a legal relationship between him and the servitude owner, such as co-ownership or agency, or when there is clear and convincing evidence that he intended to act for the servitude owner. . . ." La. Rev. Stat. Ann. § 31:43.

2. Activities Between 1978 and 1996

Assuming, arguendo, that the servitude did not prescribe due to nonuse prior to 1978, it is evident that the servitude still would have lapsed sometime between 1978 and 1996. The impediment to exploration of the Fort Polk artillery range was lifted as of 31 March 1978. See United States' Mot. for Summ. J., Ex. 48 (letter dated 31 March 1977 from John Camp to Michael Drost acknowledging that Army's moratorium was to end on 31 March 1978); Ex. 55 (letter from Major General William B. Steele to Commander, US Army FORSCOM dated 6 June 1977 explaining that moratorium over Fort Polk was to end on 31 March 1978). The plaintiffs urge, however, that the government continued effectively to deny access to the servitude through a de facto moratorium subsequent to 1978. As mentioned previously, mere preparatory activities such as geophysical exploration and surveying, do not interrupt prescription. See La. Rev. Stat. Ann. § 31:30. It is undisputed that Wm. T. Burton Industries did not engage in actual drilling between 1978 and 1996. See Pls.' Resp. to United States' Statement of Material Facts, Resp. to Statement 36, at 58. Therefore, the only way the plaintiffs can avoid summary judgment is if they can show that the United States continued to block access to the lands burdened by the 1929 servitude between 1978 and 1996.

There were several occurrences that should have put Wm. T. Burton Industries on notice that they could have used their servitude subsequent to 1978. As an initial matter, Wm. T. Burton Industries should have been put on notice that entry would be permitted by the fact that the government stopped paying Wm. T. Burton Industries to refrain from using the artillery range for drilling activity in 1978. See United States' Statement of Material Facts, Statement 27; United States' Mot. for Summ. J., Ex. 55 (letter from Major General William B. Steele to Commander, US Army FORSCOM dated 6 June 1977 explaining that moratorium payments were to end on 31 March 1978); Pls.' Resp. to United States' Statement of Material Facts, Statement 27, at 43. Moreover, it is apparent that various companies were able to access portions of the servitude to conduct seismographic surveys after 1978. For instance, with a permit from Wm. T. Burton Industries, Shell Oil secured the right to enter a portion of the lands burdened by the servitude in 1980. See id., Exs. 20, 21. Certainly, the existence of a permit between Wm. T. Burton Industries and Shell shows that Wm. T. Burton Industries had knowledge that the government was allowing access to a portion of the servitude. Further, Delta Exploration and Petty Ray Geosource, on behalf of Chevron Oil, each ran seismic surveys with permission of the Forestry Service and the Army in 1981. See id., Pls.' Resp. to Statements 42d, 42f, at 66-68; United

States' Mot. for Summ J., Exs. 73. 74. The United States also allowed Hunt Exploration to access the servitude in 1980, although there is no indication that Hunt actually undertook exploratory actions. See United States' Mot. for Summ. J., Ex. 69.

In addition, Hunt's chart detailing seismic surveys shot over the servitude shows that seventeen seismic lines were shot by various companies including Seitel Data Ltd., Shell, Stratex, Chevron, Amoco/Delta, and Petty-Ray Geophysical between 1980 and 1984. See Hunt Decl., Attachments; United States' Mot. for Summ. J., Ex. 90.[22] Certainly, if some companies were able to conduct seismic surveys over Group A and B lands during the 1980s, plaintiffs cannot now argue that an obstruction blocked its access to the servitude. Finally, there is absolutely no evidence in the record that Wm. T. Burton Industries or any other company sought access to the servitude between 1984 and 1996. Even if the servitude did not prescribe prior to 1984, this twelve year period of inactivity alone would have resulted in the servitude reverting to the United States as surface owner.

