# Exhibit F

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CENTRAL PINES LAND COMPANY, ET AL. ) Plaintiffs, ) versus ) THE UNITED STATES, ) Defendant ) | No. 98-314 L<br>Chief Judge Edward J. Damich |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS

Central Pines Land Company, D, S & T, Inc., Drost & Brame, Inc., Linda Lew Lawton Drost, Evelyn Gay Lawton Duhon, Jack E. Lawton, Jr., and Tower Minerals Company, Inc. respectfully respond as follows to defendant's First Set Of Interrogatories And Requests For Production Of Documents To Plaintiffs as follows:

## INTERROGATORIES

**INTERROGATORY NO. 1:**

Please state the date or dates on which you contend that your property interests were taken, the portion or parcel(s) that were taken, the period and duration of the alleged taking, and identify the event or events, every relevant fact on which your contention is based, and all documents relating thereto.

**ANSWER TO INTERROGATORY NO. 1:**

To the knowledge of Plaintiffs, prior to October 9, 1992 the United States did not claim



W.T. Drost
12-13-05
Exhibit No. 1
DD Juranka, RPR

ownership of minerals underlying Group C. Letter dated August 5, 1988, by Danny W. Britt, Forest Supervisor, to Regional Forester concludes by stating that there was no basis to presume that the minerals affecting property acquired by the United States after 1940 were owned by the United States.

On October 9, 1992, a title opinion is believed to have been rendered to the United States which Plaintiffs understand related to Group C and which stated that the United States "can now claim mineral ownership where drilling has not occurred for a ten-year period regardless of the date of acquisition by the U.S." By letter dated November 8, 1995, Plaintiffs' Freedom of Information Act request for the letter was denied. Accordingly, Plaintiffs do not have a copy of that title opinion.

Other than as discussed below relating to the military use of the surface of Group C, to Plaintiffs' knowledge, October 9, 1992 is the earliest date that the United States took Group C. The entirety of Group C was affected.

On October 7, 1993, Charles E. Steele, Director of Lands And Minerals, United States Department Of Agriculture, Forest Service issued a memorandum number 2820 which advised that additional lands were available for leasing by the United States as a result of the October 9, 1992 opinion. The memorandum included Group C lands and a Controlled Surface Use Stipulation #1 which applied to the Intensive Use Area for Fort Polk.

Commencing in June 1992, the United States began issuing mineral leases on Group A and Group B lands which were claimed by Plaintiffs at that time. Plaintiffs do **not** contend that granting mineral leases on Group A and Group B lands was a taking of Group C lands.

In the spring of 1995, while negotiating a mineral lease on property in the area of, but not within Group C, Plaintiffs learned from a potential lessee that the United States was claiming title to Group C lands. Plaintiffs are unaware of the source of the information supplied.

Inquiry lead Plaintiffs to the Office Of General Counsel, United States Department Of

Agriculture in Little Rock, Arkansas. After preliminary telephone conversations, by letter dated November 9, 1995 addressed to Mr. Mike Cruse, Deputy General Counsel, Plaintiffs supplied the United States with pertinent title documents, land use records and legal principles which established that Plaintiffs owned the minerals under Group C lands.

After various discussions, Plaintiffs were referred by Mike Cruse to Mr. Jeffery D. Eisenberg, Office Of General Counsel, United States Department Of Agriculture, Washington, D.C.

In the meantime, portions of Group C were included by the United States in a proposed mineral lease sale by the United States scheduled for March 28, 1996. The date the United States gave notice of its intention to lease the Group C properties for the scheduled March 28, 1996 sale is an alternative date for the taking of Plaintiffs' property. While the proposed lease sale included not less than approximately 5,300 acres of Group C property, the United States effectively took the entirety of Group C because Plaintiffs' title is uniform for the full tract.

By letter dated February 29, 1996 to Eisenberg, Plaintiffs asserted title to the Group C minerals being offered to lease by the United States and respectfully requested that the properties be withdrawn from proposed lease sale.

Eisenberg requested that Plaintiffs submit a settlement proposal whereby the United States would be compensated for mineral production under Group C. Accordingly, by letter dated March 11, 1996 to Eisenberg, Plaintiffs submitted a proposal whereby, in addition to other matters, Plaintiffs would be recognized as owners of that part of Group C included in the Joint Order Interchanging Administrative Jurisdiction Of Department Of The Army Lands And National Forest Lands executed by the Secretary Of Army on December 4, 1974 and by the Secretary Of Agriculture on March 12, 1975 and the United States would receive a mineral royalty on production from such property. The actions of Eisenberg in proposing that the United States would not recognize Plaintiffs' title without

compensation to the United States constitute a taking of Group C. While communications with Eisenberg were limited to that portion of Group C included in the Joint Order Interchanging Administrative Jurisdiction Of Department Of The Army Lands And National Forest Lands executed by the Secretary Of Army on December 4, 1974 and by the Secretary Of Agriculture on March 12, 1975, the taking was of the entire Group C because of Plaintiffs' uniform title to the entire tract.

By letter dated April 6, 1995, a representative of Union Pacific Resources Company offered to lease Plaintiffs' minerals affecting property outside of Group C but confirmed that the company was interested in developing Plaintiffs' acreage in the "Artillery Range."

By letter dated August 6, 1996, Jeffery D. Eisenberg responded to Plaintiffs' settlement proposal by rejecting the settlement offer and declining to make a counteroffer. Because of the uniformity of Plaintiffs' title to Group C, Eisenberg's August 6, 1996 letter constitutes a taking of the entire tract.

Thereafter, on August 22, 1996, Plaintiffs filed civil action number CV96-2000 on the docket of the United States District Court, Western District of Louisiana against the United States for declaratory judgment pursuant to 28 U.S.C.§2201 and to quiet title to real estate pursuant to 28 U.S.C. §2409a. In their Complaint, Plaintiffs specifically sought recognition of their title to Group C.

The United States answered Plaintiffs suit, specifically denying that Plaintiffs were the owners of minerals relating to Group C. In the course of the litigation, the United States consistently asserted ownership of Group C minerals. The position of the United States in the litigation, commencing with its Answer filed on October 24, 1996, constitutes a taking of the entirety of Group C minerals from Plaintiffs. The taking continued until final judgment in the litigation.

By letter dated September 24, 1996, Chesapeake Operating, Inc., which had previously leased approximately 33,607.5325 acres from Plaintiffs on property in the area but not within Group C,

extended an offer to Plaintiffs to lease approximately 4,383.67 acres of Group C minerals (ultimately the lease covered 4,822 acres). Because of the competing title claim to Group C minerals by the United States, Chesapeake specifically conditioned its offer upon being permitted to obtain "protection leases from the United States" and required Plaintiffs to agree "not to interfere with Chesapeake's attempt to secure a protection lease from the U.S.A." Finally, Chesapeake conditioned its offer upon Plaintiffs agreeing to confirm in writing to the United States "in a form acceptable to the Justice Department" that Plaintiffs would not attempt to upset any proposed lease sale by the United States of the same mineral property.

In an effort to promote mineral development of Group C, Plaintiffs acquiesced to Chesapeake's limitations. Accordingly, on September 26, 1996, Plaintiffs entered into a mineral lease with Chesapeake. The lease covered 4,822.10 acres of Group C. By letter of same date, Plaintiffs advised the United States through its counsel, Jeff Eisenberg, of the lease and specifically confirmed that no plaintiff in the litigation would attempt to upset or otherwise interfere with the scheduled mineral lease sale. The fact that the assertion of ownership by the United States to Group C resulted in Plaintiffs being required to permit their mineral lessee to obtain a "protection" lease from the United States which would contain Controlled Surface Use Stipulation #1 constitutes a taking of the property involved in the Chesapeake lease.

United States Department Of Justice attorney, Bret Birdsong, advised Plaintiffs that additional Group C acreage may be included in the scheduled lease sale and requested that Plaintiffs agree to not attempt to upset the sale with regard to the additional acreage. In an effort to promote mineral development of Group C, Plaintiffs acquiesced and by letter dated October 9, 1996 complied with the request of the United States Department Of Justice.

The fact that Plaintiffs were required to permit their mineral lessee to obtain a "protection"

lease from the United States which would contain Controlled Surface Use Stipulation #1 and further agree to not interfere with the lease of the property by the United States constitutes a taking of Group C.

The United States granted the following mineral leases affecting Group C properties: Lease Nos. 47572, 47574, and 47750 to Union Pacific Resources Company and Lease Nos. 48555, 48556, 48557, 48558, 48559 and 48560 to Chesapeake Operating, Inc. All of the leases contained ten year terms terminating April 30, 2007. Granting of these mineral leases constitutes a taking of Plaintiffs' property.

Since acquisition of the surface of Group C properties in 1943, a substantial portion of the property has been, in fact, subject to military operations including bombing practice, artillery practice, small arms fire and troop maneuvers by the United States Army and Air Force. Unexploded bombs are found and disposed of from Group C. Portions of Group C include artillery impact areas for howitzer, heavy artillery and tank gunnery practice.

too dangerous

At some date, unknown to Plaintiffs, portions of Group C became too contaminated and/or dangerous for mineral operations. Plaintiffs do not know the geographic extent of this area. The dangerous or contaminated condition of portions of Group C constitutes a taking of Plaintiffs property.

United States established Standard Operating Procedures For Exploration And Field Development Drilling of Oil/Gas Wells, SOP No. 32X-2, which contain procedures and restrictions on mineral development on Group C.

Prior to drilling a well within Group C, Plaintiffs' lessees (all of whom had acquired "protective" leases from the United States) were required to submit a detailed Application For Permit To Drill Or Deepen to the Bureau Of Land Management. Within Group C, the procedure also required the filing of a Final Environmental Assessment and the ultimate issuance of "Conditions Of Approval

For Oil And Gas Exploration."

Without regard to whether the SOP, Application For Permit To Drill Or Deepen, Final Environmental Assessment and/or the Conditions Ff Approval For Oil And Gas Exploration are appropriate and reasonable for lessees of the United States in situations where the United States owns the minerals, imposition of such requirements and procedures on lessees of Plaintiffs constitutes a taking of Group C property. Under Louisiana law, a mineral owner has unrestricted right to access to the surface of the property burdened by the mineral servitude.

By letter dated January 9, 1997, Plaintiffs' mineral lessee, Chesapeake, wrote Ted Hammerschmidt, Deputy Director, Directorate of Engineering & Housing, Fort Polk, to determine procedures for access to Group C and to determine operating parameters for mineral operations.

On March 11, 1997, representatives of Plaintiffs' mineral lessee, Sonat Exploration Company, met with representatives of the United States to discuss possible access to, and mineral operations on, Group C. Not less than 18 representatives of various Army and Forest Service agencies were in attendance at the meeting, which included the following discussion items:

Could we drill in this area

> Sonat was admonished by Mr. Hammerschmidt, Fort Polk Deputy Director of Public Works, that a proposed well location was in an area referred to as "Ranges 40-43, the tank gunnery ranges." He explained that the tanks shoot "120 mm projectiles" and "will deliver about 6500 meters." He stated that he was concerned about a "vertical stack of valves", *i.e.* an oil well wellhead christmas tree, for a well at that location and "how we can successfully protect it so that we don't cause something problematic to occur." Hammerschmidt further advised that: "Inside this fan is considered an area which increases the possibility of an accident; wells 19-1, 31-1 and 21-1 are all within this fan area."
>
> Dr. Ron Tomas, Fort Polk Office of the Garrison Commander, commented on the "fan" as follows: "the fan is very conservative and the probability of something happening is very high."
>
> Hammerschmidt advised that the Army was "not willing to accept responsibility for people while training is ongoing."
>
> Hammerschmidt advised that wellheads in the area must be protected with "berming."

Hammerschmidt advised that underground pipelines should be buried to 15 feet deep (industry standard is 36").

The discussion specifically included safety issues relating to wells taking "a direct hit."

Dr. Tomas stated that Sonat should consider moving its preferred location for well 31-1 "nearer Lookout Road." Tomas said that the range in question was used about 60 days per year and "reiterated if they don't move, there will be massive amounts of coordination required to get a truck to the site."

Despite Sonat personnel following up on several discussion items and actually filing permits for drilling within Group C, Sonat never drilled any well with a physical location within the surface of Group C.

On April 1, 1997, representatives of Plaintiffs' lessee, Chesapeake, met with representatives of the United States to discuss access to, and mineral operation restrictions within, Group C. Not less than 14 representatives of the Army and Forest Service attended the meeting. The Chesapeake meeting was similar to the Sonat meeting with discussions focused on safety aspects of live fire, depth for placing pipelines, location of wells, placement of production facilities and the avoidance of "flares" which could be dangerous to night flying aircraft.

