# Exhibit I

Taken on: **December 13, 2005**

Deposition of: **Jack Lawton, Jr.**

Deposition of

# Jack Lawton, Jr.

In the Case of:

## Central Pines Land Co., et al
## vs.
## USA

Taken on:

**December 13, 2005**

*KAUFMAN, HOFFMAN, TAYLOR, WYATT & D'ARCOURT*
*Phone: 800-503-2274*
*Fax: 337-234-0715*
http://www.kaufmanandassociates.com

A P P E A R A N C E S

FOR PLAINTIFFS, CENTRAL PINES LAND COMPANY, ET AL.:

A.J. GRAY, III
THE GRAY LAW FIRM
Hibernia Tower, Suite 1700
One Lakeshore Drive
Lake Charles, Louisiana 70602

FOR DEFENDANT, THE UNITED STATES OF AMERICA:

ALEX KRIEGSMAN
UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
Natural Resources Section
601 D Street, NW, 3rd Floor, Room 3814
Washington, D.C. 20004

ALSO PRESENT:

WILLIAM THOMAS DROST
DELIA JAQUETTE
LIEUTENANT COLONEL MICHAEL D. GRAHAM

I N D E X

Page No.

Examination by Mr. Kriegsman . . . . . . . . . 5

mean, well, the girls weren't, just Will Drost and -- you know, is representing the family and the companies.

**Q. So you and the plaintiffs were communicating with these companies, Chesapeake, Belco, Sonat, UPRC and Swift, and these companies were telling you that they were communicating with the United States; is that right?**

A. Uh-huh.

MR. KRIEGSMAN: Did we get the response?

A. Yes. I'm sorry.

BY MR. KRIEGSMAN:

**Q. But you don't know of any communications, any direct communications, between the plaintiffs and the United States?**

A. I'm not aware of what the lawyers did or anything like that, no.

**Q. Okay. And these impediments that we're talking about, when was that that these impediments started or when you first found out about them? Did you first find out about them in '95, '96 from these companies?**

A. No. I would say, actually, it could have -- I mean, it was -- artillery range has been there,

like I said, forever. The first trend that came through there was the Tuscaloosa Woodbind trend in the '70s when I was still in school or right after I got out of -- right before I got out of school. And people just would laugh at us when we tried to -- I don't even remember the companies anymore. Shell might have been one of them, I'm not sure, to go in there. And they said, you know, it's not worth our time because we can't get in there. It's an artillery range.

Q. **And we're talking about the late '70s, right? Because you started with the company in '77.**

A. '77.

Q. **Okay.**

A. Tuscaloosa trend started, probably, about '75, I guess.

Q. **Okay. And at that time you talked with some companies about going in to drill or explore and they just kind of laughed and said there's no way that's going to happen; is that right?**

A. Yes, sir.

Q. **What other attempts did you make between '77 and this '95 time period that we're talking about to access or exercise your mineral rights on the Group C lands?**

A. Being that we were drilling wells actively then and we would talk to people and tell them we had big chunks of fee land in central Louisiana trying to get them interested in doing it. It's just the course of business. You know, I look at a deal. "You got anything?" Say, "Yeah. We have a bunch of mineral land there." That kind of thing.

Q. **Okay. And when I asked you earlier about, you know, why we're here today and why you're suing the United States, it's because these impediments that the United States has put in place are preventing you from accessing your mineral rights; is that right?**

A. Yes, sir.

Q. **Okay. And we talked about the impediments that you believe the United States put in place in the mid '90s; is that right?**

A. No. They've been there.

Q. **Okay. So the impediments have been there since --**

A. Well, the artillery shells have.

Q. **So the United States had put these impediments in place long before '95?**

A. They've been accumulating a long time.

Q. Okay. So long before '95?
A. And continuing.
Q. Okay. And they were in place in the late '70s when you got laughed at?
A. Oh, yeah. I know the Army never makes mistakes, but once in a while they'll shoot a shell crossways too.
Q. What do you think is the oil and gas potential of the Group C lands?
A. I'd have to ask the experts. I think we have that documented here.
Q. Okay. But you own mineral rights on the Group C lands?
A. Yes, sir.
Q. And part of your business is developing mineral rights?
A. Developing or having them developed, yes, sir, try to.
Q. So what do you try to do when you try to develop those or exercise those mineral rights? What is it that you try to do?
A. Well, if somebody comes to us, we try to get the best lease we can on our terms. If we have seismic on the area we'll try to make a deal where they can look at our seismic and develop

# Exhibit J

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CENTRAL PINES LAND COMPANY, ET AL. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 98-314 L |
| versus | ) | |
| | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

PLAINTIFFS' RESPONSE TO
DEFENDANT'S SECOND SET OF INTERROGATORIES
AND
REQUEST FOR PRODUCTION OF DOCUMENTS

Central Pines Land Company, L.L.C., D, S & T, Inc., Drost & Brame, Inc., Linda Lew Lawton Drost, Evelyn Gay Lawton Duhon, Jack E. Lawton, Jr., Tower Minerals Company, L.L.C. and William B. Lawton Company, L.L.C. respectfully respond to defendants Second Set Of Interrogatories And Request For Production Of Documents as follows:

INTERROGATORIES

INTERROGATORY NO. 20:

Please state whether you have ever received any income from, or whether you are engaged in a business or other endeavor for profit on, or with respect to, the property which is the subject of this litigation, and state the income and expenses generated therefrom, and identify any documents which evidence such income and/or activities.

RESPONSE TO INTERROGATORY NO. 20:

No plaintiff is engaged in a business or other endeavor for profit on, or with respect to, the

property which is the subject of this litigation. However, plaintiffs have generated income from the property. In response to defendants previous Interrogatory No. 9, plaintiffs stated as follows: Plaintiffs have received the following income from Group C since 1978:

A. Central Pines Land Company, L.L.C.: Mineral lease bonus, approximately $843,867.50.

B. Tower Minerals Company, L.L.C.: Mineral lease bonus, approximately $843,867.50.

C. Linda Lew Lawton Drost: Mineral royalty income, $13,660.56.

D. Evelyn Gay Lawton Duhon: Mineral royalty income, $13,660.56.

E. Jack E. Lawton, Jr.: Mineral royalty income, $27,321.12.

F. D, S & T, Inc.: Mineral royalty income, $106,552.43.

G. Drost & Brame, Inc.: Mineral royalty income, $71,034.96.

Now, since William B. Lawton Company, L.L.C. and Jack E. Lawton, Sr. have been added as plaintiffs, the following information is provided:

H. William B. Lawton Company, L.L.C. has received no income from Group C since 1978.

I. Jack E. Lawton, Sr. received $179,627.30 in mineral royalty income from Group C since 1978.

None of the income received by any plaintiff is the subject of any expenses.

