IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **CENTRAL PINES LAND COMPANY, ET AL.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 98-314 L** |
| **versus** | ) | |
| | ) | **Chief Judge Edward J. Damich** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

# PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant of Rule 56(h)(2) of the United States Court of Federal Claims, Central Pines Land Company, L.L.C., Jack E. Lawton, Sr., Jack E. Lawton, Jr., Tower Minerals Company, L.L.C., William B. Lawton Company, L.L.C., Linda Lew Lawton Drost, Evelyn Gay Lawton Duhon, D, S & T, Inc. and Drost & Brame, Inc., (collectively "Plaintiffs") respectfully submit the following Opposition To Defendant's Motion For Summary Judgment in these proceedings.

In addition to this Opposition, Plaintiffs' filing includes the following: (i) Plaintiffs' Response To Defendant's Proposed Findings Of Uncontroverted Fact In Support Of Defendant's Motion For Summary Judgment; (ii) Plaintiffs' Proposed Findings Of Uncontroverted Fact In Opposition To Defendant's Motion For Summary Judgment; and (iii) an appendix volume of supporting exhibits, including deposition excerpts.

## (A) TABLE OF CONTENTS

(A) Table of Contents . . . . . ii

(B) Table of Authorities . . . . . iii

(C) Statement of Questions Involved . . . . . 1

(D) Statement of the Case . . . . . 7

Introduction and Procedural Background . . . . . 7

Facts Established in Discovery . . . . . 9

(E) Argument . . . . . 20

Introduction . . . . . 20

No "Seminal Event" . . . . . 22

Plaintiffs' "De facto Moratorium" Allegations Not Barred . . . . . 23

Plaintiffs' Lack Of Knowledge Tolled Statute Of Limitations . . . . . 24

A Series of Separate Takings . . . . . 26

United States Asserts Title To And Leases Group C . . . . . 28

Protective Lease Requirements Constitutes A Taking . . . . . 31

Plaintiffs' Lost Leasing Opportunities . . . . . 33

Chesapeake . . . . . 33

Sonat . . . . . 34

Belco . . . . . 34

Plaintiffs' Lost Drilling Opportunities . . . . . 36

Denial of Access Constitutes A Taking . . . . . 37

Permitting And Operational Requirements Constitute A Taking . . . . . 37

Military Operations Constitute A Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Contamination Constitutes A Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

(F) Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . See Separate Volume

Plaintiffs' Response To Defendant's Proposed Findings Of Uncontroverted Fact In Support Of Defendant's Motion For Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . See Separate Document

Plaintiffs' Proposed Findings Of Uncontroverted Fact In Opposition To Defendant's Motion For Summary Judgment . . . . . . . . . See Separate Document

## (B) TABLE OF AUTHORITIES

Federal Cases:

*Alliance of Descendants of Texas Land Grants v. United States*,
27 Fed.Cl. 837 (1993) . . . . . . . . . . 19, 20

*Baskett v. United States*,
2 Cl. Ct. 356 (1983) . . . . . . . . . . 20

*Boling v. United States*,
220 F.3d 1365 (Fed. Cir. 2000) . . . . . . . . . . 8, 19

*Brown Park Estates - Fairfield Dev. Co. v. United States*,
127 F.3d 1449, 1455 (Fed.Cir.1997) . . . . . . . . . . 21

*B. W. Parkway Associates Limited v. United States*,
29 Fed. Cl. 669 (1993) . . . . . . . . . . 23, 24, 25

*Caldwell v. United States*,
391 F.3d 1226 (Fed.Cir.2004) . . . . . . . . . . 21

*Catawba v. United States*,
982 F.2d 1564, 1570 (Fed. Cir. 1993) . . . . . . . . . . 20

*Central Pines Land Co., et al v. United States*,
No. 2:96-2000, slip op. W. D. La. July 28, 2000),
*aff'd*, 274 F.3d 881 (5th Cir. 2001), *cert denied*, 537 U.S. 822 (2002) . . . . . . . . 2, 9, 14, 28

