this connection, Stephen M. Sittnick, LTC, IN, G3/DPTMS prepared internal memorandum AFZX-GT dated July 23, 1997 which included the following:

> a. By definition, this impact area is, and has been, off limits to personnel and/or vehicle surface activities. Additionally, no digging in that zone is allowed due to unexploded ordnance (surface and subsurface). RLIA was established o/a 1977, and all types of dud producing munitions have been filed into that area. Any effort to surface and subsurface clear that zone for oil exploration would be extremely unsafe, and expensive.
>
> b. Any oil exploration activities in or around the RLIA zone would close a number of ranges/training areas that have Surface Danger Zones (SDZ's) oriented into RLIA. This would severely impact the training and readiness of assigned units and supported Reserve Component units. Additionally, oil exploration activities on or near RLIA would seriously impact Operations Group's use of the Zion Hills area as rotational unit maneuver space and/or Live Fire area.

(Pls. Uncontroverted No. 44)

Prior to drilling a well on Group C lands, Plaintiffs' lessees (all of whom had acquired "protective" leases from the United States) were required to submit a detailed Application For Permit To Drill Or Deepen to the Bureau Of Land Management. (Pls. Uncontroverted No. 48) Within Group C, the procedure also required the filing of a Final Environmental Assessment and the ultimate issuance of "Conditions Of Approval For Oil And Gas Exploration." (Pls. Uncontroverted No. 48) The United States established Standard Operating Procedures For Exploration And Field Development Drilling of Oil/Gas Wells, SOP No. 32X-2, which contain procedures and restrictions on mineral development on Group C. (Pls. Uncontroverted No. 47)

On March 11, 1997, representatives of Plaintiffs' mineral lessee, Sonat, met with representatives of the United States to discuss possible access to, and mineral operations on, Group C. (Pls. Uncontroverted No. 50) Not less than 18 representatives of various Army and Forest Service

agencies were in attendance at the meeting, which included the following discussion items:

> Sonat was admonished by Mr. Hammerschmidt, Fort Polk Deputy Director of Public Works, that a proposed well location was in an area referred to as "Ranges 40-43, the tank gunnery ranges." He explained that the tanks shoot "120 mm projectiles" and "will deliver about 6500 meters." He stated that he was concerned about a "vertical stack of valves", *i.e.* an oil well wellhead christmas tree, for a well at that location and "how we can successfully protect it so that we don't cause something problematic to occur." Hammerschmidt further advised that: "Inside this fan is considered an area which increases the possibility of an accident; wells 19-1, 31-1 and 21-1 are all within this fan area."
>
> Dr. Ron Tomas, Fort Polk Office of the Garrison Commander, commented on the "fan" as follows: "the fan is very conservative and the probability of something happening is very high."
>
> Hammerschmidt advised that the Army was "not willing to accept responsibility for people while training is ongoing."
>
> Hammerschmidt advised that wellheads in the area must be protected with "berming."
>
> Hammerschmidt advised that underground pipelines should be buried to 15 feet deep (industry standard is 36").
>
> The discussion specifically included safety issues relating to wells taking "a direct hit."
>
> Dr. Tomas stated that Sonat should consider moving its preferred location for well 31-1 "nearer Lookout Road." Tomas said that the range in question was used about 60 days per year and "reiterated if they don't move, there will be massive amounts of coordination required to get a truck to the site."

Despite Sonat personnel following up on several discussion items and actually filing for and obtaining permits for drilling within Group C, Sonat never drilled any well with a physical location within the surface of Group C lands. (Pls. Uncontroverted No. 51)

By letter dated January 9, 1997, Plaintiffs' mineral lessee, Chesapeake, wrote Ted

