same lease form as used by the parties for the 33,000 acre lease. (Pls. Uncontroverted No. 18)

In an effort to acquire a necessary protective lease from the United States, Chesapeake management enlisted, to no avail, the assistance of the Governor of Louisiana and a United States Senator from Louisiana. (Pls. Opp'n Ex.51, Price Dep. pp. 58-59)

Absent the action of the United States disputing Plaintiffs' title to Group C and issues concerning access to Fort Polk, Chesapeake would have leased the entirety of Group C lands from Plaintiffs. (Pls. Uncontroverted No. 19)

**Sonat:**

On July 1, 1996, Plaintiffs entered into the 28,000 acre lease with Sonat. (Pls. Uncontroverted No. 33) Sonat representatives made it clear that if they could have obtained leases and access from the United States, they would have leased the entirety of Group C lands from Plaintiffs. (Pls Opp'n Ex.48, Hamilton Dep. 33, 34-35)

**Belco:**

In 1996, Belco paid approximately $60,000,000 in mineral lease bonuses to mineral owners in the Austin Chalk trend in Louisiana. (Pls. Uncontroverted No. 27) Belco wanted to lease and drill on Group C lands. (Pls. Uncontroverted No. 28)

Commencing March, 1996, Plaintiffs negotiated with Belco to lease 20,295 acres of Group C. Plaintiffs reached agreement with Belco on the terms of a lease. Because the United States Army denied Belco access to Group C surface, Belco did not execute the lease with Plaintiffs. (Pls. Uncontroverted No. 29)

If the United States Army would have allowed Belco access to the property, Belco would have leased the entirety of Group C from Plaintiffs. (Pls. Uncontroverted No. 30)

In an effort to obtain access to Group C lands, Belco employed the prestigious Washington, D.C. law firm of Patton, Boggs & Blow. A meeting, including Belco representative Fife and a Patton, Boggs attorney, was arranged with appropriate officials at Fort Polk. After Belco rolled out its maps to show the area where it wanted to drill, it was informed: "Yeah, that's the one area that you can't have. It's an old artillery range." (Pls. Opp'n Ex.47, Fife Dep. p. 16.)

When Belco proposed using an extremely small area for a drill site, the Army personnel responded that "there was a lot of unexploded ordnance out there and that we could not go." (Pls. Opp'n Ex.47, Fife Dep. p. 16). Belco's suggestion that a small area be cleared of the unexploded ordnance "wasn't acceptable." (Pls. Opp'n Ex.47, Fife Dep. p. 17). According to Fife, "the Army said absolutely no about coming on the place itself." (Pls. Opp'n Ex.47, Fife Dep. p. 19.)

Belco even offered to"assume full responsibility, even "if something blows up out there then we're responsible. The Army has nothing to do with it. Let us go under those conditions." The Army responded that "No, you can't go out there." (Pls. Opp'n Ex. 47, Fife Dep. p. 32.)

Chesapeake, Belco and Sonat were fierce competitors for a lease on Plaintiffs' Group C lands. Chesapeake acquired 1,000,000 acres of leased land. Belco spent approximately $60,000,000 in its leasing effort. Fife, the Belco representative, referred to the activity as a "land grab:"

> Yes. Chesapeake had all of these lands leased and right in the middle of it was Fort Polk. And in the oil business you'll have land maps and the home team is usually colored yellow. Well, we always colored Chesapeake blue, so you had a sea of blue [on the map]. And to have put one big spot of yellow right in the middle of it, this is war. This is a land grab. You know, there are no friends. And he [Mr. Belfer] wanted that lease so bad.[22]

Had it not been for the actions of the United States, Plaintiffs could have leased the entirety

[22] Pls. Opp'n Ex.47, Fife Dep. p. 12.

of Group C lands. The actions of the United States constitutes a taking. The takings are separate and unrelated to termination of the moratorium on March 31, 1978. All of these activities occurred after 1995, well within the statute of limitations.

**Loss Of Drilling Opportunity Constitutes A Taking:**

Simply stated, representatives of Chesapeake, Sonat and Belco all stated at their depositions that if they had been able to obtain protection leases and had access to Group C lands, their respective companies would have drilled wells on Group C lands. ( Pls. Opp'n Ex.44, Denny Dep. 19, 21 - 22, 29, 30; Pls. Opp'n Ex.51, Price Dep. 60) (Pls Opp'n Ex.48, Hamilton Dep. 33, 34 - 35. Except for Belco which had no lease from Plaintiffs, each of the other companies had drilled successful wells pursuant to leases from Plaintiffs on contiguous property.

Plaintiffs' loss of the drilling opportunity is separate and distinct from the loss of mineral leasing opportunity. The loss of drilling opportunity is a separate taking, unrelated to termination of the moratorium on March 31, 1978. These losses occurred subsequent to 1996, well within the statute of limitations.

