IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **CENTRAL PINES LAND COMPANY, ET AL.**<br>**Plaintiffs,**<br>**versus**<br>**THE UNITED STATES,**<br>**Defendant** | ) | **No. 98-314 L**<br>**Chief Judge Edward J. Damich** |

# PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT
## IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant of Rule 56(h)(2) of the United States Court of Federal Claims, Central Pines Land Company, L.L.C., Jack E. Lawton Sr., Jack E. Lawton, Jr., Tower Minerals Company, L.L.C., William B. Lawton Company, L.L.C., Linda Lew Lawton Drost, Evelyn Gay Lawton Duhon, D, S & T, Inc. and Drost & Brame, Inc., (collectively "Plaintiffs") respectfully submit the following Proposed Findings Of Uncontroverted Fact In Opposition To Defendant's Motion For Summary Judgment in the above-referenced suit:

1. Prior to the moratorium terminating on March 31, 1978, the United States considered contingency plans to prevent, impede or limit mineral development on Group C lands after termination of the moratorium. Pls Opp'n Ex. 2, Disposition Form dated January 19, 1967 by Darwin L. Wilder and Tom Adams; Pls Opp'n Ex.3, Disposition Form dated April 30, 1974 by Clarence C. Randle, Chief, Condemnation Section, Real Estate Division; Pls Opp'n Ex. 4, Minutes of meeting at Fort Polk on June 27,

1974 prepared by Colonel Jerry L. Teague; Pls Opp'n Ex.5, Letter dated June 26, 1974 to HQDA, WASH DC from Joe H. Sheard, Colonel, CE, District Engineer; Pls Opp'n Ex. 6, Undated Memorandum (after June 27, 1974 and believed to be July 10, 1974) to Secretary of the Army from Major General D. A. Raymond, Acting Chief of Engineers; Pls Opp'n Ex.7, Undated Executive Summary Major General Commanding Robert Haldane; Pls Opp'n Ex.8, Undated Memorandum (apparently January 13, 1976) by Darwin L. Wilder; Pls Opp'n Ex.9, Memorandum for Commanding General dated January 19, 1976 by Teague; Pls Opp'n Ex.10, Disposition Form dated January 19, 1977 by Darwin L. Wilder, Chief, Acquisitions Branch, Real Estate Division; Pls Opp'n Ex. 12, Memorandum For Record dated May 2, 1977 from Captain Christopher G. Hunt, Real Estate Officer; Pls Opp'n Ex.13, Letter dated May 5, 1977 to Darwin Wilder, Real Estate Division, Fort Worth from Levin Harris, Assistant U. S. Attorney, Shreveport; Pls Opp'n Ex.14, Attorney's opinion dated May 11, 1977 by R. P. Allen, Jr. concerning Fort Polk Mineral Moratorium; Pls Opp'n Ex. 15, Letter dated June 6, 1977 to Commander, US Army FORSCOM from William B. Steele, Major General, USA, Commanding.

2. The documents in 1. above were discovered by Plaintiffs in the course of the Prior Lawsuit which was filed August 22, 1996. Pls Opp'n Ex.41, A. J. Gray, III Affidavit.

3. Between 1978 and 1991, Plaintiffs did not attempt to exercise mineral rights on Group C lands. Pls Opp'n Ex.42, Plaintiffs' Response To Defendant's First Set Of Interrogatories And Requests For Production Of Documents To Plaintiffs, Answer to Interrogatory No. 2.

4. Between 1978 and 1991, the United States took a "calculated risk" that Plaintiffs would not attempt to access Group C lands, and, thus, the United States took no action to prevent, impede or limit Plaintiffs' access to Group C lands or to otherwise prevent Plaintiffs from developing minerals on Group C lands. Pls Opp'n Ex. 16, Memo dated June 17, 1977 to Division Engineer, Southwestern from Michael B. Cottrell; Pls Opp'n Ex. 18, Memo dated June 22, 1977 to HQDA, Wash. D.C. from M. R. Long, Acting Chief, Real Estate Division; Pls Opp'n Ex. 15, Letter dated June 6, 1977 to Commander, US Army FORSCOM from William B. Steele, Major General, USA, Commanding; Pls Opp'n Ex.17, Undated letter (approximately June 1977) to Commander US Army FORSCOM from William B. Steele, Major General, USA, Commanding.

