FOR OFFICIAL USE ONLY

MINERAL RIGHTS CONFERENCE 27 JUNE 1974, FORT POLK, LOUISIANA

1. A Mineral Rights Conference was held at Fort Polk, Louisiana in building two at 1400 hours, 27 June 1974. The purpose of the meeting was to develop a coordinated and agreed upon Army position regarding the mineral rights at Fort Polk and Peason Ridge. A list of representatives is attached at inclosure one and includes members from:

a. Office of the Chief of Engineers, Hq Department of the Army

b. U. S. Justice Department, Washington, DC

c. Hq U. S. Army Training & Doctrine Command, Fort Monroe, Virginia

d. Hq U. S. Army Forces Command, Fort McPherson, Georgia

e. Southwestern Division, Corps of Engineers, Dallas, Texas

f. Fort Worth District, Corps of Engineers, Fort Worth, Texas

g. Tulsa District, Corps of Engineers, Tulsa, Oklahoma

h. U. S. Forest Service, Leesville, Louisiana

i. U. S. Air Force representatives from England, Barksdale, and Langley Air Force Bases.

j. Fort Polk, Louisiana

2. Colonel Jerry L. Teague, Director of Facilities Engineering, introduced the principles and welcomed the group to Fort Polk.

a. Copies of an information brochure were passed out which contained background data on the mineral rights problem. Copy of tab 1 of this brochure is at inclosure 2.

b. Colonel Teague presented an orientation and background briefing on the mineral rights problem. Copies of slides are at inclosure 3.

(1) Slide one depicts the orientation of Fort Polk and Peason Ridge with respect to the state of Louisiana and its major cities and nearby towns.

FOR OFFICIAL USE ONLY

(2) Slide two shows Fort Polk and Peason Ridge with Army owned, Forest Service owned, and Leased Land differentiated on the slide.

(3) Slide three is similar to slide two and shows the extent of the moratorium areas of which 33,000 acres are at Peason Ridge and 44,000 acres at Fort Polk.

(4) Slide four indicates the impact areas at Fort Polk and the AF bombing range fan at Peason Ridge in relation to the moratorium areas.

(5) Slide five indicates the relative locations of five recent oil wells drilled in the vicinity of Fort Polk and Peason Ridge.

c. Colonel Teague explained the significance of the above slides as presented and gave a summary of the contents of the brochure and historical background of Mineral Rights problems at Fort Polk. Some specific points included:

(1) That $.95 per acre was paid for the Fort Polk and Peason Ridge moritorium in 1973-74.

(2) The new negotiated price of $2.00 an acre which is to be paid in 1974-75.

(3) The two major holders of mineral rights in the moritorium areas; Mr. Burton of Lake Charles (Fort Polk) and Mr. Hodges of Shreveport (Peason Ridge).

(4) Mr. Burton wants more money for the moratorium fee while Mr. Hodges wants to drill.

(5) The Army owns Mineral Rights only on 3,000 acres of the approximately 200,000 acres in use.

(6) The Air Force bombing range at Peason Ridge is a full tactical range in use day and night, seven days a week. Availability of the range is of great importance to Air Force training operations at England Air Force Base.

(7) Five wells have recently been drilled in the vicinity of Fort Polk as shown on slide five, inclosure 3.

FOR OFFICIAL USE ONLY

(a) Well #1 drilled to 22,000 feet; Dry.

(b) Well #2 drilled 15 miles west of Fort Polk to 16,400 feet. The resulting gas well was capped due to lack of a market.

(c) Well #3 drilled to 10,000 feet; Dry.

(d) Well #4 drilled to 18,900 feet; Dry.

(e) Well #5 drilled to 19,000 feet; Dry.

(f) Well #6 is proposed location for a drilling site of Atlantic Richfield Co. just off the North side of Fort Polk.

(g) The Magnolia Well shown on the southern edge of Peason Ridge was drilled by Mr. Hodges in 1949. Hodges indicates that an oil strata was found; however, continued drilling developed salt water and the well was capped. Mr. Hodges has stated he would like to drill another well 660 feet North and East of the Magnolia site.

