EXECUTIVE SUMMARY

The recent denial of FY 76 MCA funds by Congress and the subsequent action directing the US Army to reassess the need for the acquisition of mineral rights at this installation signify the nation's priorities and interests in pursuing solutions to the current and projected energy shortages. In this atmosphere of attempting to reduce the nation's dependency on foreign energy sources, it can be reasonably anticipated that increased emphasis will be focused on the subject of oil and gas exploration in the domestic sphere in the future. This policy is understood and appreciated.

In consideration of the prevailing attitude, justification for the acquisition of mineral rights bears reassessment. Earlier initiatives at Fort Polk to acquire mineral rights were not basically motivated by economic considerations, but were based on a consideration of alleviating intrusions on military activities and assigned missions. This principal consideration is no less important today, and in fact is more eminent than at any time in the past.

The combat readiness of 5th Inf Div (M) units and nondivisional units demands unencumbered access to all areas of the military reservation to satisfy training dictates. Nevertheless, on the basis of information contained in Inclosures 1 and 2, with qualification, mineral exploration can be permitted without detriment to US Army readiness goals. Specifically, exploration can occur in locations outside the cantonment areas, tank ranges, certain artillery ranges, and impact areas by close scheduling of training activities and coordination with the mineral explorer without significant impact on the readiness activity of units stationed at Fort Polk. These qualifications similarly extend to encompass USAF interests. Exploration activities cannot ensue in a concurrent time frame in specified locations of the Peason Range without degradation of USAF training readiness. Compatibility could be realized by conducting exploration activities outside of critical locations, prudent scheduling of aerial training operations, and by exercising close coordination with commercial exploring interests. Final approval of drilling sites and access routes must, however, remain with the Installation Commander. Inclosure 3 sets forth a proposal for the establishment of procedures to monitor current exploration of lands adjacent to Fort Polk.

3 Incl
as

ROBERT HALDANE
Major General, USA
Commanding

Incl 1

NECESSITY FOR MINERAL RIGHTS ACQUISITION

1. SITUATION.

a. The DD Form 1391 (Military Construction Line Item Data), dated 1 October 1976, provides the justification for obtaining title to outstanding mineral rights underlying 32,279 acres at Peason Ridge and 110,404 acres within the boundary of Fort Polk Proper. It also provides for the purchase of fee title to 866 acres of land currently leased by the US Army.

b. Mineral exploration moratorium for which the Installation pays a negotiated fee is currently held on 43,953 acres (Leesville Artillery Range) and all of Peason Ridge. No mineral exploration moratorium is held over the remaining 66,451 acres of the main reservation. All of the land on Fort Polk proper and Peason Ridge have been regarded in the past as essential to support the assigned military mission, including training requirements of the Air Force, National Guard, and Reserve forces.

c. An approach to the necessity for acquiring the mineral rights at Fort Polk, including the Peason Ridge area of Central Louisiana, is one of analogy. There is not now nor has there been in the past any commercial oil or gas production on the property. A few dry holes have been drilled on the property; however, there is substantial leasing and drilling activity in all directions from the property. There is an active lease on the property which was taken in the idea that the restrictions on the property would be released in the future for oil and gas development. However, this single interest would neither justify or refute necessity to acquire the mineral rights.

d. The retention of mineral rights by private owners has necessitated, on a recurring basis, the filing of Declarations of Taking with the US Federal District Court imposing a mineral moratorium on the real estate. The current declarations were filed resulting in moratoria, Civil Actions No's 19118 and 19119, which run from 1 July 1973 until 30 June 1978. In the event the Federal Government fails to acquire such rights, additional mineral rights moratoria and probably higher annual rates will ensue to the continuing detriment of Federal funding.

e. In the past this installation has contended that serious coordination problems would be encountered between exploration interests and the installation mission. In the past there has been less emphasis and need for the use of maneuver area since Fort Polk has basically a training mission. The conversion of Fort Polk from a training base to the home station of a mechanized division (-) imposes a greater requirement for the use of all available maneuver area. With greater focus on the conduct of field training for a mechanized division and greater usage of the larger caliber weapon ranges, encroachment by owners of the mineral rights will pose greater problems of coordination between the military and private commercial interests.


FOR OFFICIAL USE ONLY

f. The compatibility of mineral exploration with long term division training usage is examined in detail at Incl 2. If in the foreseeable future and without regard for training requirements, private exploration is permitted within the installation boundaries, ownership of both the land surface and mineral rights by the Federal Government could prove economically cost favorable. This may be realized through the elimination of moratorium fees and the issuance of negotiated leases in selected areas of the reservation without significant detriment to the military mission.