Sent by Te'optier
13 Jan 1976

RE Files

13 Jan 76

# TRIP REPORT - FT POLK MINERAL MORATORIUM

## Background History

1. Ft Polk has maintained a mineral moratorium for more than 35 years over approximately 33,000 acres of land at Peason Ridge Artillery Range and 44,000 acres of land at Ft Polk Artillery Range. Payments to the mineral owners have increased during each 5-year period and are currently $2 per mineral acre and expected to go up to $5 per acre in the near future. The administrative cost to the Ft Worth District of maintaining the mineral moratorium exceeds $12,000 per annum.

2. The Department of the Army proposed to acquire fee minerals in FY 76 under the Artillery Ranges plus an additional 67,000 acres at Ft Polk outside the Artillery Range at an estimated cost of $20 - $50 per acre, or approximately $5 million. In November 1975, Congress denied or postponed the Army's request for funds and directed the Army to further study the need to acquire the minerals and evaluate the compatibility of mineral exploration and continued military training missions.

3. Upon receipt of this information, I asked for a conference through the U. S. Attorney's office to negotiate an agreed price per acre for the remaining 2-year period at Ft Polk with Burton Industries, represented by Mr. John Camp. Due to conflict in Mr. Harris's court calendar, meeting was postponed from December 10 to December 17 in Mr. Camp's office at Lake Charles, LA.

4. COL Teague, DFE, called me about December 8 and asked what I thought the negotiated figure per acre would cost to maintain the moratorium for FY 76 and FY 77. They needed this information for budgetary purposes. I gave him the figure of $5 per acre. I advised him of my plan to meet with Mr. Camp and Mr. Harris at Lake Charles on December 17. He called back a few days later and requested my presence at Ft Polk to discuss Ft Polk's position prior to meeting in Lake Charles.

5. On December 16 I met with the staff of all involved parties, see attached draft of meeting, at 10:30 a.m. for 1-1/2 hours. We adjourned and met again with the General at 1 p.m. It was the opinion of all concerned that cannons and oil wells were compatible in certain areas at certain times. Maps had been prepared showing certain areas not affected, another area minimally affected, some impact in the next category, and last category with impact area where it would have major impact. Cost of moving impact area is estimated at $2 million. The impact area covers about four sections of land. Small arms area, category 3, covers about 6-8 sections of land. Another area where drilling cannot be permitted is cantonment area. Government owns minerals under the cantonment area on the north side of the base, but I do

not believe we own the minerals on the west side of the base where all the new construction of barracks, housing, PX, hospital, etc., is currently being constructed. The General pointed out that he can only recommend a course of action. The ultimate decision will be made at the Washington level and will no doubt be influenced by political input. I was instructed to query the major oil owners as to their short and long term plans to develop minerals on the two installations and report back to Ft Polk at the earliest possible date. He promised to consider any reasonable request they might make.

6. The following morning I met with Mr. John Camp and Leven H. Harris, Assistant U. S. Attorney in Lake Charles. After a short discussion of the ARCO proposed $2 million, 20,000 feet closed well on the north perimeter of Artillery Range at Ft Polk, and the proposed well 16 miles west of Ft Polk in Section 10, Township 1 south to a depth of 10,000 - 12,000 feet at a cost of $200,000, I offered 95¢ per acre to maintain the present moratorium for an additional two years. Mr. Camp was taken by surpise and asked if I was serious. I told him I was but would raise the offer to $1. He said he was thinking more like $5 per acre, and this would be low if the ARCO well came in as a producer. I replied that this would be too much if they drilled a dry well. I asked him what the mineral owners' short and long plans were if the moratorium was lifted and they were permitted to drill on the base. Again he was surprised and asked if it would be possible to get on base and do seismograph work and later drill. I told him Ft Polk would consider any reasonable request. I told him I was interested in knowing if cannons and oil wells were compatible. A lengthy discussion followed. From this discussion the following facts were deduced:

a. Price to be paid to maintain the moratorium was not fully negotiated, but it will be $5 per acre or slightly less.

b. Their short term plans are to explore and develop the area on the north side of the base and in the artillery range. Exact locations are unknown because it depends on what they find from drilling ARCO well.

c. Long term plans (two to five years) are to explore and develop the area south and west of the impact area.

d. They want the moratorium lifted on the north half of the artillery range and to be paid on the south half of the range.

e. They have no current plans to drill in small arms area, cantonment area, or any other area.

f. Their short and long term plans could be changed by what is discovered from drilling the deep ARCO well and seismograph showings.

