# DISPOSITION FORM

For use of this form, see AR 340-15, the proponent agency is TAGCEN.

| REFERENCE OR OFFICE SYMBOL | SUBJECT |
|---|---|
| SWFRE-A | Trip Report, Civil Action 19118, Fort Polk Minerals |

TO MEMO FOR RECORD — FROM Ch, Acquisition Br — DATE 19 Jan 77 — CMT 1

Mr. Wilder/db/2111

1. On 3 December 1976, I met with Andy Hodges, principal mineral owner and lessee, and Levine Harris, Assistant US Attorney, concerning stipulations and judgments providing for limited drilling at Peason Ridge Artillery Range. Mr. Hodges reported that he hoped to begin drilling operations on the south edge of Peason Ridge Artillery Range about the middle of January 1977. He has the money to drill a depth of 10,000 to 12,000 feet but he is still in the process of selling off interest in the well by "Hedging His Bet." He furnished me his map of Peason Ridge Artillery showing in yellow areas what he owned or had leased (Attachment No. 1). I furnished him a copy of the map that my Mr. Allen furnished me outlining in orange the areas not covered by the five stipulations and judgments. We agreed generally of ownership of the minerals in comparing the two maps together. The hatched areas on Mr. Hodge's map are those areas in which the Government owned 3/4 of the minerals with the other 1/4 being owned by Federal Land Bank in Houston. There are approximately six or seven areas outstanding of less than 300 acres not owned by the Government or covered by stipulations and judgments. Mr. Hodges and Mr. Harris each agreed that there was little or minimum risk in leaving these small areas outstanding because no prudent driller could afford to drill on any of these small areas. A driller would be able to recuperate the cost of the well but thereafter he would be producing oil or gas for the owners of the minerals in the surrounding areas at no cost to the other mineral owners. This is because of the pooling requirements under "Louisiana Law." Mr. Harris will disburse funds currently on deposit in the Registry Court but no further deposits will be made because stipulations and judgments will run impertinently.

2. Mr. Hodges advised that ARCO well located on the north edge of Fort Polk had been drilled dry. The well did produce a small amount of gas with high hydro carbon sulphur at about 16,000 feet. He also spoke of some drilling activity 10 to 15 miles east of Leesville.

3. On 16 December 1976, I met with Colonel Teague, Director of Facilities Engineering, at 1400 hours in Colonel Teague's office. The following were present:

Colonel Teague - Director of Facilities Engineering
CPT Hunt - DFAE Real Property
Lou Sherman - Civ JAG, GS-12
Dr. Ron Thomas - Civ Environmentalist, GS-12
Bob Montague - Civ, GS-DPT
MAJ Maio - G3/DPT, Operator

I advised Colonel Teague's staff that Mr. Hodges expected to commence drilling about the 15th of January. Colonel Teague was extremely complimentary of Mr. Hodge's conduct and cooperation and could not foresee any difficulties in Hodge's drilling at Peason Ridge Artillery Range.

SWFRE-A 19 January 1977

SUBJECT: Trip Report, Civil Action 19118, Fort Polk Minerals

4. The next subject discussed was how we were to handle this situation at Leesville Artillery Range. I recommended to them that no further payments be made and to let the moratorium expire by not giving notice to extend. The current term ends on 31 March 1977. Civil Action 19118 could be extended one additional year to 31 March 1978. I suggested that if there were no mineral moratorium, any driller would have to ask permission of the Commanding General before entering. The surface owner has equal rights with mineral owners. Each must be reasonable. At that time the Commanding General could advise him when and where he might drill and under what conditions. If agreement could not be reached, an injunction from the Federal Court could be obtained and a new moratorium placed into effect within 30 days to six weeks. I pointed out the greatest danger with this approach was that the cost of moratorium per year thereafter would likely increase drastically over our present payment of $2.00 per year. Next we discussed taking a stipulation to permit limited drilling similar to what has been done at Peason Ridge Artillery Range. It was decided to present the two proposals to the Commanding General the following day and let him make the final determination.

