# DISPOSITION FORM

For use of this form, see AR 340-15, the proponent agency is TAGCEN.

| REFERENCE OR OFFICE SYMBOL | SUBJECT |
|---|---|
| SWFRE-A | Memorandum for Record of Trip Report, Civil Action 19,118, Fort Polk Minerals |

TO Real Estate Files FROM Darwin L. Wilder DATE 18 March 1977 CMT 1

Mr. Wilder/db/2111

1. Reference is made to trip report dated 19 January 1977 in which, after my last visit with Mr. Camp and MG Steele, I was of the opinion that (1) Burton Industries was interested in money and in drilling, and (2) in the event a stipulation permitting limited drilling could not be obtained, the mineral owners would settle for $0.95 for FY 78.

2. On 16 February 1977 I met with Mr. John Camp and his oil and gas attorney, Charles Carwile, in Lake Charles. Mr. Camp had a busy schedule, so we proceeded immediately with business at hand.

3. A copy of map was furnished as promised, showing 25,800 acres outlined in red where drilling would not be possible, as this is the impact area. There is daily firing of cannon and tanks in this impact area, as well as many live duds dating back as far as World War II. Mr. Camp stated that he had contacted several of the oil and gas drillers, and they were not interested in drilling under the same terms and conditions imposed in the stipulation at Peason Ridge. He also advised that only a few leases were extended on areas north and outside of the artillery range after the ARCO well came in dry. My conclusion is there will be no further oil and gas exploration in this area at any time in the foreseeable future.

4. Mr. Camp stated that he had recently leased at $25 per mineral acre several sections of land adjoining the south boundary line of the artillery range. He expressed the hope that a test well could be drilled in this area within the next two or three years.

5. After it became obvious that the Government could not get similiary stipulations signed by Burton Industries, Sabine Royalty-Globe, or Crowell Land and Mineral Corporation, inquiry was made as to how much money he expected to receive per mineral acre if notice were given and the moratorium for the last year of the current civil action. Mr. Camp stated that, since he had leased the area south of our boundary line at $25 an acre, he expected not less than $2, the current rate. He was advised that this figure was too high, and the most we could consider would be $0.95 per mineral acre, which has been budgeted by Fort Polk for FY 78. He was asked if he would take $0.95 if the Government would release some 1,200 to 1,800 acres south of the paved road near the southern boundary of the artillery range. Mr. Camp replied that, since we are not using it, we should release these mineral acres, but insisted on $2 an acre for all the remaining mineral acres.

6. In telephone conversation with Mr. Harris, Assistant U.S. Attorney handling this civil action, Mr. Harris advised that notice has already been issued, and it would be impracticable to try to revest these mineral acres for the coming year. After further discussion we each concluded that these few acres could be used as a bargaining tool if a new civil action is filed extending the moratorium for an additional five years.

SWFRE-A
SUBJECT: Memorandum for Record of Trip Report, Civil Action 19,118, Fort Polk Minerals

18 March 1977

7. In summary, it is concluded that Burton Industries is not interested in a stipulation permitting limited drilling in certain areas. They are interested in collecting annual payments for the mineral moratorium at $2 per acre per annum. If the mineral moratorium is maintained for an additional five years, $2 per acre is preferable over submitting the matter to jury trial, which I consider extremely dangerous.

8. On 17 February 1977 I met with Captain Hunt, DAFE, Real Property, in the absence of Colonel Teague, who was on TDY in Washington. Since I had nothing new to report, no attempt was made for a conference with MG Steele. Captain Hunt asked me to furnish him a copy of this trip report outlining several alternatives, with recommendation, available to the command.

9. I recommend:

a. The moratorium be maintained for FY 78 and the United States authorized to stipulate at $2 per mineral acre on the entire 43,953.65 acres;

b. The moratorium not be extended for an additional five years beginning 31 March 1978.

c. The mineral owners' oil and gas lessees be permitted in FY 79 and thereafter to conduct seismograph surveys.

d. In the event the results of the seismograph surveys look favorable and oil and gas lessees want to drill, they be permitted to drill after we negotiate as to time, place, and conditions for drilling.

e. If negotiation is not acceptable to Fort Polk, an injunction or restraining order be obtained from the Federal Court until the mineral moratorium can be imposed for an additional five-year period.

10. The danger, risk, and advantages of the above recommendations are:

a. Continuation of annual mineral payments are likely to increase in future years, and the cost will be prohibitive. This payment is a "rip-off."

b. If there is oil or gas under the artillery range, it is needed for National Defense and to meet National Energy Crises. The likelihood of discovering a large producing oil field is remote, but anything is possible. There are no producing oil and gas wells in Vernon Parish. The possibility of discovering gas wells seem more likely and, if discovered in paying quantities, spacing is likely to be set by Louisiana authority at one well per section, or 640 acres. With this spacing, pooling, and directional drilling (one-half mile to depth of 10,000 feet), is it not possible to continue Fort Polk's military readiness without materially disrupting the effectiveness of the military mission?

SWFRE-A
18 March 1977
SUBJECT: Memorandum for Record of Trip Report, Civil Action 19,118, Fort Polk Minerals

c. Asking the current Congress to provide funds to maintain the moratorium may be unteneable. It is better to consent and negotiate the best terms and conditions rather than to be directed by Congress or a Presidential edict to permit drilling.

d. Because Fort Polk is a military reservation, neither the Federal Court nor the people (including Congressmen) of Louisiana are likely to let Fort Polk be closed. It would severely hurt the economic and financial condition of all Northern Louisiana if Fort Polk were closed.

e. Considering the worst possible condition wherein drilling did materially affect the mission in the impact area of the artillery range, the cost to relocate or rearrange bunkers, safety artillery fans and berms, etc., would be at oil and gas lessee's expense. Oil and gas lessee cannot drill in the construction or impact area without liability. Neither the surface owner's rights nor the mineral owner's rights are absolute. One must exercise his rights so as not to inconvenience or damage the other. Problems can be overcome if all parties act reasonable and are considerate of the others.

f. The only way to solve this problem is to offer to let them drill the area, otherwise we will be forced to pay the mineral moratorium plus an estimated $12,000 administrative cost to keep it alive. If they drill and find no oil or gas, we could probably buy the minerals at a nominal consideration of $1 per acre. If they drill and find oil or gas, try to figure out a way to live with them. I believe "cannons" and "oil or gas wells" are compatible.

g. Purchasing the minerals underlying the artillery range is not considered practical today.

10. I will request a conference with MG Steele and Colonel Teague to discuss the matter further and explore all possible solutions. Determination must be made within the next few months. The current civil action which maintains the moratorium will expire 31 March 1978, and it normally takes six to nine months to file a new civil action. Negotiations can be continued with the principal mineral owners, but obtaining similar agreements to those at Peason Ridge now appears highly unlikely.

DARWIN L. WILDER
Chief, Acquisition Branch
Real Estate Division