Judges File
RE

FORT POLK, LA

MINERAL MORATORIUM

Attorney's Opinion

ISSUE: To what extent may an oil and gas lessee use the surface of the land without violating the rights of the lessor or his grantees or lessees of the land or of the surface only?

This depends principally upon the express and implied provisions of the lease relative to the use of the surface of the demised land.

An oil and gas lease carries with it the right to possession of the surface to the extent reasonably necessary to enable the lessee to perform the obligations imposed upon him by the lease. Smith v. Schuster, App. 1953, 66 So. 2d. 430. Summers, Oil and Gas, Sec. 652, Vol. 4, page 2. Accordingly, the right to use of the surface for such purposes is implied if it is not granted, whether the form of conveyance is a mineral deed or a lease.

The granting clause of an oil and gas lease states the purpose for which the lease is made and the lessee's privileges of user of the land for the accomplishment of this purpose. The problem is one of determining whether the use attempted to be made is named in the lease or is necessary to the drilling and production of oil and gas, bearing in mind the fact that the lessor is privileged to use the surface in any manner not inconsistent with the lessee's rights. An oil and gas lessee's privileges of user of the land, whether expressly granted or inferred as being reasonably necessary for the accomplishment of the purposes of the lease, are valid and effective as long as the lease remains in force against the lessor, his grantees of the land, and surface or mineral lessees who take with actual or constructive notice. See: Summers, Oil and Gas, Vol. 4, Sec. 652, pp. 6-8. The oil and gas lessor retains by express provisions of the lease, or by implication, the privilege of using the premises in any way not inconsistent with the lessee's rights and privileges of user. Drilling operations may be carried on anywhere on the land in the absence of express provisions of the lease to the contrary, and, if not negligently performed, they do not constitute a nuisance. See: Lynn v. Maag, (C.A. Tex. 1955), 220 F. 2d. 703. A lessor or his subsequent purchaser may recover damages caused by the oil and gas lessee's negligence in operating the land. See: Wilcox Oil Co. v. Walters, 1955, 284 P. 2d. 726 (lessee liable for escaping salt water from wells and storage facilities to surface lessee for injury to cattle). If the lessee's acts are found to be a reasonable use of the surface, he is not liable for injury resulting from their performance.

In Texas, the mineral lessee enjoys a dominant estate over that of the lessor; he has a general duty to make a reasonable use of the premises in accordance with the provisions of the lease and to exercise reasonable care. Lynn, supra. In Louisiana, Smith, supra, a lessor recovered from the lessee the cost of filling unused slush pits and cleaning rubbish from the land. If the acts complained of are found not to constitute a reasonable use of the surface, or are prohibited by the lease, or a statute, the lessee is liable for the injury done or threatened, and the lessor or surface owner is entitled to a legal or equitable remedy. Summers, supra, pp. 21-27. The Louisiana Mineral Code, cited as LSA-R.S. 31, contains statutory provisions which are supplementary to those of the Louisiana Civil Code, and, in the event of a conflict between these two codes, the provisions of the Mineral Code prevail. LSA-R.S. 31-2. There are certain principles in the Louisiana mineral property system that are based on public policy. Articles 73 through 75 of the Mineral Code are examples of this, which are applicable to mineral servitudes. These articles respectively prohibit the creation of one servitude on two or more noncontiguous tracts of land, contracting for a prescriptive period greater than ten years, or making the rules of use of mineral servitudes less burdensome than those provided by the Mineral Code. LSA-R.S. 31:3, p.432.

With reference to the liability of mineral lessee conducting exploration and developmental operations for oil and gas, two conclusions emerge under Louisiana law. One is that the jurisprudence indicates a strong tendency to impose liability on the operator for damage to persons or to adjacent or neighboring property resulting from the conduct of otherwise lawful operations when they are inherently dangerous. The second is that the conceptual articulation of this result has not been of great importance. In Fontenot v. Magnolia Pet. Co., 227 La. 866, 80 So. 2d. 845 (1955), the court, citing Article 667 of the Civil Code, imposed what amounts to a strict liability for damage to neighboring property resulting from geophysical operations which included blasting. Article 667 incorporates the "sic utere" doctrine. In Watkins v. Gulf Ref. Co., 206 La. 942, 20 So. 2d. 273 (1944), the court used negligence concepts to impose liability for damage resulting from a blowout and holds that the facts of the case required application of the doctrine of "res ipsa loquitur." Thus, the courts are giving great weight to the hazardous aspects of oil and gas operations, with the result that a high degree of responsibility is placed upon such enterprises when they involve inherent risks of damage through the escape of oil or gas or the use of explosives.

The Louisiana Legislature in 1974 enacted LSA-R.S. 31:11, Correlative rights of landowner and owner of a mineral right, which reads: "The owner of land burdened by a mineral right and the owner of a mineral right must exercise their respective rights with reasonable regard for those of the other." Article 11 intended to provide a flexible formula governing the relationship

between the mineral servitude owner and the owner of the servient estate. There are several articles of the Civil Code which could be applied to this relationship. Article 777 of the Civil Code, for example, provides that the owner of the servient estate can do nothing tending to diminish the use of the servitude or make it more inconvenient. He cannot change the condition of the premises or transfer the exercise of the servitude to a different place from that on which it was assigned in the first instance. Article 11 contemplated that the relationship be one in which the parties each must exercise their rights to use the land with reasonable regard for those of the other. Uses by one party which may be considered ultra-hazardous as to the other's right to concurrent use of the land may in proper circumstances result in the imposition of liability without regard to the manner of performance of the activity in question.

It should be kept in mind, however, that the mineral lessee (operator) may follow the land, regardless of transfers of ownership. He may assert his rights against the world just as the proprietor of any other right. He may enjoy directly and draw from the land a part of its economic advantages by appropriating a wasting asset. He has certain rights of preference, and he holds a right that is in reality susceptible of a type of possession through exercise. The mineral lessee keeps in mind the fact that a mineral lease must have a term and may not be continued for more than ten years without drilling or mining operations or production (Article 115). Thus, mineral servitudes are said to be subject to prescription for nonuse, except for the so-called "imprescriptible" mineral rights that arise from conveyance to the United States, the State of Louisiana, or any of their subdivisions (See: Articles 149-152), the effect of which is a form of suspension of prescription (moratorium) so long as the land remains in the hands of such Federal or State ownership. Once such lands return to the stream of private commerce, prescription would again apply as in the normal case. LSA-R.S. 31-149.

In view of the foregoing, it would appear that at least three courses of action are available with regard to the mineral moratorium affecting certain lands which are a part of Fort Polk, LA, namely: (a) Continue the present moratorium; (b) allow the moratorium to expire on 31 March 1978; or (c) enter into an agreement which would allow for a partial lifting of the moratorium in selective areas similar to the arrangements at Peason Ridge, LA. Should either of the latter two courses be pursued, the following items should be kept in mind: (1) Department of the Army as represented by the Commanding General, Fort Polk, LA, must equate the risk factors of allowing limited exploratory and developmental operations in selected areas of the base with those of military security of the base and the needs of the nation for oil and gas; (2) mineral lessee or operator must agree to assume the risk for damages incurred to persons or to adjacent or neighboring property as a

result of their operations, however incurred; and (3) that a clear understanding be reached between the parties (surface and subsurface owners) regarding the applicable law, Federal or State, in event of a conflict arising between them which could give rise to litigation.

R. P. ALLEN, JR.
Attorney
Real Estate Division
Fort Worth District, Corps of Engineers

Dated: 11 May 1977