# HYDROCARBON LEASE

THIS AGREEMENT, entered into effective as of the 1st day of August, 19 95, by and between J. Lawton Company & Tower Land Company, Inc., whose mailing address is (Please refer to signature page.), ("Lessor") and Chesapeake Operating, Inc. 6104 N. Western Avenue, Oklahoma City, OK 73118, ("Lessee").

W I T N E S S E T H :

Lessor, in consideration of the sum of One Hundred and 000/100--------------- DOLLARS ($ 100.00) and other valuable consideration, hereby leases and lets unto Lessee the exclusive right to enter upon and use the land hereinafter described ("the land") for the exploration for, and production of hydrocarbons (defined for purposes of this lease as oil, gas and all other non-solid hydrocarbons), together with the use of the surface of the land for all purposes incident to the exploration for the production, ownership, possession, and transportation of such hydrocarbons from the land, and the right to dispose of salt water as hereinafter provided for, with the right of ingress and egress to and from the land at all times for such purposes, including the right to construct,maintain and use roads thereon for operations hereunder; all subject to stipulations hereinafter set forth; the land to which this lease applies and which is affected hereby being situated in Rapides and Vernon Parish (es), Louisiana, and described in Exhibit "A" attached.

For the purpose of calculating the payments hereinafter provided for, the land is estimated to comprise 33,607.5325 acres, whether it actually comprises more or less.

This lease shall be for a term of three (3) years and no months from the date hereon (" the primary term") and so long thereafter as oil, gas or some other non-solid hydrocarbon is being produced in paying quantities or drilling operations are conducted on the land, all as hereinafter provided for; all subject to the following conditions and agreements.

1. This lease shall terminate on the 1st day of August, 19 96, unless on or before that date Lessee either (1) commences the actual drilling ("spudding-in") of a well on the land in search of hydrocarbons and thereafter continues such operations through the drilling of a well to completion or abandonment; or (2) pays to Lessor a rental of ------------------------------------------------ ~~DOLLARS~~ - $ 2,520,564.94 for all or that part of the land which Lessee elects to continue to hold hereunder, which payment shall maintain Lessee's rights hereunder in effect as to such land without drilling operations for one (1) year from the date last above mentioned; and Lessee may continue to maintain the rights granted without drilling operations for one additional twelve (12) months' period (during the primary term)by paying Lessor, on or before the beginning of the third twelve (12) months' period, the sum of ------------------------------------------ ~~DOLLARS~~ - $ 2,520,564.94 for all or that part of the land held hereunder. Payments to Lessor may be mailed or delivered for deposit to its credit in the Calcasieu Marine National Bank of Lake

Charles, Sulphur Branch, Sulphur, Louisiana ("the Bank"). The Bank or its successor shall continue to be the depository for such rentals as the representative of Lessor, and the cessation of its operations or any disruption of its business activities shall not terminate or affect Lessee's right to so deposit all payments. The receipt by the Bank or by Lessor of the check or draft of Lessee on or before the rental paying date shall be considered as payment of rental and operate to maintain Lessee's rights in force and effect. Should the Bank fail or refuse to accept Lessee's check or draft, the attempted payment in the manner provided shall not be thereby rendered ineffective, and Lessee shall not be in default for failure to pay the rental until thirty (30) days after Lessor shall have furnished Lessee with a recordable instrument naming a new depository.

2. Lessee may, at any time prior to or after the discovery and production of hydrocarbons on the land, execute and deliver to Lessor, or file in the conveyance records of the Parish in which the land is situated, a release or releases of any portion or portions of the land or any stratum or strata thereof and be relieved of all obligations subsequently arising hereunder as to the land, stratum or strata so released

In the event of the termination of this lease for nonpayment of rentals, or in the event of expiration of this lease pursuant to its terms, Lessee shall have the right to retain around each well then producing hydrocarbons in paying quantities, or being drilled or worked on, the number of acres fixed and located by the spacing or unit order of any Regulatory Body of the State of Louisiana or of the United States under which such well is being drilled or produced; and if no spacing order has been issued, then Lessee shall have the right to retain forty (40) acres of the land surrounding each well then producing oil in paying quantities, and -160- acres of the land surrounding each well then producing gas in paying quantities, or such lesser amount of Lessor's land in each instance as may then be affected by this lease, the acreage retained around each well to be in as near a square form as is practical. Lessee shall have such rights of way or servitudes affecting the acreage released or forfeited as are necessary for Lessee's operations on the land retained hereunder.

3. After the beginning of drilling operations on the land and prior to the discovery and production of hydrocarbons in paying quantities, Lessee may maintain the rights granted during and after the primary term by continuing such operations with due diligence without the lapse of more than one hundred fifty (150) days between abandonment of work on one well and beginning the actual drilling of another; and during the primary term such operations may be discontinued and the rights granted maintained by commencing rental payments, by paying within one hundred fifty (150) days from the cessation of operations (regardless of the fixed rental paying date) the proportion of the fixed yearly rental that the number of days between one hundred fifty (150) days after the date of cessation of operations and the next ensuing anniversary date bears to the twelve (12) months' period; but, if said one hundred fifty (150) days shall expire during any year for which rental or other payment has been made, no rental shall be due until the next fixed rental paying date. The rental shall be proportionately reduced by the number of acres of lands leased herein then contained in a producing unit. In order to avoid paying rentals on released lands, Lessee shall release a minimum of 960 acres of contiguous lands, or if there is insufficient contiguous acreage in the released lands to equal 960 acres, Lessee shall release the entirety of all acreage in a given section and a half section contiguous thereto. In no event shall the rental be calculated on less than all acreage owned by Lessor and leased hereunder in the township in which Lessee desires to maintain lands under this lease through the payment of rentals.

4. If prior to or after discovery of oil or gas on the lands leased hereunder, a well producing hydrocarbons in paying quantities for thirty (30) consecutive days is brought in on adjacent lands not owned by Lessor and draining the land then held hereunder Lessee, in order to maintain the rights granted, shall within ninety (90) days, after notice from Lessor, begin to prosecute with reasonable diligence, the drilling of a well in an effort to discover hydrocarbons thereby and to protect the land from drainage, or release the affected acreage. For purposes of this paragraph, drainage shall be presumed whenever any such well is located on adjacent property within 990 feet from any boundary line of the land if an oil well, and within 1980 feet from any boundary line of the land if a gas well.

5. After the discovery and production of hydrocarbons in paying quantities on the land, the rights granted shall be maintained in effect during and after the primary term without the payment of the rentals so long as hydrocarbons are being produced in paying quantities and/or drilling operations are being conducted as set forth below.

Lessee shall drill for the common advantage of Lessor and Lessee the number of wells necessary for the full development of the property. Should more than one hundred fifty (150) days elapse between the completion or abandonment of a well and the spudding in of another well, then Lessee's rights to all undeveloped portions of the land shall terminate. Thereafter, the developed portion to be retained (sometimes hereinafter called "tract held by production") shall be that portion of the land surrounding each producing well as defined by the spacing or unit order issued by the Louisiana Department of Conservation (or such successor, agency or regulatory body), or in the absence of such order, forty (40) acres surrounding each producing oil well or -160- acres surrounding each gas well. A well producing both oil and gas shall be characterized as an oil or gas well for purposes of this paragraph in accordance with the regulations of the Louisiana Department of Conservation. Retained tracts, in the absence of a unit or spacing order, shall as nearly as possible be centered on the producing well will maintain Lessee's rights in its respective tract only from the surface to 100' below the strata or stratum then producing in the particular well.

Upon termination as set forth above, Lessee shall execute, and file in the conveyance records of the parish in which the land is situated, a release of each tract so held by production as to depths more than 100' below the strata or stratum then producing in the well on the tract and a release of the balance of the acreage as to all depths. A copy of the release certified by the Clerk of Court shall be furnished to Lessor.

