THE GRAY LAW FIRM
A PROFESSIONAL LAW CORPORATION
ONE LAKESHORE DRIVE, SUITE 110
POST OFFICE BOX 1467
LAKE CHARLES, LOUISIANA 70602-1467

FACSIMILE
(318) 494-0697

TELEPHONE
(318) 494-0694

November 9, 1995

Mr. Mike Cruse
Deputy General Counsel
Office of General Counsel
United States Department of Agricultural
Room 3201
Federal Building
Little Rock, Ark 72203

**Re: Imprescriptible Mineral Interests of Tower Minerals Company, Inc. and Central Pines Land Company Under Portions of the Kisatchie National Forest in Vernon Parish, Louisiana**

Dear Mike:

Several months ago you took the time to talk to me on the telephone concerning the interests of Tower Minerals Company, Inc. and Central Pines Land Company in minerals under portions of the Kisatchie National Forest in Vernon Parish, Louisiana. Thank you.

Tower Minerals Company, Inc. is a wholly owned subsidiary of William B. Lawton Company, Inc. Central Pines Land Company is a wholly owned subsidiary of Jack Lawton, Inc. The Lawton entities are closely held corporations owned by the William B. Lawton family and the Jack E. Lawton family respectively.

In mid-May 1995, Lawton representatives learned that the United States Bureau of Land Management had granted mineral leases on property in Vernon Parish, Louisiana, the surface of which belongs to the United States, but upon which the minerals were reserved by ancestors-in-title to the Lawton entities (hereinafter referred to generally as the "Lawton Mineral Title"). The attached Exhibit "A" is an inventory of such leases which cloud the Lawton mineral title. A "Leasehold" map is included with the materials transmitted with this letter to graphically show the location of the leases (Exhibit "B" to this letter).

As you suggested in our previous telephone conversation, the purpose of this letter is to familiarize you with pertinent title documents, condemnation proceedings, land use

---

records and legal principles to determine whether an amicable resolution to the problem can be reached. To assist you in understanding the situation I enclose several volumes containing pertinent documents. This volumes of documents accompany this letter as Exhibit "C".

All of the lands under consideration were part of a tract of land of over 100,000 acres owned by Gulf Lumber Company in the 1920's. In 1929, Gulf Lumber Company conveyed 100% of the minerals in the property to S. H. Fullerton.[1] By two (2) separate transactions in 1933 and 1936, the United States acquired by conventional deed from Gulf Lumber Company the lands shown as Tracts A and B on the map attached hereto as Exhibit "D",[2] subject to the outstanding mineral ownership of S. H. Fullerton. Tracts A and B cover lands now within the Kisatchie National Forest (said lands being sometimes hereinafter referred to as the "Kisatchie situation"). In 1937, Wm. T. Burton[3] acquired all of the minerals underlying the Kisatchie situation lands[4] and full title to the lands shown as Tract C on the map attached hereto as Exhibit "D". In 1943, the United States acquired Tract C by expropriation subject to an express reservation of all of the minerals underlying said tract in favor of Wm. T. Burton.[5] Tract C covers lands now within the artillery range of Fort Polk (said lands being sometimes referred to as the "artillery range situation").

By subsequent conveyances, Tower Minerals Company, Inc. and Central Pines Land Company have acquired all of the mineral rights of Wm. T. Burton in the Kisatchie situation (Tracts A and B) and in the artillery range situation (Tract C). A graphic summary of relevant transactions in the chain of title to Tracts A, B and C is attached hereto as Exhibit "E".

Under a memorandum agreement with the Forest Service, the Department of

---

1 See Document Nº 1, Mineral Deed dated December 24, 1929 from Gulf Lumber Company to S. H. Fullerton.

2 See Document Nº 2, Deed dated December 29, 1933 from Gulf Lumber Company to United States of America and Document Nº 3, Deed dated March 14, 1936 from Gulf Lumber Company to United States of America.

3 Mr. Burton was the grandfather of William B. Lawton and Jack Edward Lawton.

4 See Document Nº 5, Mineral Deed dated April 26, 1937 from Fullerton Minerals Company to Wm. T. Burton.

5 See Document Nº 8, Judgment of Taking dated May 15, 1943. Mr. Burton had acquired the property from Gulf Lumber Company by deed dated April 26, 1937, see Document Nº 4.

