---

Forestry Act as a result of the operation of liberative prescription, the evidence in ***Nebo*** established that while buying vast lands in Louisiana subject to perpetual mineral servitudes, agents of the United States were advising prospective vendors that Louisiana law of prescription did not apply to lands purchased by the United States. As noted in ***Nebo***, this fact was supported by a memorandum dated May 29, 1935, issued by the Alexandria, Louisiana, Office of the Forestry Service which memorandum specifically declared that Articles 789 and 3546 of the Louisiana Civil Code did not apply to lands sold to the United States for national forest purposes.

The policy statements and subsequent actions taken consistent therewith by the National Forest Reservation Commission appear entirely consistent with the intent of Congress in allowing acquisition of lands under the Weeks Forestry Act subject to perpetual mineral interests. It is indisputable that the majority rule in this country in the various states is that a grant or reservation of minerals creates a separate mineral estate in perpetuity (in the absence of a contractual stipulation to the contrary). Therefore, Congress must be considered to have intended that acquisitions under the Weeks Forestry Act could be made subject to such perpetual mineral reservations. The Louisiana legislature passed Act 315 of 1940 to remove all doubt with respect to the issue of whether the law of liberative prescription applied to existing mineral interests or mineral interests created in transfers to the United States. This Act merely clarified and guaranteed that Louisiana citizens in other states vis-a-vis transfers to the United States. In situations where the government desired to acquire minerals rights, it could have (and in some cases did) negotiate a contractually limited term on the mineral reservations. (See ***Lieter***, supra., and ***Little Lake Misere***, supra.)

In the absence of such a contractual limitation, in light of clear congressional intent and the clear statements of policy by the National Forest Reservation Commission, there is no basis for concluding that the government had any intention, or expectancy, with respect to the acquisition of minerals. Considering the clear congressional intent that acquisitions of land under the Weeks Forestry Act could be made subject to perpetual mineral rights, there is no basis for a court to hold that application of Act 315 of 1940 to the Kisatchie situation is "hostile" to the interests of the United States. It is plainly not "hostile" to said "interest" because the government never intended to acquire any interests in minerals in the Kisatchie situation.

Under the circumstances, it would be inconsistent for the government to claim that (1) Act 315 of 1940 deprives it of a substantive right it thought existed on the date of the acquisition of the Kisatchie situation lands (2) application of the Act is "hostile" to its contractually bargained for expectations or (3) same interferes with the use of the property for the purposes intended under the Act. When applied to general, nonspecific

reservations of minerals, Act 315 of 1940 does no more than support the position of the United States in entering into the Louisiana acquisitions with reservations of minerals as was stated by the Solicitor of the Department of Agriculture in an Opinion dated March 25, 1944:

> This statute (Act 315 of 1940) is in harmony with the view of the law expressed in Acting Solicitor Boyle's opinion and is consistent with the government's carrying out the contract which the vendor entered into relying upon the good faith of the United States.[24]

**B. In the alternative, if Act 315 of 1940 is inapplicable, Louisiana law relating to prescriptibility of mineral interests is wholly inapplicable to the Kisatchie situation.**

In the alternative, even if a court should determine Act 315 of 1940 is inapplicable, such a finding likely will not assist the government in this case. In the ***Little Lake Misere*** case, the court declined to apply Act 315 of 1940 but, instead, held the language of the particular reservation in the contract to be applicable:

> Since Act 315 is plainly not in accord with the federal program implemented by the 1937 and 1939 land acquisitions, State law is not a permissible choice here. The choice of law merges with the constitutional demands of controlling federal legislation; we turn away from State law by default. Once it is clear that Act 315 has no application here, **we need not choose between "borrowing" some residual state rule of interpretation or formulating an independent federal "common law" rule**; neither rule is the law of Louisiana yet either rule resolves this dispute in the government's favor. **The contract itself is unequivocal** ... [respondents] interest in ... minerals terminated ... no later than July 23, 1947 and August 30, 1949. (emphasis added)[25]

The court did not have to determine whether Louisiana law or federal law applied since the

24 90 F.Supp. at p. 92.

