# HYDROCARBON LEASE

THIS AGREEMENT, entered into effective as of the 1st day of July, 1996, by and between Central Pines Land Company, whose mailing address is 101 North Huntington St., Sulphur, Louisiana 70663; and Tower Minerals Company, Inc., whose address is One Lakeshore Drive, Suite 1700, Lake Charles, Louisiana 70629, ("Lessor") and Sonat Exploration Company, whose address is 6101 S. Broadway, Suite 200, Tyler, TX 75703 ("Lessee").

## WITNESSETH:

Lessor, in consideration of the sum of $2,866,893.00 and other valuable consideration, hereby leases and lets unto Lessee the exclusive right to enter upon and use the land hereinafter described ("the land") for the exploration for and production of hydrocarbons (defined for purposes of this lease as oil, gas and all other non-solid hydrocarbons), together with the use of the surface of the land for all purposes incident to the exploration, production, ownership, possession and transportation of such hydrocarbons from the land, and the right to dispose of salt water as hereinafter provided, with the right of ingress and egress to and from the land at all times for such purposes, including, without limitation, the right to construct, maintain, use and/or operate pipelines, roads and any other structures and facilities necessary or useful in connection with Lessee's operations hereunder; all subject to stipulations hereinafter set forth; the land to which this lease applies and which is affected hereby being situated in Vernon Parish, Louisiana, and described in Exhibit "A" attached.

For the purpose of calculating the payments hereinafter provided for, the land is estimated to comprise 28,668.93 acres, whether it actually comprises more or less.

This lease shall be for a term of three (3) years and no months from the date hereof ("the primary term") and so long thereafter as oil, gas or some other non-solid hydrocarbon is being produced in paying quantities or drilling operations are conducted on the land, all as hereinafter provided for; all subject to the following conditions and agreements.

1. (a) This lease shall terminate on the 1st day of July, 1997, unless on or before that date Lessee either (i) commences the actual drilling ("spudding-in") of a well on the land in search of hydrocarbons and thereafter continues such operations through the drilling of a well to completion or abandonment; or (ii) pays to Lessor a rental of $75.00 per acre for all or that part of the land which Lessee elects to continue to hold hereunder, which payment shall maintain Lessee's rights hereunder in effect as to such land without drilling operations for one (1) year from the date last above mentioned; and Lessee may continue to maintain the rights granted without drilling operations for one additional twelve (12) month period (during the primary term) by paying Lessor, on or before the beginning of the third twelve (12) month period, the sum of $75.00 per acre for all or that part of the land held hereunder. Payments to Lessor may be mailed or delivered for deposit to its credit in the Calcasieu Marine National Bank of Lake Charles, Sulphur Branch, Sulphur, Louisiana ("the Bank"). The Bank or its successor shall continue to be the depositary for such rentals as the representative of Lessor, and the cessation of its operations or any disruption of its business activities shall not terminate or affect Lessee's right to so deposit all payments. The receipt by the Bank or by Lessor of the check of Lessee on or before the rental paying date shall be considered as payment of rental and operate to maintain Lessee's rights in force and effect. Should the Bank fail or refuse to accept Lessee's check or draft, the attempted payment in the manner provided shall not be thereby rendered ineffective, and Lessee shall not be in default for failure to pay the rental until thirty (30) days after Lessor shall have furnished Lessee with a recordable instrument naming a new depository. Upon a settlement of or final judgment in the Dispute (as hereinafter defined in Paragraph 7), the delay rental provided for herein shall be proportionately reduced based on Lessor's proportionate mineral servitude interest or Lessor's Allocated Production Interest (as defined in Paragraph 7, below), in the land as determined by virtue of any such settlement or final judgment, provided, however, Lessee shall not be entitled to recover any portion of any rentals paid under this paragraph prior to such a settlement or judgment; any proportionate reductions shall be prospective only.

(b) At any time prior to or after the commencement of drilling operations on a well drilled by Lessee on the land, or lands pooled or unitized therewith, but not less than thirty (30) days prior to the next rental date following said commencement as provided above, or not

less than thirty (30) days prior to the end of the primary term, whichever comes first, Lessee shall execute and deliver to Lessor an instrument ("Designation"), designating from the land a block of acreage around said well (hereinafter the "Designated Block"), which designated acreage block shall not exceed 7,000 acres. A Designated Block shall constitute a single contiguous tract and shall be in the shape of a rectangle or parallelogram, to the greatest extent possible. The area or configuration of any Designated Block may be altered only with the prior written consent of Lessor. Following execution and delivery of a Designation by Lessee to Lessor, operations on or production from the land included within the Designated Block shall continue this lease in force and effect only as to the land included within the Designated Block. Lessee may maintain the remaining land lying outside said Designated Block(s) during the primary term of this lease by the payment of rentals as provided in Subparagraph (a) above (calculated by multiplying the number of acres outside the Designated Block(s) times the per acre rental provided in Subparagraph (a) above) or by designating additional blocks and commencing operations or production as elsewhere provided in this lease.

2. Subject to the provisions of Paragraph 7(e) below, Lessee may, at any time prior to or after the discovery and production of hydrocarbons on the land, execute and deliver to Lessor, or file in the conveyance records of the parish in which the land is situated, a release or releases of any portion or portions of the land or any stratum or strata thereof and be relieved of all obligations subsequently arising hereunder as to the land, stratum or strata so released. A certified copy of such release(s) shall be delivered immediately to Lessor. In the event of termination of this lease for nonpayment of delay rentals or any other cause other than failure to pay royalty under the terms of this lease, Lessee shall have the right to retain around each well then producing hydrocarbons in paying quantities, or being drilled or worked on, the land included within the exterior geographical boundaries of any declared unit created under Paragraph 12 of this lease or any conservation unit created by order of any regulatory body of the State of Louisiana or of the United States under which such well is being drilled or produced; and if no declared or conservation units have been created, Lessee shall have the right to retain (a) in the case of a vertical well, forty (40) acres of the land surrounding each oil well then producing in paying quantities, and one hundred sixty (160) acres of the land surrounding each gas well then producing in paying quantities, or (b) in the case of horizontal wells, up to a maximum of nine hundred and sixty (960) acres for a single lateral horizontal well then producing oil or gas in paying quantities, and up to a maximum of one thousand nine hundred twenty (1,920) acres for a dual opposing lateral horizontal well then producing oil or gas in paying quantities; or such lesser amount of the land in each instance as may then be affected by this lease, the acreage retained around each well to be in as near a rectangle or parallelogram as is practical. The rights retained in the acreage relating to each well shall be limited to those zones and horizons lying between the surface of the earth and one hundred feet (100') below the base of the deepest formation then producing in the well located on said acreage. Lessee shall have the right to such rights of way or servitudes affecting the land released or forfeited as are reasonably necessary for Lessee's operations on the land retained hereunder. For purposes of this lease, the terms "oil well" and "gas well" shall have the meanings prescribed by applicable law or the regulatory body of the State of Louisiana; and the term "horizontal well" in this lease shall mean a well which is completed in the Austin Chalk or Saratoga Chalk Formations and in which the horizontal section of the wellbore measured from vertical exceeds 2,000 feet, in the case of a single lateral horizontal well, and in which the horizontal section of each wellbore exceeds 2,000 feet, in the case of a dual opposing lateral horizontal well, and the horizontal component(s) thereof in the reservoir is(are) at least sixty (60) degrees from vertical. In the event that Lessee drills a horizontal well or wells not covered by the above definition, Lessee and Lessor will make a good faith attempt to mutually agree on appropriate amendments to this lease dealing with any such well(s).

