LEASE NUMBER___________
LESSEE NUMBER__________

# OIL, GAS & HYDROCARBON LEASE

THIS AGREEMENT, entered into effective as of the 15th day of September, 1996, by and between Central Pines Land Company, whose mailing address is 101 North Huntington Street, Sulphur, Louisiana 70663-2601, and Tower Minerals Company, Inc., whose mailing address is Suite 1700, One Lakeshore Drive, Lake Charles, Louisiana 70602, ("Lessor") and Chesapeake Operating, Inc., 6104 N. Western Avenue, Oklahoma City, OK 73118, ("Lessee").

W I T N E S S E T H :

Lessor, in consideration of the sum of One Hundred and 000/100--------------- DOLLARS ($100.00) and other valuable consideration, hereby leases and lets unto Lessee the exclusive right to enter upon and use the land hereinafter described ("the land") for the exploration for, and production of hydrocarbons (defined for purposes of this lease as oil, gas and all other non-solid hydrocarbons), together with the use of the surface of the land for all purposes incident to the exploration for the production, ownership, possession, and transportation of such hydrocarbons from the land, and the right to dispose of salt water as hereinafter provided for; hereunder; all subject to stipulations hereinafter set forth; the land to which this lease applies and which is affected hereby being situated in Vernon Parish, Louisiana, and described in Exhibit "A" attached.

For the purpose of calculating the payments hereinafter provided for, the land is estimated to comprise 4,822.10 acres, whether it actually comprises more or less.

This lease shall be for a term of three (3) years and no months from the date hereon ("the primary term") and so long thereafter as oil, gas or some other non-solid hydrocarbon is being produced in paying quantities or drilling operations are conducted on the land, all as hereinafter provided for; all subject to the following conditions and agreements.

1. This lease shall terminate on the 15th day of September, 1997, unless on or before that date Lessee either (l) commences the actual drilling ("spudding-in") of a well on the land in search of hydrocarbons and thereafter continues such operations through the drilling of a well to completion or abandonment; or (2) pays to Lessor a rental of $1,687,735.00 for all or that part of the land which Lessee elects to continue to hold hereunder, which payment shall maintain Lessee's rights hereunder in effect as to such land without drilling operations for one (1) year from the date last above mentioned; and Lessee may continue to maintain the rights granted without drilling operations for one additional twelve (12) months' period (during the primary term) by paying Lessor, on or before the beginning of the third twelve (12) months' period, the sum of $1,687,735.00 for all or that part of the land held hereunder. Payments to Lessor may be mailed or delivered for deposit to its credit in Hibernia National Bank, Sulphur Branch, Sulphur, Louisiana ("the Bank"). The Bank or its successor shall continue to be the depository for such rentals as the representative of Lessor, and the cessation of its operations or any disruption of its business activities shall not terminate or affect Lessee's right to so deposit all payments. The receipt by the Bank or by Lessor of the check or draft of Lessee on or before the rental paying date shall be considered as payment of rental and operate to maintain Lessee's rights in force and effect. Should the Bank fail or refuse to accept Lessee's check or draft, the attempted payment in the manner provided shall not be thereby rendered ineffective, and Lessee shall not be in default for failure to pay the rental until thirty (30) days after Lessor shall have furnished Lessee with a recordable instrument naming a new depository.

2. Lessee may, at any time prior to or after the discovery and production of hydrocarbons on the land, execute and deliver to Lessor, or file in the conveyance records of the Parish in which the land is situated, a release or releases of any portion or portions of the land or any stratum or strata

thereof and be relieved of all obligations subsequently arising hereunder as to the land, stratum or strata so released.

In the event of the termination of this lease for nonpayment of rentals, or in the event of expiration of this lease pursuant to its terms, Lessee shall have the right to retain around each well then producing hydrocarbons in paying quantities, or being drilled or worked on, the number of acres fixed and located by the spacing or unit order of any Regulatory Body of the State of Louisiana or of the United States under which such well is being drilled or produced; and if no spacing order has been issued, then Lessee shall have the right to retain forty (40) acres of the land surrounding each well then producing oil in paying quantities, and 160 acres of the land surrounding each well then producing gas in paying quantities, or such lesser amount of Lessor's land in each instance as may then be affected by this lease, the acreage retained around each well to be in as near a square form as is practical.

3. After the beginning of drilling operations on the land and prior to the discovery and production of hydrocarbons in paying quantities, Lessee may maintain the rights granted during and after the primary term by continuing such operations with due diligence without the lapse of more than one hundred fifty (150) days between abandonment of work on one well and beginning the actual drilling of another; and during the primary term such operations may be discontinued and the rights granted maintained by commencing rental payments, by paying within one hundred fifty (150) days from the cessation of operations (regardless of the fixed rental paying date) the proportion of the fixed yearly rental that the number of days between one hundred fifty (150) days after the date of cessation of operations and the next ensuing anniversary date bears to the twelve (12) months' period; but, if said one hundred fifty (150) days shall expire during any year for which rental or other payment has been made, no rental shall be due until the next fixed rental paying date. The rental shall be proportionately reduced by the number of acres of lands leased herein then contained in a producing unit. In order to avoid paying rentals on released lands, Lessee shall release a minimum of 960 acres of contiguous lands, or if there is insufficient contiguous acreage in the released lands to equal 960 acres, Lessee shall release the entirety of all acreage in a given section and a half section contiguous thereto. In no event shall the rental be calculated on less than all acreage owned by Lessor and leased hereunder in the township in which Lessee desires to maintain lands under this lease through the payment of rentals.

