# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CENTRAL PINES LAND COMPANY, ET AL. )<br>)<br>Plaintiffs, )<br>)<br>versus )<br>)<br>THE UNITED STATES, )<br>)<br>Defendant ) | No. 98-314 L<br><br>Chief Judge Edward J. Damich |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS

Central Pines Land Company, D, S & T, Inc., Drost & Brame, Inc., Linda Lew Lawton Drost, Evelyn Gay Lawton Duhon, Jack E. Lawton, Jr., and Tower Minerals Company, Inc. respectfully respond as follows to defendant's First Set Of Interrogatories And Requests For Production Of Documents To Plaintiffs as follows:

## INTERROGATORIES

### INTERROGATORY NO. 1:

Please state the date or dates on which you contend that your property interests were taken, the portion or parcel(s) that were taken, the period and duration of the alleged taking, and identify the event or events, every relevant fact on which your contention is based, and all documents relating thereto.

### ANSWER TO INTERROGATORY NO. 1:

To the knowledge of Plaintiffs, prior to October 9, 1992 the United States did not claim



W.T. Drost
12-13-05
Exhibit No. 1
DD Juranka, RPR

ownership of minerals underlying Group C. Letter dated August 5, 1988, by Danny W. Britt, Forest Supervisor, to Regional Forester concludes by stating that there was no basis to presume that the minerals affecting property acquired by the United States after 1940 were owned by the United States.

On October 9, 1992, a title opinion is believed to have been rendered to the United States which Plaintiffs understand related to Group C and which stated that the United States "can now claim mineral ownership where drilling has not occurred for a ten-year period regardless of the date of acquisition by the U.S." By letter dated November 8, 1995, Plaintiffs' Freedom of Information Act request for the letter was denied. Accordingly, Plaintiffs do not have a copy of that title opinion.

Other than as discussed below relating to the military use of the surface of Group C, to Plaintiffs' knowledge, October 9, 1992 is the earliest date that the United States took Group C. The entirety of Group C was affected.

On October 7, 1993, Charles E. Steele, Director of Lands And Minerals, United States Department Of Agriculture, Forest Service issued a memorandum number 2820 which advised that additional lands were available for leasing by the United States as a result of the October 9, 1992 opinion. The memorandum included Group C lands and a Controlled Surface Use Stipulation #1 which applied to the Intensive Use Area for Fort Polk.

Commencing in June 1992, the United States began issuing mineral leases on Group A and Group B lands which were claimed by Plaintiffs at that time. Plaintiffs do **not** contend that granting mineral leases on Group A and Group B lands was a taking of Group C lands.

In the spring of 1995, while negotiating a mineral lease on property in the area of, but not within Group C, Plaintiffs learned from a potential lessee that the United States was claiming title to Group C lands. Plaintiffs are unaware of the source of the information supplied.

Inquiry lead Plaintiffs to the Office Of General Counsel, United States Department Of

Agriculture in Little Rock, Arkansas. After preliminary telephone conversations, by letter dated November 9, 1995 addressed to Mr. Mike Cruse, Deputy General Counsel, Plaintiffs supplied the United States with pertinent title documents, land use records and legal principles which established that Plaintiffs owned the minerals under Group C lands.

After various discussions, Plaintiffs were referred by Mike Cruse to Mr. Jeffery D. Eisenberg, Office Of General Counsel, United States Department Of Agriculture, Washington, D.C.

In the meantime, portions of Group C were included by the United States in a proposed mineral lease sale by the United States scheduled for March 28, 1996. The date the United States gave notice of its intention to lease the Group C properties for the scheduled March 28, 1996 sale is an alternative date for the taking of Plaintiffs' property. While the proposed lease sale included not less than approximately 5,300 acres of Group C property, the United States effectively took the entirety of Group C because Plaintiffs' title is uniform for the full tract.

By letter dated February 29, 1996 to Eisenberg, Plaintiffs asserted title to the Group C minerals being offered to lease by the United States and respectfully requested that the properties be withdrawn from proposed lease sale.

Eisenberg requested that Plaintiffs submit a settlement proposal whereby the United States would be compensated for mineral production under Group C. Accordingly, by letter dated March 11, 1996 to Eisenberg, Plaintiffs submitted a proposal whereby, in addition to other matters, Plaintiffs would be recognized as owners of that part of Group C included in the Joint Order Interchanging Administrative Jurisdiction Of Department Of The Army Lands And National Forest Lands executed by the Secretary Of Army on December 4, 1974 and by the Secretary Of Agriculture on March 12, 1975 and the United States would receive a mineral royalty on production from such property. The actions of Eisenberg in proposing that the United States would not recognize Plaintiffs' title without

compensation to the United States constitute a taking of Group C. While communications with Eisenberg were limited to that portion of Group C included in the Joint Order Interchanging Administrative Jurisdiction Of Department Of The Army Lands And National Forest Lands executed by the Secretary Of Army on December 4, 1974 and by the Secretary Of Agriculture on March 12, 1975, the taking was of the entire Group C because of Plaintiffs' uniform title to the entire tract.

