*Officers:* President, William B. Lawton
Vice President, William T. Drost
Secretary, Mary Margaret Duhon

*Shareholders:* William Thomas Drost
Desiree Drost Brame

*(ii) In 1978:* Corporation did not exist in 1978.

*(iii) At all times between 1978 and the present:*
Since 1995, please see the following:

*Owners:* Same

*Controllers:* Same

*Directors:* Same

*Officers:*

| | |
|---|---|
| President: | William B. Lawton |
| Vice President: | William T. Drost |
| Secretary: | Mary Margaret Duhon |

*Shareholders:* Same

*(d)* *All types of business activity undertaken:* Ownership of royalty interests

*(e)* *All business or corporate subsidiaries and/or parent companies:* None.

*(f)* Drost & Brame, Inc. has no legal relationship to Central Pines Land Company, D, S & T, Inc. or Tower Minerals Company, Inc.

**(4) TOWER MINERALS COMPANY, INC.**

*(a)* *Incorporated* on August 11, 1995 in Lake Charles, Calcasieu Parish, Louisiana;

*(b)* *Corporate Address:* 641 W. Prien Lake Road
Lake Charles, LA 70601

*Principal Place Of Business:* 641 W. Prien Lake Road
Lake Charles, LA 70601

*(c)* *Owners, Controllers, Directors, Officers and Shareholders on:*

*(i) On date of Incorporation:*

*Owner:* William B. Lawton Company, Inc.

*Controller:* William B. Lawton Company, Inc.

*Director:* William B. Lawton

*Officers:* President, William B. Lawton
Vice President, William T. Drost
Secretary, Mary Margaret Duhon

*Shareholders:* William B. Lawton Company, Inc.

*(ii) In 1978:* Corporation did not exist in 1978

*(iii) At all times between 1978 and the present:*
Since 1995, please see the following:

*Owners:* Same

*Controllers:* Same

*Directors:* Same

| *Officers:* | | |
|---|---|---|
| | President: | William B. Lawton |
| | Vice President: | William T. Drost |
| | Secretary: | Mary Margaret Duhon |
| | Asst. Secretary: | Betty Cryar (until 10/23/96) |
| | Asst. Secretary: | Andrew Jackson Gray, III |

*Shareholders:* Same

(d) *All types of business activity undertaken:* Ownership of minerals.

(e) *All business or corporate subsidiaries and/or parent companies:* This corporation has no subsidiaries, however, it is owned by its parent company, William B. Lawton Company, Inc.

(f) Tower Minerals Company, Inc. has no legal relationship to Central Pines Land Company, D, S & T, Inc. or Drost & Brame, Inc.

**INTERROGATORY NO. 13:**

Please provide complete annual financial statements for each year from 1978 to the present for:

(a) Central Pines Land Company

(b) D, S & T, Inc.

(c) Drost & Brame, Inc.

(d) Tower Minerals Company, Inc.

**ANSWER TO INTERROGATORY NO. 13:**

Annual financial statements for Central Pines Land Company are included in the package of documents produced herewith.

Annual financial statements are not maintained for D, S & T, Inc., Drost & Brame, Inc. and Tower Minerals Company, Inc.

**INTERROGATORY NO. 14:**

Please identify the date upon which, the manner in which, and the terms under which each Plaintiff acquired their interests in the Group C Lands, and identify any documents which evidence these transactions.

**ANSWER TO INTERROGATORY NO. 14:**

Please see answers to Interrogatory No. 7 above.

**INTERROGATORY NO. 15:**

Please identify in detail all information which was available to each Plaintiff, prior to their acquisition of their interests in the Group C Lands, with regard to the ability to access those lands and any restrictions on access. Please identify any documents relevant to these matters, and indicate whether these documents were relied upon by Plaintiffs prior to their acquisition of the Group C Lands.

**ANSWER TO INTERROGATORY NO. 15:**

Central Pines Land Company: As a subsidiary of Jack Lawton, Inc. which was itself

created pursuant to the corporate reorganization of Wm. T. Burton Industries, Inc., Central Pines Land Company recognizes that all information in the files of Wm. T. Burton Industries, Inc. and all knowledge of the management of Wm. T. Burton Industries, Inc. was available to it at the time it acquired its interest in the property.

Tower Minerals Company, Inc.: As a subsidiary of William B. Lawton Company, Inc., formerly known as Wm. T. Burton Industries, Inc., Tower Minerals Company, Inc. recognizes that all information in the files of Wm. T. Burton Industries, Inc. and all knowledge of the management of Wm. T. Burton Industries, Inc. was available to it at the time it acquired its interest in the property.

Linda Lew Lawton Drost: All public records were "available" to Linda Lew Lawton Drost at the time of her acquisition of the property. Ms. Drost relied on the law of Louisiana to provide access to the property.

