Taken on: **December 13, 2005**

Deposition of: **William Drost**

Deposition of

# William Drost

In the Case of:

# Central Pines Land Co., et al
# vs.
# USA

Taken on:

**December 13, 2005**

*KAUFMAN, HOFFMAN, TAYLOR, WYATT & D'ARCOURT*
*Phone: 800-503-2274*
*Fax: 337-234-0715*
http://www.kaufmanandassociates.com

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

CENTRAL PINES LANE COMPANY, *
ET AL.
Plaintiffs *

v. * NO. 98-314 L

THE UNITED STATES OF AMERICA *
Defendant

* * * * * * * * * * * * * * * * * * * * * * * *

The oral deposition of WILLIAM THOMAS DROST was taken in the above-entitled cause on behalf of Defendant pursuant to the following stipulations before Deidre D. Juranka, Certified Court Reporter in and for the State of Louisiana, at the offices of The Gray Law Firm, Hibernia Tower, Suite 1700, One Lakeshore Drive, Lake Charles, Louisiana, on December 13, 2005, beginning at 8:57 a.m.

A. It could have been '94 --
**Q. Okay.**
A. -- as early, if anything.
**Q. Okay. So sometime in the mid '90s you entered --**
A. Mid '90s, mid to early '90s.
**Q. Okay. You entered into a negotiation with Belco?**
A. Correct.
**Q. Belco was going to do what?**
A. Belco was very excited and interested and was ready to spend a tremendous amount of money exploring for minerals in this area. I had numerous phone calls with their representatives. They were willing to pay premium in bonus and rental. They informed us at this table in this room that they were going to put a retired general on their board. They had numerous meetings. They were -- felt confident that they could get access, and we supported them in their attempts to explore our minerals.
**Q. And what happened?**
A. They were unable to do such.
**Q. Why?**
A. Well, it wasn't because we wouldn't let them. You know, we encouraged them. We were able to agree to terms and the ball was in their court to

deal with the Government. And from what I understand, it just -- the Government put those certain restrictions and it drug out to a point that they just pursued interests in other areas of the country or the state.

**Q. And --**

A. That's, you know, what I understand happened.

**Q. What do you mean by certain restrictions?**

A. Well, some of the things that I've spoken to insofar as how, when, where. You know, that gets to the point where it's not very affordable, it's not safe to pursue.

**Q. What would have been unsafe?**

A. Well, we all know there's unexploded ordnance there, there's environmental concerns.

**Q. And I still don't understand what these restrictions were. You said certain restrictions.**

A. Well, you know, I'm happy to be here. I'm happy to answer your questions. But, you know, there's been numerous depositions and inquiries to all these matters; and I know you've read them all.

I was not at these meetings with the Government. Okay. These companies went in there and they negotiated to try to get in there and

MR. KRIEGSMAN: Sure.

MR. GRAY: -- at this point? Would you ask him -- when he responded that Chesapeake wanted to lease "everything we owned in Vernon," would you ask him if that included, in his opinion, Tract C?

MR. KRIEGSMAN: Sure.

BY MR. KRIEGSMAN:

**Q. In your opinion, when Chesapeake said that they wanted to lease everything that you owned, did that include Tract C?**

A. It did.

**Q. And did they lease everything that you owned, including Tract C?**

A. Ultimately they leased 33,607 acres.

**Q. Is that everything you owned?**

A. No.

**Q. Why did they not lease everything that you owned?**

A. I can't answer that. I don't know.

**Q. Do you have any knowledge that the reason they did not lease everything you owned was because of something done by the United States?**

A. I don't know.

**Q. You don't have any knowledge of that?**

A. Huh-uh.

Q. Okay. And in this next paragraph here, and I think this is what we were talking about before, it says, "Commencing in March of 1996 plaintiffs negotiated with Belco to lease 20,000 acres of Group C. Belco reported that it was unable to obtain access to Group C surface --
A. Right.
Q. -- and discontinued the lease discussions."
A. Yeah. Correct.
Q. And you're familiar with that?
A. Yeah. We spoke to that.
Q. Okay. And let's see if we can get some more specifics to the extent you --
A. Right.
Q. -- remember it. Why was Belco unable to obtain access to Group C?
A. From what I remember, it was -- again, and I'm going to repeat myself, but they were -- a lot of time was being -- and these are my words: Foot dragging, okay, on the part of the Government, you know. I can recall speaking with the representative of Belco and, you know, he's -- four weeks later we're getting -- you know, having a phone call returned. You know, I remember those things like that. And, then

