UNITED STATES COURT OF FEDERAL CLAIMS

COPY

CENTRAL PINES LAND COMPANY, ET AL., )
)
Plaintiffs, )
)
vs. ) NO. 98-314 L
)
)
THE UNITED STATES, )
)
Defendant. )

DEPOSITION OF GEORGE P. DENNY

TAKEN ON BEHALF OF THE DEFENDANT

IN OKLAHOMA CITY, OKLAHOMA

ON JULY 18, 2006

REPORTED BY: ELIZABETH CAUDILL, CSR, RMR, CRR

You've been identified by the plaintiffs in this case as a person with knowledge regarding efforts by Chesapeake to access Fort Polk for drilling.

Is that an accurate description?

A Yes.

Q Can you describe that knowledge?

A Well, I mean, we were in discussions with -- I'll just use the term the Lawtons to secure oil and gas leases, and we had a concern of being able to access the surface for drilling operations because it lied within the confines of the fort.

Q And so had you purchased leases from the Lawtons at that point?

A Outside of this area, yes.

Q But not in this area?

A Not within the fort.

Q And you were considering purchasing leases in this area but you had a concern regarding access; is that correct?

A I'm pretty sure we made offers subject to us getting protection leases.

Q And did you get those protection leases?

Q The issue that you had a concern regarding access to the surface.
A I don't think it was ever resolved.
Q Did Chesapeake attempt to get access?
A Sure we did.
Q And what was the result?
A We didn't get access.
Q Someone told you you couldn't have access?
A I don't know if -- I don't know what we were told, but I know we didn't drill any wells on the fort.
Q Did you not drill any wells because you were told by the Army or the forest that you couldn't have access or you didn't drill wells because of unrelated business decisions?
A It's my understanding that we didn't drill any wells because we didn't have access.
Q What's the basis of that understanding?
A My basis or --
Q You just said it's your understanding that you didn't drill wells because you didn't have access, and I'm trying to figure out what's the basis of that understanding.
A There was a meeting at Fort Polk, and

Q Do you know if that meeting represented a formal request by Chesapeake to gain access or was that an informational, informal meeting for Chesapeake to find out?

A I don't know.

Q And so what happened at that meeting?

A It was just a general discussion. Mostly the Army personnel asking questions of our operations guys. Just general discussion about, you know, how long does it take to drill these wells and are the operations 24/7, that sort of thing.

Q Do you remember anyone from Chesapeake asking questions of the Army?

A Not specifically.

Q Do you remember anyone from Chesapeake asking the Army if Chesapeake could have access to the surface?

A Not specifically.

Q You said no real decisions were made after that meeting.

A That I'm aware of.

Q Okay. Why was Chesapeake interested in this area in the first place?

A We were interested in drilling wells.

If we had access and we were able to negotiate a lease with the Lawtons and were able to buy a protection lease, we were interested in drilling oil and gas wells on the fort.

Q Why?

A Because we had success in the area. And we were drilling wells all over trying to identify what we were termed sweet spots where production was -- or drilling wells was -- was justified.

Q Were you pursuing other leases in that area near the fort?

A Yes.

Q Did you purchase those leases?

A Yes.

Q Did you drill wells in that area?

A Yes.

Q Where, roughly?

MR. GIPSON: This may get into the map being hard to read.

MR. KRIEGSMAN: Sure.

Q (By Mr. Kriegsman) Just looking at that map, do you remember if you drilled wells north of the fort? South of the fort? East or west of the fort?

A Mostly south and east of the fort and directly southeast of the fort.
Q And how about directly east of the fort?
A Yes.
Q You drilled wells there?
A Yes.
Q Those were producing wells?
A Yes. I think they are still producing. I know they did produce and were pretty good wells.
Q East of the fort?
A Yes.
(Witness confers with counsel)
A Do you know the well name that was the well for this unit and that unit?
Q I don't. Jack might know.
THE WITNESS: Jack, is that the Reickers and the Addison? Right here. Reickers? Addison?
MR. DROST: Yeah, I believe -- I believe so.
THE WITNESS: Lawton 27?
MR. DROST: Right, and 31. Where's 31? 31st there. Yeah, I believe so.

THE WITNESS: I know where I am.

Q (By Mr. Kriegsman) So did you want to explain that further what wells you drilled are related here on the map?

A I have knowledge directly offsetting the fort. We drilled the Reickers 1-27 and the Addison, I think it was the 1-28.

MR. GRAY: Would you ask Mr. Denny to spell Addison?

MR. KRIEGSMAN: Sure. Would you spell Addison.

THE WITNESS: A-D-D-I-S-O-N.

Q (By Mr. Kriegsman) Okay. You might as well spell Reickers.

MR. GRAY: You told your court reporter it was Edison in DC.

MR. KRIEGSMAN: Okay. Thanks.

MR. GIPSON: As in Thomas Edison?

MR. GRAY: Yes.

Q (By Mr. Kriegsman) Can you spell Reickers?

A R-E-I-K-E-R-S.

MR. DROST: R-E-I-C-K-E-R.

Q (By Mr. Kriegsman) Is that right, R-E-I-C-K?

A I'm good with that.
Q Okay. So after that meeting, you said no real decision was made regarding whether to purchase leases or drill a well on the fort; is that right?
A I said that, yes.
Q Is that --
A We didn't pursue the leases, to the best of my knowledge, after that meeting.
Q Okay. And you don't know why; is that correct?
A No.
Q You mentioned protection leases. Could you explain for us what a protection lease is?
A It's buying a lease that covers the same minerals from another lease so that if one title fails on one you'll have the other half leased or the other interest leased.
Q So if you're interested in leasing a particular acreage and more than one party is claiming title to that acreage, you would take a protection lease so that regardless of -- so when that cloud is resolved, you would have a lease either way; is that correct?
A Yes. Yes.

fort was no good in terms of a play. Would you agree with that statement?

