# TRANSCRIPT OF PROCEEDINGS

| | | |
|---|---|---|
| CENTRAL PINES LAND CO., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Docket No. 98-314L |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Deposition of: GARY S. DUNLAP

Pages: 1 through 63

Place: Washington, D.C.

Date: July 6, 2006

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

Q Okay.
A It would be that area there.
Q Okay.
MR. GRAY: I have another little map that has it outlined. Someone else outlined it, but if you would like to use it, I think it --
MR. KRIEGSMAN: Okay. All right. Great. Thanks. We'll mark this as Exhibit 3.
(The document referred to was marked for identification as Deposition Exhibit No. 3.)
MR. KRIEGSMAN: Okay. Show it to the witness.
BY MR. KRIEGSMAN:
Q Does that look accurate, the description?
A Yes.
Q Okay. So Chesapeake was purchasing a lot of leases in this area, is that right?
A Yes. As Mr. Price testified, we had a trend or a fairway through Louisiana we were extending from Texas, and actually we ended up acquiring about a million acres in Louisiana.
Q And why was Chesapeake interested in this area?
A There had been some previous wells drilled

A We drilled the Lawton 25, the Lawton 27. The 27 is right up next to the boundary of the lease we took. We were also involved in the Reichers, the Edison. I believe someone had drilled all these wells here.

Q How did these wells do in this area?

A As I recall, the 27 was a very nice well, and the Reichers and the Edison were nice wells.

Q Those are all south of the fort, is that right?

A Well, they're up against the fort.

Q Up against the forest, but by looking at this map, which identifies the fort boundary, they're all south of the fort, is that correct?

A At this red line? At this bold red line?

Q Yes.

A That would be south of the fort, yes.

Q Okay. Did you drill any wells to the east of the fort?

A I don't recall.

Q Okay. Looking at this map, you know, as you can probably tell, I'm not an oil man, but that looks like a dry hole. Is that right?

A Yes, that's a shallow well I would think, an old well.

Q Okay. And that's in 2 north, 6 west?
A But I couldn't verify the accuracy of this.
Q Okay. And I'm not asking you to.
MR. GRAY: It's your map. It's not his.
MR. KRIEGSMAN: Okay.
BY MR. KRIEGSMAN:
Q 1 north, 4 west, that's parallel with the fort. This map identifies that as a dry hole, is that right?
A Yes. And again, that's an old, old well.
Q We talked earlier about the trend or the fairway, right?
A Yes.
Q Is it fair to say that the trend or the fairway lies south of the fort as the fort is identified on this map?
A No, sir. Initially, the trend was a fairway 30 miles wide that went across the state, and obviously it got reduced as drilling occurred to a narrow band. But again, if you locate Berr Ferry up here, it's on the other side of the fort, and it's not to say that fairways go just east/west; they tilt, they curve based upon shows and wells and drilling activity.
Q And I understand that, that that was the

of acreage that was leased and drilled?

A Yes.

Q Is that because the way that this trend played out, the productive limits were reached to the south of the fort?

A Well, again, the Lawton 27, the Edison, Reichers, these were all good wells.

Q Okay. This map identifies this land here as forest land used by the Army. I'm referring to the fort itself.

MR. GRAY: Okay. This is Group C land.

MR. KRIEGSMAN: I understand that, but --

MR. GRAY: And by definition, Group C land means it was acquired by the United States Army.

MR. KRIEGSMAN: Okay.

MR. GRAY: After 1943.

MR. KRIEGSMAN: And I'll ask you not to interrupt, counsel. You and I can argue about that later. I'm asking him questions about this map and what this map identifies as Fort Polk property.

BY MR. KRIEGSMAN:

Q And you're able to see that on this map, sir?

A Yes. Mm-hmm.

Q Okay. And is it fair to say that the Austin

BY MR. GRAY:

Q Yes. And the question is, without title disputes and without any issues that may or may not have existed with the Army, had the remainder of Tract C, which I'm going to tell you Tract C is 19,000 acres less the 4,800 that you leased, would Chesapeake have leased out those properties under the same terms and conditions as reflected on -- what is the lease number?

A Two.

Q On No. 2.

MR. KRIEGSMAN: Object to the form and object to a hypothetical question. He's a fact witness. That's not his knowledge.

THE WITNESS: In 1996, we were very aggressive in buying leases through this area.

BY MR. GRAY:

Q So based on that, do you think you would have still leased it?

A Yes.

Q And I'd like to show you a letter dated September --

MR. GRAY: Let's go ahead and identify the September 24 letter as the next number now, and I'd like to show you a September 26 letter.

63

## CERTIFICATE OF COURT REPORTER/NOTARY PUBLIC

I, *Bernadette O. Herboso*, the officer before whom the foregoing testimony was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me and thereafter reduced to typewriting; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto; nor am I financially or otherwise interested in the outcome of the [illegible]

*Bernadette O. Herboso*

Court Reporter/Notary Public

My Commission Expires: *November 14, 2008*