Taken on: **May 23, 2006**

Deposition of: **Mel Fife**

Deposition of:

# Mel Fife

In the case of:

# Central Pines Land Co., et al
# vs.
# The United States of America

Taken on:

**May 23, 2006**

*KAUFMAN, HOFFMAN, TAYLOR,*
*WYATT & D'ARCOURT*
*Phone: 800-503-2274*
*Fax: 337-234-0715*
http://www.kaufmanandassociates.com

geologist, Gary will give you the areas and we want to start buying leases over there. I want to see what kind of landman you are. I want to see how long it will take you to spend a million dollars."

Well, it took three or four days to get the guys over here. And five days after they hit the ground I called him and I said, "I spent the million dollars. What do you want me to do?"

And he said, "I'll put another million in.

And five days later I called him back and said, "I need another million."

And he said, "This time I'm putting in five million. I'm tired of talking to you about it."

So, you know, I had beaucoups of money to spend. And at one time I had a hundred people on the ground scattered all the way across Louisiana acquiring oil and gas leases. And in that year, the year that I had those brokers over here, we spent roughly $60 million in the Austin Chalk in Louisiana acquiring leases.

Now, also about this time Occidental Petroleum, Oxy, had drilled an incredible well at Masters Creek, which is to the east of where Fort Polk is located. Well, that set the whole thing

on fire over here and lease bonuses went through the roof. You know, I know that the paperwork says that we offered them $300 and were willing to pay them $300 an acre. Robert Belfer would have paid $500 an acre for that lease if he had to. He wanted it so bad because he was going to get to break it off with Aubrey McClendon.

**Q. Get to break it off?**

A. Yes. Chesapeake had all of these lands leased and right in the middle of it was Fort Polk. And in the oil business you'll have land maps and the home team is usually colored yellow. Well, we always colored Chesapeake blue so you had a sea of blue. And to have put one big spot of yellow right in the middle of it, this is war. This is a land grab. You know, there are no friends. And he wanted that lease so bad.

**Q. Belfer?**

A. Yes. When I came over here the first time to visit with the Lawtons, the week before Belco was in the process of going public. They were going to have an IPO. They had one of their road show presentations in Houston the week before I came over here. And I'd just bought a brand new Hart, Schaffner & Marx suit and it was tailored just

he'd have given me half the company.

BY MR. KRIEGSMAN:

**Q. When you say "If I could have bought this lease" --**

A. The Lawtons' lease. Yeah, the stuff on Fort Polk. You know, as soon as I came back from visiting over here and reported back to him they want 300 an acre and 27 and a half percent royalty. And he said, "That's not a problem." I said, "Well, you know" -- and we already -- he already was aware that the Army was going to be a problem.

**Q. Belfer was already aware?**

A. Yeah. And so he hired -- he hired some guys in Washington, some lobbyists, and one of them was an old buddy of the man that was the general at Fort Polk at the time. And he flew down and we met in Alexandria and stayed there that night and then the next morning early went over to Fort Polk. And we didn't meet with the general. We met with -- I think most of the people, the best I can remember, were civilians.

**Q. At the fort?**

A. Yeah. I think a lot -- and I say most of them. I think a good percentage of them were civilians.

But, you know, they rolled out their maps and, you know, we rolled out our maps. "This is the area that we want." And they said, "Yeah, that's the one area that you can't have. It's an old artillery range."

**Q. What did they mean, you can't have access to it?**

A. Can't have access to it. It's an old artillery range. And I remember because I'd done basic training at Fort Polk in 1968 and that was out in the area where you have to crawl on your stomach and they shoot live rounds of ammunition over your head and bombs go off and this and that and the other. And they just said that there was a lot of unexploded ordnance out there and that we could not go.

Well, it takes five acres to drill an Austin Chalk well. And, actually, you can do it on less than that. We had drilled some wells within the city limit of Bryan, Texas where the drill sites were only about an acre and a half and all of the liquids, the drilling fluids and everything, were in containers. And so we proposed that. "Wait a minute. We can do it in an acre and a half." And, you know, "Can't we go out there and run a mine sweep or a metal detector or something over

just an acre and a half and y'all come clean it up and then we can drill our well?" No, that wasn't acceptable.

