Deposition of: **Thad D. Minaldi** Taken on: **May 23, 2006**

Deposition of:

# Thad D. Minaldi

In the case of:

# Central Pines Land Co., et al
# vs.
# The United States of America

Taken on:

**May 23, 2006**

*KAUFMAN, HOFFMAN, TAYLOR,*
*WYATT & D'ARCOURT*
*Phone: 800-503-2274*
*Fax: 337-234-0715*
http://www.kaufmanandassociates.com

a fellow named Mark Virant, with whom we were discussing, specifically asked us about how we saw title in that area. I know at that time my knowledge was not deep at all about the history of those lands other than the Burton-Lawtons always operated under the assumption that they owned the mineral rights underneath the fort and the artillery range, and it was a memorable moment in my professional life when Mark Virant told me that the Military was claiming the mineral rights to the Fort Polk and artillery range lands and told me that they had put the lands up for lease. And I don't -- at this point, I'm not sure, but I think he even told me they had signed leases; but I'm not so -- I'm not sure exactly about that. And then he, essentially, put me on the footing of having to defend our ownership.

And so we as a group met and discussed how we would respond to Union Pacific Resources' suggestion that we didn't own the mineral rights and we undertook a certain analysis, presented it -- presented to Mark Virant and Union Pacific Resources what our claims -- the summary of our claims, summary of our ownership, and we

continued to discuss the leasing of all of our lands in that particular area.

We continued to deal with all three of these people. At some point along the way I think Oxy was not moving as quickly as Union Pacific Resources or Chesapeake so the center of our -- or the emphasis of our negotiations continued primarily with Chesapeake and Union Pacific Resources. And at some point we thought that we had to make a decision, otherwise we could have kept negotiating, and so we faxed out a letter, as I recall, to Union Pacific Resources, Oxy and Chesapeake saying that we would accept certain -- these certain terms and the first to respond saying they accepted those terms we would continue to work with. And Chesapeake was the first to respond.

I think in those discussions they informed us that they were not going to sign a lease on our Fort Polk and artillery range mineral rights because of government issues and military issues. So they preferred to go ahead, at that point, and proceed to signing a lease on lands that were not complicated by the Military use or the Federal Government's claim to ownership.

A. But not for everything.

**Q. And that was because of? Why was that, that it wasn't for everything?**

A. In our discussions they -- I don't remember the specifics of the conversation, but I recall that they wanted to pursue only the lands on which there were no military and federal government claims.

**Q. So once they told you they weren't interested in -- once Chesapeake told you they weren't interested in the lands where there were issues with the Government, did you then go back to UPRC and Oxy about the remaining lands?**

A. No, because I was probably working ten hours a day with my regular work and Chesapeake to try and sign this 20 something thousand acre lease with Chesapeake. I think at that time -- no. I'm trying to think of the time period or how close after this Oxy, UPRC and Chesapeake negotiation that Sonat appeared on the scene.

I remember going straight from Chesapeake -- I'm sorry. Those are loose terms. I remember that soon after concluding the Chesapeake lease we began discussions with Sonat about some of our other lands and mineral rights in this particular

paid us a little more after we had made what we thought was a straight-up, straightforward offer to all three of them allowing all three of them, including Mark Virant, to accept our offer --

**Q. Virant's with UPRC?**

A. Yes, sir.

**Q. Okay.**

A. -- I thought that was a little -- I thought that was very unprofessional.

**Q. Yeah.**

A. So it had nothing to do -- so our -- at that point -- at that point he was in a box, and I guess he had a problem with his people about why he didn't move fast so I think he was trying to cover himself by telling me that.

**Q. And you said Chesapeake only wanted to lease the lands that didn't have issues with the Government; is that right?**

A. If I understand your question, yes, at some point in our discussions they said they only wanted to lease the lands that didn't have the federal government and the military complications.

**Q. And then what happened? You said you went right into negotiations with Sonat. What happened with them?**

**didn't -- they weren't interested --**

A. Right.

Q. **-- if there were issues with the Government?**

**Was there subsequent leases with Chesapeake that included Group C?**

A. Yes. Chesapeake came back, after having drilled a number of wells on Lawton lands and other lands in the area and having had some success and having seen their company become a success story, did come back to us and want to lease some lands that, again, had military base and federal government implications. I think -- I think some of this acreage was Group C, but as I sit here right now I can't say if all of it was Group C.

But I know that, just as Sonat had said, Chesapeake was telling us that before they could do anything on this land they would have to go visit with the Military and find out what could be done and if it could be done and when it could be done and how it would have to be done to have a well drilled or to conduct operations on the military base.

Q. **Okay. Turning back to -- it says you have "knowledge of plaintiffs' efforts to determine if the United States was claiming minerals under the**

**disputed property." Could you tell me about that knowledge.**

A. I think after Mark Virant told us about the Federal Government leasing it or bidding it for lease --

**Q. And sorry to interrupt. Do you remember when that was when Mark Virant told you that?**

A. It was when we were running -- it was while we were discussing with UPRC and Chesapeake and Oxy that first set of leases, as I recall. I remember -- I remember it being a surprise. I remember it changing -- I remember it giving us something else that we had to do at the time we were trying to lease this land.

**Q. And that's --**

A. In terms of a date or a month or a year, I don't know that right now.

**Q. And that's when you first heard about it, when the plaintiffs first heard about -- first heard that the United States was claiming minerals; you heard that from Mark Virant?**

A. I heard it from Mark Virant and, as I recall, I reported it to the Jack Lawton family and the Bill Lawton family.

**Q. And that was the first time the plaintiffs had**

**knowledge of that?**

A. It's the first time I had knowledge of it, and I understand it's the first time that any of us -- any of the Lawton -- Burton-Lawton family had knowledge of this.

