# TRANSCRIPT OF PROCEEDINGS

CENTRAL PINES LAND CO., et al., )
)
Plaintiffs, ) Docket No. 98-314L
)
v. ) (Judge Edward Damich)
)
THE UNITED STATES, et al., )
)
Defendants. )

Deposition of: THOMAS PRICE, JR.

Pages: 1 through 72

Place: Washington, D.C.

Date: July 6, 2006

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

precise on these, but let's just say 2000, I was the vice president of corporate development, which at that time entailed all of the relations that I mentioned there as well as being responsible for investor relations as well.

And in 2000, approximately 2000, I think, my title went to senior vice president of investor and government relations. And then in 2003 perhaps, it was changed back to senior vice president of corporate development. Actually that would be -- this was filed in the year 2006. I guess that would have been 2005, the title change back to senior V.P. of corporate development.

Q Okay. And when you made this change in 2000, were there additional duties that you took on or are there other duties that you were no longer focusing on? Could you describe them?

A Yes. No, really just there was probably more focus on just the expansion of our activities. We were making a lot of acquisitions at the time.

Q What is Chesapeake?

A Chesapeake is the nation's most active oil and gas explorer. We are the second largest independent natural gas producer in the United States. And the company headquarters are in Oklahoma City. A

New York Stock Exchange listed company, Fortune 500.

Q And could you just briefly explain in layman's terms what that means to be an oil and gas explorer?

A We try to identify geologic formations on shore in the United States that will allow us to produce oil and gas to fuel the nation's economy.

Q And once you identify geological formations, what? You then take leases or purchase leases? What typically happens?

A Well, that would be one of the steps in that process. It might be the first step. It might not be, depending upon what other geoscience was being used. But frequently the next step after we've identified in general terms the prospectivity, then we acquire and look after them.

Q And then you drill as well?

A We do.

Q Okay. You talked about corporate relations, investor relations, government relations. How involved are you with more the business aspect, the day-to-day management or decisions about the prospects or decisions about purchasing leases?

A Not at all.

Q Your background is more of a business

gas drilling activities, there would be some areas that might be more or less sensitive than others.

Q Okay. Okay. And in the mid or in the 1995 to '97 timeframe, you were the vice president of corporate development at Chesapeake, is that right?

A Correct.

Q Okay. Can you explain what your duties were? And we talked about Chesapeake is an oil and gas explorer. Was Chesapeake at that time interested in Fort Polk and the lands in the vicinity of Fort Polk?

A We were interested in central Louisiana.

Q Okay.

A Which included a portion of Fort Polk and the Kisatchie Forest.

Q Okay. And why was Chesapeake interested in this area?

A Because we had made an assumption that we could drill profitably in central Louisiana like formations that we had drilled to in Texas and that this was the extension of that same geological prospect.

Q And that's the Austin Chalk?

A Yes. Correct.

Q And Chesapeake purchased a lot of leases in

to drill more wells, might it have been beneficial?
It might have been.

Q But you don't have any knowledge of Chesapeake not purchasing leases because of an ownership dispute?

A No, I just don't have any knowledge of that at all.

Q Are you familiar with the concept of a protection lease?

A Sure.

Q What is that?

A Well, that you want to take a lease from someone that you were not certain of the validity of the title.

Q So two parties were in dispute over ownership of a particular parcel of land and you wanted to lease that parcel, you might pay both of them?

A Sure.

Q Is that a common practice?

A I'm just not in the land business, so I don't know how common that is generally.

Q Okay. Do you know if this was common in the '90s?

A Well, I really don't. I think it's in a

competitive bidding on oil and gas leases in a national forest area.

Q And you say national forest area, but you attended a meeting at the fort.

A Correct.

Q And so even though you said you don't necessarily understand the boundaries and such, you knew you were dealing with properties claimed by the Army?

A Correct. And I knew that regardless of where the beneficiaries were that the wells were going to be drilled right here.

Q And Chesapeake was interested in drilling those wells?

A Correct.

Q In fact, they had their senior vice president contacting the governor with regard to that activity, did they not?

A Well, but, I mean, at that time, I was just involved in this.

Q They had their vice president contacting a governor in an effort to use political influence, did they not?

A In an effort to educate and to the consequences of not taking steps to evaluate whether

Q Okay. I understand that you have testified here that you don't have knowledge of whether Chesapeake leases from the Lawtons or not, is that right?
A Correct. That's correct.
Q And do I understand you do not have knowledge of whether Chesapeake had any leases on Fort Polk from the Army?
A I think that I said I was not aware of whether we had any on Fort Polk or in the immediate vicinity.
Q Yes.
A So as I -- let me just leave it at that, yeah.
Q But it is clear that as of April 1997, that regardless of what leases Chesapeake may or may not have had in the vicinity from whoever it may have had, you were interested in additional leases on the Fort Polk area?
A Correct.
Q And that was because the management of the company thought that the area was prospective?
A Correct.
MR. GRAY: I don't have any other questions.
MR. KRIEGSMAN: Just quickly.

CERTIFICATE OF COURT REPORTER/NOTARY PUBLIC

I, Bernadette Herboso, the officer before whom the foregoing testimony was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me and thereafter reduced to typewriting; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto; nor am I financially or otherwise interested in the outcome of the action.

Court Reporter/Notary Public

My Commission Expires: 11/14/2008