**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CENTRAL PINES LAND COMPANY, ET AL. | ) | |
| | ) | |
| Plaintiffs, | ) | No. 98-314 L |
| | ) | |
| vs. | ) | |
| | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . 2

I. Plaintiffs' "De Facto Moratorium" Arguments Are Barred by the Statute of Limitations . . . . . . . . . . 2

II. Plaintiffs' "De Facto Moratorium" Arguments Fail as a Matter of Law . . . . . . . . . . 7

III. Plaintiffs' Allegations Regarding "Dangerous" and "Contaminated" Conditions Fail to State a Claim . . . . . . . . . . 12

IV. Plaintiffs' Allegations Regarding the United States' Claim of Ownership Fail to State a Claim . . . . . . . . . . 13

CONCLUSION . . . . . . . . . . 15

## TABLE OF AUTHORITIES

**FEDERAL CASES**

*Alliance of Descendants of Texas Land Grants v. United States*,
27 Fed. Cl. 837 (1993), *aff'd*, 37 F.3d 1478 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . 4

*B.W. Parkway Assoc., Ltd. v. United States*,
29 Fed. Cl. 669 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Boit v. Gar-Tec Products, Inc.*,
967 F.2d 671 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Boling v. United States*,
220 F.3d 1365 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Central Pines Land Co. v. United States*,
274 F. 3d 881 (2001), *cert. denied,* 537 U.S. 822 (2002) . . . . . . . . . . . . . . . . . . . . . 13, 14

*Duncan Energy Co. v. United States Forest Serv.*,
50 F.3d 584 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Fallini v. United States*,
56 F.3d 1378 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Kleppe v. New Mexico*,
426 U.S. 529 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Lau Ah Yew v. Dulles*,
257 F.2d 744 (9th Cir. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Lion Raisins, Inc. v. United States*,
416 F.3d 1356 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Mitchell v. United States*,
10 Cl. Ct. 63, *as modified*, 10 Cl. Ct. 787 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Universal Athletic Sales Co. v. American Gym Recreational & Athletic Equip. Corp.*,
546 F.2d 530 (3rd Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**STATE CASES**

*Gailey v. McFarlain*,
193 So. 570 (La. 1940) . . . . . . . . . . 14, 15

*Gayoso Co. v. Arkansas Natural Gas Corp.*,
145 So. 677 (La. 1933) . . . . . . . . . . 14

**FEDERAL STATUTES**

28 U.S.C. § 2501 . . . . . . . . . . 15
30 U.S.C. § 22 . . . . . . . . . . 10
30 U.S.C. § 601 . . . . . . . . . . 10
40 U.S.C. § 471 . . . . . . . . . . 10

**STATE STATUTES**

La. Rev. Stat. Ann. § 31:11(A) . . . . . . . . . . 11, 12

**PRELIMINARY STATEMENT**

Defendant, United States of America, respectfully submits this Reply in Support of its Motion for Summary Judgment. As Defendant explained in its opening memorandum, Plaintiffs' claim regarding the Group C lands is barred by the statute of limitations. This Court has already determined that the application of the continuing claim doctrine will determine whether Count II -- Plaintiffs' remaining claim -- is time barred. Because Plaintiffs are still unable to point to any unsuccessful attempts to access the Group C lands since 1978, the continuing claim doctrine does not apply and Count II must fail.

Plaintiffs' allegations also fail to state a claim. Plaintiffs allege that the United States committed an "unconstitutional taking" of their Group C mineral rights through "de facto moratoriums" that denied Plaintiffs access to the surface of Group C. But because Plaintiffs are still unable to point to any attempts by Plaintiffs to access Group C, or identify anyone from the Army ever telling Plaintiffs that they could not access Group C, these allegations fail to state a claim.

