**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CENTRAL PINES LAND COMPANY, ET AL. | ) | |
| | ) | |
| Plaintiffs, | ) | No. 98-314 L |
| | ) | |
| vs. | ) | |
| | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

**DEFENDANT'S RESPONSE**
**TO**
**PLAINTIFFS' PROPOSED FINDING OF UNCONTROVERTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

1. Prior to the moratorium terminating on March 31, 1978, the United States considered contingency plans to prevent, impede or limit mineral development on Group C lands after termination of the moratorium. Pls Opp'n Ex. 2, Disposition Form dated January 19, 1967 by Darwin L. Wilder and Tom Adams; Pls Opp'n Ex.3, Disposition Form dated April 30, 1974 by Clarence C. Randle, Chief, Condemnation Section, Real Estate Division; Pls Opp'n Ex. 4, Minutes of meeting at Fort Polk on June 27, 1974 prepared by Colonel Jerry L. Teague; Pls Opp'n Ex.5, Letter dated June 26, 1974 to HQDA, WASH DC from Joe H. Sheard, Colonel, CE, District Engineer; Pls Opp'n Ex. 6, Undated Memorandum (after June 27, 1974 and believed to be July 10, 1974) to Secretary of the Army from Major General D. A. Raymond, Acting Chief of Engineers; Pls Opp'n Ex,7, Undated Executive Summary Major General Commanding Robert Haldane; Pls Opp'n Ex.8, Undated Memorandum (apparently January 13, 1976) by Darwin L. Wilder; Pls Opp'n Ex.9, Memorandum for Commanding General dated January 19, 1976 by Teague; Pls Opp'n Ex.10, Disposition Form dated January 19, 1977 by Darwin L. Wilder, Chief, Acquisitions Branch, Real Estate Division; Pls Opp'n Ex. 12, Memorandum For Record dated May 2, 1977' from Captain Christopher G. Hunt, Real Estate Officer; Pls Opp'n Ex. 13, Letter dated May 5, 1977 to Darwin Wilder, Real Estate Division, Fort Worth from Levin Harris, Assistant U. S. Attorney, Shreveport; Pls Opp'n Ex. 14, Attorney's opinion dated May 11, 1977 by R. P. Allen, Jr. concerning Fort Polk Mineral Moratorium; Pls Opp'n Ex. 15, Letter dated June 6, 1977 to Commander, US Army FORSCOM from William B. Steele, Major General, USA, Commanding.

Defendant’s Response to Proposed Finding of Uncontroverted Fact No. 1:

Defendant’s disagree with Plaintiffs’ chracterization. These documents show, at most,

that prior to the termination of the moratorium, the Army considered what their alternatives would be when the moratorium expired.

2. The documents in 1. above were discovered by Plaintiffs in the course of the Prior Lawsuit which was filed August 22, 1996. Pls Opp'n Ex.41, A. J. Gray, III Affidavit.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 2:

Defendant cannot confirm when Plaintiffs' discovered the above-referenced documents. Defendant's knowledge of Fort Polk's use as a military installation dates back to at least 1977.

3. Between 1978 and 1991, Plaintiffs did not attempt to exercise mineral rights on Group C lands. Pls Opp'n Ex.42, Plaintiffs' Response To Defendant's First Set Of Interrogatories And Requests For Production Of Documents To Plaintiffs, Answer to Interrogatory No. 2.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 3:

Defendant agrees that Plaintiffs have produced no evidence of any attempt to exercise mineral rights on Group C lands between 1978 and 1991.

