# EXHIBIT Q

UNITED STATES DEPARTMENT OF JUSTICE

| | | |
|---|---|---|
| CENTRAL PINES LAND CO., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Docket No. 98-314L |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Deposition of:

GARY S. DUNLAP

a witness of lawful age, taken on behalf of the Defendant, pursuant to notice, in the offices of the U.S. Department of Justice, Room 3508, 601 D Street, N.W. Washington, D.C., 20004, on Thursday, July 6, 2006, at 3:02 p.m., before Bernadette Herboso, Notary Public in and for the District of Columbia, when were present:

APPEARANCES:

On behalf of Plaintiffs:

A. J. GRAY, III, Esquire
The Gray Law Firm
Hibernia Tower
One Lakeshore Drive
P.O. Box 1467
Lake Charles, Louisiana 70602-1467
(337) 494-0694

APPEARANCES: (Cont'd)

On behalf of Defendant:

ALEX KRIEGSMAN, Esquire
U.S. Department of Justice
Environment & Natural Resources Division
General Litigation Section
601 D Street, N.W.
Washington, D.C. 20004
(202) 305-3022

On behalf of the Witness:

FRED GIPSON, Esquire
Chesapeake Energy Corporation
6100 North Western Avenue
Oklahoma City, Oklahoma 73118
(405) 879-9257

misunderstand that?
A No, it's a separate issue.
Q Okay.
A We were interested in knowing that if we acquired the lease that we could drill it.
Q Ah, I see. Okay. And what happened at the meeting with the Army? I understand you weren't there, but what's your understanding?
A The report back to me is they were concerned with their training operations, rigs running at night with lights for night vision and their helicopters and just invading their territory so to speak, that they would have to work around us instead of us working around them, and we were trying to convince them that we would work around them.
Q Were you able to convince them of that?
A I think the general consensus after the meeting was that it went well, but it just seemed to die on the vine and nothing ever happened. We got no official responses, and the property was never put up for bid as far as I know.
Q So when you say there was "no official response," does that mean there was an official request?
MR. GIPSON: Object to the form. You can

answer if you can.

MR. KRIEGSMAN: Okay. That's a fair objection obviously.

THE WITNESS: My recollection is that we were prohibited from operations on the base at all. Now where that came from, that was our understanding.

BY MR. KRIEGSMAN:

Q Okay. Let me back up because that's a fair objection. Was there an official request made of the Army by Chesapeake?

A We thought the official request had been made at the meeting, that that was what the meeting was all about, that we wanted to have their consent to working with us on an operational basis.

Q And that was your understanding, that that meeting was an official request?

A Yes.

Q Okay. And what's the basis for that understanding?

A We asked for the meeting to make a decision whether we could have operations on the base.

(Pause.)

Q If I could just ask you to turn to Exhibit 2. No, I'm sorry. This would be Exhibit 3. The page, I believe it's the second to the last. It's