# EXHIBIT R

AFZX-PW (420-10a) 3 April 1997

MEMORANDUM FOR RECORD

SUBJECT: Chesapeake Energy Corporation Meeting -- 1 April 1997

1. A meeting was held in the ERMD Conference Room on 1 April 1997 at 1300 hours with the following persons in attendance:

a. Mr. Ted L. Hammerschmidt, Deputy Director of Public Works

b. Mr. Tom Price, Vice President - Corporate Development, Chesapeake Energy Corporation

c. Mr. Steve Dixon, Senior Vice President - Operations, Chesapeake Energy Corporation

d. Mr. Dale Clark, Senior Drilling Engineer, Chesapeake Energy Corporation

e. Ms. Jan Horton, Landman, Chesapeake Energy Corporation

f. Mr. Martin Walke, Consultant, Chesapeake Energy Corporation.

g. Mr. George Denny, Landman, Chesapeake Energy Corporation

h. Mr. John Duhon, Petroleum Engineer, U. S. Department of the Interior Bureau of Land Management Jackson District Office

i. Mr. Jim Burton, District Ranger, U. S. Forest Service

j. Ms. Betty Higgins, Mineral & Oil Representative, U. S. Forest Service

k. Mr. Hunter Howell, U. S. Forest Service

l. CW2 Shafter, Jr., Aviation Safety, HHC USAG

m. Mr. Wiley Clark, G3 Training

n. Mr. Barry Oswald, G3 Range Control

o. CPT Paul Brandau, SJA

705856

AFZX-PW (420-10a) 3 April 1997
SUBJECT: Chesapeake Energy Corporation Meeting - 1 April 1997

p. Mr. John Costa, Safety

q. Mr. Ellis Smith, Chief, EPSD, DPW

r. CPT Jeffrey Farnsworth, JRTC Operations Group

s. Mr. Don Jean, ENRMD, DPW

t. Ms. Cindy Carter, EPSD, DPW

2. Mr. Hammerschmidt introduced himself as the Deputy Director of Public Works and stated that Dr. Tomas was on leave and gave regrets on missing this very important meeting. Mr. Hammerschmidt stated representatives are present at this meeting from U. S. Forest Service, the Directorate of Public Works, Range Control, G3 Training, Safety, Aviation, and others. He stated what we would like to do is to see if we could secure interest for Chesapeake Energy Corporation today and perhaps ask questions to get a better understanding of your needs and how we can fulfill the obligations to Chesapeake. Mr. Price stated he did see a few familiar faces and that their purpose today was to get a little bit more details about what had been discussed at the last meeting. He stated his company has gone at great lengths to recognize that this will be an effort which will be beneficial for the security of the country, the perpetuation of the base and not be indifferent to the interests of the U. S. Forest Service. He stated that his company is just another one of the companies whose agenda is to take advantage of the evolution of technology we have seen in central Louisiana and try to insure the economic viability of Fort Polk and Vernon Parish and work in harmony with what we are going to accomplish. He discussed briefly that past communication has taken place with Mr. Herbert Carter at the last meeting and touched upon each of the items on the agenda. He stated since none of these items posed any conflict in terms of oil and gas exploration and extensive use of the Intensuve Use area and the ability to carry on training at the same time as oil and gas exploration was ongoing, their plan is again to insure minimal conflict on all parties. He stated the purpose of the meeting as he understands it today is to try to let the Army know and understand their needs and how they can best coordinate that on a large-scale basis. Mr. Hammerschmidt stated time permitting, this is a fair overview and that is why such a large group of persons has gathered today so you can understand our needs and whatever conflict may appear we can work through and call them considerations instead of conflicts.