Plaintiffs argue that the government's restrictions made it impractical to use their servitude. Even if the government's moratorium may have made it more difficult and

[22] Again, even if these companies were acting as agents of Wm. T. Burton Industries when they shot the surveys, mere geophysical operations are not sufficient to interrupt prescription. See La. Rev. Stat. Ann. § 31:30.

less productive to engage in drilling operations on the Group A lands, pursuant to Louisiana law, the availability of even a portion of the land for drilling would not have suspended prescription. See Mire, 186 So. 2d at 595-597; Hanszen, 246 So. 2d at 206. The plaintiffs do not present any pertinent summary judgment evidence to refute the government's argument that no obstacle existed that prevented the plaintiffs' predecessor Wm. T. Burton Industries from accessing portions of the servitude between 1978 and 1996.[23]

## IV. Conclusion

For the reasons set forth above, we DENY plaintiffs' motion to strike the declarations of Hunt and Jaquette. Interpreting the evidence in the light most favorable to the plaintiffs, as we are bound to do in a motion for summary judgment, we conclude that no issues of material fact remain for trial. Although numerous factual disputes remain between the parties, summary judgment is not precluded if there are mere factual discrepancies. Rather, there must be a genuine issue of material fact remaining for trial. See Anderson, 477 U.S. at 249-50, 106 S. Ct. at 2509-10. We find no remaining issues of fact that would affect the outcome of this case.

[23] The plaintiffs point out that the government leased the minerals to other companies beginning in 1992. See Pls.' Resp. to United States' Statement of Material Facts, Ex. 16. The surface owner's leasing of the minerals underlying his land to someone other than the servitude owner does not in and of itself constitute an obstacle. See Gayoso Co. v. Arkansas Natural Gas Corp., 145 So. 677, 679-80 (La. 1933); see also Gailey v. McFarlain, 193 So. 570, 578-79 (La. 1940)(prior recorded mineral lease on land upon which mineral servitude is subsequently created does not constitute an obstacle).

Plaintiffs have failed to refute the government's argument that there were at least ten years of nonuse of the servitude between 1964 and 1996 with competent summary judgment evidence. Ten years of nonuse effectuates a reversion of the mineral servitude to the surface owners. See La. Rev. Stat. Ann. § 31:27 (Mineral Code concept of prescription); La. Civ. Code Ann. art. 753 (prescription under the Civil Code). The servitude therefore reverted to the ownership of the United States sometime prior to 1996. This finding comports with the public policy of this state, which "favors the timely return of outstanding minerals to the owner of the land." Mire, 186 So. 2d at 597. The government's motion for summary judgment is GRANTED and the plaintiffs' complaint is DISMISSED WITH PREJUDICE.

Alexandria, Louisiana

28 July 2000

COPY SENT:
DATE: 7-28-00
BY: mel
TO: Gray
Beard
Minaldi
Lalonde
Thompson
Broadwell
Smith
Baudier
Means
Hebert
Kletz
Roush
Lairner

F. A. LITTLE, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT

# Exhibit C

CAMP, CARMOUCHE, PALMER, CARWILE & BARSH
ATTORNEYS AT LAW

ALEXANDRIA OFFICE
L[illegible]ANA SAVINGS BUILDING
OFFICE BOX 869
[illegible]ANDRIA, LA. 71301
318-487-1414

NEW ORLEANS OFFICE
110 VETERANS BLVD.
P. O. DRAWER 8308
METAIRIE, LA. 70002
504 - 837-1386

9TH FLOOR, LOUISIANA SAVINGS TOWER
POST OFFICE DRAWER 2001
318-433-0355
LAKE CHARLES, LOUISIANA
70601

WASHINGTON OFFICE
SUITE 700
1200 SEVENTEENTH ST., N. W.
WASHINGTON, D. C. 20036
202 - 223-4040

March 4, 1977

Mr. C. Mitchell Drost
Route 2 Box 815
Sulphur, LA 70663

Dear Mitch:

We have received from the U. S. Attorney a Notice of Extension by the Corp of Engineers of the moratorium against exploration of the Fort Polk Artillery Range, which will run through March 31, 1978. This will be the last year of the current 5 year optional extensions by the Government.