Chesapeake never drilled a well with a surface location within Group C.

Because the United States asserted title to Group C, potential mineral lessees of Plaintiffs would not execute mineral leases with Plaintiffs unless reasonably assured that "protection" leases could be obtained from the United States. In the summer of 1997, the Bureau Of Land Management received offers to lease parcels within Group C from Plaintiffs' lessees or persons acting on their behalf. Stephen M. Sittnick, LTC, IN, G3/DPTMS responded to an internal inquiry with memorandum AFZX-GT dated July 23, 1997. The response included the following:

a. By definition, this impact area is, and has been, off limits to personnel and/or vehicle surface activities. Additionally, no digging in that zone is allowed due to unexploded ordnance

(surface and subsurface). RLIA was established o/a 1977, and all types of dud producing munitions have been filed into that area. Any effort to surface and subsurface clear that zone for oil exploration would be extremely unsafe, and expensive.

b. Any oil exploration activities in or around the RLIA zone would close a number of ranges/training areas that have Surface Danger Zones (SDZ's) oriented into RLIA. This would severely impact the training and readiness of assigned units and supported Reserve Component units. Additionally, oil exploration activities on or near RLIA would seriously impact Operations Group's use of the Zion Hills area as roational unit maneuver space and/or Live Fire area.

The dangerous or contaminated condition of the surface of Group C, the ongoing military operations and the permitting requirements constitute a taking of Plaintiffs property.

**INTERROGATORY NO. 2:**

Please state what actions you took to exercise or attempt to exercise your mineral rights between 1978 and the present, including but not limited to identifying what portion or parcel(s) you attempted to access, any oral communication or written correspondence between you and the Defendant, and all documents relating thereto.

**ANSWER TO INTERROGATORY NO. 2:**

Between 1978 and 1991 Plaintiffs have no record of attempts to exercise mineral rights on Group C.

Commencing December 11, 1991, corporate parents of Central Pines Land Company and Tower Minerals Company, Inc. negotiated with representatives of Helmerick & Payne to develop mineral properties which included portions of Group C. Plaintiffs and Helmerick & Payne were unable to reach agreement on terms of a lease.

Commencing February 5, 1992, corporate parents of Central Pines Land Company and Tower Minerals Company, Inc. negotiated with McGinty-Durham, Inc. to lease approximately 13,276 acres

of land contiguous with and including Group C. Plaintiffs and McGinty-Durham, Inc. were unable to reach agreement on terms of a lease.

By Hydrocarbon Lease dated effective August 1, 1995, corporate parents of Central Pines Land Company and Tower Minerals Company, Inc. leased approximately 33,607.5325 acres of land contiguous to, but not included within, Group C to Chesapeake Operating, Inc.

In the course of negotiating the mineral lease, Chesapeake expressed interest in leasing Group C, *i.e.*, the "Artillery Range." Chesapeake continued or followed up with the negotiations to lease the "Artillery Range" by letter dated March, 1996. By letter dated April 8, 1996, Plaintiffs confirmed their willingness to lease Group C on the same lease form as used by the parties for the August 1, 1995 Hydrocarbon Lease. Chesapeake did not respond.

By Hydrocarbon Lease dated July 1, 1996, Central Pines Land Company and Tower Minerals Company, Inc. leased approximately 28,668.93 acres of property contiguous with and partially including Group C to Sonat Exploration Company.

Effective September 15, 1996, Central Pines Land Company and Tower Minerals Company, Inc. leased approximately 4,822.10 acres of Group C to Chesapeake Operating, Inc.

Commencing March, 1996, Plaintiffs negotiated with Belco Oil & Gas Corp. to lease 20,295 acres of Group C. Belco reported that it was unable to obtain access to Group C surface and discontinued the lease discussions.

Commencing April 24, 1996, Central Pines Land Company and Tower Minerals Company, Inc. negotiated with Sonat Exploration Company in an effort to lease approximately 9,798.44 acres of Group C. The United States withdrew the property from its proposed lease sale; and, without the possibility of a "protective" lease, Plaintiffs were unable to lease the 9,798.44 acres.

In the spring of 1995, while negotiating a mineral lease on property in the area of but not within

Group C, Plaintiffs learned from a potential lessee that the United States was claiming title to the Group C lands. Inquiry led Plaintiffs to the Office Of General Counsel, United States Department Of Agriculture in Little Rock, Arkansas. After preliminary telephone conversations, by letter dated November 9, 1995 addressed to Mr. Mike Cruse, Deputy General Counsel, Plaintiffs supplied the United States with pertinent title documents, land use records and legal principles which established that Plaintiffs owned the minerals under Group C lands.

After various discussions, Plaintiffs were referred by Mike Cruse to Mr. Jeffery D. Eisenberg, Office Of General Counsel, United States Department Of Agriculture, Washington, D.C.

By letter dated February 29, 1996 to Eisenberg, Plaintiffs asserted title to the Group C minerals being offered to lease by the United States and respectfully requested that the properties be withdrawn from proposed lease sale.

At the request of Eisenberg by letter date March 11, 1996, Plaintiffs submitted a proposal whereby, in addition to other matters, plaintiff would be recognized as owners of that part of Group C included in the Joint Order Interchanging Administrative Jurisdiction Of Department Of The Army Lands And National Forest Lands executed by the Secretary Of Army on December 4, 1974 and by the Secretary Of Agriculture on March 12, 1975 and the United States would receive a mineral royalty on production from such property. By letter dated August 6, 1996, Jeffery D. Eisenberg responded to Plaintiffs' settlement proposal by rejecting the settlement offer and declining to make a counteroffer.

On August 22, 1996, Plaintiffs filed civil action number CV96-2000 on the docket of the United States District Court, Western District Of Louisiana against the United States for declaratory judgment pursuant to 28 U.S.C.§2201 and to quiet title to real estate pursuant to 28 U.S.C. §2409a. In their Complaint, Plaintiffs specifically sought recognition of their title to Group C.

Plaintiffs litigated CV96-2000 to final judgment, the result of which was recognition of Plaintiffs' ownership of the minerals relating to Group C.

While the litigation in CV96-2000 was progressing, Plaintiffs' lessees, Chesapeake and Sonat were each separately attempting to obtain access to Group C to drill wells. Chesapeake and Sonat were not able to satisfactorily conclude the negotiations and no well was ever drilled from the surface of Group C.

**INTERROGATORY NO. 3:**

Please state what actions you took to exercise or attempt to exercise your mineral rights between April of 1992 and the present, including but not limited to identifying what portion or parcel(s) you attempted to access, any oral communication or written correspondence between you and the Defendant, and all documents relating thereto.

**ANSWER TO INTERROGATORY NO. 3:**

See answer to Interrogatory No. 2 above.

**INTERROGATORY NO. 4:**

Please state what actions by the Defendant constituted a "partial taking of use of [Plaintiffs] mineral rights in 'Group C,'" including but not limited to identifying what portion or parcel(s) were allegedly taken, any oral communication or written correspondence between you and the Defendant, and all documents relating thereto.

**ANSWER TO INTERROGATORY NO. 4:**

See answer to Interrogatory No. 1 above.

**INTERROGATORY NO 5:**

Please state what actions by the Defendant prevented or restricted your use of, or access to your mineral rights in the Group C Lands, including but not limited to identifying the date of each action

and what portion or parcel(s) of land was affected, any oral communication or written correspondence between you and the Defendant, and all documents relating thereto.

**ANSWER TO INTERROGATORY NO. 5:**

See answer to Interrogatory No. 1 above.

**INTERROGATORY NO. 6:**

Please state the legal description of the property interests allegedly taken by the United States.

**ANSWER TO INTERROGATORY NO. 6:**

**MINERALS GROUP C**
**Vernon Parish, Louisiana**

**Township One South, Range Five West (T1S-R5W)**

Section 5: N/2 of NW/4 and SW/4 of NW/4

**Township One North, Range Five West (T1N-R5W)**

Section 4: Being diagonal SW/2 of SW/4

Section 6: Entire Section

Section 7: Entire Section

Section 8: Entire Section

Section 9: S/2 and NW/4 and diagonal SW/2 of NE/4

Section 10: Diagonal SW/2 of SW/4

Section 15: S/2 and NW/4 and diagonal SW/2 of NE/4

Section 16: E/2 and NW/4 and S/2 SW/4 and NE/4 of SW/4

Section 17: Entire Section

Section 20: Entire Section

Section 21: W/2 and W/2 of E/2 and NE/4 of NE/4 and the diagonal NW/2 of SE/4 of NE/4

Section 28: W/2 and W/2 of NE/4 and diagonal NW/2 of W/2 of SE/4

Section 29: Entire Section

Section 32: W/2 and N/2 of NE/4 and SE/4 of NE/4 and S/2 of SE/4 & Fractional NE/4 of SE/4 except 13 acres on West side

Section 33: NW/4 and N/2 of SW/4

**Township One North, Range Six West (T1N-R6W)**

Section 2: Entire Section

Section 3: W/2 of NW/4

Section 4: S/2; S/2 of NE/4 and NE/4 of NE/4; E/2 of NW/4 of NE/4; and S/2 of NW/4; NW/4 of NW/4

Section 5: W/2 of Section

Section 6: Entire Section

Section 7: Diagonal NE/2 and a tract of land situated in Section 7, T1N-R6W, and being more particularly described as follows: BEGINNING at the southeast corner of Section 7; THENCE west to southwest corner of said section; THENCE north to northwest corner of said section; THENCE southeast to the point of beginning, less and except the southwest 1/4 of northwest 1/4

Section 8: S/2; NE/4; E/2 of NW/4; W/2 of SW/4 of NW/4 and NW/4 of NW/4

Section 9: W/2; and S three-fourths of SE/4; NW/4 of NW/4 of SE/4 and NE/4 of NE/4 of SE/4 and W/2 of SW/4 of NE/4 and NE/4 of SW/4 of NE/4 and NE/4 of NE/4 and N/2 of SE/4 of NE/4 and SE/4 of SE/4 of NE/4 and NW/4 of NE/4

Section 10: Entire Section

Section 11: Entire Section

Section 12: Entire Section

Section 16: SE/4 SW/4

Section 27: NW/4 of NW/4

**<u>Township One North, Range Seven West (T1N-R7W)</u>**

Section 1: Being the diagonal NE/2 of NW/4; SW/2 of Lot 4 or SW/2 of NW/4 of NW/4 (diagonal division); SW/4 of NW/4; SW/2 of SE/4 of NW/4 (diagonal division); and, SW/4

**<u>Township Two North, Range Five West (T2N-R5W)</u>**

Section 30: Being the diagonal SW/2 of SW/4

Section 31: Being the diagonal SW/2 of NW/4 of NE/4

Section 32: Being the diagonal SW/2 of SW/4

**<u>Township Two North, Range Six West (T2N-R6W)</u>**

Section 14: Being the diagonal SW/2 of SW/4

Section 16: Entire Section, less and except the S/2 of NW/4 of NW/4 and N/2 of SW/4 of NW/4

Section 17: E/2 of E/2

Section 18: SE/4 and SE/4 of NE/4, SE/4 of SW/4, NE/4 of SW/4, Diagonal SE/2 of SW/4 of SW/4

Section 20: Entire Section

Section 22: Entire Section

Section 24: Diagonal SW/2 of SW/4

Section 25: SE/4 of SE/4

Section 26: Entire Section

Section 28: Entire Section

Section 29: SE/4 of NE/4

Section 30: Entire Section

Section 31: NE/4 of SE/4

Section 32: SW/4 and NE/4 and N/2 of NW/4, SE/4 of NW/4, NE/4 of SE/4, S/2 of SE/4

Section 33: SW/4 of SW/4, SW/4 of SE/4, NE/4 of SE/4

Section 34: Entire Section

Section 35: NW/4 SE/4

Section 36: S/2 and NW/4, and W/2 of NE/4

**Township Two North, Range Seven West (T2N-R7W)**

Section 24: NE/4 of SE/4

Section 33: E/2 of NE/4, NE/4 of SE/4

**INTERROGATORY NO. 7:**

Please identify all persons who owned any legal, equitable, or beneficial interest in any portion of the property, on the date or dates of the alleged taking, the type of interest each person holds or held in the property, the date or dates on which that interest was purchased or acquired, and the method of acquisition.