**INTERROGATORY NO. 21:**

With regard to (1) William B. Lawton Company, Inc. later known as William B. Lawton Company, L.L.C., please identify:

(a) The date and place of incorporation.

(b) Corporate address and principal place of business.

(c) All owners, controllers, directors, officers and shareholders, (i) on the date of incorporation, (ii) in 1978 (ii) and (iii) at all times between 1978 and the present.

(d) All types of business activity undertaken.

(e) All business or corporate subsidiaries and/or parent companies.

(f) The legal relationship, if any, between (i) Central Pines Land Company (ii) D, S & T, Inc., (iii) Drost & Brame, Inc., (iv) Tower Minerals Company and (v) William B. Lawton Company, L.L.C.

(g) All corporate ancestry and successorship.

(h) The reason(s) for reorganization as a limited liability corporation.

**<u>RESPONSE TO INTERROGATORY NO. 21</u>:**

(a) Incorporated on May 2, 1955 under the name Wm. T. Burton Industries, Inc.

On May 2, 1988, Wm. T. Burton Industries, Inc. changed its name to William B. Lawton Company, Inc.

On April 20, 2005, William B. Lawton Company, L.L.C. was formed and effective April 30, 2005, William B. Lawton Company, Inc. merged into William B. Lawton Company, L.L.C., with the limited liability company surviving the merger.

(b) Corporate Address: 641 W. Prien Lake Road
Lake Charles, LA 70601

Principal Place Of Business: 641 W. Prien Lake Road
Lake Charles, LA 70601

(c) Owners, Controllers, Directors, Officers and Shareholders on:

(i) On date of incorporation:

Owner: William T. Burton
Ethel Lewis Burton

| | |
|---|---|
| | Grady Roper<br>Jack Edward Lawton<br>William B. Lawton<br>A. Stanford Dudley |
| Officers: | William T. Burton, President<br>Grady Roper, Executive Vice President<br>Jack Edward Lawton, Vice President<br>William B. Lawton, Vice President<br>Ethel Lewis Burton, Vice President<br>A. Stanford Dudley, Secretary-Treasurer |
| Directors: | William T. Burton<br>Ethel Lewis Burton<br>Grady Roper<br>Jack Edward Lawton<br>William B. Lawton<br>A. Stanford Dudley |

(ii) From 1978 through July 1979:

| | |
|---|---|
| Owner: | Jack E. Lawton, Sr.<br>William B. Lawton |
| Officers: | Jack E. Lawton, Sr., President<br>William B. Lawton, Vice President<br>Leland M. Stevens, Secretary |
| Directors: | Jack E. Lawton, Sr.<br>William B. Lawton<br>Charles W. Carwile<br>Leland M. Stevens<br>Charles M. Drost |

(iii) From July 1979 through July 1980:

| | |
|---|---|
| Owner: | Jack E. Lawton, Sr.<br>William B. Lawton |
| Officers: | Jack E. Lawton, Sr., President<br>William B. Lawton, Vice President<br>Jack E. Lawton, Jr., Vice President<br>Charles W. Carwile, Executive Vice President |

Charles M. Drost, Vice President and Assistant Secretary - Treasurer
Leland M. Stevens, Secretary - Treasurer

Directors: Jack E. Lawton, Sr.
William B. Lawton
Charles W. Carwile
Leland M. Stevens
Charles M. Drost

(iii) From July 1980 through August 8, 1980:

Owner: Jack E. Lawton, Sr.
William B. Lawton

Officers: Jack E. Lawton, Sr., President
William B. Lawton, Vice President
Jack E. Lawton, Jr., Vice President
Charles W. Carwile, Executive Vice President
Charles M. Drost, Vice President and Assistant Secretary - Treasurer
Leland M. Stevens, Secretary - Treasurer

Directors: Jack E. Lawton, Sr.
William B. Lawton
Charles W. Carwile
Leland M. Stevens
Charles M. Drost
Jack E. Lawton, Jr.

(iv) From August 8, 1980 through April 29, 1988:

Owner: Jack E. Lawton, Sr.
William B. Lawton

Officers: Jack E. Lawton, Sr., President
William B. Lawton, Vice President
Jack E. Lawton, Jr., Vice President and Assistant Secretary
Charles W. Carwile, Executive Vice President
Charles M. Drost, Vice President and Secretary

Directors: Jack E. Lawton, Sr.

William B. Lawton
Charles W. Carwile
Charles M. Drost
Jack E. Lawton, Jr.

(v) As of April 29, 1988:

| | |
|---|---|
| Owner: | The Lawton Company (Partnership) |
| Officers: | Jack E. Lawton, President<br>Charles M. Drost, Secretary |
| Directors: | Jack E. Lawton, Sr.<br>William B. Lawton<br>Charles W. Carwile<br>Charles M. Drost<br>Jack E. Lawton, Jr. |

(vi) As of May 2, 1988 through August 1991:

| | |
|---|---|
| Owner: | William B. Lawton Company (Partnership) |
| Officers: | William B. Lawton, President<br>Charles M. Drost, Vice President and Secretary |
| Directors: | William B. Lawton<br>Charles M. Drost |

(vii) As of August 1, 1991 through 1995:

| | |
|---|---|
| Owner: | William B. Lawton Company (Partnership) |
| Officers: | William B. Lawton, President<br>Robert W. Enos, Secretary<br>Betty Cryar, Assistant Secretary |
| Director: | William B. Lawton |

(viii) As of January 1995 through July 11, 1996:

| | |
|---|---|
| Owner: | William B. Lawton Company (Partnership) |
| Officers: | William B. Lawton, President |

William T. Drost, Vice President
Mary Margaret Duhon, Secretary
Betty Cryar, Assistant Secretary

Director: William B. Lawton

(ix) As of July 11, 1996 through October 23, 1996:

Owner: William B. Lawton Company (Partnership)

Officers: William B. Lawton, President
Mary Margaret Duhon, Secretary
Betty Cryar, Assistant Secretary

Director: William B. Lawton

(x) As of October 23, 1996 through April 30, 2006:

Owner: William B. Lawton Company (Partnership)

Officers: William B. Lawton, President
William T. Drost, Vice President
Mary Margaret Duhon, Secretary
A. J. Gray, III, Assistant Secretary

Director: William B. Lawton

(ix) On April 30, 2005 and all times since then to the present:

Owner/Member: The William B. Lawton Company (Partnership)

Officers: William B. Lawton, President
William T. Drost, Vice President/Secretary

Managers: William B. Lawton
William T. Drost

(d) All types of business activity undertaken:

Since incorporation, the core business has been landownership and mineral development. In 1955, the company was engaged in the following: (1) operation of a shipyard which included the construction, maintenance and operation of tugboats,

dredges and barges; (2) dredging waterways and dredging for clam and reef shells which were used in construction and industrial applications; (3) farming for sugar cane, rice and soy beans; (4) cattle business; (5) operation of a sugar mill and rice dryer; (6) growing and harvesting of timber; (7) gravel mining, transportation and marketing; (8) drilling for and production of hydrocarbons; and (9) retail merchandising.

Over the years, subsequent to incorporation, the company has (1) been a one bank holding company for a national bank; (2) operated an aircraft charter business; (3) operated a ladies dress shop; and (4) operated a private restaurant. The company is no longer engaged in any of these businesses.

Currently, the company is focused on its core business and manages a portfolio of stocks and bonds.

(e) All business or corporate subsidiaries and/or parent companies:

Parent: William B. Lawton Company (Partnership)

Subsidiaries: Port Resources, L.L.C.
River Oaks Exploration, L.L.C.
Lawton Louisiana, L.L.C.
The City Club Of Lake Charles, L.L.C.
Mary-William & Company, L.L.C.
Rayville Resources, L.L.C.
Tower Energy Co., L.L.C.
Tower Land Company, L.L.C.
Tower Minerals Company, L.L.C.

(f) William B. Lawton Company, L.L.C. has no legal relationship to Central Pines Land Company, L.L.C., D, S & T, Inc. or Drost & Brame, Inc. Tower Minerals Company, L.L.C. is a subsidiary of William B. Lawton Company, L.L.C.

(g) Other than stated above, there is no corporate ancestry nor successorship.

(h) Limited liability companies are not subject to corporate franchise taxes in Louisiana.

**INTERROGATORY NO. 22:**

Please provide complete annual financial statements for each year from 1978 to the present for William B. Lawton Company, Inc. later known as William B. Lawton Company, L.L.C.

**RESPONSE TO INTERROGATORY NO. 22:**

William B. Lawton Company, L.L.C. objects to providing its annual financial statements for each year from 1978 until the present. Ownership of the minerals involved in this matter has generated no income to the company.

**INTERROGATORY NO. 23:**

Please identify the date upon which, the manner in which, and the terms under which William B. Lawton Company, Inc., later known as William B. Lawton Company, L.L.C. acquired its interests in the Group C Lands, and identify any documents which evidence these transactions.

**RESPONSE TO INTERROGATORY NO. 23:**

Deed (also called Act of Sale) dated May 2, 1955 from Wm. T. Burton to Wm. T. Burton Industries, Inc. and recorded in Conveyance Book 229, Page 61 of the records of Vernon Parish, Louisiana;

Amendment (to the May 2, 1955 transfer from Wm. T. Burton to Wm. T. Burton Industries, Inc.) dated June 19, 1961 by and between William T. Burton and Wm. T. Burton Industries, Inc. and recorded in Conveyance Book 290, Page 161 of the records of Vernon Parish, Louisiana;

Supplement to Prior Act of Sale dated July 7, 1973 by and between Wm. T. Burton and Wm. T. Burton Industries, Inc. and recorded in Conveyance Book 441, Page 150 of the records of Vernon Parish, Louisiana;

Each of the above documents are included within the previously supplied package of title documents. As previously stated, Wm. T. Burton Industries, Inc. changed its name to William B. Lawton Company, Inc., through which all other parties to this litigation received their interests in the property. See answer to previous Interrogatory No. 7.

**INTERROGATORY NO. 24:**

Please identify in detail all information which was available to William B. Lawton Company,

Inc., later known as William B. Lawton Company, L.L.C., prior to their acquisition of their interests in the Group C Lands, with regard to the ability to access those lands and any restrictions on access. Please identify any documents relevant to these matters, and indicate whether those documents were relied upon by Plaintiffs prior to their acquisition to the Group C Lands.

**RESPONSE TO INTERROGATORY NO. 24:**

All public records were "available" to William B. Lawton Company, L.L.C. at the time of its acquisition of the property from William T. Burton in 1955. At that time the property was the subject to a court imposed moratorium on access. Plaintiffs have previously identified documents relating to the moratorium and the actions of William T. Burton Industries, Inc., as the company was formerly known, to access the property. Since the activities occurred prior to 1992, William B. Lawton Company, L.L.C. does not consider such information relevant at this time. William B. Lawton Company, L.L.C. relies on the law of Louisiana to provide access to the property.

**INTERROGATORY NO. 25:**

Please identify any and all mineral leases granted by you subsequent to 1978 relating to all or any portion of Group C land. For each lease please include the date, the term of the lease, parties to the lease, legal description, acreage and financial considerations.

**RESPONSE TO INTERROGATORY NO 25:**

Oil, Gas & Hydrocarbon Lease (dated effective September 15, 1996) from Central Pines Land Company and Tower Minerals Company, Inc., as Lessor, to Chesapeake Operating, Inc., as Lessee (copy enclosed):

| | |
|---|---|
| Group C Acres covered: | approximately 4,800 acres; see lease and map for description |
| Primary Term: | 3 years |
| Bonus: | $1,687,735.00 ($350.00 per acre) |

| | |
|---|---|
| Annual Rentals: | $1,687,735.00 ($350.00 per acre) |
| Royalty: | 27.5% of 8/8ths (this lease also provides that12.5% of 8/8ths royalty out of said 27.5% of 8/8ths royalty may be withheld or deposited in the registry of the court pending final judgment or settlement of the dispute) |

Hydrocarbon Lease (dated effective July 1, 1996) from Central Pines Land Company, and Tower Minerals Company, Inc., as Lessor, to Sonat Exploration Company, as Lessee (copy enclosed):

| | |
|---|---|
| Group C Acres covered: | approximately 80 acres |
| Primary Term: | 3 years |
| Bonus: | $100.00 per acre + an additional lease bonus of $50.00 per acre upon settlement of the dispute (or final judgment) + a 2.5% overriding royalty on acreage unrelated to the leased premises |
| Annual Rentals: | $75.00 per acre + an additional lease rental of $75.00 per acre payable upon settlement of the dispute (or final judgment) |
| Royalty: | 25% of 8/8ths (this lease also provides that12.5% of 8/8ths royalty out of said 27.5% of 8/8ths royalty may be withheld or deposited in the registry of the court pending final judgment or settlement of the dispute) |

**SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 18:**

Adding the following:

37. Davis E. Richards
    Manager Of Drilling & Completion
    El Paso Corporation
    1001 Louisiana Street
    Houston, TX 77002
    (713) 420-2600

    Mr. Richards, is believed to have knowledge of why Sonat Exploration Company did not drill wells on Group C.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1:** Please produce for inspection and copying each and every document which supports your response to Interrogatory No. 20.