*Central Pines Land Company , et al. v. United States*,
61 Fed.Cl. 527 (2004) . . . . . . . . . . 8

*L.E. Cooke Corp. v. United States*,
27 Fed.Cl. 753, 754 (1993) . . . . . . . . . . 24

*Dalles Irrigation District v. United States*,
71 Fed. Cl. 344 (2006) . . . . . . . . . . 21, 25

*Del Rio Drilling Programs, Inc. v. United States*,
35 Fed.Cl. 186, (1996), *superseded* 37 Fed.Cl. 157 (1997),
*reversed on other grounds and remanded by*
146 F.3d 1358 (Fed. Cir. 1998), *reinstated by* 46 Fed.Cl. 683 (2000) . . . . . . . . . . 36

*Friedman v. United States*,
159 Ct.Cl.1, 310 F.3d 381 (Fed. Cir. 1963) . . . . . . . . . . 9, 26

*Hatter v. United States*,
2003 F.3d 795 (Fed. Cir. 2000) . . . . . . . . . . 9, 19, 20, 26

*Hopland Band of Pomo Indians v. United States*,
855 F.2d 1573, 1577 (FedCir.1988) . . . . . . . . . . 24

*Japanese War Notes Claimants Ass'n, Inc. v. United States*,
178 Ct.Cl. 630, 632, 373 F.2d 356, 358, *cert. denied*,
389 U.S. 971, 88 St.Ct. 466, 19 L.Ed.2d 461 (1967) . . . . . . . . . . 20

*Mesa Ranch Partnership v. United States*,
2 Cl. Ct. 700, 707 (1983) . . . . . . . . . . 23

*Mitchell v. United States*,
10 Cl. Ct. 63, *as modified*, 10 Cl.Ct. 787 (1986) . . . . . . . . . . 9, 26

*M.R.K. Corp. v. United States*,
15 Cl.Ct. 538, 544-45 (1988) . . . . . . . . . . 24

*Stearns v. United States*,
53 Fed.Cl. 446 (2002) . . . . . . . . . . 28, 29

*Walker v. United States*,
69 Fed. Cl. 222 (2005) . . . . . . . . . . 20, 21

State Cases:

*Patton v. Frost Lumber Industries*,
176 La. 916, 147 So.33 (La. 1933) . . . . . . . . . . 19

Federal Statutes:

28 U.S.C. § 2501 . . . . . . . . . . 19

Louisiana Statutes

La. R.S. 31: 21 . . . . . . . . . . 18

La. R.S. 31: 22, 23 . . . . . . . . . . 19

## (C) STATEMENT OF QUESTIONS INVOLVED

Defendant's Motion For Summary Judgment And Memorandum In Support is deficient since it does not include a Statement Of Questions Involved as required by RCFC 5.2(a)(1). In accordance with RCFC 5.2 (a)(2), Plaintiffs submit the following Statement Of Questions Involved:

1. Whether action of the United States in terminating, on March 31, 1978, a mineral moratorium, which previously prevented owners of the mineral servitude from entering Group C lands, constituted a taking of Plaintiffs' property from which the statute of limitations is measured. Plaintiffs submit that the action did not constitute a taking of Plaintiffs' property.

2. If action of the United States in terminating the mineral moratorium constituted a taking of Plaintiffs' property, whether such taking was a "single event" causing Plaintiffs' claims to accrue on March 31, 1978, or whether there are a series of subsequent separate takings which accrued on subsequent various dates. Plaintiffs submit that, commencing in 1992, there were a series of separate takings which accrued on various dates.

3. Whether, after termination of the mineral moratorium on March 31, 1978, the United States took action constituting a taking of Plaintiffs' Group C lands prior to the United States asserting title in 1992. Plaintiffs submit that no such action was taken.

4. Whether action of the United States prior to March 31, 1978 in formulating contingency plans in the event Plaintiffs attempted to conduct mineral activities on Fort Polk constituted a taking of Plaintiffs' property, particularly in light of the fact that the United States did not act on the plans. Plaintiffs submit that contingency

planning by the United States did not constitute a taking of Plaintiffs' property.