Hammerschmidt, Deputy Director, Directorate of Engineering & Housing, Fort Polk, to determine procedures for access to Group C and to determine operating parameters for mineral operations. (Pls. Uncontroverted No. 49) On April 1, 1997, representatives of Chesapeake met with representatives of the United States to discuss access to and mineral operation restrictions within Group C. Not less than 14 representatives of the Army and Forest Service attended the meeting. The Chesapeake meeting was similar to the Sonat meeting with discussions focused on safety aspects of live fire, depth for placing pipelines, location of wells, placement of production facilities and the avoidance of "flares" which could be dangerous to night flying aircraft. (Pls. Uncontroverted No. 52)

Chesapeake never drilled a well with a surface location within Group C lands. (Pls. Uncontroverted No. 53)

**(F) ARGUMENT**

In the Prior Lawsuit, Plaintiffs were recognized as owners of the minerals under Group C lands. Under Louisiana law, Plaintiffs' ownership is a permanent mineral servitude not subject to prescription, defined by the Louisiana Mineral Code as follows:

> A mineral servitude is the right of enjoyment of land belonging to another for the purpose of exploring for and producing minerals and reducing them to possession and ownership.[12]

As compared to the surface estate, in Louisiana, the mineral servitude is the dominant estate. The mineral servitude owner is entitled to use "so much of the land as is reasonably necessary to conduct his operations."[13] From the moment a mineral servitude becomes effective, the owner is vested with

---

[12] La.R.S.31:21.

[13] La.R.S.31:22. The mineral owner is only obligated to restore the surface at the earliest reasonable time. *See,* La.R.S.31:22.

the absolute right to develop minerals on all or any part of the land burdened by the servitude. *Patton v. Frost Lumber Industries*, 176 La. 916, 147 So.33 (La. 1933). The Louisiana Mineral Code makes it clear that the mineral servitude owner has the right to conduct operations:

> The owner of a mineral servitude may conduct his operations with the freedom and subject to the restrictions that apply to a landowner. He may protect his right against interference or damage by all of the means available to a landowner.[14]

Based on these legal principles, Plaintiffs, as owners of the mineral servitude burdening Group C lands, and have and had the absolute right to go on the land and conduct operations. Plaintiffs could grant these rights to others through a mineral lease.

The Fifth Amendment of the United States Constitution ensures that the federal government does not appropriate private property for public use without just compensation. *Boling v. United States*, 220 F.3d 1365 (Fed. Cir. 2000), citing U.S. Const. Amend. V. A wide spectrum of government action has been found to constitute a taking of property within the meaning of the Fifth Amendment. *Boling*, supra. at 1370.

In the pending motion, the Defendant contends that the statute of limitations has run and bars Plaintiffs' claims. The applicable statute is 28 U.S.C. § 2501 which provides as follows:

> Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.

For this Court to entertain a plaintiff's claim, the plaintiff must sue in this Court within six years after the claim first accrues. *Hatter v. United States*, 203 F.3d 795 (Fed. Cir. 2000); *Alliance of Descendants of Texas Land Grants v. United States*, 27 Fed.Cl. 837, 842 (1993). A claim first accrues when all events have occurred which fix the alleged liability of the government and entitle

---

14 La.R.S.31:23.

the plaintiff to institute an action. *Walker v. United States*, 69 Fed. Cl. 222 (2005); *Baskett v. United States*, 2 Cl. Ct. 356 (1983); *Alliance*, supra., both citing *Japanese War Notes Claimants Ass'n, Inc. v. United States*, 178 Ct.Cl. 630, 632, 373 F.2d 356, 358, *cert. denied*, 389 U.S. 971, 88 St.Ct. 466, 19 L.Ed.2d 461 (1967).

For the statute of limitations to be satisfied, the plaintiff must identify an event that directly affects the rights asserted in the suit which took place within six years prior to filing the complaint. *Alliance*, supra. Stated a little differently, the court in *Catawba v. United States*, 982 F.2d 1564, 1570 (Fed. Cir. 1993), ruled as follows:

> It is hornbook law that a claim does not accrue until all events necessary to fix the liability of the defendant have occurred - when "the plaintiff has a legal right to maintain his or her action."