**Denial Of Access Constitutes A Taking:**

The Belco situation presents not only a loss of lease opportunity, but a clear denial of access to drill. Denying Belco access to drill under a lease to be obtained from Plaintiffs' on Group C lands constitutes a separate taking. The taking is unrelated to termination of the moratorium on March 31, 1978. This action occurred in 1996, well within the statute of limitations.

**Permitting And Operational Requirements Constitute A Taking:**

When the United States first offered Group C lands for leasing, it included a "Controlled Surface Use Stipulation #1" (Pls. Uncontroverted No. 7). Consistently thereafter, the United States

imposed various operating standards for operations on the Fort. Standard Operating Procedures For Exploration And Field Development Drilling of Oil/Gas Wells, SOP No. 32X-2 contains procedures and restrictions on mineral development on Group C lands. (Pls. Opp'n Ex.40). Prior to drilling a well within Group C, which never happened, Plaintiffs' lessees (all of whom had acquired "protective" leases from the United States) were required to submit a detailed Application For Permit To Drill Or Deepen to the Bureau Of Land Management. Within Group C, the procedure also required the filing of a Final Environmental Assessment and the ultimate issuance of "Conditions Of Approval For Oil And Gas Exploration."

When a representative of Sonat's successor, Swift Energy Company, went to Fort Polk to inquire about drilling, he was presented with a "Special Stipulations, Fort Polk, Louisiana." (Pls. Opp'n. Ex.52, Zanovich Dep. Ex. 6.)

The recurring theme of each of these controlled use stipulations, standard operating procedures, permits, conditions of approval and special stipulations is that "the military mission of Fort Polk supersedes all other land uses." Plaintiffs do not contend that, as a matter of national security, the military mission should not be paramount. Plaintiffs merely contend that under clear Louisiana law, the mineral servitude is the dominant estate and by making the military mission supersede all other uses, the United States violates Plaintiffs' rights. Such action constitutes a taking of Plaintiffs' property.

Zanovich, the Swift Energy Company witness, testified that the Special Stipulations, Fort Polk, Louisiana "would make it nearly impossible for a company to want to drill or have operations on these lands with these stipulations." (Pl. Opp'n Ex.52, Zanovich Dep. p. 41.

The situation is similar to that in *Del Rio Drilling Programs, Inc. v. United States*, 35 Fed.Cl.

186, (1996), *superseded by* 37 Fed.Cl. 157 (1997), *reversed on other grounds and remanded by* 146 F.3d 1358 (Fed. Cir. 1998), *reinstated by* 46 Fed.Cl. 683 (2000). In *Del Rio*, the controversy involved land on the Uintah and Ouray Indian Reservation. The land was owned by the United States. Congress split the land into a surface estate and a mineral estate. The surface estate was transformed into an Indian Reservation. The BLM issued various leases to plaintiffs for mineral operations on the mineral estate. When the mineral lessees attempted to exercise their rights, they learned that they were expected to obtain road rights-of-way and drilling pad permits from the Bureau of Indian Affairs. In Utah, as in Louisiana, ownership of mineral rights is dominant over the surface estate. This Court made it clear that plaintiffs rights were taken when the mineral operations were subordinated to the Indian right of way requirements. This Court ruled:

> Of course the "right" to exploit the minerals would be worthless without the additional right of access to them. If the lessee of the mineral estate has to ask the owner of the surface for a right-of-way to access the minerals, then the lessee has no easement at all.[23]

In reinstating the opinion, this Court further ruled:

> Second, and most importantly for purposes of this opinion, it establishes that, contrary to the position of BIA and BLM, the Tribal Consent Act did not give the Tribe the legal right to stop plaintiffs from accessing their leasehold estates.[24]

In this situation, the United States Army had no legal right to restrict Plaintiffs' access or to impose any controlled use stipulations, standard operating procedures, permits, conditions of approval and special stipulations. By doing so, the United States took Plaintiffs' property rights. These takings are unrelated to termination of the moratorium on March 31, 1978. These are separate independent takings which occurred within the statute of limitations in this case.

---

23 34 Fed..Cl. at 195.

24 46 Fed..Cl. at 684.

**Military Operations Constitute A Taking:**

In the Summer of 1997, Plaintiffs' potential lessee requested that the United States offer a portion of Group C for leasing. Because of the claim of the United States, Plaintiffs' potential lessee required protection leases. Stephen M. Sittnick, LTC, IN, G3/DPTMS responded to an internal inquiry with memorandum AFZX-GT dated July 23, 1997. The response included the following:

> a. By definition, this impact area is, and has been, off limits to personnel and/or vehicle surface activities. Additionally, no digging in that zone is allowed due to unexploded ordnance (surface and subsurface). RLIA was established o/a 1977, and all types of dud producing munitions have been filed into that area. Any effort to surface and subsurface clear that zone for oil exploration would be extremely unsafe, and expensive.
>
> b. Any oil exploration activities in or around the RLIA zone would close a number of ranges/training areas that have Surface Danger Zones (SDZ's) oriented into RLIA. This would severely impact the training and readiness of assigned units and supported Reserve Component units. Additionally, oil exploration activities on or near RLIA would seriously impact Operations Group's use of the Zion Hills area as rotational unit maneuver space and/or Live Fire area.