5. Prior to October 9, 1992, the United States did not claim ownership of minerals underlying Group C, and, after the moratorium ended, took no formal action to deprive Plaintiffs access to Group C minerals. Pls. Opp'n Ex. 19, Letter dated August 5, 1988, by Danny W. Britt, Forest Supervisor, to Regional Forester; Pls. Opp'n Ex.1, Memorandum on Moratorium on Minerals, Fort Polk dated December 16, 1966 to Chief of Engineers from Jack W. Fickessen, Colonel, CE, District Engineer; Pls. Opp'n Ex. 5, Letter dated June 26, 1974 to HQDA, WASH DC from Joe H. Sheard, Colonel, CE, District Engineer.

6. On October 9, 1992, a title opinion was rendered to the United States which, as to Group C lands, stated that the United States "can now claim mineral ownership where drilling has not occurred for a ten-year period regardless of the date of

acquisition by the U.S." Plaintiffs do not have a copy of the title opinion. By letter dated November 8, 1995, Plaintiffs' Freedom of Information Act request for the letter was denied.

7. On October 7, 1993, Charles E. Steele, Director of Lands And Minerals, United States Department Of Agriculture, Forest Service issued a memorandum number 2820 which advised that additional lands were available for leasing by the United States as a result of the October 9, 1992 opinion. The memorandum included Group C lands and a Controlled Surface Use Stipulation #1 which applied to the Intensive Use Area for Fort Polk. Pls Opp'n Ex.20.

8. In the spring of 1995, while negotiating a mineral lease on property in the area of, but not within, Group C, Plaintiffs first learned from a potential mineral lessee that the United States was claiming title to Group C lands. Pls. Opp'n Ex.50, Minaldi Dep. pp. 18, 29-30, 47-48, 60; Pls Opp'n Ex.43, Drost Dep. 84-85, 86, 87.

9. By letter dated April 6, 1995, a representative of Union Pacific Resources Company offered to lease Plaintiffs' minerals affecting property outside of Group C but confirmed that the company was interested in developing Plaintiffs' acreage in the "Artillery Range," a portion of Group C lands. Pls. Opp'n Ex.21.

10. By Hydrocarbon Lease dated effective August 1, 1995, corporate parents of Central Pines Land Company, L.L.C. and Tower Minerals Company, L.L.C. leased to Chesapeake Operating, Inc. ("Chesapeake") approximately 33,607.5325 acres of land contiguous to, but not included within, Group C ("33,000 acre lease"). Pls Opp'n Ex. 22; Pls Opp'n Ex. 46, Dunlap Dep. Ex. 4; Pls Opp'n Ex. 44, Denny Dep. 2; Pls

Opp'n Ex.43, Drost Dep. p. 107.

11. Chesapeake stock is publicly traded on the New York Stock Exchange. Pls Opp'n Ex.51, Price Dep. pp. 12-13; Pls. Opp'n Ex. 49, Hood Dep. p. 10.

12. Chesapeake is a Fortune 500 company. Pls. Opp'n Ex. 51, Price Dep. p. 13.

13. Chesapeake claims to be the nations's most active oil and gas explorer and the second largest independent natural gas producer in the United States. Pls Opp'n Ex. 51, Price Dep. p. 12.

14. Under the 33,000 acre lease, Chesapeake successfully drilled wells on Plaintiff's property contiguous to and offsetting Group C. Pls. Opp'n Ex. 46, Dunlap Dep. pp. 31-32, 34; Pls. Opp'n Ex. 44, Denny Dep. pp. 23-24; Pls. Opp'n Ex. 49, Hood Dep. pp. 18, 19.

15. In the 1995 to 1997 time frame, Chesapeake considered the area of Fort Polk prospective for oil and gas drilling in the Austin Chalk geological formation. Pls Opp'n Ex. 51, Price Dep. pp. 19, 66; Pls Opp'n Ex. 45, Dixon Dep. pp 21-22.

16. In the course of negotiating the 33,000 acre mineral lease, Chesapeake expressed interest in leasing Group C. Pls. Opp'n Ex. 50, Minaldi Dep. at pp. 19, 23, 25, 28; Pls Opp'n Ex.43, Drost Dep. 105, 108.