(8) The current estimated cost of purchasing the mineral rights in the moratorium areas is approximately 3.2 million dollars, $30.00 an acre at Peason Ridge and $50.00 an acre at Fort Polk's Leesville Artillery Range.

d. Colonel Teague requested that the attendees take time to read through the background summary at Tab 1 of the brochure (incl 2), and then reconvene following a break for detailed discussion of alternatives presented by FORSCOM.

3. Questions presented at this time are as follows:

a. Does Mr. Hodges own mineral rights on property in the immediate area outside of Peason Ridge? Yes.

b. Has Mr. Hodges drilled any wells in that area? Mr. Hodges drilled the Magnolia well in 1949 and we do not know of any others.

c. Why hasn't Mr. Hodges drilled on other areas that he has mineral rights? No one knows, possibly he does not consider it economically wise yet.



FOR OFFICIAL USE ONLY

d. Is the Fort Polk Leesville Artillery Range considered dangerous? Yes, there are many unknown duds. Peason Ridge may not be quite as dangerous.

e. How much would it cost to clean up the impact areas? In terms of time, it would require termination of training and would be very expensive. It would also depend on how extensive the dud clearing requirement would be. It was mentioned that Mr. Hodges said he would hold the Army harmless if permitted to conduct oil and gas exploration operations in the impact areas.

4. Colonel Anderson, Fort Polk, reiterated that if Mr. Hodges was permitted to drill one well, others will want to come in and drill. Fort Polk has a potentially serious problem with mineral rights and is looking for help.

5. Following the break, Mr. Berge, Chief of Engineers Office, DA, chaired the meeting. He stated that the purpose of the meeting was to come to a general agreement and lay out the issues to be considered by the Army, as well as the Air Force. He stated that as he visualized it, there was a need to come to a consensus of opinion during the meeting on what should be done. If a decision could not be reached during the meeting, it would need to be coordinated through channels to OCE. What is done involves a lot of judgement factors that have to be considered by each commander tied in with other agencies. To tie down the alternatives, Mr. Berge referred to the brochure, Tab 1, page 1-8 (Incl 2). These alternatives are in a message from the Commander, TRADOC.

a. Continue to prohibit drilling under existing moratorium.

b. Allow selective drilling for exploratory purposes.

c. Attempt acquisition of mineral rights by purchase or condemnation.

d. Attempt acquisition of mineral rights and subsequently permit drilling.

6. The following discussion ensued. It was noted that in the FY 1976 MCA program, funds were programmed to buy the mineral rights. This action is supported at a high priority level at the Department of Army. There is definetely a time problem in that we are still 1 1/2 to 2 years away on the FY 76 program and we need the mineral rights today. Mr. Berge pointed out that the Army Vice Chief of Staff thinks that it would be preferable for the Army to tell Mr. Hodges to observe the moratorium and for the Army to proceed to purchase the mineral rights. Mr. Berge stated the following, "That may be the best solution, my personal view is that we should go for all the mineral rights. Meanwhile I would stall on the answer to a letter requesting permission to drill outside the moratorium area." Mr. Berge

indicated that Congressman Sikes of the House Armed Services Committee had directed in November 1973 that military facilities not be released for oil exploration until the Secretary of Defense determines that they are of no value to national defense.

7. On the second alternative - to allow exploratory drilling. Mr. Berge indicated that if we let Mr. Hodges get in, others will come in. If you do permit exploratory drilling and they strike a well, how many wells will they want to drill? That is a factor that will impact on military use of the land. If you let someone go in and they strike oil, then you face the question, where will it stop. Colonel Teague asked if we can legally permit someone in the moritorium area? Legally, we could not. If permission were asked, we could let a mineral owner go in if they agree to forgo their moritorium fee. If we let one in, there will be a rush for drilling permits.