7. Mr. Camp agreed to furnish a letter to me with a copy to Ft Polk after discussion with other mineral owners and lessees on when, where, and how, and other conditions on drilling at Ft Polk if permitted. Three weeks have passed, and I still do not have his letter. I wonder about contents of his letter.

## PEASON RIDGE

On January 9, 1976, Mr. Harris, Mr. Hodges, and I met in the U. S. Attorney's office in Shreveport to discuss the moratorium. Mr. Hodges holds the lease on all of Peason Ridge, the 7/8th working interest, and is one of the four major mineral owners. The discussion went substantially the same as it had gone with Mr. Camp in Lake Charles. The major difference was that Mr. Hodges could not speak for the other 3/4th mineral owners as Mr. Camp did for Ft Polk. From this discussion the following facts were determined:

1. Mr. Camp's short term plan, if permitted, is to drill within 30 days a 8,000 - 10,000-foot well on the south edge of the base east of the old Magnolia well, which had showing in the Wilcox sands.

2. His long term plan is to drill a 16,000 - 20,000-foot well near the center of east boundary line, about 1-1/2 miles inside the base within the next year or so.

3. Future plans would depend on results of these wells and seismograph showings.

4. He maintains that he has political influence and will use it if he is not permitted to drill. He was the one who visited US Congressmen and Senators in Washington in November 1975. His political influence is not from the Louisiana delegation, although he purports to know them on first name basis.

5. He intends to go to court, if not permitted to drill, and challenge our right to maintain moratorium during this time of energy shortage.

6. He maintains that cannons and oil wells are compatible.

7. He promises full cooperation and will allow the Army to pick the time of drilling but not the location of any drilling site.

8. He promises to sign hold harmless clause to protect the Army, bury his lines six to eight feet deep, put all oil tanks outside of the base, etc.

9. If he finds oil or gas, or if he finds justifiable showing from his drilling operation, he demands the right to drill again at a location selected by him in his search for oil and gas.

10. If the moratorium is lifted, his leases covering the other three major mineral owners require him to drill on their minerals within 90 to 180 days. He does not want to drill on their minerals now but will be required to do so unless he can negotiate with the mineral lessors for an extension of time within which he must drill.

11. He has the money to drill the first well, short term plan, but will have to negotiate for money to continue his long term plans.

12. He admits the danger of losing his leases if first medium depth wells are not producers, but is extremely anxious to gamble. He offered to give us his minerals if he is permitted to prove-up a sufficient number of dry holes.

13. He would not agree to a mineral subordination, because he is the mineral owner only of an undivided one-half interest in 11,000 to 12,000 acres. Moratorium payments are paid to mineral owners, not to oil and gas lessees. He believes the other mineral owners (26,000 acres) want their annual payments and are not particularly interested in whether he drills or not. He apparently believes he can find oil and gas. The mineral owners, apparently, are not this optimistic. He wants to strike it rich; the mineral owners would rather have their annual payments.

## CONCLUSIONS AND OPINIONS

1. It will be most difficult if not impossible to extend the moratorium for another 5-year term beginning in April 1978. Why? Because each civil action will exceed $50,000 per annum and will require approval of the Military Armed Services Committees.

2. We will no longer be able to maintain our position that the two artillery range, which are 10 to 12 miles apart, are two different military installations and file them as separate civil actions. Why? Because Fort Polk is one military installation with two artillery ranges. It is a package deal. Since we now have the attention of Congress, our actions will likely be closely scrutinized.

3. The mineral owners will demand and expect their annual payments to be increased. Why? The price of oil and gas continues to go up. Under the new energy bill recently signed by the President, it will continue to do so in the future.

4. Negotiated out-of-court settlements as to price to maintain moratorium or acquire fee title to the minerals are better than court trials. Why? U. S. Courts and Louisiana juries have not been sympathetic to our cause in the past. Why? This is our track record. Department of Justice was extremely pleased with settlement at $2 per acre for parts of this 5-year term. They were willing to pay $10 to $15 per acre.