5. At 1000 hours on 17 December, we met with the Commanding General with the following persons present:

MG Steele, William
Colonel Teague
CPT Hunt
LTC Boller, R., SJA
LTC Miller, L., GS - Operation & Training
D. L. Wilder, GS - Fort Worth District

Colonel Teague outlined the history of mineral exploration in Vernon Parish and surrounding areas as well as when and how the mineral moratorium was placed on the artillery ranges by the court for protection of the artillery ranges. I presented the two proposals as outlined above to the Commanding General and waited for his reaction. He asked a few general questions. His primary concern seemed to be that neither the FWD or Department of Justice could react in time to stop the oil and gas drilling before adverse publicity developed in the news media. He was also concerned with the outcome of a law suit before Federal Judge during this period of energy crisis. For this reason he directed me to ascertain the intent of Burton Industries and hopefully to obtain a similar stipulation with mineral owners as we obtained at Peason Ridge.

6. On 20 December 1976 at 0900 hours, I met with Mr. John Camp, Attorney for Burton Industries and his staff in his office at Lake Charles, Louisiana. They made inquiry as to developments at Peason Ridge and I informed them that Mr. Hodges hoped to commence his first well sometime after the first of the year. I asked what his future intentions were in drilling. He stated they still had an interest in drilling another deep well in the vicinity of ARCO dry well, maybe within the artillery range.

He also indicated that they were still interested in the area south and east of the artillery range, in and around the impact area. He indicated that they had not been able to obtain a large enough block of land to make drilling possible in the near future. Mr. Camp's primary interest seemed to be to continue the moratorium at the present rate of $2.00 through 31 March 1977. He was advised that the primary desire of FWD as well as the Commanding General at Fort Polk was to stop the payment of these monies, as rent. He was asked if he was interested in signing similar stipulations used at Peason Ridge. Mr. Camp objected to one well per year and insisted that since Burton Industries owned 31,295.91 acres, they should be permitted three wells. I agreed to accept two wells if he would agree to drop his request to two wells at one time. He also inquired as to what areas would be prohibited and was told that it consisted of the eastern south half plus about six sections of land on the northwest half of the artillery range. He was advised that all the areas south of State Highway 467 could be made available immediately and maybe 5,000 to 8,000 acres in the artillery range. He rapidly concluded that out of the total of 44,000 acres, the maximum area available for drilling would be only about 8,000 acres. He stated that this area would not give the oil and gas lessors sufficient room to drill the number of wells desired if oil or gas was found.

7. Mr. Camp indicated that if the Government would waive its right, if any in the mineral title to lands beneath the land acquired from the Forest Service, we might be able to reach an agreement on the mineral moratorium covering the artillery range. The areas that he made reference to were about 14 to 20 sections long lying west of the artillery range and extending three sections above the Fort Polk south boundary line. Mr. Camp was claiming title to the minerals to some 14 to 20 sections of land. I advised Mr. Camp that neither I nor the Corps of Engineers had the right to waive any claim of ownership to these minerals. This can be done only by Act of Congress. He then asked if this could be settled by Federal Court and I advised that it could but we each agreed that any such law suit would probably be settled by the US Supreme Court. No title search of the minerals has been done in this area. It is known that the Government purchased with the surface certain mineral right. It is also known that the land was acquired in the mid 30's prior to enactment of Section 315 Louisiana Statute in 1942 covering description. If the minerals were reserved by the owner in 1935, they would revert to the surface owner in 1945. The 1942 Act probably could not be retroactive and the Government does have a strong claim of title to these minerals. Mr. Camp is not sure of his title.

8. The meeting was concluded. I am to meet with them again after they have contacted their primary oil and gas lessees and the owners of Sabine Royalty Globe, owner of 10,300 acres and Crowell Inc., owner of nine tracts (826 acres).

9. At this stage of the negotiations (1) I concluded that these mineral owners are more interested in money than in drilling; (2) if stipulations can be obtained to limit oil and gas exploration that they will accept payment of 95¢ per acre for FY 78; (3) that the Commanding General, Fort Polk, will demand that the present mineral

SWFRE-A

SUBJECT: Trip Report, Civil Action 19118, Fort Polk Minerals

19 January 1977

moratorium be maintained if stipulations cannot be obtained to limit drilling operations like we did at Peason Ridge; and, (4) that we will object through channels to payment of any monies to maintain mineral moratorium.

Darwin L. Wilder

DARWIN L. WILDER
Chief, Acquisition Branch
Real Estate Division