~~As to any tract held by production, Lessor may request~~ an assignment of Lessee's rights to Lessor's nominee of any or all formations behind the well pipe which tests or other geological information available reasonably indicates might be capable of producing oil or gas in paying quantities from which oil or gas has not been produced in paying quantities, or which Lessee has not attempted to produce, within the preceding 12 months, which assignment shall provide for the reservation of a ______ % overriding royalty by Lessee. Should Lessee fail to commence additional drilling or completion efforts directed toward one or more of such formations within 12 months, Lessee shall immediately ~~thereafter grant the requested assignment~~.

Should production from a well cease from any cause, and

Lessee is not then engaged in drilling or reworking operations on the tract held by that well, this lease shall terminate as to that tract unless Lessee restores such production, or commences additional drilling or reworking operations on that tract, within ninety (90) days thereafter and continues such operations without the lapse of more than ninety (90) days between the end of one such effort and the commencement of an additional effort, in an attempt to restore production of hydrocarbons from that tract.

Lessee shall at all times conduct such operations for the exploration and development of this lease as a prudent operator would, in an earnest effort to procure the full development thereof.

~~Should Lessee, by the drilling of any well located on the land, discover gas or gaseous substances capable of production in paying quantities, but which Lessee is unable to produce (or which although previously produced, Lessee is unable to continue to produce) because of lack of a reasonable market or of marketing facilities, or because of governmental restrictions, then if the lease is not being otherwise maintained, Lessee's rights may be maintained for successive periods of one (1) year each for no more than five (5) consecutive years by the payment to Lessor of "shut-in gas rental", annually in advance, in a sum equal to the full amount of the annual rental provided for in Paragraph 1 hereof; provided that Lessee shall not be obligated to pay such shut-in gas rental until ninety (90) days after the lease ceases to be maintained in some other manner. During the period Lessee is paying such shut-in gas rental, it shall be considered that gas is being produced from the leased premises in paying quantities.~~

6. Subject to the provisions of Paragraph 9 hereof, the royalties to be paid by Lessee are:

(a) On oil and other liquid hydrocarbons ("royalty oil"), 22.5% Before Payout("BPO")/25% After Payout("APO") of that produced and saved from the land and not used for fuel in conducting operations on the property, the same to be delivered to Lessor free of expense at Lessor's option in tanks furnished by Lessor at the well or to Lessor's credit in any pipeline or other transportation facility to which the well is connected. In the event Lessor does not furnish tanks for such royalty oil, Lessee shall sell Lessor's royalty oil at the best market price obtainable, and pay Lessor the price received f.o.b. the land, less any severance or production tax imposed thereon;

(b) On gas, including casinghead gas, or other gaseous substances, and the liquid hydrocarbon content thereof produced from the land (or on acreage pooled therewith) and sold or used by Lessee in operations involving other lands, or for the extraction of gasoline or other by-products, and subject to the alternate option set forth below for Lessor to receive its share of such production in kind, the royalties payable to Lessor under this sub-paragraph (b) shall be the market value at the wells of -------------22.5%BPO/25%APO------------ of the gas so sold or used; PROVIDED that, on gas sold at the wells, the royalty shall be ---22.5%BPO/25%APO--- -------------------- of the amount realized from such sale;

PROVIDED that, while Lessee or any subsidiary sub-lessee, agent, assignee, or any other person acting under this lease or for and in behalf of Lessee processes gas produced from the land in an absorption plant or other facility in the field or otherwise, in lieu of the royalties on that gas as provided above, Lessor's royalty thereon shall be (1) ------------22.5%BPO/25%APO-------------- of the value at the wells of any liquid hydrocarbons recovered by Lessee by means of drip, separator, low temperature extraction unit, or similar apparatus, before the gas is run to such plant of the liquid hydrocarbons recovered, and (2) -------------22.5%BPO/25%APO-------- of the market value at the plant of residue gas sold or used in operations involving lands other than those leased hereby; PROVIDED that, the total royalties payable to Lessor for the sale of residue gas and plant products shall never be less than the amount Lessor would receive if the gas were sold at the lease after conventional separation; and FURTHER PROVIDED that, no deduction for costs or expense shall be made for liquid hydrocarbons recovered by drip, separator, or other apparatus on the flow line of the well. In determining the quantity of the gas on which royalties are payable, gas produced from the land, before being commingled with other gas, shall be measured or gauged by a method recognized in the industry.

Notwithstanding the alternate provisions set forth above in this sub-paragraph (b) or payment of royalties due under this sub-paragraph (b) as --22.5%BPO/25%APO-- ------------------ of the market value thereof, and notwithstanding any other provision in this lease to the contrary, Lessor expressly reserves the right and option at any time, and/or from time to time, upon ninety (90) days written notice to Lessee, to elect to take in kind its share of the production covered by this sub-paragraph (b), being ------------22.5%BPO/25%APO-------------- of all gas, including casinghead gas, or other gaseous substances and the liquid hydrocarbon content thereof produced from the land (or any acreage pooled therewith), and not used by Lessee in operations affecting solely the land, and Lessor may, pursuant to this latter election, take its share of the gas at the wellhead, or at Lessor's option, if Lessee (or any subsidiary sub-lessee, agent, assignee, or other person acting under this lease, or for or in behalf of Lessee) processes any part of the gas produced from the land in an absorption plant or other facility in the field or otherwise, in lieu of the -22.5%BPO/25%APO- -------------------------- share in kind of that part of such production, Lessor may elect to take in kind ------- ---------22.5%BPO/25%APO----- of (1) any liquid hydrocarbons recovered by Lessee by means of drip, separator, low temperature extraction unit, or similar apparatus before the gas is run to such absorption or similar type plant, (2) the liquid hydrocarbons recovered from and through such plant, and (3) all residue gas; PROVIDED that, no deduction for costs or expenses shall be made for liquid hydrocarbons recovered by drip, separator, or other apparatus on the flow line of the well facility, or recovered through an absorption or similar facility. In determining the quantity of gas to be received by Lessor, should Lessor choose to exercise the option provided by this sub-paragraph (b), and receive in kind its gas, casinghead, gaseous substances, and the liquid hydrocarbon content

thereof, the gas produced from the leased premises shall be measured or gauged by a method recognized in the industry, before being processed or commingled with any other gas, if such commingling be necessary for the practical, reasonable, and economic handling of the gas, but no such commingling shall occur, without prior written permission of Lessor, if the value, character, or content of Lessor's share of the gas being taken in kind would thereby be reduced in value or marketability. Should Lessor exercise the option to take its share of the production in kind as provided by this sub-paragraph (b), Lessee agrees to make available, at Lessee's cost, such connection facilities as may be necessary, reasonable, and practical for Lessor to receive its share of such production into a pipeline or pipelines of Lessor or its designee.

(c) -----------22.5%BPO/25%APO---------- of the value of all other hydrocarbons produced and marketed.

Lessee may inject gas, water, brine or other fluids into subsurface strata, but may not, without written consent of Lessor, use the land to dispose of salt water or other substances from wells not located on the land (or on lands unitized therewith). No royalties shall be due on any gas produced by Lessee and injected into subsurface strata through a well or wells located on the land if such injection of gas benefits only Lessor's land and enhances the probability of improving and/or increasing the production of gas and/or oil therefrom.

~~7. Lessee shall be responsible for all damages caused by Lessee's operations.~~ and Lessee shall ~~indemnify~~ and hold Lessors harmless from any and all causes ~~of action~~ or claims directly or indirectly arising by ~~way of Lessee's sole or joint actions~~.