---

Defense has the right to intensively use most (approximately 2/3rds) of the land covered by the Kisatchie situation for small arms firing ranges, tank firing ranges, artillery range impact areas, bombing ranges, maneuver areas, and other related military facilities. The balance of the land[6] (approximately 1/3rd) in the Kisatchie situation is presently designated as a "limited use area" under an agreement between the Forest Service and the Department of Defense.

A portion[7] of the surface in the "artillery range" situation acquired from Mr. Burton by condemnation in 1943 for military purposes was, in 1975, transferred from the Department of Defense to the Forest Service for surface management. Most of these lands are included in the "Intensive Use Area." The balance of these lands are in the "Limited Use Area" whereby the Department of Army may enter upon to conduct tactical exercises simulating conditions of war.

Between 1943 and 1978, the United States imposed a drilling and operations moratorium on William T. Burton and his successors in title relative to portions of the lands in both the Kisatchie situation and Artillery Range situation through a series of expropriations of the mineral owner's right to utilize the surface of the lands for oil and gas exploration purposes. The basic condemnation documents are included in Exhibit "C".

Apparently, most of the Lawton properties subject to Forest Service jurisdiction (*i.e.*, most of the lands in the Kisatchie situation) were declared by the Forest Service as being available for mineral leasing based upon legal opinions of the Office of General Counsel, United States Department of Agricultural. While those opinions have not been made available to Lawton representatives, it is assumed that they are based upon ***United States v. Little Lake Misere Land Company***, 412 U.S. 580, 37 L.Ed.2d 187, 93 S.Ct. 2389 (1973). Under the facts of that case, the United States Supreme Court declined to apply Louisiana legislative Act 315 of 1940 to a reservation of minerals for a specific term in a land transaction completed before the passage of the act.

As will be shown in detail below, there is sound legal authority for application of Act 315 of 1940 to the Lawton minerals. Additionally, both the "Kisatchie" fact situation as well as the "artillery range" fact situation can be distinguished from the facts of ***Little Lake Misere.***

---

6 With the exception of the lands included in the Fullerton Lake National Historic Site.

7 Sections 15,16,17,20,21,29,32 and 33 of T1N-R5W and Section 5 of T1S-R5W.

As to both situations, even if the mineral servitude is prescriptible, such prescription has been interrupted or suspended by actions of the United States in preventing mineral operations on the property. The actions of the United States constitute an obstacle as contemplated by Article 59 of the Louisiana Mineral Code.

**Legal Principles**

***Frost-Johnson Lumber Co. v. Salling's Heirs***[8] established the principle that Louisiana law, contrary to common law jurisdictions, does not permit creation of a mineral estate distinct or separate from ownership of land. Regardless of the form of the transaction, a landowner who sells or reserves minerals in property, merely creates a mineral servitude. A mineral servitude is a right of enjoyment of land belonging to another for the purpose of exploring for and producing minerals and reducing them to possession and ownership. A mineral servitude may be extinguished by prescription resulting from nonuse for ten years (hereinafter referred to as ten year liberative prescription of nonuse), confusion, and other methods not relevant to our discussion. When the mineral servitude terminates, it ceases to be a burden on the full ownership of the land. It is sometimes said that the servitude returns to the title out of which it was created, *i.e.*, the minerals "return" to the owner of the surface.

Prescription on a mineral servitude may be interrupted by mineral operations on or production from the lands subject to the mineral servitude or by acknowledgment by the owner of the land subject to the servitude. If interrupted, the ten year liberative prescription begins to run anew from the date of the last act of interruption. Thus, the good faith drilling of a well on lands affected by the mineral servitude interrupts prescription and extends the servitude for an additional ten years beyond the date of last operations on the well. Prescription can also be suspended if the mineral servitude owner is prevented from using the servitude by an obstacle that he can neither prevent nor remove. Prescription does not run as long as the obstacle exists. A mineral servitude may also be created for a specifically contractually agreed term of less than ten years. When this occurs, the rules relating to liberative prescription do not apply.[9] This scheme of mineral ownership is unique to Louisiana.

In the 1930's, "new deal" legislation passed by the United States Congress required the acquisition of vast lands in various states to accomplish the purposes of the federal

8 150 La. 756, 91 So. 207 (1922).