25 93 S.Ct at p. 2403.

language of the contract provided the law between the parties. Thus, State law was **irrelevant** and the court enforced the express language of the contract. In the Kisatchie situation, the language of the contract provides that the acquisition was made subject to the prior conveyance of minerals to S. H. Fullerton. The mineral deed to S. H. Fullerton provided that the minerals were transferred to Fullerton "forever". Thus, if one strictly applies the rationale of ***Little Lake Misere*** to the Kisatchie situation, while Act 315 of 1940 may not be applicable, the language of the contract, insofar as it accurately reflects the intention of the parties, is the law between the parties and should be enforced as written. The original grant in the 1929 mineral deed to S.H. Fullerton provided:

> To have and to hold said minerals and especially said oil, gas, coal, petroleum, sulphur, salt, iron, lignite and all other minerals in, under and upon said land unto the said S. H. Fullerton, his heirs and assigns **forever**. (emphasis added)[26]

The 1933 Sale to the United States from Gulf Lumber Company provided with reference to the prior reservation:

> Excepting, however, from this sale, all of the minerals, including oil, gas, petroleum, sulphur, iron, lignite, salt and any other minerals in, on, or under the lands herein conveyed, **as conveyed** to S. H. Fullerton of St. Louis, Missouri, by Gulf Lumber Company by instrument dated the 24th day of December, 1929, and of record in conveyance record 84, Page 537 et. seq. of the records of Vernon Parish, Louisiana. (emphasis added)[27]

The interpretation that the United States intended to acquire the land subject to a perpetual outstanding mineral servitude in favor of S. H. Fullerton is:

1. In accord with the language of the contract;

2. Consistent with the express intent and expectations of the parties as evidenced by

26 See Document Nº 1, Mineral Deed dated December 24, 1929 from Gulf Lumber Company to S. H. Fullerton.

27 See Document Nº 2, Deed dated December 29, 1933 from Gulf Lumber Company to United States of America.

representations by government agents and the position of the National Forest Reservation Commission during of the period of the acquisition;

3. In harmony with, as opposed to hostile to, the congressional scheme relative to land acquisitions under the Weeks Forestry Act as evidenced by the official position of the National Forest Reservation Commission at that time; and

4. In accord with apparent congressional and Louisiana legislative intent that Louisiana law of prescription would not apply to mineral reservations in sales to the United States, or to mineral rights in existence as to lands transferred to the United States, but, rather, that said reservations or previously existing rights would be enforceable in accordance with the terms of the contracts creating them.

A review of the above factors makes it evident that application of the rationale of the ***Little Lake Misere*** decision means that the Louisiana law of liberative prescription would not apply and that the mineral reservation in the 1929 mineral deed would be applied as the law between the parties and enforced according to its terms.

**1. The language of the contract**: The 1929 mineral reservation is "forever". The United States agreed to accept the transfer of the Kisatchie situation lands excepting the minerals "as conveyed" to S. H. Fullerton. There is nothing ambiguous about the terms "forever" or "as conveyed" when used in the context of these agreements. S. H. Fullerton was president of Gulf Lumber Company in 1933, the date of the transfer to the United States. Because of his obvious interest in continuing the 1929 mineral servitude in existence, it is clear that Fullerton intended to require that the government honor the strict terms of the prior mineral grant.

**2. The intent or expectation of the parties**: Far from harboring the expectation that the Forestry Service would one day acquire full title to the minerals underlying Louisiana lands acquired under the Weeks Forestry Act as a result of operation of liberative prescription, the evidence in ***Nebo*** established that while buying vast lands in Louisiana subject to perpetual mineral servitudes, agents of the United States were

advising prospective vendors that the Louisiana law of prescription did not apply to lands purchased by the United States.[28] As noted in ***Nebo***, this fact was supported by a memorandum dated May 29, 1935, issued by the Alexandria, Louisiana, Office of the Forestry Service which specifically declared that Articles 789 and 3546 of the Louisiana Civil Code did not apply to lands sold to the United States for national forest purposes. According to the ***Nebo*** court, minutes of the National Forest Reservation Commission established that long before the 1935 sale in ***Nebo*** to the United States (and also long before the 1933 Gulf Lumber Company sale to the United States), the Commission had taken the position that Louisiana laws of prescription did not apply to lands sold to the United States.[29] It had also taken the position that, as a matter of policy, the Commission would not approve the purchase of mineral rights with funds which had been appropriated under the Weeks Forestry Act for acquisition of lands for forest purposes. In a memorandum dated September 4, 1935, C. W. Boyle, an Assistant Solicitor of the Department of Agriculture rejected the opinion of a Mr. McGregor and concluded that Louisiana laws of prescription were not applicable to lands purchased under the Weeks Forestry Act.