3. After the commencement of actual drilling operations on the land included within a Designated Block and prior to the discovery and production of hydrocarbons in paying quantities on the land, either during or after the primary term, and subject to the requirements of Paragraph 1(b), Lessee may maintain the rights granted herein as to the land included within said Designated Block during and after the primary term by continuing such operations with due

diligence without the lapse of more than one hundred fifty (150) days between abandonment of work on one well and beginning the actual drilling of another; and during the primary term such operations may be discontinued and the rights granted herein maintained as to the land included within such Designated Block by commencing or resuming rental payments by paying within one hundred fifty (150) days from the cessation of operations (regardless of the fixed rental paying date) the proportion of the fixed yearly rental that the number of days between one hundred fifty (150) days after the date of cessation of operations and the next ensuing anniversary date bears to the twelve (12) month period, but, if said one hundred fifty (150) days shall expire during any year for which a rental or other payment has been made, no rental shall be due until the next fixed rental paying date. If Lessee commences the drilling of any well on the land included within a Designated Block pursuant to the requirements of this paragraph prior to the date on which it otherwise would be required to drill such well in order to maintain this lease in force and effect as to such land, the drilling of the next such well on the land within such Designated Block under this continuous drilling provision may be deferred beyond the one hundred fifty (150) day period provided above for a period equivalent to the period which elapses between the date on which such well is commenced and the date on which commencement would otherwise have been required; (hereinafter referred to as "Deferred Drilling Credit Days"). Lessee shall be entitled to accumulate Deferred Drilling Credit Days from well to well within a Designated Block provided, however, that the Deferred Drilling Credit Days accumulated by Lessee shall never be used so as to extend the date for commencing the actual drilling of the next well under the continuous drilling obligation above more than three hundred (300) days from the abandonment of the last well drilled on the land or lands pooled therewith. At least once every six (6) months, Lessee shall furnish Lessor with a written report setting forth the next commencement date for each well required to be drilled hereunder in each Designated Block(s).

4. (a)(i) After the discovery and production of hydrocarbons in paying quantities on the land within a Designated Block, or lands pooled or unitized therewith, either during or after the primary term, this lease may be maintained as to the lands included within such Designated Block as hereinafter provided. Lessee may maintain the rights granted herein as to the lands within such Designated Block by commencing the actual drilling of a well on the land located within said Designated Block on or before the expiration of one hundred fifty (150) days from the date on which the first well is completed and thereafter by continuing such operations with due diligence without the lapse of more than one hundred fifty (150) days between the abandonment of operations on or completion of one well and the commencement of actual drilling on another, provided, however, that if said completion or abandonment be within the primary term of this lease, Lessee shall have the option of maintaining all land within the Designated Block not held by production in paying quantities or the payment of shut-in rentals under Paragraph 4(c) below by commencing or resuming rental payments in accordance with Paragraph 3 above

(ii) Should more than one hundred fifty (150) days elapse between the completion or abandonment of a well within a Designated Block and the commencement of actual drilling of another well on land within such Designated Block, or, if during the primary term this lease is not being maintained as to the land within such Designated Block by the payment of rentals as provided immediately above, Lessee's rights under this lease as to the non-producing portions of the land within said Designated Block shall terminate. Thereafter, the producing portion to be retained (sometimes hereinafter called "tract held by production") within said Designated Block shall be that portion of the land surrounding each well then producing in paying quantities located within the exterior geographical boundaries of a conservation unit(s) created by order(s) issued by the Louisiana Department of Conservation (or such successor, agency or regulatory body) or included within a declared unit(s) created under Paragraph 12 hereinafter, or in the absence of such order(s) or declared unit(s), (a) in the case of a vertical well, forty (40) acres surrounding each oil well then producing in paying quantities or one hundred sixty (160) acres surrounding each gas or gas condensate well then producing in paying quantities, or (b) in the case of a horizontal well, up to a maximum of nine hundred and sixty (960) acres for a single lateral horizontal well then producing in paying quantities, and up to a maximum of one thousand nine hundred twenty (1,920) acres for a dual opposing lateral

horizontal well then producing in paying quantities. A vertical well producing both oil and gas shall be characterized as an oil or gas well for purposes of this paragraph in accordance with the regulations of the Louisiana Department of Conservation. Any tracts held by production and not included in a conservation unit or declared unit under this lease shall be in the shape of a rectangle or parallelogram as nearly as possible be centered on the producing well; Lessee's rights in the respective tract held by production shall be limited to those zones and horizons from the surface to one hundred feet (100') below the base of the deepest formation then producing in the particular well.

(iii) If Lessee commences the drilling of any well on the land included within a Designated Block pursuant to the requirements of this paragraph prior to the date on which it otherwise would be required to drill such well in order to maintain this lease in force and effect as to such land, Lessee may earn and utilize Deferred Drilling Credit Days as provided in Paragraph 3, above. At least once every six (6) months, Lessee shall furnish Lessor with a written report setting forth the next commencement date for each well required to be drilled hereunder in each Designated Block(s).

(b) Upon termination of this lease as set forth above, Lessee shall execute and file in the conveyance records of the parish in which the land is situated a release of each tract so held by production as to depths more than one hundred feet (100') below the base of the deepest formation then producing in the respective well on each tract held by production and a release of the balance of the land as to all depths. A copy of the release certified by the Clerk of Court shall be furnished to Lessor within ten (10) days of the recordation thereof.

(c) Should production from a well drilled hereunder cease from any cause and Lessee is not then engaged in drilling or reworking operations on the tract held by production from that well, this lease shall terminate as to that tract held by production unless Lessee restores such production, or commences additional drilling or reworking operations on that tract held by production, within one hundred fifty (150) days thereafter and continues such operations without the lapse of more than one hundred fifty (150) days between the end of one such effort and the commencement of an additional effort in an attempt to restore production of hydrocarbons from that tract held by production.

(d) Lessee shall at all times conduct such operations for the exploration and development of this lease as a prudent operator would, in an earnest effort to procure the full development of the land.

(e) Should Lessee, by the drilling of any well located on the land, discover gas or gaseous substances capable of production in paying quantities, but which Lessee is unable to produce (or which although previously produced, Lessee is unable to continue to produce) because of lack of a reasonable market or of marketing facilities, if the lease is not being otherwise maintained, Lessee's rights hereunder may be maintained for successive periods of one (1) year each for no more than five (5) consecutive years by the payment to Lessor of "shut-in gas rental" which rental shall be due and payable in the manner provided in Paragraph 3 above in a sum equal to (i) the number of days between the date the well was shut-in to the next anniversary date of this lease divided by 365 days, (ii) multiplied by Fifty Dollars ($50.00), and (iii) multiplied by the number of acres subject to this lease which would be held by production from said well in the absence of continuous operations on acreage within the Designated Block on which the well is located under Paragraph 4(a) above. Any such payment shall maintain and extend Lessee's rights hereunder as to the land within the Designated Block which would otherwise be held by production by said well if producing in the absence of continuous operations on other acreage within the Designated Block on which the well is located as provided in Paragraph 4(a) above. During the period Lessee is paying such shut-in gas rental, it shall be considered that gas is being produced from the land allocated thereto in paying quantities. No shut-in rental shall be due if this lease is otherwise being maintained in accordance with its terms as to the lands on which the shut-in well is located.