4. If prior to or after discovery of oil or gas on the land leased hereunder, a well producing hydrocarbons in paying quantities for thirty (30) consecutive days is brought in on adjacent lands not owned by Lessor and draining the land then held hereunder, Lessee, in order to maintain the rights granted, shall, within ninety (90) days, after notice from Lessor, begin to prosecute with reasonable diligence, the drilling of a well in an effort to discover hydrocarbons thereby and to protect the land from drainage, or release the affected acreage. For purposes of this paragraph, drainage shall be presumed whenever any such well is located on adjacent property within 990 feet from any boundary line of the land if an oil well, and within 1980 feet from any boundary line of the land if a gas well.

5. After the discovery and production of hydrocarbons in paying quantities on the land, the rights granted shall be maintained in effect during and after the primary term without the payment of the rentals so long as hydrocarbons are being produced in paying quantities and/or drilling operations are being conducted as set forth below.

Lessee shall drill for the common advantage of Lessor and Lessee the number of wells necessary for the full development of the land. Should more than one hundred fifty (150) days elapse between the completion or abandonment of a well and the spudding in of another well, then Lessee's rights to all undeveloped portions of the land shall terminate, Thereafter, the developed portion to be retained (sometimes hereinafter called "tract held by production") shall be that portion of the land surrounding each producing well as defined by the spacing or unit order issued by the Louisiana Department of Conservation (or such successor, agency or regulatory body), or in the absence of such order, forty (40) acres surrounding each producing oil well or 160 acres surrounding each gas well. A well producing both oil and gas shall be characterized as an oil or gas well for purposes of

this paragraph in accordance with the regulations of the Louisiana Department of Conservation. Retained tracts, in the absence of a unit or spacing order, shall as nearly as possible be centered on the producing well will maintain Lessee's rights in its respective tract only from the surface to 100' below the strata or stratum then producing in the particular well.

Upon termination as set forth above, Lessee shall execute, and file in the conveyance records of the parish in which the land is situated, a release of each tract so held by production as to depths more than 100' below the strata or stratum then producing in the well on the tract and a release of the balance of the acreage as to all depths. A copy of the release certified by the Clerk of Court shall be furnished to Lessor.

Should production from a well cease from any cause, and Lessee is not then engaged in drilling or reworking operations on the tract held by that well, this lease shall terminate as to that tract unless Lessee restores such production, or commences additional drilling or reworking operations on that tract, within ninety (90) days thereafter and continues such operations without the lapse of more than ninety (90) days between the end of one such effort and the commencement of an additional effort, in an attempt to restore production of hydrocarbons from that tract.

Lessee shall at all times conduct such operations for the exploration and development of this lease as a prudent operator would, in an earnest effort to procure the full development thereof.

6. Subject to the provisions of Paragraph 9 hereof, the royalties to be paid by Lessee are:

(a) On oil and other liquid hydrocarbons ("royalty oil"), 27.5% of that produced and saved from the land and not used for fuel in conducting operations on the land, the same to be delivered to Lessor free of expense at Lessor's option in tanks furnished by Lessor at the well or to Lessor's credit in any pipeline or other transportation facility to which the well is connected. In the event Lessor does not furnish tanks for such royalty oil, Lessee shall sell Lessor's royalty oil at the best market price obtainable, and pay Lessor the price received f.o.b. the land, less any severance or production tax imposed thereon;

(b) On gas, including casinghead gas, or other gaseous substances, and the liquid hydrocarbon content thereof produced from the land (or on acreage pooled therewith) and sold or used by Lessee in operations involving other lands, or for the extraction of gasoline or other by-products, and subject to the alternate option set forth below for Lessor to receive its share of such production in kind, the royalties payable to Lessor under this sub-paragraph (b) shall be the market value at the wells of 27.5% of the gas so sold or used; PROVIDED that, on gas sold at the wells, the royalty shall be 27.5% of the amount realized from such sale; PROVIDED that, while Lessee or any subsidiary sub-lessee, agent, assignee, or any other person acting under this lease or for and in behalf of Lessee processes gas produced from the land in an absorption plant or other facility in the field or otherwise, in lieu of the royalties on that gas as provided above, Lessor's royalty thereon shall be (1) 27.5% of the value at the wells of any liquid hydrocarbons recovered by Lessee by means of drip, separator, low temperature extraction unit, or similar apparatus, before the gas is run to such plant of the liquid hydrocarbons recovered, and (2) 27.5% of the market value at the plant of residue gas sold or used in operations involving lands other than those leased hereby; PROVIDED that, the total royalties payable to Lessor for the sale of residue gas and plant products shall never be less than the amount Lessor would receive if the gas were sold at the lease after conventional separation; and FURTHER PROVIDED that, no deduction for costs or expense shall be made for liquid hydrocarbons recovered by drip, separator, or other apparatus on the flow line of the well. In determining the quantity of the gas on which royalties are payable, gas produced from the land, before being commingled with other gas, shall be measured or gauged by a method recognized in the industry.