By letter dated April 6, 1995, a representative of Union Pacific Resources Company offered to lease Plaintiffs' minerals affecting property outside of Group C but confirmed that the company was interested in developing Plaintiffs' acreage in the "Artillery Range."

By letter dated August 6, 1996, Jeffery D. Eisenberg responded to Plaintiffs' settlement proposal by rejecting the settlement offer and declining to make a counteroffer. Because of the uniformity of Plaintiffs' title to Group C, Eisenberg's August 6, 1996 letter constitutes a taking of the entire tract.

Thereafter, on August 22, 1996, Plaintiffs filed civil action number CV96-2000 on the docket of the United States District Court, Western District of Louisiana against the United States for declaratory judgment pursuant to 28 U.S.C.§2201 and to quiet title to real estate pursuant to 28 U.S.C. §2409a. In their Complaint, Plaintiffs specifically sought recognition of their title to Group C.

The United States answered Plaintiffs suit, specifically denying that Plaintiffs were the owners of minerals relating to Group C. In the course of the litigation, the United States consistently asserted ownership of Group C minerals. The position of the United States in the litigation, commencing with its Answer filed on October 24, 1996, constitutes a taking of the entirety of Group C minerals from Plaintiffs. The taking continued until final judgment in the litigation.

By letter dated September 24, 1996, Chesapeake Operating, Inc., which had previously leased approximately 33,607.5325 acres from Plaintiffs on property in the area but not within Group C,

extended an offer to Plaintiffs to lease approximately 4,383.67 acres of Group C minerals (ultimately the lease covered 4,822 acres). Because of the competing title claim to Group C minerals by the United States, Chesapeake specifically conditioned its offer upon being permitted to obtain "protection leases from the United States" and required Plaintiffs to agree "not to interfere with Chesapeake's attempt to secure a protection lease from the U.S.A." Finally, Chesapeake conditioned its offer upon Plaintiffs agreeing to confirm in writing to the United States "in a form acceptable to the Justice Department" that Plaintiffs would not attempt to upset any proposed lease sale by the United States of the same mineral property.

In an effort to promote mineral development of Group C, Plaintiffs acquiesced to Chesapeake's limitations. Accordingly, on September 26, 1996, Plaintiffs entered into a mineral lease with Chesapeake. The lease covered 4,822.10 acres of Group C. By letter of same date, Plaintiffs advised the United States through its counsel, Jeff Eisenberg, of the lease and specifically confirmed that no plaintiff in the litigation would attempt to upset or otherwise interfere with the scheduled mineral lease sale. The fact that the assertion of ownership by the United States to Group C resulted in Plaintiffs being required to permit their mineral lessee to obtain a "protection" lease from the United States which would contain Controlled Surface Use Stipulation #1 constitutes a taking of the property involved in the Chesapeake lease.

United States Department Of Justice attorney, Bret Birdsong, advised Plaintiffs that additional Group C acreage may be included in the scheduled lease sale and requested that Plaintiffs agree to not attempt to upset the sale with regard to the additional acreage. In an effort to promote mineral development of Group C, Plaintiffs acquiesced and by letter dated October 9, 1996 complied with the request of the United States Department Of Justice.

The fact that Plaintiffs were required to permit their mineral lessee to obtain a "protection"

lease from the United States which would contain Controlled Surface Use Stipulation #1 and further agree to not interfere with the lease of the property by the United States constitutes a taking of Group C.

The United States granted the following mineral leases affecting Group C properties: Lease Nos. 47572, 47574, and 47750 to Union Pacific Resources Company and Lease Nos. 48555, 48556, 48557, 48558, 48559 and 48560 to Chesapeake Operating, Inc. All of the leases contained ten year terms terminating April 30, 2007. Granting of these mineral leases constitutes a taking of Plaintiffs' property.

Since acquisition of the surface of Group C properties in 1943, a substantial portion of the property has been, in fact, subject to military operations including bombing practice, artillery practice, small arms fire and troop maneuvers by the United States Army and Air Force. Unexploded bombs are found and disposed of from Group C. Portions of Group C include artillery impact areas for howitzer, heavy artillery and tank gunnery practice.

At some date, unknown to Plaintiffs, portions of Group C became too contaminated and/or dangerous for mineral operations. Plaintiffs do not know the geographic extent of this area. The dangerous or contaminated condition of portions of Group C constitutes a taking of Plaintiffs property.

United States established Standard Operating Procedures For Exploration And Field Development Drilling of Oil/Gas Wells, SOP No. 32X-2, which contain procedures and restrictions on mineral development on Group C.

Prior to drilling a well within Group C, Plaintiffs' lessees (all of whom had acquired "protective" leases from the United States) were required to submit a detailed Application For Permit To Drill Or Deepen to the Bureau Of Land Management. Within Group C, the procedure also required the filing of a Final Environmental Assessment and the ultimate issuance of "Conditions Of Approval

For Oil And Gas Exploration."