Evelyn Gay Lawton Duhon: All public records were "available" to Ms. Duhon at the time of her acquisition of the property. Ms. Duhon relied on the law of Louisiana to provide access to the property.

Jack E. Lawton, Jr.: All public records were "available" to Mr. Lawton at the time of his acquisition of the property. Mr. Lawton relied on the law of Louisiana to provide access to the property.

D, S & T, Inc.: All public records were "available" to D, S & T, Inc. at the time of its acquisition of the property. The corporation relied on the law of Louisiana to provide access to the property.

Drost & Brame, Inc.: All public records were "available" to Drost & Brame, Inc., at the time of its acquisition of the property. The corporation relied on the law of Louisiana to provide

access to the property.

**INTERROGATORY NO. 16:**

Please identify any restrictions on access to or use of your property interests that were in place at the time of your acquisition of your interests in the Group C lands. Please identify any documents relevant to these matters.

**ANSWER TO INTERROGATORY NO. 16:**

Under Louisiana law, the owner of minerals has unrestricted use of the surface of the property burdened by the mineral servitude. Thus, the owner of the surface can impose no legal restrictions on access to or use of the property by the mineral servitude holder.

Notwithstanding, all Plaintiffs are successors to Wm. T. Burton. Group C was expropriated from Mr. Burton in 1943. Prior to the expropriation, there were no restrictions on Mr. Burton's access to the property. When expropriated, the United States imposed a moratorium on access to the property for mineral development. The moratorium terminated in 1978. When Plaintiffs acquired their interests, the property was used as a military base, with the United States Army controlling the surface. All limitations on access and the consequences of the military operations discussed in these responses to discovery apply to each Plaintiff.

**INTERROGATORY NO. 17:**

Please identify each factual averment of Defendant's partial answer to the Complaint which the Plaintiffs claim is untrue or inaccurate upon the basis of facts and information known to Plaintiffs. Please state the facts supporting your denial of each factual averment identified.

**ANSWER TO INTERROGATORY NO. 17:**

Partial Answer Paragraph 1: No response required.

Partial Answer Paragraph 2: Defendant denied that Group C contains 21,118.2 acres.

Plaintiffs determined the acreage based on available title, survey and land record data. Land sections within Group C are oversized, *i.e.*, larger than 640 acres. In Civil Action CV96-2000, Defendant herein produced to Plaintiffs survey maps relied upon by Defendant. Based upon a comparison of the respective information, Plaintiffs submit that Defendant's data reflects virtually the identical acres as Plaintiffs alleged in paragraph 2 of the First Amended Complaint. Plaintiffs' proposed witness, James Val Miller, can testify through deposition on this issue.

Partial Answer Paragraph 3: Defendant denied the last sentence of this paragraph. In light of this Court's ruling eliminating Group A and Group B properties from this litigation, the denial is no longer relevant.

Partial Answer Paragraph 4: Defendant denied the first sentence of paragraph 4. In light of this Court's ruling eliminating Group A and Group B properties from this litigation, the denial is no longer relevant.

Defendant denied the second sentences of paragraphs 4(A) and 4(B). In light of this Court's ruling eliminating Group A and Group B properties from this litigation, the denial is no longer relevant.

Partial Answer Paragraph 5: Plaintiffs' ownership of Group C minerals was a subject of a status conference with the Court on November 22, 2004. The Court ordered an additional status conference for December 2, 2004 at which time the parties were ordered to be prepared to determine whether there is a dispute regarding the ownership of the mineral rights in the Group C lands. Plaintiffs counsel submitted title documents and reasons for judgment to Defendant's trial attorney Terry M. Petrie. Thereafter, Mr. Petrie informed the Court that the United States was satisfied with Plaintiffs' title and that such ownership was no longer an issue. Thus, Defendant's denials of various parts of Paragraph 5 are no longer relevant.

Partial Answer Paragraph 6: No response required.

Partial Answer Paragraph 7: No response required.

Partial Answer Paragraph 8: An exhaustive search of relevant documents fails to reflect that any compensation was offered to or paid to Fullerton Minerals Company, or its successors-in-title, for any taking of mineral rights as alleged by Plaintiffs in paragraph 8 of the First Amended Complaint.

Partial Answer Paragraph 9: No response required.

Partial Answer Paragraph 10: The allegations of the first sentence of paragraph 10 of Plaintiffs' First Amended Complaint is stated in the negative, *i.e.*, an event did not occur. An exhaustive search of relevant documents fails to reflect any conclusions other than as alleged by Plaintiffs in paragraph 10 of their First Amended Complaint. With regard to the second sentence of paragraph 10 of Plaintiffs' First Amended Complaint, Plaintiffs refer to the Solicitor of the Department Of Agriculture in an Opinion dated March 25, 1944.

Partial Answer Paragraph 11: No response required.