**start with Belco.**
A. They're all -- it's all a blanket coverage insofar as the problems associated with access.
**Q. Okay.**
A. I mean, the same problems Belco encountered were not different than the problems Sonat encountered or the problems UPRC encountered.
**Q. But as for the Belco problems, you know of them from Belco, not from anyone at your companies having communication --**
A. That's correct.
**Q. -- with the Government?**
A. That's correct.
**Q. Is it possible that Belco had other reasons for not wanting to go through with the leases?**
A. Well, they're unknown to me.
**Q. But it may be possible?**
A. Sure. Anything's possible.
**Q. Okay. Businesses encounter different problems as they go along. They could have --**
A. Sure.
**Q. -- encountered a problem unrelated to you or the Government.**
A. Well, they could have; but, I mean, they basically told us that their lack of ability to

get in there was the problem. I mean, it was...
Q. **In the next paragraph it deals with Sonat --**
A. Okay.
Q. **-- and it talks about the United States withdrew the property from its proposed lease sale --**
A. Right.
Q. **-- without the possibility of protective lease. Are you familiar with that incident?**
A. I am familiar with that.
Q. **Okay. So what does that mean, the United States withdrew the property from its proposed lease sale?**
A. The United States decided that -- well, let me rephrase that. The United States incorrectly asserted that they owned the minerals. They believed that -- I assume they believed that they were their minerals to lease, but at some point in time the United States decided not to lease what they thought they owned.
Q. **So you entered into -- you negotiated with Sonat?**
A. Correct.
Q. **And then what happened after that? What was the next step? You had a negotiation with Sonat?**
A. Okay.
Q. **Negotiate -- Sonat seemed like they were**

a minute.
MR. GRAY: Go ahead.
(A recess was taken from 10:34 to 10:56.)
BY MR. KRIEGSMAN:
**Q. Okay. We talked earlier about Belco in 1996 and we talked about how the plaintiffs negotiated with Belco to enter into a lease and then Belco came back and said that they were unable to obtain access because of restrictions that were put in place by the military; is that accurate?**
A. I think that that is fairly accurate, but I might say that it was consistent with all the companies that we were negotiating with. I might add --
**Q. Okay.**
A. -- that it was not specific to Belco.
**Q. Okay. But what we're saying is correct. You would add in addition to that --**
A. That is my recollection of those negotiations, that Belco just ran out of time, they ran out of money. I don't know. I don't know what their problems were other than that the Government was their -- was their problem.
**Q. So the Government was Belco's problem in regard to this lease?**
A. It wasn't our problem. I mean, we --

**Q. Okay.**

A. -- we had an agreement that hinged on access. Our agreement was not signed. Therefore, they weren't granted access.

**Q. And Belco told you that they were not going to go through with the lease because of restrictions that --**

A. No. No. Belco didn't tell me they weren't going to go through with the lease. They didn't tell me that.

**Q. What'd they tell you?**

A. They only told me that they were going to -- you know, when we left this table they were going to -- high hopes that by putting this general -- this general was going to get them in the door. "We'll call you when we get through the door." And, you know, we understood through various conversations and whatnot that they were having trouble getting access and then not being able to carry forward with the operations as they related to, you know, the things we talked about, not drilling at night and all those issues and timing, same issue we've been over.

**Q. Okay. And that was 1996 when you learned that Belco was having these problems gaining access?**

**correct?**

A. Well, except that -- we began by talking about Belco; but I'm pretty sure that these other companies actually came maybe a little before Belco, was the way I remember.

**Q. Well, let's talk about those. What other companies do you remember that came before Belco?**

A. Sonat. They were all about the same time. All this happened really at one time.

**Q. Okay.**

A. I can't say that Sonat came before Belco. I mean, Sonat and Belco were, you know, one right after another. I mean, it was ongoing negotiations.

**Q. Okay. Well, I'd like to talk about each of the companies here. And I know this has happened a while ago --**

A. That's fine.

**Q. -- but we are here to talk about this deposition today --**

A. Let me just say something so maybe this will clarify because -- you're not asking me this; but I'm going to go ahead and tell you that I first learned of what I consider the problem from a meeting we had -- one of the -- what I call the

first meeting we had with a representative from UPRC, that the fellow from UPRC was interested in leasing some of our fee property.

**Q. When was that, roughly?**

A. Early '95. I guess it was '95.

**Q. And that property was on the Group C lands?**

A. No, some of our fee lands.

**Q. Okay.**

A. Okay.

**Q. Were they A and B lands or totally unrelated to this?**

A. No. They were unrelated.

**Q. Okay.**

MR. GRAY: Property to the east and north of where we're talking about now.

BY MR. KRIEGSMAN:

**Q. Is that correct?**

A. Yeah.

**Q. UPRC was interested in leasing --**

A. They came and said, "Y'all have some land up here."

**Q. Yeah.**

A. "You know, we'd like to talk to you about leasing it."

**Q. Okay.**

A. And we said, "Great." So we began discussions. And before he left he said, "By the way, the Government is about to lease this other stuff." And that's when I first learned that the Government was taking a position that they could lease those minerals, and that was well before any of what we're talking about now.