A That's Tom's statement. I don't know what -- one way or the other.

Q Do you have an opinion on that?

A Do I have an opinion?

Q Yes.

A A personal opinion?

Q Yes.

A I think we would have -- I think we would have drilled on the fort if we could have got on it.

Q Do you think it's been pretty well proven that the fort is no good?

A Nobody's drilled any wells on there. I don't know how -- I don't know how you can say that.

Q Some people would argue that no one's drilled any wells there or east or west of there because it's been proven that that's no good. Was that --

A That's their opinion.

Q You disagree with that?

A I don't have an opinion either way. I'm not a geologist.

Q Okay. But you form opinions about whether certain areas are prospective?

A Yeah. Look at the wells we drilled immediately offsetting the fort. As active as we were in the area, I can't imagine us not drilling wells -- trying to prove that there was oil and gas there. If we were unsuccessful, would we have continued? I don't know.

Q So you're familiar with the United States Forest Service claim of ownership for certain portions of these lands --

A Yes.

Q -- that were also claimed by the Lawtons? Are you familiar with that?

A Yes.

Q Was Chesapeake affected by that in any way?

A I don't recall.

Q Do you know of any way that Chesapeake was affected by that?

A No. No.

MR. KRIEGSMAN: Okay. Let's take a short break here. I think we're just about done.

MR. GIPSON: Okay.

(Break from 9:36 to 9:41)

of the record)

Q (By Mr. Gray) Does the lease state on its face the number of acres involved, Mr. Denny?

A It does.

Q How many does it say?

A 33,607.5325 net acres -- gross acres.

Q During that time period of '96 and '97, do you have an opinion as to how many acres of leases Chesapeake acquired in that area of Louisiana?

A Approximately a million.

Q And how would you characterize the Chesapeake's strategy in attempting to acquire the leases?

A Very aggressive.

Q Were there any limitations placed upon Chesapeake in acquiring the leases in that area?

A I'm not sure I understand.

Q Let me just try to ask a different question because I recognize that one might not have been correct.

As a lease broker there, were you given guidelines within which you were to operate in acquiring the leases?

A As far as bonus prices and royalty?

Q Now, are you aware of the Lawtons -- and I will tell you if the record in this matter isn't clear, that that includes Central Pines Land Company.

A Yes.

Q Were you aware that Central Pines Land Company and other Lawton entities owns these other minerals that are colored in yellow on Denny Exhibit Number 4 and colored in brown on Exhibit 8 to the McKenzie report? Were you aware that they generally own those properties?

A Yes, sir.

Q And were those in the areas of which there were discussions with the Lawtons of Chesapeake possibly obtaining a mineral lease?

A Yes, sir.

Q I know it's been 10 years, but do you recall what any of those discussions may have been, sir?

A I think that there was some discussion, again, that if we could obtain access to the fort and obtain a protection lease, that we would entertain purchasing an oil and gas lease from Central Pines, et al.

(Exhibit Number 6 marked for

identification purposes and made a part
of the record)

Q (By Mr. Kriegsman) I'm going to show you a document we can identify as Denny Deposition Exhibit 6. I'm going to ask you if you recognize that.

A I do.

MR. KRIEGSMAN: Can I see this document before you ask him any questions about it?

MR. GRAY: Sure.

MR. KRIEGSMAN: You have the plat that's referred to in the letter? Is that this?

MR. GRAY: That's not the plat. This plat was prepared in connection with this litigation.

MR. KRIEGSMAN: Do you have the plat that's referenced?

MR. GRAY: I don't have it. The property describes it properly.

MR. KRIEGSMAN: Do you know where that is?

MRS. JAQUETTE: It's off this map. It's 1 South. It's fallen off the edge of the map. This is potentially -- I can't see the sections. This piece right here, this little

impacted by the title conflict started by the United States.

Did Chesapeake drill any wells under that lease?

A Not that I'm aware of.

Q As a person who was responsible for acquiring mineral leases for Chesapeake in that area during 1996, 1997 time period, would the remaining properties colored in yellow on Denny Exhibit 4, in your opinion, would Chesapeake have acquired mineral leases on those properties had it not been for the issues with the United States?

MR. KRIEGSMAN: Objection to the form.

THE WITNESS: Is it my opinion?

Q (By Mr. Gray) Yes.

A Yes.

Q And is it your opinion that the terms and conditions which Chesapeake paid for Denny Deposition Exhibit Number 3 would be reasonable terms and conditions for Chesapeake to pay for the remaining acreage identified in yellow on Denny Deposition Exhibit Number 4?

A Yes.

MR. GRAY: One moment. I have no other

C E R T I F I C A T E

STATE OF OKLAHOMA )
) SS:
COUNTY OF OKLAHOMA )

I, ELIZABETH CAUDILL, CSR in and for the State of Oklahoma, certify that GEORGE P. DENNY was by me sworn to testify the truth; that the above and foregoing deposition was taken by me in stenotype and thereafter transcribed and is a true and correct transcript of the testimony of the witness; that the deposition was taken on JULY 18, 2006 at 8:57 a.m. in Oklahoma City, Oklahoma; that I am not an attorney for or a relative of either party, or otherwise interested in this action.

Witness my hand and seal of office on this 26th day of July, 2006.

Elizabeth Ca[illegible]
Oklahoma [illegible] Reporter
Cert[illegible]
Exp. Date: [illegible], 2006

______________________________
ELIZABETH CAUDILL, CSR, RMR, CRR
CSR No. 161