The only other thing that we could possibly do -- and can I see that map? The only other thing that we could do -- now, what you're doing in the Austin Chalk is you're drilling down over here probably close to 12,000 feet, is my guess. I know further to the east it's about 17,000 feet and back over in Texas it's 8,000 feet, but it's around 10 or 12,000 feet here. You drill down that far and then you curve and you go out.

The Austin Chalk is a fractured horizon. There is no porosity or permeability in the Austin Chalk so it can't -- there's no sponge effect. It can't soak up hydrocarbons, but it's very fragile and it cracks. And there's a zone below it and a zone above it that both produce hydrocarbons; but they are shale, clay. And the clay won't accept the hydrocarbons either. So the Chalk's in the middle and it's all cracked up. Well, that's where all the oil and gas goes, are into those cracks. So you drill down and you drill perpendicular to the cracks trying to hit as many of them as you can, and that's the

MR. KRIEGSMAN: Thanks.
A. I had a broker that was working for me out of Alexandria, Joe McGinty, and he had several people in here combing back through all the records. You know, "If you can find a hundred acre tract that somebody missed we'll buy it." And so he was doing that.
Yeah. There's Joe McGinty, Jr.'s card.
MR. GRAY: He came to the meeting.
A. So I had Joe take his people and totally surround this place, all this blue. "Find me a five-acre tract. Belfer wants the lease." You know, "It puts the screws to Aubrey. This is a" --
BY MR. KRIEGSMAN:
**Q. Aubrey is with Chesapeake?**
A. McClendon, yeah --
**Q. Okay.**
A. -- with Chesapeake. You know, "We've got to do this." And there was just no way. There was no land out here that was for sale, no way that we could get any access. And the Army said absolutely not about coming on the place itself.
**Q. Now, if the goal was just to kind of break up Chesapeake's leases, why not just lease it anyway?**

A. Well, you're not going to pay that much money for a lease if you're not going to dig it.

**Q. Yeah. So let's talk about the meeting that you had with the Army. How did you arrange that? Who did you know to contact?**

A. I left that to the fellows that were in the lobbyist law firm.

**Q. Okay.**

A. They arranged all of that.

**Q. Do you remember any of their names?**

A. No. It was the Boggs firm, I believe.

MR. GRAY: Patton, Boggs & Blow.

MR. KRIEGSMAN: I know those guys.

BY MR. KRIEGSMAN:

**Q. So you contacted the lobbyists, Patton Boggs, and you told them, "Listen, we want" --**

A. Mr. Belfer did that.

**Q. Mr. Belfer did that?**

A. He and -- his name's Tommy, isn't it, Tommy Boggs? He and Tommy Boggs are friends. So, you know, he called his political ally and said, "Can you arrange a meeting?" And he said, "Of course."

And it wasn't very long after -- I had been trying to find out who to go see, but I was kind

of getting the runaround. They cut right through all the red tape. And it was just a few days, I think, after the Lawton meeting, my meeting -- first meeting with the Lawtons, it wasn't very long after that when we met with the people at Fort Polk.

Q. **Okay. So let's back up. So first you were interested in this area?**

A. Well, you know, I had these guys over here working to find me some open acreage.

Q. **Okay.**

A. They said, "There it is."

Q. **So then you approached the Lawtons --**

A. Uh-huh.

Q. **-- and you talked to them about leasing this acreage?**

A. And we knew that it was under Fort Polk and I knew that other companies had tried to acquire the lease. I talked to David Hamilton at Sonat. They had made at least some attempt. I talked with Henry Hood, who was the vice president of land at Chesapeake. They had made a run at them. I talked with Chris Mulvaney at UPRC and -- you know, and they all said the same thing, "The Army's not going to let you in there."

Well, I do have a certain amount of professional pride. To go ahead and tell me that I can't do it, then I'm fixing to go ahead and prove you wrong. And I -- for no other reason than that. I mean, I've known those guys all of my career and I would have loved nothing than to throw a bunch of egg in their face about, "Oh, yeah, you can do the deal with the Army." But it wasn't going to happen.

**Q. So you arranged for a meeting with the Lawtons. Was that here in this office?**

A. Yeah, this very room, I believe.

**Q. Who did you contact first; do you remember?**

A. I believe McGinty did that. I think Joe McGinty was the one that made first contact.

**Q. Who was Joe McGinty?**

A. He's a broker, an oil and gas land broker in Alexandria that was doing work for me. And my instructions to Joe would have been something like "Set up a meeting and I'll be there."