**Q. And what were plaintiffs' efforts to determine if the United States was claiming --**

A. I think Mark Virant provided us with a list of the properties that the Federal Government or the Federal Government -- the Bureau of -- BLM had put up for lease. I think we hired our own person to go check records and to find out some of these things. I think we asked UPRC and Chesapeake and Oxy -- no, I won't go so -- I don't remember having a specific discussion about this with Oxy, but I think we also asked these people as part of our discussions and negotiations what they knew about it. So that's what I recall we did.

**Q. Anything else after that?**

A. After that?

**Q. Yeah. Or were you --**

A. Well, I mean, after we -- after we verified that the Federal Government was claiming interest in the mineral rights that we thought we owned we

A. That's my impression.
**Q. And how do you know that, from Belco or --**
A. Since you and I talked and, again, I was trying to piece this together, I don't -- I can't recall how I learned that. I can't recall who told me that. Certainly someone must have told me that because we never could get in touch with the gentleman at -- the fellow at Belco with whom we were dealing.
**Q. But you didn't have any discussions with Swift --**
A. I --
**Q. -- regarding the difficulty?**
A. I can't recall having a meeting with Swift about this. I just don't recall that.
**Q. Swift, at some point, purchased leases that Sonat had; is that right?**
A. That's my impression of how Swift entered this picture, but I don't recall having a conversation with or a meeting with someone from Swift about anything.
**Q. And do you know anything about Swift also owning a portion of the minerals not on Group C but kind of in that checkerboard pattern on Group C? Do you know anything about that?**
A. I think we learned when we -- as part of the

on both the landowner side and the operator side in the oil and gas business, and we thought he could help us solve some of these problems by helping address the concerns and the problems that first Sonat and then Chesapeake were having about leasing -- wanting to lease lands that were involved in this dispute and wanting to lease lands that were subject to military use.

**Q. And that was in addition to the Gray Law Firm?**

A. Yes.

**Q. You thought Jack needed some help?**

A. Well, I was house counsel at Jack Lawton, Inc. I thought I needed some help.

**Q. All right. Why did you go beyond the Gray Law Firm?**

A. Well, Jack and I were -- Jack and I were working this and we may have hired Kim -- we may have hired Kim to look at the mineral ownership issue at the time that UPRC first identified the Federal Government's claim to our mineral rights. I'm not sure of that, but Kim may have entered the picture that early to help us articulate the ownership to the Federal Government.

And the reason I'm saying that is one of the things Mark Virant -- when Mark Virant called to

tell us of this Federal Government ownership one of the things he asked me was whether we had had anybody else look at our ownership, our title, other than me, who was in-house, and Jack Gray, who was almost in-house. And we may have hired Kim at that point. I'm just not sure at this point in time.

And then the Sonat leasing may have been a carry-over from that. Regrettably -- and I should say this now. Regrettably, after you and I spoke I attempted to get my hands on my files over at the Jack Lawton offices but, with the hurricane and the moving, I was unable to find the great majority of my files prior to now. So that's why I'm operating from memory.

**Q. Sure. And are those documents lost or --**

A. I'm not sure they know exactly right now what they would consider lost or misplaced. There were a number of -- a number of people apparently had a hand in moving files out of the Jack Lawton, Inc. offices where the storm had punctured the roof and there was a great deal of water entry and place these files in new filing cabinets in a storage area close by. It seems that from time to time, and this being one of

comfortable taking a lease from one as opposed to the other to go on the land and undertake the difficult and expensive operations it takes to find hydrocarbons, not to mention the earlier activities of conducting seismic and things like that.

So, bringing it to this situation, when the Government was claiming ownership of these other mineral rights it clearly affected Mark Virant and Union Pacific Resources because they felt compelled -- he felt compelled to tell me about this as we were discussing leasing all of these lands. It obviously impacted Chesapeake because they went from talking about leasing all of our lands to leasing only 20 something thousand that didn't have this military or government implication.

**Q. But Chesapeake did lease a portion of the Group C lands?**

A. Right.

**Q. And they just took protection leases, right?**

A. Yes, sir.

**Q. So I don't see how that -- where the problem is if there was a concern about ownership. You're saying they wouldn't want to lease them because**

and losses were. I don't recall what the allegations in the lawsuit are and I'm only -- we're only dealing in examples.

Q. **I understand that.**

A. Okay.

Q. **But with that caveat, can you answer the question, then? Was it 250 is what they would have gotten, signed a lease for 250 but only got 200, or signed a lease for 250 when they could have signed a lease for 350?**

A. I think we could have signed a lease for 350 or 4 with Sonat but for the Government's claim.

Q. **And what's the basis for the opinion? Did you have a discussion with Sonat where they said we're only going to pay -- we're not going to pay as much money because of this cloud on title?**

A. Because we -- my understanding and my impression now is because we got 400 something dollars per acre from Chesapeake subsequently and we got an agreement with Belco for 300 something dollars an acre. So the range of prices at which we could have bought these leases -- we could have signed these leases but for the Government's claim to ownership ranges from 150 on the low side to 300, $400 per acre on the high side, based upon our

C E R T I F I C A T E

This certification is valid only for a transcript accompanied by my original signature and blue official seal on this page.

I, DEIDRE D. JURANKA, RPR, Certificate No. 21001, Certified Court Reporter in good standing with the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that THAD D. MINALDI, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto affixed my signature at Lake Charles, Louisiana, this the 31st day of May, 2006.

OFFICIAL SEAL
DEIDRE D. JURANKA
Certified Court Reporter
in and for the State of Louisiana
Certificate Number 21001
Certificate expires 12-31-06

Deidre D. Juranka