Plaintiffs next allege that they have been denied access to their minerals because of "dangerous" and "contaminated" conditions on the surface of the Group C lands. As set forth in Defendants' opening brief, Plaintiffs' claims regarding "dangerous" or "contaminated" conditions on the surface of Group C accrued, by Plaintiffs' own acknowledgments, long before 1992, the operative date for the statute of limitations. Plaintiffs fail to respond to these arguments and their "dangerous conditions" arguments must therefore fail.

Finally, Plaintiffs' arguments regarding the assertion of ownership and leasing activity for the Forest Service portions of the Group C lands are without merit. As set forth in Defendant's

opening brief, these arguments were already rejected by the district court in the related action and are belied by the facts of the case. Plaintiffs' Opposition fails to respond to these arguments in any way.

## ARGUMENT

### I. Plaintiffs' "De Facto Moratorium" Arguments Are Barred by the Statute of Limitations.

Plaintiffs allege that the United States has taken their property interests through "de facto moratoriums" which denied them access to their mineral rights. ¶ 39. Specifically, Plaintiffs assert that after the formal moratorium ended, the United States had a "secret policy" to continue to deny Plaintiffs access to the surface of the Group C lands. ¶ 16. This "secret policy" allegedly amounts to a "de facto moratorium." ¶ 39. Because, as the First Amended Complaint ("FAC") acknowledges, this claim accrued when the formal moratorium ended in 1978, it is barred by the statute of limitations.

This Court has already determined that "the applicability of the continuing claim doctrine will determine whether or not Count II is time-barred." August 12, 2004 Order at 24. Anticipating a motion for summary judgment, the Court directed the parties to outline attempts by Plaintiffs to access their Group C mineral rights since 1978, and how, if at all, Defendant acted in response. Id. at 32. Because Plaintiffs are still unable to show any attempt to access their Group C mineral rights, or point to any evidence demonstrating that the United States told Plaintiffs they could not access this area, the continuing claim doctrine does not apply and Count II is time-barred.

Plaintiffs concede that between 1978 and 1992 the United States did not prevent or

impede Plaintiffs' access to their Group C minerals. Opposition at 23, Plfs. Ex. 41.[1] And Plaintiffs are still unable to point to any attempts by Plaintiffs, or anyone acting on Plaintiffs' behalf, to access Plaintiffs' Group C minerals since 1992. Indeed, Plaintiffs acknowledge that they have never requested permission from the Army to access the surface of the Group C lands. Plfs. Resp. Def. Prop. Uncontroverted at 4. Accordingly, Plaintiffs fail to satisfy the test set forth by the Court, and their attempts to invoke the continuing claim doctrine – and avoid the statute of limitations – must fail.

Curiously, Plaintiffs now assert that the United States did not prevent Plaintiffs from accessing their mineral rights after the moratorium was lifted in 1978. Opp. at 21 ("the exact opposite occurred . . . the United States did not deprive Plaintiffs of use of their property"). Plaintiffs then assert that because the United States did not prevent Plaintiffs from accessing Group C after the moratorium expired, there was no "seminal event" and the continuing claim doctrine applies. This argument must fail because it is contradicted by the allegations in the FAC. See ¶ 33 ("[a]fter the termination of said moratorium, the United States **continued to**

---

[1] Plaintiffs' lead counsel, A.J. Gray, has submitted an affidavit from himself stating that Plaintiffs made no attempt to access their Group C minerals between 1978 and 1992. Plfs. Ex. 41. Mr. Gray states that he has specific knowledge of these facts because he has represented Plaintiffs for over 35 years and is familiar with the facts underlying Plaintiffs' allegations. Id. This affidavit appears to make Mr. Gray a witness in this case, despite the fact that he did not identify himself as a person with knowledge of the facts stated in the Complaint during discovery. See Plfs. Ex. 42 at 36-48. See also Lau Ah Yew v. Dulles, 257 F.2d 744, 746 (9th Cir. 1958) ("[i]t is usually inappropriate for an attorney connected with the trial of a case to testify on behalf of his client. He should ordinarily withdraw before becoming a witness."); Universal Athletic Sales Co. v. American Gym Recreational & Athletic Equip. Corp., 546 F.2d 530, 539-40 (3rd Cir. 1976) ("the value of such testimony must be discounted because of the interest of the lawyer or his firm in the outcome of the litigation"); Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 674 n.1 (1st Cir. 1992) (applying Universal Athletic Sales rule to trial, as well as pre-trial, phases of case).