4. Between 1978 and 1991, the United States took a "calculated risk" that Plaintiffs would not attempt to access Group C lands, and, thus, the United States took no action to prevent, impede or limit Plaintiffs' access to Group C lands or to otherwise prevent Plaintiffs from developing minerals on Group C lands. Pls Opp'n Ex. 16, Memo dated June 17, 1977 to Division Engineer, Southwestern from Michael B. Cottrell; Pls Opp'n Ex. 18, Memo dated June 22, 1977 to HQDA, Wash. D.C. from M. R. Long, Acting Chief, Real Estate Division; Pls Opp'n Ex. 15, Letter dated June 6, 1977 to Commander, US Army FORSCOM from William B. Steele, Major General, USA, Commanding; Pls Opp'n Ex. 17, Undated letter (approximately June 1977) to Commander US Army FORSCOM from William B. Steele, Major General, USA,

Commanding.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 4:

Defendant disagrees with the use of the term "calculated risk" as it is unclear what this means. Defendant agrees that United States took no action to prevent, impede or limit Plaintiffs' access to Group C lands or to otherwise prevent Plaintiffs from developing minerals on Group C lands.

5. Prior to October 9, 1992, the United States did not claim ownership of minerals underlying Group C, and, after the moratorium ended, took no formal action to deprive Plaintiffs access to Group C minerals. Pls. Opp'n Ex. 19, Letter dated August 5, 1988, by Danny W. Britt, Forest Supervisor, to Regional Forester; Pls. Opp'n Ex. 1, Memorandum on Moratorium on Minerals, Fort Polk dated December 16, 1966 to Chief of Engineers from Jack W. Fickessen, Colonel, CE, District Engineer; Pls. Opp'n Ex. 5, Letter dated June 26, 1974 to HQDA, WASH DC from Joe H. Sheard, Colonel, CE, District Engineer.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 5:

Defendant agrees.

6. On October 9, 1992, a title opinion was rendered to the United States which, as to Group C lands, stated that the United States "can now claim mineral ownership where drilling has not occurred for a ten-year period regardless of the date of acquisition by the U.S." Plaintiffs do not have a copy of the title opinion. By letter dated November 8, 1995, Plaintiffs' Freedom of Information Act request for the letter was denied.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 6:

Defendant objects to Plaintiffs' attempt to characterize and quote from a document that

Plaintiffs concede they have not read.

7. On October 7, 1993, Charles E. Steele, Director of Lands And Minerals, United States Department Of Agriculture, Forest Service issued a memorandum number 2820 which advised that additional lands were available for leasing by the United States as a result of the October 9, 1992 opinion. The memorandum included Group C lands and a Controlled Surface Use Stipulation #1 which applied to the Intensive Use Area for Fort Polk. Pls Opp'n Ex.20.

Defendant’s Response to Proposed Finding of Uncontroverted Fact No. 7:

Defendant agrees that the Memorandum described above was issued and that it applied to portions of the Group C lands that were part of Kisatchie National Forest. Defendant disagrees that the letter applied to “a Controlled Surface Use Stipulation #1 which applied to the Intensive Use Area for Fort Polk” as this is not stated in the letter.

8. In the spring of 1995, while negotiating a mineral lease on property in the area of, but not within, Group C, Plaintiffs first learned from a potential mineral lessee that the United States was claiming title to Group C lands. Pls. Opp'n Ex.50, Minaldi Dep. pp. 18, 29-30, 47-48, 60; Pls Opp'n Ex.43, Drost Dep. 84-85, 86, 87.

Defendant’s Response to Proposed Finding of Uncontroverted Fact No. 8:

Defendant lacks sufficient knowledge to respond, but notes that the United States never claimed title to all of the Group C lands.

9. By letter dated April 6, 1995, a representative of Union Pacific Resources Company offered to lease Plaintiffs' minerals affecting property outside of Group C but confirmed that the company was interested in developing Plaintiffs' acreage in the "Artillery Range," a portion of Group C lands. Pls. Opp'n Ex.21.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 9:

Defendant disagrees. The cited exhibit does not demonstrate that Union Pacific Resources Company would have leased any portion of the Group C lands.

10. By Hydrocarbon Lease dated effective August 1, 1995, corporate parents of Central Pines Land Company, L.L.C. and Tower Minerals Company, L.L.C. leased to Chesapeake Operating, Inc. ("Chesapeake") approximately 33,607.5325 acres of land contiguous to, but not included within, Group C ("33,000 acre lease"). Pls Opp'n Ex. 22; Pls Opp'n Ex. 46, Dunlap Dep. Ex. 4; Pls Opp'n Ex. 44, Denny Dep. 2; Pls Opp'n Ex.43, Drost Dep. p. 107.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 10:

Defendant agrees.