3. Discussion:

a. Mr. Dixon stated Chesapeake desires to try to develop oil and gas in and around the

Fort Polk reservation. He stated the drilling is in a fairly deep zone at 14,000 - 16,000 total vertical depth so that it will require continuous drilling normally with pressure at the surface while drilling. He stated they do need continuous operation and they would have to vent natural gas to the surface.

b. Mr. Price stated the drilling site requirements include four to five acres of surface location and lights on the rig derrick for 24 hour operations. Drilling rigs with the capacity to drill deep are large, horizontal wells and approximately 170 feet high. He is not sure what problems this may pose to the helicopter pilots.

c. Mr. Hammerschmidt asked for a feel of the number of wells within Chesapeake's exploration needs in the Intensive Use area. Mr. Dixon stated there are 1,920 acre units which is rather conceptual in nature. Mr. Price stated they have tried to insure the fact that it was understood that the industry has no conflict with Fort Polk's expansionary aspirations. He stated they would like to be able to represent to any party about the compatibility and that yes, we have discussed how this area will be developed and yes, we are comfortable we will be able to develop a plan for its development. The Chesapeake personnel indicated on the map they displayed that they will drill in the Northeast corner of Section II and asked where it would be most harmonious for them to make a drilling program. Mr. Hammerschmidt stated we are working to acquire use of a 45,000 acre tract of land on the South portion or about 20 well sites. He stated Fort Polk has the obligation to work around the challenges which will be provided to the customer and he does not foresee a problem.

d. The physical requirements of production facilities and pipeline locations necessary for development of oil and gas in the area and the location was discussed. Mr. Price stated there is a large difference between a production facility and a drilling site. He stated they will drill for about 120 days while the production facility is out in force. Mr. Dixon stated he doesn't know what the security of the wellhead would be but would anticipate not having activities during the production stage. After the initial production state, there would be some automation and drivers would only be driving by daily to check on facility. Mr. Dixon stated the production facility would be completely off site and would be 4 - 6 feet high.

e. Mr. Hammerschmidt stated on the Intensive Use Land we had concerns on the potential location of the wells which were downrange. He also stated adverse impacts from live fire have not been evaluated.

f. Mr. Hammerschmidt stated the helicopter pilots need to become aware of production and official notification will need to take place within the Aviation community. CW2 Shafter stated the aviators are given a hazardous map indicating any particular items to be

watchful of, i.e., oil wells, lighted derricks, etc. The major concern from the aviation side of the house is that the area might be too well lit. He explained that during flight while using the night vision goggles, the large lights and flares shut down the goggles and it might be shut down to the point of losing sight of other aircraft. He offered the suggestion of devising a sort of shield to reduce the glare. CW2 Shafter stated the aviators are becoming sensitized to the night vision goggles during combat flying and they are flying on tree-top level. Mr. Price asked if the helicopters come from a specific location, and CW2 Shafter stated they come from all directions. He explained that the "box" is East to West and explained the dimensions of the "box." Mr. Hammerschmidt stated this is a dedgradation of training that the Army will have to accept and deal with.

g. CPT Farnsworth introduced himself and explained that he writes the scenarios and executes the training during rotations. He stated other options have been looked at from other companies concerning use of the flare and the need to flare gas during drilling, completion, production and maintenance of the wells. He wanted to know if the flare goes away during production. Also he stated it is the sudden unanticipated flash of light which can cause an accident. He stressed that if there was anyway to control the flare or minimize the effects of the flare that would be immensely helpful. Mr. Dixon stated they could build a pit to make the flare as low as possible. CPT Farnsworth explained that if the parties come to agreement on the number of facilities, these can be explained to the units and then become a part of the scenario, and the presence of the Chesapeake personnel would be expected. Mr. Price stated there is a difference between a production operation and drilling operation and explained the difference in flaring in both situations. CPT Farnsworth stated that 9 months and 90 days out they talk to the units about all of the issues and give them the specific restrictions.

h. Mr. Duhon stated there is some flaring during production. Mr. Duhon explained the product comes to the surface and then separate the phases out from each other. The gas would go to a low pressure separator and sometimes cannot be sold.

i. Mr. Hammerschmidt stated the Army understands Chesapeake will have a drilling rig there 3 - 5 months and the Aviation community accepts the risks to night flying in terms of flaring which is unpredictable. However, from the Army's perspective, any opportunity they have to minimize the flash or flare would be extremely helpful to the aviators. Mr. Dixon emphasized they will try to do whatever they can to minimize the huge fire ball.

j. Mr. Burton stated the U. S. Forest Service (USFS) personnel are dealing with a lot of different companies and each has different and unique technologies in this business. He stated whatever may be the case with one company may be completely different with another and the Chesapeake personnel must work very closely with the USFS on all aspects.