As you know, Charles and I have had a series of meetings with the Corp of Engineers which has offered to make about one-fourth of the range available for exploration, if we will not charge them any moratorium fee for our lands in the remaining three-quarters of the range.

We consider the proposal inequitable, particularly since we do not have a prospective leasee for the North end of the range where most of the released acreage would be.

Even though this extension has been filed, the matter remains open for negotiation.

My own feeling is that the Government should pay us the current $2.00 rate for lands retained.

We had settled in 1974 for a $2.00 per acre rate through March of 1976 and then extended that rate through March of 1977. A rate will have to be agreed upon for the period of March, 1977 through March, 1978. If the $2.00 rate were followed, a payment of $62,591.82 would be due.

We will keep you informed of any developments.

Sincerely,

[illegible] C. CAMP

JCC/njk
cc: William B. Lawton
Jack E. Lawton
Charles W. Carwile

U.S. Sum. J. Exhibit 48
Central Pines v. USA

501647

# Exhibit D

DEPARTMENT OF THE ARMY
HEADQUARTERS 5TH INFANTRY DIVISION (MECHANIZED) AND FORT POLK
FORT POLK, LOUISIANA 71459

AFZX-CG

SUBJECT: Fort Polk Mineral Rights

6 Jun 77

Commander
US Army FORSCOM
Fort McPherson, GA 30330

1. References:

a. HQDA message, 301542Z April 1976, SAB, attached as Incl 1.

b. AFEN-CDR message, 171200Z May 1976, SAB, attached as Incl 2.

2. In accordance with the above references, the Mineral Moratorium affecting the Peason Ridge Maneuver Area was removed as agreements were reached with mineral owners. In March 1977, drilling began on the first exploratory well at Peason Ridge and moratorium payments there were stopped.

3. With the experience gained from coexisting with the first well, the Installation is now able to better analyze the impact of permitting mineral exploration on the Leesville Artillery Range on Fort Polk Proper. This area, comprising approximately 44,000 acres, is under a mineral moratorium which will expire on 31 March 1978. To extend the moratorium for a subsequent five-year period is expected to cost a minimum of $2.00 to $5.00 per acre for the first year with a possible increase each year thereafter.

4. Although it is desireable to remove the moratorium under terms which specifically protect the Army training requirements, the owners of minerals interests on the Leesville Artillery Range have refused to agree to such stipulated conditions. At the same time, they have not expressed an interest in mineral exploration at this time. It is our studied opinion that their only consideration is for continued moratorium payments.

5. After carefully considering the factors involved, it is the Installation's intention to stop moratorium payments and permit the moratorium to expire

AFZX-CG
SUBJECT: Fort Polk Mineral Rights

without extension on 31 March 1978. In the event that mutually agreeable stipulations have not been reached at that time, the Army will still have some measure of protection from uncontrolled oil and gas exploration:

a. All previous Wildcat Wells in the immediate area have been dry holes. With present-day drilling costs over One Million Dollars per well, it is inconceivable that the area will be overrun by new Wildcats.

b. As surface owners, the Army still retains control over right-of-entry.

c. Due to unusual safety hazards, no prudent driller could be expected to drill within impact areas.

d. If pushed to the wall, the Army could probably reestablish a moratorium over smaller, selected areas.

6. To augment the above built-in safeguards, negotiations and discussions are continuing between representatives of Fort Polk, the Fort Worth District of the Corps of Engineers, and principal mineral owners. [redacted]

WILLIAM B. STEELE
Major General, USA
Commanding

# Exhibit E


VERNON PARISH
Fort Polk
Kisatchie National Forest
Group C Lands
2N 8W
1N 8W
1S 8W
2N 7W
1N 7W
1S 7W
2N 6W
1N 6W
1S 6W
2N 5W
1N 5W
1S 5W
GROUP C LANDS
VERNON PARISH,
LOUISIANA