**ANSWER TO INTERROGATORY NO. 7:**

The ownership of the property subject to this litigation is as follows:

(A) Central Pines Land Company owns an undivided fifty percent (50%) of all of the oil, gas and other minerals subject to the following royalties: one-half of one percent (0.5%) in favor of Jack E. Lawton, Jr., one-fourth of one percent (0.25%) in favor of Evelyn Gay Lawton Duhon, one-fourth of one percent (0.25%) in favor of Linda Lew Lawton Drost, Plaintiffs' See Plaintiffs' title Exhibits "D", "E", "R", "U", "W", "Y", "FF", "HH", "II" and "JJ";

(B) Tower Minerals Company, Inc. owns an undivided fifty percent (50%) of all of the oil, gas and other minerals subject to the following royalties: one-half of one percent (0.5%) in favor of Jack E. Lawton, Jr., one-fourth of one percent (0.25%) in favor of Evelyn Gay Lawton Duhon, one-fourth of one percent (0.25%) in favor of Linda Lew Lawton Drost, four and two-

tenths percent (4.2%) in favor of D, S & T, Inc. and two and eight-tenths percent (2.8%) in favor of Drost & Brame, Inc. See Plaintiffs' title Exhibits "D", "E", "O", "P", "Q", "S", "T", "V", "X", "Z", "AA", "CC", "DD", "EE" and "KK".

Prior to 1988, the property was owned by Wm. T. Burton Industries, Inc., subject to royalty conveyances for the benefit of Linda Lew Lawton Drost, Evelyn Gay Lawton Duhon and Jack E. Lawton, Jr.

In the spring of 1988, Wm. T. Burton Industries, Inc. was reorganized pursuant to Section 355 of the Internal Revenue Code of 1986, but continued to exist under a new name, *i.e.*, William B. Lawton Company, Inc. See Plaintiffs' Title Exhibits "F", "G", "H" and "I"

After the reorganization, the property continued to be owned, through appropriate subsidiaries of each, 50-50 by William B. Lawton Company, Inc. (formerly named Wm. T. Burton Industries, Inc.) and Jack Lawton, Inc. (formerly named Burton Exploration Co.). See Plaintiffs' title Exhibits "K", "L", "M", "N", "O", "P", "Q", "R", "U", "V", "W", "X", "Y", "BB", "CC", "FF", "HH", "II", "JJ"and "KK".

Tower Minerals Company, Inc. is a subsidiary of William B. Lawton Company, Inc. which, subject to royalty conveyances for the benefit of members of the William B. Lawton family, owns fifty percent (50%) of the former Wm. T. Burton Industries, Inc. interests in the property. Tower Minerals Company, Inc. acquired its ownership on August 28, 1995. See Plaintiffs' Title Exhibits "Q", "S", "T", "V", "X", "Z", "AA", "CC", "DD", "EE"and "KK".

Central Pines Land Company is a subsidiary of Jack Lawton, Inc. which, subject to a royalty conveyances to Jack E. Lawton, Jr., owns fifty percent (50%) of the former Wm. T. Burton Industries, Inc. interests in the property. Central Pines Land Company acquired its ownership on August 29, 1995. See Plaintiffs' Title Exhibits "R", "U", "W", "Y", "FF", "GG", "II", "JJ", and

"LL".

D, S & T, Inc. owns a mineral royalty in the property of four and two-tenths percent (4.2%). The beneficial owners of D, S. & T, Inc. are the following grandchildren of William B. Lawton: Mary Margaret Duhon, Katherine Duhon Smith and Evelyn Duhon Truax. D, S & T, Inc acquired its royalty interest on November 1, 1995 through the following Plaintiffs' Title Exhibits: "T", "AA" and "DD".

Drost & Brame, Inc. owns a mineral royalty in the property of two and eight-tenths percent (2.8%). The beneficial owners of Drost & Brame, Inc. are the following grandchildren of William B. Lawton: William T. Drost and Desiree Drost Brame. Drost & Brame, Inc. acquired its royalty interest on November 1, 1995 through the following Plaintiffs' Title Exhibits: "S", "Z" and "EE".

Linda Lew Lawton Drost owns a mineral royalty in the property of one-fourth of one percent (0.25%). Linda Lew Lawton Drost acquired her royalty interest on May 17, 1978 through the following Plaintiffs' Title Exhibit: "E".

Evelyn Gay Lawton Duhon owns a mineral royalty in the property of one-fourth of one percent (0.25%). Evelyn Gay Lawton Duhon acquired her royalty interest on May 17, 1978, through the following Plaintiffs' Title Exhibit: "E".

Jack E. Lawton, Jr. owns a mineral royalty in the property of one-half of one percent (0.5%). Jack E. Lawton, Jr. acquired his royalty interest on May 17, 1978 through the following Plaintiffs' title Exhibit: "D".

In the course of answering these interrogatories, Plaintiffs' saw that William B. Lawton Company, Inc. and Jack Lawton, Inc. retained mineral royalty interests in their respective conveyances to Tower Land Company, Inc. and Central Pines Land Company.

With regard to its previous fifty percent (50%) of the minerals under Group C, which were

conveyed by it to Tower Minerals Company, Inc., William B. Lawton Company, Inc. retained the royalties less one half of one percent (.5%) outstanding to Jack E. Lawton, Jr., one-fourth of one percent (.25%) outstanding in Evelyn Gay Lawton Duhon, one-fourth percent (.25%) outstanding in Linda Lew Lawton Drost and four and two tenths percent (4.2%) conveyed to D, S & T, Inc. and two and eight tenths percent (2.8%) conveyed to Drost & Brame, Inc.

With regard to its previous fifty percent (50%) of the minerals under Group C, which were conveyed by it to Central Pines Land Company, Jack Lawton, Inc. retained the royalties less one half of one percent (.5%) outstanding to Jack E. Lawton, Jr., one-fourth of one percent (.25%) outstanding in Evelyn Gay Lawton Duhon and one-fourth of one percent (.25%) outstanding in Linda Lew Lawton Drost. On January 24, 2000 Jack Lawton, Inc transferred the retained royalty to Jack E. Lawton, Sr.

Plaintiffs intend to amend pleadings in this case to reflect the conveyances and to add William B. Lawton Company, Inc. and Jack E. Lawton, Sr. as parties.

**INTERROGATORY NO. 8:**

Please identify all plans, preparations or studies which have been prepared by you, or on your behalf, to determine the suitability of the subject property for exploration, drilling, or mining, or to develop or prepare the property for exploration, drilling, or mining, and all plans, preparations or studies which have been conducted by you, or on your behalf, for any other reason whatsoever, including seismic studies, studies or evaluations of the soil, hydrology, geology, engineering, botany, planning, feasibility, marketing or economies, cash-flow projections, or any mineral interest or other natural resource, and identify all documents which evidence such studies, including for each of these plans, preparations, or studies:

(a) the identity of all persons who contributed to the study;

(b) the date on which the study was prepared;

(c) an estimation of the total costs, and a specific itemization, including estimated costs, of each component necessary for calculation of the total development or utilization costs referenced in (c) above.

**ANSWER TO INTERROGATORY NO. 8:**

Other than the expert reports prepared and used in connection with Civil Action CV96-2000, Plaintiffs possess no such plans.

**INTERROGATORY NO. 9:**

Please state whether you, your predecessors-in-interest, or others holding any interest in the subject property at any time between 1978 and the present have ever received any income from, or whether you are engaged in a business or other endeavor for profit on, or with respect to, the property which is the subject of this litigation, and state the income and expenses generated therefrom, and identify any documents which evidence such income and/or business activities.

**ANSWER TO INTERROGATORY NO. 9:**

Plaintiffs have received the following income from Group C since 1978:

A. Central Pines Land Company: Mineral lease bonus, approximately $843,867.50.

B. Tower Minerals Company, Inc.: Mineral lease bonus, approximately $843,867.50.

C. Linda Lew Lawton Drost: Mineral royalty income, $13,660.56.

D. Evelyn Gay Lawton Duhon: Mineral royalty income, $13,660.56.

E. Jack E. Lawton, Jr.: Mineral royalty income, $27,321.12.

F. D, S & T, Inc.: Mineral royalty income, $106,552.43.

G. Drost & Brame, Inc.: Mineral royalty income, $71,034.96.

**INTERROGATORY NO. 10:**

Please identify every event or action, other than the actions allegedly taken by defendant on the date or dates of the alleged taking, which effected, either adversely or beneficially, the available uses of the subject property. Please identify the date of any event described above and each and every fact on which you base your contention.

**ANSWER TO INTERROGATORY NO. 10:**

Other than as stated in responses to these interrogatories, Plaintiffs are not aware of such actions.

**INTERROGATORY NO. 11:**

Please identify all communications, oral and written, between Plaintiffs and any others holding an interest in the subject property between 1978 and the present, which concern the subject property, and identify all documents which evidence such communications.

**ANSWER TO INTERROGATORY NO. 11:**

Other than Plaintiffs and William B. Lawton Company, Inc. and Jack E. Lawton, Sr., no persons own an interest in the property. There are no such communications between Plaintiffs and William B. Lawton Company, Inc. and Jack E. Lawton, Sr.

**INTERROGATORY NO. 12**:

With regard to (1) Central Pines Land Company, (2) D, S & T, Inc., (3) Drost & Brame, Inc., and (4) Tower Minerals Company, Inc., please identify:

(a) The date and place of incorporation.

(b) Corporate address and principal place of business.

(c) All owners, controllers, directors, officers and shareholders (i) on the date of incorporation, (ii) in 1978 and (iii) at all times between 1978 and the present.

(d) All types of business activity undertaken.

(e) All business or corporate subsidiaries and/or parent companies.

(f) The legal relationship, if any, between (i) Central Pines Land Company, (ii) D, S & T, Inc., (iii) Drost & Brame, Inc., and (iv) Tower Minerals Company, Inc.

**ANSWER TO INTERROGATORY NO. 12:**

**(1) CENTRAL PINES LAND COMPANY**

*(a)* *Incorporated* on July 7, 1995 in Sulphur, Calcasieu Parish, Louisiana;

*(b)* *Corporate Address:* 101 N. Huntington Street
Sulphur, LA 70663

*Principal Place Of Business:* 101 N. Huntington Street
Sulphur, LA 70663

*(c)* *Owners, Controllers, Directors, Officers and Shareholders on:*

*(i) On date of Incorporation:*

*Owner:* Jack Lawton, Inc.

*Officers:* Jack E. Lawton, Sr., CEO
Jack E. Lawton, Jr., President
Thad D. Minaldi, Executive Vice President
S. Glenn Gay, Secretary

*Directors:* Jack E. Lawton, Sr.
Jack E. Lawton, Jr.
Holly B. Lawton

*(ii) In 1978:* Corporation did not exist in 1978.

*(iii) At all times between 1978 and the present:*
Since 1995, please see the following:

*Owner:* Jack Lawton, Inc.

*Officers:* President, Jack E. Lawton, Jr.

*Directors:* Jack E. Lawton, Sr.
Jack E. Lawton, Jr.
Holly B. Lawton

(d) *All types of business activity undertaken:* Ownership of the subject property is the only asset and only business activity of Central Pines Land Company.

(e) *All business or corporate subsidiaries and/or parent companies:* Central Pines Land Company is owned 100% by Jack Lawton, Inc. Central Pines Land Company has no subsidiaries.

(f) Central Pines Land Company has no legal relationship to D, S & T, Inc., Drost & Brame, Inc. or Tower Minerals Company, Inc.

**(2) D, S & T, INC.**

(a) *Incorporated* on November 1, 1995 in Lake Charles, Calcasieu Parish, Louisiana;

(b) *Corporate Address:* One Lakeshore Drive, Suite 1700
Lake Charles, LA 70629

*Principal Place Of Business:* 641 W. Prien Lake Road
Lake Charles, LA 70601

(c) *Owners, Controllers, Directors, Officers and Shareholders on:*

*(i) On date of Incorporation:*

*Owners:* Mary Margaret Duhon
Katherine Duhon Smith
Evelyn Duhon Truax

*Controllers:* D, S & T Voting Trust Agreement,
William B. Lawton, Trustee

*Directors:* William B. Lawton

*Officers:* President, William B. Lawton
Vice President, William T. Drost
Secretary, Mary Margaret Duhon

*Shareholders:* Mary Margaret Duhon
Katherine Duhon Smith
Evelyn Duhon Truax

*(ii) In 1978:* Corporation did not exist in 1978.

*(iii) At all times between 1978 and the present:*
Since 1995, please see the following:

*Owners:* Same

*Controllers:* Same

*Directors:* Same

*Officers:* President: William B. Lawton
Vice President: William T. Drost
Secretary: Mary Margaret Duhon

*Shareholders:* Same

(d) *All types of business activity undertaken:* Ownership of royalty interests

(e) *All business or corporate subsidiaries and/or parent companies:* None.