**RESPONSE TO REQUEST NO. 1:**

The income received by Central Pines Land Company and Tower Minerals Company, L.L.C. relates to the following mineral leases, copies of which are produced with this response:

Oil, Gas & Hydrocarbon Lease (dated effective September 15, 1996) from Central Pines Land Company and Tower Minerals Company, Inc., as Lessor, to Chesapeake Operating, Inc., as Lessee, and Hydrocarbon Lease (dated effective July 1, 1996) from Central Pines Land Company, and Tower Minerals Company, Inc., as Lessor, to Sonat Exploration Company, as Lessee.

The mineral royalty income received by Jack E. Lawton, Linda Lew Lawton Drost, Evelyn Gay Lawton Duhon, Jack E. Lawton, Jr., D, S &T, Inc and Drost & Brame, Inc. relates to wells for which interpleader actions are pending in the United States District Court for the Western District of Louisiana, to which defendant is a party. Such information is equally available to defendant in the United States District Court for the Western District of Louisiana as is available to plaintiffs.

**REQUEST NO. 2:** Please produce for inspection and copying each and every document which supports your response to Interrogatory No. 21.

**RESPONSE TO REQUEST NO. 2:**

Please see the following documents copies of which are produced with this response:

**REQUEST NO. 3:** Please produce for inspection and copying each and every document which supports your response to Interrogatory No. 22.

**RESPONSE TO REQUEST NO. 3:**

None.

**REQUEST NO. 4:** Please produce for inspection and copying each and every document which supports your response to Interrogatory No. 24.

**RESPONSE TO REQUEST NO 4:**

All such documents have been previously provided to the defendant.

**REQUEST NO. 5:** Please produce for inspection and copying each and every document which supports your response to Interrogatory No. 25.

**RESPONSE TO REQUEST NO. 5:**

Please see the mineral leases produced in response to number 1 above.

**REQUEST NO. 6:** Please produce for inspection and copying each and every document which supports your response to Interrogatory Nos. 26 and 27.

**RESPONSE TO REQUEST NO. 6:**

No such interrogatories were propounded.

**SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Please see the attached exhibits listed as follows:

1. Memorandum For Distribution dated March 22, 1993 by Major General John F. Sobke, Assistant Chief of Engineers (distribution to all Fort commanders) Re: Oil And Gas Leasing Stipulations; more control for army; stipulations to fully support installation commanders.

2. Letter dated August 17, 1995 to BLM from Sonat Exploration transmitting application to Drill Scobee 34 and U.S.A. 35.

3. Letter dated April 11, 1996 to Herb Carter, Fort Polk from Gary Collipp showing proposed well locations – including proposed location of U.S.A. 19-1.

4. Memo concerning offers to lease: handwritten note says turn down; too many potential mission interruption possibilities.

5. Letter dated June 6, 1997 from James L. Burton to John Duhon of the Bureau of Land Management in Jackson, Mississippi with attached Bureau of Land Management Application for Permit to Drill or Deepen by Sonat Exploration Co. U.S.A. 21 No. 1.

Respectfully submitted,
**THE GRAY LAW FIRM (APLC)**

BY: ______________________

**A. J. GRAY, III** (La. Bar #6253)
P. O. Box 1467
Lake Charles, LA 70602-1467
Telephone: (337) 494-0694
Facsimile: (337) 494-0697

Of Counsel:

Thomas C. McKowen, IV
STRAIN, DENNIS & BATES, L.L.P.
318 St. Charles Street
Baton Rouge, LA 70802
Telephone: (225) 343-0100
Facsimile: (225) 343-0344

**CERTIFICATE OF SERVICE**

I hereby certify that copies of the foregoing SUPPLEMENTAL RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS was served on the following counsel of record by first class mail, postage prepaid:

Alex Kriegsman
United States Department Of Justice
Environmental And Natural Resources Division
Natural Resources Section
601 D Street, N.W., Room 3814
Washington, D.C. 20004

Dennis Daugherty
Attorney
Department of the Interior
Office of the Solicitor
Division of Mineral Resources
Branch of Onshore Minerals
1849 C St., N.W. Rm 6312
Washington, D.C. 20240

LTC Michael D. Graham
Litigation Attorney
U.S. Army Environmental Law Division
901 N. Stuart Street, Suite 400
Arlington, VA 22203-1837

THUS DONE AND SIGNED on this 5th day of May, 2006.

**A. J. GRAY, III**

THE GRAY LAW FIRM
A PROFESSIONAL LAW CORPORATION
HIBERNIA TOWER
ONE LAKESHORE DRIVE, SUITE 1700
POST OFFICE BOX 1467
LAKE CHARLES, LOUISIANA 70602-1467
graylaw@graylawfirm.com

FACSIMILE
(337) 494-0697

TELEPHONE
(337) 494-0694

May 5, 2006

Certified Mail
Return Receipt Requested

Mr. Alex Kriegsman
Trial Attorney
U.S. Department Of Justice
Environment And Natural Resources Division
Natural Resources Section
601 D Street, N.W., Room 3814
Washington, D.C. 20530

Re: Central Pines Land Company, et al
v. No. 98-314L
The United States
Our File No. L0474-19

Dear Alex:

Enclosed on behalf of Plaintiffs is Plaintiffs' Response To Defendant's Second Set Of Interrogatories And Request For Production Of Documents.

Should you have any questions, please do not hesitate to contact me.