5. If the action of the United States, prior to March 31, 1978, in formulating contingency plans in the event Plaintiffs attempted to conduct mineral activities on Fort Polk constituted a taking, whether the statute of limitations was tolled due to the fact that the plans were confidential, secret or otherwise not public and that Plaintiffs did not learn of such planning until conducting discovery in *Central Pines Land Co., et al v. United States*, No. 2:96-2000, slip op. W. D. La. July 28, 2000), *aff'd*, 274 F.3d 881 (5th Cir. 2001), *cert denied*, 537 U.S. 822 (2002) (the "Prior Lawsuit"). Plaintiffs submit that since the United States took no action on its contingency plans and since Plaintiffs had no knowledge of such planning until after filing the Prior Lawsuit on August 22, 1996, the statute of limitations was tolled.

6. Whether the action of the United States in 1992 in asserting title to Group C lands constituted a separate taking of Plaintiffs' property. Plaintiffs submit that actions of the United States in asserting title to Group C lands constituted a taking of Plaintiffs' property.

7. Whether actions of the United States in the Prior Lawsuit of denying that Plaintiffs were the owners of minerals relating to Group C lands and in consistently asserting ownership of Group C minerals constituted a separate taking of Plaintiffs' property. Plaintiffs submit that actions of the United States in the Prior Lawsuit constitute a taking of Plaintiffs' property.

8. Whether actions of the United States subsequent to 1992 of including Group C lands in mineral lease sales constituted a separate taking of Plaintiffs's property. Plaintiffs

submit that actions of the United States in offering Group C lands for mineral leasing constituted a taking of Plaintiffs' property.

9. Whether actions of the United States subsequent to 1992 in granting mineral leases affecting Group C lands constituted separate takings of Plaintiffs' property. Plaintiffs submit that granting mineral leases on Group C lands by the United States constituted takings of Plaintiffs' property.

10. Subsequent to 1992, considering that, as a consequence of the United States asserting title to Group C lands, Plaintiffs' mineral lessees and potential mineral lessees required "protection" mineral leases from the United States prior to operations on Group C lands, whether action of the United States in requiring mineral leases affecting Group C lands to include "Controlled Surface Use Stipulation #1" constituted separate takings of Plaintiffs' property. Plaintiffs submit that action of the United States in requiring use of the Controlled Surface Use Stipulation #1 in mineral leases constituted takings of Plaintiffs' property.

11. Subsequent to 1992, considering that, as a consequence of the United States asserting title to Group C lands, Plaintiffs' mineral lessees and potential mineral lessees required "protection" leases from the United States prior to operations on Group C lands, whether action of the United States in requiring Plaintiffs, as a condition to the United States offering portions of Group C lands for protective mineral leasing, to confirm in writing to the United States "in a form acceptable to the Justice Department" that Plaintiffs would not attempt to upset any proposed lease sale by the United States constitutes a separate taking of Plaintiffs' property. Plaintiffs submit

that such action by the United States constituted a taking of Plaintiffs' property.

12. Subsequent to 1992, considering that, as a consequence of the United States asserting title to Group C lands, Plaintiffs' mineral lessees and potential mineral lessees required "protection" leases from the United States prior to operations on Group C lands, whether actions of the United States in refusing to offer portions of Groups C lands for protective leasing constituted separate takings of Plaintiffs' property. Plaintiffs submit that such action by the United States constituted takings of Plaintiffs' property.

13. Commencing April 24, 1996, considering that Plaintiffs negotiated with Sonat Exploration Company ("Sonat") to lease 9,798.44 acres of Group C lands conditioned upon Sonat's ability to obtain a protection lease from the United States, whether action of the United States in including Group C lands in a proposed lease sale and thereafter withdrawing the Group C lands from the lease sale constitutes a separate taking of Plaintiffs' property. Plaintiffs submit that such action constitutes a taking of Plaintiffs' property.