According to the court in *Boling*, the continuing claims doctrine is applicable when the government owes a continuing duty to the plaintiffs.[15] In such cases, each time the government breaches that duty, a new cause of action arises. *See, Hatter v. United States*, 203 F3d 795, 797-98 (Fed.Cir.2000) The continuing claims doctrine, however, does not apply in cases where a single governmental action causes a series of deleterious effects, even though those effects may extend long after the initial government breach. *Boling*, supra. at 1373.

**No "Seminal Event:"**

Since the Defendants' Motion For Summary Judgment And Memorandum In Support did not include a Statement of Issues Involved as required by RCFC 5.2(a)(1), Plaintiffs have had difficulty in clearly determining Defendant's issues. Plaintiffs recognize that the Defendant does not specifically say that action of the United States in permitting the mineral moratorium to terminate

---

15 *Boling v. United States,* 220 F.3d 1365, 1373 (Fed.Cir. 2000).

constituted a taking of Plaintiffs' property. But, nevertheless, the Defendant does argue that:

> Plaintiffs' "de facto moratorium" allegations . . . are traceable to a single event -- the lifting of the formal moratorium, when Defendant allegedly continued to deny access "but made no payment for such takings."[16]

Termination or lifting of the moratorium was simply that. After March 31, 1978, there was no longer a legal prohibition against Plaintiffs accessing their Group C lands. A taking occurs when the owner is deprived of use of the property. *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed.Cir.2004); *Walker v. United States*, 69 Fed. Cl. 222 (2005). In this case, the exact opposite occurred. By permitting the moratorium that previously prevented owners of the mineral servitude from entering Group C lands to terminate, the United States did not deprive Plaintiffs of use of their property. The United States granted Plaintiffs legal access which had been previously denied.

On March 31, 1978, the date the moratorium terminated, no events had "occurred which fix the liability of the Government and entitle the claimant to institute an action" and terminating the moratorium was not "single distinct event, which may have continued ill effects later on." *Dalles Irrigation District v. United States*, 71 Fed. Cl. 344 (2006), quoting from *Brown Park Estates - Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1455 (Fed.Cir.1997).

Plaintiffs submit that there being no taking, there could be no "seminal event" triggering the statute of limitations.

**Plaintiffs' "De facto Moratorium" Allegations Not Barred:**

Defendant argues that Plaintiffs claims relating to a "de facto moratorium" are traced to the "single event" which the Defendant defines as "governmental interference with access to their

---

16 Defendant's Motion For Summary Judgment And Memorandum In Support, p. 15.

mineral rights."[17] The Defendant further argues that the "wrong" is "traceable to a 'seminal event' and not susceptible to being broken down to a series of wrongs that would each amount to an independent claim."[18] Not only are Defendant's arguments concerning the "tracing back" and the "single event" inconsistent, Defendant misconstrues Plaintiffs' Count II allegations and misconstrues the facts of this case.

Prior to the moratorium terminating on March 31, 1978, the United States considered various contingency plans to prevent, impede or limit mineral development on Group C lands after termination of the moratorium. (Pls. Uncontroverted No. 1) The contingency plans included putting up signs saying "keep out" and "let them sue" (Pls. Opp'n Ex. 2); prohibit drilling, purchase minerals or "deny any type of entry" (Pls Opp'n Ex. 4); lifting the moratorium in "selected areas" (Pls.Opp'n Ex.9); countering a demand to drill a well on a particular site with a "mini-moratorium" (Pls. Opp'n Ex.12); and refuse drilling, force mineral owners to sue in court of claims, or negotiate drilling program (Pls. Opp'n Ex.13).

The Defendant's own Exhibit D,[19] a letter from the Commanding General at Fort Polk to Commander US Army FORSCOM, Fort McPherson, GA, written during the moratorium period, summarized the contingency position of the United States:

> a. All previous Wildcat Wells in the immediate area have been dry wholes. With present-day drilling costs over One Million Dollars per well, it is inconceivable that the area will be overrun by new Wildcats.
>
> b. As surface owners, the Army still retains control over right-of-entry.