In the above situation, the protective lease could not be obtained, and, thus, Plaintiffs were unable to lease their property.

On March 11, 1997, representatives of Plaintiffs' mineral lessee, Sonat, met with representatives of the United States to discuss possible access to, and mineral operations on, Group C lands. (Pls. Uncontroverted No. 50) Not less than 18 representatives of various Army and Forest Service agencies were in attendance at the meeting, which included the following discussion items:

> Sonat was admonished by Mr. Hammerschmidt, Fort Polk Deputy Director of Public Works, that a proposed well location was in an area referred to as "Ranges 40-43, the tank gunnery ranges." He explained that the tanks shoot "120 mm projectiles" and "will deliver about 6500 meters." He stated that he was concerned about a "vertical stack of valves", *i.e.* an oil well wellhead christmas tree, for

> a well at that location and "how we can successfully protect it so that we don't cause something problematic to occur." Hammerschmidt further advised that: "Inside this fan is considered an area which increases the possibility of an accident; wells 19-1, 31-1 and 21-1 are all within this fan area."
>
> Dr. Ron Tomas, Fort Polk Office of the Garrison Commander, commented on the "fan" as follows: "the fan is very conservative and the probability of something happening is very high."
>
> Hammerschmidt advised that the Army was "not willing to accept responsibility for people while training is ongoing."
>
> Hammerschmidt advised that wellheads in the area must be protected with "berming."
>
> Hammerschmidt advised that underground pipelines should be buried to 15 feet deep (industry standard is 36").
>
> The discussion specifically included safety issues relating to wells taking "a direct hit."
>
> Dr. Tomas stated that Sonat should consider moving its preferred location for well 31-1 "nearer Lookout Road." Tomas said that the range in question was used about 60 days per year and "reiterated if they don't move, there will be massive amounts of coordination required to get a truck to the site."

On April 1, 1997, representatives of Plaintiffs' lessee, Chesapeake, met with representatives of the United States to discuss access to, and mineral operation restrictions within, Group C. Not less than 14 representatives of the Army and Forest Service attended the meeting. The Chesapeake meeting was similar to the Sonat meeting with discussions focused on safety aspects of live fire, depth for placing pipelines, location of wells, placement of production facilities and the avoidance of "flares" which could be dangerous to night flying aircraft. (Pls. Uncontroverted No. 52)

It is inconceivable that any reasonable mineral operator would conduct operations under circumstances discussed with either Sonat or Chesapeake. Surely, any prudent operator would take

the Garrison Commander serious when he stated that "the fan is very conservative and the probability of something happening is very high." No prudent operator would risk having a well taking "a direct hit." The cost of the "massive amounts of coordination required to get a truck to the site" could destroy the economics of a well. No prudent operator should take a risk when the Army has made it clear that the Army was "not willing to accept responsibility for people while training is ongoing."

None of Plaintiffs's lessees took the risk. Neither Chesapeake nor Sonat drilled wells on Group C.

In its memorandum, the Defendant suggested that the meetings attended by Chesapeake and Sonat were not official, in that neither company made specific requests to drill. To the contrary, Chesapeake representatives thought the meeting was official:

Q. Okay. Let me back up because that's a fair objection. Was there an official request made of the Army by Chesapeake?

A. We thought the official request had been made at the meeting, that that was what the meeting was all about, that we wanted to have their consent to working with us on an operational basis.

Q. And that was your understanding, that that meeting was an official request?

A. Yes.[25]

At the meeting, Chesapeake was represented by its Vice-President of Corporate Development, its Senior Vice-President of Operations, its Senior Drilling Engineer, its Manager of Business Development, a landman and a consultant. [26] On the United States side, there were not less than 14 representatives of the Army and Forest Service attending the meeting. Plaintiffs respectfully submit

25 Pls. Opp'n Ex.46, Dunlap Dep. p. 21.

26 Pls. Opp'n Ex.44, Denny Dep. pp. 42-43.

that the meeting was official and that Chesapeake was there exactly as Mr. Dunlap testified "to have their consent to working with us on an operational basis."

Chesapeake never drilled a well with a surface location within Group C. (Pls. Uncontroverted No. 53)

A similar situation existed at the Sonat meeting. In addition to the Sonat team, not less than 18 representatives of the Army and Forest Service were in attendance. One of the attendees was the Garrison Commander. Despite Sonat following up on several discussion items and actually filing for permits for drilling within Group C, Sonat never drilled any well with a physical location within the surface of Group C.