17. By letter dated March, 1996, Chesapeake followed up with the negotiations to lease the Group C lands "Artillery Range."

18. By letter dated April 8, 1996, Plaintiffs confirmed their willingness to lease to Chesapeake Group C lands on the same lease form as used by the parties for the 33,000 acre lease.

19. Absent the action of the United States disputing Plaintiffs' title to Group C and issues concerning access to Fort Polk, Chesapeake would have leased the entirety of Group C from Plaintiffs. Pls Opp'n. Ex. 46, Dunlap Dep. p. 54; Pls. Opp'n Ex. 44, Denny Dep. pp.17, 45-46, 56; Pls Opp'n Ex. 50, Minaldi Dep. p. 79; Pls. Opp'n Ex.43, Drost Dep. pp. 105, 108.

20. During the relevant time period of 1996 and 1997, Chesapeake leased approximately 1,000,000 acres of land in and around the Fort Polk area. Pls. Opp'n Ex. 44, Denny Dep. p. 35; Pls. Opp'n Ex. 46, Dunlap Dep. p. 15.

21. A "protection" lease is a second mineral lease on the same property taken by a mineral lessee from one asserting a competing ownership interest against the first or primary mineral lessee. Pls. Opp'n Ex. 44, Denny Dep. p. 25; Pls. Opp'n Ex.51, Price Dep. p. 40.

22. If Chesapeake had been able to obtain a protection mineral lease from the United States on Group C and if the Army had permitted access to the property, Chesapeake would have drilled wells on Group C. Pls. Opp'n Ex. 44, Denny Dep. pp. 19, 21-22, 29, 30; Pls. Opp'n Ex. 51, Price Dep. p. 60.

23. After learning in the spring of 1995 that the United States claimed title to Group C lands, inquiry lead Plaintiffs to the Office Of General Counsel, United States Department Of Agriculture in Little Rock, Arkansas. By letter dated November 9, 1995 addressed to Mike Cruse, Deputy General Counsel, Plaintiffs supplied the United States with pertinent title documents, land use records and legal principles which established that Plaintiffs owned the minerals under Group C lands. Pls.

Opp'n Ex. 23.

24. Cruse referred Plaintiffs to Jeffery D. Eisenberg, Office Of General Counsel, United States Department Of Agriculture, Washington, D.C. By letter dated February 29, 1996 to Eisenberg, Plaintiffs asserted title to the Group C minerals which were being offered for lease by the United States. Plaintiffs respectfully requested that the properties be withdrawn from proposed lease sale. Pls Opp'n Ex.24.

25. Not less than 5,300 acres of Group C lands were included by the United States in a proposed mineral lease sale by the United States scheduled for March 28, 1996. Pls. Opp'n Ex.24.

26. Pursuant to Eisenberg's request, by letter dated March 11, 1996, Plaintiffs submit a proposal whereby in exchange for recognizing Plaintiffs' title to Group C lands, the United States would be compensated for mineral production under Group C. Pls. Opp'n Ex. 25.

27. In 1996, Belco Oil & Gas Corp. ("Belco") paid approximately $60,000,000 in mineral lease bonuses to mineral owners in the Austin Chalk trend in Louisiana. Pls. Opp'n Ex. 47, Fife Dep. p. 11)

28. Belco wanted to drill on Group C lands. (Pls. Opp'n Ex.47, Fife Dep. pp. 12, 15, 21, 28)

29. Commencing March, 1996, Plaintiffs negotiated with Belco to lease 20,295 acres of Group C. Plaintiffs reached agreement with Belco as to the terms of a lease; but because the United States Army denied Belco access to Group C surface, Belco did not execute a lease with Plaintiffs. Pls. Opp'n Ex. 47, Fife Dep. pp. 12, 15, 33; Pls.

Opp'n Ex. 43, Drost Dep. pp. 107, 108.

30. If the United States Army would have allowed Belco access to the property, Belco would have leased the entirety of Group C from Plaintiffs. Pls. Opp'n Ex.47, Fife Dep. pp. 16 - 17, 25, 28-29, 33, 34; Pls. Opp'n Ex. 47, Fife Dep. Ex. 2; Pls. Opp'n Ex. 50, Minaldi Dep. pp. 45, 79; Pls Opp'n Ex.43, Drost Dep. pp. 34-35, 46, 49-50, 73, 74, 105, 107, 108.