8. Additional discussion surfaced the following questions.

a. If Army is going to acquire these rights and considering we are still two years away from obtaining funds to buy, how much do we then pay them for condemnation if they go in and strike oil? From the standpoint of litigation, if we let someone go in and they strike oil or gas, it would adversely affect the Army position of acquiring the mineral rights. The timing is very bad now from the standpoint of acquisition because of the energy crisis. In continuing to prohibit drilling, TRADOC and FORSCOM point out that this course of action may backfire with the discovery of oil or gas outside the reservation area and we may need to back off from the moritorium. This has to be considered in the Army's decision to continue military construction at Fort Polk and its planned long range use.

b. Has there been a presedent set at any other installation permitting oil exploration? It was indicated that Fort Chaffee has seven wells operating at this time. The Department of Interior determined that ongoing drilling operations outside the boundries were draining oil reserves from under the post. There are other places where permission for exploration has been given but the product not taken.

c. Suppose Atlantic Richfield hits a gusher just off the reservation and expanded the field, can the military resist oil explorations under those conditions inside the range areas? The Army would have to take a position. Politically there is no problem in regards to the encroachment into the military reservation. The installation and its

activity is of vital importance to a very large portion of the state. On the point of going out and buying the rights, we can't until we get the authority and funds, meanwhile an oil discovery would escalate the cost of buying the rights. The discovery of a 5,000 barrel per day well would increase the cost of $5,000 - $7,000 an acre in the immediate area and we are at least 1 1/2 years away from acquisition of those rights. For this action to go into the FY 75 MCA program would require a lot of work getting title owners, etc. for which there is absolutely insufficient time. The possibility was mentioned that if there was any mineral value in the land, it would have been developed long ago. It was also mentioned that drilling the wells could possibly help because unless drilling is permitted, nothing is known of the true mineral value and dry holes increase the probability of no oil at Fort Polk. Mr. Smith of the Tulsa Engineer District stated that the odds are 19 in 20 that the wells would be dry. With the continuing energy crisis, the cost of drilling becomes less prohibitive. Additionally, new and proposed legislative changes will make exploration more profitable. If Fort Polk had a few dry holes, we could go to court with good odds of a ruling in favor of the government.

d. Has the government gone in and checked the area for oil? It was mentioned that we don't own the mineral rights. Another question was how many dry holes would Mr. Hodges want to drill befor he gave up? Probably three at a maximum. In regard to this the question arose, if odds are one in twenty of hitting a productive well why wouldn't he want to drill to twenty? Most of all it would be the expense. New technology permits much deeper wells today than were ever dreamed possible in 1935; however, these wells are very expensive and no company can permit many dry holes. Another aspect to remember is that the extent of these fields is going to be limited. You are going to have to keep in prospective that it will not extend all across Fort Polk. Mr. Berge again recommended the buy of all the mineral rights. Colonel Schultz agreed and pointed out that the Army is at Fort Polk to stay permanently.

9. A question arose concerning the purchasing of mineral rights on forest service land. Mr. Burleson (Forest Service) indicated that the Department of Interior handled all their real estate actions. Mr. Musgrove (Air Force) indicated that the Air Force had purchased the mineral rights on old Camp Claiborne range where the land belonged to the Forest Service. Colonel Schultz indicated that OCE should assist the District Engineer in defining the problems in obtaining Forest Service or Dept of Interior concurrance with the proposed mineral rights purchase. He indicated that we should provide our best estimate

as to the number of additional acres outside the moratorium area, weighted toward the high side, and revise the DD Forms 1391 Military Construction Project Data accordingly. Major Boller (Ft Polk JAG) indicated that Mr. Zeidner of the Justice Dept is currently checking ownership of mineral rights on land purchased in the area prior to 1940. Mr. Smith (Tulsa Engr District) was asked to provide additional data on estimated cost of fee acquisition of mineral rights on the additional land. Mr. Burleson (Forest Service) can furnish some information on ownership of minerals on the Forest Service land involved.

10. A question arose on the actual shape of the intensive use area and limited use area of the Forest Service land. The Fullerton Triangle, it was disclosed is a limited use area although it lies within the reservation boundry as drawn for intensive use. Mr. Eskite (U.S. Justice Dept.) questioned the importance of the Fullerton Triangle. It was resolved that the mineral rights to this land should also be purchased as the area is a valuable training area to Fort Polk.

11. Colonel Schultz indicated that discussion of alternative 4, "acquisition of mineral rights and subsequent drilling" should be deferred to some later date when faced with this issue. A Question arose as to the willingness of the Air Force to pay part of the cost at Peason Ridge. Colonel Schultz indicated that a contract would be made at Departmental level to determine the Air Force position. It was brought out that 10 Air Force squadrons use the range at Peason. The estimated cost of transferring the training to an alternate range was $300,000 per unit or 3 million dollars per year. Additionally, loss of the range would make it very difficult to maintain a fighter wing at England AFB. The permanent change of station cost of moving the wing alone would be 4 million dollars not including the cost of providing facilities at the new station. The Air Force indicated they would furnish additional justification data for the DD Forms 1391.