5. The estimated cost of acquiring minerals at $5 million is unrealistic. Why? Our estimate of value at $20 to $50 per acre is realistic and considered

fair to both the Government and mineral owners, but ultimately the cost will exceed this substantially. We will probably testify in a range of $20 to $50 per acre, and the mineral owners' experts will testify to $30,000 to $40,000 per acre. We would likely put on two mineral experts at a cost of approximately $50,000 for court trial. This would not include expense of Department of Justice trial attorney from Washington or regular cost of the Federal Courts. The mineral owners would have 10 or 12 witnesses whose qualifications are subject to challenge; but, after all, it is only an opinion. No one knows what is under each mineral acre without drilling. Their cost of obtaining expert mineral testimony would come at small cost, because they would use their own staff, State and Parish officials, and college professors. What would be the jury award? No one knows, but $100 to $200 per mineral acre is likely to be considered by Department of Justice trial attorneys as a great success.

6. Negotiated settlements for the remaining two-year term of moratorium at Fort Polk Artillery Range can be concluded at $3 or $4 per mineral acre. Why? Mineral owners are more interested today in the annual payment than they are in drilling. They are not likely to do anything until they find out what is in the bottom of the deep ARCO well. I have a strong feeling that they wish to hold these minerals, if any, in reserve for future exploration when prices are higher. They do not have the burning desire to drill today, and apparently do not believe this area has a great potential. In opposition to this opinion is the fact that ARCO is willing to spend $2 million on a deep wild-cat well. This will be a guarded well (no one permitted to know the results of their finding). If the well is dry or has small potential, they probably will release all or part of their 100,000-acre block because of the annual lease payments. If they hit a "spindle-top," no force, including the Department of the Army, can keep them off or out of Fort Polk.

7. Negotiated settlements of the remaining three-year term of moratorium at Peason Ridge Artillery Range can be settled for $5 per acre. Why? Hodges, the oil and gas lessee covering the entire 33,000 acres, does not have the funds to drill all areas in accordance with his lease with the mineral owners. He might be able to negotiate his way out with the mineral owners, but he is not likely to drill numerous wells at one time. Cost generally directs drilling one well at a time. New wells are justified on showing of the last one drilled. Further, mineral owners want their annual payments. Hodges is the only one with a burning desire to drill now, and his current interest is only in one or two locations.

8. There is no "hue-and cry" and no great clamor that the mineral moratorium be lifted in its entirety today. Why? Burton Industries and its driller, ARCO, only want the moratorium lifted on the north part of Fort Polk Artillery Range. Yet they want the same amount of money or more for the south half even though they have no current plans to drill in this area. It is indeed strange and rather curious that they make demands for money and want to drill in the area over which the Army wants to keep them out. Why have they not drilled

in 67,000 acres of land not covered by the moratorium? In and around the impact area the potential must be marginal, because no one has shown any recent interest in the area outside the range which goes almost to Fort Polk's boundary line.

## RECOMMENDATIONS

1. Lift the mineral moratorium in its entirety by April 1, 1976, by not giving notice to extend. This is an element of risk to the future of Fort Polk, but I do not consider it as much a risk as trying to maintain the moratorium indefinitely. Sooner or later the cost will be prohibitive, so why not now. Continued payments are a waste of Government funds, because ultimately the decision must be made. It not only would result in a substantial saving of money but would improve Army image with Congress and the public by showing an affirmative attitude during the energy crises.

2. Oil wells and cannons are compatible. Neither Hodges, Burton Industries, nor other mineral owners would do or commit any act that would prejudice the existence of Fort Polk. Their income in other holdings in minerals, land, timber, industries, etc., exceed what monies, if any, they are likely to receive on oil and gas from these military installations. They are honorable people and extremely anxious to maintain this base for the economy of Central and Northern Louisiana.

3. Recommend acquisition of the 866 leased land and acquisition of fee minerals in all new construction areas.

4. Alternate recommendation: Agree to compromise by lifting the moratorium in certain areas and maintaining it in others. If oil companies are permitted to drill, they will drill one well at a time. Ft Polk can postpone the ultimate decision by lifting the moratorium in certain areas for the next two years. This likely would please lessee and mineral owners and reduce the negotiated price paid to maintain the moratorium.

Darwin L Wilder

DARWIN L. WILDER
Chief, Acquisition Branch
Real Estate Division
U. S. Army Engineer District, Fort Worth

attached:
1. Draft of Staff Meeting 17 Dec 75
2 D/F by Ltc Miller - G3 - Ft Polk
3 Message DA Washington to ForsCom 5 - 31 Jan 76
4 message DA Washington to FORSCOM dated 12 Dec
5 Shreveport Journal - 14 Nov 75
6. mission - Draft of Special Regulation