8. The provisions of this lease shall be binding upon and inure to the benefit of the successors and assigns of Lessor and Lessee; but, notwithstanding any actual or constructive notice by Lessee, no change in the ownership of the land or any interest therein, or in the capacity or status of Lessor, whether resulting from sale, inheritance, interdiction, emancipation, attainment of majority, or otherwise, shall impose any additional burden on Lessee, nor shall any change in ownership or in status or capacity of Lessor impair the effectiveness of payments made to Lessor herein unless the then record owner of this lease shall have been furnished, thirty (30) days before payment is due, with certified copy of recorded instrument or judgment evidencing such transfer, inheritance or sale or evidence of such change in status or capacity of Lessor. The furnishing of such evidence shall not affect the validity of payments made in advance. Any record owner of a divided or undivided interest in this lease may pay the entire rental payable hereunder and such payment shall be for the benefit of those holding leasehold rights hereunder. If at any time, two or more persons are entitled to participate in the rental payable hereunder, Lessee may pay or tender the rental jointly to such persons or to their joint credit in the depository named herein; or, at Lessee's election, the proportionate part of the rental to which each participant is entitled may be paid or tendered to such person separately or to such person's separate credit in the depository, and payment or tender to any participant of his portion of the rentals hereunder shall maintain this lease as to such participant.

Notwithstanding any provision to the contrary herein, Lessee may not sublease or assign this lease in whole or in part without Lessor's prior written consent, which consent, Lessor may withhold with or without reasonable cause. No sublease or assignment shall operate to release the original Lessee from any obligations undertaken in this lease, but in any event of sublease or assignment, the sublessee or assignee shall become directly responsible to Lessor for all obligations of the Lessee undertaken in this lease.

9. This lease is made without any warranty of title whatsoever, even as to the return of the consideration received for the lease or any rentals or other payments received hereunder, but Lessee is subrogated to all of Lessor's rights and actions in warranty against all former owners and vendors except as to Wm. T. Burton personally. Lessee may, at its option, discharge any tax, mortgage or other lien upon the land and be subrogated thereto and have the right to apply to the repayment of Lessee any rentals and/or royalties accruing hereunder. If Lessor owns less than the entire undivided interest in all or any portion of the land or mineral rights relating thereto, rentals and royalties as to such portion of the land in which an interest is outstanding may be reduced proportionately to the interest of Lessor therein; but the failure of Lessee to reduce rentals shall not affect Lessee's rights to reduce royalties; and in the event Lessor's title or an interest therein is claimed by others, Lessee shall have the right to withhold payment of royalties for a reasonable time not to exceed ninety (90) days after notice or discovery of such claim, and/or within such ninety (90) days to commence concursus proceedings in a court of compentent jurisdiction and deposit such royalties in the registry of the Court until final determination of Lessor's rights.

10. The requirements of this lease shall be subject to any State and/or Federal law or order regulating operations on the land. Should Lessee be prevented from complying with any express or implied covenants of this lease, from conducting drilling or reworking operations thereon, or from producing hydrocarbons from the land by reason of scarcity or inability (after effort made in good faith) to obtain equipment or material or authority to use same, or by failure of carriers to transport or furnish facilities for transportation, or by operation of force majeure, any Federal or State law, or any order, rule or regulation of governmental authority, or other causes beyond Lessee's control, then while so prevented, Lessee's obligation to comply with such covenant shall be suspended and Lessee shall not be liable for damages for failure to comply herewith; and this lease shall be extended while and so long as Lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing hydrocarbons from the leased premises, and the time while Lessee is so prevented shall not be counted against Lessee, provided, however, that no such extension shall exceed a period of twelve (12) months.

11. ~~Lessee, at its option, is hereby given the right~~ and power without any further approval from Lessor to pool or combine the acreage, royalty, or mineral interest covered by this lease, or any portion thereof, with other land, lease or Leases, royalty and mineral interests in the immediate vicinity thereof, when, in Lessee's reasonable judgment, it is necessary or advisable to properly develop and operate the land to promote the conservation of hydrocarbons underlying the land, or to comply with the ~~spacing or unitization order of any regulatory body in the State~~

~~of Louisiana or the United States having jurisdiction. The term~~ "regulatory body" shall include any governmental tribunal or group (civil or military) issuing orders governing the drilling of wells or the production of hydrocarbons, irrespective of whether such orders are designed to promote conservation or to conserve materials or equipment for National Defense or similar purposes. Such pooling and/or any units formed for drilling and/or production purposes, located only within the land or, including any part of the land shall be of tracts which will form one contiguous tract of land for each unit, and the unit or units so created shall not exceed substantially forty (40) acres each, surrounding each oil well and substantially ____________ acres each for each gas or gas-distillate well, unless a larger spacing pattern or larger drilling or producing units (including a field or pool unit) have been fixed and established by an order of a regulatory body of the State of Louisiana or of the United States, in which event the unit or units may be of the size fixed by said order. Lessee shall execute and record in the Conveyance Records of the Parish in which the land is situated, an instrument identifying and describing any acreage pooled into units under the limitation above set forth, and upon such recordation, the unit or units shall thereby become effective. In lieu of the royalties payable on gas elsewhere herein specified, and subject to the provisions of Paragraph 9 hereof, Lessor shall receive on account of production from any unit so pooled such portion of the royalties stipulated herein as the amount of Lessor's acreage placed in the unit, or Lessor's royalty interest therein, bears to the total acreage so pooled in the particular unit involved. Drilling or reworking operations on or production of hydrocarbons from land included in such pooled unit shall have the effect of continuing this lease in force and effect during or after the primary term as to the land included in such unit, whether or not such operations be on or such production be from land covered hereby. Any unit formed by Lessee hereunder may be created either prior to the drilling or after the completion of the unit well; and separate units may be created for oil and for gas even though the areas thereof overlap. Lessee may reduce and diminish the extent of any voluntary unit created by Lessee under the terms of this paragraph so as to eliminate from such unit any acreage or lease upon which there is or may be an adverse claim; and Lessee may also re-form any voluntary unit created by Lessee under the terms of this paragraph to conform with an order of a regulatory body issued after such unit was originally established. Such revision of the unit shall be evidenced by an instrument in writing executed by Lessee, which shall identify and describe the land included in the unit as revised and shall be recorded in Conveyance Records of the Parish where the land is situated.

Should any portion of the land be pooled or unitized with other lands, either by virtue of the provisions of this Paragraph 11 or by order of any regulatory body of the State of Louisiana or the United States, operations on or production from such portions contained within any such unit shall not maintain this lease in force and effect as to any portion of the land not ~~physically situated within such unit.~~

12. Lessee may remove any and all casing and equipment from the land, but title to any and all casing and equipment remaining on the land six (6) months after termination of this lease shall immediately and automatically vest in Lessor.

13. Lessee shall conduct its operations with the least interference with the present ~~and future~~ use of the surface for residential, commercial, industrial, agricultural, grazing, or other such usual purposes, and in the location of Lessee's operations and facilities on the land, Lessee shall take all reasonable precautions to minimize interference with the present ~~or future~~ use of the surface of the lands by Lessor for such purposes. All existing roads used by Lessee in connection with its operations shall be maintained by Lessee during such use. At the conclusion of Lessee's operations, such roads, shall be left or placed by Lessee in a useful condition, equal or superior to their condition at the present time. For purposes of this paragraph, least interference shall mean the least amount of interference practical in conducting oil field operations.

Any existing drainage ditches and/or canals used by Lessee in its operations shall be used by it in such a manner as to not interfere with the present normal method of drainage. No additional drainage facilities may be constructed by Lessee without prior approval of Lessor.

At the option of Lessor, all pipelines, except temporary pipelines used in connection with the drilling, testing or reworking of wells, constructed by Lessee shall be placed at locations designated by Lessor and buried at least three(3) feet below the surface level of the ground, and five(5) feet below the bottoms of all drainage ditches and canals.