9 Exhibit "F" accompanying this letter contains relevant articles from the Louisiana Mineral Code.

programs enacted. Some Louisiana landowners voluntarily parted with their lands under the belief that liberative prescription on the mineral interests created would not run since the lands were acquired by the federal government. Other landowners resisted federal acquisition to the utmost, thus making administration of the federal programs more difficult and costly.

In most common law jurisdictions, a reservation of minerals in an act of sale or expropriation created a perpetual separate mineral estate, or real right. Thus, a reservation of minerals in such transactions in other states meant that the government would **never** become the owner of the minerals without a separate acquisition or expropriation procedure. Assuming the laws relative to liberative prescrisption applied, landowners in other states enjoyed a more favorable position vis-a-vis retaining minerals in transfers to the United States under the various federal programs. Desiring to assist the federal government by making it easier for Louisiana citizens to voluntarily participate in the various federal acquisitions and to remove doubt with respect to the issue of whether liberative prescription applied to servitudes created in transfers to the United States or in existence on the date of the transfer to the United States, the Louisiana legislature enacted a series of laws carving out an exception to the general rule of prescriptibility of mineral servitudes by giving landowners imprescriptible mineral servitudes when lands were acquired by the government either with a reservation of minerals or subject to an outstanding mineral servitude.

Two legislative acts passed in 1938[10] dealt with the subject of imprescriptible mineral servitudes. They applied to acquisitions by the state government as well as by the federal government. Act 315 of 1940 repealed the earlier acts and provided as follows:

> When land is acquired by conventional deed or contract, condemnation or expropriation proceedings by the United States of America, or any of its subdivisions or agencies, from any person, firm or corporation and by the act of acquisition, verdict or judgment, oil, gas and/or other minerals or royalties are reserved, or the land so acquired is by the act of acquisition conveyed subject to a prior sale or reservation of oil, gas and/or other minerals or royalties, still in force and effect, said rights so reserved or previously sold shall be imprescriptible.

10 Acts 68 and 151 of 1938. Act 68 was limited to "spillway or floodway" properties and Act 151 applied to "public works or improvements."

---

In ***Whitney National Bank v. Little Creek Oil Co.***[11] the Louisiana Supreme Court applied the act retroactively and found imprescriptible a mineral servitude created in 1932. This ruling was consistent with the Louisiana jurisprudence establishing that laws relating to prescription which has not yet accrued are considered remedial, and not substantive, changes in the law and therefore are to be applied retroactively unless otherwise specified in the act. ***United States v. Nebo Oil Co.***[12] was decided after the ***Whitney*** case but involved the same transactions as ***Whitney***. The litigation involved certain tracts of land which were subject to mineral servitudes created in 1932. The lands, covered by the previously existing mineral servitude, were acquired, in connection with the creation of the Kisatchie National Forest, by the federal government in 1936, expressly subject to the outstanding mineral servitude. The servitude was still in existence, since prescription had not yet accrued, when Act 315 of 1940 was enacted into law. After a lapse of more than ten years, the United States sued for a judgment declaring that the mineral servitude had terminated by ten year liberative prescription. The United States Fifth Circuit Court of Appeal ruled that retroactive application of the act was constitutional. The United States Supreme Court denied writs.

In ***Nebo***, the court reasoned that since the expectancy of a landowner in the extinction of an outstanding mineral servitude was not a vested right, a change in the prescriptive period, being remedial, did not interfere with substantive rights. This holding was consistent with prior Louisiana jurisprudence relating to changes in unaccrued prescriptive periods. The district court also held, in the alternative to the holding above, that Louisiana law of liberative prescription had been pre-empted by federal law, and, therefore, was not applicable where land was acquired by the United States under the Weeks Forestry Act.

As will be seen below, the factual situation in ***Nebo*** is closely analogous to the facts of the Kisatchie situation. Both ***Nebo*** and the Kisatchie situation involve retroactive application of Act 315 of 1940 to a mineral servitude burdening a tract on the date the tract was acquired by the United States. The same federal land acquisition act - the Weeks Forestry Act - and the same national forest - Kisatchie - are involved. The language describing the prior sales and reservations in ***Nebo*** is virtually identical to that in the sale from Gulf Lumber Company to the United States. In virtually all respects, the ***Nebo*** case is indistinguishable from the servitude in the Lawton Kisatchie situation. Because of the expressly limited language contained in the ***Little Lake Misere*** case discussed below,

---

11 212 La. 949, 33 So. 2d 693 (1947).