It is clear from the records of the National Forest Reservation Commission that, consistently from 1931 through at least 1947, the Commission believed that Louisiana law of prescription would not apply where property was acquired under the Weeks Forestry Act by the United States, either with a reservation of minerals or subject to a previous reservation of minerals, and that any such reservation would be binding upon the United States according to its terms. Therefore, the government cannot today argue, as in ***Little Lake Misere***, that it had any expectation or bargained for contractual interest in the minerals being subject to termination. To the contrary, it fully expected, represented and re-affirmed that the laws of prescription in Louisiana were not applicable to transfers to it under the Weeks Forestry Act and that the United States was bound by the terms of mineral reservations to which its acquisitions were subject.

**3. Permanent Reservations are in harmony with, not hostile to, the congressional scheme of land acquisition under the Weeks Law:**

The court noted in ***Little Lake Misere*** relative to the possible application of State law that:

---

28 ***U.S. v. Nebo***, 90 F.Supp. 73, 87.

29 ***U.S. v. Nebo***, supra p.90.

> However, in a setting in which the rights of the United States are at issue in a contract to which it is a party and the "issue's outcome bears some relationship to a federal program, no rule may be applied which would not be wholly in accord with that program."[30]

The Court in ***Little Lake Misere*** held that since the contract was unequivocal, and presumably not "hostile" to the federal program, it was the applicable law between the parties to the transaction. Thus, it was by operation of the contract - not operation of Louisiana law of liberative prescription - that the mineral interest was deemed terminated. The rule should be no less so where the contact by its terms happens to favor the vendor or a third party rather than the United States. The enforcement of such a provision is consistent with, not hostile to, the federal land acquisition program under the Weeks Forestry Act. As noted in the excerpt quoted above at page 12, the Secretary of Agriculture and the National Forest Reservation Commission had adopted the policy of purchasing lands under the Act subject to reservations of minerals in perpetuity.

The District Court concluded in ***Nebo*** that the evidence conclusively proved that "the Commission had authorized the acquisition of millions of acres of land subject to the reservation of mineral rights **in perpetuity** (emphasis added) and had repeatedly authorized the acquisition of tracts where the mineral rights were outstanding in third persons on the ground that "such mineral rights will not interfere with the use of the land for national forest purposes or diminish the value of the land." [31]

The government cannot now in good faith suggest that enforcement of the mineral reservation as written, understood and interpreted by the parties is inconsistent with, or hostile to, the implementation of the Act. Therefore, the contract should be enforced as the law between the parties.

**4. Neither Congress nor the Louisiana Legislature intended that the Louisiana law of prescription would apply to reservations contained in, or existing previously to, acquisition by the U.S. government under the Weeks Law**:

It is uncontradicted that the ***Frost-Johnson*** decision relating to mineral servitudes and prescription relating thereto posed a serious obstacle to implementation of the Weeks

---

30 93 S.Ct. at p. 2402-3.

31 ***U.S. v. Nebo***, supra at 87.

Forestry Act in Louisiana. The ***Nebo*** District Court noted this as follows:

> It is a matter of common knowledge that the acquisition of tracts for these and other similar federal purposes were seriously hampered and impeded by the Louisiana laws of prescription. The difficulties encountered by the Department of Agriculture in the acquisition of lands for national forest purposes because of the Louisiana laws of prescription are repeatedly stated in the records of the National Forest Reservation Commission and the Department of Agriculture.[32]

In the "Act of Consent" enacted by the Louisiana Legislature authorizing the United States to acquire lands in Louisiana for national forest purposes, the State gave to the United States "power ... to pass such laws as it may deem necessary to the acquisition as herein provided for incorporation in said forests covered or cut over lands lying in Louisiana as in the opinion of the Federal Government may be needed." (La. Act No. 90 of 1922 as amended by Act No. 71 of 1924). Section 9 of the Weeks Forestry Act, as amended in 1913, provides that:

> Such acquisition by the United States should not be defeated because of located or defined rights of way, easements and reservations which, from their nature will, in the opinion of the National Forest Reservation Commission and the Secretary of Agriculture, in no manner interfere with the use of the lands so incumbent for the purposes of the Weeks Act.