(f) A well shall be deemed completed when work thereon is finished and the well is capable of producing oil or gas in paying quantities. For the purposes of determining completion, a well shall be deemed capable of producing in paying quantities when testing shows the well capable of such production and all subsurface work necessary for production is completed, notwithstanding that surface facilities, such as gathering systems, pipelines, treatment facilities, storage facilities or other equipment and facilities necessary to produce, store, transport and market the production are not in place or completed. A well shall be deemed abandoned on the date Lessee removes a drilling or completion rig from the well site following cessation of good faith operations to drill or complete the well. Lessee shall notify Lessor in writing of the completion or abandonment of any well within ten (10) days of the completion or abandonment of same.

5. If prior to or after discovery of oil or gas on the land, a well producing hydrocarbons in paying quantities for forty-five (45) consecutive days is brought in on adjacent lands not owned by Lessor and draining the land then held hereunder and no portion of the land is included in a pooled unit for such well Lessee, in order to maintain the rights granted herein, within sixty (60) days after notice from Lessor shall (a) begin to prosecute with reasonable diligence, the drilling of a well on the land in an effort to discover hydrocarbons thereby and to protect the land from drainage, (b) commence proceedings before the regulatory body having jurisdiction for the unitization of the well on the adjacent lands with a portion or portions of the land and thereafter diligently pursue such proceedings until an appropriate unit for the well on the adjacent lands has been established (and if such unit, when established, fails to include any portion or portions of the land, Lessee shall have no further obligation to offset such well or otherwise protect the land from drainage by that well), or (c) subject to the provisions of Paragraph 7(a) below, release the affected acreage, but insofar and only insofar as this lease covers the formation producing in the well to be offset. For purposes of this paragraph, drainage shall be presumed whenever (i) any such vertical well is located on adjacent property within 330 feet from any boundary line of the land if an oil well, and within 660 feet from any boundary line of the land if a gas well, and (ii) any such horizontal well is located on adjacent property within 1,980 feet from any boundary line of the land. In the event Lessee elects (b) above and Lessee is the operator of the well which triggers such election, then the royalties payable to Lessor hereunder shall be due beginning with the date of first production. In all other cases, such royalties shall be due from and after the effective date of any unit established pursuant to (b) above.

6. The royalties to be paid by Lessee are:

(a) on oil and other liquid hydrocarbons ("royalty oil"), twenty-five percent (25%) of that produced and saved from the land or on land pooled therewith and not used for fuel in conducting operations on the property, the same to be delivered to Lessor free of expense, at Lessor's option, in tanks furnished by Lessor, at Lessor's expense, at the well or to Lessor's credit in any pipeline or other transportation facility to which the well is connected. In the event Lessor does not furnish tanks for such royalty oil, Lessee shall sell Lessor's royalty oil at the best market price obtainable, and pay Lessor twenty-five percent (25%) of the gross proceeds realized by Lessee from said sale free of all costs to the Lessor to the point of delivery to the purchaser, less any severance or production tax imposed thereon.

(b)(i) On gas, including casinghead gas, or other gaseous substances, and the liquid hydrocarbon content thereof produced from the land (or on acreage pooled therewith) and sold or processed for the extraction of gasoline, distillate, or other liquid hydrocarbons or by products and sold, and subject to the alternate option set forth below for Lessor to receive its share of such production in kind, twenty-five percent (25%) of the gross proceeds realized by Lessee from such sale free of all costs to the Lessor to the point of delivery to the purchaser; PROVIDED that, where Lessee or any subsidiary, sub-lessee, affiliate, parent, agent, assignee, or any other person acting under this lease, or any other person acting for and on behalf of Lessee, processes gas, casinghead gas, or other gaseous substances, produced from the land in an absorption plant, gasoline plant or other processing facility, in the field or otherwise, in lieu of the royalties on that

gas as provided above, Lessor's royalty thereon shall be: (1) twenty-five percent (25%) of the gross proceeds realized by Lessee from the sale free of all costs to the Lessor to the point of delivery to the purchaser of any liquid hydrocarbons recovered by Lessee by means of drip, separator, low temperature extraction unit, or similar apparatus, before the gas is run to such plant; (2) twenty-five percent (25%) of the gross proceeds realized by Lessee from the sale free of all costs to the Lessor to the point of delivery to the purchaser of any liquid hydrocarbons extracted at such plant, less an amount equal to sixty-five percent (65%) of the royalty share of the liquid hydrocarbons taken by the plant as a charge for extracting said liquid hydrocarbons ("the plant's take") which plant's take shall not exceed twenty percent (20%) of the liquid hydrocarbons recovered; and (3) twenty-five percent (25%) of the gross proceeds realized by Lessee from the sale of residue gas free of all costs to the Lessor to the point of delivery to the purchaser; PROVIDED that the total royalties payable to Lessor for the sale of residue gas and plant products shall never be less than the amount Lessor would receive if the gas were sold at the lease after conventional separation; and PROVIDED further that the total royalties payable to Lessor on gas, casinghead gas, or other gaseous substances, and the liquid content thereof, produced from the lands or lands pooled therewith and sold shall never be less than the fair market value of same delivered free of all costs to Lessor (except as provided in (2) above relating to the plant's take on liquids extracted in a processing plant) to the point of delivery to the purchaser; PROVIDED FURTHER that if Lessee sells same to a third party in a bona fide arms length transaction, the proceeds received by Lessee shall be considered the fair market value. In determining the quantity of the gas on which royalties are payable, gas produced from the land, before being commingled with other gas, shall be measured or gauged by a method recognized in the industry.

(ii) Notwithstanding the alternate provisions set forth above in subparagraph (b) or the payment of royalties due under this sub-paragraph (b), and notwithstanding any other provision in this lease to the contrary, Lessor expressly reserves the right and option at any time, and/or from time to time, upon ninety (90) days written notice to Lessee, to elect to take in kind its share of the production covered by Subparagraph (b), and Lessor may, pursuant to such election, take its share of the gas at the wellhead, or at Lessor's option, if Lessee (or any subsidiary sub-lessee, agent, assignee, or other person acting under this lease, or for or in behalf of Lessee) processes any part of the gas produced from the land in an absorption plant or other facility in the field or otherwise, in lieu of the royalties provided for hereinabove, Lessor may elect to take in kind its royalty share of (1) any liquid hydrocarbons recovered by Lessee by means of drip, separator, low temperature extraction unit, or similar apparatus before the gas is run to such absorption or similar type plant, (2) the liquid hydrocarbons recovered from and through any plant of the kind described hereinabove after deducting sixty-five percent (65%) of the royalty share of the plant take on said liquids (which plant's take shall not exceed twenty percent (20%) of the liquid hydrocarbons recovered), and (3) all residue gas; PROVIDED that, no deduction for costs or expenses shall be made for liquid hydrocarbons recovered by drip, separator, or other apparatus on the flow line of the well facility, or recovered through an absorption or similar facility. In determining the quantity of gas to be received by Lessor, should Lessor choose to exercise the option provided by Subparagraph (b), and receive in kind its gas, casinghead, gaseous substances, and the liquid hydrocarbon content thereof, the gas produced from the land shall be measured or gauged by a method recognized in the industry, before being processed or commingled with any other gas, if such commingling be necessary for the practical, reasonable and economic handling of the gas, but no such commingling shall occur, without prior written permission of Lessor, if the value, character, or content of Lessor's share of the gas being taken in kind would thereby be reduced in value or marketability. Should Lessor exercise the option to take its share of the production in kind as provided by Subparagraph (b), Lessee agrees to make available, at Lessor's cost, such connection facilities as may be necessary, reasonable and practical for Lessor to receive Lessor's share of such production into a pipeline or pipelines of Lessor or its designee.