Notwithstanding the alternate provisions set forth above in this sub-paragraph (b) or payment of royalties due under this sub-paragraph (b) as 27.5% of the market value thereof, and notwithstanding any other provision in this lease to the contrary, Lessor expressly reserves the right and option at any time, and/or from time to time, upon ninety (90) days written notice to Lessee, to elect to take in kind its share of the production covered by this sub-paragraph (b), being 27.5% of all gas, including casinghead gas, or other gaseous substances and the liquid hydrocarbon content thereof produced from the land (or any acreage pooled therewith), and not used by Lessee in operations affecting solely the land, and Lessor may, pursuant to this latter election, take its share of the gas at the wellhead, or at Lessor's option, if Lessee (or any subsidiary sub-lessee, agent, assignee, or other person acting under this lease, or for or in behalf of Lessee) processes any part of the gas produced from the land in an absorption plant or other facility in the field or otherwise, in lieu of the 27.5% share in kind of that part of such production, Lessor may elect to take in kind 27.5% of (1) any liquid hydrocarbons recovered by Lessee by means of drip, separator, low temperature extraction unit, or similar apparatus before the gas is run to such absorption or similar type plant, (2) the liquid hydrocarbons recovered from and through such plant, and (3) all residue gas; PROVIDED that, no deduction for costs or expenses shall be made for liquid hydrocarbons recovered by drip, separator, or other apparatus on the flow line of the well facility, or recovered through an absorption or similar facility. In determining the quantity of gas to be received by Lessor, should Lessor choose to exercise the option provided by this sub-paragraph (b), and receive in kind its gas, casinghead, gaseous substances, and the liquid hydrocarbon content thereof, the gas produced from the land shall be measured or gauged by a method recognized in the industry, before being processed or commingled with any other gas, if such commingling be necessary for the practical, reasonable, and economic handling of the gas, but no such commingling shall occur, without prior written permission of Lessor, if the value, character, or content of Lessor's share of the gas being taken in kind would thereby be reduced in value or marketability. Should Lessor exercise the option to take its share of the production in kind as provided by this sub-paragraph (b), Lessee agrees to make available, at Lessee's cost, such connection facilities as may be necessary, reasonable, and practical for Lessor to receive its share of such production into a pipeline or pipelines of Lessor or its designee.

(c) 27.5% of the value of all other hydrocarbons produced and marketed.

Lessee may inject gas, water, brine or other fluids into subsurface strata, but may not, without written consent of Lessor, use the land to dispose of salt water or other substances from wells not located on the land (or on lands unitized therewith). No royalties shall be due on any gas produced by Lessee and injected into subsurface strata through a well or wells located on the land if such injection of gas benefits only Lessor's land and enhances the probability of improving and/or increasing the production of gas and/or oil therefrom.

7. THIS PARAGRAPH DELETED.

8. The provisions of this lease shall be binding upon and inure to the benefit of the successors and assigns of Lessor and Lessee; but, notwithstanding any actual or constructive notice by Lessee, no change in the ownership of the land or any interest therein, or in the capacity or status of Lessor, whether resulting from sale, inheritance, interdiction, emancipation, attainment of majority, or otherwise, shall impose any additional burden on Lessee, nor shall any change in ownership or in status or capacity of Lessor impair the effectiveness of payments made to Lessor herein unless the then record owner of this lease shall have been furnished, thirty (30) days before payment is due, with certified copy of recorded instrument or judgment evidencing such transfer, inheritance or sale or evidence of such change in status or capacity of Lessor. The furnishing of such evidence shall not affect the validity of payments made in advance. Any record owner of a divided or undivided interest in this lease may pay the entire rental payable hereunder and such payment shall

be for the benefit of those holding leasehold rights hereunder. If at any time, two or more persons are entitled to participate in the rental payable hereunder, Lessee may pay or tender the rental jointly to such persons or to their joint credit in the depository named herein; or, at Lessee's election, the proportionate part of the rental to which each participant is entitled may be paid or tendered to such person separately or to such person's separate credit in the depository, and payment or tender to any participant of his portion of the rentals hereunder shall maintain this lease as to such participant.

Notwithstanding any provision to the contrary herein, Lessee may not sublease or assign this lease in whole or in part without Lessor's prior written consent, which consent, Lessor may withhold with or without reasonable cause. No sublease or assignment shall operate to release the original Lessee from any obligations undertaken in this lease, but in any event of sublease or assignment, the sublessee or assignee shall become directly responsible to Lessor for all obligations of the Lessee undertaken in this lease.

9. This lease is made without any warranty of title whatsoever, even as to the return of the consideration received for the lease or any rentals or other payments received hereunder, but Lessee is subrogated to all of Lessor's rights and actions in warranty against all former owners and vendors except as to Wm. T. Burton personally. Lessee may, at its option, discharge any tax, mortgage or other lien upon the land and be subrogated thereto and have the right to apply to the repayment of Lessee any rentals and/or royalties accruing hereunder. If Lessor owns less than the entire undivided interest in all or any portion of the land or mineral rights relating thereto, rentals and royalties as to such portion of the land in which an interest is outstanding may be reduced proportionately to the interest of Lessor therein; but the failure of Lessee to reduce rentals shall not affect Lessee's rights to reduce royalties; and in the event Lessor's title or an interest therein is claimed by others, Lessee shall have the right to withhold payment of royalties for a reasonable time not to exceed ninety (90) days after notice or discovery of such claim, and/or within such ninety (90) days to commence concursus proceedings in a court of competent jurisdiction and deposit such royalties in the registry of the Court until final determination of Lessor's rights.

10. The requirements of this lease shall be subject to any State and/or Federal law or order regulating operations on the land. Should Lessee be prevented from complying with any express or implied covenants of this lease, from conducting drilling or reworking operations thereon, or from producing hydrocarbons from the land by reason of scarcity or inability (after effort made in good faith) to obtain equipment or material or authority to use same, or by failure of carriers to transport or furnish facilities for transportation, or by operation of force majeure, any Federal or State law, or any order, rule or regulation of governmental authority, or other causes beyond Lessee's control, then while so prevented, Lessee's obligation to comply with such covenant shall be suspended and Lessee shall not be liable for damages for failure to comply herewith; and this lease shall be extended while and so long as Lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing hydrocarbons from the land, and the time while Lessee is so prevented shall not be counted against Lessee, provided, however, that no such extension shall exceed a period of twelve (12) months.