Without regard to whether the SOP, Application For Permit To Drill Or Deepen, Final Environmental Assessment and/or the Conditions Ff Approval For Oil And Gas Exploration are appropriate and reasonable for lessees of the United States in situations where the United States owns the minerals, imposition of such requirements and procedures on lessees of Plaintiffs constitutes a taking of Group C property. Under Louisiana law, a mineral owner has unrestricted right to access to the surface of the property burdened by the mineral servitude.

By letter dated January 9, 1997, Plaintiffs' mineral lessee, Chesapeake, wrote Ted Hammerschmidt, Deputy Director, Directorate of Engineering & Housing, Fort Polk, to determine procedures for access to Group C and to determine operating parameters for mineral operations.

On March 11, 1997, representatives of Plaintiffs' mineral lessee, Sonat Exploration Company, met with representatives of the United States to discuss possible access to, and mineral operations on, Group C. Not less than 18 representatives of various Army and Forest Service agencies were in attendance at the meeting, which included the following discussion items:

> Sonat was admonished by Mr. Hammerschmidt, Fort Polk Deputy Director of Public Works, that a proposed well location was in an area referred to as "Ranges 40-43, the tank gunnery ranges." He explained that the tanks shoot "120 mm projectiles" and "will deliver about 6500 meters." He stated that he was concerned about a "vertical stack of valves", *i.e.* an oil well wellhead christmas tree, for a well at that location and "how we can successfully protect it so that we don't cause something problematic to occur." Hammerschmidt further advised that: "Inside this fan is considered an area which increases the possibility of an accident; wells 19-1, 31-1 and 21-1 are all within this fan area."
>
> Dr. Ron Tomas, Fort Polk Office of the Garrison Commander, commented on the "fan" as follows: "the fan is very conservative and the probability of something happening is very high."
>
> Hammerschmidt advised that the Army was "not willing to accept responsibility for people while training is ongoing."
>
> Hammerschmidt advised that wellheads in the area must be protected with "berming."

Hammerschmidt advised that underground pipelines should be buried to 15 feet deep (industry standard is 36").

The discussion specifically included safety issues relating to wells taking "a direct hit."

Dr. Tomas stated that Sonat should consider moving its preferred location for well 31-1 "nearer Lookout Road." Tomas said that the range in question was used about 60 days per year and "reiterated if they don't move, there will be massive amounts of coordination required to get a truck to the site."

Despite Sonat personnel following up on several discussion items and actually filing permits for drilling within Group C, Sonat never drilled any well with a physical location within the surface of Group C.

On April 1, 1997, representatives of Plaintiffs' lessee, Chesapeake, met with representatives of the United States to discuss access to, and mineral operation restrictions within, Group C. Not less than 14 representatives of the Army and Forest Service attended the meeting. The Chesapeake meeting was similar to the Sonat meeting with discussions focused on safety aspects of live fire, depth for placing pipelines, location of wells, placement of production facilities and the avoidance of "flares" which could be dangerous to night flying aircraft.

Chesapeake never drilled a well with a surface location within Group C.

Because the United States asserted title to Group C, potential mineral lessees of Plaintiffs would not execute mineral leases with Plaintiffs unless reasonably assured that "protection" leases could be obtained from the United States. In the summer of 1997, the Bureau Of Land Management received offers to lease parcels within Group C from Plaintiffs' lessees or persons acting on their behalf. Stephen M. Sittnick, LTC, IN, G3/DPTMS responded to an internal inquiry with memorandum AFZX-GT dated July 23, 1997. The response included the following:

a. By definition, this impact area is, and has been, off limits to personnel and/or vehicle surface activities. Additionally, no digging in that zone is allowed due to unexploded ordnance

(surface and subsurface). RLIA was established o/a 1977, and all types of dud producing munitions have been filed into that area. Any effort to surface and subsurface clear that zone for oil exploration would be extremely unsafe, and expensive.

b. Any oil exploration activities in or around the RLIA zone would close a number of ranges/training areas that have Surface Danger Zones (SDZ's) oriented into RLIA. This would severely impact the training and readiness of assigned units and supported Reserve Component units. Additionally, oil exploration activities on or near RLIA would seriously impact Operations Group's use of the Zion Hills area as roational unit maneuver space and/or Live Fire area.

The dangerous or contaminated condition of the surface of Group C, the ongoing military operations and the permitting requirements constitute a taking of Plaintiffs property.

**INTERROGATORY NO. 2:**

Please state what actions you took to exercise or attempt to exercise your mineral rights between 1978 and the present, including but not limited to identifying what portion or parcel(s) you attempted to access, any oral communication or written correspondence between you and the Defendant, and all documents relating thereto.

**ANSWER TO INTERROGATORY NO. 2:**

Between 1978 and 1991 Plaintiffs have no record of attempts to exercise mineral rights on Group C.