Partial Answer Paragraph 12: Plaintiffs recognize and agree with Defendant that no portion of the Limited Use Area was used as a bombing range.

Partial Answer Paragraph 13: No response required. The various documents speak for themselves and are the best evidence of their content.

Partial Answer Paragraph 14: No response required. The various instruments speak for themselves and are the best evidence of their content.

Partial Answer to Paragraph 15: Plaintiffs generally accept Defendant's allegations.

Partial Answer to Paragraph 16: Plaintiffs urge that the following support the allegations of Paragraph 16 of the First Amended Complaint:

In his deposition in Civil Action CV96-2000, Mr. John Camp said he visited Fort Polk trying to get access. General William Steele expressed interest in working together; but all persons knew that there would be no access.

Memo dated February 4, 1976 to HQDA from Colonel Schulz RE: suspend action to acquire minerals at Fort Polk; provided Mission of installation is not hampered by mineral activities, specifically that final approval of drilling sites and access remain with Installation Commander.

Memorandum on Moratorium on Minerals, Fort Polk dated December 16, 1966 to Chief of Engineers from Jack W. Fickessen, Colonel, CE, District Engineer RE: Military needs to acquire minerals under Fort Polk; consideration to claiming by prescription, but could not win because of history of moratorium and recognizing private ownership; file test case on 2600 acre contonment area (never subject to moratorium) claiming government ownership; no further moratorium payments; expropriate minerals.

Disposition Form dated January 19, 1967 by Darwin L. Wilder and Tom Adams RE: Telephone call with various persons including Zeidner; will not get authority to acquire minerals; moratorium waste of money; put up signs saying "keep out" and let them sue; Wilder said unfair to landowners; government not previously claimed minerals, would be estopped.

Letter dated March 1, 1967 to Division Engineer from Max McCord, Director of Real Estate RE: Any request to drill should be referred to Chief of Engineering; not authorized to permit drilling because ownership in doubt; no greater liability for claim action than in condemnation

Memorandum For The Record dated April 30, 1974 by Thomas Kerscher concerning meeting April 25, 1994 meeting at Fort Polk by Zeider and Anthony Liotta concerning minerals at fort and fact that Fort Polk is being fully utilized and should not continue to pay moratorium

Disposition Form dated April 30, 1974 by Clarence C. Randle, Chief, Condemnation Section, Real Estate Division RE: Commanding General concerning about possible drilling on Fort Polk and being in a position to prevent

Minutes of meeting at Fort Polk on June 27, 1974 prepared by Colonel Jerry L. Teague RE: major mineral owners are Burton and Hodges; Burton wants money and Hodges wants to drill; government only owns 3,000 acres of minerals out of the total of 200,000 acres in use; estimated cost of purchasing minerals is $3.2 million; Leesville Artillery Range is considered dangerous because of unknown "duds"; if Hodges is permitted to drill one well, others will want to drill; conclusion -- prohibit drilling; purchase minerals; deny any type of entry;

Letter dated June 26, 1974 to HQDA, WASH DC from Joe H. Sheard, Colonel, CE,

District Engineer RE: drilling not to be permitted; don't own minerals; Nebo; Little Lake Misiere; Act 315.

Undated Memorandum (after June 27, 1974 and believed to be July 10, 1974) to Secretary of the Army from Major General D. A. Raymond, Acting Chief of Engineers RE: obtain approval to exclude all owners of minerals from Fort Polk; energy problem; pressure to drill; to allow drilling even on selected areas would put pressure for more drilling; oil and gas development is important, but do it elsewhere; separate action being taken to acquire title to minerals.

Memo dated July 22, 1974 to HQDA (DAEN-REZ) WASH DC from Major General Warren K. Bennett, Chief of Staff RE: Army Position -- No exploratory testing; acquire all minerals by FY 76 MCA program (estimated cost $4.4 million); any other course would jeopardize meaningful training at Fort Polk.

Undated Executive Summary (subsequent to Congressional denial of funding to acquire minerals at Fort Polk ,FY 76 MCA,) by Major General Commanding Robert Haldane RE: mineral exploration can only occur outside of cantonment areas, tank ranges, certain artillery ranges, and impact areas by close scheduling; can not have mineral development concurrent with military activities; control must rest with Installation Commander.

Memo dated December 12, 1975 to FORSCOM from DA WASH DC RE: Congress denied funds for mineral acquisition; develop additional information concerning need for minerals and valuations; develop program to monitor mineral development on adjacent property; notify of all wells giving details

Notes of meeting on December 17, 1975 at Fort Polk including Teague and Wilder to discuss mineral rights at Fort Polk

Undated Memorandum (apparently January 13, 1976) by Darwin L. Wilder RE: trip to Fort Polk -- Army proposed to acquire minerals in 1976, but Congress denied request; future moratorium to cost $5 per acre; Burton wants to drill near ARCO well; on long term Burton wants to drill south and west of impact area; Camp to supply letter; Congress will probably not permit moratorium on two artillery ranges; better to negotiate and avoid jury trial; $5 million to low a figure for acquiring minerals; if one well hits, not force including the Army can keep them off Fort Polk; Burton wants money and to drill too; Recommendation: stop paying moratorium payments; Burton will not do anything to close Fort Polk; as alternative, negotiate limited drilling.