And I think that's what you're asking me, but I wanted to start by saying that's when -- and, in my mind, when this started, this whole lawsuit. It's not specific to Tract C, but it's what began the -- you know, this whole ordeal.

**Q. Okay. So when we talk about this whole ordeal we're talking about the problems --**

A. Well, the lawsuit.

**Q. -- we have in this case?**

A. The lawsuit.

**Q. The lawsuit and the problems deal with your inability to exercise your mineral rights --**

A. Well, the problem --

**Q. -- on the Group C lands?**

A. The problem is the Government's -- yes. Yes. To answer your question, yes.

MR. KRIEGSMAN: Okay. Could you read back that last question.

THE REPORTER: "The lawsuit and the problems deal with your inability to exercise your mineral rights" --

BY MR. KRIEGSMAN:

**Q. Okay. And you first learned of that in 1995 when you learned that the Government was taking the position of ownership of the Group C lands?**

A. I first learned of the Government's position of ownership in the early meeting with UPRC, yes.

**Q. Okay. Prior to that meeting did you ever encounter a problem accessing the Group C lands or exercising your mineral rights on the Group C lands?**

A. Beginning with my employment in '94, no.

**Q. So all these things we talked about of the Government putting these requirements in place of drilling -- acquiring 15 -- make sure I get it right here.**

A. Well, it's --

**Q. -- 15 feet buried and casing, that all happened after you learned about the Government's position of ownership?**

A. Yes.

**Q. We talked about dangerous conditions as one of the problems?**

**Q. And the companies that never followed through on the lease, Belco is one of them. Were there any others?**

A. I recall that all of the companies negotiated with us to lease all of our properties. They all did. I can list them. I mean, they're the same ones.

**Q. I just want to distinguish between a company that entered into a lease and then had a problem or a company that just negotiated a lease but the lease wasn't completed because of the problem. And you said earlier --**

A. Only Belco is a company that we agreed to terms but they were unable, that I recall.

**Q. Okay.**

A. But we had leases with other companies but we still had the same issues. In other words, we had a lease but they said, "Well, we want to lease more." Okay. In other words, we had a lease with Chesapeake but Chesapeake was interested in -- we had two leases with Chesapeake. They were interested in a third lease or a fourth. And the same with Sonat and the same with UPRC and the same -- you know, it was not a one-time deal, not a one-shot meeting.

**Q. Let's start with -- okay.**
A. We had fee lands there. We had -- you know, you've seen our maps, colored Tracts A and B and C and D. And we had different negotiations going at the same time with the same companies. Okay. Chesapeake leased 33,000 acres. Well, they were interested in 4800 more. They were interested in 19,000. Okay. The next day we might meet with Sonat. They had a 28 -- they leased 28,000. Well, they wanted more. They were competing with Chesapeake.
**Q. Let's go through them one at a time.**
A. All right.
**Q. Belco you had a negotiation with --**
A. Belco was the only company that we did not have a lease with that had an ongoing negotiation with us to lease the Tract C or, you know, lands that fell within it.
**Q. And they didn't have a lease because --**
A. We didn't have a lease with them beforehand. The rest of the companies --
**Q. Hold on. Hold on. You didn't get the lease eventually because of?**
A. Their inability to develop the entire tract.
**Q. And they were unable to develop that because of**

**U.S. Governmental requirements?**

A. From what I understand from Belco, yes. We'd agreed to terms. They were willing to pay our -- agreed to our lease form and pay us and go on their merry way.

**Q. That's enough on Belco. We've talked about that before.**

A. All right.

**Q. Chesapeake. You entered into leases with them. They wanted more leases.**

A. Right.

**Q. You said they had two leases and they were interested in more?**

A. Right.

**Q. You discussed more with them; is that correct?**

A. That's a correct statement.

**Q. But you didn't enter into more leases with them because of actions taken by the Government or requirements of the Government?**

A. Chesapeake was willing to lease all of our acreage up there, Tracts A, B, C and D. So was UPRC, Sonat. They were all willing to lease it all. They wanted to develop it all.

**Q. And Chesapeake --**

A. The net result is what you see today in those

C E R T I F I C A T E

This certification is valid only for a transcript accompanied by my original signature and blue official seal on this page.

I, DEIDRE D. JURANKA, RPR, Certificate No. 21001, Certified Court Reporter in good standing with the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that WILLIAM THOMAS DROST, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 128 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto affixed my signature at Lake Charles, Louisiana, this the 26th day of December, 2005.

OFFICIAL SEAL
DEIDRE D. JURANKA
Certified Court Reporter
in and for the State of Louisiana
Certificate Number 21001
Certificate expires 12-31-06