MR. KRIEGSMAN: Thanks.

MR. GRAY: We'll copy it.

MR. KRIEGSMAN: Okay. We'll make, maybe, an exhibit.

MR. GRAY: Maybe.

a fair claim to the minerals. We talked some about the Army. They said, "Good luck dealing with the Army and this is what we want, 300 an acre, and these are the terms."

MR. KRIEGSMAN: Can we mark this map?

MR. GRAY: You can. Can I show you what the map is attached to, if you want to get the whole thing?

MR. KRIEGSMAN: Sure.

MR. GRAY: You see I wrote him a letter on March 21st saying this is the deal there. So you might just lay the foundation with my letter and go from there.

MR. KRIEGSMAN: Okay. Thanks. I appreciate that.

BY MR. KRIEGSMAN:

**Q. So this map that we've been looking at here, it's attached to a March 21st, 1996 letter from Mr. Gray to you --**

A. Uh-huh.

**Q. -- is that correct?**

A. Yeah.

MR. KRIEGSMAN: Okay. So we'd like to mark this letter and the attached map which states "Exhibit B, Tract C" as Exhibit 2.

**Q. I know all about that.**
A. You know, Mr. Belfer, I remember once he said, "You can fight city hall," he said, "but you don't want to go to war with the Army."
**Q. And so when did you first learn that there were issues with the Army regarding access?**
A. In conversations with the landmen from other companies.
**Q. Did you learn it at that meeting with the Lawtons?**
A. I think I already knew about it.
**Q. Already knew about it. Did you discuss --**
A. I mean, it's Fort Polk and it's not leased. Why isn't it leased? Well, obviously, everything around it's leased. Why didn't they lease this? Well, I mean, you don't have to be a real brain surgeon to figure out that there is a problem with the Army.
**Q. Did you discuss that with the Lawtons during that meeting?**
A. I think that, best I can remember, I was brought up to date about the other companies, you know, that had tried to gain access but had so far all been unsuccessful. Well, all right, but we're going to hire, you know, these guys from

Washington and we're going to try and see if we can't, you know, kick the door down on the post and get in there. And ultimately it just wasn't -- it wasn't a practical business thing to do.

**Q. Had you already -- so when you went to the meeting with the Lawtons, and this would have been March 20th, 1996, you had already -- or someone from Belco had already contacted Patton Boggs?**

A. I don't recall exactly the order, you know, that things went in. I know that we talked here and Mr. Belfer was talking to the Patton Boggs people, and it could have been even simultaneous.

**Q. And you don't remember if there was any discussion at the March 20th meeting with the Lawtons about access issues with the Army?**

A. Like I said, best of my recollection, they brought me up to date on attempts that other companies had made.

**Q. Okay. And then --**

A. I had -- and I had either talked to those guys at those other companies either just before this meeting or just after this -- the March 30th meeting with the Lawtons.

**Q. So, I mean, what was the relationship like with these competing companies? It seems like on the one hand you're kind of fiercely competitive, you've got this map with the yellow and blue, but on the other hand you're able to talk to folks there. How would you describe that relationship in general?**

A. It's -- when you're talking to them, like when you're talking to your fellows at the other company, it's basically your friendship. And, you know, I mean, those guys were all friends and all still are friends. And I could call and say, "Hey, tell me about what happened over at Fort Polk."

"Oh, man. That's a waste of time. It's a total waste of time. You're never going to get anything out of the Army." And I got basically that story from all of them.

**Q. And so you hired Patton Boggs, Patton Boggs set up this meeting that you had at the fort with the Army?**

A. Right.

**Q. And you met with a number of people there who were all civilians?**

A. Like I say, I don't know that they were all

civilians but I think that most of -- most of them were in civilian attire. I'll put it that way.

**Q. Okay. And was it your understanding that the folks that you were meeting with would be the ones making the decision regarding access?**

A. Yeah.

**Q. And how did you know that?**

A. Patton Boggs.

**Q. Patton Boggs said these are the guys --**

A. You know, they had contacted the general. The general had said, "These are the people that you need to talk to."

**Q. Yeah.**

A. And so those were the people that we talked to.

**Q. Okay. And tell me again, you sat down with them and they basically told you you're not allowed in?**

A. Right.

**Q. Did they give you a firm no and said, "We're not giving you access"?**

A. Yeah.

**Q. Yes?**

A. Yes. And, like I said, we had several proposals -- proposals to them.

**Q. You brought those proposals to the meeting?**

A. Yes.

**Q. And then --**

A. Now, I don't know that they were in writing. They were just ideas that were being exchanged during the meeting, you know, what if we did or what if we did that or what if we did something else. "What if we assumed full responsibility. I mean, if something blows up out there then we're responsible. The Army has nothing to do with it. Let us go under those conditions."