**prohibit** the mineral owner from using the surface of the lands for oil and gas exploration purposes, but made no payment for such takings.") (Emphasis added). Accordingly, Plaintiffs' "de facto moratorium" allegations accrued, if at all, when the moratorium was lifted and the prohibition "continued." See Alliance of Descendants of Texas Land Grants v. United States, 27 Fed. Cl. 837, 842 (1993), aff'd, 37 F.3d 1478 (Fed. Cir. 1994) ("[i]t is axiomatic that a cause of action ... accrues at the time the taking occurs.")

Plaintiffs also seek to invoke the continuing claim doctrine by trying to convince this Court that the present case is similar to Mitchell v. United States, 10 Cl. Ct. 63, as modified, 10 Cl. Ct. 787 (1986). As set forth in Defendant's opening brief, Plaintiffs' reliance on Mitchell is misplaced. In Mitchell, Native Americans brought suit against the Federal Government for mismanagement of tribal forests, based upon the Government's sale of timber for less than its market value, and on the Government's failure to replant trees (regenerate) as required by statute. Mitchell, 10 Cl. Ct. at 66. Specifically, the plaintiffs claimed that the Secretary of the Interior, acting through the Bureau of Indian Affairs ("BIA"), had failed to properly discharge his duties under federal statutes that assigned to him various responsibilities with respect to timber. Id. The focus of the continuing claim analysis rested, in part, upon the alleged failure of BIA to replant portions of the timber allotments that had been cut or burned over. Id. at 77. The court concluded that the BIA had a continuing duty to maintain the tracts of timberland in a state of productivity. Mitchell v. United States, 10 Cl. Ct. 787, 788 (1986). The court viewed this ongoing breach of this "continuing duty as creating a series of individual actionable wrongs." Id. Therefore, "the existence of a continuing duty to regenerate mean[t] that on each day the BIA failed in its duty to regenerate a given [area], there arose a new cause of action." Id. The court

concluded that "those causes of action which arose in the six-year limitations period may be sued upon." Id.

Mitchell is also quite different from the present case. Like the "pay cases," the court in Mitchell found that BIA had failed in its statutory duty to the plaintiffs, each breach amounting to a separate cause of action. The defendant in Mitchell had a continuing "duty to maintain each tract of Indian timberland in a state of continuous productivity and to plant whenever necessary to achieve that end." Id. at 788. Therefore, each day that BIA neglected its duty constituted a separate and distinct breach of the agency's statutory duty. In the present case, Plaintiffs are unable to point to a specific duty that Defendant breached -- much less one that Defendant breached over a period of time, each giving rise to a separate and independent action. Indeed, Plaintiffs now assert that between 1978 and 1992, there was no taking at all. Opp. at 21. If Plaintiffs' claim accrued at all, it was when the moratorium was lifted. Accordingly, this doctrine is inapplicable. See Boling v. United States, 220 F.3d 1365, 1373 (Fed. Cir. 2000) (refusing to apply continuing claim doctrine to environmental takings claims when claim was traceable back to a single breach that resulted in a series of deleterious effects); Fallini v. United States, 56 F.3d 1378, 1380, 1382-84 (Fed. Cir. 1995) (statute of limitations bars claim; Congress passing statute requiring the plaintiffs to allow wild horses to drink on their property was single event causing takings claim to accrue, despite fact that "every drink" was "continuing economic burden").