11. Chesapeake stock is publicly traded on the New York Stock Exchange. Pls Opp'n Ex.51, Price Dep. pp. 12-13; Pls. Opp'n Ex. 49, Hood Dep. p. 10.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 11:

Defendant agrees.

12. Chesapeake is a Fortune 500 company. Pls. Opp'n Ex. 51, Price Dep. p. 13

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 12:

Defendant agrees.

13. Chesapeake claims to be the nations's most active oil and gas explorer and the second largest independent natural gas producer in the United States. Pls Opp'n Ex. 51, Price Dep. p. 12.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 13:

Defendant agrees.

14. Under the 33,000 acre lease, Chesapeake successfully drilled wells on Plaintiff's property contiguous to and offsetting Group C. Pls. Opp'n Ex. 46, Dunlap Dep. pp. 31-32, 34; Pls. Opp'n Ex. 44, Denny Dep. pp. 23-24; Pls. Opp'n Ex. 49, Hood Dep. pp. 18, 19.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 14:

Defendant agrees that Chesapeake drilled wells on Plaintiffs' property. Defendant objects to the remainder of this statement. It is unclear what is meant by successful and the cited documents do not support Plaintiffs' description of where these wells were located.

15. In the 1995 to 1997 time frame, Chesapeake considered the area of Fort Polk prospective for oil and gas drilling in the Austin Chalk geological formation. Pls Opp'n Ex. 51, Price Dep. pp, 19, 66; Pls Opp'n Ex. 45, Dixon Dep. pp 21-22.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 15:

Defendant agrees that at some point during 1995 to 1997 Chesapeake considered the area of Fort Polk prospective for oil and gas drilling in the Austin Chalk geological formation. Defendant disagrees that this was true during the entire 1995 to 1997 time frame.

16. In the course of negotiating the 33,000 acre mineral lease, Chesapeake expressed interest in leasing Group C. Pls. Opp'n Ex. 50, Minaldi Dep. at pp. 19, 23, 25, 28; Pls Opp'n Ex.43, Drost Dep. 105,108.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 16:

Defendant objects that this statement is vague and not supported by the cited documents.

17. By letter dated March, 1996, Chesapeake followed up with the negotiations to lease the Group C lands "Artillery Range."

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 17:

Defendant objects that this statement is vague and not supported by the cited documents.

18. By letter dated April 8, 1996, Plaintiffs confirmed their willingness to lease to Chesapeake Group C lands on the same lease form as used by the parties for the 33,000 acre lease.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 18:

Defendant objects that this statement is vague and notes that it is not supported by any documents as required by RCFC 56(h).

19. Absent the action of the United States disputing Plaintiffs' title to Group C and issues concerning access to Fort Polk, Chesapeake would have leased the entirety of Group C from Plaintiffs. Pls Opp'n. Ex. 46, Dunlap Dep. p. 54; Pls. Opp'n Ex. 44, Denny Dep. pp.17, 45-46, 56; Pls Opp'n Ex. 50, Minaldi Dep. p. 79; Pls. Opp'n Ex.43, Drost Dep. pp. 105, 108.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 19:

Defendant disagrees. After several dry holes were drilled and after Chesapeake sustained serious financial hardship from their Austin Chalk program, which nearly bankrupted the company, Chesapeake made a business decision not to lease the entirety of Group C from Plaintiffs. This decision was not related to any actions by the United States.

20. During the relevant time period of 1996 and 1997, Chesapeake leased approximately 1,000,000 acres of land in and around the Fort Polk area. Pls. Opp'n Ex. 44, Denny Dep. p. 35; Pls. Opp'n Ex. 46, Dunlap Dep. p. 15.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 20:

Defendant agrees that Chesapeake leased approximately 1,000,000 acres but objects to the term "in and around the Fort Polk area" as vague.