AFZX-PW (420-10a) 3 April 1997
SUBJECT: Chesapeake Energy Corporation -- 1 April 1997

k. Mr. Price stated they have discussed having off-site production facilities where the gathering lines will be about 3 feet deep. Ms. Higgins stated in the Intensive Use area it may be needed to have 6 feet from the top of the pipe. Ms. Higgins asked where the production site would be located and was informed off USFS land about 5 miles. Mr. Jim Burton stated this site may be off USFS land but not off the USFS boundary and cautioned that straight lines don't happen much in woodpecker country. He stated the Chesapeake personnel would be required to follow the same strict guidelines concerning USFS property.

l. The physical requirements of production facilities and pipeline locations necessary for development of oil and gas in the area was discussed. Mr. Dixon stated the central production facility would be 10+ acres depending on the processes. They would probably take raw gas to it and it would basically be a tank farm with multiple separation drilling. Mr. Hammerschmidt asked about traffic in and out of that facility. Mr. Dixon stated he would like to have the pipeline for oil and gas and have the water disposed on site. It was discussed that the pipeline locations and depths would be dictated by the USFS.

m. Mr.Dixon asked about wellheads themselves. CPT Farnsworth stated that when the units are informed about the particular restrictions during training, this would an item added to that overlay. He stated Range Control would determine where to dig, however, if a road is associated with that, it makes it easier to explain to the units. Right now the units deal with archeological sites anyway so it would not be a problem. Mr. Hammerschmidt stated that an answer is due to the Chesapeake personnel on the depth of pipeline on drilling perspective. Ms. Higgins stated if at all possible they try to work with the existing right of ways.

n. Safety of personnel, property and equipment was discussed. Mr. Hammerschmidt stated that safety is important to all of us. Mr. Price stated they do not want to adversely affect the operations where somebody is surprised by a flare, and the best way we can do that is to have the production off site and minimize the amount of flares.

o. A discussion was held concerning coordination of personnel. Mr. Hammerschmidt stated the role of trainers assuming surface safety control and they will need to know at all times where Chesapeake personnel are working to avoid any opportunities for conflict. He explained the use of radio and cellular phone communications with the range control personnel. Mr. Oswald further explained that his people will need to know at all times the location of personnel and where drilling is occurring. He also explained the precautionary measures needed to be taken farther north where hunting occurs. He explained the importance of Chesapeake providing Range Control with a point of contact to maintain 24 hour a day communication. Due to the necessity of working and training simultaneously,

AFZX-PW (420-10a) 3 April 1997
SUBJECT: Chesapeake Energy Corporation -- 1 April 1997

coordination cannot be overstressed. Mr. Price stated communication will not be a problem and they will be proactive in this area.

p. Mr. Dixon discussed the fact that Chesapeake must have the ability to accommodate continuous 24-hour, seven day a week operations for oil and gas drilling operations. He also stressed the need for unrestricted access to wells, production facilities and pipeline by numerous drilling personnel, as well as subcontractors, vendors, and local, state and federal inspectors on a full-time basis 24 hours a day, seven days a week during all phases of operation. Mr. Price stated it would be beneficial to take some of the attendees to one of their facilities to see the entire scope of the facility. He stated normally approximately 30 people come in and out of the facility and they will be living and working on site in trailers for approximately 120 days.

q. Mr. John Costa, Safety Officer, asked if the possibility exists where Chesapeake personnel would be bringing radioactive materials onto the military installation. He stated if these types materials are to be brought onto Ft. Polk, a permit must be granted. CPT Brandau stated that all environmental rules and regulations must be complied with. Mr. Price stated as long as they are aware of the rules, regulations, and points of contact of persons dealing with particular subjects, they will have no problem whatsoever.