(f) D, S & T, Inc. has no legal relationship to Central Pines Land Company, Drost & Brame, Inc. or Tower Minerals Company, Inc.

**(3) DROST & BRAME, INC.**

(a) *Incorporated* on November 1, 1995 in Lake Charles, Calcasieu Parish, Louisiana;

(b) *Corporate Address:* One Lakeshore Drive, Suite 1700
Lake Charles, LA 70629

*Principal Place Of Business:* 641 W. Prien Lake Road
Lake Charles, LA 70601

(c) *Owners, Controllers, Directors, Officers and Shareholders on:*

*(i) On date of Incorporation:*

*Owners:* William Thomas Drost
Desiree Drost Brame

*Controllers:* Drost & Brame, Inc. Voting Trust Agreement,
William B. Lawton, Trustee

*Director:* William B. Lawton

*Officers:* President, William B. Lawton
Vice President, William T. Drost
Secretary, Mary Margaret Duhon

*Shareholders:* William Thomas Drost
Desiree Drost Brame

*(ii) In 1978:* Corporation did not exist in 1978.

*(iii) At all times between 1978 and the present:*
Since 1995, please see the following:

*Owners:* Same

*Controllers:* Same

*Directors:* Same

| | | |
|---|---|---|
| *Officers:* | President: | William B. Lawton |
| | Vice President: | William T. Drost |
| | Secretary: | Mary Margaret Duhon |

*Shareholders:* Same

(d) *All types of business activity undertaken:* Ownership of royalty interests

(e) *All business or corporate subsidiaries and/or parent companies:* None.

(f) Drost & Brame, Inc. has no legal relationship to Central Pines Land Company, D, S & T, Inc. or Tower Minerals Company, Inc.

**(4) TOWER MINERALS COMPANY, INC.**

(a) *Incorporated* on August 11, 1995 in Lake Charles, Calcasieu Parish, Louisiana;

(b) *Corporate Address:* 641 W. Prien Lake Road
Lake Charles, LA 70601

*Principal Place Of Business:* 641 W. Prien Lake Road
Lake Charles, LA 70601

(c) *Owners, Controllers, Directors, Officers and Shareholders on:*

*(i) On date of Incorporation:*

*Owner:* William B. Lawton Company, Inc.

*Controller:* William B. Lawton Company, Inc.

*Director:* William B. Lawton

*Officers:* President, William B. Lawton
Vice President, William T. Drost
Secretary, Mary Margaret Duhon

*Shareholders:* William B. Lawton Company, Inc.

*(ii) In 1978:* Corporation did not exist in 1978

*(iii) At all times between 1978 and the present:*
Since 1995, please see the following:

*Owners:* Same

*Controllers:* Same

*Directors:* Same

| | | |
|---|---|---|
| *Officers:* | President: | William B. Lawton |
| | Vice President: | William T. Drost |
| | Secretary: | Mary Margaret Duhon |
| | Asst. Secretary: | Betty Cryar (until 10/23/96) |
| | Asst. Secretary: | Andrew Jackson Gray, III |

*Shareholders:* Same

(d) *All types of business activity undertaken:* Ownership of minerals.

(e) *All business or corporate subsidiaries and/or parent companies:* This corporation has no subsidiaries, however, it is owned by its parent company, William B. Lawton Company, Inc.

(f) Tower Minerals Company, Inc. has no legal relationship to Central Pines Land Company, D, S & T, Inc. or Drost & Brame, Inc.

**INTERROGATORY NO. 13:**

Please provide complete annual financial statements for each year from 1978 to the present for:

(a) Central Pines Land Company

(b) D, S & T, Inc.

(c) Drost & Brame, Inc.

(d) Tower Minerals Company, Inc.

**ANSWER TO INTERROGATORY NO. 13:**

Annual financial statements for Central Pines Land Company are included in the package of documents produced herewith.

Annual financial statements are not maintained for D, S & T, Inc., Drost & Brame, Inc. and Tower Minerals Company, Inc.

**INTERROGATORY NO. 14:**

Please identify the date upon which, the manner in which, and the terms under which each Plaintiff acquired their interests in the Group C Lands, and identify any documents which evidence these transactions.

**ANSWER TO INTERROGATORY NO. 14:**

Please see answers to Interrogatory No. 7 above.

**INTERROGATORY NO. 15:**

Please identify in detail all information which was available to each Plaintiff, prior to their acquisition of their interests in the Group C Lands, with regard to the ability to access those lands and any restrictions on access. Please identify any documents relevant to these matters, and indicate whether these documents were relied upon by Plaintiffs prior to their acquisition of the Group C Lands.

**ANSWER TO INTERROGATORY NO. 15:**

Central Pines Land Company: As a subsidiary of Jack Lawton, Inc. which was itself

created pursuant to the corporate reorganization of Wm. T. Burton Industries, Inc., Central Pines Land Company recognizes that all information in the files of Wm. T. Burton Industries, Inc. and all knowledge of the management of Wm. T. Burton Industries, Inc. was available to it at the time it acquired its interest in the property.

Tower Minerals Company, Inc.: As a subsidiary of William B. Lawton Company, Inc., formerly known as Wm. T. Burton Industries, Inc., Tower Minerals Company, Inc. recognizes that all information in the files of Wm. T. Burton Industries, Inc. and all knowledge of the management of Wm. T. Burton Industries, Inc. was available to it at the time it acquired its interest in the property.

Linda Lew Lawton Drost: All public records were "available" to Linda Lew Lawton Drost at the time of her acquisition of the property. Ms. Drost relied on the law of Louisiana to provide access to the property.

Evelyn Gay Lawton Duhon: All public records were "available" to Ms. Duhon at the time of her acquisition of the property. Ms. Duhon relied on the law of Louisiana to provide access to the property.

Jack E. Lawton, Jr.: All public records were "available" to Mr. Lawton at the time of his acquisition of the property. Mr. Lawton relied on the law of Louisiana to provide access to the property.

D, S & T, Inc.: All public records were "available" to D, S & T, Inc. at the time of its acquisition of the property. The corporation relied on the law of Louisiana to provide access to the property.

Drost & Brame, Inc.: All public records were "available" to Drost & Brame, Inc., at the time of its acquisition of the property. The corporation relied on the law of Louisiana to provide

access to the property.

**INTERROGATORY NO. 16:**

Please identify any restrictions on access to or use of your property interests that were in place at the time of your acquisition of your interests in the Group C lands. Please identify any documents relevant to these matters.

**ANSWER TO INTERROGATORY NO. 16:**

Under Louisiana law, the owner of minerals has unrestricted use of the surface of the property burdened by the mineral servitude. Thus, the owner of the surface can impose no legal restrictions on access to or use of the property by the mineral servitude holder.

Notwithstanding, all Plaintiffs are successors to Wm. T. Burton. Group C was expropriated from Mr. Burton in 1943. Prior to the expropriation, there were no restrictions on Mr. Burton's access to the property. When expropriated, the United States imposed a moratorium on access to the property for mineral development. The moratorium terminated in 1978. When Plaintiffs acquired their interests, the property was used as a military base, with the United States Army controlling the surface. All limitations on access and the consequences of the military operations discussed in these responses to discovery apply to each Plaintiff.

**INTERROGATORY NO. 17:**

Please identify each factual averment of Defendant's partial answer to the Complaint which the Plaintiffs claim is untrue or inaccurate upon the basis of facts and information known to Plaintiffs. Please state the facts supporting your denial of each factual averment identified.

**ANSWER TO INTERROGATORY NO. 17:**

Partial Answer Paragraph 1: No response required.

Partial Answer Paragraph 2: Defendant denied that Group C contains 21,118.2 acres.

Plaintiffs determined the acreage based on available title, survey and land record data. Land sections within Group C are oversized, *i.e.*, larger than 640 acres. In Civil Action CV96-2000, Defendant herein produced to Plaintiffs survey maps relied upon by Defendant. Based upon a comparison of the respective information, Plaintiffs submit that Defendant's data reflects virtually the identical acres as Plaintiffs alleged in paragraph 2 of the First Amended Complaint. Plaintiffs' proposed witness, James Val Miller, can testify through deposition on this issue.

Partial Answer Paragraph 3: Defendant denied the last sentence of this paragraph. In light of this Court's ruling eliminating Group A and Group B properties from this litigation, the denial is no longer relevant.

Partial Answer Paragraph 4: Defendant denied the first sentence of paragraph 4. In light of this Court's ruling eliminating Group A and Group B properties from this litigation, the denial is no longer relevant.

Defendant denied the second sentences of paragraphs 4(A) and 4(B). In light of this Court's ruling eliminating Group A and Group B properties from this litigation, the denial is no longer relevant.

Partial Answer Paragraph 5: Plaintiffs' ownership of Group C minerals was a subject of a status conference with the Court on November 22, 2004. The Court ordered an additional status conference for December 2, 2004 at which time the parties were ordered to be prepared to determine whether there is a dispute regarding the ownership of the mineral rights in the Group C lands. Plaintiffs counsel submitted title documents and reasons for judgment to Defendant's trial attorney Terry M. Petrie. Thereafter, Mr. Petrie informed the Court that the United States was satisfied with Plaintiffs' title and that such ownership was no longer an issue. Thus, Defendant's denials of various parts of Paragraph 5 are no longer relevant.

Partial Answer Paragraph 6: No response required.

Partial Answer Paragraph 7: No response required.

Partial Answer Paragraph 8: An exhaustive search of relevant documents fails to reflect that any compensation was offered to or paid to Fullerton Minerals Company, or its successors-in-title, for any taking of mineral rights as alleged by Plaintiffs in paragraph 8 of the First Amended Complaint.

Partial Answer Paragraph 9: No response required.

Partial Answer Paragraph 10: The allegations of the first sentence of paragraph 10 of Plaintiffs' First Amended Complaint is stated in the negative, *i.e.*, an event did not occur. An exhaustive search of relevant documents fails to reflect any conclusions other than as alleged by Plaintiffs in paragraph 10 of their First Amended Complaint. With regard to the second sentence of paragraph 10 of Plaintiffs' First Amended Complaint, Plaintiffs refer to the Solicitor of the Department Of Agriculture in an Opinion dated March 25, 1944.

Partial Answer Paragraph 11: No response required.

Partial Answer Paragraph 12: Plaintiffs recognize and agree with Defendant that no portion of the Limited Use Area was used as a bombing range.

Partial Answer Paragraph 13: No response required. The various documents speak for themselves and are the best evidence of their content.

Partial Answer Paragraph 14: No response required. The various instruments speak for themselves and are the best evidence of their content.

Partial Answer to Paragraph 15: Plaintiffs generally accept Defendant's allegations.

Partial Answer to Paragraph 16: Plaintiffs urge that the following support the allegations of Paragraph 16 of the First Amended Complaint:

In his deposition in Civil Action CV96-2000, Mr. John Camp said he visited Fort Polk trying to get access. General William Steele expressed interest in working together; but all persons knew that there would be no access.

Memo dated February 4, 1976 to HQDA from Colonel Schulz RE: suspend action to acquire minerals at Fort Polk; provided Mission of installation is not hampered by mineral activities, specifically that final approval of drilling sites and access remain with Installation Commander.

Memorandum on Moratorium on Minerals, Fort Polk dated December 16, 1966 to Chief of Engineers from Jack W. Fickessen, Colonel, CE, District Engineer RE: Military needs to acquire minerals under Fort Polk; consideration to claiming by prescription, but could not win because of history of moratorium and recognizing private ownership; file test case on 2600 acre contonment area (never subject to moratorium) claiming government ownership; no further moratorium payments; expropriate minerals.

Disposition Form dated January 19, 1967 by Darwin L. Wilder and Tom Adams RE: Telephone call with various persons including Zeidner; will not get authority to acquire minerals; moratorium waste of money; put up signs saying "keep out" and let them sue; Wilder said unfair to landowners; government not previously claimed minerals, would be estopped.