Yours very truly,

A. J. GRAY, III

AJGIII/ch
Enclosures
cc: William T. Drost (w/enc.)
Jack E. Lawton, Jr. (w/enc.)
Thomas C. McKowen, IV (w/enc.)
Dennis Daugherty (w/enc.)
LTC Michael D. Graham (w/enc.)

# Exhibit K

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CENTRAL PINES LAND COMPANY, ET AL ) | |
| Plaintiffs ) | |
| vs. ) | No. 98-314 L |
| THE UNITED STATES OF AMERICA, ) | Hon. Edward J. Damich |
| Defendant ) | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF

STEVEN LAWERENCE HOCHSTEIN

JULY 19, 2006

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF STEVEN LAWRENCE HOCHSTEIN, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 19th day of July, 2006, from 9:12 a.m. to 10:13 a.m., before Linda S. Partida, CSR, in and for the State of Texas, reported by computerized stenotype machine at the offices of the United States Attorney, 910 Travis Street, 15th Floor, Houston, Texas, pursuant to the Federal Rules of Civil Procedure (and the provisions stated on the record or attached therein.)

NMA ORIGINAL

A P P E A R A N C E S

FOR THE PLAINTIFFS

Mr. A.J. Gray, III
The Gray Law Firm, P.L.C.
One Lakeshore Drive
1700 Hibernia Tower
Lake Charles, Louisiana 70602-1467
Telephone: 337-494-0694 - Fax: 337-494-0697

FOR THE DEFENDANT

Mr. Alex Kriegsman
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
Post Office Box 663
Washington, D.C. 20044-0663
Telephone: 202-305-3022 - Fax: 202-305-0506

ALSO PRESENT:

Delia Jaquette

* * * * *

this area?

A. Yeah. I -- I -- I -- honestly, I -- I can't remember which acreage was where.

Q. Okay.

A. I mean, I know there was Exxon fee and Lawton fee. I remember the names. There was, of course, the U.S.A. lands.

Q. Okay.

And do you remember meetings that -- that you had with the Army, that Sonat had with the Army?

A. Yes, I do.

Q. Okay. And what was the purpose of those meetings?

A. Well, the -- the -- the military obviously had control of the surface, as well as the Forestry Service. And I remember two specific meetings that -- that I attended, formal meetings. The first was an introductory meeting where our intent was to go in and -- and explain to the -- the BLM, the -- or the Forestry Service and the -- and the military what our intentions were, what the -- what the -- what the geology looked like, why we were going in there, what a typical operation was, what kind of resources we thought we would need, and just basically to educate

them, say, you know, "Here we are," you know, put a face with the name, "Geologically, this is why we're in here. This is how we -- you know, if we had a free drop, this is how we would develop it. We understand this is a negative impact for you. You know, we're here to work together."

*Q.* Uh-huh.

*A.* You know, just to kind of -- to give them a feel for what we were doing and -- and why we were there.

*Q.* And do you remember approximately the date of that meeting or the year?

*A.* No, I -- I do not.

*Q.* Okay. Well, it's been quite some time. So...

*A.* It's -- yeah.

*Q.* And how did that first meeting go?

*A.* Ultimately, it was a good meeting. It started off kind of rough. There was a lot of sabre rattling and -- and kind of a pissing contest at the beginning, if you will. Pardon my slang.

The -- but ultimately, when we explained and -- what we were doing and why, it settled down to a -- to a civil and -- you know, conversation to try to come to a -- a mutual

understanding. And then we set a second meeting date.

Q. Okay. And, so, Sonat considered that first meeting to be successful?

A. Yes.

Q. It accomplished your goals?

A. Uh-huh.

Q. And what happened at the second meeting?

A. The second meeting, I don't remember nearly as well. I was more on the sidelines as opposed to an active participant.

The second meeting was more operational, you know, and logistics and how are we going to -- you know, what -- how are we going to move forward, you know; we want to drill a well; you know, we have to, you know, permit it, get the BLM involved. It was more a logistical meeting.

My purpose there was just to kind of make the introduction. And, you know, my land guys and -- and permit people and all that were there; and they kind of worked through. It was more a working meeting of how are we physically going to do the process.

Q. Uh-huh.

And, so, ultimately, would -- would

you say that the military was accommodating?

A. Yes.

Q. And did you end up drilling wells on the fort?

A. You know, I -- I'm -- I'm remembering that we did drill wells on the fort.

Q. Okay.

A. I know we drilled a lot of wells in the Kisatchie National Forest. I know we did a lot of red-cockaded woodpecker surveys, a tremendous amount of those. You know, I remember driving through -- driving to a well location and having to pull over as a group of tanks and Bradley fighting vehicles went down the road.

And, so, you know, I -- I don't remember where the exact surface locations were, whether they were on the -- but my recollection and my memory is is that we drilled several wells on the -- on the fort.

Q. Okay.

And how did this Austin Chalk trend eventually play out for -- for Sonat?

A. It was very good. We -- we made a lot of production from here. We had -- as I mentioned, these were -- some of these wells were -- were world

class oil and gas wells. Some weren't. It's -- it's a statistical-type play. It's a fractured reservoir. It's -- you know. So, you -- it's -- it's not exactly predictable as to what your well outcome will be.

I know we originally thought that we would drill these wells closer together than what we ended up drilling them, because it appeared that the wells were draining a significantly larger area than what we had originally -- originally thought. So, there weren't as many wells as we thought we were going to drill early on just from a spacing standpoint.

Q. And event -- but, eventually, you said that Sonat made a decision to move on?

A. Uh-huh.

Q. Saying that was, I believe you said, because of -- of safety and environmental issues in the area. You had a couple of blowouts; is that right?

A. That was a big part of it, yeah.

Q. Uh-huh.

A. And -- and, also -- and -- and, also, the other -- the other part -- and -- and -- and I mentioned at the time -- the Austin Chalk is a -- the

nature of the development of -- of this kind of play is very capital intensive; but you get your -- you get your reserves out real quick. You get your -- you get your money back real fast. And then you have to pour the money right back in to get another well drilled, because the production's declining very fast. And, so, it's a -- the -- the -- the buzz word used is it's a treadmill.

And there's good things and bad things about a treadmill. It's just -- you know, and when the new management came in, you know, they didn't like the treadmill aspect of it. They liked the -- they liked the income stream coming off -- coming off of it, but they didn't like the capital intensity of it.

And, so, that and combined with the safety issues were kind of the -- the two overriding factors on why -- why they decided to -- to divest of the chalk assets.