14. Recognizing that under Louisiana law, a mineral owner has unrestricted right to access to the surface of the property burdened by the mineral servitude, whether action of the United States in imposing "Standard Operating Procedures For Exploration And Field Development Drilling of Oil/Gas Wells, SOP No. 32X-2," for mineral operations on Group C lands constitutes separate takings of Plaintiffs' property. Plaintiffs submit that such action constituted takings of Plaintiffs' property.

15. Recognizing that under Louisiana law, a mineral owner has unrestricted right to

access to the surface of the property burdened by the mineral servitude, whether action of the United States in requiring, prior to drilling a well within Group C lands, that Plaintiffs' lessees submit a detailed "Application For Permit To Drill Or Deepen to the Bureau Of Land Management" which included the filing of a Final Environmental Assessment and the ultimate issuance of "Conditions Of Approval For Oil And Gas Exploration" constituted separate takings of Plaintiffs' property. Plaintiffs submit that such action constituted takings of Plaintiffs' property.

16. Between March, 1996 and July, 1997, considering that absent action of the United States in disputing Plaintiffs' title to Group C lands and issues concerning access to Fort Polk, Chesapeake Operating Company ("Chesapeake") would have leased the entirety of Group C lands from Plaintiffs, whether action of the United States constituted a separate taking of Plaintiffs' property. Plaintiffs submit that such action by the United States constitutes a taking of Plaintiffs' property.

17. In the Spring of 1996, considering that Belco Oil & Gas Corp. ("Belco") reached agreement with Plaintiffs for Belco to lease 20,295 acres of Group C lands conditioned upon Belco being able to obtain access to Group C lands from the United States, whether action of the United States in denying access to Belco constituted a separate taking of Plaintiffs' property. Plaintiffs submit that such action constitutes a taking of Plaintiffs' property.

18. In the Spring of 1996, considering that Belco reached an agreement with Plaintiffs for Belco to lease 20,295 acres of Group C lands and considering that Belco would have drilled on Group C lands provided Belco obtained access to the property from

the United States, whether action of the United States in denying access to Belco constituted a separate taking of Plaintiffs' property. Plaintiffs submit that such action constituted a taking of Plaintiffs' property.

19. Whether current action of the United States in conducting military operations on Group C lands, including bombing practice, artillery practice, small arms fire and troop maneuvers resulting in unexploded bombs on portions of Group C lands including artillery impact areas for howitzer, heavy artillery and tank gunnery practice constitutes a separate taking of Plaintiffs' property. Plaintiffs submit that such action constitutes a taking of Plaintiffs' property.

20. Considering that at some date unknown to Plaintiffs portions of Group C lands became too contaminated and/or dangerous for mineral operations, whether military operations of the United States causing such contamination or dangerous condition constitutes a separate taking of Plaintiffs' property. Plaintiffs submit that the contaminated and dangerous situation constitutes a taking of Plaintiffs' property, particularly in light of the fact that Plaintiffs learned of the situation during discovery in the Prior Lawsuit.

## (D) STATEMENT OF THE CASE

Defendant's Motion For Summary Judgment And Memorandum In Support is deficient as it does not include a Statement Of The Case as required by RCFC 5.2(a)(1). In accordance with RCFC 5.2 (a) (2), Plaintiffs submit the following Statement Of The Case:

**Introduction and Procedural Background:**

Plaintiffs instituted these proceedings on April 3, 1998 in response to the affirmative defense

of lack of jurisdiction (insofar as the action asserted a takings claim) raised by the United States to Plaintiffs' quiet title action brought in the Prior Lawsuit.[1] In the Prior Lawsuit, plaintiffs asserted ownership, adverse to the United States, to various mineral servitudes located in Vernon Parish, Louisiana. The mineral servitudes burden or affect land owned by the United States and used by it as a national forest and as a United States Army Base, Fort Polk.