---

17 Defendant's Motion For Summary Judgment And Memorandum In Support, at p. 15.

18 Id.

19 This document is also Pls. Opp'n Ex.15.

> c. Due to unusual safety hazards, no prudent driller could be expected to drill within the impact areas.
>
> d. If pushed to the wall, the Army could probably reestablish a moratorium over smaller, selected areas.

There is no evidence that the United States acted on its contingency plans, at least not until after 1992. Instead, the United States decided to take a "calculated risk" that Plaintiffs would not attempt to access Group C lands. (Pls. Uncontroverted No. 4) Between 1978 and 1992, the United States took no action to prevent, impede or limit Plaintiffs' access to Group C lands or to otherwise prevent Plaintiffs from developing minerals on Group C lands. (Pls. Uncontroverted No. 5)

Defendant's "calculated risk" is not a "seminal event." Defendant's "calculated risk" does not even rise to the level of a threat of condemnation which this court has previously ruled "does not provide a basis for finding that a taking has occurred. *B. W. Parkway Associates Limited v. United States*, 29 Fed. Cl. 669 (1993), citing *Mesa Ranch Partnership v. United States*, 2 Cl. Ct. 700, 707 (1983).

Plaintiffs submit that contingency plans of the United States to deal with possible attempts by Plaintiffs to access Group C lands for drilling does not constitute a taking which would trigger the statute of limitations.

**Alternatively, Plaintiffs' Lack Of Knowledge Tolled The Statute Of Limitations:**

Even assuming that the contingency plan of the United States constituted a taking, which Plaintiff's deny, Plaintiffs had no knowledge, and should not have been reasonably expected to have knowledge, of the contingency plans until discovery in the Prior Lawsuit. Plaintiffs filed the Prior Lawsuit on August 22, 1996. This action was filed April 3, 1998 and was promptly stayed by order filed May 15, 1998.

Exhaustive discovery was conducted in connection with the Prior Lawsuit. The documents ultimately supporting the "de facto moratorium" allegations were all discovered by Plaintiffs in connection with the Prior Lawsuit. (Pls. Uncontroverted No. 2) Plaintiffs' original Complaint in these proceedings did not contain allegations of a de facto moratorium. Such allegations appear for the first time in Plaintiffs' Amended Complaint, Count II, paragraph 39, which was filed January 6, 2003 after conclusion of the Prior Lawsuit. The entirely of the allegation is as follows:

> Except for the actions of the United States of America in claiming ownership of the Property, and denying plaintiffs access to the property for mineral exploration through moratoriums, "defacto" moratoriums, and military use of the Property inconsistent with mineral activities, plaintiffs could have and would have granted mineral leases affecting "Group C" to persons or entities interested in leasing the property and exploring for oil and gas.

This Court has made it clear that the limitations period first accrues or begins to run when a potential plaintiff knows or reasonably should know of all the events which fix the government's alleged liability. *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (FedCir.1988). If an injury is clear but its source unknown, the six-year period starts when the plaintiff has reason to know the cause of the injury. *L.E. Cooke Corp. v. United States*, 27 Fed.Cl. 753, 754 (1993); *M.R.K. Corp. v. United States*, 15 Cl.Ct. 538, 544-45 (1988).

All of the documents in this case relating to the "de facto" moratorium are internal documents of the United States Army, of which Plaintiffs had no knowledge and to which Plaintiffs had no access until discovery in the Prior Lawsuit. A similar situation existed in *B. W. Parkway Associates Limited*, supra., where this Court ruled that the existence of internal government documents discovered by the plaintiffs in the course of the litigation did not trigger the running of the statute of limitations:

> This lawsuit is well within the statute of limitations. BWPA claims that the totality of the government's conduct amounted to a taking of the property. . . The evidence supporting BWPA's theory in this case consisted of internal government documents to which BWPA had no access until it conducted discovery.[20]

Unlike *Dalles Irrigation Dist.*, supra., the instant case presents a situation where the contingency plans of the United States are "inherently unknowable." There were simply no dealings between the Plaintiffs and the United States between 1978 and 1995 when Plaintiffs learned that the United States was claiming title to Group C lands. (Pls. Uncontroverted No. 8)