The military operations are relevant in two separate ways. First in the action of the United States in refusing to lease portions of Group C lands because mineral operations would interfere with, or be inconsistent with the military operations. Second, because no prudent operator would conduct business in an around the military operations. Such military operations constitute separate takings of Plaintiffs' property. These takings are not related to termination of the moratorium in 1978. The instances cited above all occurred within the statute of limitations.

**Contamination Constitutes A Taking:**

The same July 23, 1997 memorandum from Stephen M. Sittnick, referred to above also reflects that the decision to not offer portions of Group C lands for leasing was based on the fact that the property contained unexploded ordnance (surface and subsurface); any effort to surface and subsurface clear that zone for oil exploration would be extremely unsafe, and expensive. Based on the memo, at some date, unknown to Plaintiffs, portions of Group C became too contaminated and/or dangerous for mineral operations. Plaintiffs do not know the geographic extent of this area. The

dangerous or contaminated condition of portions of Group C constitutes a separate taking of Plaintiffs property. This taking is unrelated to termination of the moratorium in 1978. Plaintiffs learned of the situation in discovery in the Prior Lawsuit. The situation continues and is within the statute of limitations.

## (F) CONCLUSION

As mineral owners, Plaintiffs are entitled to unrestricted access to Group C lands for mineral operations. On March 31, 1978, the date the moratorium terminated, no events "occurred which fix the liability of the Government and entitle the claimant to institute an action" and terminating the moratorium was not a "single distinct event, which may have continued ill effects later on." Plaintiffs submit that there being no taking, there could be no "seminal event" triggering the statute of limitations.

Prior to the moratorium terminating on March 31, 1978, the United States considered various contingency plans to prevent, impede or limit mineral development on Group C lands after termination of the moratorium. There is no evidence that the United States acted on its contingency plans, at least not until after 1992. Instead, the United States decided to take a "calculated risk" that Plaintiffs would not attempt to access Group C lands. Between 1978 and 1992, the United States took no action to prevent, impede or limit Plaintiffs' access to Group C lands or to otherwise prevent Plaintiffs from developing minerals on Group C lands.

Defendant's "calculated risk" is not a "seminal event." Defendant's "calculated risk" does not even rise to the level of a threat of condemnation which this court has previously ruled "does not provide a basis for finding that a taking has occurred.

Plaintiffs learned of Defendants contingency plans and its calculated risk in connection with

the Prior Lawsuit. Even if such events had triggered the statute of limitations, the statute was tolled until Plaintiffs learned of the situations.

The facts of the instant case establish separate and distinct actions of the United States in asserting title to Group C lands and issuing mineral leases on Group C lands all while prohibiting access, imposing unreasonable restrictions and otherwise refusing to cooperate with Plaintiffs and Plaintiffs' mineral lessees.

None of the separate takings relate to termination of the moratorium in 1978. All occurred after 1992, well within the statute of limitations.

The situation is obvious. As testified to by the Belco witness while being examined by counsel for Defendant:

> I mean, it's Fort Polk and it's not leased. Why isn't it leased? Well, obviously, everything around it's leased. Why didn't they lease this? Well, I mean, you don't have to be a real brain surgeon to figure out that there is a problem with the Army.[27]

Plaintiffs respectfully submit that Defendants motion should be denied.

[27] Pls. Opp'n Ex. 47, Fife Dep. p. 28.

Respectfully submitted,

**THE GRAY LAW FIRM (APLC)**

BY: /S/ A. J. GRAY, III
**A. J. GRAY, III** (La. Bar #6253)
P. O. Box 1467
Lake Charles, LA 70602-1467
Telephone: (337) 494-0694
Facsimile: (337) 494-0697

Of Counsel:

Thomas C. McKowen, IV
STRAIN, DENNIS, & BATES, L.L.P.
318 St. Charles Street
Baton Rouge, LA 70802
Telephone: (225) 343-0100
Facsimile : (225) 343-0344

**CERTIFICATE OF SERVICE**

I hereby certify that copies of the foregoing PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT was served on the following counsel of record by first class mail, postage prepaid:

Alex Kriegsman
United States Department Of Justice
Environmental And Natural Resources Division
Natural Resources Section
601 D Street, N.W., Room 3814
Washington, D.C. 20004

Terry Petrie
Natural Resources Section
Environment And Natural Resources Division
U.S. Department of Justice
999 18th Street
Suite 945, North Tower
Denver, CO 80202

LTC Michael D. Graham
Litigation Attorney
U.S. Army Environmental Law Division
901 N. Stuart Street, Suite 400
Arlington, VA 22203-1837

THUS DONE AND SIGNED on this 13TH day of February, 2007.

/s/ A. J. GRAY, III

**A. J. GRAY, III**