31. Commencing April 24, 1996, Plaintiffs negotiated with Sonat Exploration Company ("Sonat") in an effort to lease approximately 9,798.44 acres of Group C. Pls. Opp'n Ex.48, Hamilton Dep. pp.70-71, 72, 73; Hamilton Dep. Ex. 3; Hamilton Dep. Ex. 4; Hamilton Dep. Ex. 5; Opposition Ex. 43, Drost Dep. p. 107.

32. The United States withdrew the property sought to be leased by Sonat from its proposed lease sale. Without the possibility of a "protective" lease, Plaintiffs were unable to lease the 9,798.44 acres to Sonat. Pls. Opp'n Ex. 48, Hamilton Dep. p. 77.

33. By Hydrocarbon Lease dated July 1, 1996, Plaintiffs leased approximately 28,668.93 acres of property contiguous with and partially including Group C to Sonat. Pls Opp'n Ex.48, Hamilton Dep. 67; Hamilton Dep. Ex. 2; Pls Opp'n Ex.43, Drost Dep. p. 107.

34. If Sonat had been able to obtain a protective mineral lease and access, it would have drilled on Fort Polk. Pls Opp'n Ex.48, Hamilton Dep. pp. 33, 34-35.

35. By letter dated August 6, 1996, Eisenberg responded to Plaintiffs' proposal by rejecting the settlement. Pls. Opp'n Ex.31.

36. On August 22, 1996, Plaintiffs filed civil action number CV96-2000 on the docket

of the United States District Court, Western District of Louisiana against the United States for declaratory judgment pursuant to 28 U.S.C.§2201 and to quiet title to real estate pursuant to 28 U.S.C. §2409a. In their Complaint, Plaintiffs sought recognition of their title to Group C. See, *Central Pines Land Co., et al v. United States*, No. 2:96-2000, slip op. W. D. La. July 28, 2000), *aff'd*, 274 F.3d 881 (5th Cir. 2001), *cert denied*, 537 U.S. 822 (2002).

37. The United States answered Plaintiffs suit, denying that Plaintiffs were the owners of minerals relating to Group C. In the course of the litigation, the United States consistently asserted ownership of Group C minerals. See, *Central Pines Land Co., et al v. United States*, No. 2:96-2000, slip op. W. D. La. July 28, 2000), *aff'd*, 274 F.3d 881 (5th Cir. 2001), *cert denied*, 537 U.S. 822 (2002).

38. By letter dated September 24, 1996, Chesapeake, Plaintiffs' lessee under the 33,000 acre lease, offered to lease from Plaintiffs approximately 4,383.67 acres of Group C minerals (ultimately the lease covered 4,822 acres). Because of the competing title claim to Group C minerals by the United States, Chesapeake specifically conditioned its offer to Plaintiffs upon being permitted to obtain "protection leases from the United States" and required Plaintiffs to agree "not to interfere with Chesapeake's attempt to secure a protection lease from the U.S.A." Chesapeake conditioned its offer upon Plaintiffs agreeing to confirm in writing to the United States "in a form acceptable to the Justice Department" that Plaintiffs would not attempt to upset any proposed lease sale by the United States of the same mineral property. Pls. Opp'n Ex. 32; Pls. Opp'n Ex. 49, Hood Dep. p. 14, 26, 31, Hood Dep. Ex. 2; Pls Opp'n Ex.

46, Dunlap Dep. Ex. 5.; Pls. Opp'n Ex.44, Denny Dep. Ex. 7.

39. In an effort to promote mineral development of Group C, Plaintiffs acquiesced to Chesapeake's limitations. On September 26, 1996, Plaintiffs entered into a mineral lease with Chesapeake. The lease covered 4,822.10 acres of Group C. Pls Opp'n Ex. 33; Pls Opp'n Ex. 46, Dunlap Dep. Ex. 2; Pls. Opp'n Ex.44, Denny Dep. Ex. 3.

40. By letter dated September 26, 1996, Plaintiffs advised the United States through its counsel, Eisenberg, of the lease and confirmed that no plaintiff would attempt to upset or otherwise interfere with the scheduled mineral lease sale. Pls Opp'n Ex. 34; Pls Opp'n Ex.49, Hood Dep. Ex. 5.; Pls Opp'n Ex. 46, Dunlap Dep. Ex. 7.