12. Colonel Connell summed up the Army position and assigned tasks as follows:

a. The Army will continue to prohibit drilling under the existing moratorium.

b. The Army will attempt to purchase the mineral rights on all of Fort Polk and Peason Ridge.

FOR OFFICIAL USE ONLY

c. The Justice Department should determine ownership of minerals on all parcels of land involved with the assistance of the Fort Worth District Engineers in coordination with the office of the Chief of Engineers.

d. Fort Polk will revise the DD Forms 1391 (Military Construction Project Data) to reflect the new scope and costs to acquire the mineral rights in the FY 76 MCA program.

e. The Army will continue to deny entry on the reservation for any type of exploration.

f. Fort Polk will furnish the Fort Worth District Engr information on the number of additional acres of land involved so Mr. Smith (Tulsa Engineer District), can furnish a new cost estimate for fee acquisition rights.

g. It was unanimously agreed that action to purchase the mineral rights should not be delayed until the moratoriums run out in expectation of a lower price.

h. Colonel Schultz agreed to prepare the Army position paper and staff it through the appropriate channels.

13. The meeting adjourned at 1645 hours.

Jerry L Teague

JERRY L. TEAGUE
Colonel, CE
Director of Facilities Engineering

FOR OFFICIAL USE ONLY



701455

.R OFFICIAL USE ON )

MINERAL RIGHTS CONFERENCE 27 June 74
Fort Polk, Louisiana

ATTENDEES

| NAME | GRADE | ORGANIZATION |
| --- | --- | --- |
| Mr. W. L. Berge | GS-17 | Office Chief Engineers |
| Mr. L. E. Ingram | GS-15 | Office Chief Engineers |
| Mr. Glen Eskite | GS-15 | U.S. Justice Dept. |
| Mr. Max Finley | GS-14 | U.S. Justice Dept. |
| COL R. M. Connell | | TRADOC |
| Major Baldwin | | TRADOC |
| COL G. W. Schultz | | FORSCOM |
| Major Anderson | | FORSCOM |
| Mr. M. Long | GS-14 | Southwestern Division Engineer |
| Mr. Clarence Randel | GS-13 | Fort Worth District Engineer |
| Mr. Harold Smith | GS-13 | Tulsa District Engineer |
| Mr. R. A. Burleson | GS-11 | Kisatchie National Forest<br>Vernon Ranger District |
| COL Moore | | 23rd Tactical Fighter Wing<br>England Air Force Base |
| CPT Lyons | | 23rd Tactical Fighter Wing<br>England Air Force Base |
| CPT Shaunnessy | | Staff Judge Advocate<br>Legal Office EAFB - |
| Mr. Tomes | GS-12 | Civil Engineer Squadron<br>England Air Force Base |
| LTC Owen | | Tactical Air Command |
| Mr. Van Patten | GS-12 | Tactical Air Command |
| Mr. Mu[illegible]rove | GS-12 | Tactical Air Command |
| LTC Pearson | | Shaw AFB, South Carolina |
| LTC McClelland | | 917th Tactical Fighter Group<br>Barksdale AFB, Louisiana |
| LTC Moore | | Barksdale AFB |
| CPT Smith | | Barksdale AFB |

FOR OFFICIAL USE ONLY

MINERAL RIGHTS CONFERENCE 27 June 74
Fort Polk, Louisiana

FORT POLK ATTENDEES

| NAME | GRADE | ORGANIZATION |
|---|---|---|
| COL R. L. Anderson | | Deputy Installation Commander |
| COL J. W. Radcliffe | | Director of Plans & Training |
| LTC L. A. Pace | | Director of Plans & Training |
| COL J. L. Teague | | Director of Facilities Engineerin |
| MAJ R. R. Boller | | Staff Judge Advocate |
| CPT R. P. Dunleavy | | Information Office |
| Mr. R. J. Ray | GS-11 | Directorate of Facilities Engineering |