When Lessee has disturbed the surface of the land, Lessee shall at all times, as near as is then practical, considering operations then underway or immediately completed, fill all holes and ditches dug by it, and otherwise promptly restore the surface of the land to its original contour and condition.

Should Lessor, at any time, desire to cross any pipeline of Lessee with a drainage ditch or canal, in connection with Lessor's operations on the land, Lessee shall, at Lessor's request, relocate its pipeline and lower its pipeline to at least five (5) feet below the bottom of such drainage ditch or canal at Lessee's sole cost and expense.

Should any location made, result in the discovery and production of hydrocarbons, Lessee may construct permanent roads of shell or other similar material to the well or wells involved; and in considering the locations of such permanent roads to be constructed, due regard shall be given for Lessor's use of the

land for residential, commercial, industrial, agricultural and grazing purposes and the roads shall be located, constructed and maintained in such manner as to least interfere with such uses. Any such road which is not required for purposes incidental to production and/or drilling or reworking operations on the land for a period of six (6) consecutive months, shall be considered as having been abandoned by Lessee, and, upon written request by Lessor, the roadway shall be removed, and the area upon which it was located shall be restored by Lessee to as near its original condition as practical. Lessor may, however, designate other existing roadways, or designate the particular routes to be used in new roadways, for access by Lessee to its well locations.

Lessee shall in its operations use only steel mud tanks except in the case of reserve pits, and in the case of the latter, the residue remaining therein upon the completion or abandonment of each well drilled hereunder at any particular location shall not be left upon the ground, but shall be disposed of without damage to the surface of the ground, which shall be left clean and tillable, and, as nearly as practical, shall be restored to its original condition within thirty (30) days after the completion or abandonment of each well.

Lessee may not construct camps or houses for employees, or any other structures except those necessary or convenient to the drilling, completion and production of wells physically located only on the land, and any such structures, including the necessary tank batteries for the drilling, completion and production of such wells, shall be located in such a manner so that the utilized area around each completed well will be held to a minimum and provide the least interference with the use of the surface for residential, commercial, industrial and agricultural purposes, as is reasonably possible with oil and gas operations.

Any rigs and all other equipment, fixtures, appliances, and facilities used by or for Lessee in the drilling of and/or production from wells or in connection with any other activities permitted under the provisions hereof shall be removed as soon as practical after the completion or abandonment of the particular well, and the area upon which such rig, equipment, fixtures, appliances and facilities were located shall be left in as nearly as practical the condition of such area prior to the erection of such rig and equipment, and the land shall in any case, be restored so as to be fully useful for residential, commercial, industrial and agricultural purposes, at least to the extent that such lands and the surface therof could have been used for such purposes without added cost to Lessor as of the date of this lease.

No salt water shall be stored in pits erected upon the land or discharged into canals or drainage ditches constructed thereon, but shall be disposed of by injecting the same back into the ground below all fresh water sands or otherwise disposed of in accordance with rules and regulations of the Department of Conservation and/or the Wildlife and Fisheries Commission of the State of Louisiana.

14. Lessee shall, at its sole risk, cost and expense, have surveys made of any well with a logging device customarily used and accepted in the oil industry on scales of 1" = 100' and 1" = 20' using all standard curves acceptable by the industry to

be made from surface casing to total depth of the well or to such depth to which it is possible to run a log by diligent effort to reach total depth. In addition, a porosity survey shall be made by Lessee at its sole cost, risk and expense at all resistive zones, if in its reasonable opinion same is deemed advisable and in accordance with good operational practices. Lessee shall notify Lessor by telephone, at its address, of Lessee's intention to run any surveys, logs or associated tests at least eight (8) hours prior to the running thereof in order to permit time for a representative of Lessor to arrive and witness same.

Two satisfactory copies of each and all surveys or logs shall be delivered promptly to Lessor at its address. Lessee shall also, upon the written request of Lessor, furnish samples of cuttings and cores, if same are taken, in containers to be furnished by Lessee with information marked thereon as to the depth from which same are taken. Any such samples requested shall be thoroughly dried, sacked, marked and shipped or delivered immediately to Lessor at its above mentioned address or to such other address as may be furnished by Lessor.

Lessee further agrees to furnish Lessor with a drilling report and production report along with copies of all logs, surveys, run tickets and all other information obtained by Lessee in drilling any well under the terms of this lease. The failure of Lessee to comply with the provisions of this Paragraph 14 shall not be cause or justification for the cancellation of this lease unless and until such failure has continued for thirty (30) days after Lessee shall have been notified in writing that such failure exists.

Lessor shall at Lessor's own risk be entitled at all reasonable times to inspect Lessee's operations under this lease and shall have access to the derrick floor, with the right to witness all gauging of the tanks, and to gauge the tanks.

15. Lessor reserves the right to purchase gas produced under this lease for use as fuel in the conduct of its own drilling or production operations in this area at the contract price Lessee is otherwise receiving for the sale of gas from this lease. If no gas sale contract exists, Lessor will pay Lessee the then current price for gas in the area.

16. The consideration paid by Lessee to Lessor is accepted as full and adequate consideration for all rights, options and privileges herein granted.

17. Should Lessee receive "take or pay" payments on this lease for gas not delivered, Lessor must be paid royalty hereunder just as if the take or pay amounts were for gas that had been sold and delivered. If and when the gas purchaser receives "make up" gas, additional royalty for the make up gas would be due to Lessor on any supplemental payments made by the gas purchaser due to upward price adjustment.

Should monthly payments received under this paragraph exceed 1/12th of the annual shut-in gas royalty which would otherwise be due under this lease, such payments would suspend the shut-in gas rental so long as they continue, otherwise they would serve only as a credit toward the annual shut-in gas rental.

18. Lessee agrees that, at any time during the existence of this lease, should Lessee acquire, or indirectly acquire or benefit by the acquisition by Lessee's agents, brokers, affiliates, parent, subsidiaries, partners or investors, of a lease within a geographic area that extends outward from the perimeter of the land(s) covered by this lease within Township 1 North-Range 4 West and/or within Township 1 North-Range 5 West a distance of five (5) miles in all directions, which provides for a greater bonus, royalty, delay rental or shut-in rental and/or payment than is provided in this lease, this lease, insofar as the lands leased herein in Township 1 North-Range 4 West and Township 1 North-Range 5 West, shall be immediately and automatically amended without notice from Lessor to increase the bonus, royalty, delay rental or shut-in rental and/or payment to the higher amount as the case may be, and Lessee thereupon shall pay to Lessor the difference between such higher amount and the amount provided in this lease; provided however, that such lease shall cover a mineral right(s) regarding 480 acres or more, or that such lease be one (1) of two (2) or more leases from a single lessor or owner which leases cover a mineral right(s) regarding in the aggregate 480 acres or more, or that such lease be one (1) of two (2) or more leases from one (1) or more lessors or owners who share a common owner, which leases cover a mineral right(s) regarding in the aggregate 480 acres or more. This provision shall not affect lands leased herein which are part of a unit for a producing well or are retained by Lessee for an unspaced producing well. This provision shall operate as an express resolutory condition of this lease, and upon failure by the Lessee to so amend this lease and pay the difference, Lessor at its option may seek dissolution of this lease or the enforcement of this provision together with the collection of such unpaid amount(s), together with interest at the highest rate provided by law on such amount(s) from the date such amount(s) was due, together with reasonable attorney fees and all expenses incurred in the course of Lessor's enforcement action and/or effort.