12 190 F.2d 1003 (5th Cir. 1951).

***Nebo*** is still good law today.

***Leiter Minerals, Inc. v. United States***[13] involved protracted litigation in both state and federal courts. The mineral rights in question were established in a deed dated December 21, 1938 from Thomas Leiter conveying land to the United States. The instrument contained a "reservation" of the "right to mine and remove" oil and gas which was specifically stipulated to expire on April 1, 1945. The reservation contained additional terms and conditions under which the mineral reservation could be extended. While the reservation was in effect, the Louisiana Legislature passed Act 315 of 1940. Ultimately the terms of the reservation were not met and no minerals were produced by Leiter. The United States leased the property to others with The California Company successfully drilling more than eighty wells.

The issue in ***Leiter*** was whether Act 315 of 1940 made the minerals imprescriptible. However, the threshold issue in the case was whether, by language of the reservation, the parties intended to create a mineral interest with a contractually stipulated, definite term, subject to extension under only certain contractually agreed upon circumstances, (and therefore, the rules relating to liberative prescription and the interruption thereof would not apply) or whether the parties intended to merely contractually alter the ten year liberative prescription of 10 years to 7 years, but with all other rules relating to prescription applying.

Leiter sued in state court and the United States sued in federal court. Before the matter was resolved both the United States Supreme Court[14] and the Louisiana Supreme Court[15] rendered decisions. The final decision[16] was by the United States Fifth Circuit Court of Appeal which ruled only a contractual alteration of the normal ten year liberative prescription period to seven years was intended, that all other rules relating to prescription applied. Therefore, Act 315 of 1940 applied and rendered the minerals imprescriptible. On appeal to the Unites States Supreme Court, the case was dismissed as moot due to a settlement by the parties.

---

13 329 F.2d 85 (5th Cir. 1964).

14 ***Leiter Minerals v. United States***, 352 U.S. 220, 77 S.Ct. 287 (1957).

15 ***Leiter Minerals, Inc. v. California Co.***, 241 La. 915, 132 So.2d 845 (1961).

16 ***Leiter Minerals, Inc. v. United States***, 329 F.2d 85 (5th Cir. 1964).

---

***United States v. Little Lake Misere Land Company, Inc.***[17] involved minerals under land in Cameron Parish, Louisiana acquired by the United States as part of the Lacassine Wildlife Refuge. Two separate parcels were acquired, one by purchase in 1937 and one by condemnation in 1939. The property was acquired pursuant to the Migratory Bird Conservation Act. Both the 1937 act of sale and the 1939 judgment of condemnation reserved to Little Lake Misere Land Company, Inc. minerals for the specific period of ten years from the date title vested in the United States. The reservations contained a 60 day continuous operations clause which provided for the maintenance of the servitude beyond ten years. This provision is completely different from statutory requirements for maintenance of a servitude and interruption of liberative prescription. **Both instruments recited that at the end of ten years, "the right to mine, produce and market said oil, gas, sulphur or other mineral shall terminate . . . and the complete fee title to said lands shall thereby become vested in the United States."** (emphasis added)

A simple reading of the provisions in the instruments in question in the ***Little Lake Misere case*** reveal that the mineral reservation was clearly a reservation for a **contractually limited term** which term could be extended only by satisfaction of the detailed requirements of the reservation. Such a limited term mineral estate could also have been created in common law jurisdictions in an acquisition under the Weeks Forestry Act.

The United States Supreme Court ruled as follows in holding that the minerals prescribed:

> Under Louisiana's Act 315, land acquisitions of the United States, explicitly authorized by the Migratory Bird Conservation Act, are made subject to a rule of retroactive imprescriptibility, **a rule that is plainly hostile to the interests of the United States. As applied to a consummated land transaction under a contract with specifically defined conditions for prolonging the vendor's mineral reservation, retroactive application of Act 315 to the United States deprives it of bargained-for contractual interests.**[18]

In reaching the decision, Justice Burger of the Supreme Court was careful not to declare

---

17 412 U.S. 580, 37 L.Ed.2d 187, 93 S.Ct. 2389 (1973).