The District Court in ***Nebo*** reasoned that Louisiana law had been superseded by Federal law:

> It is evident from the foregoing statutes that Louisiana authorized the United States to enact such legislation as was necessary to the acquisition of lands for national forest purposes and that Congress, recognizing that lands could not be acquired unless they were purchased subject to outstanding mineral rights, has exercised the power granted to it by Louisiana and has specifically declared that the acquisition of lands for national forest purposes shall not be

32 ***U.S. v. Nebo***, supra at p. 97.

> defeated by mineral reservations which do not interfere with the use of the land for forest purposes. As Mr. Boyle points out in his opinions, however, the Louisiana laws of prescription were operating as an effective bar to the acquisition of lands in Louisiana for forest purposes. Landowners were unwilling to sell their lands because they ran a risk of losing their mineral rights in ten years, even though those rights had been reserved in perpetuity. This operation of the Louisiana laws of prescription, however, was directly contrary to the express provisions of Section 9 of the Weeks Law and completely nullified and frustrated the intent and purpose of that Section. Consequently, unless the Section is to be rendered meaningless, it must be held to have superseded the prescriptive provisions of the Louisiana Civil Code.[33]

We think the above is the correct analysis under ***Little Lake Misere***. In ***Little Lake Misere***, the court faced a **contractual term** mineral interest and whether that contractual term mineral interest could be altered by a subsequent Louisiana law. Such a contractual term mineral interest would have been enforceable irrespective of the applicability of underlying State law *i.e.* irrespective of whether the underlying scheme of law was that of mineral servitudes under Louisiana law or that of a common law jurisdiction recognizing a separate mineral estate. The court never got to the issue of whether Louisiana law relating to mineral servitudes and liberative prescription applied. If faced with an unrestricted contractual provision, providing that a mineral interest excepted was "forever", in a transfer to the United States under the Weeks Forestry Act, a court applying ***Little Lake Misere*** must necessarily inquire whether the provision should be enforced as the contract between the parties, whether the substantive law of Louisiana should be incorporated as part of the contract, or whether it should apply some "federal common law."

The Louisiana law of prescription of nonuse was plainly hostile to the implementation of the Weeks Forestry Act because it made land acquisitions by the United States difficult and more expensive. Thus acquisitions in Louisiana were more difficult and expensive than in other states with regimes allowing permanent separate estates in minerals. Such a scheme should be deemed "specifically aberrant or hostile," and, therefore, not an appropriate standard for federal law.

---

33 ***U.S. v. Nebo***, supra at p. 101.

---

That Louisiana law relating to liberative prescription applicable to mineral servitudes did not apply because it frustrated and interfered with land acquisitions under the Weeks Forestry Act was the official government position at the time of the sale to the United States by Gulf Lumber Company. The ***Nebo*** District Court found as follows:

> This interpretation of the applicable statutes was the official opinion of the Department of Agriculture prior to the enactment of Act No. 315 of 1940. In his opinion of March 4, 1935, Mr. Boyle, after pointing out that the Louisiana act of consent was enacted after Articles 789 and 3546 of the Louisiana Civil Code, stated:
>
>> "It was the intention of the State that the consent statute should give to the United States power to pass such laws as would be necessary to acquire the land and administer it. . . .The provisions of the State law as to nonuser of servitude appear to be an effective bar to the acquisition of lands in Louisiana for National Forest purposes if the State law applies to a deed conveying land to the United States.
>>
>> . . . .
>>
>> From the facts and law applicable thereto, I am of the opinion that the consent statute of Louisiana was intended to supersede any State law which may conflict with the acquisition by the United States of lands for National Forest purposes and to confer upon Congress power to pass such laws as are necessary to the acquisition; that Section 518, Title 16 U.S. C.A. makes reservations in deeds subject to rules and regulations of the Secretary of Agriculture; that the reservations and deeds in Louisiana would be subject to these rules and regulations; and that Articles 789 and 3546 of the Civil Code of

Louisiana would not apply."[34]

As a result, were a court to elect to not apply Act 315 of 1940, but, rather enter into the federal conflict of laws analysis required under ***Little Lake Misere***, the court would not elect to "borrow" State law since such borrowed law would also be hostile to the implementation of the federal law on the date of the transactions. The applicability of State law was not intended by the Congress or the Louisiana Legislature since such "applicability" tended to frustrate implementation of the Weeks Forestry Act in Louisiana. The Act, as interpreted, by the Secretary and the Commission, authorized acquisition of property subject to reservations of, or subject to previously existing, perpetual mineral interests. The terms of the Act, therefore, as well as the terms of the reservation, constitute the applicable law as between the Lawton entities and the United States government.