(c) On gas, including casinghead gas, or other gaseous substances, and the liquid hydrocarbon content thereof, produced from the land (or on acreage pooled therewith) and which Lessee may use or cause to be used in operations involving other lands or for the extraction of

gasoline, distillate or other by products, twenty-five percent (25%) of the fair market value of said gas, casinghead gas, other gaseous substances or liquid hydrocarbons at the point of use by the Lessee.

(d) Twenty-five percent (25%) of the gross proceeds realized by Lessee from the sale of all other hydrocarbons produced and sold free of all costs to the Lessor to the point of delivery to the purchaser.

(e)(i) Lessee shall not, directly or indirectly, sell or deliver any gas produced hereunder to a parent, subsidiary or affiliate of Lessee without the prior written approval of Lessor.

(ii) The term "proceeds" used in Subparagraphs (a), (b) and (d) above shall include anything of value received by Lessee under any contract for the sale of production from the lands or lands pooled therewith. ~~Except as otherwise provided above, "fair market value" as used~~ hereinabove shall mean the average spot gas price obtained in arms length ~~contracts,~~ including all premiums, allowances, adjustments and other things of value, ~~being~~ paid on the effective date of the sale or use, for gas-well gas or casing~~head gas~~, other gaseous substances or the liquid hydrocarbon content thereof ~~which is~~ produced and sold from the general area where the land is located and ~~sold under~~ a comparable spot-gas sales contracts for gas of like quality and volume, ~~and sold in a comparable market to comparable delivery point.~~

(f) Lessor shall bear the severance taxes levied against its royalty share of all production hereunder, and payment of royalties shall be made after deduction of the severance taxes paid by Lessee thereon. Subject to the foregoing, and except as otherwise expressly provided in Paragraph 6 (b) (2) above relating to liquid hydrocarbons extracted at any absorption plant or other facility, all of the royalties hereinabove stipulated shall be computed, and paid or delivered without any deduction or charge on account of any cost or expense of operation, exploration, completion, development, production, saving, gathering, storage, treatment, cleaning, dehydration, extraction, separation, recovery, marketing, processing, compression, transportation, delivery, or any other deduction or charge whatsoever, whether of the same or different character, unless agreed to in writing by Lessor.

(g) It is a material consideration of this lease that the royalties payable to Lessor on the sale of any hydrocarbons produced from the land, or lands pooled therewith, shall be calculated based upon one hundred percent (100%) of the sale price, or one hundred percent (100%) of anything of value received by Lessee in connection with the sale of any such hydrocarbons, and that, except as expressly provided in Paragraph 6(b)(2) above relating to liquid hydrocarbons extracted at any absorption plant or other facility, the Lessor shall not bear any costs or expenses whatsoever, however characterized or incurred, including, but not limited to, expenses incurred by lessee in preparing the hydrocarbons for sale, making the hydrocarbons marketable, or transporting the hydrocarbons to the delivery point.

(h) Lessee may inject gas, water, brine or other fluids produced from well operations on the land into subsurface strata, but Lessee, without prior written consent of Lessor, may not use the land to dispose of salt water or other substances from wells not located on the land or on lands unitized therewith. No royalties shall be due on any gas produced by Lessee and injected into subsurface strata through a well or wells located on the land if such injection of gas benefits only Lessor's land and enhances the probability of improving and/or increasing the production of gas and/or oil therefrom.

(i) Subject to the provisions of Paragraph 7 below, in the event that Lessor owns less than the full mineral interest in any part of the land for reasons unrelated to the Dispute as provided in said Paragraph 7, then any rentals and royalties payable to Lessor hereunder shall be reduced to that proportion of such rentals and royalties which Lessor's mineral interest in the land bears to the whole mineral interest therein, provided, however, that any such proportionate reduction shall be prospective only and Lessee shall have no right to recover from Lessor any

rentals or royalties paid under the terms of the lease prior to any such determination of ownership.

7(a) The parties hereto recognize that Lessee and/or others in privity with Lessee hold oil and gas leases from the United States of America on all or parts of the land and that a dispute exists between Lessor and the United States of America as to the existence of a mineral servitude in favor of Lessor bearing upon 100% of the mineral rights in the land and/or the validity of Lessee's oil and gas leases from the United States (the "Federal Leases") as compared to this lease (the "Dispute"). "Federal Leases" as the term is used herein shall include the oil and gas leases described on Exhibit "C" attached hereto and any renewal or extension thereof, or any new lease obtained or acquired by Lessee, its successors, assigns, or any Affiliates thereof, or any party in privity with Lessee, in whole or in part, bearing upon all or any portion of the land within two (2) years of the termination, for any cause, of the leases described on Exhibit "C". Affiliate means a legal entity which, directly or indirectly, controls, or is controlled, directly or indirectly, by Lessee, its successors or assigns, or which is controlled by any entity which controls Lessee, its successors or assigns. Control means the ownership, directly or indirectly, of twenty percent (20%) or more of the shares or voting rights in any entity.

(b) As an inducement to Lessor to enter into this lease, without which said lease would not be granted, Lessee agrees to pay Lessor a minimum royalty of twelve and one-half percent of eight-eighths (12.5% of 8/8ths) on all oil, gas or other hydrocarbons produced and saved from or attributable to the land ("Minimum Royalty"). Lessee shall not have the right to reduce, suspend, fail to pay, or recover such Minimum Royalty for any reason whatsoever arising out of or connected with the Dispute. This Minimum Royalty shall be payable from first production and shall be unconditionally guaranteed by Lessee and paid to Lessor irrespective of the pendency of the Dispute, or the pendency of any litigation, or the actual outcome of any settlement or litigation relating to the Dispute. The Minimum Royalty shall be determined and paid and delivered to Lessor in the same manner and in accordance with the same terms and conditions as the base lease royalty stipulated in Paragraph 6 hereinabove, subject to the following terms and conditions. Under no circumstances can the Minimum Royalty be suspended, escrowed or paid into the registry of any court regardless of the existence of any potential, threatened or pending litigation with respect to the Dispute. Upon final judgment of a court in a proceeding involving the Dispute, or upon any agreement, compromise or settlement, whether before or after any litigation with respect to the Dispute has been commenced, (either of those ~~which~~ events to be hereinafter referred to as "a Dispute Resolution") in which it is determined or agreed that Lessor owns a mineral servitude affecting all or a portion of the mineral rights in the land, or in which the Lessor and the United States Government enter into a settlement whereby the actual ownership issue is not resolved but, instead, same agree to merely divide production from all or a portion of the land, or lands pooled therewith, (example: the parties agree to resolve the Dispute by allocating a certain percent of production to the Federal Lease and a certain percent of production to this Lease), or the Lessor and the United States Government agree to allocate production to this Lease and the Federal Lease in any other manner without finally resolving the Dispute, (hereinafter referred to as the "Allocated Production Interest") Lessor's total lease royalty shall be calculated as follows: twelve and one-half percent of eight-eighths (12.5% of 8/8ths) on all oil, gas or other hydrocarbons produced and saved from or attributable to the land <u>plus</u> Lessor's proportionate mineral servitude interest or Lessor's Allocated Production Interest (as determined by any such settlement or judgment) times twelve and one-half percent of eight-eighths (12.5% of 8/8ths) on all oil, gas or other hydrocarbons produced and saved from or attributable to the land. It is specifically understood and agreed by Lessee that even should it be determined in a Dispute Resolution that the Lessor owns no mineral rights in the land or portions thereof or in the event it should be determined in a Dispute Resolution that Lessor shall own only a mineral royalty interest, or some other non-executive mineral right, burdening the mineral rights of the United States of America in the land, payable under the Federal Leases and/or under any future leases executed by the United States of America bearing upon the land, the obligation of Lessee to pay the Minimum Royalty provided for herein, as to all acreage originally covered hereby, on which it may be agreed or determined that Lessor owns no mineral rights or on which it may be agreed that Lessor shall own only a mineral royalty interest, or some