11. THIS PARAGRAPH DELETED.

12. THIS PARAGRAPH DELETED.

13. Lessor owns no interest in the surface of the land; however, Lessor grants to Lessee, non-exclusively, any rights of access or surface use Lessor may have as a matter of law. Lessee shall conduct its operations in accordance with the rules and regulations of the surface owner.

14. Lessee shall, at its sole risk, cost and expense, have surveys made of any well with a logging device customarily used and accepted in the oil industry on scales of 1"=100' and 1"=20' using all standard curves acceptable by the industry to be made from surface casing to total depth of the well or to such depth to which it is possible to run a log by diligent effort to reach total depth. In addition, a porosity survey shall be made by Lessee at its sole cost, risk and expense at all resistive zones, if in its reasonable opinion same is deemed advisable and in accordance with good operational

practices. Lessee shall notify Lessor by telephone, at its address, of Lessee's intention to run any surveys, logs or associated tests at least eight (8) hours prior to the running thereof in order to permit time for a representative of Lessor to arrive and witness same.

Two satisfactory copies of each and all surveys or logs shall be delivered promptly to Lessor at its address. Lessee shall also, upon the written request of Lessor, furnish samples of cuttings and cores, if same are taken, in containers to be furnished by Lessee with information marked thereon as to the depth from which same are taken. Any such samples requested shall be thoroughly dried, sacked, marked and shipped or delivered immediately to Lessor at its above mentioned address or to such other address as may be furnished by Lessor.

Lessee further agrees to furnish Lessor with a drilling report and production report along with copies of all logs, surveys, run tickets and all other information obtained by Lessee in drilling any well under the terms of this lease. The failure of Lessee to comply with the provisions of this Paragraph 14 shall not be cause or justification for the cancellation of this lease unless, and until, such failure has continued for thirty (30) days after Lessee shall have been notified in writing that such failure exists.

Lessor shall at Lessor's own risk be entitled at all reasonable times to inspect Lessee's operations under this lease and shall have access to the derrick floor, with the right to witness all gauging of the tanks, and to gauge the tanks.

15. Lessor reserves the right to purchase gas produced under this lease for use as fuel in the conduct of its own drilling or production operations in this area at the contract price Lessee is otherwise receiving for the sale of gas from this lease. If no gas sale contract exists, Lessor will pay Lessee the then current price for gas in the area.

16. The consideration paid by Lessee to Lessor is accepted as full and adequate consideration for all rights, options and privileges herein granted.

17. Should Lessee receive "take or pay" payments on this lease for gas not delivered, Lessor must be paid royalty hereunder just as if the take or pay amounts were for gas that had been sold and delivered. If and when the gas purchaser receives “make up" gas, additional royalty for the make up gas would be due to Lessor on any supplemental payments made by the gas purchaser due to upward price adjustment.

Should monthly payments received under this paragraph exceed 1/12th of the annual shut-in gas royalty which would otherwise be due under this lease, such payments would suspend the shut-in gas rental so long as they continue, otherwise they would serve only as a credit toward the annual shut-in gas rental.

18. Lessee agrees that, at any time during the existence of this lease, should Lessee acquire, or indirectly acquire or benefit by the acquisition by Lessee's agents, brokers, affiliates, parent, subsidiaries, partners or investors of, a lease within a geographic area that extends outward from the perimeter of the land(s) covered by this lease a distance of five (5) miles in all directions, except any lease with the United States of America hereinafter defined and referred to as the “Federal Leases,” which provides for a greater bonus, royalty, delay rental or shut-in rental and/or payment than is provided in this lease, this lease shall be immediately and automatically amended without notice from Lessor to increase the bonus, royalty, delay rental or shut-in rental and/or payment to the higher amount as the case may be, and Lessee thereupon shall pay to Lessor the difference between such higher amount and the amount provided in this lease; provided however, that such lease shall cover a mineral right(s) regarding 480 acres or more, or that such lease be one (1) of two (2) or more leases from a single lessor or owner which leases cover a mineral right(s) regarding in the aggregate 480 acres or more, or that such lease be one (1) of two (2) or more leases from one (1) or more lessors or owners who share a common owner, which leases cover a mineral right(s) regarding in the aggregate 480 acres or more. This provision shall not affect the land leased herein which are part of a unit for a producing well or are retained by Lessee for an unspaced producing well. This

provision shall operate as an express resolutory condition of this lease, and upon failure by the Lessee to so amend this lease and pay the difference, Lessor, at its option, may seek dissolution of this lease or the enforcement of this provision together with the collection of such unpaid amount(s), together with interest at the highest rate provided by law on such amount(s) from the date such amount(s) was due, together with reasonable attorney fees and all expenses incurred in the course of Lessor's enforcement action and/or effort.