Commencing December 11, 1991, corporate parents of Central Pines Land Company and Tower Minerals Company, Inc. negotiated with representatives of Helmerick & Payne to develop mineral properties which included portions of Group C. Plaintiffs and Helmerick & Payne were unable to reach agreement on terms of a lease.

Commencing February 5, 1992, corporate parents of Central Pines Land Company and Tower Minerals Company, Inc. negotiated with McGinty-Durham, Inc. to lease approximately 13,276 acres

of land contiguous with and including Group C. Plaintiffs and McGinty-Durham, Inc. were unable to reach agreement on terms of a lease.

By Hydrocarbon Lease dated effective August 1, 1995, corporate parents of Central Pines Land Company and Tower Minerals Company, Inc. leased approximately 33,607.5325 acres of land contiguous to, but not included within, Group C to Chesapeake Operating, Inc.

In the course of negotiating the mineral lease, Chesapeake expressed interest in leasing Group C, *i.e.,* the "Artillery Range." Chesapeake continued or followed up with the negotiations to lease the "Artillery Range" by letter dated March, 1996. By letter dated April 8, 1996, Plaintiffs confirmed their willingness to lease Group C on the same lease form as used by the parties for the August 1, 1995 Hydrocarbon Lease. Chesapeake did not respond.

By Hydrocarbon Lease dated July 1, 1996, Central Pines Land Company and Tower Minerals Company, Inc. leased approximately 28,668.93 acres of property contiguous with and partially including Group C to Sonat Exploration Company.

Effective September 15, 1996, Central Pines Land Company and Tower Minerals Company, Inc. leased approximately 4,822.10 acres of Group C to Chesapeake Operating, Inc.

Commencing March, 1996, Plaintiffs negotiated with Belco Oil & Gas Corp. to lease 20,295 acres of Group C. Belco reported that it was unable to obtain access to Group C surface and discontinued the lease discussions.

Commencing April 24, 1996, Central Pines Land Company and Tower Minerals Company, Inc. negotiated with Sonat Exploration Company in an effort to lease approximately 9,798.44 acres of Group C. The United States withdrew the property from its proposed lease sale; and, without the possibility of a "protective" lease, Plaintiffs were unable to lease the 9,798.44 acres.

In the spring of 1995, while negotiating a mineral lease on property in the area of but not within

Group C, Plaintiffs learned from a potential lessee that the United States was claiming title to the Group C lands. Inquiry led Plaintiffs to the Office Of General Counsel, United States Department Of Agriculture in Little Rock, Arkansas. After preliminary telephone conversations, by letter dated November 9, 1995 addressed to Mr. Mike Cruse, Deputy General Counsel, Plaintiffs supplied the United States with pertinent title documents, land use records and legal principles which established that Plaintiffs owned the minerals under Group C lands.

After various discussions, Plaintiffs were referred by Mike Cruse to Mr. Jeffery D. Eisenberg, Office Of General Counsel, United States Department Of Agriculture, Washington, D.C.

By letter dated February 29, 1996 to Eisenberg, Plaintiffs asserted title to the Group C minerals being offered to lease by the United States and respectfully requested that the properties be withdrawn from proposed lease sale.

At the request of Eisenberg by letter date March 11, 1996, Plaintiffs submitted a proposal whereby, in addition to other matters, plaintiff would be recognized as owners of that part of Group C included in the Joint Order Interchanging Administrative Jurisdiction Of Department Of The Army Lands And National Forest Lands executed by the Secretary Of Army on December 4, 1974 and by the Secretary Of Agriculture on March 12, 1975 and the United States would receive a mineral royalty on production from such property. By letter dated August 6, 1996, Jeffery D. Eisenberg responded to Plaintiffs' settlement proposal by rejecting the settlement offer and declining to make a counteroffer.

On August 22, 1996, Plaintiffs filed civil action number CV96-2000 on the docket of the United States District Court, Western District Of Louisiana against the United States for declaratory judgment pursuant to 28 U.S.C.§2201 and to quiet title to real estate pursuant to 28 U.S.C. §2409a. In their Complaint, Plaintiffs specifically sought recognition of their title to Group C.

Plaintiffs litigated CV96-2000 to final judgment, the result of which was recognition of Plaintiffs' ownership of the minerals relating to Group C.

While the litigation in CV96-2000 was progressing, Plaintiffs' lessees, Chesapeake and Sonat were each separately attempting to obtain access to Group C to drill wells. Chesapeake and Sonat were not able to satisfactorily conclude the negotiations and no well was ever drilled from the surface of Group C.

**INTERROGATORY NO. 3:**

Please state what actions you took to exercise or attempt to exercise your mineral rights between April of 1992 and the present, including but not limited to identifying what portion or parcel(s) you attempted to access, any oral communication or written correspondence between you and the Defendant, and all documents relating thereto.

**ANSWER TO INTERROGATORY NO. 3:**

See answer to Interrogatory No. 2 above.