Memorandum for Commanding General dated January 19, 1976 by Teague: Wilder's alternative recommendations: (1) lift moratorium entirely; acquire 866 acres of leased land; acquire minerals in cantonment area (2) lift moratorium in selected areas.

Disposition Form dated January 19, 1977 by Darwin L. Wilder, Chief, Acquisitions

Branch, Real Estate Division RE: trip to Fort Polk with John Camp and others; recommended that moratorium expire; driller must ask permission before entering property; if not agreeable, obtain injunction and new moratorium; decided to let Commanding General make decision; General wanted to know intent of Burton Industries to see if agreement could be reached; met with Camp who advised that Burton had interest in drilling well in vicinity of ARCO dry well and maybe within the artillery range; Camp wanted to continue the moratorium; discussion about number of wells to be drilled at one time; property south of State Highway 467 could be made available; Camp rapidly concluded that out of 44,000 acres, only about 8,000 would be available for drilling; Camp wanted agreement to settle mineral title in Forest Service area as well; Conclusion: Burton more interested in money than drilling; will accept $.95 per acre if limited drilling permitted; Commanding General will demand that moratorium be maintained if agreement can not be reached.

Disposition Form dated March 18, 1977 by Darwin L. Wilder RE: Second meeting with John Camp: showed Camp a map outlining 25,800 acres where no drilling would be possible; Camp said not interested in drilling under same terms as Hodges; Camp expected not less than $2.00 per acre for continuation of moratorium; Burton not interested in stipulation to permit limited drilling in certain areas; Burton wants money for moratorium; Recommendation: extend moratorium for additional year at $2; no further extension of moratorium; mineral owners be permitted to conduct seismograph surveys after 1978; negotiate possible drilling sites; if not successful, new moratorium; ---- too much risk for operator; too expensive; offer to let them drill; if no oil, no problem; if oil, find solution; not practical to purchase minerals at this time.

Memorandum For Record dated May 2, 1977 from Captain Christopher G. Hunt, Real Estate Officer RE: Meeting to consider Fort Polk mineral options: ultimately will have to release Fort Polk for mineral exploration; demands to drill well on particular sites could be countered with "mini-moratorium."

Letter dated May 5, 1977 to Darwin Wilder, Real Estate Division, Fort Worth from Levin Harris, Assistant U. S. Attorney, Shreveport RE: Options at Fort Polk include (1) renewing moratorium; (2) let moratorium expire; refuse drilling; force mineral owners to sue in court of claims; or (3) negotiate drilling program.

Attorney' opinion dated May 11, 1977 by R. P. Allen, Jr. concerning Fort Polk Mineral Moratorium RE: Correlative rights for surface and mineral operations; Options available: (a) continue moratorium; (b) allow moratorium to expire; (c) agreement for partial lifting of moratorium for selected areas; Military must still consider risk factors of allowing drilling on base security and nations need for oil; mineral operator must assume risk of damages.

Disposition Form dated May 27, 1977 to Commander from Colonel Jerry L. Teague, Facilities Engineer RE: please sign letter notifing Commander, US Army FORSCOM of Fort Polk's intention to allow mineral moratorium to expire March 31,

1978; will save $80,000 to $200,000 per year.

Letter dated June 6, 1977 to Commander, US Army FORSCOM from William B. Steele, Major General, USA, Commanding RE: at Leesville Artillery Range recommend letting moratorium expire; government protected because (a) all previous wells were dry; wells are expensive to drill; inconceivable that area will be overrun by new wildcat wells; (b) Army controls surface and right of entry; (c) due to safety hazards, no prudent driller would drill; (d) if pushed, Army can reestablish moratorium over smaller, selected areas

Memo dated June 15, 1977 to HQDA; WASH DC from HQ, FORSCOM RE: concur in Fort Polk plan to permit moratorium to expire; plan will save $200,000 per annum.

Memo dated June 17, 1977 to Division Engineer, Southwestern from Michael B. Cottrell RE: Termination of Civil Action No. 19118; history of moratorium; negotiations underway; owners at Fort Polk will not agree to stipulation like Peason Ridge; recommend abandoning proceedings; "take calculated risk that there will be no drilling for oil or gas on the artillery range. Should the mineral owners find prudent lessees who would drill in this area at a cost of approximately one million per will, there is no assurance they would find oil or gas. We recommend the risk be taken and no new civil action be filed."