"No, you can't go out there."

**Q. Dr. Ron Thomas, does that name ring a bell?**

A. Huh-uh.

**Q. Do you know anything about a claim of ownership by the United States or the ownership for these minerals being disputed at that time? Do you know anything about that?**

A. It seems like that maybe at my meeting here with the Lawtons that that was discussed. But, like I said, I think Mr. Gray here, he was extremely confident that they would prevail and so we -- so I didn't feel like I was wasting my time talking to the Lawtons.

**Q. Now, when you were looking at taking this lease**

**for this area here in blue on Exhibit 2 was there any talk of you having to take a protection lease for any portion of that?**

A. No.

**Q. Did you -- the terms of this offer, it says bonus payment of 300 per acre, annual rentals of 300 an acre, 27 and a half percent royalty. That's right? That's the terms that you discussed?**

A. Uh-huh. And we were ready, willing and able to do the deal at those terms.

**Q. Okay.**

A. Like I said earlier, I think Mr. Belfer would have paid $500 an acre for this lease.

**Q. Were these terms affected in any way by a claim of ownership by the United States?**

A. Huh-uh. Like I said --

**Q. I'm sorry. Can you give a verbal answer?**

A. No. Repeat the question.

**Q. Were these terms that we mentioned, $300 an acre bonus, $300 an acre rental, 27 and a half percent royalty, were those terms affected in any way by a claim of ownership by the United States?**

A. No.

**Q. Were they affected in any way by a cloud on title --**

**Q. Okay. I didn't mean to suggest anything improper. I think you understand why I would ask.**
A. I'm semi-retired and -- I'll be 56 in February, and my goal for the last 30 years has been to retire while I'm 55. I'm going to make it.
MR. GRAY: We can't compete with Shell Oil anyway.
THE WITNESS: No.
A. I own a royalty interest in some leases that are being drilled in northwestern Alabama and --
BY MR. KRIEGSMAN:
**Q. And I hope you don't take that personally.**
A. No. No. But, I mean, that's -- I mean, hopefully, after this year I'll never have to do this again, you know, never work again. I mean, I've got something else I want to do but it's not in the oil business.
**Q. And so what ultimately transpired?**
A. We punted it.
**Q. You told Belfer --**
A. You know, "We can't do it, Robert." And he was very disappointed, you know. I really wish that we could have done it but -- and I believe that's when he said, "You can fight city hall, but you

can't fight the U.S. Army."
**Q. And, I mean, was there -- did you ever consider taking the lease and pushing the access issue?**
A. No. We hit a stone wall, you know. And he had pulled out as big of guns as he had, Patton Boggs, and it bore no fruit at all.
**Q. And so did you respond to this --**
A. I don't think --
**Q. -- letter?**
A. Not that I remember.
**Q. Did you ever get back to the Lawtons and say, "Hey, we" --**
A. Actually, I don't think I ever did. Who knows what might happen? Maybe they close down Fort Polk sometime, you know. So you never want to say absolutely, totally, positively no; but, you know, I mean, in situation like this it's kind of -- it's a usual thing to do -- to just let it dangle. It's not costing you any money. And we had bigger fish to fry out to the east, and I was working 17 or 18 hour days at that time.
**Q. And you may have answered this already. At that meeting with the Army, who was there besides the folks from the Army? It was you --**
A. Just me and the gentleman from Patton Boggs.

C E R T I F I C A T E

This certification is valid only for a transcript accompanied by my original signature and blue official seal on this page.

I, DEIDRE D. JURANKA, RPR, Certificate No. 21001, Certified Court Reporter in good standing with the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that MEL FIFE, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto affixed my signature at Lake Charles, Louisiana, this the 31st day of May, 2006.

OFFICIAL SEAL
DEIDRE D. JURANKA
Certified Court Reporter
in and for the State of Louisiana
Certificate Number 21001
Certificate expires 12-31-06

Deidre D. Juranka