Perhaps recognizing the weakness of their attempts to invoke the continuing claim doctrine, Plaintiffs next seek to avoid the statute of limitations by arguing a "lack of knowledge." Opp. at 23. Plaintiffs assert that they were unaware of the "de facto moratorium" until discovery

in the prior lawsuit, which was filed in 1996. Id. at 23-25. According to Plaintiffs, before 1996, the "de facto moratorium" was merely a "contingency plan" of the Army, and it was not actually acted on until 1996. Id. at 23. Again Plaintiffs' argument contradicts the allegations of the FAC. See ¶ 32 ("[a]fter the termination of said moratorium, the United States **continued to prohibit** the mineral owner from using the surface of the lands for oil and gas exploration purposes, but made no payment for such takings.") (emphasis added). It is also belied by allegations in the FAC and Plaintiffs' Opposition, which assert that the "de facto moratorium" included permitting requirements and military operations inconsistent with mineral exploration and extraction. ¶¶ 35, 39; Opp. at 34-40. Plaintiffs have repeatedly acknowledged that they were aware of the military operations on Fort Polk dating back to the 1940s and it is well established in the record. See ¶ 15 ("Beginning in 1942, the United States of America began using [Group C] for small arms firing ranges, tank firing ranges, artillery range impact areas, bombing ranges, maneuver areas, and other related military training and facilities."); Ex. F at 6 ("[s]ince acquisition of the surface of Group C properties in 1943, a substantial portion of the property has been, in fact, subject to military operations including bombing practice, artillery practice, small arms fire and troop maneuvers by the United States Army and Air Force. Unexploded bombs are found and disposed of from Group C."); December 13, 2005 Deposition of Plaintiff Jack Lawton, Jr., Exhibit I at 28-31 (stating that United States created "impediments" to Plaintiffs' access to Group C including "artillery shells" that have "been accumulating a long time," dating back to the "late 70's"). Indeed, John Camp, executive director of Burton Industries, Plaintiffs' predecessor in interest, was given a tour of Fort Polk on June 29, 1977, during which the military operations were explained to him. See Exhibit P ("On June 29th [1977] . . . Mr. Camp and his wife were given

two briefings, a helicopter view of Fort Polk, and lunch with [Major General] Steele and his wife").[2]/

The record also shows Plaintiffs' knowledge of potential permitting and operational requirements on Fort Polk dating back to at least 1977.

> Will Fort Polk permit just any oil and gas lessee on the artillery range? No, Fort Polk should insist on a dependable and reliable major oil companies because of the risk and danger involved. They will be required to post a large liability bond, comply with environmental laws and regulations and restore property after completion of drilling operations, etc. Mr. Camp agrees and will likely use Conoco or ARCO.

See Ex. P at 2.[3]/

Plaintiffs are therefore precluded from now arguing that they were "unaware" of the "de facto moratorium" and this attempt to avoid the statute of limitations must also fail.[4]/

## II. Plaintiffs' "De Facto Moratorium" Arguments Fail as a Matter of Law.

Even if the Court were to look past the statute of limitations problem, Plaintiffs' "de facto moratorium" arguments nonetheless fail to state a claim. Plaintiffs allege that the United States has taken Plaintiffs' mineral rights through a secret policy to deny Plaintiffs access to Group C,

---

[2]/ It is also worth noting that although Plaintiffs now disavow it, the FAC alleges that the moratorium continued until 1983. ¶ 32.

[3]/ Since Mr. Camp's visit to Fort Polk was in 1977 (before the moratorium was lifted in 1978) the above-quoted language does not necessarily represent Army policy or requirements after the moratorium was lifted. As noted below, Army policy is set forth in AR 405, Exhibit O. But Mr. Camp's visit to Fort Polk does establish Plaintiffs' knowledge of potential issues regarding access to Group C and belies Plaintiffs' assertions that they learned of these issues for the first time in 1996.