21. A "protection" lease is a second mineral lease on the same property taken by a mineral lessee from one asserting a competing ownership interest against the first or primary mineral lessee. Pls. Opp'n Ex. 44, Denny Dep. p. 25; Pls. Opp'n Ex.51, Price Dep. p. 40.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 21:

Defendant generally agrees but notes there are additional reasons a party may seek a protective lease.

22. If Chesapeake had been able to obtain a protection mineral lease from the United States on Group C and if the Army had permitted access to the property, Chesapeake would have drilled wells on Group C. Pls. Opp'n Ex. 44, Denny Dep. pp. 19, 21-22, 29, 30; Pls. Opp'n Ex. 51, Price Dep. p. 60.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 22:

Defendant disagrees. Plaintiffs' speculation is not supported by the facts. Chesapeake appears to have abandoned much of its Austin Chalk program for financial failures unrelated to the United States Army.

23. After learning in the spring of 1995 that the United States claimed title to Group C lands, inquiry lead Plaintiffs to the Office Of General Counsel, United States Department Of Agriculture in Little Rock, Arkansas. By letter dated November 9, 1995 addressed to Mike Cruse, Deputy General Counsel, Plaintiffs supplied the United States with pertinent title documents, land use records and legal principles which established that Plaintiffs owned the minerals under Group C lands. Pls. Opp'n Ex. 23.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 23:

Defendant disagrees. The United States only claimed title to a portion of the Group C

lands. Defendant lacks sufficient knowledge as to when Plaintiffs learned of this.

24. Cruse referred Plaintiffs to Jeffery D. Eisenberg, Office Of General Counsel, United States Department Of Agriculture, Washington, D.C. By letter dated February 29, 1996 to Eisenberg, Plaintiffs asserted title to the Group C minerals which were being offered for lease by the United States. Plaintiffs respectfully requested that the properties be withdrawn from proposed lease sale. Pls Opp'n Ex.24.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 24:

Defendant disagrees. The United States only claimed title to a portion of the Group C lands. Defendant lacks sufficient knowledge as to when Plaintiffs learned of this.

25. Not less than 5,300 acres of Group C lands were included by the United States in a proposed mineral lease sale by the United States scheduled for March 28, 1996. Pls. Opp'n Ex.24.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 25:

Defendant agrees.

26. Pursuant to Eisenberg's request, by letter dated March 11, 1996, Plaintiffs submit a proposal whereby in exchange for recognizing Plaintiffs' title to Group C lands, the United States would be compensated for mineral production under Group C. Pls. Opp'n Ex. 25.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 26:

Defendant agrees.

27. In 1996, Belco Oil & Gas Corp. ("Belco") paid approximately $60,000,000 in mineral lease bonuses to mineral owners in the Austin Chalk trend in Louisiana. Pls. Opp'n Ex. 47, Fife Dep. p. 11)

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 27:

Defendant lacks sufficient knowledge to respond.

28. Belco wanted to drill on Group C lands. (Pls. Opp'n Ex.47, Fife Dep. pp. 12, 15, 21, 28)

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 28:

Defendant lacks sufficient knowledge to respond.

29. Commencing March, 1996, Plaintiffs negotiated with Belco to lease 20,295 acres of Group C. Plaintiffs reached agreement with Belco as to the terms of a lease; but because the United States Army denied Belco access to Group C surface, Belco did not execute a lease with Plaintiffs. Pls. Opp'n Ex. 47, Fife Dep. pp. 12, 15, 33; Pls. Opp'n Ex. 43, Drost Dep. pp. 107, 108.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 29:

Defendant agrees that there is no evidence Belco executed a lease for the Group C lands with Plaintiffs. Defendant disagrees that the United States Army ever denied Belco access to the surface of Group C. Belco, not being a lessee, was never in a position to request access.