r. Mr. Jim Burton stated one USFS concern is hydrogen sulfide. Mr. Dixon stated they have not experienced any of that substance.

s. CPT Farnsworth stated traffic in and out will be a concern but something they can work around. The question is how many sites at one time can they manage. Mr. Price stated where the locations are may have an impact on how many sites there are. CPT Farnsworth stated the importance of synchronizing efforts and working together.

t. Mr. Hammerschmidt asked when Chesapeake would anticipate on the ground construction? Mr. Dixon stated probably one year from now and they would expect to be drilling for at least two years.

u. Mr. Hammerschmidt stated many roads on USFS are constructed for rather light traffic and asked if Chesapeake would be having a lot of heavy traffic? Mr. Dixon stated at times it would be really heavy and other times not. Mr. Burton stated his concern for maintenance of the roads and that this would not be a USFS responsibility. Mr. Hammerschmidt stated an example of Lookout Road which the Army has responsibility for maintaining and we will need to enter into a maintenance agreement with the USFS, Chesapeake and the Army concerning maintenance of roads.

AFZX-PW (420-10a) 3 April 1997
SUBJECT: Chesapeake Energy Corporation meeting -- 1 April 1997

v. Mr. Price stated that there are certain economic issues involving the Army, public interests and oil and gas operators which they must be attentive to when making decisions. He stated their goal is to provide the appropriate mechanism to protect the fundamental right to develop oil and gas leases yet accommodate the needs of Fort Polk and the U. S. Forest Service. Mr. Price asked how they are to put something together that provides for this memorandum of understanding which gives everyone a reasonable degree of confidence relative to what we discussed today and formalize the process under which we will provide services? Mr. Hammerschmidt stated formal minutes will be completed after this meeting and distributed to all parties. Mr. Price stated that will then give them a chance to develop a plan which hopefully could be implemented at this time approximately 9 months to one year from now. Mr. Walke stated when Chesapeake provides the Environmental Assessment on the operation this is usually a 6-month process and after that process, they would know the location of the wells.

w. Mr. Hammerschmidt stated as soon as Chesapeake feels comfortable with laying out the plan, we need to get the Range Control, Operations, and Training people together to start sooner than later and this will enhance everyone's operation immensely. Mr. Hammerschmidt reminded the Chesapeake personnel that this is USFS Limited Use land and most communication will go through them to us. Ms. Higgins stated if documents are made available to her she will then forward copies to DPW, Operations, Range Control, and all other appropriate personnel.

x. Mr. Don Jean introduced himself from the Environmental Division, Directorate of Public Works, and stated he would like to see something on the location of the water and ground water protection. Mr. Dixon stated normally surface fluids are held and disposed of on site. During drilling of the well, they will reinject underneath that. Mr. Jean also asked about production on the rathole and Mr. Clark stated we are only looking about 10-15 feet in the ground. Mr. Dixon stated the drinking water is trucked in.

4. Mr. Hammerschmidt stated in bringing the meeting to closure that Mr. Barry Oswald is the scheduler of training land and the point man for the Chesapeake personnel. Mr. Price stated they will come up with a plan on what was discussed today and make sure everyone is in agreement. Then if anyone has any conflict they will need to notify the Chesapeake personnel. Mr. Hammerschmidt thanked everyone for their attendance and cooperation and felt this was a very productive meeting and reiterated the goal for everyone is the safety of personnel, property and equipment and to insure no conflicts arise.

TED L. HAMMERSCHMIDT
Deputy Director of Public Works

705862

**ACTIONS/TASKERS**

* Actions for DPTMS

1. Depth of pipeline on drilling perspective

** Actions for DPW:

1. Maintenance Agreement - Roads

***Actions for Chesapeake:

1. Memorandum of Understanding

****Action for EPSD:

1. Coordination of operation with all parties

705863