Letter dated March 1, 1967 to Division Engineer from Max McCord, Director of Real Estate RE: Any request to drill should be referred to Chief of Engineering; not authorized to permit drilling because ownership in doubt; no greater liability for claim action than in condemnation

Memorandum For The Record dated April 30, 1974 by Thomas Kerscher concerning meeting April 25, 1994 meeting at Fort Polk by Zeider and Anthony Liotta concerning minerals at fort and fact that Fort Polk is being fully utilized and should not continue to pay moratorium

Disposition Form dated April 30, 1974 by Clarence C. Randle, Chief, Condemnation Section, Real Estate Division RE: Commanding General concerning about possible drilling on Fort Polk and being in a position to prevent

Minutes of meeting at Fort Polk on June 27, 1974 prepared by Colonel Jerry L. Teague RE: major mineral owners are Burton and Hodges; Burton wants money and Hodges wants to drill; government only owns 3,000 acres of minerals out of the total of 200,000 acres in use; estimated cost of purchasing minerals is $3.2 million; Leesville Artillery Range is considered dangerous because of unknown "duds"; if Hodges is permitted to drill one well, others will want to drill; conclusion -- prohibit drilling; purchase minerals; deny any type of entry;

Letter dated June 26, 1974 to HQDA, WASH DC from Joe H. Sheard, Colonel, CE,

District Engineer RE: drilling not to be permitted; don't own minerals; Nebo; Little Lake Misiere; Act 315.

Undated Memorandum (after June 27, 1974 and believed to be July 10, 1974) to Secretary of the Army from Major General D. A. Raymond, Acting Chief of Engineers RE: obtain approval to exclude all owners of minerals from Fort Polk; energy problem; pressure to drill; to allow drilling even on selected areas would put pressure for more drilling; oil and gas development is important, but do it elsewhere; separate action being taken to acquire title to minerals.

Memo dated July 22, 1974 to HQDA (DAEN-REZ) WASH DC from Major General Warren K. Bennett, Chief of Staff RE: Army Position -- No exploratory testing; acquire all minerals by FY 76 MCA program (estimated cost $4.4 million); any other course would jeopardize meaningful training at Fort Polk.

Undated Executive Summary (subsequent to Congressional denial of funding to acquire minerals at Fort Polk ,FY 76 MCA,) by Major General Commanding Robert Haldane RE: mineral exploration can only occur outside of cantonment areas, tank ranges, certain artillery ranges, and impact areas by close scheduling; can not have mineral development concurrent with military activities; control must rest with Installation Commander.

Memo dated December 12, 1975 to FORSCOM from DA WASH DC RE: Congress denied funds for mineral acquisition; develop additional information concerning need for minerals and valuations; develop program to monitor mineral development on adjacent property; notify of all wells giving details

Notes of meeting on December 17, 1975 at Fort Polk including Teague and Wilder to discuss mineral rights at Fort Polk

Undated Memorandum (apparently January 13, 1976) by Darwin L. Wilder RE: trip to Fort Polk -- Army proposed to acquire minerals in 1976, but Congress denied request; future moratorium to cost $5 per acre; Burton wants to drill near ARCO well; on long term Burton wants to drill south and west of impact area; Camp to supply letter; Congress will probably not permit moratorium on two artillery ranges; better to negotiate and avoid jury trial; $5 million to low a figure for acquiring minerals; if one well hits, not force including the Army can keep them off Fort Polk; Burton wants money and to drill too; Recommendation: stop paying moratorium payments; Burton will not do anything to close Fort Polk; as alternative, negotiate limited drilling.

Memorandum for Commanding General dated January 19, 1976 by Teague: Wilder's alternative recommendations: (1) lift moratorium entirely; acquire 866 acres of leased land; acquire minerals in cantonment area (2) lift moratorium in selected areas.

Disposition Form dated January 19, 1977 by Darwin L. Wilder, Chief, Acquisitions

Branch, Real Estate Division RE: trip to Fort Polk with John Camp and others; recommended that moratorium expire; driller must ask permission before entering property; if not agreeable, obtain injunction and new moratorium; decided to let Commanding General make decision; General wanted to know intent of Burton Industries to see if agreement could be reached; met with Camp who advised that Burton had interest in drilling well in vicinity of ARCO dry well and maybe within the artillery range; Camp wanted to continue the moratorium; discussion about number of wells to be drilled at one time; property south of State Highway 467 could be made available; Camp rapidly concluded that out of 44,000 acres, only about 8,000 would be available for drilling; Camp wanted agreement to settle mineral title in Forest Service area as well; Conclusion: Burton more interested in money than drilling; will accept $.95 per acre if limited drilling permitted; Commanding General will demand that moratorium be maintained if agreement can not be reached.

Disposition Form dated March 18, 1977 by Darwin L. Wilder RE: Second meeting with John Camp: showed Camp a map outlining 25,800 acres where no drilling would be possible; Camp said not interested in drilling under same terms as Hodges; Camp expected not less than $2.00 per acre for continuation of moratorium; Burton not interested in stipulation to permit limited drilling in certain areas; Burton wants money for moratorium; Recommendation: extend moratorium for additional year at $2; no further extension of moratorium; mineral owners be permitted to conduct seismograph surveys after 1978; negotiate possible drilling sites; if not successful, new moratorium; ---- too much risk for operator; too expensive; offer to let them drill; if no oil, no problem; if oil, find solution; not practical to purchase minerals at this time.

Memorandum For Record dated May 2, 1977 from Captain Christopher G. Hunt, Real Estate Officer RE: Meeting to consider Fort Polk mineral options: ultimately will have to release Fort Polk for mineral exploration; demands to drill well on particular sites could be countered with "mini-moratorium."

Letter dated May 5, 1977 to Darwin Wilder, Real Estate Division, Fort Worth from Levin Harris, Assistant U. S. Attorney, Shreveport RE: Options at Fort Polk include (1) renewing moratorium; (2) let moratorium expire; refuse drilling; force mineral owners to sue in court of claims; or (3) negotiate drilling program.

Attorney' opinion dated May 11, 1977 by R. P. Allen, Jr. concerning Fort Polk Mineral Moratorium RE: Correlative rights for surface and mineral operations; Options available: (a) continue moratorium; (b) allow moratorium to expire; (c) agreement for partial lifting of moratorium for selected areas; Military must still consider risk factors of allowing drilling on base security and nations need for oil; mineral operator must assume risk of damages.

Disposition Form dated May 27, 1977 to Commander from Colonel Jerry L. Teague, Facilities Engineer RE: please sign letter notifing Commander, US Army FORSCOM of Fort Polk's intention to allow mineral moratorium to expire March 31,

1978; will save $80,000 to $200,000 per year.

Letter dated June 6, 1977 to Commander, US Army FORSCOM from William B. Steele, Major General, USA, Commanding RE: at Leesville Artillery Range recommend letting moratorium expire; government protected because (a) all previous wells were dry; wells are expensive to drill; inconceivable that area will be overrun by new wildcat wells; (b) Army controls surface and right of entry; (c) due to safety hazards, no prudent driller would drill; (d) if pushed, Army can reestablish moratorium over smaller, selected areas

Memo dated June 15, 1977 to HQDA; WASH DC from HQ, FORSCOM RE: concur in Fort Polk plan to permit moratorium to expire; plan will save $200,000 per annum.

Memo dated June 17, 1977 to Division Engineer, Southwestern from Michael B. Cottrell RE: Termination of Civil Action No. 19118; history of moratorium; negotiations underway; owners at Fort Polk will not agree to stipulation like Peason Ridge; recommend abandoning proceedings; "take calculated risk that there will be no drilling for oil or gas on the artillery range. Should the mineral owners find prudent lessees who would drill in this area at a cost of approximately one million per will, there is no assurance they would find oil or gas. We recommend the risk be taken and no new civil action be filed."

Undated letter (approximately June 1977) to Commander US Army FORSCOM from William B. Steele, Major General, USA, Commanding RE: Let moratorium expire; Army has following measures of protection (a) all wells have been dry, they are expensive; (b) Army still controls surface; (c) due to safety hazards, no prudent driller would drill in impact areas; (d) Army can always re-establish moratorium.

Memo dated June 22, 1977 to HQDA, Wash. D.C. from M. R. Long, Acting Chief, Real Estate Division RE: assume approval to take calculated risk rather than continue mineral moratorium.

Disposition Form dated July 12, 1977 by Darwin L. Wilder, Chief, Acquisition Branch, Real Estate Division reporting on visit to Fort Polk by John Camp RE: Camp treated royally, helicopter view, lunch, etc; Camp requested permission to commence seismograph work; permission was denied; perhaps on weekends after moratorium expires; will let Camp know; Camp told that request to drill was premature; Ft. Polk will only permit dependable and reliable major oil companies because of risk and danger involved; must post large bond; Ft. Polk will not grant permission is location interferes with military mission; not likely to drill in impact areas; certain areas on side of artillery range where drilling would have little interference.

Partial Answer to Paragraph 17: No response required.

Partial Answer to Paragraph 18: No response required for first two sentences. Third

sentence relates to information "Plaintiffs should have known." Plaintiffs simply assert that they did not know of the government's claim to Group C until Spring, 1995.

Partial Answer to Paragraph 19: No response required.

Partial Answer to Paragraph 20: No response required.

Partial Answer to Paragraph 21: No response required.

Partial Answer to Paragraphs 22 - 30: No response required.

Partial Answer to Paragraphs 31: No response required.

Partial Answer to Paragraph 32: No response required. Legal documents and proceedings are the best evidence of their content and speak for themselves.

Partial Answer to Paragraph 33: See responses to Interrogatory No. 2 and elsewhere.

Partial Answer to Paragraph 34: See responses to Interrogatory No. 2 and elsewhere.

Partial Answer to Paragraph 35: See previous responses herein.

Partial Answer to Paragraph 36: See previous responses herein.

Partial Answer to Paragraph 37: No response required.

Partial Answer to Paragraph 38: No response required.

Partial Answer to Paragraph 39: No response required.

Partial Answer to Paragraph 40: No response required.

**INTERROGATORY NO. 18:**

Please identify each individual likely to have knowledge of the facts stated in the Complaint and identify categories of facts known by each individual.

**ANSWER TO INTERROGATORY NO. 18:**

The following may have knowledge of the facts stated in the Complaint:

1. Jeffrey B. Ahbe
Geosciences Manager - Austin Chalk
Union Pacific Resources Company
P. O. Box 7
Forth Worth, Texas 76101-0007
(817) 877-6000
(817) 877-7708

Union Pacific Resources Company conducted mineral operations in the Austin Chalk area of Louisiana and negotiated with Plaintiffs for a mineral lease. Mr. Ahbe is expected to have information concerning Union Pacific's operations, operations of others and mineral leasing in the area. Mr. Ahbe is believed to have knowledge of the leasing activities of the United States regarding portions of Tract C.

2. Brett Birdsong
U.S. Department of Justice
Environmental and Natural Resources Division
P. O. Box 663
Washington, D.C. 20044-0663
(202)304-0428

Mr. Birdsong communicated with Plaintiffs concerning Plaintiffs' claims of ownership of minerals under Tract C. Mr. Birdsong is believed to have played a role in denying Plaintiffs' claims to Tract C and asserting the claim of the United States to such minerals.

3. Danny W. Britt
Forest Supervisor
United States Department of Agriculture
Forest Service
Kisatchie National Forest
Shreveport Hwy.
Pineville, LA 71360

Or

Danny W. Britt
206 Red Fox Circle
Pineville, LA 71360

Mr. Britt has been involved with portions of Tract C since at least 1988. He has knowledge of the military use of the property, including the Special Use Permits; the leasing activities of the United States affecting Group C; and efforts by Plaintiffs' ancestors in title and third persons to develop minerals on the property. Mr. Britt has expressed opinions concerning ownership of minerals on portions of the property. He executed an affidavit and was deposed in Civil Action CV96-2000.

4. Cynthia W. Carter
Realty Specialist
Directorate of Public Works
Engineer Plans and Services Division
Planning Branch
Fort Polk, LA 71459

Ms. Carter has been involved with the real property issues at Fort Polk from the early 1980's. Ms. Carter attended meetings at Fort Polk which included lessees and potential lessees of Plaintiffs who were attempting to drill wells on Group C. She has knowledge of efforts of persons to obtain seismic permits; the permitting process and the mineral leasing stipulations applicable to Fort Polk; the status of the minerals under Fort Polk at various relevant times; and restrictions imposed upon persons attempting to develop minerals under Fort Polk.

5. Herbert M. Carter
Deputy Director of Public Works
Fort Polk, LA 71459

Mr. Carter has been involved in mineral activities at Fort Polk at least since 1996. He has attended meetings with Plaintiffs' lessees or potential lessees who were attempting to drill wells on the disputed property.

6. Carl D. Chiasson
P. O. Box 53414
Lafayette, Louisiana 70505
(337) 232-2702

Mr. Chaisson is an independent mineral lease broker who attempted to obtain leases from Plaintiffs for the drilling of wells on the disputed property. Mr. Chaisson is believed to have knowledge of mineral operations in the area and efforts to obtain mineral leases in the relevant area.