Q. So, it's fair to say the decision to divest was a business and safety based decision?

A. Yes.

Q. That's okay.

It wasn't because of anything that happened with the Army?

A. No. This was a -- a business decision over the entire scope of the play, not just this asset here.

Q. Okay. It wasn't because of any problems you had with the Forest Service or -- or beyond?

A. No.

Q. Okay.

You mentioned that you -- you drilled the best stuff first. Could you tell me where -- where that is -- where the best stuff is in relation to the fort?

A. Well, you don't have any geology on your map; so -- so, it's going to be quite difficult. Do you have -- do you have some geology on there?

Q. I've got some other maps in this report. Let me open another one. Maybe that will...

A. You know, I'm -- I'm going to point to the best; and then those wells aren't necessarily going to be the best. So, when I say "the best," it's at -- it's, at the time that when you're deciding where to drill, you think that's the best.

There's a -- there's a --

*MS. JAQUETTE:* Have these got the wells on the Austin Chalk drilled?

A. Well, let me just explain conceptually; and

# Exhibit L

UNITED STATES COURT OF FEDERAL CLAIMS

CENTRAL PINES LAND COMPANY, ET AL., )
)
Plaintiffs, )
)
vs. ) NO. 98-314 L
)
)
THE UNITED STATES, )
)
Defendant. )

DEPOSITION OF GEORGE P. DENNY
TAKEN ON BEHALF OF THE DEFENDANT
IN OKLAHOMA CITY, OKLAHOMA
ON JULY 18, 2006

REPORTED BY: ELIZABETH CAUDILL, CSR, RMR, CRR

APPEARANCES

For the Plaintiffs: A.J. Gray, III
Attorney at Law
Capital One Tower
One Lakeshore Drive
Lake Charles, Louisiana 70602

For the Defendant: Alex Kriegsman
Attorney at Law
U.S. Department of Justice
Natural Resources Section
601 D Street, NW
Third Floor, Room 3814
Washington, D.C. 20044

For the Witness: Fred R. Gipson
Attorney at Law
6100 North Western
Oklahoma City, Oklahoma 73118

Also Present: William T. Drost
Delia K. Jaquette
Matt Toppins



CONTENTS


| | Page | Line |
|---|---|---|
| Direct Examination by Mr. Kriegsman | 5 | 6 |
| Cross-Examination by Mr. Gray | 32 | 23 |
| Redirect Examination by Mr. Kriegsman | 57 | 2 |
| Jurat Page | 65 | |
| Witness Signature Page | 66 | |
| Reporter's Certificate | 67 | |


DEFENDANT'S INDEX OF EXHIBITS


| | Page | Line |
|---|---|---|
| Exhibit 1 | 7 | 1 |
| Exhibit 2 | 34 | 24 |
| Exhibit 3 | 36 | 18 |
| Exhibit 4 | 37 | 13 |
| Exhibit 5 | 39 | 13 |
| Exhibit 6 | 45 | 25 |
| Exhibit 7 | 51 | 23 |


* * * * * *



STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and among the attorneys for the respective parties hereto that the deposition of GEORGE P. DENNY may be taken on behalf of the DEFENDANT on JULY 18, 2006 in Oklahoma City, Oklahoma, by Elizabeth Caudill, Certified Shorthand Reporter within and for the State of Oklahoma, pursuant to Subpoena and Notice.

IT IS FURTHER STIPULATED AND AGREED by and among the attorneys for the respective parties hereto that all objections, except as to the form of the question, are reserved until the time of trial, at which time they may be made with the same force and effect as if made at the time of the taking of this deposition.

* * * * * *



* * * * * *

GEORGE P. DENNY,

having been first duly sworn at 8:57 a.m., deposes and says in reply to the questions propounded as follows, to wit:

DIRECT EXAMINATION

BY MR. KRIEGSMAN:

Q Okay. Good morning.
A Good morning.
Q My name's Alex Kriesgman. I'm a trial attorney with the Department of Justice. And this is Delia Jaquette with the United States Forest Service, and we represent the United States in this matter.
Could you please state and spell your name for the record.
A George P. Denny, G-E-O-R-G-E P. D-E-N-N-Y.
Q Thanks. And you understand that you are under oath?
A I am.
Q And you are here to testify in the civil action brought by the Central Pines Land Company and others against the United States?
A Yes.

Oklahoma, the Mid-Continent region. That was in about '98, approximately. And did that for a short period of time.
And then Chesapeake created a group called business development, and I was transferred into that group. And I am now manager of business development.
Q What are your current duties?
A I oversee the day-to-day operations of business development. We've got 11 negotiators who try and secure assets through farmouts, oil and gas leases, and enhance Chesapeake's interests in positions in the Mid-Continent and Gulf Coast Texas.
Q So what is business development?
A I just explained that.
Q I think I understand what you were doing, but if you could give me a more global description of business development.
A Business development is a group of negotiators who try and solicit farmouts, term assignments, assignments of oil and gas leases from third parties to either increase Chesapeake's interests or to secure an interest in units where we want to drill wells.



Q And where are those operations? All over this area in the southwest?
A Operations -- you mean where do my guys work?
Q Or where are you trying to secure leases?
A Mostly in the Mid-Continent region, which is Oklahoma, Kansas.
Q Texas?
A South Texas. Yeah, Texas, Arkansas.
Q Louisiana?
A Very, very little.
Q Are you familiar with the current litigation that we're here for today?
A Vaguely.
Q What do you know about it?
A I know that Central Pines, et al., is suing the United States over inability to use and enjoy its minerals in certain portions of Louisiana.
Q And you're familiar with Fort Polk?
A I am.
Q Are you familiar with what we call the Group C lands?
A No.



Q If I showed you a map, would that refresh your memory of the area?
A Possibly.
MR. GIPSON: Where's that big map of yours?
MR. KRIEGSMAN: You know, I didn't drag that one this time.
MR. GIPSON: Well, see, we actually have a magnetic wall here. We could have put it up on the wall.
MR. KRIEGSMAN: You have better resources than us.
Q (By Mr. Kriegsman) This is the November 28th, 2005, report of Mike McKenzie, Exhibit 8. This is a map of the area. So Fort Polk is identified on the map, and these areas shaded in brown are what we would call the Group C mineral servitudes.
A Okay. I'm supposed to be able to read this?
Q You know, you don't need to read all the little details there. I just wanted to give you an overview of the area.
I'm not asking you to read it now, either. I just wanted to have it out.