Throughout the Prior Lawsuit as well as in these proceedings, the parties have referred to the lands and mineral servitudes affecting them as "Group A," "Group B," and "Group C." They are so identified in the Complaint in this matter and in Exhibit "A" to the First Amended and Restated Complaint (the "Amended Complaint"), filed on January 6, 2003. The Group A and Group B mineral servitude was created prior to the passage of Act 315 of 1940 by the Louisiana Legislature. The Group C mineral servitude was created thereafter. These facts were found to be dispositive of ownership in the Prior Lawsuit.[2]

The mineral servitude affecting Group A and Group B was held to have terminated by Louisiana's ten year prescription of non-use.[3] Therefore, the United States, as landowner, has the exclusive right to search for minerals and to reduce them to possession on such lands. As to Group C, plaintiffs were held to be the owners of full mineral servitudes affecting such lands.[4] As such, under Louisiana law, Plaintiffs were and are entitled to unrestricted use of the surface of Group C lands. The United States, as owner of the surface, can impose no legal restrictions on access to or use of the property by Plaintiffs as the mineral servitude owners.

---

1 As defined above, the Prior Lawsuit is *Central Pines Land Co., et al v. United States*, No. 2:96-2000, slip op. W. D. La. July 28, 2000), *aff'd*, 274 F.3d 881 (5th Cir. 2001), *cert denied*, 537 U.S. 822 (2002).

2 *See, Central Pines Land Co. et al v. United States*, 274 F3d 881, 886, 893 (5th Cir. 2001).

3 *Id.*, pp. 892, 894.

4 *Id.* p. 893.

The instant proceedings were stayed pending resolution of the Prior Lawsuit. Upon final resolution, by denial of certiorari by the United States Supreme Court on October 7, 2002, Plaintiffs filed their Amended Complaint to take into account the final rulings and facts learned in discovery in the Prior Lawsuit.

In the instant proceedings, the Defendant previously filed a Partial Motion To Dismiss Or In The Alternative Partial Motion For Summary Judgment Of Plaintiffs' Amended Complaint and a Motion For Judgment On The Pleadings. On August 12, 2004, this Court (Yock, Senior Judge), issued its Opinion and Judgment.[5]

The Opinion and Judgment dismissed Count I of Plaintiffs' Amended Complaint. As to Count II, this Court determined that it lacked sufficient factual record to evaluate whether Plaintiffs' Group C claims are barred by the statute of limitations. This Court determined that to be timely under the Court's six-year statute of limitations, Plaintiffs' Count II takings claim must have accrued after April 3, 1992.

In its prior motion, the Defendant argued that Count II involved a single alleged taking that accrued no later than March 31, 1978, *i.e.*, the date a formal moratorium preventing Plaintiffs from entering Group C lands lapsed or terminated. This Court noted that in the Amended Complaint and in briefs Plaintiffs characterized their Group C claims differently, arguing that the Defendant's wrongful behavior began long ago and continues to the present day. This Court concluded that "the applicability of the continuing claims doctrine will determine whether or not Court II is time barred."[6] The primary authorities cited by the Court were: *Boling v. United States*, 220 F.3d 1365

---

[5] *See*, *Central Pines Land Company, et. al. v. United States*, 61 Fed. Cl. 527 (2004).

[6] August 12, 2004 Opinion at 24; *Central Pines Land Company, et. al. v. United States*, 61 Fed. Cl. 527, 537 (2004).

(Fed. Cir. 2000); *Hatter v. United States*, 2003 F.3d 795 (Fed. Cir. 2000); *Mitchell v. United States*, 10 Cl. Ct. 63, *as modified*, 10 Cl.Ct. 787 (1986); and *Friedman v. United States*, 159 Ct.Cl.1, 310 F.3d 381 (Fed. Cir. 1963.

In denying Defendant's Motion For Judgment On The Pleadings, this Court noted that "the parties sharply disagree about whether or not the alleged wrongful prevention of access of the Group C lands can be traced back to a single event or a series of separate ones."[7] The Court concluded by ruling:

> In summary, the Defendant's Motion for Judgment on the Pleadings on Count II must be denied because the plaintiffs' Group C takings claims cannot be resolved on the incomplete factual record before the Court. While the parties dispute whether or not the continuing claims doctrine applies in this case, their pleadings have done little to clarify what actions the parties have taken from 1978 through the present. Therefore, the Defendant's Motion for Judgment on the Pleadings cannot be granted.[8]

Since the Court's ruling, the parties have conducted extensive discovery and the Defendant has filed the pending Motion For Summary Judgment.