Even if Plaintiffs were imputed with knowledge on the date the United States decided to assert title, this case is within the statute of limitations. Prior to October 9, 1992, the United States did not claim ownership of minerals underlying Group C and, after the moratorium ended, took no formal action to deprive Plaintiffs access to Group C minerals. (Pls' Uncontroverted No. 5) On October 9, 1992, a title opinion was rendered to the United States which, as to Group C lands, stated that the United States "can now claim mineral ownership where drilling has not occurred for a ten-year period regardless of the date of acquisition by the U.S." (Pls' Uncontroverted No. 6) Plaintiffs submit that October 9, 1992 is the earliest possible date a statute of limitations could have commenced to run.

**A Series Of Separate Takings:**

The Defendant incorrectly asserts that Plaintiffs are asserting a single taking of the right of access to their mineral rights. To the contrary, Plaintiffs assert a series of separate taking commencing in 1992. This case presents an example of the "continuing claim" doctrine, which was developed in this Court as far back as 1962. *Friedman v. United States*, 159 Ct. Cl. 1, 310 F.2d 381

---

[20] *B.W. Parkway Associates*, supra. at 29 Fed.Cl.669, 676.

(1962), *writ denied* 373 U.S. 932 (1963). The continuing claim doctrine was upheld by the Federal Circuit in an *en banc* decision. *Hatter v. United States*, 203 F.3d 795 (Fed. Cir. 2000), *reversed in part on different issue* 532 U.S. 557 (2001).

In this case, conduct of the United States in preventing use of Group C lands by plaintiffs did not occur once and then cease. This is not a situation such as building a structure which causes flooding of a landowner's property where the actions are completed although the damage is continuing. In such a case, suit must be brought within six years of the completion of the structure -- the cessation of the wrongful conduct. In the instant case, the wrongful conduct never ceased; it continues until the present day. Therefore, this suit is timely as to federal actions which occurred within six years of suit being filed.

A somewhat similar situation was addressed and resolved by this Court in *Mitchell v. United States*, 10 Cl. Ct. 63, *as modified* 10 Cl. Ct. 787 (1986). *Mitchell* involved alleged mishandling of timber sales by the United States on lands allotted to Indians. The Indian allottees asserted that the wrong was continuing and that therefore the statute of limitations had not commenced to accrue. This Court rejected their argument, but found that the "continuing claim" doctrine was applicable:

> In this court's view, a better approach is to view the continuing wrong as a series of actionable wrongs, and allow plaintiff to sue for those wrongs which have occurred during the limitations period. This approach would prevent the defendant from escaping all liability and hence "acquiring a right" to continue its wrongdoing, while also retaining intact the six-year statute of limitations which Congress has enacted for this court. The jurisprudence of this court endorses such an approach; it is referred to as the "continuing claim" doctrine. *See Friedman v. United States*, 159 Ct.Cl. 1, 6-8, 310 F.2d 381, 384-85 (1962), *cert. denied*, 373 U.S. 932, 83 S.Ct. 1540, 10 L.Ed.2d 691 (1963).

*Id.* at 75.

The facts of the instant case establish separate and distinct actions of the United States in asserting title to Group C lands and issuing mineral leases on Group C lands all while prohibiting access, imposing unreasonable restrictions and otherwise refusing to cooperate with Plaintiffs and Plaintiffs' mineral lessees. Accepting Defendant's argument would allow the United States to acquire the right to continue its wrongdoing. This is certainly not the law. Clearly, plaintiffs may pursue their claims for temporary takings of access to Group C for the period from April 3, 1992 (six years before suit was filed) forward.