41. United States Department Of Justice attorney, Bret Birdsong, advised Plaintiffs that additional Group C acreage may be included in a scheduled lease sale and requested that Plaintiffs agree to not attempt to upset the sale with regard to the additional acreage. In an effort to promote mineral development of Group C, Plaintiffs acquiesced and by letter dated October 9, 1996 complied with the request of the United States Department Of Justice. Pls Opp'n Ex. 35; Pls Opp'n Ex.46, Dunlap Dep. Ex. 8.

42. Because the United States claimed title to Group C, Plaintiffs' lessees and prospective lessees were required to obtain protection leases from the United States on acreage leased from Plaintiffs. The protection lease requirement put Plaintiffs' lessees and potential lessees at risk that a competitor would obtain the lease from the United States at public bidding, thus precluding development of the property. Pls. Opp'n.Ex. 49, Henry Hood Dep. p. 35-36.

43. The United States granted the following mineral leases affecting Group C properties: Lease Nos. 47572, 47574, and 47750 to Union Pacific Resources Company and Lease Nos. 48555, 48556, 48557, 48558, 48559 and 48560 to Chesapeake Operating, Inc. All of the leases contained ten year terms terminating April 30, 2007. Pls. Opp'n Ex. 42.

44. Because the United States asserted title to Group C, potential mineral lessees of Plaintiffs would not execute mineral leases with Plaintiffs unless reasonably assured that "protection" leases could be obtained from the United States. In the summer of 1997, the Bureau Of Land Management received offers to lease parcels within Group C from Plaintiffs' lessees or persons acting on their behalf. Stephen M. Sittnick, LTC, IN, G3/DPTMS responded to an internal inquiry with memorandum AFZX-GT dated July 23, 1997. The response included the following:

a. By definition, this impact area is, and has been, off limits to personnel and/or vehicle surface activities. Additionally, no digging in that zone is allowed due to unexploded ordnance (surface and subsurface). RLIA was established o/a 1977, and all types of dud producing munitions have been filed into that area. Any effort to surface and subsurface clear that zone for oil exploration would be extremely unsafe, and expensive.

b. Any oil exploration activities in or around the RLIA zone would close a number of ranges/training areas that have Surface Danger Zones (SDZ's) oriented into RLIA. This would severely impact the training and readiness of assigned units and supported Reserve Component units. Additionally, oil exploration activities on or near RLIA would seriously impact Operations Group's use of the Zion Hills area as rotational unit maneuver space and/or Live Fire area.

Pls Opp'n Ex. 38.

45. A substantial portion of Group C land is, in fact, subject to military operations including bombing practice, artillery practice, small arms fire and troop maneuvers by the United States Army and Air Force. Unexploded bombs are found and disposed of from Group C. Portions of Group C include artillery impact areas for howitzer, heavy artillery and tank gunnery practice. Pls Opp'n Ex. 38; Pls. Opp'n Ex. 51, Price Dep. Ex. 3.

46. At some date, unknown to Plaintiffs, portions of Group C became too contaminated and/or dangerous for mineral operations. Plaintiffs do not know the geographic extent of this area. The dangerous or contaminated condition of portions of Group C constitutes a taking of Plaintiffs property.

47. United States established Standard Operating Procedures For Exploration And Field Development Drilling of Oil/Gas Wells, SOP No. 32X-2, which contain procedures and restrictions on mineral development on Group C. Pls. Opp'n Ex. 40.

48. Prior to drilling a well within Group C, Plaintiffs' lessees (all of whom had acquired "protective" leases from the United States) were required to submit a detailed Application For Permit To Drill Or Deepen to the Bureau Of Land Management. Within Group C, the procedure also required the filing of a Final Environmental Assessment and the ultimate issuance of "Conditions Of Approval For Oil And Gas Exploration."

49. By letter dated January 9, 1997, Plaintiffs' mineral lessee, Chesapeake, wrote Ted Hammerschmidt, Deputy Director, Directorate of Engineering & Housing, Fort Polk, to determine procedures for access to Group C and to determine operating parameters

for mineral operations.