19. Other special provisions of this lease are:

a. The term "Payout" as employed in Paragraph 6.a., 6.b. and 6.c. is defined herein as the date on which the total gross proceeds from the sale of oil, gas and other hydrocarbons produced from the leased premises and/or acreage pooled therewith equal the charges and/or costs actually incurred in the drilling, completion, equipping and operation of the well prior to the payout date, 6:00 a.m. Central Standard Time. Calculations for Payout as employed in said Paragraphs and defined herein shall be on a well-by-well basis, and the calculations shall exclude the amounts actually paid to Lessors and other lessors/landowners for landowners' royalty, and associated severance taxes actually paid on behalf of Lessors and other lessors/landowners, on oil, gas and other hydrocarbons produced from the leased premises and/or from acreage pooled therewith.

Prior to the payout of the well, Lessee shall maintain true and correct books showing the production from the well and the charges and/or costs actually incurred in the drilling, completion, equipping and operation of the well. Such books shall be open to Lessor and/or Lessor's representative for inspection and/or audit at all reasonable times during business hours. Not less than quarterly Lessee shall furnish to Lessor a report reflecting the relevant production, proceeds from the sale of production, the relevant costs during the preceding quarter and the unrecovered amount of charges and/or costs Lessee is entitled to receive before payout of the well.

b. Lessee's responsibility for and obligation of indemnity and defense shall include, but not be limited to, causes of action and/or claims for attorney fees and for causes of action and/or claims which directly or indirectly are attributable to or arise out of the actual or alleged release or presence of hazardous materials and/or waste and/or contamination which occurs as a result of action or inaction under this lease on the leased premises and/or on acreage pooled therewith.

c. Should Lessee, its successors or assigns obtain at any time a title opinion and/or an evironmental audit, assessment, study or any type of investigation, or cause such items to be performed on the leased premises or any portion thereof, Lessee shall deliver immediately to Lessors a copy therof and provide to Lessors full disclosure of the research conducted for and/or on the leased premises. Lessors shall not be bound by any obligation of confidentiality upon receipt of such items and/or information.

d. Lessee, at its option, is hereby given the right and power without any further approval from Lessor to pool, communitize or combine the acreage, royalty, or mineral interest covered by this lease, or any portion thereof, with other land, lease or leases, royalty and mineral interests in the immediate vicinity thereof, when it is necessary or advisable to properly develop and operate the land to promote the conservation of hydrocarbons underlying the land, or to comply with the spacing or unitization order of any regulatory body in the State of Louisiana or the United States having jurisdiction. The term "regulatory body" shall include any governmental tribunal or group (civil or military) issuing orders governing the drilling of wells or the production of hydrocarbons. Such pooling and/or any units formed for drilling and/or production purposes, located only within the land or, including any part of the land, shall be of tracts which will form one contiguous tract of land for each unit, and the unit or units so created shall not exceed substantially forty (40) acres each surrounding each oil well and substantially one hundred sixty (160) acres each for each gas or gas-distillate well, and substantially nine hundred sixty (960) acres for each horizontal completion as defined hereinbelow, or if the horizontal completion, as defined herein below, is a dual opposing lateral well, one thousand nine hundred and twenty (1,920) acres around such well, unless a larger spacing pattern or larger drilling or producing units (including a field or pool unit) have been fixed and established by an order of a regulatory body of the State of Louisiana or of the United States, in which event the unit or units may be of the size fixed by said order. Lessee shall execute and record in the Conveyance Records of the Parish in which the land is situated an instrument identifying and describing any acreage pooled into units under the limitation above set forth, and upon such recordation, the unit or units shall thereby become effective. In lieu of the royalties payable elsewhere herein specified, and subject to the provisions of Paragraph 9 hereof, Lessor shall receive on account of production from any unit so pooled such portion of the royalties stipulated herein as the amount of Lessor's acreage placed in the unit, or Lessor's royalty interest therein, bears to the total acreage so pooled in the particular unit involved.

Should any portion of the lands leased herein be pooled or unitized with other lands, either by virtue of the provisions of this Paragraph 19.d. or by order of any regulatory body of the State of Louisiana or the United States, drilling or reworking operations on or production of hydrocarbons from lands leased herein included in such pooled unit shall have the effect of continuing this lease in force and effect during or after the primary term only as to the lands leased herein included in such unit, whether or not such operations be on or such production be from lands leased herein. Such operations on or production from such portions of the lands leased herein contained within any such unit shall not maintain this lease in force and effect as to any portion of the lands leased herein not physically situated within such unit. Nothing within this paragraph of Paragraph 19.d. precludes Lessee from paying delay rentals during the primary term of this lease, or otherwise having the lease maintained as provided elsewhere in this lease.

Any unit formed by Lessee hereunder may be created either prior to the drilling or after the completion of the unit well; and separate units may be created for oil and for gas even though the areas thereof overlap. Lessee may reduce and diminish the extent of any voluntary unit created by Lessee under the terms of this paragraph so as to eliminate from such unit any acreage or lease upon which there is or may be an adverse claim; and Lessee may also re-form any voluntary unit created by Lessee under the terms of this paragraph to conform with an order of a regulartory body issued after such unit was originally established. Such revision of the unit shall be evidenced by an instrument in writing executed by Lessee which shall identify and describe the land included in the unit as revised and shall be recorded in Conveyance Records of the Parish where the land is situated.

For purposes of the foregoing the terms "oil well" and "gas well" shall have the meanings prescribed by applicable law or the Regulatory Body of the State of Louisiana. Additionally, for the first well drilled under this lease on the lands leased herein or on acreage pooled therewith, the term "horizontal completion" means a well in which the horizontal section of the wellbore to the deepest depth drilled exceeds 2,000 feet, and the horizontal component of the gross completion

interval in the reservoir is at least sixty (60) degrees from vertical, and the gross completion interval lies within the horizontal section of the wellbore. For subsequent wells drilled under this lease on the lands leased herein or on acreage pooled therewith, the term "horizontal completion" means a well in which the horizontal section of the wellbore to the deepest depth drilled exceeds 1000 feet, and the horizontal componant of the gross completion interval in the reservoir is at least sixty (60) degrees from vertical, and the gross completion interval lies within the horizontal section of the wellbore.

If, as a result of geological or mechanical conditions which render further drilling futile or which unreasonably endanger the wellbore, the horizontal section of wellbore to the deepest depth drilled does not exceed the below provided distances, Lessee shall be able to retain, for an unspaced horizontal completion, the acreage provided with the distances:

i. between 150' and 330', 160 acres;
ii. between 330' and 660', 320 acres;
iii. 660', up to 999', 640 acres.

e. Notwithstanding anything herein to the contrary, Lessee is subrogated to all of Lessor's rights and actions in warranty against all former owners and vendors except as to Wm. T. Burton, personally, and except as to William B. Lawton Company, Inc. and Jack Lawton, Inc.

f. The following sentence shall revise and supplement Paragraph 2 and Paragraph 5, being added as the last sentence of Paragraph 2 and as the second to last sentence of the second paragraph of Paragraph 5, as further supplemented in Paragraph 19.g., to wit:

"In the event of an unspaced horizontal completion, as defined herein in Paragraph 19.d., Lessee shall have the right to retain, in as near a lay down, rectangular form as is practical, nine hundred and sixty (960) acres around such well, or if the horizontal completion, as defined herein in Paragraph 19.d., is a dual opposing lateral well, Lessee shall have the right to retain, in as near a lay down, rectangular form as is practical, one thousand nine hundred and twenty (1,920) acres around such well."

g. The following sentence shall revise and supplement Paragraph 4, being added as the last sentence of Pargraph 4, to wit:

"Further, with regard to any horizontal well completed in a Cretaceous age formation on adjacent lands, drainage shall not be presumed unless said well is drilled within the above described distances from a boundary line of the land on strike with a fracture pattern of said well."

h. The following sentence shall revise and supplement the second paragraph Paragraph 5, being added as the last sentence of said paragraph, to wit:

"Notwithstanding the continuous drilling requirement set forth herein, Lessee, during the primary term of this lease, shall enjoy the right to maintain this lease by recommencing payment of the rental as provided in Paragraph 3."