18 412 U.S. at p. 596, 93 S.Ct. at p. 2399, emphasis added.

---

the Louisiana act unconstitutional[19] or to otherwise rule that it was not applicable in appropriate circumstances.

The Court recognized the argument that under some circumstances (presumably the Kisatchie situation), the federal government might be bound by changes in Louisiana's prescriptive scheme:

> Were the terms of the mineral reservation at issue here less detailed and specific, it might be said that the Government acknowledged and intended to be bound by unforeseeable changes in state law. But the mineral reservations before us are flatly inconsistent with the respondents's suggestion that the United States in fact expected that these reservations would be wholly subject to retroactive modifications.[20]

There have been no further reported cases involving the application of Act 315 of 1940 where the United States was a party. However, Act 315 of 1940 has been applied prospectively by Louisiana courts since the ***Little Lake Misere*** decision. In ***Heirs of Viator v. Tri-Parish Investors, Ltd.***[21] the Louisiana Third Circuit Court of Appeal applied Act 315 of 1940 to a mineral reservation contained in an expropriation judgment in favor of the United States in 1956. The mineral servitude was held imprescriptible.

Exhibit "F" accompanying this letter contains relevant articles from the Louisiana Mineral Code.

**United States Position**

**Kisatchie Situation:**

On June 20, 1986 the Office of General Counsel rendered an opinion to the United States Department of Agriculture, Forest Service, Kisatchie National Forest that property covered by the December 29, 1933 conveyance from Gulf Lumber Company to the United States was available for mineral leasing. Apparently, an additional opinion was rendered October 9, 1992. Attempts to obtain the opinions through the Freedom of Information Act

---

19 It should be noted that the Fifth Circuit Court of Appeal decision specifically held that Act 315 is not unconstitutional. See ***United States v. Little Lake Misere Land Company***, 453 F.2d 360 (1971).

20 412 U.S. 602, 93 S.Ct. 2402.

21 618 So.2d 36 (La. App. 3rd Cir. 1993).

have been denied. However, based upon telephone conversations with Delia Jaquette of the Forest Service it is apparent that the ***Little Lake Misere*** decision is the basis for the opinions. The analysis of the government appears to be simply that since Act 315 applies only to the United States and attempts to treat acquisitions by the United States differently than acquisitions by other governmental entities in Louisiana, the act is "hostile" to the interest of the United States and therefore does not apply to the United States.

Consistent with the opinions of its counsel, mineral leases have been granted by the United States on virtually all of Tracts A and B. The "Leasehold" map reflects leases held by Texaco, Sonat, Helmerich & Payne, and others.

**Artillery Range Situation**:

A letter dated August 5, 1988, [Nº **24**] from Danny W. Britt, Forest Supervisor to Regional Forester concerning the "Tract V-10 Mineral Status"[22] tracts the history of the acquisition of the property and of the moratorium payments and takes the position that the minerals are still in private ownership. The letter stated "we have no legal opinion on any lands acquired by the U.S. after January 1, 1940. For these reasons, I have no basis to presume the minerals on Tract V-10 are currently U. S. owned."

A subsequent letter dated November 7, 1991 [Nº **25**], from Charles E. Steele, Director of Lands and Minerals, United States Department of Agriculture, Forest Service to Acting Deputy State Director, Operations, Eastern States Office again reviews the history of the property and concludes that the lands are not available for mineral leasing. The letter refers to the fact that the expropriation judgment excepted minerals, ingress/egress for exploration was denied, and the tracts are located on an active military base. The letter concluded as follows:

> We are denying consent to lease these lands until such time as we can obtain title information regarding the actual mineral ownership at the time the War Department acquired the lands. We will request OGC provide a title opinion as to what effect the continual denial of the ingress/egress right may have had on any term mineral reservations in existence at the time the lands were acquired. It is possible these reservations may have been extended by the federal government denying the rights.

22 Area managed by Forest Service for Department of Army or "owned" by Forest Service by virtue of exchange with Department of Army which was included in 1943 condemnation from Mr. Burton.

---

As of June 15, 1992 the opinion of the Office of General Counsel had not been obtained.