**Artillery Range Situation:**

With respect to the "Artillery Range" situation, there is no basis for the application of ***Little Lake Misere***. When the United States acquired the artillery range lands in 1943, and included a general, unrestricted, reservation of minerals in favor of the landowner, Act 315 of 1940 was the law in Louisiana. Hence, under the law in existence on the date of the transaction, the mineral servitude so created is imprescriptible. This rule resulted in a mineral reservation having the same effect vis-a-vis the United States as though the government had acquired land subject to a mineral reservation in any other State in the country. The Louisiana Third Circuit Court of Appeal has held that Act 315 of 1940 is applicable to acquisitions by the United States after the effective date of the act. ***Heirs of Viator v. Tri-Parish Investors, Inc.***, supra. As noted in our discussion above application of the rule of imprescriptibility after 1940 is clearly (a) consistent with the express language of the agreement; (b) consistent with the intent and expectation of the United States on the date of the transaction and (c) in no way interfered with, but in fact promoted, implementation of the Act. The 1944 reservation falls squarely within Justice Burger's suggestion that the statute would be applicable under certain circumstances:

> We do not depreciate Louisiana's concern with facilitating federal land acquisitions by removing uncertainty on the part of reluctant vendors over the duration of mineral reservations retained by them. From all appearances, this concern was a significant force behind the enactment of the 1940 Legislation. But today, we are not asked to consider Act 315 on

34 ***U.S. v. Nebo***, supra at p. 102.

---

the face, or as applied to transactions consummated after 1940. . .[35]

Clearly the United States government is bound by the law of imprescriptibility (Act 315 of 1940) which was in effect on May 15, 1943, the date of its acquisition of the artillery range tract.

**Kisatchie and Artillery Situations:**

Court documents have consistently recognized Lawton minerals as being "reserved permanently." For more than thirty-five years the government has made court filings recognizing that Mr. Burton and his successors were owners of the minerals in question. These court filings were made after enactment of Act 315 of 1940 and both before and after rendition of the ***Little Lake Misere*** decision. However, even if it would be established by the government that Act 315 of 1940 does not apply to either or both the Kisatchie or artillery situations and that the laws of prescription does apply to the mineral interests to which the government acquisitions were subject, such a finding would not materially advance the government's claim to the minerals. Even if the rules of prescription are applicable, prescription has been continually suspended or interrupted by the government through various expropriation proceedings and military use of the property preventing the exercise of the servitudes.

By virtue of the various expropriation procedures which were filed between 1948 and 1973 Mr. Burton and his successors have been prevented from exercising their right to explore for their minerals on the lands under discussion. The expropriation of the right of the mineral owner to use the surface in these various proceedings constitutes an obstacle which the Lawtons could not prevent or remove. Therefore, same suspended prescription on the mineral servitudes affected thereby.

Since 1943, a substantial portion of the property has been, in fact, continuously subject to bombing practice and artillery practice by the United States Army and Air Force. According to personnel in the ordinance disposal section at Fort Polk, over 400 unexploded bombs are found and disposed of each year by UXB teams, approximately half coming from Tracts A, B and C. Fort Polk, for many years, was the home to two (2) armored divisions. In connection with the U. S. Air Force use of Tracts A, B and C, unexploded 2,000 pound bombs have been found at various inactive ranges. An officer at the explosive ordinance disposal section stated that because much of the recently discovered grenades, shells, and bombs are more than 20 years old (WWII, Korean &

---

35 ***United States v. Little Lake Misere Land Company, Inc.,*** supra., 93 S.Ct. at p. 2400.

---

Vietnam era), they can become more unstable (depending on the type of fuse and/or explosive) with the passage of time and "should be treated with extraordinary caution." On portions of Tract A and C lies the Redleg 1 Artillery Impact Area, the currently active impact are for 155MM howitzer, heavy artillery and tank gunnery practice. On the surface of Tract A is a bazooka range, a rifle grenade range, and numerous other small arms impact areas including a TOW missile range.