other non-executive mineral right, shall nevertheless continue in full force and effect, as set forth hereinafter, subject, however, to the provisions of Subparagraph (e) below. In such event, the Minimum Royalty guaranteed by Lessee shall constitute both the personal obligation of Lessee and a real right in and to twelve and one-half percent of eight-eighths (12-1/2% of 8/8ths) of all of the oil, gas or other hydrocarbons produced, saved and marketed from or allocated to the land under the terms and conditions of the Federal Leases burdening the present or future interest of Lessee in and to the Federal Leases, which Minimum Royalty shall be calculated and paid in accordance with the terms and conditions of Paragraph 6 of this Lease (hereinafter the "Overriding Royalty Interest"). Lessee shall execute and record a suitable instrument of transfer or assignment of the Overriding Royalty Interest evidencing the right of Lessor in production from the Federal Leases within sixty (60) days of written notification of any such final judgment or settlement. The effective date of said Assignment shall be the effective date of the final judgment or agreement referred to immediately above. Such Assignment shall be free and clear of all burdens and encumbrances and shall incorporate by reference or by inclusion all of the terms and conditions of Paragraph 6 herein regarding calculation and payment of royalties. The obligation of Lessee to create in favor of Lessor the Overriding Royalty Interest in production from or attributable to the land under the Federal Leases in the event Lessor should ultimately be determined in a Dispute Resolution to own no mineral rights or only a mineral royalty interest, or some other non-executive mineral right, in the land is part of the initial consideration of this lease without which said Lease would not be granted. In the event that Lessor owns less than the full mineral interest in any part of the land for reasons unrelated to the Dispute, then the Minimum Royalty shall be reduced to that proportion of such Minimum Royalty which Lessor's mineral interest in the land bears to the whole mineral interest therein. Other than the obligation relating to the Minimum Royalty as hereinabove provided for, all Lease Obligations (as defined in Paragraph 11 hereof) shall terminate with respect to the land or portions thereof in which it is determined in a Dispute Resolution that Lessor has no executive mineral interest or Allocated Production Interest. Notwithstanding anything contained in the last preceding sentence, the obligations incorporated in the following paragraphs of the lease shall survive with respect to the land or portions thereof in which it is determined in a Dispute Resolution that Lessor owns no mineral rights or that Lessor owns only a mineral royalty interest in the land, to-wit: Paragraphs 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, 18, and 19(a).

(c) The royalties payable to Lessor under the terms of this lease and/or by virtue of the Dispute Resolution, when combined with the twelve and one-half percent (12-1/2%) royalty payable to the United States of America or its transferees under the terms of the Federal Leases and/or the Dispute Resolution, shall never exceed 25% of 8/8ths of all of the oil, gas or other hydrocarbons produced and saved from or attributable to the land. However, in the event Lessee should acquire a renewal or replacement lease(s) for the current Federal Leases which renewal or replacement lease(s) provide for a royalty in excess of twelve and one-half percent (12-1/2%), the maximum royalty payable under both this lease and said Federal Lease as to acreage affected by the renewal or replacement lease(s) shall not be in excess of the total of twelve and one-half percent (12-1/2%) plus the royalty under the renewal or replacement leases (Example: if new federal leases are obtained by Lessee with a royalty of 18.5%, the maximum royalty payable under both leases shall be 12.5% + 18.5%, or 31%). It is expressly agreed that no change in the net revenue of Lessee or royalty to the lessor under the Federal Leases, or renewals, extensions or replacement leases thereof, shall in any way diminish or reduce the Minimum Royalty and/or the Overriding Royalty Interest due Lessor herein as provided in Paragraph 7(b) above.

(d) Lessee shall be entitled to withhold or suspend proceeds of production attributable to the difference between the Minimum Royalty provided above and the base lease royalty provided in Paragraph 6 above (said difference being referred to below as the "Non-Guaranteed Royalty") during the pendency of the Dispute. In the event Lessee elects to withhold or suspend proceeds attributable to the Non-Guaranteed Royalty during the pendency of the Dispute, said proceeds shall be deposited in an interest bearing account in the Calcasieu Marine National Bank of Lake Charles, Sulphur Branch, Sulphur, Louisiana, or deposited in the registry of the court in the event of litigation between the United States of America and the Lessor, or a concursus proceeding involving the United States of America, Lessor and Lessee, involving the Dispute.

Lessee agrees to be bound by any final judgments or settlements entered into between the United States of America and the Lessor with respect to the Dispute and, except with respect to Lessee's right to file and participate in an concursus proceeding, Lessee hereby waives its right to participate either as a party to any settlement agreement or as a proper, necessary or indispensable party in any such litigation. Lessee agrees not to initiate, file or provoke any concursus or interpleader action until after the date the initial well is spud on the land or on acreage pooled or unitized therewith. In the event Lessee should elect to file a concursus proceeding or interpleader, same shall be filed only in the United States District Court for the Western District of Louisiana, Lake Charles Division. In the event litigation regarding the Dispute has already been commenced by either the United States or Lessors, Lessee shall make any such deposit of funds in the registry of the court where said proceedings are pending.

(e) In the event Lessee voluntarily releases or surrenders this lease as to all or any portion of the land or in the event this lease shall terminate due to the operation of any express resolutory condition provided for herein, then, in that event, within ten (10) days of any such release, surrender or termination, Lessee shall also release and surrender any interest then held, owned or controlled, directly or indirectly, by Lessee, its Affiliates or parties in privity with Lessee, in the Federal Leases as to the portion of the land covered thereby which is included within the area as to which this lease has been voluntarily released or surrendered or which has terminated due to the operation of any express resolutory condition of this lease. In such event, Lessee shall be relieved of all obligations with respect to this lease as to the Minimum Royalty on future production from said released area.

(f) Nothing herein contained, nor any action or non-action of Lessor hereunder, shall ever be deemed a waiver of any right, title, interest or claim which Lessor may have in or to any of the land, nor ever serve as an estoppel against the assertion by Lessor of full title thereto or possession thereof.