19. Other special provisions of this lease are:

a. (i) The parties hereto recognize that Lessee intends to acquire oil and gas leases from the United States of America on all or parts of the land subject to this lease and that a dispute exists between Lessor and the United States of America as to the existence of a mineral servitude in favor of Lessor bearing upon 100% of the mineral rights in the land and/or the validity of any oil and gas leases Lessee may acquire from the United States (the "Federal Leases") as compared to this lease (the "Dispute"). The parties specifically recognize that Lessor has filed the following suit to determine ownership, among other properties, of the mineral rights in the land: ***Central Pines Land Company; Tower Minerals Company, Inc.; Jack E. Lawton, Jr.; Evelyn Gay Lawton Duhon; Linda Lew Lawton Drost; D, S & T, Inc.; and Drost & Brame, Inc. v. United States of America and Texaco Exploration and Production Inc., Sonat Exploration Company, Helmerich & Payne, Inc., Chesapeake Operating, Inc. and C. H. C Gerard***, number CV 96-2000 of the docket of the United States District Court for the Western District of Louisiana. "Federal Leases" as the term is used herein shall include any oil and gas leases and any renewal or extension thereof, or any new lease obtained or acquired by Lessee, its successors, assigns, or any Affiliates thereof, or any party in privity with Lessee, in whole or in part, bearing upon all or any portion of the land within two (2) years of the termination, for any cause, of any leases acquired from the United States of America. Affiliate means a legal entity which, directly or indirectly, controls, or is controlled, directly or indirectly, by Lessee, its successors or assigns, or which is controlled by any entity which controls Lessee, its successors or assigns. Control means the ownership, directly or indirectly, of twenty percent (20%) or more of the shares or voting rights in any entity.

(ii) As an inducement to Lessor to enter into this lease, without which said lease would not be granted, Lessee agrees to pay Lessor a minimum royalty of fifteen percent (15%) ("Minimum Royalty") on all oil, gas or other hydrocarbons produced and saved from or attributable to the land. For purposes of clarity, Lessor and Lessee acknowledge that the Minimum Royalty is a guaranteed portion of the base lease royalty provided in Paragraph 6 hereof. Lessee shall not have the right to reduce, suspend, fail to pay, or recover such Minimum Royalty for any reason whatsoever arising out of or connected with the Dispute. This Minimum Royalty shall be payable from first production and shall be unconditionally guaranteed by Lessee and paid to Lessor irrespective of the pendency of the Dispute, or the pendency of any litigation, or the actual outcome of any settlement or litigation relating to the Dispute so long as Lessor's title is otherwise merchantable. The Minimum Royalty shall be determined and paid and delivered to Lessor in the same manner and in accordance with the same terms and provisions as the base lease royalty stipulated in Paragraph 6 hereinabove, subject to the following terms and conditions. Under no circumstances can the Minimum Royalty be suspended, escrowed or paid into the registry of any court regardless of the existence of any litigation with respect to the Dispute. Upon any settlement or final judgment with respect to the Dispute, Lessor's total lease royalty shall be calculated as follows: fifteen percent (15%) plus Lessor's proportionate mineral interest (as determined by any such settlement or judgment) times twelve and one-half percent (12.5%). It is specifically understood and agreed by Lessee that even should it be determined by final judgment of a court or by agreement, compromise, settlement, or otherwise, in any litigation or proceeding with

respect to the Dispute that Lessor owns no mineral interest in the land or portions thereof, the obligation of Lessee to pay the Minimum Royalty provided for herein, as to all acreage originally covered hereby, shall nevertheless continue in full force and effect, subject, however, to the provisions of Subparagraph (iii) below. Notwithstanding anything herein to the contrary, in the event that Lessor owns less than the full mineral interest in any part of the land for reasons unrelated to the Dispute, then, the Minimum Royalty, shall be reduced to that proportion of such Minimum Royalty which Lessor's mineral interest in the land bears to the whole mineral interest therein.

(iii) Lessee shall be entitled to withhold or suspend proceeds of production attributable to the difference between the Minimum Royalty provided above and the base lease royalty provided in Paragraph 6 above (said difference being referred to below as the "Non-Guaranteed Royalty") during the pendency of the Dispute. In the event, Lessee elects to withhold or suspend proceeds attributable to the Non-Guaranteed Royalty during the pendency of the Dispute, said proceeds shall be deposited in an interest bearing account in Hibernia National Bank, Sulphur Branch, Sulphur, Louisiana, or deposited in the registry of the court as provided below. Lessee agrees to be bound by any final judgments or settlement with respect to the Dispute and hereby waives its right to participate either as a party to any settlement agreement or as a necessary or indispensable party in any such litigation. In the event Lessee should elect to file a concursus proceeding or interpleader, same shall be filed only in the United States District Court for the Western District of Louisiana, Lake Charles Division. Lessee shall make any such deposit of funds in the registry of the court in the case captioned ***Central Pines Land Company; Tower Minerals Company, Inc.; Jack E. Lawton, Jr.; Evelyn Gay Lawton Duhon; Linda Lew Lawton Drost; D, S & T, Inc.; and Drost & Brame, Inc. v. United States of America and Texaco Exploration and Production Inc., Sonat Exploration Company, Helmerich & Payne, Inc. Chesapeake Operating, Inc. and C. H. C Gerard***, number CV 96-2000 of the docket of the United States District Court for the Western District of Louisiana.

(iv) Lessee may not voluntarily release or surrender this lease as to all or any portion of the land unless, within ten (10) days of any such release, Lessee shall also release and surrender any interest then held, owned or controlled, directly or indirectly, by Lessee in any Federal Lease as to the portion of the land covered thereby which is included within the area as to which this lease has been voluntarily released or surrendered. In such event, Lessee shall be relieved of all obligations with respect to this lease as to and the Minimum Royalty on future production from said released area.