**INTERROGATORY NO. 4:**

Please state what actions by the Defendant constituted a "partial taking of use of [Plaintiffs] mineral rights in 'Group C,'" including but not limited to identifying what portion or parcel(s) were allegedly taken, any oral communication or written correspondence between you and the Defendant, and all documents relating thereto.

**ANSWER TO INTERROGATORY NO. 4:**

See answer to Interrogatory No. 1 above.

**INTERROGATORY NO 5:**

Please state what actions by the Defendant prevented or restricted your use of, or access to your mineral rights in the Group C Lands, including but not limited to identifying the date of each action

and what portion or parcel(s) of land was affected, any oral communication or written correspondence between you and the Defendant, and all documents relating thereto.

**ANSWER TO INTERROGATORY NO. 5:**

See answer to Interrogatory No. 1 above.

**INTERROGATORY NO. 6:**

Please state the legal description of the property interests allegedly taken by the United States.

**ANSWER TO INTERROGATORY NO. 6:**

**MINERALS GROUP C**
**Vernon Parish, Louisiana**

**Township One South, Range Five West (T1S-R5W)**

Section 5: N/2 of NW/4 and SW/4 of NW/4

**Township One North, Range Five West (T1N-R5W)**

Section 4: Being diagonal SW/2 of SW/4

Section 6: Entire Section

Section 7: Entire Section

Section 8: Entire Section

Section 9: S/2 and NW/4 and diagonal SW/2 of NE/4

Section 10: Diagonal SW/2 of SW/4

Section 15: S/2 and NW/4 and diagonal SW/2 of NE/4

Section 16: E/2 and NW/4 and S/2 SW/4 and NE/4 of SW/4

Section 17: Entire Section

Section 20: Entire Section

Section 21: W/2 and W/2 of E/2 and NE/4 of NE/4 and the diagonal NW/2 of SE/4 of NE/4

Section 28: W/2 and W/2 of NE/4 and diagonal NW/2 of W/2 of SE/4

Section 29: Entire Section

Section 32: W/2 and N/2 of NE/4 and SE/4 of NE/4 and S/2 of SE/4 & Fractional NE/4 of SE/4 except 13 acres on West side

Section 33: NW/4 and N/2 of SW/4

**Township One North, Range Six West (T1N-R6W)**

Section 2: Entire Section

Section 3: W/2 of NW/4

Section 4: S/2; S/2 of NE/4 and NE/4 of NE/4; E/2 of NW/4 of NE/4; and S/2 of NW/4; NW/4 of NW/4

Section 5: W/2 of Section

Section 6: Entire Section

Section 7: Diagonal NE/2 and a tract of land situated in Section 7, T1N-R6W, and being more particularly described as follows: BEGINNING at the southeast corner of Section 7; THENCE west to southwest corner of said section; THENCE north to northwest corner of said section; THENCE southeast to the point of beginning, less and except the southwest 1/4 of northwest 1/4

Section 8: S/2; NE/4; E/2 of NW/4; W/2 of SW/4 of NW/4 and NW/4 of NW/4

Section 9: W/2; and S three-fourths of SE/4; NW/4 of NW/4 of SE/4 and NE/4 of NE/4 of SE/4 and W/2 of SW/4 of NE/4 and NE/4 of SW/4 of NE/4 and NE/4 of NE/4 and N/2 of SE/4 of NE/4 and SE/4 of SE/4 of NE/4 and NW/4 of NE/4

Section 10: Entire Section

Section 11: Entire Section

Section 12: Entire Section

Section 16: SE/4 SW/4

Section 27: NW/4 of NW/4

**Township One North, Range Seven West (T1N-R7W)**

Section 1: Being the diagonal NE/2 of NW/4; SW/2 of Lot 4 or SW/2 of NW/4 of NW/4 (diagonal division); SW/4 of NW/4; SW/2 of SE/4 of NW/4 (diagonal division); and, SW/4

**Township Two North, Range Five West (T2N-R5W)**

Section 30: Being the diagonal SW/2 of SW/4

Section 31: Being the diagonal SW/2 of NW/4 of NE/4

Section 32: Being the diagonal SW/2 of SW/4

**Township Two North, Range Six West (T2N-R6W)**

Section 14: Being the diagonal SW/2 of SW/4

Section 16: Entire Section, less and except the S/2 of NW/4 of NW/4 and N/2 of SW/4 of NW/4

Section 17: E/2 of E/2

Section 18: SE/4 and SE/4 of NE/4, SE/4 of SW/4, NE/4 of SW/4, Diagonal SE/2 of SW/4 of SW/4

Section 20: Entire Section

Section 22: Entire Section

Section 24: Diagonal SW/2 of SW/4

Section 25: SE/4 of SE/4

Section 26: Entire Section

Section 28: Entire Section

Section 29: SE/4 of NE/4

Section 30: Entire Section

Section 31: NE/4 of SE/4

Section 32: SW/4 and NE/4 and N/2 of NW/4, SE/4 of NW/4, NE/4 of SE/4, S/2 of SE/4