Undated letter (approximately June 1977) to Commander US Army FORSCOM from William B. Steele, Major General, USA, Commanding RE: Let moratorium expire; Army has following measures of protection (a) all wells have been dry, they are expensive; (b) Army still controls surface; (c) due to safety hazards, no prudent driller would drill in impact areas; (d) Army can always re-establish moratorium.

Memo dated June 22, 1977 to HQDA, Wash. D.C. from M. R. Long, Acting Chief, Real Estate Division RE: assume approval to take calculated risk rather than continue mineral moratorium.

Disposition Form dated July 12, 1977 by Darwin L. Wilder, Chief, Acquisition Branch, Real Estate Division reporting on visit to Fort Polk by John Camp RE: Camp treated royally, helicopter view, lunch, etc; Camp requested permission to commence seismograph work; permission was denied; perhaps on weekends after moratorium expires; will let Camp know; Camp told that request to drill was premature; Ft. Polk will only permit dependable and reliable major oil companies because of risk and danger involved; must post large bond; Ft. Polk will not grant permission is location interferes with military mission; not likely to drill in impact areas; certain areas on side of artillery range where drilling would have little interference.

Partial Answer to Paragraph 17: No response required.

Partial Answer to Paragraph 18: No response required for first two sentences. Third

sentence relates to information "Plaintiffs should have known." Plaintiffs simply assert that they did not know of the government's claim to Group C until Spring, 1995.

Partial Answer to Paragraph 19: No response required.

Partial Answer to Paragraph 20: No response required.

Partial Answer to Paragraph 21: No response required.

Partial Answer to Paragraphs 22 - 30: No response required.

Partial Answer to Paragraphs 31: No response required.

Partial Answer to Paragraph 32: No response required. Legal documents and proceedings are the best evidence of their content and speak for themselves.

Partial Answer to Paragraph 33: See responses to Interrogatory No. 2 and elsewhere.

Partial Answer to Paragraph 34: See responses to Interrogatory No. 2 and elsewhere.

Partial Answer to Paragraph 35: See previous responses herein.

Partial Answer to Paragraph 36: See previous responses herein.

Partial Answer to Paragraph 37: No response required.

Partial Answer to Paragraph 38: No response required.

Partial Answer to Paragraph 39: No response required.

Partial Answer to Paragraph 40: No response required.

**INTERROGATORY NO. 18:**

Please identify each individual likely to have knowledge of the facts stated in the Complaint and identify categories of facts known by each individual.

**ANSWER TO INTERROGATORY NO. 18:**

The following may have knowledge of the facts stated in the Complaint:

1. Jeffrey B. Ahbe
   Geosciences Manager - Austin Chalk
   Union Pacific Resources Company
   P. O. Box 7
   Forth Worth, Texas 76101-0007
   (817) 877-6000
   (817) 877-7708

   Union Pacific Resources Company conducted mineral operations in the Austin Chalk area of Louisiana and negotiated with Plaintiffs for a mineral lease. Mr. Ahbe is expected to have information concerning Union Pacific's operations, operations of others and mineral leasing in the area. Mr. Ahbe is believed to have knowledge of the leasing activities of the United States regarding portions of Tract C.

2. Brett Birdsong
   U.S. Department of Justice
   Environmental and Natural Resources Division
   P. O. Box 663
   Washington, D.C. 20044-0663
   (202)304-0428

   Mr. Birdsong communicated with Plaintiffs concerning Plaintiffs' claims of ownership of minerals under Tract C. Mr. Birdsong is believed to have played a role in denying Plaintiffs' claims to Tract C and asserting the claim of the United States to such minerals.

3. Danny W. Britt
   Forest Supervisor
   United States Department of Agriculture
   Forest Service
   Kisatchie National Forest
   Shreveport Hwy.
   Pineville, LA 71360

   Or

   Danny W. Britt
   206 Red Fox Circle
   Pineville, LA 71360

Mr. Britt has been involved with portions of Tract C since at least 1988. He has knowledge of the military use of the property, including the Special Use Permits; the leasing activities of the United States affecting Group C; and efforts by Plaintiffs' ancestors in title and third persons to develop minerals on the property. Mr. Britt has expressed opinions concerning ownership of minerals on portions of the property. He executed an affidavit and was deposed in Civil Action CV96-2000.

4. Cynthia W. Carter
Realty Specialist
Directorate of Public Works
Engineer Plans and Services Division
Planning Branch
Fort Polk, LA 71459

Ms. Carter has been involved with the real property issues at Fort Polk from the early 1980's. Ms. Carter attended meetings at Fort Polk which included lessees and potential lessees of Plaintiffs who were attempting to drill wells on Group C. She has knowledge of efforts of persons to obtain seismic permits; the permitting process and the mineral leasing stipulations applicable to Fort Polk; the status of the minerals under Fort Polk at various relevant times; and restrictions imposed upon persons attempting to develop minerals under Fort Polk.