[4]/ Accordingly, Plaintiffs' reliance on B.W. Parkway Assoc., Ltd. v. United States, 29 Fed. Cl. 669 (1993) (Opp. at 24-25) is misplaced. Unlike B.W. Parkway Assoc., Plaintiffs here were aware of the facts giving rise to the FAC since at least 1977 – well beyond the statute of limitations.

resulting in a "de facto moratorium." ¶ 16. But Plaintiffs concede that they themselves never attempted to access the Group C minerals. Plfs. Resp. Def. Prop. Uncontroverted at 4. Instead, Plaintiffs now argue that the Army's actions in allegedly discouraging third parties from leasing Group C from Plaintiffs constitutes a taking. Id. at 32-35. These allegations fail to state a claim. As set forth in Defendant's opening brief at 22-23, the meetings between the Army and Plaintiffs' potential lessees were nothing more than informal information sessions. And Plaintiffs acknowledge that after hearing from third parties that the Army was allegedly creating obstacles to access, they never followed up with the Army to confirm if the allegations were true or question if indeed the Army was impeding potential lessees access to Group C. Deposition of William Drost, Ex. H at 73-74.

Plaintiffs now assert that a meeting between the Army and potential lessee Chesapeake was more than informational and represented an actual request to access Fort Polk. Opp. at 39. Plaintiffs quote an individual from Chesapeake, Gary S. Dunlap, who thought an official request to access Fort Polk was made of the Army at an April 1, 1997, meeting between the Army and Chesapeake. Opp. at 39 (citing Dunlap deposition at 21). Plaintiffs' assertion is contradicted by the undisputed facts of the case. First, the individual Plaintiffs refer to, Mr. Dunlap, acknowledged in the same deposition that he was not present at the April 1, 1997, meeting between the Army and Chesapeake. Deposition of Gary S. Dunlap, Ex. Q at 20.[5]/ In addition, George P. Denny of Chesapeake, who was present at the meeting, testified that there was just a "general discussion," that the meeting was "[m]ostly the Army personnel asking questions of

[5]/ Mr. Dunlap also testified that the general consensus at Chesapeake was that the meeting with the Army went well. Id.

[Chesapeake's] operations guys," and that he does not believe there was any request by Chesapeake to access the surface of Group C. Ex. L at 18-21.[6]/ Denny's testimony is confirmed by the minutes of the April 1, 1997 meeting, which show that Chesapeake had not even developed a plan yet, much less made a request. Minutes of April 1, 1997 meeting, Exhibit R at 7.

Moreover, Plaintiffs do not and cannot allege that at the time of the meeting, Chesapeake had leased any portion of the Group C mineral rights within Fort Polk. Accordingly, Chesapeake was not in a position to make any formal request to access Fort Polk. Thus, because Plaintiffs cannot point to any attempt by Plaintiffs, or anyone acting on their behalf, to access Group C, the "de facto moratorium" allegations fail to state a claim.[7]/

But even if, for purposes of this summary judgment motion, the Court accepts Plaintiffs' unsupportable assertion that potential lessees formally asked the Army to access Group C, Plaintiffs' "de facto moratorium" arguments are still without merit. Plaintiffs assert that these meetings with the Army – in which the Army allegedly discouraged third parties from leasing Group C – amount to a taking because they are a violation of Louisiana law. Opp. at 19. This argument must fail.

First, because the Army was operating pursuant to a federal regulation, Louisiana law is

---

[6]/ Mr. Denny was identified by Plaintiffs as a "person with knowledge" of the facts stated in the FAC. Ex. F at 40.

[7]/ The speculation of Mel Fife of Belco as to why portions of Fort Polk were not leased also fails to rescue Plaintiffs' claims. Opp. at 42. Belco also did not have a lease for Group C and was not in a position to request access to Group C. Ex. M at 42-43. And as Mr. Fife acknowledged in his deposition, Belco was not a lessee or representative of Plaintiffs and no formal request was made of the Army for permission to access Group C. Id.