30. If the United States Army would have allowed Belco access to the property, Belco would have leased the entirety of Group C from Plaintiffs. Pls. Opp'n Ex.47, Fife Dep. pp. 16 - 17, 25, 28-29, 33, 34; Pls. Opp'n Ex. 47, Fife Dep. Ex. 2; Pls. Opp'n Ex. 50, Minaldi Dep. pp. 45, 79; Pls Opp'n Ex.43, Drost Dep. pp. 34-35, 46, 49-50, 73, 74, 105, 107, 108.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 30:

Defendant objects to the extent this statement suggests the United States Army ever denied Belco access to Group C.

31. Commencing April 24, 1996, Plaintiffs negotiated with Sonat Exploration Company ("Sonat") in an effort to lease approximately 9,798.44 acres of Group C. Pls. Opp'n Ex.48, Hamilton Dep. pp.70-71,72, 73; Hamilton Dep. Ex. 3; Hamilton Dep. Ex. 4; Hamilton Dep. Ex. 5; Opposition Ex. 43, Drost Dep. p. 107.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 31:

Defendant objects that this statement is not supported by the cited documents.

32. The United States withdrew the property sought to be leased by Sonat from its proposed lease sale. Without the possibility of a "protective" lease, Plaintiffs were unable to lease the 9,798.44 acres to Sonat. Pls. Opp'n Ex. 48, Hamilton Dep. p. 77.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 32:

Defendant objects that this statement is not supported by the cited documents.

33. By Hydrocarbon Lease dated July 1, 1996, Plaintiffs leased approximately 28,668.93 acres of property contiguous with and partially including Group C to Sonat. Pls Opp'n Ex.48, Hamilton Dep. 67; Hamilton Dep. Ex. 2; Pls Opp'n Ex.43, Drost Dep. p. 107.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 33:

Defendant objects that this statement is not supported by the cited documents.

34. If Sonat had been able to obtain a protective mineral lease and access, it would have drilled on Fort Polk. Pls Opp'n Ex.48, Hamilton Dep. pp. 33, 34-35.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 34:

Defendant lacks sufficient information to respond, but notes that several companies made business decisions not to drill in the area of Fort Polk. This business decisions were based on the drilling of dry holes and unrelated to the United States Army.

35. By letter dated August 6, 1996, Eisenberg responded to Plaintiffs' proposal by rejecting the settlement. Pls. Opp'n Ex.31.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 35:

Defendant agrees.

36. On August 22, 1996, Plaintiffs filed civil action number CV96-2000 on the docket of the United States District Court, Western District of Louisiana against the United States for declaratory judgment pursuant to 28 U. S.C. §2201 and to quiet title to real estate pursuant to 28 U.S.C. §2409a. In their Complaint, Plaintiffs sought recognition of their title to Group C. See, Central Pines Land Co., et al v. United States, No. 2:96-2000, slip op. W. D. La. July 28, 2000), aff'd, 274 F.3d 881 (5th Cir. 2001), cert denied, 537 U.S. 822 (2002).

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 36:

Defendant agrees.

37. The United States answered Plaintiffs suit, denying that Plaintiffs were the owners of minerals relating to Group C. In the course of the litigation, the United States consistently asserted ownership of Group C minerals. See, Central Pines Land Co., et al v. United States, No. 2:96-2000, slip op. W. D. La. July 28, 2000), aff'd, 274 F.3d 881 (5th Cir. 2001), cert denied, 537 U.S. 822 (2002).

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 37:

Defendant agrees.

38. By letter dated September 24, 1996, Chesapeake, Plaintiffs' lessee under the 33,000 acre lease, offered to lease from Plaintiffs approximately 4,383.67 acres of Group C minerals (ultimately the lease covered 4,822 acres). Because of the competing title claim to

Group C minerals by the United States, Chesapeake specifically conditioned its offer to Plaintiffs upon being permitted to obtain "protection leases from the United States" and required Plaintiffs to agree "not to interfere with Chesapeake's attempt to secure a protection lease from the U.S.A." Chesapeake conditioned its offer upon Plaintiffs agreeing to confirm in writing to the United States "in a form acceptable to the Justice Department" that Plaintiffs would not attempt to upset any proposed lease sale by the United States of the same mineral property. Pls. Opp'n Ex. 32; Pls. Opp'n Ex. 49, Hood Dep. p. 14, 26, 31, Hood Dep. Ex. 2; Pls Opp'n Ex. 46, Dunlap Dep. Ex. 5.; Pls. Opp'n Ex.44, Denny Dep. Ex. 7.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 38:

Defendant agrees that Chesapeake leased approximately 4,800 acres of Group C from Plaintiffs. Defendant objects to the remainder of this statement as not supported by the cited documents.