7. Gary B. Collipp
Senior Engineer
Sonat Exploration Company
910 S. 5th St.
Raton, NM 87740
(505) 445-2433

Or

Gary B. Collipp
613 Wellington
Tyler, TX 75703

As an engineer employed by one of Plaintiffs' lessees, Mr. Collipp negotiated with representatives of Fort Polk in efforts to obtain access to the property for mineral development. Mr. Collipp has knowledge of the restrictions imposed on those attempting to develop minerals on the property. Mr. Collipp has knowledge of the affect of military uses of the property on mineral development.

8. Michael B. Cottrell
Chief, Real Estate Division
Department of the Army
Fort Worth District, Corps of Engineers
2100 Rosslyn Chapel Ct.
Arlington, TX 76012
(817) 277-0743

Mr. Cottrell employed appraisers to appraise the minerals under Fort Polk. Mr. Cottrell expressed opinions of the cost of acquiring minerals under Fort Polk. Mr. Cottrell has knowledge of the attempts by the United States to acquire the minerals under Fort Polk; title to and ownership of minerals under Fort Polk during relevant time periods; the moratorium and the decision made by the United States to permit the moratorium to terminate; efforts by third persons to lease property under Fort Polk for mineral development and for seismic surveys; contamination of the Fort Polk property by unexploded ordinance, shells, rockets, mines and other below ground obstructions which would be obstacles to mineral development.

9. Michael L. Cruse
Deputy General Counsel
Office of General Counsel
United States Department of Agriculture
Room 3201
Federal Building
700 West Capital Ave.
Little Rock, Ark 72201

Mr. Cruse communicated with Plaintiffs concerning their claim to minerals under the disputed property. By letter dated November 9, 1995 Plaintiffs informed the United States their claim to Group C. Mr. Cruse is believed to have knowledge of the decision of the United States to assert title to the disputed property.

10. William David Davas
Sonat Exploration Company
6101 South Broadway, Suite 200
Tyler, TX 75703

As an employee of one plaintiff's lessees, Davas was involved in efforts to obtain access to Fort Polk for drilling. He attended meetings at Fort Polk on that subject and participated in plans to drill on the fort. He communicated with Cindy Carter and considered plans for Fort Polk similar to the Fort Chaffee Surface Use and Operational Plan Agreement.

11. George P. Denny, Landman
Cheasapeake Energy Corporation
P.O. Box 18496
Oklahoma, OK 73154
(405) 848-8000

As an employee of one of Plaintiffs' mineral lessees, Mr. Denny was aware of the efforts to lease Plaintiffs' minerals under Fort Polk. Mr. Denny is believed to have knowledge of overall mineral leasing efforts in the area. Mr. Denny communicated with Plaintiffs concerning the availability of property for mineral leasing.

12. Steven C. Dixon
Senior Vice President - Production
Chesapeake Energy Corporation
P. O. Box 18496
Oklahoma City, OK 73154
(405) 848-8000

As an officer of one of Plaintiffs' lessees, Mr. Dixon attended meetings at Fort Polk to discuss obstacles to drilling downrange from the various artillery ranges. Mr. Dixon has knowledge of the adverse impacts from live fire and various restrictions imposed upon persons attempting to develop minerals at Fort Polk.

13. William T. Drost
641 West Prien Lake Road
Lake Charles, LA 70601-8315
(337) 480-3797

As a representative of Plaintiffs, Mr. Drost has knowledge of the efforts of

Plaintiffs to obtain mineral leases on Group C. Mr. Drost has knowledge of Plaintiffs' efforts to determine if the United States was claiming minerals under the disputed property. Mr. Drost attended meetings with representatives of Helmerich & Payne, Inc., Chesapeake Energy Corporation, Sonat Exploration Company, Union Pacific Resources Company, Belco Oil and Gas Corp., and Swift Energy Company all concerning mineral leasing and operations in the area of the disputed property and concerning the difficulty of obtaining access to Fort Polk for drilling.

14. Jeffrey Eisenberg
USDA - OGC
South Building 4636
14th & Independence Ave. S.W.
Washington, D.C. 20250 - 1400

Now believed to be as follows:

Jeffrey Eisenberg
National Wildlife Federation
Arlington, VA 22201
(703) 533-3828

Mr. Eisenberg is believed to have played a role in asserting title to the disputed property on behalf of the United States and in denying Plaintiffs claims to the property. Plaintiffs attempted to negotiate settlements with Mr. Eisenberg concerning portions of Tract C. By letter dated August 6, 1996 Mr. Eisenberg denied the claim of Plaintiffs and has asserted a claim to ownership of the minerals adverse to that of Plaintiffs. Mr. Eisenberg participated in the decision by the United States to withdraw portions of Tract C from leasing despite the claim of ownership thereto by the United States. By letter dated September 26, 1996, in a effort to cause the drilling of wells on portions of Tract C, Plaintiffs informed Mr. Eisenberg that Plaintiffs would not upset or otherwise interfere with scheduled mineral lease sale through restraining order, injunction or other judicial proceedings. Mr. Eisenberg is believed to have participated in the drafting of various affidavits used in the previous litigation.

15. Mel Fife
Land Manager
Belco Oil & Gas Corp.
14300 Cornerstone Village Drive
Suite 421
Houston, TX 77014

Or

713-817-5088

Mel Fife
6485 Pine Shadows Rd.
Cleveland, TX 77328
(281) 432-2786

As an employee of Belco Oil & Gas Corp., Mr. Fife is believed to have knowledge of efforts by Belco to obtain access to Fort Polk for drilling. Mr. Fife is expected to have knowledge of the efforts by Belco and others to obtain mineral leases in the area.

16. David V. Hamilton
Land Manager
Sonat Exploration Company
6101 S. Broadway
Suite 200
Tyler, TX 75703
(903) 561-3360

Now believed to be as follows:

David V. Hamilton
Kaiser-Frances Oil Company
1320 Lake Robbins Dr.
Suite 270
The Woodlands, TX 77380
(281) 681-1919

As an employee of Sonat Exploration Company, Mr. Hamilton is believed to have knowledge of efforts by Sonat to obtain access to Fort Polk for drilling. Mr. Hamilton is expected to have knowledge of the efforts by Sonat and others to obtain mineral leases in the area including efforts to obtain leases on portions of Tract C.

17. Ted Hammerschmidt
Deputy Director of Public Works
Directorate of Engineering & Housing
Fort Polk

Mr. Hammerschmidt has been involved in mineral development questions at Fort Polk since the early 1980's. Mr. Hammerschmidt attended meetings at Fort Polk with Plaintiffs's lessees and potential lessees concerning restrictions and obstacles to drilling at Fort Polk. He has knowledge of the procedures imposed and of the dangers involved in attempting to develop minerals within the military base and the status of the minerals at Fort Polk at various relevant time periods.

18. Henry J. Hood
Vice President - Land and Legal
Cheaspeake Energy Corporation
P. O. Box 18496
Oklahoma City, OK 73154-0496
(405) 848-8000, Ext. 400

As an employee of Cheaspeake Energy Corporation, Mr. Hood is believed to have knowledge of efforts by Cheaspeake to obtain access to Fort Polk for drilling. Mr. Hood is expected to have knowledge of the efforts by Cheaspeake and others to obtain mineral leases in the area including efforts to obtain leases on portions of Tract C.

19. Vance E. Johnson
Chief, Real Property
Fort Polk, LA 71459

Or

Vance E. Johnson
1920 Hwy. 113
Glenmora, LA 71433

Mr. Johnson was involved in real property issues at Fort Polk since the 1970's. He has knowledge of persons attempting to obtain access to Fort Polk for mineral leasing and seismic surveys; ownership of minerals at Fort Polk and efforts by the United States to obtain the minerals; the moratorium and the decision by the United States to permit the moratorium to terminate; meetings with military representatives and John C. Camp; restrictions imposed upon mineral development at Fort Polk; and whether property at Fort Polk was available for mineral leasing.

20. Robert C. Joslin
Deputy Chief
National Forest System
U.S. Forest service
Alexandria, VA

Mr. Joslin provided an affidavit in the previous litigation. He is believed to have knowledge of the matters covered by that affidavit.

21. Jack E. Lawton, Jr.
101 N. Huntington Street
Sulphur, LA 70663
(337) 527-5221

As a representative of Plaintiffs, Mr. Lawton has knowledge of the efforts of Plaintiffs to obtain mineral leases on the disputed property. Mr. Lawton has knowledge of Plaintiffs' efforts to determine if the United States was claiming minerals under the disputed property. Mr. Lawton attended meetings with representatives of Helmerich & Payne, Inc., Chesapeake Energy Corporation, Sonat Exploration Company, Union Pacific Resources Company, Belco Oil and Gas Corp., and Swift Energy Company all concerning mineral leasing and operations in the area of the disputed property and concerning the difficulty of obtaining access to Fort Polk for drilling.

22. Timothy J. Mahaffey
Landman Advisor
Domestic Exploration
OXY USA Inc.
Box 12021
Bakersfield, CA 93389-2021
(805) 321-6618

As an employee of OXY USA Inc., one of Plaintiffs' lessees in the area, Mr. Mahaffey is believed to have knowledge of mineral leasing and operations in the area.

23. James Val Miller, MBA, CPL
430 First Street
Jennings, Louisiana 70546
(337) 247-4230

Mr. Miller is a certified petroleum landman. He has extensive knowledge of mineral leasing and operations in the Fort Polk area as well as the efforts by Plaintiffs and Plaintiffs' lessees and potential lessees to obtain access to Fort Polk for mineral leasing and seismic surveys.

24. Thad D. Minaldi
One Lakeside Plaza
Suite 400
Lake Charles, LA 70601
(337) 436-9491

As a representative of Plaintiffs, Mr. Minaldi has knowledge of the efforts of Plaintiffs to obtain mineral leases on Group C. Mr. Minaldi has knowledge of Plaintiffs' efforts to determine if the United States was claiming minerals under the disputed property. Mr. Minaldi attended meetings with representatives of Helmerich & Payne, Inc., Chesapeake Energy Corporation, Sonat Exploration Company, Union Pacific Resources Company, Belco Oil and Gas Corp., and Swift Energy Company all concerning mineral leasing and operations in the area of the

disputed property and concerning the difficulty of obtaining access to Fort Polk for drilling.

25. Barry Oswald
G3/DPTMS Range
JRTC & Fort Polk

Mr. Oswald attended meetings with representatives of Plaintiffs' lessees concerning the possibility of drilling wells at Fort Polk. Mr. Oswald has knowledge of issues concerning possible well sites in the intensive use area of the Fort; contemplated measures to protect well Christmas trees from live fire; depths for construction and routes for proposed pipelines; and other safety issues concerning mineral exploration at Fort Polk.

26. William J. Phillips
Senior Landman
Helmerich & Payne, Inc.
1437 South Boulder Ave.
Tulsa, Oklahoma 74114
(918) 742-5531

As an employee of Helmerich & Payne, Inc., a mineral company active in the area, Mr. Phillips is believed to have knowledge of mineral leasing and operations in the area.

27. Thomas S. Price, Jr.
Senior Vice President - Investor and Governmental Relations
Chesapeake Energy Corporation
P. O. Box 18496
Oklahoma City, OK 73154
(405) 848-8000

As an officer of one Plaintiffs' lessees, Mr. Price met with representatives at Fort Polk concerning possible oil well drilling. Mr. Price has knowledge of the military's requirements, the permitting and regulatory process, safety issues and obstacles involved in attempting to develop mineral resources at Fort Polk.

28. Stephen M. Sittnick
LTC, IN
G3 / DPTMS
Fort Polk

While at Fort Polk Mr. Sittnick reviewed a memorandum dated July 15, 1997 concerning offers to lease areas including Red Leg Impact Area and Memorandum dated July 23, 1997 concerning offers to lease. He recommended not leasing. He

stated the area was "off limits," that clearing the area for drilling would be unsafe and expensive. He stated that drilling would require closing ranges and would impact military operations.

29. Dr. Charles Howard Stagg
Chief, Environmental and Natural Resources Management
Directorate of Public Works
Fort Polk

Dr. Stagg has knowledge of the military's requirements, the permitting and regulatory process, safety issues and obstacles involved in attempting to develop mineral resources at Fort Polk.

30. Charles E. Steele
Director of Lands and Minerals
United States Department of Agriculture
Forest Service
2500 Shreveport Hwy.
Pineville, LA 71360

Mr. Steele has knowledge of the history of mineral leasing efforts at Fort Polk. He has knowledge of access for mineral development being denied. Mr. Steele has knowledge of the title issues and legal opinions possessed by the Forest Service.