You've been identified by the plaintiffs in this case as a person with knowledge regarding efforts by Chesapeake to access Fort Polk for drilling.
Is that an accurate description?
A Yes.
Q Can you describe that knowledge?
A Well, I mean, we were in discussions with -- I'll just use the term the Lawtons to secure oil and gas leases, and we had a concern of being able to access the surface for drilling operations because it lied within the confines of the fort.
Q And so had you purchased leases from the Lawtons at that point?
A Outside of this area, yes.
Q But not in this area?
A Not within the fort.
Q And you were considering purchasing leases in this area but you had a concern regarding access; is that correct?
A I'm pretty sure we made offers subject to us getting protection leases.
Q And did you get those protection leases?

Page 18

A I don't recall.
Q You mentioned you had concern regarding access to the surface. Can you elaborate on what you mean by that? What is it you were concerned about?
A The fort or the government or the Army not letting us on the surface for our operations.
Q And did you pursue that? Did you contact the Army or anyone from the government regarding accessing the surface?
A Did I or did Chesapeake?
Q I'd like to know the answer to both.
A I didn't.
Q Okay. Did Chesapeake?
A I'm sure we did.
Q When?
A I don't recall exact dates.
Q Do you know who contacted the Army or the government from Chesapeake?
A No.
Q But you didn't?
A No.
Q And do you know how that issue was resolved?
A What issue?

Page 19

Q The issue that you had a concern regarding access to the surface.
A I don't think it was ever resolved.
Q Did Chesapeake attempt to get access?
A Sure we did.
Q And what was the result?
A We didn't get access.
Q Someone told you you couldn't have access?
A I don't know if -- I don't know what we were told, but I know we didn't drill any wells on the fort.
Q Did you not drill any wells because you were told by the Army or the forest that you couldn't have access or you didn't drill wells because of unrelated business decisions?
A It's my understanding that we didn't drill any wells because we didn't have access.
Q What's the basis of that understanding?
A My basis or --
Q You just said it's your understanding that you didn't drill wells because you didn't have access, and I'm trying to figure out what's the basis of that understanding.
A There was a meeting at Fort Polk, and

Page 20

there was some discussion regarding our operations, how it would impact the day-to-day operations of the fort.
And no real decisions that I was aware of was made at that meeting, but nothing ever happened after that meeting.
Q When was that meeting?
A I don't recall the exact date.
Q Were you there?
A I was.
Q Who else was there?
A Oh, there was a room full of people.
Q Who in that room do you remember?
A From Chesapeake or just in general?
Q Yeah, anyone you remember I'd like to know.
A I think Mr. Dixon was there, Jan Horton, I think Mr. Gray was there. I'm not -- I don't -- it's been a long time.
Q And what was the purpose of that meeting?
A To discuss the possibility of drilling wells on Fort Polk.
Q And who requested the meeting?
A I don't know.

Page 21

Q Do you know if that meeting represented a formal request by Chesapeake to gain access or was that an informational, informal meeting for Chesapeake to find out?
A I don't know.
Q And so what happened at that meeting?
A It was just a general discussion. Mostly the Army personnel asking questions of our operations guys. Just general discussion about, you know, how long does it take to drill these wells and are the operations 24/7, that sort of thing.
Q Do you remember anyone from Chesapeake asking questions of the Army?
A Not specifically.
Q Do you remember anyone from Chesapeake asking the Army if Chesapeake could have access to the surface?
A Not specifically.
Q You said no real decisions were made after that meeting.
A That I'm aware of.
Q Okay. Why was Chesapeake interested in this area in the first place?
A We were interested in drilling wells.

# Exhibit M

Taken on: **May 23, 2006**

Deposition of: **Mel Fife**

Deposition of:

# Mel Fife

In the case of:

## Central Pines Land Co., et al
## vs.
## The United States of America

Taken on:

**May 23, 2006**

*KAUFMAN, HOFFMAN, TAYLOR,*
*WYATT & D'ARCOURT*
*Phone: 800-503-2274*
*Fax: 337-234-0715*
http://www.kaufmanandassociates.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CENTRAL PINES LAND COMPANY, ET AL. *
*
VS. * NO. 98-314 L
*
THE UNITED STATES OF AMERICA *

* * * * * * * * * * * * * * * * * * * * * * * * * * 

The oral deposition of MEL FIFE was taken in the above-entitled cause on behalf of Defendant pursuant to the following stipulations before Deidre D. Juranka, Certified Court Reporter in and for the State of Louisiana, at the offices of The Gray Law Firm, Hibernia Tower, One Lakeshore Drive, Suite 1700, Lake Charles, Louisiana, on May 23, 2006, beginning at 3:30 p.m.

A P P E A R A N C E S

FOR PLAINTIFFS, CENTRAL PINES LAND COMPANY, ET AL.:

A.J. GRAY, III
THE GRAY LAW FIRM
Hibernia Tower, Suite 1700
One Lakeshore Drive
Lake Charles, Louisiana 70602

FOR DEFENDANT, THE UNITED STATES OF AMERICA:

ALEX KRIEGSMAN
UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
Natural Resources Section
601 D Street, NW, 3rd Floor, Room 3814
Washington, D.C. 20004

ALSO PRESENT:

DELIA JAQUETTE

REPORTED BY:

DEIDRE D. JURANKA, RPR
Certified Stenotype Reporter

science behind those wells.

Well, maybe we can do this if we can find a little piece of land over here for sale --

Q. **And you're pointing to something off of Group C?**

A. -- yeah, but we got to have it right next to it. If we can get a drill site over here then we can drill underneath and accomplish our mission. There was a problem, though. Chesapeake had all these leases and they weren't going to give us a subsurface easement to go through their mineral rights, but we still thought we might be able to get away with it. We thought we might be able to do it.

Q. **So these lands that you're pointing to which are adjacent to the blue Group C --**

A. Yeah, all of these along here.

Q. **Those are owned by the Lawtons but already leased to Chesapeake?**

A. I'm not sure. I don't remember exactly who owned them, but I had --

MR. GRAY: That is substantially the case. I'm not telling you where the property line is but, basically, the property to the east of Group C is Lawton fee land that was leased to Chesapeake.

over here. So as far as what happened in the western part of Louisiana, I really didn't follow.