**Facts Established In Discovery:**

Between 1950 and 1978, through a series of condemnation proceedings, the United States instituted a mineral moratorium that prevented owners of the mineral servitude from entering Group C lands. (Def's Uncontroverted No. 4) The moratorium formally ended on March 31, 1978.[9] (Def's Uncontroverted No. 6)

The moratorium having terminated, after March 31, 1978, there was no legal prohibition

---

7 August 12, 2004 Opinion at 30; *Central Pines Land Company, et. al. v. United States*, 61 Fed. Cl. 527, 539 (2004).

8 August 12, 2004 Opinion at 31; *Central Pines Land Company, et. al. v. United States*, 61 Fed. Cl. 527, 540 (2004).

9 Plaintiffs concede the 1978 date and no longer contend that the moratorium ended in 1983.

against Plaintiffs accessing their mineral rights on Group C lands. Notwithstanding, between 1978 and 1991, Plaintiffs did not attempt to exercise mineral rights on Group C lands. (Pls' Uncontroverted No. 3)

Between 1978 and 1991, the United States took a "calculated risk" that Plaintiffs would not attempt to access Group C lands. The United States took no action to prevent, impede or limit Plaintiffs' access to Group C lands or to otherwise prevent Plaintiffs from developing minerals on Group C lands. (Pls' Uncontroverted No. 4)

Prior to October 9, 1992, the United States did not claim ownership of minerals underlying Group C lands and, after the moratorium ended, took no formal action to deprive Plaintiffs access to Group C minerals. (Pls' Uncontroverted No.5) On October 9, 1992, a title opinion was rendered to the United States which, as to Group C lands, stated that the United States "can now claim mineral ownership where drilling has not occurred for a ten-year period regardless of the date of acquisition by the U.S." (Pls' Uncontroverted No.6) Plaintiffs submit that October 9, 1992 is the earliest possible date the United States took any portion of Group C lands. Because of the uniformity of Plaintiffs' title across the tract, the entirety of Group C was affected by the taking.

On October 7, 1993, Charles E. Steele, Director of Lands And Minerals, United States Department Of Agriculture, Forest Service, issued a memorandum which advised that additional lands were available for leasing by the United States as a result of the October 9, 1992 title opinion. The memorandum included Group C lands and a Controlled Surface Use Stipulation #1 which applied to Group C lands. (Pls' Uncontroverted No. 7)

In the spring of 1995, while Plaintiffs were negotiating a mineral lease on Plaintiffs' private property in the area of, but not within, Group C lands, Plaintiffs first learned from a potential lessee

that the United States was claiming title to Group C lands. (Pls' Uncontroverted No. 8)

By Hydrocarbon Lease dated effective August 1, 1995, Plaintiffs[10] leased to Chesapeake approximately 33,607.5325 acres of land contiguous to, but not included within, Group C lands ("33,000 acre lease"). (Pls' Uncontroverted No. 10) Under the 33,000 acre lease, Chesapeake successfully drilled wells on Plaintiff's property. (Pls' Uncontroverted No.14)

Shares of Chesapeake are publicly traded on the New York Stock Exchange. (Pls' Uncontroverted No. 11) It is a Fortune 500 company which claims to be the nations's most active oil and gas explorer and the second largest independent natural gas producer in the United States. (Pls' Uncontroverted Nos. 12 and 13)

In the 1995 to 1997 time frame, Chesapeake considered the area of Fort Polk prospective for oil and gas drilling in the Austin Chalk geological formation. (Pls' Uncontroverted No. 15) During that relevant time period, Chesapeake leased approximately 1,000,000 acres of land in and around Fort Polk. ( Pls Uncontroverted No. 20)

In the course of negotiating the 33,000 acre lease, Chesapeake expressed interest in leasing Plaintiffs' Group C lands. (Pls' Uncontroverted No. 16) Chesapeake followed up by letter dated March, 1996. By letter dated April 8, 1996, Plaintiffs confirmed their willingness to lease Group C lands on the same form as used for the 33,000 acre lease.