The following facts reflect the series of separate takings by the United States:

**United States Asserted Title And Leased Group C Lands:**

On October 7, 1993, Charles E. Steele, Director of Lands And Minerals, United States Department Of Agriculture, Forest Service issued a memorandum advising that Group C lands were available for leasing by the United States. The memorandum included a Controlled Surface Use Stipulation #1 to be used on mineral leases relating to Group C lands. (Pls. Uncontroverted No. 7)

In the spring of 1995, while negotiating a mineral lease on private property in the area of, but not within, Group C, Plaintiffs first learned from a potential mineral lessee that the United States was claiming title to Group C lands. (Pls. Uncontroverted No. 8)

Not less than 5,300 acres of Group C lands were included by the United States in a proposed mineral lease sale by the United States scheduled for March 28, 1996. (Pls. Uncontroverted No. 25) Plaintiffs objected to the sale and requested that their acreage be withdrawn. (Pls. Uncontroverted No. 26)

On August 22, 1996, Plaintiffs filed the Prior Lawsuit. Plaintiffs sought recognition of their

title to Group C. See, *Central Pines Land Co., et al v. United States*, No. 2:96-2000, slip op. W. D. La. July 28, 2000), *aff'd*, 274 F.3d 881 (5th Cir. 2001), *cert denied*, 537 U.S. 822 (2002). The United States answered Plaintiffs suit, denying that Plaintiffs were the owners of minerals relating to Group C lands. In the course of the litigation, the United States consistently asserted ownership of Group C minerals.

The United States granted the following mineral leases affecting Group C properties: Lease Nos. 47572, 47574, and 47750 to Union Pacific Resources Company and Lease Nos. 48555, 48556, 48557, 48558, 48559 and 48560 to Chesapeake Operating, Inc. Absent production under the leases, all of the leases contained ten year terms terminating April 30, 2007. (Pls. Uncontroverted No. 43)

Plaintiffs' title to Group C lands is uniform across the entire tract. Once the United States asserted title to Group C lands, offered the portions of Group C lands for lease and subsequently granted mineral leases on portions of Group C lands, Plaintiffs' entire property was taken. No potential mineral lessee of Plaintiffs could operate on Group C lands without a "protection" lease from the United States. A "protection" lease is a second mineral lease on the same property taken by a mineral lessee from one asserting a competing ownership interest against the first or primary mineral lessee. (Pls. Uncontroverted No. 21)

Simply stated, Plaintiffs could no longer develop the minerals on Group C lands. Plaintiffs could not lease the minerals for drilling to any of the active drillers. A similar situation was presented in *Stearns v. United States*, 53 Fed.Cl. 446 (2002). In *Stearns*, an agency of the United States issued an unfavorable interpretation of the term "on federal lands" and stated that the plaintiff lacked "valid existing rights." As a consequence, this Court recognized that the plaintiff could no longer lease its mineral rights:

> At that point, the best option plaintiff could offer a potential purchaser or lessee was the right to seek permission to mine from the Secretary of Interior. . . The right to seek permission does not have much value in the marketplace.[21]

Plaintiffs respectfully submit that the action of the United States as outlined above in asserting title to Group C lands, offering Group C lands for mineral lease and granting mineral leases on Group C lands constitutes separate distinct takings of Plaintiffs' property. Plaintiffs' claims in this regard are unrelated to termination of the moratorium on March 31, 1978. All of the actions of the United States related to these claims occurred subsequent to October 9, 1992. All of Plaintiffs' claims relating to these issues are within the statute of limitations. None of the claims are barred.

**Protective Lease Requirement Constitutes A Taking:**

Commencing April 24, 1996, Plaintiffs negotiated with Sonat in an effort to lease approximately 9,798.44 acres of Group C. (Pls. Uncontroverted No. 31) At the request of Sonat which required a protective lease on the property, United States offered the property for leasing. For reasons unknown to Plaintiffs, the United States withdrew the property sought to be leased by Sonat from its proposed lease sale. Without the possibility of a "protective" lease, Plaintiffs were unable to lease the 9,798.44 acres to Sonat. (Pls. Uncontroverted No. 32)