50. On March 11, 1997, representatives of Plaintiffs' mineral lessee, Sonat, met with representatives of the United States to discuss possible access to, and mineral operations on, Group C lands. Pls. Opp'n Ex. 37; Pls. Opp'n Ex. 48, Hamilton Dep. 45) Not less than 18 representatives of various Army and Forest Service agencies were in attendance at the meeting, which included the following discussion items:

> Sonat was admonished by Mr. Hammerschmidt, Fort Polk Deputy Director of Public Works, that a proposed well location was in an area referred to as "Ranges 40-43, the tank gunnery ranges." He explained that the tanks shoot "120 mm projectiles" and "will deliver about 6500 meters." He stated that he was concerned about a "vertical stack of valves", *i.e.* an oil well wellhead christmas tree, for a well at that location and "how we can successfully protect it so that we don't cause something problematic to occur." Hammerschmidt further advised that: "Inside this fan is considered an area which increases the possibility of an accident; wells 19-1, 31-1 and 21-1 are all within this fan area."
>
> Dr. Ron Tomas, Fort Polk Office of the Garrison Commander, commented on the "fan" as follows: "the fan is very conservative and the probability of something happening is very high."
>
> Hammerschmidt advised that the Army was "not willing to accept responsibility for people while training is ongoing."
>
> Hammerschmidt advised that wellheads in the area must be protected with "berming."
>
> Hammerschmidt advised that underground pipelines should be buried to 15 feet deep (industry standard is 36").
>
> The discussion specifically included safety issues relating to wells taking "a direct hit."
>
> Dr. Tomas stated that Sonat should consider moving its preferred location for well 31-1 "nearer Lookout Road." Tomas said that the range in question was used about 60 days per year and "reiterated if they don't move, there will be massive amounts of coordination required to get a truck to the site."

51. Despite Sonat personnel following up on several discussion items and actually filing for permits for drilling within Group C, Sonat never drilled any well with a physical location within the surface of Group C. Pls Opp'n Ex. 48, Hamilton Dep.

52. On April 1, 1997, representatives of Plaintiffs' lessee, Chesapeake, met with representatives of the United States to discuss access to, and mineral operation restrictions within, Group C. Not less than 14 representatives of the Army and Forest Service attended the meeting. The Chesapeake meeting was similar to the Sonat meeting with discussions focused on safety aspects of live fire, depth for placing pipelines, location of wells, placement of production facilities and the avoidance of "flares" which could be dangerous to night flying aircraft. Pls. Opp'n Ex. 51, Price Dep. Ex. 3.

53. Chesapeake never drilled a well with a surface location within Group C. Pls. Opp'n Ex.44, Denny Dep. pp. 39, 54.

54. Representatives of Plaintiffs' potential lessee, Belco, met with representatives of the United States to obtain access to Group C lands. Representatives of the United States Army specifically denied Belco's request. Pls. Opp. Ex. 47, Fife Dep. pp. 15-17, 28-29, 31-32, 38-39.

Respectfully submitted,

**THE GRAY LAW FIRM (APLC)**

BY: /S/ A. J. GRAY, III

**A. J. GRAY, III** (La. Bar #6253)
P. O. Box 1467
Lake Charles, LA 70602-1467
Telephone: (337) 494-0694
Facsimile: (337) 494-0697

Of Counsel:

Thomas C. McKowen, IV
STRAIN, DENNIS, & BATES, L.L.P.
318 St. Charles Street
Baton Rouge, LA 70802
Telephone: (225) 343-0100
Facsimile : (225) 343-0344

**CERTIFICATE OF SERVICE**

I hereby certify that copies of the foregoing PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT was served on the following counsel of record by first class mail, postage prepaid:

Alex Kriegsman
United States Department Of Justice
Environmental And Natural Resources Division
Natural Resources Section
601 D Street, N.W., Room 3814
Washington, D.C. 20004

Terry Petrie
Natural Resources Section
Environment And Natural Resources Division
U.S. Department of Justice
999 18th Street
Suite 945, North Tower
Denver, CO 80202

LTC Michael D. Graham
Litigation Attorney
U.S. Army Environmental Law Division
901 N. Stuart Street, Suite 400
Arlington, VA 22203-1837

THUS DONE AND SIGNED on this 13TH day of February, 2007.

/s/ A. J. GRAY, III
**A. J. GRAY, III**