i. The last paragraph of Paragraph 5, at page 4 herein, having been stricken in its entirety, is replaced by the following paragraph, which shall supplement Paragraph 5, being added as the last paragraph of Paragraph 5, to wit:

"Should the drilling of any well located on the land leased herein discover gas or gaseous substances capable of production in paying quantities, but which well is unable to be produced (or which well, although previously produced, is unable to continue to be produced) because of lack of a reasonable market or of marketing facilities, or because of governmental restrictions, then if the lease is not being otherwise maintained, Lessee's rights insofar as the acreage included in the unit for said well or to be retained by Lessee if the well is an unspaced horizontal completion may be maintained for successive periods of one (1) year each for no more than five (5) consecutive years by the payment to Lessor of "shut-in gas rental",

annually in advance, in the amount of fifty ($50) dollars per net mineral acre of the lands leased herein included in the unit for said well; provided that Lessee shall not be obligated to pay such shut-in gas rental until ninety (90) days after the lease ceases to be maintained in some other manner. During the period Lessee is paying such shut-in gas rental, it shall be considered that gas is being produced in paying quantities from the acreage included in the unit for said well or to be retained by Lessee if the well is an unspaced horizontal completion."

j. The following paragraph supplements Paragraph 6, being added as the last paragraph of Paragraph 6, to wit:

"Notwithstanding anything herein, or elsewhere provided in this Lease, to the contrary, Lessor's royalty is to be free and clear of all exploring, completing, producing, developing, processing, marketing and transporting costs incurred to the point of sale of the production of hydrocarbons under this lease; provided however Lessor's royalty shall bear its proportionate share of any severance or production tax imposed thereon."

k. The following paragraph shall supplement Paragraph 13, being added as the last paragraph of Paragraph 13, to wit:

Notwithstanding anything herein, or elsewhere provided in the lease, to the contrary, Lessee, without expense to Lessor, shall plug and abandon, or cause to be plugged and abandoned, all wells drilled on the lands leased herein, and in doing so, said operations shall conform to all laws and regulations of the State of Louisiana and of the United States of America regarding the plugging and/or abandonment of wells. Lessee promptly shall supply, or promptly cause to be supplied, to Lessor copies of all reports filed with said regulatory body or bodies regarding said plug and abandonment."

l. Paragraph 7, previously having been stricken in its entirety, is replaced by the following paragraph, to wit:

"7. Lessee shall be responsible for any and all damages caused by operations conducted under this lease. Lessee shall fully defend, protect, indemnify and hold harmless Lessor, its parents, subsidiaries, directors, officers, employees, successors, assigns and any other party owning an interest in the mineral rights leased herein by, through or under Lessor or a party Lessor, from any and all causes of action or claims including costs and attorney fees, arising directly or indirectly by way of the operations conducted under this lease, of whatever kind or nature, including but not limited to environmental damage."

m. Notwithstanding anything herein to the contrary, any drilling and/or reworking operations lawfully conducted under this lease by an operator of a lawfully created unit within which lands leased herein have been unitized shall have the same force and effect as if the Lessee had conducted such operations under this lease.

n. Neither Party hereto shall file this lease of record. A Memorandum Of Hydrocarbon Lease setting forth only the names and addresses of the parties, the date and primary term of the lease, and a description of the lands leased herein may be recorded by Lessee to give notice to third parties.

IN WITNESS WHEREOF, this instrument is executed on the dates hereinafter stated, but this instrument is effective as of the date first written above.

WITNESSES:

LESSORS:

J. LAWTON COMPANY

BY: ______________________
Jack E. Lawton, Jr., President
101 North Huntington St.
Sulphur, LA 70663-2601
318-527-5221
318-527-5276 (FAX)
Date: SEPT. 11, 1995

TOWER LAND COMPANY, INC.

BY: ______________________
William B. Lawton, President
Ste. 1700, CM Tower
One Lakeshore Drive
Lake Charles, LA 70629
318-433-0142
318-433-0635 (FAX)
Date: SEPT. 11, 1995

LESSEE:

CHESAPEAKE OPERATING, INC.

BY: ______________________

NAME: Aubrey K. McClendon

TITLE: President

DATE: September 8, 1995

STATE OF LOUISIANA
PARISH OF CALCASIEU

On this 11 day of SEPT., 1995 before me appeared JACK E. LAWTON, JR., to personally known, who, upon being duly sworn, did swear that he is the President of J. LAWTON COMPANY and that the foregoing instrument was signed on behalf of said corporation by the authority of its Board of Directors and said JACK E. LAWTON, JR. acknowledged said instrument to be the free act and deed of said corporation.

NOTARY PUBLIC,
CALCASIEU PARISH, LOUISIANA

STATE OF LOUISIANA
PARISH OF CALCASIEU

On this 11 day of SEPT. . 1995 before me appeared WILLIAM B. LAWTON, to me personally known, who, upon being duly sworn, did swear that he is the President of TOWER LAND COMPANY, INC. and the foregoing instrument was signed on behalf of said corporation by the authority of its Board of Directors and said WILLIAM B. LAWTON acknowledged said instrument to be the free act and deed of said corporation.

NORARY PUBLIC,
CALCASIEU PARISH, LOUISIANA

STATE OF OKLAHOMA
COUNTY OF OKLAHOMA

On this 8th day of September, 1995, before me appeared AUBREY K. McCLENDON, to me personally known, who, upon being duly sworn, did swear that he is the President of CHESAPEAKE OPERATING, INC., and the foregoing instrument was signed on behalf of said corporation by the authority of its Board of Directors and said AUBREY K. McCLENDON acknowledged said instrument to be the free act and deed of said corporation.

KIMBERLI G. CISSELL NOTARY PUBLIC IN AND FOR STATE OF OKLAHOMA CLEVELAND COUNTY

Notary Public
Name: Kimberli G. Cissell
Commission Expires: 5/12/99

EXHIBIT "A" TO HYDROCARBON LEASE BY
AND BETWEEN J. LAWTON COMPANY AND
TOWER LAND COMPANY, INC., AS LESSORS,
AND CHESAPEAKE OPERATING, INC., AS LESSEE

(29 Pages)

RAPIDES PARISH

Township 1 North, Range 4 West

Section 3: E/2 of NW/4; S/2 of S/2 of NW/4 of NW/4; SW/4 of NW/4; S/2 of SW/4; PLUS, A certain parcel or tract of land located in the Northwest Quarter of the Northwest Quarter (NW1/4 of NW1/4), Section 3, Township 1 North, Range 4 West, Rapides Parish, Louisiana, more particularly described as follows to-wit:

Beginning at the Northwest corner of the Northwest 1/4, Section 3, Township 1 North, Range 4 West; thence proceed South 0 degrees 16 minutes East, along the quarter section line between the Northwest 1/4 of the Northwest 1/4, Section 3, Township 1 North, Range 4 West, and the Northeast 1/4 of the Northeast 1/4, Section 4, Township 1 North, Range 4 West, a distance of 995.3 feet; thence turn left and proceed South 89 degrees 42 minutes East, a distance of 1337.8 feet; thence turn left and proceed North 0 degrees 20 minutes West, a distance of 995.9 feet; thence turn left and proceed North 89 degrees 45 minutes West, along the quarter section line between the Northwest 1/4 of the Northwest 1/4, Section 3, Township 1 North, Range 4 West, and the Southwest 1/4 of the Southwest 1/4 of Section 34, Township 2 North, Range 4 West, Rapides Parish, Louisiana, a distance of 1337.2 feet to the point of beginning containing 30.56 acres, more or less. (Acquired by Wm. T. Burton Industries, Inc. from Alfred Goleman, et ux, by Act of Exchange dated December 20 and 27, 1976, recorded January 11, 1977 as File #663123 in COB 893, page 661).