**Lawton Position**

**Kisatchie Situation:**

**A. Act 315 of 1940 is applicable to the reservation in the 1929 Mineral Deed; *Little Lake Misere* is distinguishable from *Nebo* and, therefore, the Kisatchie situation is controlled by *Nebo*.**

There is no question that the reservation in the 1929 Mineral Deed from Gulf Lumber Company to S. H. Fullerton is "less detailed and specific" than the mineral reservation at issue in ***Little Lake Misere***. Additionally, as opposed to ***Little Lake Misere***, in the Lawton Kisatchie situation, the United States was not a party to the 1929 Mineral Servitude, but instead, took the properly expressly subject thereto and also subject to the general laws relating to same. Therefore, Lawton Kisatchie situation, like ***Nebo***, falls within the language limiting the ***Little Lake Misere*** case quoted on page 9 above and, therefore, could be subject to retroactive changes in the law of prescription, provided prescription had not yet accrued.

A reading of ***Little Lake Misere*** leaves no doubt that the Supreme Court believed that the parties in that case intended a significant modification of the ten year prescription of nonuse and that this was a bargained for element in the transaction. It is significant that ***Little Lake Misere*** states that "In the ***Leiter Minerals*** litigation, retrospective application of Act 315 to a detailed, conditional mineral reservation was at issue for the first time" (emphasis added). Thus, the Court impliedly distinguished ***Nebo***, which dealt with different facts (and facts which are much more closely analogous to the Lawton situation). The negative import of this statement is that ***Nebo*** did not deal with "the retrospective application of Act 315 to a detailed, conditional mineral reservation." The ***Little Lake Misere*** Court seems to have carefully avoided questioning, even implicitly, the holding in ***Nebo.*** It could be argued that, by so carefully distinguishing ***Nebo***, the ***Little Lake Misere*** Court implicitly approved it.

Unlike the ***Little Lake Misere*** situation, the reservation of minerals in the Lawton situations were "forever". None of the Lawton reservations contemplated that, at the end of a specific time, "complete title" would vest in the United States. The United States never bargained for nor paid for any Lawton minerals. Under no circumstances can the United States argue that it contemplated receiving Lawton minerals.

---

The reservation in ***Little Lake Misere*** was particular and specific, and, therefore, constituted the law between the parties. Since the reservation in the Kisatchie situation is general and unrestricted, if termination of the servitude would have been controlled by the general law of Louisiana relating to the ten year prescription of nonuse, the legislature was free to alter the prescriptive period. In 1940, when Act 315 was adopted, the claim of the United States relative to the minerals was, at best, based upon a mere expectation or hope that the prescriptive period would not be interrupted or changed. The argument that a person has a vested right in a statute of limitations or period of prescription which was in force when a contract was made, or cause of action arose, has been repeatedly rejected by both the Louisiana and federal courts.[23] This well established jurisprudence should have no less validity merely because the United States could be affected by a change in prescription.

The United States might claim that Act 315 of 1940 is unenforceable against it under the ***Little Lake Misere*** decision because its implementation is hostile to the United States in that it would interfere with the purposes for which the government purchased the land in question. This argument was rejected by the trial court in ***Nebo***, supra. In ***Nebo***, the trial court found that not only had the National Forest Reservation Commission repeatedly found and determined that acquisition of lands for forest purposes under the Weeks Act with permanent reservations of minerals did not interfere with the use of the lands for forest purposes, but that such mineral reservations were actually beneficial to good forest management because certain practices of mineral operations assisted in fire prevention and establishment of local markets for timber.

The minutes of the meeting of the National Forest Reservation Commission proved conclusively that the Commission authorized the acquisition of millions of acres of land subject to the reservation of mineral rights in perpetuity and repeatedly authorized the acquisition of tracts where the mineral rights were outstanding in third persons. Today, the Forest Service holds title to millions of acres in other jurisdictions, many of which are subject to permanent separate mineral ownership in favor of third parties. It is unlikely that the Forest Service could now argue that laws of other jurisdictions providing that sales of minerals or reservations of minerals in sales of land creating perpetual, separate mineral estates are "hostile" to the interests of the United States, and, therefore, are inapplicable in order that the United States can now gain title to the minerals.

In addition, far from harboring the expectation that the Forest Service would one day acquire full title to the minerals underlying Louisiana lands acquired under the Weeks

---

23 ***U.S. v. Nebo***, 90 F.Supp. 73 (E.D. La. 1950); ***Terry v. Anderson***, 95 U.S. 628.