According to an officer at the explosive ordinance disposal department, chemical weapons were once unearthed. There are numerous abandoned ranges all over Tracts A, B and C where, with regularity, unexploded bombs are found after rains. In addition to the problem a driller or producer might confront with unexploded ordinance, there is the problem that almost the entirety of Tracts A, B and C are presently used by the JRTC for parachute jumps, maneuvers, bivouacs, live fire, and night training exercises.

One area on Tract A contains a simulated village used for training in house-to-house combat. On Tract A is situated a 700 acre site (as measured from a "base map" furnished by range control officials at Fort Polk) designed as the Explosives Ordinance Disposal Area. We understand that this is the area where, for approximately fifty years, defective and unexploded munitions have been dumped.

Several officials at Fort Polk's Range Control Department pointed out that no oil and gas operations would be allowed at night [because of regular exercises involving highly sensitive night optical equipment (known as "night-ops")] or while maneuvers simulating war conditions are being conducted.

There can be no question that the above activities have constituted and continue to constitute an obstacle, in fact, to exploration by Mr. Burton and the Lawton entities. If the rules relating to prescription were to be deemed to apply, prescription has been, and continues to be, suspended as to all lands affected by the above military use and operations.

**Conclusion**

The Lawton family feels strongly that the Bureau of Land Management, in executing mineral leases affecting the lands discussed above, has slandered its mineral title. Further, your lessees should be advised that any attempt by them to exercise rights under the mineral eases will be considered a trespass and all appropriate remedies against said parties will be pursued. Mr. Cruse, after you have had an opportunity to study this letter and the accompanying materials, please give me a call. I would like to discuss this situation with you. We would like to avoid litigation; but, at the same time, we feel that the

Mr. Mike Cruse
November 9, 1995

---

Lawton family has a strong position that it is currently the owner of one hundred (100%) percent of the minerals underling lands in both the Kisatchie situation and artillery range situation, and that said mineral interests are imprescriptible.

Yours very truly,

**STRAIN, DENNIS, MAYHALL & BATES, L.L.P**

By:____________________
Kim G. Mayhall
318 St. Charles Street
Baton Rouge, Louisiana 70802

**THE GRAY LAW FIRM (APLC)**

By:____________________
A. J. GRAY, III

Is your RETURN ADDRESS completed on the reverse side?

**SENDER:**

- Complete items 1 and/or 2 for additional services.
- Complete items 3, and 4a & b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write "Return Receipt Requested" on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):

1. ☐ Addressee's Address
2. ☐ Restricted Delivery

Consult postmaster for fee.

3. Article Addressed to:
MR. MIKE CRUSE
DEPUTY GENERAL COUNSEL
OFFICE OF GENERAL COUNSEL
U. S. DEPARTMENT OF AGRICULTURE
ROOM 3201
FEDERAL BUILDING
LITTLE ROCK, AR 72203

NOV 1 5 19..

4a. Article Number
P-309-099-907

4b. Service Type
☐ Registered ☐ Insured
☒ Certified ☐ COD
☐ Express Mail ☐ Return Receipt for Merchandise

7. Date of Delivery 11-13-95

5. Signature (Addressee)

8. Addressee's Address (Only if requested and fee is paid)

6. Signature (Agent) Wineger

PS Form 3811, December 1991 ☆U.S. GPO: 1993—352-714 **DOMESTIC RETURN RECEIPT**

Thank you for using Return Receipt Service.

P 309 099 907

UNITED STATES POSTAL SERVICE

**Receipt for Certified Mail**

No Insurance Coverage Provided
Do not use for International Mail
(See Reverse)

Sent to / Street and No. / P.O., State and ZIP Code:
MR. MIKE CRUSE, DEPUTY GENERAL COUNSEL, OFFICE OF GENERAL COUNSEL, U.S. DEPT OF AGRICULTURE ROOM 3201, FEDERAL BUILDING LITTLE ROCK, AR 72203

| | |
|---|---|
| Postage | $ 6.95 |
| Certified Fee | 1.10 |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | 1.10 |
| Return Receipt Showing to Whom, Date, and Addressee's Address | |
| TOTAL Postage & Fees | $ 9.15 |
| Postmark or Date | NOVEMBER 9, 1995 |

MAIN OFFICE NOV - 9 1995

PS Form 3800, June 1991

Fold at line over top of envelope to the right of the return address

**CERTIFIED**

P 309 099 907

**MAIL**