(g) Upon a settlement or final judgment of the Dispute, Lessee shall pay to Lessor an additional lease bonus of Fifty ($50.00) Dollars per acre, to be proportionately reduced, if applicable, in the same manner provided for the proportionate reduction of delay rentals in Paragraph 1(a) above, based upon the original acreage of this lease notwithstanding that at the time of payment some or all of the land may be held by production or some or all of the land is no longer covered by this lease.

(h) Upon a settlement or final judgment of the Dispute, Lessee also shall pay to Lessor additional lease rentals of Seventy-Five ($75.00) Dollars per acre, for each rental period as to which rentals were paid or will be paid, to be proportionately reduced, if applicable, in the same manner provided for the proportionate reduction of delay rentals in Paragraph 1(a) above, based upon the total acreage held or to be held by the payment or such rentals during the respective rental periods provided for in Paragraph 1 above.

8(a) Lessee shall be responsible for all damages and/or injuries caused by operations conducted under this lease. Lessee shall fully defend, protect, indemnify and hold harmless Lessor, its parents, subsidiaries, directors, officers, employees, successors, assigns and any other party owning an interest in the mineral rights leased herein or royalties therein, by, through or under Lessor or any party Lessor, from any and all causes of action or claims, including costs and reasonable attorneys' fees, arising directly or indirectly by way of any operations conducted under this lease, of whatever kind or nature, including but not limited to environmental damage. Lessee's responsibility for and obligation of indemnity and defense shall include, but not be limited to, causes of action and/or claims for attorney fees and for causes of action and/or claims which directly or indirectly are attributable to or arise out of the actual or alleged release or presence of hazardous materials and/or waste and/or contamination which occurs as a result of Lessee's sole or joint action or inaction on the land and/or on acreage pooled therewith.

(b) Lessee acknowledges that Lessor does not own the surface of the land and that most of the surface is owned by the United States of America. A substantial portion of the land

has been, in fact, continuously subject to bombing practice and artillery practice by the United States Army and Air Force. Unexploded bombs, grenades, and shells exist on the land. Chemical weapons may exist on the land. Portions of the land may lie within an artillery impact area, including an impact area for 155MM howitzer, heavy artillery and tank gunnery practice. A portion of the land may include a bazooka range, a rifle grenade range, and numerous other small arms impact areas including a TOW missile range. A portion of the land may be used for parachute jumps, maneuvers, bivouacs, live fire, and night training exercises. Access to the land for oil and gas purposes may be subject to restrictions by or regulations of agencies of the United States of America. Notwithstanding, and in addition to, any other indemnity provision of this lease, Lessee hereby agrees to indemnify and hold harmless and defend Lessor, its parents, subsidiaries, shareholders, officers, directors, successors, assigns, agents, attorneys, employees, any party owning an interest in the mineral rights leased herein or royalties therein by, through or under Lessor or any party Lessor, and anyone for whom Lessor may be held legally responsible, obligated or liable, from and against all suits, claims, demands and causes of action that may be at any time brought or made by any person, partnership, venture, firm, corporation or other entity, organization or public body or agency, including the United States Department of Defense, Department of Agriculture, Department of Interior and Department of Justice and also including but not limited to employees of Lessor and Lessee, arising out of or in any way connected with activities, operations, equipment or facilities on or off the land under this lease provided further that the above indemnity is to include all reasonable legal expenses and reasonable attorney's fees for counsel chosen by Lessor should Lessor be called upon to respond to any suit, claim, demand or cause of action.

(c) Lessee's obligations under this paragraph shall extend to any and all claims relating to operations under this lease, regardless of whether based on absolute liability, strict liability, negligence or other fault, defect, warranty or otherwise. It is further agreed that if any suit, claim, demand or cause of action is brought or arises, which is or might be covered by this indemnification provision, the party hereto that first receives notice thereof will undertake to notify the other party hereto. However, failure to give such notice shall not operate to relieve any other obligations under this lease. Lessor will not take any dispositive action affecting any such suit, claim, demand, or cause of action without Lessee's prior knowledge, participation and consent.

9(a) The provisions of this lease shall be binding upon and inure to the benefit of the successors and assigns of Lessor and Lessee; but, notwithstanding any actual or constructive notice by Lessee, no change in the ownership of the land or any interest therein, or in the capacity or status of Lessor, whether resulting from sale, inheritance, interdiction, emancipation, attainment of majority, or otherwise, shall impose any additional burden on Lessee, nor shall any change in ownership or in status or capacity of Lessor impair the effectiveness of payments made to Lessor herein unless the then record owner of this lease shall have been furnished, at least thirty (30) days before payment is due, with a certified copy of a recorded instrument or judgment evidencing such transfer, inheritance or sale or evidence of such change in status or capacity of Lessor. The furnishing of such evidence shall not affect the validity of payments made in advance. Any record owner of a divided or undivided interest in the lease may pay the entire rental payable hereunder and such payment shall be for the benefit of those holding leasehold rights hereunder. If at any time, two or more persons are entitled to participate in the rental payable hereunder, Lessee may pay or tender the rental jointly to such persons or to their joint credit in the depository named herein; or, at Lessee's election, the proportionate part of the rental to which each participant is entitled may be paid or tendered to such person separately or to such person's separate credit in the depository, and payment or tender to any participant of his portion of the rentals hereunder shall maintain this lease as to such participant.

(b) Notwithstanding any provision to the contrary herein, Lessee may not sublease or assign this lease in whole or in part without Lessor's prior written consent. which consent Lessor may withhold with reasonable cause. Lessee shall require any future assignee, or sublessee to expressly assume all obligations hereunder, including, without limitation, the obligations relating to the Minimum Royalty provided under Paragraph 7 hereinabove. Lessor acknowledges that Lessee is acquiring this lease for itself and on behalf of Union Pacific Resources Company and/or Helmerich & Payne, Inc., and that Lessee intends to assign portions of this lease to either or both of such parties, and Lessor hereby consents to such assignment(s), provided that Union Pacific

Resource Company and Helmerich & Payne, Inc. expressly assume all of the obligations of the lease including, but without limitation, the obligations relating to the Minimum Royalty provided in Paragraph 7, hereinabove. No sublease or assignment shall operate to release the original Lessee or any subsequent lessee or sublessee from any obligations undertaken in this lease, but in any event of sublease or assignment, the sublessee or assignee shall become directly responsible to Lessor for all obligations of the Lessee undertaken in this lease.

10. This lease is made without any warranty of title whatsoever even as to the return of the consideration received for the lease or any rentals or other payments received hereunder, but Lessee is subrogated to all of Lessor's rights and actions in warranty against all former owners and vendors except as to William T. Burton personally, Wm. T. Burton Industries, Inc., Jack Lawton, Inc., and William B. Lawton Company, Inc. Lessee may, at its option, discharge any tax, mortgage or other lien upon the land and be subrogated thereto and have the right to apply to the repayment of Lessee any rental and/or royalties accruing hereunder.