(v) Nothing herein contained, nor any action or non-action of Lessor hereunder, shall ever be deemed a waiver of any right, title, interest or claim which Lessor may have in or to any of the land, nor ever serve as an estoppel against the assertion by Lessor of full title thereto or possession thereof.

b. Lessee's responsibility for and obligation of indemnity and defense shall include, but not be limited to, causes of action and/or claims for attorney fees and for causes of action and/or claims which directly or indirectly are attributable to or arise out of the actual or alleged release or presence of hazardous materials and/or waste and/or contamination which occurs as a result of action or inaction under this lease on the land and/or on acreage pooled therewith.

c. Should Lessee, its successors or assigns obtain at any time a title opinion and/or an environmental audit, assessment, study or any type of investigation, or cause such items to be performed on the land or any portion thereof, Lessee shall deliver immediately to Lessors a copy therof and provide to Lessors full disclosure of the

research conducted for and/or on the land. Lessors shall not be bound by any obligation of confidentiality upon receipt of such items and/or information.

d. Lessee, at its option, is hereby given the right and power without any further approval from Lessor to pool, communitize or combine the acreage, royalty, or mineral interest covered by this lease, or any portion thereof, with other land, lease or leases, royalty and mineral interests in the immediate vicinity thereof, when it is necessary or advisable to properly develop and operate the land to promote the conservation of hydrocarbons underlying the land, or to comply with the spacing or unitization order of any regulatory body in the State of Louisiana or the United States having jurisdiction. The term "regulatory body" shall include any governmental tribunal or group (civil or military) issuing orders governing the drilling of wells or the production of hydrocarbons. Such pooling and/or any units formed for drilling and/or production purposes, located only within the land or, including any part of the land, shall be of tracts which will form one contiguous tract of land for each unit, and the unit or units so created shall not exceed substantially forty (40) acres each surrounding each oil well and substantially one hundred sixty (160) acres each for each gas or gas-distillate well, and substantially nine hundred sixty (960) acres for each horizontal completion as defined hereinbelow, or if the horizontal completion, as defined herein below, is a dual opposing lateral well, one thousand nine hundred and twenty (1,920) acres around such well, unless a larger spacing pattern or larger drilling or producing units (including a field or pool unit) have been fixed and established by an order of a regulatory body of the State of Louisiana or of the United States, in which event the unit or units may be of the size fixed by said order. Lessee shall execute and record in the Conveyance Records of the Parish in which the land is situated an instrument identifying and describing any acreage pooled into units under the limitation above set forth, and upon such recordation, the unit or units shall thereby become effective. In lieu of the royalties payable elsewhere herein specified, and subject to the provisions of Paragraph 9 hereof, Lessor shall receive on account of production from any unit so pooled such portion of the royalties stipulated herein as the amount of Lessor's acreage placed in the unit, or Lessor's royalty interest therein, bears to the total acreage so pooled in the particular unit involved.

Should any portion of the land leased herein be pooled or unitized with other lands, either by virtue of the provisions of this Paragraph 19.d. or by order of any regulatory body of the State of Louisiana or the United States, drilling or reworking operations on or production of hydrocarbons from the land leased herein included in such pooled unit shall have the effect of continuing this lease in force and effect during or after the primary term only as to the land leased herein included in such unit, whether or not such operations be on or such production be from the land leased herein. Such operations on or production from such portions of the land leased herein contained within any such unit shall not maintain this lease in force and effect as to any portion of the land leased herein not physically situated within such unit. Nothing within this paragraph of Paragraph 19.d. precludes Lessee from paying delay rentals during the primary term of this lease, or otherwise having the lease maintained as provided elsewhere in this lease. This paragraph shall not apply in the event Lessee is conducting continuous drilling operations pursuant to paragraph 3 or paragraph 5, above, within a pooling and/or unit so formed, whether either by virtue of the provisions of this Paragraph 19.d. or fixed or established by order of any regulatory body of the State of Louisiana or the United States, which is comprised at least fifty percent (50%) by land covered by this lease, or which is comprised at least fifty (50%) percent by land covered by this lease and land covered under that certain Hydrocarbon Lease between J. Lawton Company and Tower Land Company, Inc., as Lessors, and Chesapeake Operating, Inc., as Lessee, dated as of August 1, 1995.

Any unit formed by Lessee hereunder may be created either prior to the drilling or after the completion of the unit well; and separate units may be created for oil and for

gas even though the areas thereof overlap. Lessee may reduce and diminish the extent of any voluntary unit created by Lessee under the terms of this paragraph so as to eliminate from such unit any acreage or lease upon which there is or may be an adverse claim; and Lessee may also re-form any voluntary unit created by Lessee under the terms of this paragraph to conform with an order of a regulatory body issued after such unit was originally established. Such revision of the unit shall be evidenced by an instrument in writing executed by Lessee which shall identify and describe the land included in the unit as revised and shall be recorded in Conveyance Records of the Parish where the land is situated.

For purposes of the foregoing the terms "oil well" and "gas well" shall have the meanings prescribed by applicable law or the Regulatory Body of the State of Louisiana. Additionally, for the first well drilled under this lease on the land leased herein or on acreage pooled therewith, the term "horizontal completion" means a well in which the horizontal section of the wellbore to the deepest depth drilled exceeds 2,000 feet, and the horizontal component of the gross completion interval in the reservoir is at least sixty (60) degrees from vertical, and the gross completion interval lies within the horizontal section of the wellbore. For subsequent wells drilled under this lease on the land leased herein or on acreage pooled therewith, the term "horizontal completion" means a well in which the horizontal section of the wellbore to the deepest depth drilled exceeds 1000 feet, and the horizontal component of the gross completion interval in the reservoir is at least sixty (60) degrees from vertical, and the gross completion interval lies within the horizontal section of the wellbore.