Section 33: SW/4 of SW/4, SW/4 of SE/4, NE/4 of SE/4

Section 34: Entire Section

Section 35: NW/4 SE/4

Section 36: S/2 and NW/4, and W/2 of NE/4

**Township Two North, Range Seven West (T2N-R7W)**

Section 24: NE/4 of SE/4

Section 33: E/2 of NE/4, NE/4 of SE/4

**INTERROGATORY NO. 7:**

Please identify all persons who owned any legal, equitable, or beneficial interest in any portion of the property, on the date or dates of the alleged taking, the type of interest each person holds or held in the property, the date or dates on which that interest was purchased or acquired, and the method of acquisition.

**ANSWER TO INTERROGATORY NO. 7:**

The ownership of the property subject to this litigation is as follows:

(A) Central Pines Land Company owns an undivided fifty percent (50%) of all of the oil, gas and other minerals subject to the following royalties: one-half of one percent (0.5%) in favor of Jack E. Lawton, Jr., one-fourth of one percent (0.25%) in favor of Evelyn Gay Lawton Duhon, one-fourth of one percent (0.25%) in favor of Linda Lew Lawton Drost, Plaintiffs' See Plaintiffs' title Exhibits "D", "E", "R", "U", "W", "Y", "FF", "HH", "II" and "JJ";

(B) Tower Minerals Company, Inc. owns an undivided fifty percent (50%) of all of the oil, gas and other minerals subject to the following royalties: one-half of one percent (0.5%) in favor of Jack E. Lawton, Jr., one-fourth of one percent (0.25%) in favor of Evelyn Gay Lawton Duhon, one-fourth of one percent (0.25%) in favor of Linda Lew Lawton Drost, four and two-

tenths percent (4.2%) in favor of D, S & T, Inc. and two and eight-tenths percent (2.8%) in favor of Drost & Brame, Inc. See Plaintiffs' title Exhibits "D", "E", "O", "P", "Q", "S", "T", "V", "X", "Z", "AA", "CC", "DD", "EE" and "KK".

Prior to 1988, the property was owned by Wm. T. Burton Industries, Inc., subject to royalty conveyances for the benefit of Linda Lew Lawton Drost, Evelyn Gay Lawton Duhon and Jack E. Lawton, Jr.

In the spring of 1988, Wm. T. Burton Industries, Inc. was reorganized pursuant to Section 355 of the Internal Revenue Code of 1986, but continued to exist under a new name, *i.e.,* William B. Lawton Company, Inc. See Plaintiffs' Title Exhibits "F", "G", "H" and "I"

After the reorganization, the property continued to be owned, through appropriate subsidiaries of each, 50-50 by William B. Lawton Company, Inc. (formerly named Wm. T. Burton Industries, Inc.) and Jack Lawton, Inc. (formerly named Burton Exploration Co.). See Plaintiffs' title Exhibits "K", "L", "M", "N", "O", "P", "Q", "R", "U", "V", "W", "X", "Y", "BB", "CC", "FF", "HH", "II", "JJ"and "KK".

Tower Minerals Company, Inc. is a subsidiary of William B. Lawton Company, Inc. which, subject to royalty conveyances for the benefit of members of the William B. Lawton family, owns fifty percent (50%) of the former Wm. T. Burton Industries, Inc. interests in the property. Tower Minerals Company, Inc. acquired its ownership on August 28, 1995. See Plaintiffs' Title Exhibits "Q", "S", "T", "V", "X", "Z", "AA", "CC", "DD", "EE"and "KK".

Central Pines Land Company is a subsidiary of Jack Lawton, Inc. which, subject to a royalty conveyances to Jack E. Lawton, Jr., owns fifty percent (50%) of the former Wm. T. Burton Industries, Inc. interests in the property. Central Pines Land Company acquired its ownership on August 29, 1995. See Plaintiffs' Title Exhibits "R", "U", "W", "Y", "FF", "GG", "II", "JJ", and

"LL".

D, S & T, Inc. owns a mineral royalty in the property of four and two-tenths percent (4.2%). The beneficial owners of D, S. & T, Inc. are the following grandchildren of William B. Lawton: Mary Margaret Duhon, Katherine Duhon Smith and Evelyn Duhon Truax. D, S & T, Inc acquired its royalty interest on November 1, 1995 through the following Plaintiffs' Title Exhibits: "T", "AA" and "DD".

Drost & Brame, Inc. owns a mineral royalty in the property of two and eight-tenths percent (2.8%). The beneficial owners of Drost & Brame, Inc. are the following grandchildren of William B. Lawton: William T. Drost and Desiree Drost Brame. Drost & Brame, Inc. acquired its royalty interest on November 1, 1995 through the following Plaintiffs' Title Exhibits: "S", "Z" and "EE".