5. Herbert M. Carter
Deputy Director of Public Works
Fort Polk, LA 71459

Mr. Carter has been involved in mineral activities at Fort Polk at least since 1996. He has attended meetings with Plaintiffs' lessees or potential lessees who were attempting to drill wells on the disputed property.

6. Carl D. Chiasson
P. O. Box 53414
Lafayette, Louisiana 70505
(337) 232-2702

Mr. Chaisson is an independent mineral lease broker who attempted to obtain leases from Plaintiffs for the drilling of wells on the disputed property. Mr. Chaisson is believed to have knowledge of mineral operations in the area and efforts to obtain mineral leases in the relevant area.

7. Gary B. Collipp
Senior Engineer
Sonat Exploration Company
910 S. 5th St.
Raton, NM 87740
(505) 445-2433

Or

Gary B. Collipp
613 Wellington
Tyler, TX 75703

As an engineer employed by one of Plaintiffs' lessees, Mr. Collipp negotiated with representatives of Fort Polk in efforts to obtain access to the property for mineral development. Mr. Collipp has knowledge of the restrictions imposed on those attempting to develop minerals on the property. Mr. Collipp has knowledge of the affect of military uses of the property on mineral development.

8. Michael B. Cottrell
Chief, Real Estate Division
Department of the Army
Fort Worth District, Corps of Engineers
2100 Rosslyn Chapel Ct.
Arlington, TX 76012
(817) 277-0743

Mr. Cottrell employed appraisers to appraise the minerals under Fort Polk. Mr. Cottrell expressed opinions of the cost of acquiring minerals under Fort Polk. Mr. Cottrell has knowledge of the attempts by the United States to acquire the minerals under Fort Polk; title to and ownership of minerals under Fort Polk during relevant time periods; the moratorium and the decision made by the United States to permit the moratorium to terminate; efforts by third persons to lease property under Fort Polk for mineral development and for seismic surveys; contamination of the Fort Polk property by unexploded ordinance, shells, rockets, mines and other below ground obstructions which would be obstacles to mineral development.

9. Michael L. Cruse
Deputy General Counsel
Office of General Counsel
United States Department of Agriculture
Room 3201
Federal Building
700 West Capital Ave.
Little Rock, Ark 72201

Mr. Cruse communicated with Plaintiffs concerning their claim to minerals under the disputed property. By letter dated November 9, 1995 Plaintiffs informed the United States their claim to Group C. Mr. Cruse is believed to have knowledge of the decision of the United States to assert title to the disputed property.

10. William David Davas
Sonat Exploration Company
6101 South Broadway, Suite 200
Tyler, TX 75703

As an employee of one plaintiff's lessees, Davas was involved in efforts to obtain access to Fort Polk for drilling. He attended meetings at Fort Polk on that subject and participated in plans to drill on the fort. He communicated with Cindy Carter and considered plans for Fort Polk similar to the Fort Chaffee Surface Use and Operational Plan Agreement.

11. George P. Denny, Landman
Cheasapeake Energy Corporation
P.O. Box 18496
Oklahoma, OK 73154
(405) 848-8000

As an employee of one of Plaintiffs' mineral lessees, Mr. Denny was aware of the efforts to lease Plaintiffs' minerals under Fort Polk. Mr. Denny is believed to have knowledge of overall mineral leasing efforts in the area. Mr. Denny communicated with Plaintiffs concerning the availability of property for mineral leasing.

12. Steven C. Dixon
Senior Vice President - Production
Chesapeake Energy Corporation
P. O. Box 18496
Oklahoma City, OK 73154
(405) 848-8000

As an officer of one of Plaintiffs' lessees, Mr. Dixon attended meetings at Fort Polk to discuss obstacles to drilling downrange from the various artillery ranges. Mr. Dixon has knowledge of the adverse impacts from live fire and various restrictions imposed upon persons attempting to develop minerals at Fort Polk.

13. William T. Drost
641 West Prien Lake Road
Lake Charles, LA 70601-8315
(337) 480-3797

As a representative of Plaintiffs, Mr. Drost has knowledge of the efforts of

Plaintiffs to obtain mineral leases on Group C. Mr. Drost has knowledge of Plaintiffs' efforts to determine if the United States was claiming minerals under the disputed property. Mr. Drost attended meetings with representatives of Helmerich & Payne, Inc., Chesapeake Energy Corporation, Sonat Exploration Company, Union Pacific Resources Company, Belco Oil and Gas Corp., and Swift Energy Company all concerning mineral leasing and operations in the area of the disputed property and concerning the difficulty of obtaining access to Fort Polk for drilling.