not controlling. See Duncan Energy Co. v. United States Forest Serv., 50 F.3d 584, 590-91 (8th Cir. 1995) (United States Forest Service regulations regarding use of surface by mineral owners supersede state law, to the extent state law provided unrestricted access to the surface it was pre-empted by federal regulations allowing Forest Service to control access to surface). In Duncan, the plaintiff owned mineral rights within a national forest where, as here, the United States owned the surface. The Forest Service required mineral owners to submit surface use plans and required them to comply with guidelines set forth in federal regulations. Id. at 586. Under North Dakota law, however, the mineral estate is the dominant estate and mineral owners are entitled to unrestricted access with twenty days notice to the surface owner. Id. at 591. The plaintiffs in Duncan – similar to Plaintiffs here – argued that the Forest Service's actions in requiring them to comply with Forest Service surface regulations were a violation of North Dakota law and amounted to a taking. The Eighth Circuit rejected this argument. Finding that federal regulations protecting federal lands pre-empted North Dakota law, the Eighth Circuit held that the mineral owners were required to comply with the Forest Service regulations. Id. at 592.

In the present case, even if the Court were to accept Plaintiffs' arguments that the Army violated Louisiana law in informing potential lessees of permitting requirements for accessing Group C, Plaintiffs still fail to state a claim. Army Regulation 405-30, Mineral Exploration and Extraction became effective July 15, 1984. See Exhibit O. AR 405-30 implements Department of Defense Directive 4700.3 and was issued pursuant to 30 U.S.C. 22, 30 U.S.C. 601 and 40 U.S.C. 471.[8]/ "This regulation assigns responsibilities and sets policies and procedures for

---

[8]/ Department of Defense Directive 4700.3 is attached as Exhibit S. On October 13, 2004, it was replaced by Department of Defense Directive 4165.6, attached as Exhibit T.

mineral exploration and extraction and extraction on Army controlled lands." AR 405-30 at 1. Part 6 provides:

> **Availability of Minerals.** Under the multiple-use principle, lands will be made available for mineral exploration and extraction to the extent possible, consistent with military operations, national defense activities, and civil works activities.

Id.

Accordingly, Plaintiffs' argument that they possess an "absolute right" to access the Group C minerals is without merit. Even if the Court accepts Plaintiffs' inferences regarding the alleged potential lessees' meetings with Army personnel, Plaintiffs' arguments must fail. Plaintiffs do not and cannot allege that the Army's actions violated or are inconsistent with AR 405-30. Having meetings with potential lessees to insure that exploration and extraction is, to the extent possible, consistent with military operation complies with AR 405-30. Plaintiffs do not and cannot allege otherwise. Plaintiffs therefore fail to state a claim. Duncan, 50 F. 3d at 590-92. See also Kleppe v. New Mexico, 426 U.S. 529, 539 (1976) ("the power over public land thus entrusted to Congress is without limitations").

Moreover, even if the Court were to look to Louisiana law, the allegations against the Army fail to state a claim. Louisiana law does not – as Plaintiffs suggest – give the mineral owner an "absolute right" to access his minerals. Opp. at 19. To the contrary, Louisiana law provides that both the mineral owner and the surface owner must be reasonable in regard to each other. See La. Rev. Stat. Ann. § 31:11(A) ("The owner of land burdened by a mineral right or rights and the owner of a mineral right must exercise their respective rights with reasonable regard for those of the other"). Plaintiffs do not allege that the Army ever told Plaintiffs or anyone with a right to access Group C that they could not access the surface of Group C.

Plaintiffs merely allege that their lessees met with representatives of the Army and that the Army spoke about drilling and exploring for minerals in a manner that was consistent with military activities. Such a meeting is reasonable as a matter of law. Id.

Finally, even if Louisiana law was controlling and it even if it was violated, its violation could not give rise to a takings claim, since an alleged taking must be based on lawful government action. Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1370 (Fed. Cir. 2005) (citing Rith Energy, Inc. v. United States, 270 F.3d 1347, 1352 (Fed. Cir. 2001)).