39. In an effort to promote mineral development of Group C, Plaintiffs acquiesced to Chesapeake's limitations. On September 26, 1996, Plaintiffs entered into a mineral lease with Chesapeake. The lease covered 4,822.10 acres of Group (2. Pls Opp'n Ex. 33; Pls Opp'n Ex. 46, Dunlap Dep. Ex. 2; Pls. Opp'n Ex.44, Denny Dep. Ex. 3.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 39:

Defendant agrees that Chesapeake leased approximately 4,800 acres of Group C from Plaintiffs. Defendant is without sufficient information to respond to the remainder of this statement.

40. By letter dated September 26, 1996, Plaintiffs advised the United States through its counsel, Eisenberg, of the lease and confirmed that no plaintiff would attempt to upset or

otherwise interfere with the scheduled mineral lease sale. Pls Opp'n Ex. 34; Pls Opp'n Ex.49, Hood Dep. Ex. 5.; Pls Opp'n Ex. 46, Dunlap Dep. Ex. 7.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 40:

Defendant objects that the cited documents do not support this statement.

41. United States Department Of Justice attorney, Bret Birdsong, advised Plaintiffs that additional Group C acreage may be included in a scheduled lease sale and requested that Plaintiffs agree to not attempt to upset the sale with regard to the additional acreage. In an effort to promote mineral development of Group C, Plaintiffs acquiesced and by letter dated October 9, 1996 complied with the request of the United States Department Of Justice. Pls Opp'n Ex. 35; Pls Opp'n Ex.46, Dunlap Dep. Ex. 8.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 41:

Defendant agrees that Plaintiffs sent the referenced letter on October 9, 1996. Defendant objects that the cited documents do not support the remainder of this statement.

42. Because the United States claimed title to Group C, Plaintiffs' lessees and prospective lessees were required to obtain protection leases from the United States on acreage leased from Plaintiffs. The protection lease requirement put Plaintiffs' lessees and potential lessees at risk that a competitor would obtain the lease from the United States at public bidding, thus precluding development of the property. Pls. Opp'n.Ex. 49, Henry Hood Dep. p. 35-36.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 42:

Defendant disagrees. The United States claimed title only to the Forest Service portion of Group C and Plaintiffs did, in fact, lease a majority of the Forest Service portion of Group C.

43. The United States granted the following mineral leases affecting Group C

properties:

> Lease Nos. 47572, 47574, and 47750 to Union Pacific Resources Company and Lease Nos. 48555, 48556, 48557, 48558, 48559 and 48560 to Chesapeake Operating, Inc. All of the leases contained ten year terms terminating April 30, 2007. Pls. Opp'n Ex. 42.

Defendant’s Response to Proposed Finding of Uncontroverted Fact No. 43:

Defendant agrees.

44. Because the United States asserted title to Group C, potential mineral lessees of Plaintiffs would not execute mineral leases with Plaintiffs unless reasonably assured that "protection" leases could be obtained from the United States. In the summer of 1997, the Bureau Of Land Management received offers to lease parcels within Group C from Plaintiffs' lessees or persons acting on their behalf. Stephen M. Sittnick, LTC, IN, G3/DPTMS responded to an internal inquiry with memorandum AFZX-GT dated July 23, 1997. The response included the following:

> a.) By definition, this impact area is, and has been, off limits to personnel and/or vehicle surface activities. Additionally, no digging in that zone is allowed due to unexploded ordnance (surface and subsurface). RLIA was established o/a 1977, and all types of dud producing munitions have been filed into that area. Any effort to surface and subsurface clear that zone for oil exploration would be extremely unsafe, and expensive.
>
> b.) Any oil exploration activities in or around the RLIA zone would close a number of" ranges/training areas that have Surface Danger Zones (SDZ's) oriented into RLIA. This would severely impact the training and readiness of assigned units and supported Reserve Component units. Additionally, oil exploration activities on or near RLIA would seriously impact Operations Group's use of the Zion Hills area as rotational unit maneuver space and/or Live Fire area.