31. William B. Steele
Major General, USA
Commanding
Fort Polk 71459

Now believed to be as follows:

William B. Steele
Major General USA, Retired
6820 Cooper Oaks Rd.
Columbus, GA 31904
(706) 323-5740

Major General Steele was the commander of Fort Polk during the 1970's. He met with John Camp, Darwin Wilder, Colonel Teague and others concerning Mr. Burton's attempts to obtain access to Fort Polk for drilling; efforts by the military to purchase the minerals; the moratorium; the decision to permit the moratorium to terminate; contingency plans to prevent drilling at Fort Polk after termination of the moratorium. General Steele has knowledge of the effect drilling would have on the military training mission at Fort Polk; the fact that, as commander, he controlled the surface of Fort Polk; safety issues involved in drilling for oil at Fort

Polk; and that if a mineral operator was successful in obtaining production, future access could be denied on a case by case basis with "mini" moratoriums.

32. J. Philip Thomas
Manager, Land
Domestic Exploration
OXY USA, Inc.
Box 1201
Bakersfield, CA 93389-2021
(805) 321-6634

As an employee of OXY USA Inc., one of Plaintiffs' lessees in the area, Mr. Thomas is believed to have knowledge of mineral leasing and operations in the area.

33. Dr. Ronald N. Tomas
Office of Garrison Commander
Fort Polk, LA 71459

Now believed to be as follows:

Dr. Ronald N. Tomas
1085 Maul Rd.
DeRidder, LA 70634-6532
(337) 463-8943

Dr. Tomas has been involved at Fort Polk since the early 1970's. He has knowledge of the military to acquire the minerals; the moratorium; the decision to permit the moratorium to expire; the effect of drilling activities on the military training mission; safety issues involved in drilling at Fort Polk; the permitting and regulatory process; and obstacles involved in attempting to develop mineral resources at Fort Polk.

34. Mark A. Virant
Staff Landman
Union Pacific Resources Company
P. O. Box 7
Fort Worth, Texas 76101-0007
(817) 877-6000
(817) 877-6753

Union Pacific Resources Company conducted mineral operations in the Austin Chalk area of Louisiana and negotiated with Plaintiffs for a mineral lease. Mr. Virant is expected to have information concerning Union Pacific's operations, operations of others and mineral leasing in the area.

35. Tom L. Ward
President and COO
Cheaspeake Energy Corporation
P. O. Box 18496
Oklahoma City, OK 73154-0496
(405) 840-3000, Ext. 105

As an employee of Cheaspeake Energy Corporation, Mr. Ward is believed to have knowledge of efforts by Cheaspeake to obtain access to Fort Polk for drilling. Mr. Ward is expected to have knowledge of the efforts by Cheaspeake and others to obtain mineral leases in the area including efforts to obtain leases on portions of Tract C.

36. Darin Zanovich
Swift Energy Company
16825 Northchase Drive, Suite 400
Houston, TX 77060
(281) 874-2700

As an employee of Swift Energy Company, Mr. Zanovich is believed to have knowledge of efforts by Swift to obtain access to Fort Polk for drilling. Mr. Zanovich is expected to have knowledge of the efforts by Swift and others to obtain mineral leases in the area including efforts to obtain leases on portions of Tract C.

**INTERROGATORY NO. 19:**

Please identify any other subsurface mineral rights you own other than those involved in this litigation, and whether the surface owner has placed any restrictions on access, and if so, describe those restrictions.

**ANSWER TO INTERROGATORY NO. 19:**

Central Pines Land Company: Central Pines Land Company owns no other subsurface mineral rights.

Tower Minerals Company, Inc.: Tower Minerals Company, Inc. owns no other subsurface mineral rights.

D, S & T, Inc.: D, S & T, Inc. owns mineral royalties affecting in excess of 75,000 acres of land, the extent of which is too burdensome to list in this document. As a matter of law the

surface owner can place no restrictions on access.

Drost & Brame, Inc.: Drost & Brame, Inc. owns mineral royalties affecting approximately 75,000 acres of land, the extent of which is too burdensome to list in this document. As a matter of law the surface owner can place no restrictions on access.

Jack E. Lawton, Jr.: Jack E. Lawton, Jr. owns mineral royalties affecting thousands of acres of land, the extent of which is too burdensome to list in this document. As a matter of law the surface owner can place no restrictions on access.

Linda Lew Lawton Drost: Ms. Drost owns mineral royalties affecting thousands of acres of land, the extent of which is too burdensome to list in this document. As a matter of law the surface owner can place no restrictions on access.

Evelyn Gay Lawton Duhon: Ms. Duhon owns mineral royalties affecting thousands of acres of land, the extent of which is too burdensome to list in this document. As a matter of law the surface owner can place no restrictions on access.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 1:**

Please produce or make available for inspection and copying each and every document which either supports your response or was identified in response to the interrogatories above.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 1:**

Please see the following exhibits: (1) Plaintiffs' Title Exhibits contained in one volume; and (2) Plaintiffs's Discovery Response Exhibits contained in ____ volumes.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 2:**

Please produce or make available for inspection and copying any and all appraisals, or other valuation documents, concerning any portion of the property interests in the present case, conducted before, incident to, or after any Plaintiff acquired any interest in the subject property, including contingent interests.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 2:**

See October 1, 1995, Estimate of Current Market Value of a Non-Producing Royalty Interest Covering Lands Situated in Vernon and Rapides Parish, Louisiana Prepared for William B. Lawton Company, Inc. by James Val Miller, CPL, MBA

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 3:**

Please produce or make available for inspection and copying any and all real estate tax statements, billings, invoices or similar documents concerning the subject property for all years from the date of purchase or acquisition by Plaintiffs to present.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 3:**

None, mineral interests are not subject to real estate taxes in Louisiana.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 4:**

Please produce or make available for inspection and copying any and all reports, documentation or written summaries of facts, information or opinions relied upon by you or someone on your behalf in answering these discovery requests.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 4:**

This request is extremely broad and is subject to interpretation. In addition to the materials identified in these responses, Plaintiffs offer to produce for inspection and copying all of their non-privileged file materials.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 5:**

Please produce or make available for inspection and copying any and all documents relating to any offers to purchase all or part of the subject property interests from Plaintiffs.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 5:**

None.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 6:**

Please produce or make available for inspection and copying a copy of any mortgage, deed of title or trust, sale-leaseback contract, or any other financing or ownership document for the subject property from 1979 until the present.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 6:**

Please see:

(a) Collateral Mortgage affecting Group C and other properties dated November 1, 1995 executed by Drost & Brame, Inc. in favor of William B. Lawton Company, Inc. recorded in MOB 837, Page 543 under file number 1010909 records Rapides Parish, Louisiana, and

(b) Collateral Mortgage affecting Group C and other properties dated November 1, 1995 executed by D, S & T, Inc. in favor of William B. Lawton Company, Inc. recorded in MOB 837, Page 503 under file number 1010908 records Rapides Parish, Louisiana .

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 7:**

Please produce or make available for inspection and copying any and all maps, plans, reports, memoranda, or other documents identifying the location of any oil or gas reserves or deposits, drill holes or sampling points on the subject property.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 7:**

This request is extremely broad and is subject to interpretation. In addition to the materials

identified in these responses, Plaintiffs offer to produce for inspection and copying all of their non-privileged file materials.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 8:**

Please produce or make available for inspection and copying any and all reports, memoranda, letters, maps, or other documents dealing with exploration work conducted on the subject property, including but not limited to proposed exploration programs and budgets, actual exploration work undertaken and the results obtained therefrom, and any statements of annual exploration expenditures.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 8:**

This request is extremely broad and is subject to interpretation. In addition to the materials identified in these responses, Plaintiffs offer to produce for inspection and copying all of their non-privileged file materials.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 9:**

Please produce or make available for inspection and copying any and all reports, studies, or other documents which address mining on the subject property from any location.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 9:**

This request is extremely broad and is subject to interpretation. In addition to the materials identified in these responses, Plaintiffs offer to produce for inspection and copying all of their non-privileged file materials.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 10:**

Please produce or make available for inspection and copying all reports, memoranda, letters, surveys, studies or other documents which address the potential and actual markets for any minerals or other resources located on the subject property, including any marketing plans and

strategies for the sale of any minerals or other resources produced from the properties, lists of potential and actual customers or lessees, projected and actual sales volume, and projected and actual prices.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 10:**

This request is extremely broad and is subject to interpretation. In addition to the materials identified in these responses, Plaintiffs offer to produce for inspection and copying all of their non-privileged file materials.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 11:**

Please produce or make available for inspection and copying any and all sales agreements, letters of intent, offers of sale, offers to purchase, expressions of interest, and expressions of lack of interest received from, or delivered to, potential or actual customers or lessees related to Plaintiffs' property interests.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 11:**

Plaintiffs possess no materials relating to potential sales of the property; Plaintiffs have identified elsewhere in these responses efforts to lease Group C for mineral development. In addition to the materials identified in these responses, Plaintiffs offer to produce for inspection and copying all of their non-privileged file materials.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 12:**

Please produce or make available for inspection and copying any and all reports, memoranda, letters or other documents addressing pre-production capital expenditures required for mine development on the subject property, including expenditures for equipment, facilities, infrastructure and all other assets, and including any time schedule for the expenditure of said pre-production capital.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 12:**

Plaintiffs possess none; but offer to produce for inspection and copying all of their non-privileged file materials.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 13:**

Please produce or make available for inspection and copying any and all reports, memoranda, letters or other documents addressing sustaining or replacement capital expenditures required throughout the life of any mine development on the subject property, including expenditures for equipment, facilities, infrastructure and all other assets.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 13:**

Plaintiffs possess no documents responsive to this request; but offer to produce for inspection and copying all of their non-privileged file materials.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 14:**

To the extent not produced or made available for inspection and copying for any of the foregoing requests, please provide all geologic data, petrophysical data, geophysical and seismic data, well log data, core data or any reports or studies for fields, wells, leases and/or reservoirs related to Plaintiffs' property interests in this litigation.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 14:**

This request is extremely broad and is subject to interpretation. In addition to the materials identified in these responses, Plaintiffs offer to produce for inspection and copying all of their non-privileged file materials.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 15:**

To the extent not produced or made available for inspection and copying for any of the foregoing requests, please provide all graphic presentations for fields, wells, leases and or

reservoirs related to the Plaintiffs' property interests in this litigation, including but not limited to presentations covering production, injection, pressure, cross sections and seismic interpretation.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 15:**

This request is extremely broad and is subject to interpretation. In addition to the materials identified in these responses, Plaintiffs offer to produce for inspection and copying all of their non-privileged file materials.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 16:**

To the extent not produced or made available for inspection and copying for any of the foregoing requests, please provide all maps or cross sections for fields, wells, leases and/or reservoirs related to Plaintiffs' property interests in this litigation, including but not limited to maps that show reservoir structure, isopach contours, fault planes or any other reservoir characteristics.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 16:**

This request is extremely broad and is subject to interpretation. In addition to the materials identified in these responses, Plaintiffs offer to produce for inspection and copying all of their non-privileged file materials.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 17:**

To the extent not produced or made available for inspection and copying for any of the foregoing requests, please provide all statistical studies concerning reservoir characteristics for reservoirs related to Plaintiffs' property interests in this litigation, including but not limited to studies related to permeability, facies (rock characteristics), porosity, saturations or any other combination of data.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 17:**

This request is extremely broad and is subject to interpretation. In addition to the materials identified in these responses, Plaintiffs offer to produce for inspection and copying all of their non-privileged file materials.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 18:**

To the extent not produced or made available for inspection and copying for any of the foregoing requests, please provide all reservoir studies related to Plaintiffs' property interests in this litigation, including but not limited to reservoir modeling, production decline curve analyses, material balance analyses, volumetric analyses and reserve reports.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 18:**

This request is extremely broad and is subject to interpretation. In addition to the materials identified in these responses, Plaintiffs offer to produce for inspection and copying all of their non-privileged file materials.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 19:**

To the extent not produced or made available for inspection and copying for any of the foregoing requests, please provide all documents, including files, related to land, legal, lease, geologic, drilling and/or well files for fields, wells, leases and /or reservoirs related to Plaintiffs' property interests in this litigation, including files related to any well work, equipment, designs and proposal data for wells, reservoirs and/or leases.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 19:**

This request is extremely broad and is subject to interpretation. In addition to the materials identified in these responses, Plaintiffs offer to produce for inspection and copying all of their non-privileged file materials.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 20:**

To the extent not produced or made available for inspection and copying for any of the foregoing requests, please provide all documents filed with governmental agencies and/or regulatory authorities related to fields, wells, leases and /or reservoirs related to Plaintiffs' property interests in this litigation.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 20:**