**Q. Sure.**

A. I know this, that I had a map of the central part of Louisiana on the wall behind my credenza and there was -- we called it the blue line. There was a line that followed an old seashore, an old coastline, ancient coastline. And they drew it right across kind of the middle of the state and it ended up in Lake Pontchartrain.

And my buy area was anything within 15 miles south of that line, and the brokers would call in the morning -- I actually ended up with two different brokerage companies over here working for me. And they called in the morning about 7:00 o'clock and they'd have a list of landowners and a section and a township and a range, so and so in this section, township and range wants this. No. So and so in this section wants this. Yes.

And I would just look at my line and, you know, are you within -- are you in there or are you not? Yeah, you are. We'll buy it.

**Q. Just going back for a moment to that meeting with**

**the Army. You said there was no written communications?**

A. I don't think so. I don't recall ever -- I know I don't recall ever writing anything and sending it to them and I don't recall ever receiving anything from them.

**Q. And, as we discussed, when you met with the Army you didn't -- you had not purchased the lease at that time?**

A. Right.

**Q. You were considering purchasing the lease?**

A. Yeah. And they were -- you know, the Lawtons were aware that we weren't just going to do it, that we were going to be reasonably intelligent about it and go make sure that we could get access before we paid them whatever it was, 4 or $5 million.

**Q. So would you say that because you didn't have the lease yet that meeting with the Army was more of an informal meeting?**

A. Yeah. It was for us to find out what we could and what we couldn't do.

**Q. It was an informal meeting?**

A. Yeah.

MR. KRIEGSMAN: I think we're just

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CENTRAL PINES LAND COMPANY, ET AL | ) | |
| Plaintiffs | ) | |
| vs. | ) | No. 98-314 L |
| THE UNITED STATES OF AMERICA | ) | Hon. Edward J. Damich |
| Defendant | ) | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF

# BRYAN THOMAS SIMMONS

JULY 19, 2006

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF BRYAN THOMAS SIMMONS, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 19th day of July, 2006, from 11:10 a.m. to 11:38 a.m., before Linda S. Partida, CSR, in and for the State of Texas, reported by computerized stenotype machine at the offices of the United States Attorney, 910 Travis Street, 15th Floor, Houston, Texas, pursuant to the Federal Rules of Civil Procedure (and the provisions stated on the record or attached therein.)

NMA ORIGINAL

Louisiana over near Bunkie even. So, we went to a federal lease sale and picked up some federal acreage associated with Fort Polk back while we were still in Shreveport in the eighties.

So, what I'm getting at is that was how we originally started looking at -- at the Austin Chalk potential in the Fort Polk area.

But the -- you know, it took a few years to get over down to what we called Masters Creek, where the Lawton family properties are --

*Q.* Uh-huh.

*A.* -- as I recall.

So, about the -- to getting to my visit to the Fort -- to Fort Polk, I think my first visit -- may have been my only visit -- to Fort Polk in -- in any official manner to meet with the military there was when we were -- I was still business unit manager. And I think it was our first meeting, official meeting, with them to basically gain permission, go -- try to do -- have a coexisting relationship to where we could work together and develop properties on the -- on the -- on the base.

*Q.* Uh-huh.

*A.* We -- we -- I forget who all was there. Probably, I think, Steve Hochstein may have been

there, David Hamilton; but, you know, I don't -- I -- I'm just -- since they were part of the business unit, I'm imagining they were there. But there was a group of four or five of us that went there and met with the -- the base.

And they, I think -- gosh, I don't know. Is there a general there or something? I -- I don't recall who all was in that first meeting; but they was well represented, probably eight or nine military personnel there in a big conference room. There may have been Forest Service people there or not. I just don't recall. There prob -- there -- there may have been. I don't recall.

*Q.* Uh-huh.

*A.* But, you know, we were there to illustrate to them that we -- we were a -- an upstanding company with a great health, safety, and environmental record and a strong program. We had experience as a company by working with Fort Smith, Arkansas, where we had already operated wells there on the fort and actually had them where they were -- we -- we had buried bunkers there with doors. The wells were -- were -- were below ground, basically; and you could drive a -- a Bradley fighting vehicle over them.

*Q.* Uh-huh.

*A.* I mean, there was -- so, we -- you know, we were making a pitch that we'd like to coexist with you on -- on the base.

And, you know, we were greeted with some, I guess -- they talked to us and really wanted to understand. But there was nothing during that meeting that -- we came away thinking pretty positively about our ability to work together to try to do this. Not everywhere on the base and disrupt anything, but there would be ways that we could develop the federal lands there.

So, that was my first and may have been my only time ever on the base.

*Q.* Uh-huh.

*A.* Not too long after we began to drill wells down in what we'll call the Masters Creek Field, I think I moved out of that position into the Western Shelf. Exactly the timing, I don't recall; but it was -- it was early on after maybe drilling the first couple of wells.

*Q.* Uh-huh.

And, so, what was your title at the time that you --

*A.* Business unit manager.

*Q.* When you went to the fort?

*A.* That's correct, to the best of my recollection.

*Q.* Okay.

*THE REPORTER:* I need to ask you to let him finish his question before you answer.

*THE WITNESS:* Okay.

*Q.* *(BY MR. KRIEGSMAN)* What was your title at that time?

*A.* Business unit manager.

*Q.* And you -- you met with the military at Fort Polk in order to gain permission to drill wells?

*A.* Well, I don't know that we viewed it as gain permission. I think what we wanted to do was go in and -- and discuss with them on how we could coexist and work together --

*Q.* Uh-huh.

*A.* -- to where we could develop. You know, I don't think we were looking, necessarily, for permission, because --

*Q.* Oh.

*A.* -- we did have the mineral rights. And it was -- you know, as -- as I recall, it's not just the fort. It's also the Forest Service. And, you know, there's a -- it's like a three-legged stool almost.

*Q.* Uh-huh.

Q. So, is it correct to infer that although there was issues in certain areas, such as the artillery range, that you could work around that and still be able to drill the wells that you wanted to drill?

A. Yes, sir.

Q. Okay.

And -- and is that due, in part, to the fact that, this being the Austin Chalk, you're drilling horizontal wells?

A. That's correct.

Q. Okay.

And just to reiterate, to your knowledge, you don't remember any problems from the Army that would have prevented you from drilling or purchasing leases?

A. Not to my knowledge.

Q. Okay.

*MR. KRIEGSMAN:* Okay. No further questions.

*THE WITNESS:* Thank you.

*(Proceedings concluded at 11:38 a.m.)*