Absent action of the United States in disputing Plaintiffs' title to Group C lands and issues concerning access to Fort Polk, Chesapeake would have leased the entirety of Group C lands from Plaintiffs. (Pls. Uncontroverted No. 19)

A "protection" lease is a second mineral lease on the same property taken by a mineral lessee

---

[10] Actually, corporate parents of Central Pines Land Company, L.L.C. and Tower Minerals Company, L.L.C. were the lessors.

from one asserting a competing ownership interest against the first or primary mineral lessee. (Pls. Uncontroverted No. 21) If Chesapeake had been able to obtain a protection mineral lease from the United States on Group C lands and if the Army had permitted access to the property, Chesapeake would have drilled on Group C lands. (Pls. Uncontroverted No. 22)

Portions of Group C lands were included by the United States in a proposed mineral lease sale scheduled for March 28, 1996. (Pls. Uncontroverted No. 25) While the proposed lease sale included approximately 5,300 acres of Group C lands, because Plaintiffs' title is uniform for the full tract, the action of the United States effectively took the entirety of Group C.

Inquiry concerning the proposed lease sale lead Plaintiffs to the Office Of General Counsel, United States Department Of Agriculture in Little Rock, Arkansas. By letter dated November 9, 1995 addressed to Mr. Mike Cruse, Deputy General Counsel, Plaintiffs supplied the United States with pertinent title documents, land use records and legal principles which established that Plaintiffs owned the minerals under Group C lands. (Pls. Uncontroverted No. 23) Cruse referred Plaintiffs to Jeffery D. Eisenberg, Office Of General Counsel, United States Department Of Agriculture, Washington, D.C.

By letter dated February 29, 1996 to Eisenberg, Plaintiffs asserted title to the Group C minerals being offered for lease by the United States and respectfully requested that the properties be withdrawn from proposed lease sale. (Pls. Uncontroverted No. 24) Eisenberg requested that Plaintiffs submit a proposal whereby the United States would be compensated for mineral production under Group C lands. Accordingly, by letter dated March 11, 1996 to Eisenberg, Plaintiffs submitted a proposal whereby, in addition to other matters, Plaintiffs would be recognized as owners of the relevant part of Group C lands and the United States would receive a mineral royalty on production

from such property. (Pls. Uncontroverted No. 26) By letter dated August 6, 1996, Eisenberg rejected Plaintiffs' proposal. (Pls. Uncontroverted No. 35)

In 1996, Belco paid approximately $60,000,000 in mineral lease bonuses to mineral owners in the Austin Chalk trend in Louisiana. (Pls Uncontroverted No. 27)

Commencing March, 1996, Plaintiffs negotiated with Belco to lease 20,295 acres of Group C lands. Plaintiffs reached agreement with Belco as to the terms of a lease; but because the United States Army denied Belco's access to Group C surface, Plaintiffs' lease was not executed. (Pls. Uncontroverted No. 29)

Had the United States Army allowed Belco access to the property, Belco would have leased the entirety of Group C lands from Plaintiffs. (Pls. Uncontroverted No. 30)

Commencing April 24, 1996, Plaintiffs negotiated with Sonat Exploration Company ("Sonat") in an effort to lease approximately 9,798.44 acres of Group C. (Pls. Uncontroverted No. 31) The United States withdrew the property from a proposed lease sale. Without the possibility of a "protective" lease, Plaintiffs were unable to lease the 9,798.44 acres to Sonat. (Pls. Uncontroverted No. 32)

If Sonat had been able to obtain mineral leases from the United States and access from the Army, it would have drilled on Fort Polk. (Pls. Uncontroverted No. 34)

By Hydrocarbon Lease dated July 1, 1996, Plaintiffs[11] leased approximately 28,668.93 acres of property contiguous with and partially including Group C lands to Sonat ("28,000 acre lease"). (Pls. Uncontroverted No. 33)