By letter dated September 24, 1996, Chesapeake, Plaintiffs' lessee under the 33,000 acre lease, offered to lease from Plaintiffs approximately 4,383.67 acres of Group C minerals. Because of the competing title claim to Group C minerals by the United States, Chesapeake conditioned its offer to Plaintiffs upon being permitted to obtain "protection leases from the United States" and required Plaintiffs to agree "not to interfere with Chesapeake's attempt to secure a protection lease from the U.S.A." Chesapeake conditioned its offer upon Plaintiffs agreeing to confirm in writing

---

21 *Id.*, 53 Fed.Cl. 446, 454.

to the United States "in a form acceptable to the Justice Department" that Plaintiffs would not attempt to upset any proposed lease sale by the United States of the same mineral property. (Pls. Uncontroverted No. 38)

In an effort to promote mineral development of Group C, Plaintiffs acquiesced. On September 26, 1996, Plaintiffs entered into a mineral lease with Chesapeake. The lease covered 4,822.10 acres of Group C lands. (Pls. Uncontroverted No. 39) By letter of the same date, Plaintiffs advised the United States through its counsel, Eisenberg, of the lease and specifically confirmed that no plaintiff would attempt to upset or otherwise interfere with the scheduled mineral lease sale. (Pls. Uncontroverted No. 40)

United States Department Of Justice attorney, Bret Birdsong, advised Plaintiffs that additional Group C acreage may be included in a scheduled lease sale and requested that Plaintiffs agree to not attempt to upset the sale. In an effort to promote mineral development of Group C, Plaintiffs acquiesced and by letter dated October 9, 1996 complied with the request of the United States Department Of Justice. (Pls. Uncontroverted No. 41)

The protection lease requirement put Plaintiffs' lessees and potential lessees at risk that a competitor would obtain the lease from the United States at public bidding, thus precluding development of the property. (Pls. Opp'n. Ex.49, Henry Hood Dep. p. 36)

Each of the above situations, *i.e.*, action of the United States in offering areas of Group C lands for lease, while later withdrawing the acreage for the scheduled sale; action of the United States in offering areas of Group C lands for lease conditioned upon Plaintiffs agreeing "in a form acceptable to the Justice Department" that Plaintiffs would not attempt to upset the proposed lease sale; or action of the United States resulting in Plaintiffs' potential mineral lessees risking that a

competitor would acquire the desired lease at a public sale all constitute separate takings of Plaintiffs' property. Note of these claims relate to termination of the moratorium in March 31, 1978. Each of these situations occurred subsequent to 1995. Each claim is within the limitation period of the statute of limitations.

**Plaintiffs' Lost Leasing Opportunities:**

**Chesapeake:**

Chesapeake stock is publicly traded on the New York Stock Exchange. (Pls. Uncontroverted No. 11) Chesapeake is a Fortune 500 company. (Pls. Uncontroverted No. 12) Chesapeake claims to be the nations's most active oil and gas explorer and the second largest independent natural gas producer in the United States. (Pls. Uncontroverted No. 12)

In the 1995 to 1997 time frame, Chesapeake considered the area of Fort Polk prospective for oil and gas drilling in the Austin Chalk geological formation. (Pls. Uncontroverted No. 15) During that time period, Chesapeake leased approximately 1,000,000 acres of land in around the Fort Polk area. (Pls. Uncontroverted No. 20)

Effective August 1, 1995, corporate parents of Central Pines Land Company, L.L.C. and Tower Minerals Company, L.L.C. entered into the 33,000 acre lease with Chesapeake. (Pls. Uncontroverted No. 10) Under the 33,000 acre lease, Chesapeake successfully drilled wells on Plaintiff's property contiguous to and offsetting Group C lands. (Pls. Uncontroverted No. 14)

In the course of negotiating the 33,000 acre mineral lease, Chesapeake expressed interest in leasing Group C. (Pls. Uncontroverted No. 16) By letter dated March, 1996, Chesapeake followed up with the negotiations to lease the Group C lands. (Pls. Uncontroverted No. 17) By letter dated April 8, 1996, Plaintiffs confirmed their willingness to lease to Chesapeake Group C lands on the