Section 4: SW/4 of NE/4; S/2 of S/2 of NE/4 of NE/4; NE/4 of SW/4, LESS a certain parcel or tract of land located in the Northeast 1/4 of the Southwest 1/4, Section 4, Township 1 North, Range 4 West, Rapides Parish, Louisiana, more particularly described as follows to-wit:

Beginning at the Northeast corner of the Northeast 1/4 of the Southwest 1/4, Section 4, Township 1 North, Range 4 West, Rapides Parish, Louisiana, proceed South 0 degrees 15 minutes East a distance of 361.0 feet to a point; thence proceed North 85 degrees 29 minutes West a distance of 309.7 feet to a point, being the point of beginning of the herein described property; thence continue North 85 degrees 29 minutes West a distance of 302.4 feet to a point which intersects the Northern railroad right-of-way of the Old Louisiana Sawmill Company; thence turn left and proceed South 52 degrees 24 minutes East, along the Northern right-of-way of the above mentioned railroad, a distance of 382.4 feet; thence turn left and proceed North 0 degrees 26 minutes West, a distance of 209.5 feet, to the point of beginning, containing 0.72 acres, more or less, and being more fully shown as Tract No. 1 and outlined in red on that certain Certificate of Survey by R. A. Fenstermaker dated December 9, 1976.

the Northeast 1/4 of the Southwest 1/4 of Section 4, Township 1 North, Range 4 West, Rapides Parish, Louisiana, more particularly described as follows, to-wit:

Commencing at the Northeast corner of the Northeast 1/4 of the Southwest 1/4, Section 4, Township 1 North, Range 4 West, proceed South 0 degrees 15 minutes East, a distance of 361.0 feet; thence turn right and proceed North 85 degrees 29 minutes West, a distance of 309.7 feet, thence turn left 0 degrees 26 minutes East a distance of 334.0 feet to a point lying on the Southern railroad right-of-way of the old Louisiana Sawmill Company, for the point of beginning of the herein described property; thence continue South 0 degrees 26 minutes East, a distance of 66.0 feet; thence turn right and proceed North 85 degrees 29 minutes West, a distance of 400 feet; thence proceed North 0 degrees 26 minutes West, a distance of 343.2 feet to the Southern right-of-way of the above mentioned railroad; thence turn right and proceed South 52 degrees 24 minutes East, along said railroad right-of-way, a distance of 505.9 feet to the point of beginning, containing 1.87 acres, more or less, all as is more fully shown as Tract No. 2 and outlined in red on that certain Certificate of Survey by R. A. Fenstermaker dated December 9, 1976.(Conveyed by Wm. T. Burton Industries, Inc. to Eddie Afeman, et ux, by Act of Exchange dated December 22 and 27, 1976, recorded as File #663120 in COB 893, page 652);

NW/4 of SE/4; LESS a certain rectangular piece or parcel or tract of land containing approximately 2.98 acres, more or less, together with all buildings and improvements thereon and all rights, ways and privileges and servitudes thereunto appertaining, situated in the Northwest 1/4 of the Southeast 1/4, Section 4, Township 1 North, Range 4 West, Rapides Parish, Louisiana, and more particularly described as commencing at the Northwest corner of the Northwest 1/4 of the Southeast 1/4 of Section 4, Township 1 North, Range 4 West; thence proceed South 0 degrees 15 minutes East, a distance of 362 feet to a point lying in an unnamed asphalt road, for the point of beginning of the herein described property; thence continue South 0 degrees 15 minutes East, a distance of 268.9 feet; thence turn left and proceed South 83 degrees 42 minutes East, a distance of 468.0 feet; thence proceed North 0 degrees 15 minutes West, a distance of 268.9 feet to a point lying in an unnamed asphalt road; thence turn left and proceed North 83 degrees 42 minutes West, a distance of 468 feet to the point of beginning, all as is more fully shown on that certain Certificate of Survey by R. A. Fenstermaker dated December 9, 1976 (conveyed by Wm. T. Burton Industries, Inc. to John D. Akins, Sr., et ux, by Cash Deed dated December 27, 1976, recorded as File #663124 in COB 893, page 671);

ALSO LESS a part of the Northwest Quarter of the Southeast Quarter of Section Four (NW/4 of SE/4 of Section 4) of Township One North, Range Four West described as follows: Beginning at the Northeast Corner of the Northwest Quarter of the Southeast Quarter (NE/c of NW/4 of SE/4), thence South 0 degrees 17 minutes East for a distance of 220.5 feet to the Point of Beginning; thence South 0 degrees 17 minutes East for a distance of 300 feet; thence North 81 degrees 26 minutes West along the centerline of the public road for a distance of 367.5 feet; thence North 0 degrees 17 minutes West for a distance of 300 feet; thence South 81 degrees 26 minutes East for a distance of 367.5 feet to the point of beginning, containing 2.5 acres as more fully shown by certificate of survey dated November 11, 1975, by R. A. Fenstermaker. (Conveyed by Wm. T. Burton Industries, Inc. to Lola Goleman Morrison, widow of Huey Morrison, by Quitclaim Deed dated September 12 and 29, 1975, recorded as File #647438 in COB 867, page 29; as corrected by act dated May 1, 1980).

ALSO LESS a piece or parcel of land located in the NW/4 of SE/4 of Section 4, Township 1 North, Range 4 West, Louisiana Meridian, Rapides Parish, Louisiana, shown on plat of survey prepared by Avit J. Gremillion, R.S., No. 295, dated February 1, 1980, and more particularly described as follows:

Commencing at the Northeast corner of the NW/4 of SE/4 of Section 4, Township 1 North, Range 4 West, Rapides Parish, Louisiana, run South 550.4 feet along the East line of said quarter section to the point of beginning, run thence South 1 degree 45 minutes East 80 feet, thence North 82 degrees 19 minutes West 80 feet, thence North 1 degree 45 minutes West 80 feet, thence South 82 degrees 19 minutes East 80 feet to the point of beginning (Conveyed by Wm. T. Burton Industries, Inc. et al to Hammock Water System, Inc., dated May 17, 1980, recorded as File #720776 in COB 995, page 364); PLUS, SW/4 of NE/4, (Acquired by Act of Exchange dated January 16, 1975 and February 3, 1975, recorded as File #637252 in COB 850, page 16, by Wm. T. Burton Industries, Inc. from Kenneth C. Robinson); and SE/4 of NE/4

Section 5: Entire Section, LESS a certain parcel or tract of land located in the Southeast 1/4 of Section 5, Township 1 North, Range 4 West, Rapides Parish, Louisiana, more particularly described as follows to-wit:

Beginning at the Southwest corner of the Southeast 1/4, Section 5, Township 1 North, Range 4 West, Rapides Parish, Louisiana, proceed South 89 degrees 43 minutes East, along the South right-of-way of an unnamed dirt road, a distance of 861.0 feet; thence turn left and proceed North 0 degrees 12 minutes West, a distance of 1546.1 feet; thence turn left and proceed North 89 degrees 43 minutes West, a distance of 861.0 feet; thence turn left and proceed South 0 degrees 12 minutes East, a distance of 1546.1 feet to the point of beginning, containing 30.56 acres more or less. (Conveyed to Alfred Goleman, et ux, by Wm. T. Burton Industries, Inc. by Act of Exchange dated December 20 and 27, 1976, recorded as File #663123 in COB 893, page 661);

Section 6: E/2 of NE/4; W/2 of NW/4 of NE/4; SW/4 of NE/4 except 10 acres in NE corner; E/2 of E/2 of NW/4; SW/4 of NW/4; S/2