11(a) The requirements of this lease shall be subject to any State and/or Federal law or order regulating operations on the land. Should Lessee be prevented from complying with any of its obligations, express or implied, under the terms of this lease, including, without limitation, the conducting of drilling or reworking operations thereon or the production of hydrocarbons from the land ("the Lease Obligations"), by reason of scarcity or inability (after effort made in good faith) to obtain equipment or material or authority to use same, or by failure of carriers to transport or furnish facilities for transportation, or by operation of force majeure, any federal or state law, or any order, rule or regulation of governmental authority, or other causes beyond Lessee's control, then while so prevented, Lessee's obligation to comply with the Lease Obligations shall be suspended and Lessee shall not be liable for damages for failure to comply therewith; and this lease shall be extended while and so long as Lessee is prevented by any such cause from complying with the Lease Obligations, and the time while Lessee is so prevented shall not be counted against Lessee, provided, however, that no such extension shall exceed a period of twenty-four (24) months.

(b) Lessor and Lessee acknowledge that all or a portion of the land is or may in the future be included in a "limited use area" and/or "intensive use area" whereby the United States Department of Army may enter upon the property to conduct tactical exercises simulating conditions of war. Oil and gas drilling and production activities may be severely limited or prohibited on portions of the property. In the event that Lessee is prevented from complying with any of the Lease Obligations by reason of any such limitation of use or denial of access to a portion or all of the property, such limitation or denial shall constitute a force majeure hereunder; provided, however, that no such event of force majeure shall relieve Lessee of its delay rental obligation under the provisions of Paragraph 1(a) hereof.

12. (a) Lessee, at its option, is hereby given the right and power without any further approval from Lessor to pool, communitize or combine the acreage, royalty or mineral interest covered by this lease, or any portion thereof, with other land, lease or leases, royalty and/or mineral interests, when, in Lessee's reasonable judgment, it is necessary or advisable to properly develop and operate the land, to promote the conservation of hydrocarbons underlying the land or to comply with any spacing or unitization order of any regulatory body in the State of Louisiana or the United States having jurisdiction. The term "regulatory body" as used in this Paragraph 12 shall include any governmental tribunal or group (civil or military) issuing orders governing the drilling of wells or the production of hydrocarbons, irrespective of whether such orders are designed to promote conservation or to conserve materials or equipment for national defense or similar purposes. Such pooling and/or any units formed for drilling and/or production purposes shall be of tracts which will shall form one contiguous tract of land for each unit, and the unit or units so created shall not exceed (a) in the case of a vertical well, substantially forty (40) acres surrounding each oil well and substantially one hundred sixty (160) acres surrounding each gas-distillate well, and (b) in the case of a horizontal well, up to a maximum of nine hundred and sixty (960) acres for a single lateral horizontal well, and up to a maximum of one thousand nine hundred twenty (1,920) acres for a dual opposing lateral horizontal well as provided hereinbelow, unless a larger spacing pattern or larger drilling or producing units (including a field or reservoir-wide unit) have been fixed and established by an order of a regulatory body of the State of Louisiana or of the United States, in which event the unit or units

may be of the size fixed by said order. Lessee shall execute and record in the conveyance records of the parish in which the land is situated an instrument identifying and describing any acreage pooled into units under the provisions above set forth, and upon such recordation, the unit or units shall thereby become effective. In lieu of the royalties payable elsewhere herein specified, and subject to the provisions of Paragraph 10 hereof, Lessor shall receive on account of production from any unit so pooled such portion of the royalties stipulated herein as the amount of Lessor's acreage placed in the unit bears to the total acreage so pooled in the particular unit involved. Drilling or reworking operations on or production of hydrocarbons from any lands included in such pooled unit shall have the effect of continuing this lease in force and effect during or after the primary term as to the land included in such unit, whether or not such operations be on or such production be from land covered hereby. Any unit formed by Lessee hereunder may be created either prior to the drilling or after the completion of the unit well; and separate units may be created for oil and for gas even though the areas thereof overlap. Lessee may reduce or increase the size of any declared unit created by Lessee under the terms of this paragraph so as to eliminate from such unit any acreage or lease upon which there is or may be an adverse claim; and Lessee may also re-form any declared unit created by Lessee under the terms of this paragraph to conform with an order of a regulatory body issued after such unit was originally established. Such revision of the unit shall be evidenced by an instrument in writing executed by Lessee, which shall identify and describe the land included in the unit as revised and shall be recorded in conveyance records of the parish where the land is situated.

(b) Should any portion of the land be pooled or unitized with other lands, either by virtue of the provisions of this Paragraph 12 or by order of any regulatory body of the State of Louisiana or the United States, operations on or production from such unit shall maintain this lease in force and effect only as to that portion of the land leased herein lying within the exterior geographical boundaries of said unit, subject to the additional stratigraphic limitations contained in Paragraph 4 hereinabove.

13. Subject to the provisions of Paragraph 17 below, upon abandonment of a well drilled on the property, Lessee shall properly cap and cement the bore hole in accordance with the then current regulations issued by the Louisiana Department of Conservation. Lessee shall as soon as reasonably possible remove all rigs, equipment and supplies not currently required for its operations on the land.

14(a) Lessee shall, at its sole risk, cost and expense, have surveys made of any well with a logging device customarily used and accepted in the oil industry on scales of 1" = 100' and 1 "= 20' using all standard curves acceptable by the industry to be made from surface casing to total depth of the well or to such depth to which it is possible to run a log by diligent effort to reach total depth. Lessee shall notify Lessor by facsimile, at its fax number specified in Paragraph 18 below, of Lessee's intention to run any surveys, logs or associated tests at least eight (8) hours prior to the running thereof in order to permit time for a representative of Lessor to arrive and witness same; provided, however, that Lessor acknowledges that, if Lessee utilizes a log while drilling tool during the drilling of the pilot hole and the downhole horizontal lateral(s), the logging of both the pilot hole and the downhole horizontal lateral(s) for each horizontal well constitutes one continuous logging operation for which a single notice in accordance with the above provisions shall suffice.

(b) Two satisfactory copies of each and all surveys or logs shall be delivered promptly to Lessor at its address. Lessee shall also, upon the written request of Lessor, furnish samples of cuttings and cores, if same are taken, in containers to be furnished by Lessee with information marked thereon as to the depth from which same are taken. Any such samples requested shall be thoroughly dried, sacked, marked and shipped or delivered to Lessor at its above mentioned address or to such other address as may be furnished by Lessor within ten (10) days of Lessee's receipt thereof.

(c) Lessee further agrees to furnish daily Central Pines Land Company and Tower Minerals Company, Inc. with all daily drilling reports and production reports along with copies of all logs, surveys, run tickets for test production and similar information obtained by Lessee in drilling any well under the terms of this lease. The failure of Lessee to comply with the provisions of this Paragraph 14 shall not be cause or justification for the cancellation of this lease

unless and until such failure has continued for thirty (30) days after Lessee shall have been notified in writing that such failure exists.

(d) Lessor shall at Lessor's own risk be entitled at all reasonable times to inspect Lessee's operations under this lease and shall have access to the derrick floor, with the right to witness all gauging of the tanks. All well information and/or other data furnished pursuant to this Paragraph 14 shall be held confidential by Lessor for as long as this lease continues to cover the portion of the land on which the well, for which the well information and/or other data was gathered, was drilled. Notwithstanding anything herein contained to the contrary, Lessor may furnish and/or disclose well information and or other data to Lessor's legal representatives, advisors, and consultants, and in any regulatory body proceeding or court proceeding, for purposes of maintaining, protecting, evaluating and/or enforcing Lessor's rights hereunder and/or the purposes of this lease.