If, as a result of geological or mechanical conditions which render further drilling futile or which unreasonably endanger the wellbore, the horizontal section of wellbore to the deepest depth drilled does not exceed the below provided distances, Lessee shall be able to retain, for an unspaced horizontal completion, the acreage provided with the distances:

i. between 150' and 330', 160 acres;
ii. between 330' and 660', 320 acres;
iii. 660', up to 999', 640 acres.

e. Notwithstanding anything herein to the contrary, Lessee is subrogated to all of Lessor's rights and actions in warranty against all former owners and vendors except as to Wm. T. Burton, personally, and except as to William B. Lawton Company, Inc., Tower Land Company, Inc, Jack Lawton, Inc. and J. Lawton Company.

f. The following sentence shall revise and supplement Paragraph 2 and Paragraph 5, being added as the last sentence of Paragraph 2 and as the second to last sentence of the second paragraph of Paragraph 5, as further supplemented in Paragraph 19.g., to wit:

"In the event of an unspaced horizontal completion, as defined herein in Paragraph 19.d., Lessee shall have the right to retain, in as near a lay down, rectangular form as is practical, nine hundred and sixty (960) acres around such well, or if the horizontal completion, as defined herein in Paragraph 19.d., is a dual opposing lateral well, Lessee shall have the right to retain, in as near a lay down, rectangular form as is practical, one thousand nine hundred and twenty (1,920) acres around such well."

g. The following sentence shall revise and supplement Paragraph 4, being added as the last sentence of Paragraph 4, to wit:

"Further, with regard to any horizontal well completed in a Cretaceous age formation on adjacent lands, drainage shall not be presumed unless said well

is drilled within the above described distances from a boundary line of the land on strike with a fracture pattern of said well."

h. The following sentence shall revise and supplement the second paragraph, Paragraph 5, being added as the last sentence of said paragraph, to wit:

"Notwithstanding the continuous drilling requirement set forth herein, Lessee, during the primary term of this lease, shall enjoy the right to maintain this lease by recommencing payment of the rental as provided in Paragraph 3."

i. The last paragraph of Paragraph 5, at page 4 herein, having been stricken in its entirety, is replaced by the following paragraph, which shall supplement Paragraph 5, being added as the last paragraph of Paragraph 5, to wit:

"Should the drilling of any well located on the land leased herein discover gas or gaseous substances capable of production in paying quantities, but which well is unable to be produced (or which well, although previously produced, is unable to continue to be produced) because of lack of a reasonable market or of marketing facilities, or because of governmental restrictions, then if the lease is not being otherwise maintained, Lessee's rights insofar as the acreage included in the unit for said well or to be retained by Lessee if the well is an unspaced horizontal completion may be maintained for successive periods of one (1) year each for no more than five (5) consecutive years by the payment to Lessor of "shut-in gas rental",annually in advance, in the amount of fifty ($50) dollars per net mineral acre of the land leased herein included in the unit for said well; provided that Lessee shall not be obligated to pay such shut-in gas rental until ninety (90) days after the lease ceases to be maintained in some other manner. During the period Lessee is paying such shut-in gas rental, it shall be considered that gas is being produced in paying quantities from the acreage included in the unit for said well or to be retained by Lessee if the well is an unspaced horizontal completion."

j. The following paragraph supplements Paragraph 6, being added as the last paragraph of Paragraph 6, to wit:

"Notwithstanding anything herein, or elsewhere provided in this lease, to the contrary, Lessor's royalty is to be free and clear of all exploring, completing, producing, developing, processing, marketing and transporting costs incurred to the point of sale of the production of hydrocarbons under this lease; provided however Lessor's royalty shall bear its proportionate share of any severance or production tax imposed thereon."

k. The following paragraph shall supplement Paragraph 13, being added as the last paragraph of Paragraph 13, to wit:

“Notwithstanding anything herein, or elsewhere provided in the lease, to the contrary, Lessee, without expense to Lessor, shall plug and abandon, or cause to be plugged and abandoned, all wells drilled on the land leased herein, and in doing so, said operations shall conform to all laws and regulations of the State of Louisiana and of the United States of America regarding the plugging and/or abandonment of wells. Lessee promptly shall supply, or promptly cause to be supplied, to Lessor copies of all reports filed with said regulatory body or bodies regarding said plug and abandonment."

l. Paragraph 7, previously having been stricken in its entirety, is replaced by the following paragraph, to wit:

"7. Lessee shall be responsible for any and all damages caused by operations conducted under this lease. Lessee shall fully defend, protect, indemnify and hold harmless Lessor, its parents, subsidiaries, directors, officers, employees, successors, assigns and any other party owning an interest in the mineral rights leased herein by, through or under Lessor or a party Lessor, from any and all causes of action or claims including costs and attorney fees, arising directly or indirectly by way of the operations conducted under this lease, of whatever kind or nature, including but not limited to environmental damage."

m. Notwithstanding anything herein to the contrary, any drilling and/or reworking operations lawfully conducted under this lease by an operator of a lawfully created unit within which land leased herein has been unitized shall have the same force and effect as if the Lessee had conducted such operations under this lease.

n. Lessee acknowledges that Lessor does not own the surface of the land and that most of the surface is owned by the United States of America. A substantial portion of the land has been, in fact, continuously subject to bombing practice and artillery practice by the United States Army and Air Force. Unexploded bombs, grenades, and shells exist on the land. Chemical weapons may exist on the land. Portions of the land may lie within an artillery impact area, including an impact area for 155MM howitzer, heavy artillery and tank gunnery practice. A portion of the land may include a bazooka range, a rifle grenade range, and numerous other small arms impact areas including a TOW missile range. A portion of the land may be used for parachute jumps, maneuvers, bivouacs, live fire, and night training exercises. Access to the land for oil and gas purposes may be subject to restrictions by or regulations of agencies of the United States of America. Notwithstanding, and in addition to, any other indemnity provision of this lease, Lessee hereby agrees to indemnify and hold harmless and defend Lessor, its parents, subsidiaries, shareholders, officers, directors, successors, assigns, agents, attorneys, employees, any party owning an interest in the mineral rights leased herein or royalties therein by, through or under Lessor, or any party Lessor and anyone for whom Lessee may be held legally responsible, obligated or liable, from and against all suits, claims, demands and causes of action that may be at any time brought or made by any person, partnership, venture, firm, corporation or other entity, organization or public body or agency, including the United States Department of Defense, Department of Agriculture, Department of Interior and Department of Justice and also including but not limited to employees of Lessor and Lessee, arising out of or in any way connected with operations conducted under the lease including activities, operations, equipment, or facilities on or off the land under this lease, with the exception of any claims relating to the Dispute as defined above.