Linda Lew Lawton Drost owns a mineral royalty in the property of one-fourth of one percent (0.25%). Linda Lew Lawton Drost acquired her royalty interest on May 17, 1978 through the following Plaintiffs' Title Exhibit: "E".

Evelyn Gay Lawton Duhon owns a mineral royalty in the property of one-fourth of one percent (0.25%). Evelyn Gay Lawton Duhon acquired her royalty interest on May 17, 1978, through the following Plaintiffs' Title Exhibit: "E".

Jack E. Lawton, Jr. owns a mineral royalty in the property of one-half of one percent (0.5%). Jack E. Lawton, Jr. acquired his royalty interest on May 17, 1978 through the following Plaintiffs' title Exhibit: "D".

In the course of answering these interrogatories, Plaintiffs' saw that William B. Lawton Company, Inc. and Jack Lawton, Inc. retained mineral royalty interests in their respective conveyances to Tower Land Company, Inc. and Central Pines Land Company.

With regard to its previous fifty percent (50%) of the minerals under Group C, which were

conveyed by it to Tower Minerals Company, Inc., William B. Lawton Company, Inc. retained the royalties less one half of one percent (.5%) outstanding to Jack E. Lawton, Jr., one-fourth of one percent (.25%) outstanding in Evelyn Gay Lawton Duhon, one-fourth percent (.25%) outstanding in Linda Lew Lawton Drost and four and two tenths percent (4.2%) conveyed to D, S & T, Inc. and two and eight tenths percent (2.8%) conveyed to Drost & Brame, Inc.

With regard to its previous fifty percent (50%) of the minerals under Group C, which were conveyed by it to Central Pines Land Company, Jack Lawton, Inc. retained the royalties less one half of one percent (.5%) outstanding to Jack E. Lawton, Jr., one-fourth of one percent (.25%) outstanding in Evelyn Gay Lawton Duhon and one-fourth of one percent (.25%) outstanding in Linda Lew Lawton Drost. On January 24, 2000 Jack Lawton, Inc transferred the retained royalty to Jack E. Lawton, Sr.

Plaintiffs intend to amend pleadings in this case to reflect the conveyances and to add William B. Lawton Company, Inc. and Jack E. Lawton, Sr. as parties.

**INTERROGATORY NO. 8:**

Please identify all plans, preparations or studies which have been prepared by you, or on your behalf, to determine the suitability of the subject property for exploration, drilling, or mining, or to develop or prepare the property for exploration, drilling, or mining, and all plans, preparations or studies which have been conducted by you, or on your behalf, for any other reason whatsoever, including seismic studies, studies or evaluations of the soil, hydrology, geology, engineering, botany, planning, feasibility, marketing or economies, cash-flow projections, or any mineral interest or other natural resource, and identify all documents which evidence such studies, including for each of these plans, preparations, or studies:

(a) the identity of all persons who contributed to the study;

(b) the date on which the study was prepared;

(c) an estimation of the total costs, and a specific itemization, including estimated costs, of each component necessary for calculation of the total development or utilization costs referenced in (c) above.

**ANSWER TO INTERROGATORY NO. 8:**

Other than the expert reports prepared and used in connection with Civil Action CV96-2000, Plaintiffs possess no such plans.

**INTERROGATORY NO. 9:**

Please state whether you, your predecessors-in-interest, or others holding any interest in the subject property at any time between 1978 and the present have ever received any income from, or whether you are engaged in a business or other endeavor for profit on, or with respect to, the property which is the subject of this litigation, and state the income and expenses generated therefrom, and identify any documents which evidence such income and/or business activities.

**ANSWER TO INTERROGATORY NO. 9:**

Plaintiffs have received the following income from Group C since 1978:

A. Central Pines Land Company: Mineral lease bonus, approximately $843,867.50.

B. Tower Minerals Company, Inc.: Mineral lease bonus, approximately $843,867.50.

C. Linda Lew Lawton Drost: Mineral royalty income, $13,660.56.

D. Evelyn Gay Lawton Duhon: Mineral royalty income, $13,660.56.

E. Jack E. Lawton, Jr.: Mineral royalty income, $27,321.12.

F. D, S & T, Inc.: Mineral royalty income, $106,552.43.

G. Drost & Brame, Inc.: Mineral royalty income, $71,034.96.

**INTERROGATORY NO. 10:**

Please identify every event or action, other than the actions allegedly taken by defendant on the date or dates of the alleged taking, which effected, either adversely or beneficially, the available uses of the subject property. Please identify the date of any event described above and each and every fact on which you base your contention.

**ANSWER TO INTERROGATORY NO. 10:**

Other than as stated in responses to these interrogatories, Plaintiffs are not aware of such actions.

**INTERROGATORY NO. 11:**

Please identify all communications, oral and written, between Plaintiffs and any others holding an interest in the subject property between 1978 and the present, which concern the subject property, and identify all documents which evidence such communications.