14. Jeffrey Eisenberg
USDA - OGC
South Building 4636
14th & Independence Ave. S.W.
Washington, D.C. 20250 - 1400

Now believed to be as follows:

Jeffrey Eisenberg
National Wildlife Federation
Arlington, VA 22201
(703) 533-3828

Mr. Eisenberg is believed to have played a role in asserting title to the disputed property on behalf of the United States and in denying Plaintiffs claims to the property. Plaintiffs attempted to negotiate settlements with Mr. Eisenberg concerning portions of Tract C. By letter dated August 6, 1996 Mr. Eisenberg denied the claim of Plaintiffs and has asserted a claim to ownership of the minerals adverse to that of Plaintiffs. Mr. Eisenberg participated in the decision by the United States to withdraw portions of Tract C from leasing despite the claim of ownership thereto by the United States. By letter dated September 26, 1996, in a effort to cause the drilling of wells on portions of Tract C, Plaintiffs informed Mr. Eisenberg that Plaintiffs would not upset or otherwise interfere with scheduled mineral lease sale through restraining order, injunction or other judicial proceedings. Mr. Eisenberg is believed to have participated in the drafting of various affidavits used in the previous litigation.

15. Mel Fife
Land Manager
Belco Oil & Gas Corp.
14300 Cornerstone Village Drive
Suite 421
Houston, TX 77014

Or

Mel Fife
6485 Pine Shadows Rd.
Cleveland, TX 77328
(281) 432-2786

As an employee of Belco Oil & Gas Corp., Mr. Fife is believed to have knowledge of efforts by Belco to obtain access to Fort Polk for drilling. Mr. Fife is expected to have knowledge of the efforts by Belco and others to obtain mineral leases in the area.

16. David V. Hamilton
Land Manager
Sonat Exploration Company
6101 S. Broadway
Suite 200
Tyler, TX 75703
(903) 561-3360

Now believed to be as follows:

David V. Hamilton
Kaiser-Frances Oil Company
1320 Lake Robbins Dr.
Suite 270
The Woodlands, TX 77380
(281) 681-1919

As an employee of Sonat Exploration Company, Mr. Hamilton is believed to have knowledge of efforts by Sonat to obtain access to Fort Polk for drilling. Mr. Hamilton is expected to have knowledge of the efforts by Sonat and others to obtain mineral leases in the area including efforts to obtain leases on portions of Tract C.

17. Ted Hammerschmidt
Deputy Director of Public Works
Directorate of Engineering & Housing
Fort Polk

Mr. Hammerschmidt has been involved in mineral development questions at Fort Polk since the early 1980's. Mr. Hammerschmidt attended meetings at Fort Polk with Plaintiffs's lessees and potential lessees concerning restrictions and obstacles to drilling at Fort Polk. He has knowledge of the procedures imposed and of the dangers involved in attempting to develop minerals within the military base and the status of the minerals at Fort Polk at various relevant time periods.

18. Henry J. Hood
Vice President - Land and Legal
Cheaspeake Energy Corporation
P. O. Box 18496
Oklahoma City, OK 73154-0496
(405) 848-8000, Ext. 400

As an employee of Cheaspeake Energy Corporation, Mr. Hood is believed to have knowledge of efforts by Cheaspeake to obtain access to Fort Polk for drilling. Mr. Hood is expected to have knowledge of the efforts by Cheaspeake and others to obtain mineral leases in the area including efforts to obtain leases on portions of Tract C.

19. Vance E. Johnson
Chief, Real Property
Fort Polk, LA 71459

Or

Vance E. Johnson
1920 Hwy. 113
Glenmora, LA 71433

Mr. Johnson was involved in real property issues at Fort Polk since the 1970's. He has knowledge of persons attempting to obtain access to Fort Polk for mineral leasing and seismic surveys; ownership of minerals at Fort Polk and efforts by the United States to obtain the minerals; the moratorium and the decision by the United States to permit the moratorium to terminate; meetings with military representatives and John C. Camp; restrictions imposed upon mineral development at Fort Polk; and whether property at Fort Polk was available for mineral leasing.

20. Robert C. Joslin
Deputy Chief
National Forest System
U.S. Forest service
Alexandria, VA

Mr. Joslin provided an affidavit in the previous litigation. He is believed to have knowledge of the matters covered by that affidavit.

21. Jack E. Lawton, Jr.
101 N. Huntington Street
Sulphur, LA 70663
(337) 527-5221

As a representative of Plaintiffs, Mr. Lawton has knowledge of the efforts of Plaintiffs to obtain mineral leases on the disputed property. Mr. Lawton has knowledge of Plaintiffs' efforts to determine if the United States was claiming minerals under the disputed property. Mr. Lawton attended meetings with representatives of Helmerich & Payne, Inc., Chesapeake Energy Corporation, Sonat Exploration Company, Union Pacific Resources Company, Belco Oil and Gas Corp., and Swift Energy Company all concerning mineral leasing and operations in the area of the disputed property and concerning the difficulty of obtaining access to Fort Polk for drilling.