## III. Plaintiffs' Allegations Regarding "Dangerous" and "Contaminated" Conditions Fail to State a Claim.

Plaintiffs' arguments based on the "dangerous," or "contaminated" condition of the surface are barred by the statute of limitations. As Plaintiffs acknowledge in their Opposition, a takings claim accrues when the owner is deprived of use of the property. Opp. at 21. Plaintiffs seek to avoid the statute of limitations by asserting that the contamination began "at some date, unknown to Plaintiffs." Opp. at 40. But Plaintiffs' FAC establishes that these claims accrued, if at all, long before 1992. See ¶ 15 ("Beginning in 1942, the United States of America began using [Group C] for small arms firing ranges, tank firing ranges, artillery range impact areas, bombing ranges, maneuver areas, and other related military training and facilities."). See also Ex. F at 6 ("[s]ince acquisition of the surface of Group C properties in 1943, a substantial portion of the property has been, in fact, subject to military operations including bombing practice, artillery practice, small arms fire and troop maneuvers by the United States Army and Air Force. Unexploded bombs are found and disposed of from Group C."); December 13, 2005 Deposition of Plaintiff Jack Lawton, Jr., Exhibit I at 28-31 (stating that United States created "impediments"

to Plaintiffs' access to Group C including "artillery shells" that have "been accumulating a long time," dating back to the "late 70's"); Exhibit P (detailing how John Camp, then executive director of Burton Industries, Plaintiffs' predecessor in interest, was given a tour of Fort Polk on June 29, 1977, during which the military operations were explained to him).

As set forth in Defendant's opening brief, the dangerous conditions allegations also fail to state a claim. As the Fifth Circuit explained in the related action, under Louisiana law, the fact that a portion of a servitude is inaccessible, does not constitute a denial of access so long as other portions of the servitude remain available. Central Pines Land Co. v. United States, 274 F. 3d 881, 896 (2001) (no denial of access if alleged impediment "forecloses operations on only a portion of the land burdened by the servitude"). Indeed Plaintiffs leased portions of Group C and received over $2 million in income from these leases. Plaintiffs' Response to Defendant's Second Set of Interrogatories, Exhibit J at 2. Accordingly, even if Plaintiffs' "dangerous conditions" allegations are true, they do not affect access to Group C and are immaterial as a matter of law. See id. at 896.[9]/

**IV. Plaintiffs' Allegations Regarding the United States' Claim of Ownership Fail to State a Claim.**

Plaintiffs continue to argue that the actions of the United States in asserting ownership and leasing the Forest Service portions of the Group C lands created a cloud on Plaintiffs' title and limited Plaintiffs' ability to exercise their mineral rights. Opp. at 27.[10]/ In the related

---

[9]/ Plaintiffs' Opposition fails to respond to either of these arguments.

[10]/ As set forth in Defendant's opening brief, of the approximately 21,000 acres of Group C lands, approximately 5,000 acres on the Southwest peninsula are part of the Kisatchie National Forest. See Ex. E. In 1992 the United States made a determination that Plaintiffs' mineral servitude for these lands, as well as portions of the Group A and B lands, had prescribed for non

litigation, the Fifth Circuit ultimately held that the United States' determination was correct as to the Group A and B lands, but incorrect as to the Group C lands. 274 F. 3d 881. Plaintiffs allege that these actions – asserting ownership and leasing – created a cloud on Plaintiffs' title and limited Plaintiffs' ability to exercise their Group C mineral rights. FAC ¶ 39; Ex. F at 2-5. But as set forth in Defendant's opening brief, these allegations were considered and rejected by the district court in the related action, Central Pines Land Co. v. United States, No. 2:96-2000, slip op. (W.D. La. July 28, 2000), aff'd, 274 F. 3d 881 (5th Cir. 2001), cert. denied, 537 U.S. 822 (2002) (the "related action"), Exhibit B at 33.

In the related action, one of the issues before the district court was very similar, if not the same, as one of the issues before this Court – whether the alleged actions of Defendant indeed prevented Plaintiffs from accessing their mineral rights. The district court found that Defendant's actions did not. Ex. B at 34. With regard to the allegation that the claim of ownership and leasing activity by the United States prevented access – the same allegation made here – the district court stated:

> The plaintiffs point out the government leased the minerals to other companies beginning in 1992.. . . The surface owner's leasing of the minerals underlying his land to someone other than the servitude owner does not in and of itself create an obstacle.