Pls Opp'n Ex. 38.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 44:

Defendant disagrees. The cited documents do not support this statement. The United States did not assert title to all of Group C. Plaintiffs leased a majority of the Forest Service portion of Group C.

45. A substantial portion of Group C land is, in fact, subject to military operations including bombing practice, artillery practice, small arms fire and troop maneuvers by the United States Army and Air Force. Unexploded bombs are found and disposed of from Group C. Portions of Group C include artillery impact areas for howitzer, heavy artillery and tank gunnery practice. Pls Opp'n Ex. 38; Pls. Opp'n Ex. 51, Price Dep. Ex. 3.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 45:

Defendant agrees that a substantial portion of Group C land is subject to military operations. Defendant disagrees that unexploded bombs are found and disposed of.

46. At some date, unknown to Plaintiffs, portions of Group C became too contaminated and/or dangerous for mineral operations. Plaintiffs do not know the geographic extent of this area. The dangerous or contaminated condition of portions of Group C constitutes a taking of Plaintiffs property.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 46:

Defendant objects to Plaintiffs' legal conclusion. Defendant further asserts that Fort Polk's use for military operations and the alleged conditions complained of were known to Plaintiffs prior to 1978 and Plaintiffs have acknowledged this during discovery.

47. United States established Standard Operating Procedures For Exploration And Field Development Drilling of Oil/Gas Wells, SOP No. 32X-2, which contain procedures and restrictions on mineral development on Group C. Pls. Opp'n Ex. 40.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 47:

Defendant disagrees. The document Plaintiffs cite to is an unsigned draft. Army policy regarding mineral exploration and development is set forth in Army Regulation 405-30.

48. Prior to drilling a well within Group C, Plaintiffs' lessees (all of whom had acquired "protective" leases from the United States) were required to submit a detailed Application For Permit To Drill Or Deepen to the Bureau Of Land Management. Within Group C, the procedure also required the filing of a Final Environmental Assessment and the ultimate issuance of"Conditions Of Approval For Oil And Gas Exploration."

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 48:

Defendant disagrees. The BLM requirements applied only to the Forest Service portion of Group C. Army policy regarding mineral exploration and development is set forth in Army Regulation 405-30.

49. By letter dated January 9, 1997, Plaintiffs' mineral lessee, Chesapeake, wrote Ted Hammerschmidt, Deputy Director, Directorate of Engineering & Housing, Fort Polk, to determine procedures for access to Group C and to determine operating parameters for mineral operations.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 49:

Defendant objects that there is no document supporting this statement as required by RCFC 56(h).

50. On March 11, 1997, representatives of Plaintiffs' mineral lessee, Sonat, met with representatives of the United States to discuss possible access to, and mineral operations on, Group C lands. Pls. Opp'n Ex. 37; Pls. Opp'n Ex. 48, Hamilton Dep. 45) Not less than 18 representatives of various Army and Forest Service agencies were in attendance at the meeting, which included the following discussion items:

> Sonat was admonished by Mr. Hammerschmidt, Fort Polk Deputy Director of Public Works, that a proposed well location was in an area referred to as "Ranges 40-43, the tank gunnery ranges." He explained that the tanks shoot "120 mm projectiles" and "will deliver about 6500 meters." He stated that he was concerned about a "vertical stack of valves", i.e. an oil well wellhead christmas tree, for a well at that location and "how we can successfully protect it so that we don't cause something problematic to occur." Hammerschmidt further advised that: "Inside this fan is considered an area which increases the possibility of an accident; wells 19-1, 31-1 and 21-1 are all within this fan area."
>
> Dr. Ron Tomas, Fort Polk Office of the Garrison Commander, commented on the "fan" as follows: "the fan is very conservative and the probability of something happening is very high."
>
> Hammerschmidt advised that the Army was "not willing to accept responsibility for people while training is ongoing."
>
> Hammerschmidt advised that wellheads in the area must be protected with "berming."
>
> Hammerschmidt advised that underground pipelines should be buried to 15 feet deep (industry standard is 36").
>
> The discussion specifically included safety issues relating to wells taking "a direct hit."
>
> Dr. Tomas stated that Sonat should consider moving its preferred location for well 31-1 "nearer Lookout Road." Tomas said that the range in question was used about 60 days per year and "reiterated if they don't move, there will be massive amounts of coordination required to get a truck to the site."