This request is extremely broad and is subject to interpretation. In addition to the materials identified in these responses, Plaintiffs offer to produce for inspection and copying all of their non-privileged file materials.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 21:**

To the extent not produced or made available for inspection and copying for any of the foregoing requests, please provide all data showing dates and/or time lines of activity, including but not limited to exploration, drilling, construction and production, in the fields, wells, leases and/or reservoirs related to Plaintiffs' property interests in this litigation.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 21:**

This request is extremely broad and is subject to interpretation. In addition to the materials identified in these responses, Plaintiffs offer to produce for inspection and copying all of their non-privileged file materials. Plaintiffs specifically refer to the activities of Sonat Exploration Company and Chesapeake Operating, Inc. identified elsewhere in these materials.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 22:**

To the extent not produced or made available for inspection and copying for any of the foregoing requests, please provide all data regarding finding, exploration or development costs associated with the fields, wells, leases and/or reservoirs related to Plaintiffs' property interests

in this litigation.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 22:**

This request is extremely broad and is subject to interpretation. In addition to the materials identified in these responses, Plaintiffs offer to produce for inspection and copying all of their non-privileged file materials. Plaintiffs specifically refer to the activities of Sonat Exploration Company and Chesapeake Operating, Inc. identified elsewhere in these materials.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 23:**

To the extent not produced or made available for inspection and copying for any of the foregoing requests, please provide all contracts and agreements pertaining to the exploration, development and production of acreage, leases, wells, reservoirs, and/or fields related to Plaintiffs' property interests in this litigation.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 23:**

Elsewhere in response to these discovery requests Plaintiffs have identified mineral leasing activities regarding Group C. In addition, Plaintiffs offer to produce for inspection and copying all of their non-privileged file materials.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 24:**

Please produce or make available for inspection and copying any and all documents which Plaintiffs intend to rely upon during any part of this litigation, including trial.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 24:**

Plaintiffs have not determined the documents which Plaintiffs intend to rely upon during any part of this litigation, including trial. Plaintiffs may rely on any of the documents identified in response to this discovery and identified in Plaintiffs initial disclosure.

This request is extremely broad and is subject to interpretation. In addition to the materials

identified in these responses, Plaintiffs offer to produce for inspection and copying all of their non-privileged file materials.

**REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 25:**

Please produce or make available for inspection and copying any and all documents which make reference to the subject property, or are otherwise relevant to this litigation.

**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS NO. 25:**

This request is extremely broad and is subject to interpretation. In addition to the materials identified in these responses, Plaintiffs offer to produce for inspection and copying all of their non-privileged file materials.

Respectfully submitted,

**THE GRAY LAW FIRM (APLC)**

BY:______________________________

**A. J. GRAY, III** (La. Bar #6253)
P. O. Box 1467
Lake Charles, LA 70602-1467
Telephone: (337) 494-0694
Facsimile: (337) 494-0697

Of Counsel:

Thomas C. McKowen, IV
STRAIN, DENNIS, & BATES, L.L.P.
318 St. Charles Street
Baton Rouge, LA 70802
Telephone: (225) 343-0100
Facsimile : (225) 343-0344

**CERTIFICATE OF SERVICE**

I hereby certify that copies of the foregoing RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO Plaintiffs was served on the following counsel of record by first class mail, postage prepaid:

Terry Petrie
Natural Resources Section
Environmental & Natural Resources Division
U.S. Department of Justice
999 18th Street,
Suite 945, North Tower
Denver, CO 80202

Alex Kriegsman
Natural Resources Section
Environmental & Natural Resources Division
U.S. Department of Justice
P. O. Box 663
Washington, D.C. 20044-0663

Heath Dillon
Office of the Staff of Judge Advocate
Administrative Law Division, ATTN: Heath Dillon
Building 7133, Radio Road
JRTC & Fort Polk
Fort Polk, LA 71459

THUS DONE AND SIGNED this 19th day of April, 2005.

________________________________

**A. J. GRAY, III**

# Exhibit G

Taken on: **March 16, 2006**

Deposition of: **William Drost**

Deposition of

# William Drost

In the Case of:

## Central Pines Land Co., et al

## vs.

## USA

Taken on:

**March 16, 2006**

*KAUFMAN, HOFFMAN, TAYLOR,*
*WYATT & D'ARCOURT*
*Phone: 800-503-2274*
*Fax: 337-234-0715*
http://www.kaufmanandassociates.com

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

CENTRAL PINES LAND *
COMPANY, ET AL.
Plaintiffs *

v. * NO. 98-314 L

THE UNITED STATES *
OF AMERICA
Defendant *
* * * * * * * * * * * * * * * * * * * * * * * * *

The 30(b)(6) deposition of WILLIAM B. LAWTON COMPANY, LLC via WILLIAM THOMAS DROST was taken in the above-entitled cause on behalf of the Defendant pursuant to the following stipulations before Deidre D. Juranka, Certified Court Reporter in and for the State of Louisiana, at the offices of The Gray Law Firm, Hibernia Tower, Suite 1700, One Lakeshore Drive, Lake Charles, Louisiana, on March 16, 2006, beginning at 9:50 a.m.

A P P E A R A N C E S

FOR PLAINTIFFS, CENTRAL PINES LAND COMPANY, ET AL.:

A.J. GRAY, III
THE GRAY LAW FIRM
Hibernia Tower, Suite 1700
One Lakeshore Drive
Lake Charles, Louisiana 70602

FOR DEFENDANT, THE UNITED STATES OF AMERICA:

ALEX KRIEGSMAN
UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
Natural Resources Section
601 D Street NW, 3rd Floor, Room 3814
Washington, D.C. 20004

ALSO PRESENT:

DELIA JAQUETTE
LIEUTENANT COLONEL MICHAEL D. GRAHAM

A. Most definitely.
**Q. The Group C minerals that William B. Lawton Company, LLC owns, have you done an appraisal on their value?**
A. I don't know. I don't know of one, no. The only appraisal that I know is one that I think your people had done years ago that put some dollar values on there. That's one that I know of.
**Q. Has the United States done anything that has affected the value of your Group C minerals?**
A. Has the United States -- would you repeat that?
**Q. Sure. Has the United States done anything that has affected the value of the Group C minerals --**
A. Yes.
**Q. -- that you own?**
A. Yes.
**Q. And what is that?**
A. The inability to properly explore for minerals in that area that a prudent oil and gas company would partake in.
**Q. So, although you haven't done an appraisal, it's your contention that the Group C minerals that you own today are worth less because of actions of the United States?**
A. I don't think they're -- I think that the

minerals are still there. They're not worth more or less. They're worth less to the company because they can't explore for them, but they're not worth less to me.

**Q. And what attempts have you made to explore?**

A. Well, I manage a land owning company that owns royalties and mineral rights. I'm not in the oil and gas business.

**Q. Okay. Well, when I say you I'm referring to the William B. Lawton Company, LLC.**

A. Right. William B. Lawton Company, LLC has made no attempt to --

**Q. Made any attempts to access those minerals?**

A. Well, I mean, we've actively pursued negotiations for third parties to go in there, sure, you know, on our behalf.

**Q. And were those successful?**

A. No.

**Q. Why not?**

A. Because of the inabilities that I referred to earlier.

**Q. Okay. And how do you know that?**

A. Because I was told that by representatives of these companies.

**Q. You have any firsthand knowledge of that?**

A. I do.

**Q. And what is that?**

A. Well, I know we were negotiating with Belco Oil & Gas and one of their representatives was -- you know, had been given, you know, the ability to come and lease from us and go in there and do it but he was unable to get in there.

**Q. Why was he unable to get in there?**

A. Well, from what I understand, you know, he even -- I understand Belco even hired a retired general to try to help them get access. He -- they had agreed to pay us upon getting -- upon them being able to get access. And, ultimately, they had to go and spend their money somewhere else. That's my firsthand knowledge.

**Q. Because of the Army?**

A. Well, that's -- that was what was stopping them.

**Q. But you know that from conversations you've had with Belco?**

A. Yes.

**Q. You never saw anything firsthand that the Army did?**

A. I never -- no, I never saw anything with my eyes that the Army did.

**Q. Never heard anything firsthand or any statements**

**from the Army? Did you ever have any communications with anyone from the Army that prevented you from accessing or Belco from accessing or any other company?**

A. No. I got my information from Belco and from Sonat and from Chesapeake and all these companies that were very active at that time.

**Q. So all the attempts to access the minerals were made by Sonat, Chesapeake, Belco and these other companies; there was no attempt made by William B. Lawton Company or any of the other plaintiffs?**

A. Well, yeah. I mean, I can't -- I mean, we would have leased. I consider that an attempt. We were saying yeah, please explore for minerals. You know, we encouraged mineral development on our properties. I consider that encouragement or an attempt, if you want to call it that.

**Q. But no communication between any of the plaintiffs and the Army?**

A. No.

MR. KRIEGSMAN: Okay. I think we're just about done. I just want to take a short break.

MR. GRAY: Sure.

(A brief recess was taken from 10:30 to 10:38.)

# Exhibit H

Taken on: December 13, 2005

Deposition of: William Drost

Deposition of

**William Drost**

In the Case of:

**Central Pines Land Co., et al**

**vs.**

**USA**

Taken on:

**December 13, 2005**

KAUFMAN & ASSOCIATES
TECHNOLOGICAL LEADERS IN COURT REPORTING AND LITIGATION SUPPORT SINCE 1985

*KAUFMAN, HOFFMAN, TAYLOR,*
*WYATT & D'ARCOURT*
*Phone: 800-503-2274*
*Fax: 337-234-0715*
http://www.kaufmanandassociates.com

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

CENTRAL PINES LANE COMPANY, *
ET AL.
Plaintiffs *

v. * NO. 98-314 L

THE UNITED STATES OF AMERICA *
Defendant

* * * * * * * * * * * * * * * * * * * * * * * * *

The oral deposition of WILLIAM THOMAS DROST was taken in the above-entitled cause on behalf of Defendant pursuant to the following stipulations before Deidre D. Juranka, Certified Court Reporter in and for the State of Louisiana, at the offices of The Gray Law Firm, Hibernia Tower, Suite 1700, One Lakeshore Drive, Lake Charles, Louisiana, on December 13, 2005, beginning at 8:57 a.m.

A P P E A R A N C E S

FOR PLAINTIFFS, CENTRAL PINES LAND COMPANY, ET AL.:

A.J. GRAY, III
THE GRAY LAW FIRM
Hibernia Tower, Suite 1700
One Lakeshore Drive
Lake Charles, Louisiana 70602

FOR DEFENDANT, THE UNITED STATES OF AMERICA:

ALEX KRIEGSMAN
UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
Natural Resources Section
601 D Street NW, 3rd Floor, Room 3814
Washington, D.C. 20004

ALSO PRESENT:

JACK E. LAWTON, JR.
DELIA JAQUETTE
LIEUTENANT COLONEL MICHAEL D. GRAHAM

a minute.

MR. GRAY: Go ahead.

(A recess was taken from 10:34 to 10:56.)

BY MR. KRIEGSMAN:

**Q. Okay. We talked earlier about Belco in 1996 and we talked about how the plaintiffs negotiated with Belco to enter into a lease and then Belco came back and said that they were unable to obtain access because of restrictions that were put in place by the military; is that accurate?**

A. I think that that is fairly accurate, but I might say that it was consistent with all the companies that we were negotiating with. I might add --

**Q. Okay.**

A. -- that it was not specific to Belco.

**Q. Okay. But what we're saying is correct. You would add in addition to that --**

A. That is my recollection of those negotiations, that Belco just ran out of time, they ran out of money. I don't know. I don't know what their problems were other than that the Government was their -- was their problem.

**Q. So the Government was Belco's problem in regard to this lease?**

A. It wasn't our problem. I mean, we --

Q. **Okay.**
A. -- we had an agreement that hinged on access. Our agreement was not signed. Therefore, they weren't granted access.
Q. **And Belco told you that they were not going to go through with the lease because of restrictions that --**
A. No. No. Belco didn't tell me they weren't going to go through with the lease. They didn't tell me that.
Q. **What'd they tell you?**
A. They only told me that they were going to -- you know, when we left this table they were going to -- high hopes that by putting this general -- this general was going to get them in the door. "We'll call you when we get through the door." And, you know, we understood through various conversations and whatnot that they were having trouble getting access and then not being able to carry forward with the operations as they related to, you know, the things we talked about, not drilling at night and all those issues and timing, same issue we've been over.
Q. **Okay. And that was 1996 when you learned that Belco was having these problems gaining access?**