On August 22, 1996, Plaintiffs filed the Prior Lawsuit against the United States for

[11] Actually, corporate predecessors to Central Pines Land Company, L.L.C. and Tower Minerals Company, L.L.C. were the lessors.

declaratory judgment pursuant to 28 U.S.C.§2201 and to quiet title to real estate pursuant to 28 U.S.C. §2409a. In their Complaint, Plaintiffs sought recognition of their title to Group C lands. The United States answered Plaintiffs suit, denying that Plaintiffs were the owners of minerals relating to Group C lands. In the course of the litigation, the United States consistently asserted ownership of Group C minerals. *See*, *Central Pines Land Co., et al v. United States*, No. 2:96-2000, slip op. W. D. La. July 28, 2000), *aff'd*, 274 F.3d 881 (5th Cir. 2001), *cert denied*, 537 U.S. 822 (2002).

By letter dated September 24, 1996, Chesapeake, Plaintiffs' lessee under the 33,000 acre lease, offered to lease from Plaintiffs approximately 4,383.67 acres of Group C minerals (ultimately the lease covered 4,822 acres). (Pls. Uncontroverted No. 38) Because of the competing title claim to Group C minerals by the United States, Chesapeake specifically conditioned its offer to Plaintiffs upon being permitted to obtain "protection leases from the United States." Chesapeake required Plaintiffs to agree "not to interfere with Chesapeake's attempt to secure a protection lease from the U.S.A." Chesapeake conditioned its offer upon Plaintiffs agreeing to confirm in writing to the United States "in a form acceptable to the Justice Department" that Plaintiffs would not attempt to upset any proposed lease sale by the United States of the same mineral property. (Pls. Uncontroverted No. 34)

In an effort to promote mineral development of Group C, Plaintiffs acquiesced to Chesapeake's limitations. On September 26, 1996, Plaintiffs entered into a mineral lease with Chesapeake. The lease covered 4,822.10 acres of Group C. (Pls. Uncontroverted No. 39) By letter dated September 26, 1996, Plaintiffs advised the United States through Eisenberg of the lease and specifically confirmed that no plaintiff would attempt to upset or otherwise interfere with the scheduled mineral lease sale. (Pls. Uncontroverted No. 40)

United States Department Of Justice attorney, Bret Birdsong, advised Plaintiffs that additional Group C acreage may be included in a scheduled mineral lease sale and requested that Plaintiffs agree to not attempt to upset the sale. In an effort to promote mineral development of Group C, Plaintiffs acquiesced. By letter dated October 9, 1996, Plaintiffs complied with the request of the United States Department Of Justice. (Pls. Uncontroverted No. 41)

Because the United States claimed title to Group C, Plaintiffs' lessees and prospective lessees required protection leases from the United States The protection lease requirement put Plaintiffs' lessees and potential lessees at risk that a competitor would obtain the protection lease from the United States at public bidding, thus precluding development of the property. (Pls. Uncontroverted No. 42)

In 1997, the United States granted the following mineral leases affecting Group C properties: Lease Nos. 47572, 47574, and 47750 to Union Pacific Resources Company and Lease Nos. 48555, 48556, 48557, 48558, 48559 and 48560 to Chesapeake. All of the leases contained ten year terms terminating April 30, 2007. (Pls. Uncontroverted No. 43)

Since 1992 and currently, a substantial portion of Group C land is subject to military operations including bombing practice, artillery practice, small arms fire and troop maneuvers by the United States Army and Air Force. (Pls. Uncontroverted No. 45) Unexploded bombs are found and disposed of from Group C lands. Portions of Group C lands include artillery impact areas for howitzer, heavy artillery and tank gunnery practice. (Pls. Uncontroverted No. 45)

In the summer of 1997, Plaintiffs' potential mineral lessees seeking protective leases from the United States directed offers to the United States Bureau Of Land Management to lease parcels within Group C. The United States refused to offer the property for protective mineral leasing. In