Section 8: N[illegible] W/2 of SW/4; and S/2 of SE/4

Section 9: N/2 of S/2; SW/4 of SW/4; PLUS, A certain parcel or tract of land being the West 3/4 of the Southeast 1/4 of the Southwest 1/4, Section 9, Township 1 North Range 4 West, Rapides Parish, Louisiana, more particularly described as follows, to-wit:

Commencing at the Southeast corner of the Southeast 1/4 of the Southwest 1/4, Section 9, Township 1 North, Range 4 West, Rapides Parish, Louisiana, thence proceed North 89 degrees 30 minutes West, a distance of 334.4 feet, along the South line of the Southeast 1/4 of the Southwest 1/4 of Section 9, Township 1 North, Range 4 West, Rapides Parish, Louisiana, for the point of beginning of the herein described property; thence continue North 89 degrees 30 minutes West, along the South quarter section line of the Southeast 1/4 of the Southwest 1/4 of Section 9, Township 1 North, Range 4 West, a distance of 1001.44 feet; thence turn right and proceed North 0 degrees 11 minutes West, along the West line of the Southeast 1/4 of the Southwest 1/4 of Section 9, Township 1 North, Range 4 West, a distance of 1329.9 feet; thence turn right and proceed South 89 degrees 25 minutes East, along the Northern line of the Southeast 1/4 of the Southwest 1/4 of Section 9, Township 1 North, Range 4 West, Rapides Parish, Louisiana, a distance of 1001.8 feet; thence turn right and proceed South 0 degrees 10 minutes East, a distance of 1333.0 feet to the point of beginning, containing 30 acres, more or less. (Acquired by Wm T. Burton Industries, Inc. from Webster J. Robinson, et als, by Act of Exchange dated January 7, 1977 and December 29, 1976, filed as #663906 in COB 895, page 73);

N/2, LESS a certain parcel or tract of land located in the Northwest 1/4 of the Northeast 1/4, Section 9, Township 1 North, Range 4 West, Rapides Parish, Louisiana, more particularly described as follows, to-wit:

Beginning at the Northwest corner of the Northwest 1/4 of the Northeast 1/4, Section 9, Township 1 North, Range 4 West; thence proceed South 89 degrees 3 minutes East, a distance of 945.2 feet; thence turn right and proceed South 0 degrees 57 minutes West, a distance of 921.7 feet; thence turn right and proceed South 89 degrees 3 minutes East, a distance of 945.2 feet; thence turn right and proceed North 0 degrees 57 minutes East, a distance of 921.7 feet to the point of beginning, containing 20 acres, more or less (Conveyed by Wm. T. Burton Industries, Inc. to Donald E. Robinson in Act of Exchange recorded as shown above as File #663906);

ALSO LESS a parcel in the NE/4 of Section 9, when taken together with property in NW/4 Section 10, T. 1 N., R. 4 W., contains 11.33 acres, more or less, (Conveyed by Wm. T. Burton Industries, Inc. to Webster J. Robinson by act of Exchange recorded as shown above as File #663906 [See full description listed below under Section 10. T 1 N., R. 4 W.])

Section 10: SE/4 of NE/4; W/2 of W/2; PLUS, A certain parcel or tract of land located in the Northwest 1/4 of Section 10, Township 1 North, Range 4 West, Rapides Parish, Louisiana, more particularly described as follows, to-wit:

Commencing at the Northwest corner of Section 10, Township 1 North, Range 4 West, proceed South 0 degrees 16 minutes East, along the Section line between Section 9 and Section 10, Township 1 North, Range 4 West, a distance of 1245.6 feet to a point located in an unnamed gravel road; thence turn left and proceed North 53 degrees 18 minutes East, a distance of 581.5 feet; thence turn right and proceed, along the Northern line of an old tram road, as shown on Plat 2, South 49 degrees 45 minutes East, a distance of 91.9 feet; thence continue South 54 degrees 21 minutes East, a distance of 89.9 feet; thence continue South 60 degrees 51 minutes East, a distance of 92.2 feet; thence continue South 64 degrees 11 minutes East, a distance of 91.9 feet; thence continue South 69 degrees 10 minutes East, a distance of 161.3 feet to the point of beginning of the herein described

property; from the point of beginning continue in a Southeasterly direction along the Northern line of the old tram road to a point located on the East line of the Northwest 1/4 of the Northwest 1/4, Section 10, Township 1 North, Range 4 West, Rapides Parish, Louisiana, said point being approximately 1242.3 feet South of the Northeast corner of the Northwest 1/4 of the Northwest 1/4 of Section 10, Township 1 North, Range 4 West; thence turn right and proceed along said East line of the Northwest 1/4 of the Northwest 1/4, Section 10, Township 1 North, Range 4 West, a distance of approximately 103 feet to the South line of said old tram road; thence turn right and proceed Northwesterly along the Southern line of said old tram road to a point which is South 41 degrees 37 minutes West, a distance of 106.95 feet from the point of beginning; thence turn right and proceed North 41 degrees 37 minutes East, a distance of 106.95 feet to the point of beginning, containing 1.0616 acres (Acquired by Wm. T. Burton Industries, Inc. from Webster J. Robinson, et als, by Act of Exchange recorded as shown above as File #663906);

LESS parcels in Section 9 and 10 conveyed to Webster J. Robinson, et ux, by Act of Exchange recorded as shown above as File #663906, described as:

A certain parcel or tract of land located in the Northeast 1/4 of Section 9 and Northwest 1/4 of Section 10, Township 1 North, Range 4 West, Rapides Parish, Louisiana, more particularly described as follows, to-wit:

Commencing at the Northwest corner of Section 10, Township 1 North, Range 4 West, Rapides Parish, Louisiana, proceed South 0 degrees 16 minutes East, a distance of 1245.6 feet to a point located on the section line between Section 9 and Section 10, Township 1 North, Range 4 West, and located in an unnamed gravel road; thence turn right and proceed South 53 degrees 18 minutes West, a distance of 250.0 feet to the point of beginning of the herein described property; from said point of beginning, turn left and proceed South 37 degrees 39 minutes East, a distance of 691.1 feet; thence turn left and proceed North 41 degrees 37 minutes East, a distance of 949.8 feet; thence turn left and proceed North 69 degrees 10 minutes West, a distance of 127.7 feet; thence North 64 degrees 11 minutes West, a distance of 99.2 feet; thence North 60 degrees 51 minutes West, a distance of 100.8 feet; thence North 54 degrees 21 minutes West, a distance of 99.6 feet; thence North 49 degrees 45 minutes West, a distance of 118.8 feet to a point located on the Southern line of an old tram road as shown on Plat 2; thence turn left and proceed South 53 degrees 18 minutes West a distance of 728.9 feet to the point of beginning, containing 11.33 acres, more or less,

AND ALSO: A certain parcel or tract of land located in the Northwest 1/4 of Section 10, Township 1 North, Range 4 West, Rapides Parish, Louisiana, more particularly described as follows, to-wit:

Commencing at the Northwest corner of Section 10, Township 1 North, Range 4 West, proceed South 0 degrees 16 minutes East, along the section line between Section 9 and Section 10, Township 1 North, Range 4 West, a distance of 1245.6 feet; thence turn left and proceed North 53 degrees 18 minutes East, a distance of 581.5 feet, to a point located on the North line of an old tram road, as shown on Plat 2, being the point of beginning of the herein described property; thence continue North 53 degrees 18 minutes East, a distance of 51.3 feet; thence turn right and proceed South 56 degrees 15 minutes East, a distance of 504.6 feet; thence turn right and proceed South 41 degrees 37 minutes West, a distance of 5.25 feet; thence turn right and proceed North 69 degrees 10 minutes West, a distance of 161.3 feet; thence North 64 degrees 11 minutes West, a distance of 91.9 feet; thence North 60 degrees 51 minutes West, a distance of 92.2 feet; thence North 54 degrees 21 minutes West, a distance