15. The consideration paid by Lessee to Lessor under the terms hereof is accepted as full and adequate consideration for all rights, options and privileges herein granted.

16. Should Lessee receive "take or pay," "price differential," "buydown" payments and/or other economic benefits for gas produced under this lease, Lessor must be paid royalty hereunder just as if the amounts were for gas that had been sold or delivered.

17(a) Lessee shall not at any time plug and abandon any well on the land without first giving Lessor written notice of such desire and intention, immediately if a drilling rig is then on location, otherwise at least sixty (60) days before a well is to be plugged. Lessor shall have thirty (30) days (forty-eight [48] hours if a drilling rig is then on location) after receipt of such notice within which to notify Lessee whether or not Lessor elects to take over said well for additional testing by any method, with Lessor being responsible for all costs and expenses in connection with such testing, including standby rig time. After completing its testing of such well, Lessor may elect either to return the well to Lessee or to keep the well. If Lessor shall elect to keep any well which it has taken over for purposes of testing, Lessor shall pay Lessee the salvage value of all materials in such well so taken over and kept by Lessor less the cost of salvage. If Lessor shall fail to notify Lessee of such election within said thirty (30) day (or forty-eight [48] hour) period, it shall be deemed that Lessor does not elect to take over said well.

(b) If Lessor shall elect not to take over any particular well or wells or, after taking over a well or wells for testing, should elect to return such well or wells to Lessee, then Lessee shall plug and abandon any and all wells which Lessor does not elect to take over or keep, and shall, within a reasonable time thereafter, remove all leasehold material and debris placed on said premises by Lessee and restore the property to as near its original condition as is possible and practicable, all at the risk and expense of Lessee. If Lessor elects to take over and keep a well and is successful in establishing or re-establishing production in commercial quantities from such well, Lessee shall deliver unto Lessor a reassignment of this lease insofar as same covers the drilling unit or, if designated, the acreage held by production upon which the well taken over by Lessor is located and also insofar as same covers the formation from which Lessor has established production. If Lessor elects to take over and keep a well and is unsuccessful in establishing commercial production, then Lessor shall plug and abandon the well and restore the surface, at Lessor's risk and expense, and Lessee's rights hereunder shall remain in full force and effect.

18. Any notice by either party to the other shall be in writing and shall be deemed to be duly given only if delivered personally or mailed by registered or certified mail, return receipt requested or by overnight mail (e.g. Federal Express, Airborne Express, etc.) to the attention of the party designated below, and received or rejected by the other party.

If To Lessee:

Sonat Exploration Company
6101 S. Broadway, Suite 200
Tyler, TX 75703
ATTN: Mr. David Hamilton
Fax: (903) 534-7499

If To Lessor:

Tower Minerals Company, Inc.
Suite 1700
CM Tower
One Lakeshore Drive
Lake Charles, Louisiana 70602

ATTN: Mr. William B. Lawton

Fax: (318) 433-0635

and

Central Pines Land Company
101 North Huntington
Sulphur, Louisiana 70663-2601

ATTN: Mr. Thad Minaldi

Fax (318) 527-5276

19. Other special provisions of this lease are:

(a) Should Lessee, its successors or assigns obtain at any time a title opinion and/or an environmental audit, assessment, study or any type of investigation, or cause such items to be performed on the land or any portion thereof or on acreage pooled with the land, Lessee shall deliver immediately to Lessor a copy thereof and provide to Lessor full disclosure of the research conducted for and/or on the land. Lessor shall not be bound by any obligation of confidentiality upon receipt of such items and/or information.

(b)(i) As additional consideration for this lease, Lessee, simultaneously with the execution of this lease, has assigned a 2.5% of 8/8ths overriding royalty on lease(s) covering 27,000 acres, more or less, owned by Lessee in T1N-R7W, T1N-R8W, T1S-R7W and T1S-R8W, Vernon Parish, in and to the Leases described on Exhibit "B".

(ii) It is further stipulated and agreed that the overriding royalties herein granted shall likewise affect and relate to any extension or renewal of the leases subject to this agreement and to any new mineral lease or any other contract whatsoever acquired by Lessee or any Affiliate of Lessee as defined in Paragraph 7, above, or for the account of Lessee, or by any other party in privity with Lessee, within two (2) years from the date of the termination of the mineral leases described herein for any cause. It is expressly understood and agreed that each and every party which acquires an interest in this Lease shall be required to assume all of the obligations of Lessee relating to creation of the above overriding royalty interest.

(c) Lessor and Lessee agree that this lease shall not be filed of record but that a mutually acceptable memorandum of lease shall be filed in lieu thereof.

(d) The parties hereto acknowledge that this lease was prepared jointly by both parties with the assistance of their respective counsels and therefore agree that said lease shall not be construed against either party on the basis of who prepared same.

IN WITNESS WHEREOF, this lease is executed effective as of the date first above written.

ATTEST:

By: [signature]
~~Asst. Secretary~~ E.V.P.

WITNESSES:

[signature]

James Val Miller

Central Pines Land Company

By: [signature]
Jack E. Lawton, Jr., President
Tax I.D. # 72-1300909

ATTEST:

By: Betty Cryar
~~William T. Drost~~, Secretary
BETTY CRYAR Ass't. Secy

WITNESSES:

Danielle Hamilton

James Val Miller

Tower Minerals Company, Inc.

By: ______________________
William B. Lawton, President
Tax I.D. # 72-1303706

ATTEST:

______________________
Assistant Secretary

WITNESSES:

Danielle Hamilton

______________________

Sonat Exploration Company

By: ______________________
Patrick J. Clifford
Senior Vice President

STATE OF LOUISIANA

PARISH OF CALCASIEU

On this 11th day of July, 1996, before me, the undersigned authority, appeared Jackie Hawton, Jr., to me personally known, who, being sworn, did say that he is the Pres. of Central Pines Land Company and that the foregoing instrument was signed on behalf of said corporation by authority of its Board of Directors and said Appearer acknowledged said instrument to be the free act and deed of the corporation.

______________________

Notary Public in and for
Calcasieu Parish, Louisiana

STATE OF LOUISIANA

PARISH OF CALCASIEU

On this 19th day of July, 1996, before me, the undersigned authority, appeared William A. Hawton, to me personally known, who, being sworn, did say that he is the Pres. of Tower Minerals Company, Inc., and that the foregoing instrument was signed on behalf of said corporation by authority of its Board of Directors and said Appearer acknowledged said instrument to be the free act and deed of the corporation.

______________________

Notary Public in and for
Calcasieu Parish, Louisiana

STATE OF TEXAS

COUNTY OF SMITH

On this 18th day of July, 1996, before me, the undersigned authority, appeared Patrick J. Clifford, to me personally known, who, being sworn, did say that he is the Senior Vice President of Sonat Exploration Company and that the foregoing instrument was signed on behalf of said corporation by authority of its Board of Directors and said Appearer acknowledged said instrument to be the free act and deed of the corporation.

R. D. Sharpling

Notary Public in and for
the State of Texas

R. D. SHARPLING
NOTARY PUBLIC
State of Texas
Comm. Exp. 12-02-96