Lessee's obligations under this paragraph shall extend to any and all claims relating to operations under this lease, regardless of whether based on absolute liability, strict liability, negligence or other fault, defect, warranty or otherwise. It is further agreed that if any suit, claim, demand or cause of action is brought or arises, which is or might be covered by this indemnification provision, the party hereto that first receives notice thereof will undertake to notify the other party hereto. However, failure to give such notice shall not operate to relieve any other obligations under this lease. Lessor will not take any dispositive action affecting any such suit, claim, demand, or cause of action without Lessee's prior knowledge, participation and consent.

o. Neither Party hereto shall file this lease of record. A Memorandum Of Hydrocarbon Lease setting forth only the names and addresses of the parties, the date and primary term of the lease, and a description of the lands leased herein may be recorded by Lessee to give notice to third parties.

IN WITNESS WHEREOF, this instrument is executed on the dates hereinafter stated, but

this instrument is effective as of the date first written above.

| WITNESSES: | LESSORS: |
| --- | --- |
| | CENTRAL PINES LAND COMPANY |
| William T. Bost | BY: [signature] |
| Tracey D. Duke | Thad D. Minaldi, Executive Vice President<br>101 North Huntington St.<br>Sulphur, LA 70663-2601<br>(318) 527-5221<br>(318) 527-5276 (FAX)<br>Date: 9/26/96 |
| | TOWER MINERALS COMPANY, INC. |
| William T. Bost | BY: [signature] |
| Tracey D. Duke | William B. Lawton, President<br>Suite 1700, CM Tower<br>One Lakeshore Drive<br>Lake Charles, LA 70629<br>(318) 433-0142<br>(318) 433-0635 (FAX)<br>Date: 9/26/96 |
| | LESSEE: |
| | CHESAPEAKE OPERATING, INC. |
| ______________________ | BY: ______________________<br>Aubrey K. McClendon<br>President |
| ______________________ | DATE: ______________________ |

STATE OF LOUISIANA

PARISH OF CALCASIEU

On this 26th day of Sept., 1996 before me appeared THAD D. MINALDI, to personally known, who, upon being duly sworn, did swear that he is the Executive Vice President of CENTRAL PINES LAND COMPANY and that the foregoing instrument was signed on behalf of said corporation by the authority of its Board of Directors and said THAD D. MINALDI acknowledged said instrument to be the free act and deed of said corporation.

NOTARY PUBLIC,
CALCASIEU PARISH, LOUISIANA

STATE OF LOUISIANA

PARISH OF CALCASIEU

On this 26th day of Sept., 1996 before me appeared WILLIAM B. LAWTON, to me personally known, who, upon being duly sworn, did swear that he is the President of TOWER MINERALS COMPANY, INC. and the foregoing instrument was signed on behalf of said corporation by the authority of its Board of Directors and said WILLIAM B. LAWTON acknowledged said instrument to be the free act and deed of said corporation.

NOTARY PUBLIC,
CALCASIEU PARISH, LOUISIANA

STATE OF OKLAHOMA

COUNTY OF OKLAHOMA

On this ________ day of September, 1996, before me appeared AUBREY K. McCLENDON, to me personally known, who, upon being duly sworn, did swear that he is the President of CHESAPEAKE OPERATING, INC., and the foregoing instrument was signed on behalf of said corporation, by the authority of its Board of Directors and said AUBREY K. McCLENDON acknowledged said instrument to be the free act and deed of said corporation.

NOTARY PUBLIC,
Name:________________________
Commission Expires:__________

# Exhibit "A"

## Vernon Parish, Louisiana

| Township One North, Range Five West (T1N-R5W) | | Acres |
|---|---|---|
| Section 4: | Being the diagonal SW/2 of SW/4 | 90.40 |
| Section 9: | S/2 and NW/4 and the diagonal SW/2 of NE/4 | 587.30 |
| Section 10: | The diagonal SW/2 of SW/4 | 71.74 |
| Section 15: | S/2 and NW/4 and the diagonal SW/2 of NE/4 | 552.00 |
| Section 16: | Entire Section | 739.20 |
| Section 21: | W/2 and W/2 of E/2 and NE/4 of NE/4 and the diagonal NW/2 of SE/4 of NE/4 | 580.15 |
| Section 28: | W/2 and W/2 of NE/4 and diagonal NW/2 of W/2 of SE/4 | 596.48 |
| Section 29: | Entire Section | 674.60 |
| Section 32: | W/2 and N/2 of NE/4 and SE/4 of NE/4 and S/2 of SE/4 & Fractional NE/4 of SE/4 except 13 acres on West side | 547.56 |
| Section 33: | NW/4 and N/2 of SW/4 | 256.12 |
| **Township One South, Range Five West (T1S-R5W)** | | Acres |
| Section 5: | N/2 of NW/4 and SW/4 of NW/4 | 126.55 |
| | **TOTAL ACRES** | 4,822.10 |

For identification with
O.D. Gas & Hydrocarbon Lease
effective 9/15/96
[illegible]
Notary Public
7/26/96