**ANSWER TO INTERROGATORY NO. 11:**

Other than Plaintiffs and William B. Lawton Company, Inc. and Jack E. Lawton, Sr., no persons own an interest in the property. There are no such communications between Plaintiffs and William B. Lawton Company, Inc. and Jack E. Lawton, Sr.

**INTERROGATORY NO. 12**:

With regard to (1) Central Pines Land Company, (2) D, S & T, Inc., (3) Drost & Brame, Inc., and (4) Tower Minerals Company, Inc., please identify:

(a) The date and place of incorporation.

(b) Corporate address and principal place of business.

(c) All owners, controllers, directors, officers and shareholders (i) on the date of incorporation, (ii) in 1978 and (iii) at all times between 1978 and the present.

(d) All types of business activity undertaken.

(e) All business or corporate subsidiaries and/or parent companies.

(f) The legal relationship, if any, between (i) Central Pines Land Company, (ii) D, S & T, Inc., (iii) Drost & Brame, Inc., and (iv) Tower Minerals Company, Inc.

**ANSWER TO INTERROGATORY NO. 12:**

**(1) CENTRAL PINES LAND COMPANY**

*(a)* *Incorporated* on July 7, 1995 in Sulphur, Calcasieu Parish, Louisiana;

*(b)* *Corporate Address*: 101 N. Huntington Street
Sulphur, LA 70663

*Principal Place Of Business:* 101 N. Huntington Street
Sulphur, LA 70663

*(c)* *Owners, Controllers, Directors, Officers and Shareholders on:*

*(i) On date of Incorporation:*

*Owner:* Jack Lawton, Inc.

*Officers:* Jack E. Lawton, Sr., CEO
Jack E. Lawton, Jr., President
Thad D. Minaldi, Executive Vice President
S. Glenn Gay, Secretary

*Directors:* Jack E. Lawton, Sr.
Jack E. Lawton, Jr.
Holly B. Lawton

*(ii) In 1978:* Corporation did not exist in 1978.

*(iii) At all times between 1978 and the present:*
Since 1995, please see the following:

*Owner:* Jack Lawton, Inc.

*Officers:* President, Jack E. Lawton, Jr.

*Directors:* Jack E. Lawton, Sr.
Jack E. Lawton, Jr.
Holly B. Lawton

(d) *All types of business activity undertaken:* Ownership of the subject property is the only asset and only business activity of Central Pines Land Company.

(e) *All business or corporate subsidiaries and/or parent companies:* Central Pines Land Company is owned 100% by Jack Lawton, Inc. Central Pines Land Company has no subsidiaries.

(f) Central Pines Land Company has no legal relationship to D, S & T, Inc., Drost & Brame, Inc. or Tower Minerals Company, Inc.

**(2) D, S & T, INC.**

(a) *Incorporated* on November 1, 1995 in Lake Charles, Calcasieu Parish, Louisiana;

(b) *Corporate Address:* One Lakeshore Drive, Suite 1700
Lake Charles, LA 70629

*Principal Place Of Business:* 641 W. Prien Lake Road
Lake Charles, LA 70601

(c) *Owners, Controllers, Directors, Officers and Shareholders on:*

*(i) On date of Incorporation:*

*Owners:* Mary Margaret Duhon
Katherine Duhon Smith
Evelyn Duhon Truax

*Controllers:* D, S & T Voting Trust Agreement,
William B. Lawton, Trustee

*Directors:* William B. Lawton

*Officers:* President, William B. Lawton
Vice President, William T. Drost
Secretary, Mary Margaret Duhon

*Shareholders:* Mary Margaret Duhon
Katherine Duhon Smith
Evelyn Duhon Truax

*(ii) In 1978:* Corporation did not exist in 1978.

*(iii) At all times between 1978 and the present:*
Since 1995, please see the following:

*Owners:* Same

*Controllers:* Same

*Directors:* Same

*Officers:* President: William B. Lawton
Vice President: William T. Drost
Secretary: Mary Margaret Duhon

*Shareholders:* Same

*(d)* *All types of business activity undertaken:* Ownership of royalty interests

*(e)* *All business or corporate subsidiaries and/or parent companies:* None.

*(f)* D, S & T, Inc. has no legal relationship to Central Pines Land Company, Drost & Brame, Inc. or Tower Minerals Company, Inc.

**(3) DROST & BRAME, INC.**

*(a)* *Incorporated* on November 1, 1995 in Lake Charles, Calcasieu Parish, Louisiana;

*(b)* *Corporate Address:* One Lakeshore Drive, Suite 1700
Lake Charles, LA 70629

*Principal Place Of Business:* 641 W. Prien Lake Road
Lake Charles, LA 70601

*(c)* *Owners, Controllers, Directors, Officers and Shareholders on:*

*(i) On date of Incorporation:*

*Owners:* William Thomas Drost
Desiree Drost Brame

*Controllers:* Drost & Brame, Inc. Voting Trust Agreement,
William B. Lawton, Trustee

*Director:* William B. Lawton