22. Timothy J. Mahaffey
Landman Advisor
Domestic Exploration
OXY USA Inc.
Box 12021
Bakersfield, CA 93389-2021
(805) 321-6618

As an employee of OXY USA Inc., one of Plaintiffs' lessees in the area, Mr. Mahaffey is believed to have knowledge of mineral leasing and operations in the area.

23. James Val Miller, MBA, CPL
430 First Street
Jennings, Louisiana 70546
(337) 247-4230

Mr. Miller is a certified petroleum landman. He has extensive knowledge of mineral leasing and operations in the Fort Polk area as well as the efforts by Plaintiffs and Plaintiffs' lessees and potential lessees to obtain access to Fort Polk for mineral leasing and seismic surveys.

24. Thad D. Minaldi
One Lakeside Plaza
Suite 400
Lake Charles, LA 70601
(337) 436-9491

As a representative of Plaintiffs, Mr. Minaldi has knowledge of the efforts of Plaintiffs to obtain mineral leases on Group C. Mr. Minaldi has knowledge of Plaintiffs' efforts to determine if the United States was claiming minerals under the disputed property. Mr. Minaldi attended meetings with representatives of Helmerich & Payne, Inc., Chesapeake Energy Corporation, Sonat Exploration Company, Union Pacific Resources Company, Belco Oil and Gas Corp., and Swift Energy Company all concerning mineral leasing and operations in the area of the

disputed property and concerning the difficulty of obtaining access to Fort Polk for drilling.

25. Barry Oswald
G3/DPTMS Range
JRTC & Fort Polk

Mr. Oswald attended meetings with representatives of Plaintiffs' lessees concerning the possibility of drilling wells at Fort Polk. Mr. Oswald has knowledge of issues concerning possible well sites in the intensive use area of the Fort; contemplated measures to protect well Christmas trees from live fire; depths for construction and routes for proposed pipelines; and other safety issues concerning mineral exploration at Fort Polk.

26. William J. Phillips
Senior Landman
Helmerich & Payne, Inc.
1437 South Boulder Ave.
Tulsa, Oklahoma 74114
(918) 742-5531

As an employee of Helmerich & Payne, Inc., a mineral company active in the area, Mr. Phillips is believed to have knowledge of mineral leasing and operations in the area.

27. Thomas S. Price, Jr.
Senior Vice President - Investor and Governmental Relations
Chesapeake Energy Corporation
P. O. Box 18496
Oklahoma City, OK 73154
(405) 848-8000

As an officer of one Plaintiffs' lessees, Mr. Price met with representatives at Fort Polk concerning possible oil well drilling. Mr. Price has knowledge of the military's requirements, the permitting and regulatory process, safety issues and obstacles involved in attempting to develop mineral resources at Fort Polk.

28. Stephen M. Sittnick
LTC, IN
G3 / DPTMS
Fort Polk

While at Fort Polk Mr. Sittnick reviewed a memorandum dated July 15, 1997 concerning offers to lease areas including Red Leg Impact Area and Memorandum dated July 23, 1997 concerning offers to lease. He recommended not leasing. He

stated the area was "off limits," that clearing the area for drilling would be unsafe and expensive. He stated that drilling would require closing ranges and would impact military operations.

29. Dr. Charles Howard Stagg
Chief, Environmental and Natural Resources Management
Directorate of Public Works
Fort Polk

Dr. Stagg has knowledge of the military's requirements, the permitting and regulatory process, safety issues and obstacles involved in attempting to develop mineral resources at Fort Polk.

30. Charles E. Steele
Director of Lands and Minerals
United States Department of Agriculture
Forest Service
2500 Shreveport Hwy.
Pineville, LA 71360

Mr. Steele has knowledge of the history of mineral leasing efforts at Fort Polk. He has knowledge of access for mineral development being denied. Mr. Steele has knowledge of the title issues and legal opinions possessed by the Forest Service.

31. William B. Steele
Major General, USA
Commanding
Fort Polk 71459

Now believed to be as follows:

William B. Steele
Major General USA, Retired
6820 Cooper Oaks Rd.
Columbus, GA 31904
(706) 323-5740

Major General Steele was the commander of Fort Polk during the 1970's. He met with John Camp, Darwin Wilder, Colonel Teague and others concerning Mr. Burton's attempts to obtain access to Fort Polk for drilling; efforts by the military to purchase the minerals; the moratorium; the decision to permit the moratorium to terminate; contingency plans to prevent drilling at Fort Polk after termination of the moratorium. General Steele has knowledge of the effect drilling would have on the military training mission at Fort Polk; the fact that, as commander, he controlled the surface of Fort Polk; safety issues involved in drilling for oil at Fort