Ex. B at 33, n. 23 (citing Gayoso Co. v. Arkansas Natural Gas Corp., 145 So. 677, 679-80 (La. 1933), and Gailey v. McFarlain, 193 So. 570, 578-79 (La. 1940). Plaintiffs' allegations regarding claim of ownership and leasing activity by the United States must fail for the same reasons

---

use. After making this determination, in 1995, the BLM began offering these lands to the public for competitive leasing. Ex. F at 2-4. The United States' claim of ownership and leasing activity applied only to the Kisatchie National Forest portion of Group C. Ex. F at 3. The United States neither claimed ownership, offered to lease, or leased any of the Fort Polk portions of Group C.

identified by the district court in the related action.

Defendant raised this argument in its opening brief and Plaintiffs fail to respond in their Opposition. Thus, to the extent Count II is based on Defendant's claim of ownership and leasing activity, it fails as a matter of law and should be dismissed.

As Defendant also set forth in its opening brief, the allegation regarding claim of ownership and leasing activity by the United States is belied by the facts. Plaintiffs did lease a majority of the Forest Service portion of the Group C lands. Ex. F at 5. This demonstrates that the claim of ownership did not prevent Plaintiffs from leasing the Forest Service portions of the Group C lands.

A dispute over ownership is not uncommon and an operator will typically take a "protection lease" – that is lease from all disputing parties– and allow the parties to resolve the dispute themselves. That is exactly what happened here. The disputed lands were leased by both the United States and Plaintiffs. Id. And Plaintiffs received over $2 million in income from these leases. Ex. J at 2. Plaintiffs' Opposition fails to respond to this argument as well.

The reasons identified by the district court in the related action, as well as the fact that Plaintiffs did lease a majority of the Forest Service portion of the Group C lands, are sufficient to find that the allegations regarding the United States' leasing activity are without merit.

## CONCLUSION

As set forth above, because Plaintiffs are unable to identify any unsuccessful attempts to access the Group C lands after 1978, their FAC is barred by the applicable statute of limitations, 28 U.S.C. § 2501. In the alternative, and for the same reason, Plaintiffs fail to state a claim upon which relief can be granted. The allegations in Count II regarding (1) a secret policy and de

facto moratorium; (2) dangerous conditions and military use; and (3) the claim of ownership of the Forest Service portions of Group C all fail to state a claim. Accordingly, Defendant is entitled to judgment as a matter of law on Count II. Because this is the only remaining count in the FAC, the FAC should be dismissed with prejudice.

Dated: March 14, 2007

Respectfully submitted,

MATTHEW J. MCKEOWN
Acting Assistant Attorney General
Environment and Natural Resources Division

*\/s/ Alex Kriegsman*

ALEX KRIEGSMAN
Trial Attorney
Natural Resources Section
U.S. Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-3022
Fax: (202) 305-0506

CAPT. JAMES N. HEWITT
Litigation Attorney
U.S. Army Environmental Law Division
901 N. Stuart Street, Suite 400
Arlington, VA 22203-1837
Tel: (703) 696-1596
Fax: (703) 696-2940

MATTHEW A. TILDEN, ESQ.
Office of the General Counsel
U.S. Department of Agriculture
1718 Peachtree Road, NW - Suite 576
Atlanta, GA 30309-2409
Tel. 404-347-1086
Fax. 404-347-1065

DENNIS DAUGHERTY
Assistant Solicitor
Department of the Interior
Office of the Solicitor
Division of Mineral Resources
Branch of Petroleum Resources
1849 C St., N.W., Rm 6312
Washington, DC 20240
Tel: (202) 208-5038
Fax: (202) 208-2225

ATTORNEYS FOR DEFENDANT