Defendant’s Response to Proposed Finding of Uncontroverted Fact No. 50:

Defendant agrees that representative of the Army met with representatives of Sonat on March 11, 1997 to discuss possible mineral operations on Group C lands. Defendant objects to Plaintiffs' characterizations of the meetings and the inferences Plaintiffs seek to draw. Witnesses who were present at the meeting have testified that the meeting was informational and cooperative.

51. Despite Sonat personnel following up on several discussion items and actually filing for permits for drilling within Group C, Sonat never drilled any well with a physical location within the surface of Group C. Pls Opp'n Ex. 48, Hamilton Dep.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 51:

Defendant agrees that Sonat never drilled any well with a physical location within the surface of Group C. Defendant objects that the remainder of this statement is not supported by the cited documents.

52. On April 1, 1997, representatives of Plaintiffs' lessee, Chesapeake, met with representatives of the United States to discuss access to, and mineral operation restrictions within, Group C. Not less than 14 representatives of the Army and Forest Service attended the meeting. The Chesapeake meeting was similar to the Sonat meeting with discussions focused on safety aspects of live fire, depth for placing pipelines, location of wells, placement of production facilities and the avoidance of "flares" which could be dangerous to night flying aircraft. Pls. Opp'n Ex. 51, Price Dep. Ex. 3.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 52:

Defendant agrees that the referenced meeting took place and that access to, and mineral operation restrictions within, Group C were discussed. Defendant objects to Plaintiffs'

characterization of the meeting as unsupported by the cited documents.

53. Chesapeake never drilled a well with a surface location within Group C. Pls. Opp'n Ex.44, Denny Dep. pp. 39, 54.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 53:

Defendant agrees.

54. Representatives of plaintiffs' potential lessee, Belco, met with representatives of the United States to obtain access to Group C lands. Representatives of the United States Army specifically denied Belco's request. Pls. Opp. Ex. 47, Fife Dep. Pp. 15-17, 28-29, 31-32, 38-39.

Defendant's Response to Proposed Finding of Uncontroverted Fact No. 54:

Defendant disagrees. Belco was not a lessee and therefore had no standing to request access. Access was not denied by the United States.

Dated: March 14, 2007

Respectfully submitted,

MATTHEW J. MCKEOWN
Acting Assistant Attorney General
Environment and Natural Resources Division

*/s/ Alex Kriegsman*

ALEX KRIEGSMAN
Trial Attorney
Natural Resources Section
U.S. Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-3022

Fax: (202) 305-0506

CAPT. JAMES N. HEWITT
Litigation Attorney
U.S. Army Environmental Law Division
901 N. Stuart Street, Suite 400
Arlington, VA 22203-1837
Tel: (703) 696-1596
Fax: (703) 696-2940

MATTHEW A. TILDEN, ESQ.
Office of the General Counsel
U.S. Department of Agriculture
1718 Peachtree Road, NW - Suite 576
Atlanta, GA 30309-2409
Tel. 404-347-1086
Fax. 404-347-1065

DENNIS DAUGHERTY
Assistant Solicitor
Department of the Interior
Office of the Solicitor
Division of Mineral Resources
Branch of Petroleum Resources
1849 C St., N.W., Rm 6312
Washington, DC 20240
Tel: (202) 208-5038
Fax: (202) 208-2225

ATTORNEYS FOR DEFENDANT