IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **CENTRAL PINES LAND COMPANY, ET AL.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 98-314 L** |
| **versus** | ) | |
| | ) | **Chief Judge Edward J. Damich** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

# PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT

## IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 7.2(b) and Rule 56(h)(2) of the United States Court of Federal Claims Plaintiffs respectfully reply as follows to Defendants' Response To Plaintiffs' Proposed Findings Of Uncontroverted Fact In Opposition To Defendant's Motion For Summary Judgment:

**Plaintiffs' Proposed Finding No. 1:**

Prior to the moratorium terminating on March 31, 1978, the United States considered contingency plans to prevent, impede or limit mineral development on Group C lands after termination of the moratorium. Pls Opp'n Ex. 2, Disposition Form dated January 19, 1967 by Darwin L. Wilder and Tom Adams; Pls Opp'n Ex.3, Disposition Form dated April 30, 1974 by Clarence C. Randle, Chief, Condemnation Section, Real Estate Division; Pls Opp'n Ex. 4, Minutes

of meeting at Fort Polk on June 27, 1974 prepared by Colonel Jerry L. Teague; Pls Opp'n Ex.5, Letter dated June 26, 1974 to HQDA, WASH DC from Joe H. Sheard, Colonel, CE, District Engineer; Pls Opp'n Ex. 6, Undated Memorandum (after June 27, 1974 and believed to be July 10, 1974) to Secretary of the Army from Major General D. A. Raymond, Acting Chief of Engineers; Pls Opp'n Ex.7, Undated Executive Summary Major General Commanding Robert Haldane; Pls Opp'n Ex.8, Undated Memorandum (apparently January 13, 1976) by Darwin L. Wilder; Pls Opp'n Ex.9, Memorandum for Commanding General dated January 19, 1976 by Teague; Pls Opp'n Ex.10, Disposition Form dated January 19, 1977 by Darwin L. Wilder, Chief, Acquisitions Branch, Real Estate Division; Pls Opp'n Ex. 12, Memorandum For Record dated May 2, 1977 from Captain Christopher G. Hunt, Real Estate Officer; Pls Opp'n Ex.13, Letter dated May 5, 1977 to Darwin Wilder, Real Estate Division, Fort Worth from Levin Harris, Assistant U. S. Attorney, Shreveport; Pls Opp'n Ex.14, Attorney's opinion dated May 11, 1977 by R. P. Allen, Jr. concerning Fort Polk Mineral Moratorium; Pls Opp'n Ex. 15, Letter dated June 6, 1977 to Commander, US Army FORSCOM from William B. Steele, Major General, USA, Commanding.

**Defendant's Response To Plaintiffs' Proposed Finding No. 1:**

Defendant's disagree with Plaintiffs' characterization. These documents show, at most, that prior to the termination of the moratorium, the Army considered what their alternatives would be when the moratorium expired.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 1:**

The "characterization" is not critical. Regardless of whether the documents show "contingency plans" as characterized by Plaintiffs or "alternatives" as characterized by Defendant, the documents clearly show contemplated or possible action by the United States

to prevent, impede or limit mineral development on Group C lands after termination of the moratorium. Possible courses of actions were referred to as "option" in Pls Opp'n Ex.13, Letter dated May 5, 1977 to Darwin Wilder, Real Estate Division, Fort Worth from Levin Harris, Assistant U. S. Attorney, Shreveport. Pls Opp'n Ex.14, Attorney's opinion dated May 11, 1977 by R. P. Allen, Jr. concerning Fort Polk Mineral Moratorium, recommended "three courses of action." Pls Opp'n Ex 8, Undated Memorandum (apparently January 13, 1976) by Darwin L. Wilder, used the terms "recommendations" and "alternate recommendation." The facts forming the basis for Plaintiffs' Proposed Finding No. 1 are uncontradicted in the record.

**Plaintiffs' Proposed Finding No. 2:**

The documents in 1. above were discovered by Plaintiffs in the course of the Prior Lawsuit which was filed August 22, 1996. Pls Opp'n Ex.41, A. J. Gray, III Affidavit.

**Defendant's Response To Plaintiffs' Proposed Finding No. 2:**

Defendant cannot confirm when Plaintiffs' discovered the above-referenced documents. Defendant's knowledge of Fort Polk's use as a military installation dates back to at least 1977.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 2:**

As an officer of this Court, the undersigned certifies that the documents were discovered by Plaintiffs in the course of the Prior Lawsuit which was filed August 22, 1996. Each is an internal document of the United States Army.

**Plaintiffs' Proposed Finding No. 3:**

Between 1978 and 1991, Plaintiffs did not attempt to exercise mineral rights on Group C

lands. Pls Opp'n Ex.42, Plaintiffs' Response To Defendant's First Set Of Interrogatories And Requests For Production Of Documents To Plaintiffs, Answer to Interrogatory No. 2.

**Defendant's Response To Plaintiffs' Proposed Finding No. 3:**

Defendant agrees that Plaintiffs have produced no evidence of any attempt to exercise mineral rights on Group C lands between 1978 and 1991.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 3:**

Agreed, no reply necessary.

**Plaintiffs' Proposed Finding No. 4:**

Between 1978 and 1991, the United States took a "calculated risk" that Plaintiffs would not attempt to access Group C lands, and, thus, the United States took no action to prevent, impede or limit Plaintiffs' access to Group C lands or to otherwise prevent Plaintiffs from developing minerals on Group C lands. Pls Opp'n Ex. 16, Memo dated June 17, 1977 to Division Engineer, Southwestern from Michael B. Cottrell; Pls Opp'n Ex. 18, Memo dated June 22, 1977 to HQDA, Wash. D.C. from M. R. Long, Acting Chief, Real Estate Division; Pls Opp'n Ex. 15, Letter dated June 6, 1977 to Commander, US Army FORSCOM from William B. Steele, Major General, USA, Commanding; Pls Opp'n Ex.17, Undated letter (approximately June 1977) to Commander US Army FORSCOM from William B. Steele, Major General, USA, Commanding.

**Defendant's Response To Plaintiffs' Proposed Finding No. 4:**

Defendant disagrees with the use of the term "calculated risk" as it is unclear what this means. Defendant agrees that United States took no action to prevent, impede or limit Plaintiffs' access to Group C lands or to otherwise prevent Plaintiffs from developing minerals on Group C lands.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 4:**

The term "calculated risk" was not coined by Plaintiffs. The term appears in the documents of the United States as it developed its "alternative" or "contingency" plans. Both Pls Opp'n Ex. 2, Disposition Form dated January 19, 1967 by Darwin L. Wilder and Tom Adams, and Pls.Opp'n Ex. 18, Memo dated June 22, 1977 to HQDA, Wash.D.C from M.R. Long, Acting Chief, Real Estate Division, use the term "calculated risk" in describing the planned action of the United States. References to the United States taking a "risk" or that a "risk be taken" also appear in Pls Opp'n Ex. 16, Memo dated June 17, 1977 to Division Engineer, Southwestern from Michael B. Cottrell and in Pls Opp'n Ex. 11, Disposition Form dated March 18, 1977 by Darwin L. Wilder. The facts forming the basis for Plaintiffs' Proposed Finding No. 4 are uncontradicted in the record.

**Plaintiffs' Proposed Finding No. 5:**

Prior to October 9, 1992, the United States did not claim ownership of minerals underlying Group C, and, after the moratorium ended, took no formal action to deprive Plaintiffs access to Group C minerals. Pls. Opp'n Ex. 19, Letter dated August 5, 1988, by Danny W. Britt, Forest Supervisor, to Regional Forester; Pls. Opp'n Ex.1, Memorandum on Moratorium on Minerals, Fort Polk dated December 16, 1966 to Chief of Engineers from Jack W. Fickessen, Colonel, CE, District Engineer; Pls. Opp'n Ex. 5, Letter dated June 26, 1974 to HQDA, WASH DC from Joe H. Sheard, Colonel, CE, District Engineer.

**Defendant's Response To Plaintiffs' Proposed Finding No. 5:**

Defendant agrees.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 5:**

Agreed, no reply necessary.

**Plaintiffs' Proposed Finding No. 6:**

On October 9, 1992, a title opinion was rendered to the United States which, as to Group C lands, stated that the United States "can now claim mineral ownership where drilling has not occurred for a ten-year period regardless of the date of acquisition by the U.S." Plaintiffs do not have a copy of the title opinion. By letter dated November 8, 1995, Plaintiffs' Freedom of Information Act request for the letter was denied.

**Defendant's Response To Plaintiffs' Proposed Finding No. 6:**

Defendant objects to Plaintiffs' attempt to characterize and quote from a document that Plaintiffs concede they have not read.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 6:**

Plaintiffs did not characterize nor quote *the* title opinion. The characterization and quoted language, *i.e.*, that the United States "can now claim mineral ownership where drilling has not occurred for a ten-year period regardless of the date of acquisition by the U.S.," appears in the Memorandum dated October 7, 1993, by Charles E. Steele, Director of Lands And Minerals, United States Department of Agriculture, Forest Service. Pls Opp'n Ex. 20.

**Plaintiffs' Proposed Finding No. 7:**

On October 7, 1993, Charles E. Steele, Director of Lands And Minerals, United States Department Of Agriculture, Forest Service issued a memorandum number 2820 which advised that additional lands were available for leasing by the United States as a result of the October 9, 1992

opinion. The memorandum included Group C lands and a Controlled Surface Use Stipulation #1 which applied to the Intensive Use Area for Fort Polk. Pls Opp'n Ex.20.

**Defendant's Response To Plaintiffs' Proposed Finding No. 7:**

Defendant agrees that the Memorandum described above was issued and that it applied to portions of Group C lands that were part of Kisatchie National Forest. Defendant disagrees that the letter applied to "a Controlled Surface Use Stipulation #1 which applied to the Intensive Use Area of Fort Polk" as this is not stated in the letter.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 7:**

The Memorandum and its attachments speak for themselves. Plaintiffs attached a complete copy as Pls Opp'n Ex. 20.

**Plaintiffs' Proposed Finding No. 8:**

In the spring of 1995, while negotiating a mineral lease on property in the area of, but not within, Group C, Plaintiffs first learned from a potential mineral lessee that the United States was claiming title to Group C lands. Pls. Opp'n Ex.50, Minaldi Dep. pp. 18, 29-30, 47-48, 60; Pls Opp'n Ex.43, Drost Dep. 84-85, 86, 87.

**Defendant's Response To Plaintiffs' Proposed Finding No. 8:**

Defendant lacks sufficient knowledge to respond, but notes that the United States never claimed title to all of the Group C lands.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 8:**

First, the United States did assert title to the entirety of Group C lands in the Prior Lawsuit. Second, as the record of this case reflects, the Group C mineral servitude was created in 1943 when the United States acquired the surface of the lands through

expropriation. As a consequence, Plaintiffs' title is uniform across the entirety of the tract acquired in 1943. Action of the United States in claiming title to a portion of the property on the basis of a "lack drilling for a ten-year period" affects the entirety of the tract.

**Plaintiffs' Proposed Finding No. 9:**

By letter dated April 6, 1995, a representative of Union Pacific Resources Company offered to lease Plaintiffs' minerals affecting property outside of Group C but confirmed that the company was interested in developing Plaintiffs' acreage in the "Artillery Range," a portion of Group C lands. Pls. Opp'n Ex.21.

**Defendant's Response To Plaintiffs' Proposed Finding No. 9:**

Defendant disagrees. The cited exhibit does not demonstrate that Union Pacific Resources Company would have leased any portion of Group C lands.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 9:**

Plaintiffs stand by Proposed Finding No. 9. The exact language of the letter is as follows:

> . . . . UPRC remains interested in developing your remaining acreage in the Kisatchie National Forest and the Artillery Range.

The acreage could not be "developed" without a lease from Plaintiffs.

**Plaintiffs' Proposed Finding No. 10:**

By Hydrocarbon Lease dated effective August 1, 1995, corporate parents of Central Pines Land Company, L.L.C. and Tower Minerals Company, L.L.C. leased to Chesapeake Operating, Inc. ("Chesapeake") approximately 33,607.5325 acres of land contiguous to, but not included within, Group C ("33,000 acre lease"). Pls Opp'n Ex. 22; Pls Opp'n Ex. 46, Dunlap Dep. Ex. 4; Pls Opp'n

Ex. 44, Denny Dep. 2; Pls Opp'n Ex.43, Drost Dep. p. 107.

**Defendant's Response To Plaintiffs' Proposed Finding No. 10:**

Defendant agrees.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 10:**

Agreed, no reply necessary.

**Plaintiffs' Proposed Finding No. 11:**

Chesapeake stock is publicly traded on the New York Stock Exchange. Pls Opp'n Ex.51, Price Dep. pp. 12-13; Pls. Opp'n Ex. 49, Hood Dep. p. 10.

**Defendant's Response To Plaintiffs' Proposed Finding No. 11:**

Defendant agrees.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 11:**

Agreed, no reply necessary.

**Plaintiffs' Proposed Finding No. 12:**

Chesapeake is a Fortune 500 company. Pls. Opp'n Ex. 51, Price Dep. p. 13.

**Defendant's Response To Plaintiffs' Proposed Finding No. 12:**

Defendant agrees.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 12:**

Agreed, no reply necessary.

**Plaintiffs' Proposed Finding No. 13:**

Chesapeake claims to be the nations's most active oil and gas explorer and the second largest independent natural gas producer in the United States. Pls Opp'n Ex. 51, Price Dep. p. 12.

**Defendant's Response To Plaintiffs' Proposed Finding No. 13:**

Defendant agrees.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 13:**

Agreed, no reply necessary.

**Plaintiffs' Proposed Finding No. 14:**

Under the 33,000 acre lease, Chesapeake successfully drilled wells on Plaintiff's property contiguous to and offsetting Group C. Pls. Opp'n Ex. 46, Dunlap Dep. pp. 31-32, 34; Pls. Opp'n Ex. 44, Denny Dep. pp. 23-24; Pls. Opp'n Ex. 49, Hood Dep. pp. 18, 19.

**Defendant's Response To Plaintiffs' Proposed Finding No. 14:**

Defendant agrees that Chesapeake drilled wells on Plaintiffs' property. Defendant objects to the remainder of this statement. It is unclear what is meant by successful and the cited documents do not support Plaintiffs' description of where these wells were located.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 14:**

Plaintiffs stand by Proposed Finding No. 14. The deposition testimony of Chesapeake representative Gary S. Dunlap, as examined by counsel for Defendant, was as follows:

A. We drilled the Lawton 25, the Lawton 27. The 27 is right up next to the boundary of the lease we took. We were also involved in the Reichers, the Edison. I believe some had drilled all these wells here.

Q. How did these wells do in this area?

A. As I recall, the 27 was a very nice well, and the Reichers and the Edison were nice wells.

Q. Those are all south of the fort, is that right?

A. Well, they're up against the fort.

. . .

Q. Is that because the way that this trend played out, the productive limits were reached to the south of the fort?

A. Well, again, the Lawton 27, the Edison, Reichers, these were all good wells.

Q. Okay. This map identifies this land here as forest land used by the Army. I'm referring to the fort itself.

MR. GRAY: Okay. This Group C land.

MR. KRIEGSMAN: I understand that , but - -

MR. GRAY: And by definition, Group C land means it was acquired by the United States Army.

MR. KRIEGSMAN: Okay.

Pls. Opp'n Ex. 46, Dunlap Dep. pp. 31-32, 34.

The deposition testimony of Chesapeake representative George P. Denny, as examined by counsel for Defendant, was as follows:

Q. (By Mr. Kriegsman) Just looking at that map, do you remember if you drilled wells north of the fort? South of the fort? East or west of the fort?

A. Mostly south and east of the fort and directly southeast of the fort.

Q. And how about directly east of the fort?

A. Yes.

Q. You drilled wells there?

A. Yes.

Q. Those were producing wells?

A. Yes. I think they are still producing. I know they did produce and were pretty good wells.

Q. East of the fort?

A. Yes.

. . .

Q. (By Mr. Kriegsman) So did you want to explain that further what wells you drilled are related here on the map?

A. I have knowledge directly offsetting the fort. We drilled the Reickers 1- 27 and the Addison, I think it was the 1-28.

Denny Dep. pp. 23-24.

Chesapeake representative Henry Hood gave similar and consistent testimony. It is not reproduced here because it would be repetitive and cumulative.

The facts forming the basis for Plaintiffs' Proposed Finding No. 14 are uncontradicted in the record.

**Plaintiffs' Proposed Finding No. 15:**

In the 1995 to 1997 time frame, Chesapeake considered the area of Fort Polk prospective for oil and gas drilling in the Austin Chalk geological formation. Pls Opp'n Ex. 51, Price Dep. pp. 19, 66; Pls Opp'n Ex. 45, Dixon Dep. pp 21-22.

**Defendant's Response To Plaintiffs' Proposed Finding No. 15:**

Defendant agrees that at some point during 1995 to 1997 Chesapeake considered the area of Fort Polk prospective for oil and gas drilling in the Austin Chalk geological formation.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 15:**

Agreed, no reply necessary.

**Plaintiffs' Proposed Finding No. 16:**

In the course of negotiating the 33,000 acre mineral lease, Chesapeake expressed interest in leasing Group C. Pls. Opp'n Ex. 50, Minaldi Dep. at pp. 19, 23, 25, 28; Pls Opp'n Ex.43, Drost Dep. 105, 108.

**Defendant's Response To Plaintiffs' Proposed Finding No. 16:**

Defendant objects that this statement is vague and not supported by the cited documents.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 16:**

Plaintiffs stand by Proposed Finding No. 16. The deposition testimony of Plaintiff representative Thad D. Minaldi as examined by counsel for Defendant, was as follows:

A. . . . And Chesapeake was the first to respond.

> I think in those discussions they informed us that they were not going to sign a lease on our Fort Polk and artillery range mineral rights because of government issues and military issues. So they preferred to go ahead, at that point, and proceed to signing a lease on lands that were not complicated by the Military use or the Federal Government's claim to ownership.
>
> . . .

A. Yes, Chesapeake came back, after having drilled a number of wells on Lawton lands and other lands in the area and having had some success and having seen their company become a success story, did come back to us and want to lease some lands that, again, had military base and federal government implications. I think - - I think some of this acreage was Group C, but as I sit here right now I can't say if all of it was Group C.

Pls. Opp'n Ex. 50, Minaldi Dep. at pp. 19, 23, 25, 28.

The deposition testimony of Plaintiff representative William Drost as examined by counsel for Defendant, was as follows:

A. Chesapeake was willing to lease all of our acreage up there, Tracts A, B, C and D.

> So was UPRC, Sonat. They were all willing to lease it all. They wanted to develop it all.

Pls Opp'n Ex.43, Drost Dep. 105, 108.

The facts forming the basis for Plaintiffs' Proposed Finding No. 16 are uncontradicted in the record.

**Plaintiffs' Proposed Finding No. 17:**

By letter dated March, 1996, Chesapeake followed up with the negotiations to lease the Group C lands "Artillery Range."

**Defendant's Response To Plaintiffs' Proposed Finding No. 17:**

Defendant objects that this statement is vague and not supported by the cited documents.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 17:**

Defendant is correct. The March 19, 1996 follow up by Chesapeake was by telephone conversation between Chesapeake representative Tom Ward and Plaintiffs' representative Thad Minaldi. See letter dated April 8, 1996 attached as Pls. Oppn't Ex. 53.

**Plaintiffs' Proposed Finding No. 18:**

By letter dated April 8, 1996, Plaintiffs confirmed their willingness to lease to Chesapeake Group C lands on the same lease form as used by the parties for the 33,000 acre lease.

**Defendant's Response To Plaintiffs' Proposed Finding No. 18:**

Defendant objects that this statement is vague and notes that it is not supported by any documents as required by RCFC 56(h).

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 18:**

Defendant is correct. The letter dated April 8, 1996 was inadvertently omitted with Plaintiffs' original filing. A copy is attached to this document as Exhibit 53.

**Plaintiffs' Proposed Finding No. 19:**

Absent the action of the United States disputing Plaintiffs' title to Group C and issues concerning access to Fort Polk, Chesapeake would have leased the entirety of Group C from Plaintiffs. Pls Opp'n. Ex. 46, Dunlap Dep. p. 54; Pls. Opp'n Ex. 44, Denny Dep. pp.17, 45-46, 56; Pls Opp'n Ex. 50, Minaldi Dep. p. 79; Pls. Opp'n Ex.43, Drost Dep. pp. 105, 108.

**Defendant's Response To Plaintiffs' Proposed Finding No. 19:**

Defendant disagrees. After several dry holes were drilled and after Chesapeake sustained serious financial hardship from their Austin Chalk program, which nearly bankrupted the company, Chesapeake made a business decision not to lease the entirety of Group C from Plaintiffs. This decision was not related to any actions by the United States.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 19:**

The basis for Defendant's objection is not supported by documentation or deposition testimony. Defendant's unsupported theory directly contradicts the testimony of the witnesses involved. The deposition testimony of Chesapeake representative George P. Denny was as follows:

Q. As a person who was responsible for acquiring mineral leases for Chesapeake in that area during 1996, 1997 time period, would the remaining properties colored in yellow on Denny Exhibit 4, in your opinion, would Chesapeake have acquired mineral leases on those properties had it not been for the issues with the United States?

MR. KRIEGSMAN: Objection to the form.

THE WITNESS: Is it my opinion?

Q. (By Mr. Gray) Yes.

A. Yes.

Pls. Opp'n Ex. 44, Denny Dep. p.56.

The deposition testimony of Chesapeake representative George P. Denny was as follows:

Q. Yes. And the question is, without title disputes and without any issues that may or may not have existed with the Army, had the remainder of Tract C, which I'm going to tell you Tract C is 19,000 acres less the 4,800 that you lease, would Chesapeake have leased out those properties under the same terms and conditions as reflected on - - what is the lease number?

A. Two.

Q. On No. 2.

MR. KRIEGSMAN: Object to the form and object to a hypothetical question. He's a fact witness. That's not his knowledge.

THE WITNESS: In 1966, we were very aggressive in buying leases through this area.

BY MR. GRAY:

Q. So based on that, do you think you would have still leased it?

A. Yes.

Pls Opp'n. Ex. 46, Dunlap Dep. p. 54.

The facts forming the basis for Plaintiffs' Proposed Finding No. 19 are uncontradicted in the record.

**Plaintiffs' Proposed Finding No. 20:**

During the relevant time period of 1996 and 1997, Chesapeake leased approximately 1,000,000 acres of land in and around the Fort Polk area. Pls. Opp'n Ex. 44, Denny Dep. p. 35; Pls.

Opp'n Ex. 46, Dunlap Dep. p. 15.

**Defendant's Response To Plaintiffs' Proposed Finding No. 20:**

Defendant agrees that Chesapeake leased approximately 1,000,000 acres but objects to the term "in and around the Fort Polk area" as vague.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 20:**

Perhaps Defendant is correct in stating that the term "in and around the Fort Polk area" is vague. Regardless, the record reflects that Chesapeake leased 33,607 acres from Plaintiffs, situated contiguous to and on the east side of Fort Polk (Pls Opp'n Ex. 22), and that Chesapeake leased 4,383.67 acres from Plaintiffs within Group C (Pls Opp'n Ex. 33). The deposition testimony of Chesapeake representative George Denny establishes that the 1,000,000 acres leased by Chesapeake was in the "area" of Fort Polk. After identifying the 33,000 acres lease, Denny testified as follows:

Q. How many does it say?

A. 33,607.5325 net acres - - gross acres.

Q. During that time period of '96 and '97, do you have an opinion as to how many acres of leases Chesapeake acquired in that area of Louisiana?

A. Approximately a million.

Pls Opp'n Ex. 44, Denny Dep. p. 35.

**Plaintiffs' Proposed Finding No. 21:**

A "protection" lease is a second mineral lease on the same property taken by a mineral lessee from one asserting a competing ownership interest against the first or primary mineral lessee. Pls. Opp'n Ex. 44, Denny Dep. p. 25; Pls. Opp'n Ex.51, Price Dep. p. 40.

**Defendant's Response To Plaintiffs' Proposed Finding No. 21:**

Defendant generally agrees but notes that there are additional reasons a party may seek a protective lease.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 21:**

No reply necessary.

**Plaintiffs' Proposed Finding No. 22:**

If Chesapeake had been able to obtain a protection mineral lease from the United States on Group C and if the Army had permitted access to the property, Chesapeake would have drilled wells on Group C. Pls. Opp'n Ex. 44, Denny Dep. pp. 19, 21-22, 29, 30; Pls. Opp'n Ex. 51, Price Dep. p. 60.

**Defendant's Response To Plaintiffs' Proposed Finding No. 22:**

Defendant disagrees. Plaintiffs' speculation is not supported by the facts. Chesapeake appears to have abandoned much of its Austin Chalk program for financial failures unrelated to the United States Army.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 22:**

The basis for Defendant's objection is not supported by documentation or deposition testimony. Defendant's unsupported theory directly contradicts the testimony of the witnesses involved. The deposition testimony of Chesapeake representative George P. Denny, as questioned by counsel for Defendant, was as follows:

Q. Did you not drill any wells because you were told by the Army or the forest that you couldn't have access or you didn't drill wells because of unrelated business decisions?

A. It's my understanding that we didn't drill any wells because we didn't have access.

. . .

Q. Okay. Why was Chesapeake interested in this area in the first place?

A. We were interested in drilling wells. If we had access and we were able to negotiate a lease with the Lawtons and were able to buy a protection lease, we were interested in drilling oil and gas wells on the fort.

Q. Why?

A. Because we had success in the area. And we were drilling wells all over trying to identify what we were termed sweet spots where production was - - or drilling wells was - - was justified.

Q. Were you pursuing other leases in that area near the fort?

A. Yes.

Q. Did you drill wells in that area?

A. Yes.

Pls. Opp'n Ex. 44, Denny Dep. pp. 19, 21-22.

The facts forming the basis for Plaintiffs' Proposed Finding No. 22 are uncontradicted in the record.

**Plaintiffs' Proposed Finding No. 23:**

After learning in the spring of 1995 that the United States claimed title to Group C lands, inquiry lead Plaintiffs to the Office Of General Counsel, United States Department Of Agriculture in Little Rock, Arkansas. By letter dated November 9, 1995 addressed to Mike Cruse, Deputy General Counsel, Plaintiffs supplied the United States with pertinent title documents, land use records and legal principles which established that Plaintiffs owned the minerals under Group C lands. Pls. Opp'n Ex. 23.

**Defendant's Response To Plaintiffs' Proposed Finding No. 23:**

Defendant disagrees. The United States only claimed title to a portion of the Group C lands. Defendant lacks sufficient knowledge as to when Plaintiffs learned of this.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 23:**

First, the United States did assert title to the entirety of Group C lands in the Prior Lawsuit. Second, as alleged in paragraph 5(n) of Plaintiffs First Amended and Restated Complaint, the Group C mineral servitude was created in 1943 when the United States acquired the surface of the lands through expropriation. As a consequence, Plaintiffs' title is uniform across the entirety of the tract acquired in 1943. Action of the United States in claiming title to a portion of the property on the basis of a "lack drilling for a ten-year period" affects the entirety of the tract.

**Plaintiffs' Proposed Finding No. 24:**

Cruse referred Plaintiffs to Jeffery D. Eisenberg, Office Of General Counsel, United States Department Of Agriculture, Washington, D.C. By letter dated February 29, 1996 to Eisenberg, Plaintiffs asserted title to the Group C minerals which were being offered for lease by the United States. Plaintiffs respectfully requested that the properties be withdrawn from proposed lease sale. Pls Opp'n Ex.24.

**Defendant's Response To Plaintiffs' Proposed Finding No. 24:**

Defendant disagrees. The United States only claimed title to a portion of the Group C lands. Defendant lacks sufficient knowledge as to when Plaintiffs learned of this.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 24:**

Plaintiffs stand by Proposed Finding No. 24. The correspondence speaks for itself.

Plaintiffs would have never heard of Mr. Eisenberg, absent information from Mr. Cruse.

**Plaintiffs' Proposed Finding No. 25:**

Not less than 5,300 acres of Group C lands were included by the United States in a proposed mineral lease sale by the United States scheduled for March 28, 1996. Pls. Opp'n Ex.24.

**Defendant's Response To Plaintiffs' Proposed Finding No. 25:**

Defendant agrees.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 25:**

Agreed, no reply necessary.

**Plaintiffs' Proposed Finding No. 26:**

Pursuant to Eisenberg's request, by letter dated March 11, 1996, Plaintiffs submit a proposal whereby in exchange for recognizing Plaintiffs' title to Group C lands, the United States would be compensated for mineral production under Group C. Pls. Opp'n Ex. 25.

**Defendant's Response To Plaintiffs' Proposed Finding No. 26:**

Defendant agrees.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 26:**

Agreed, no reply necessary.

**Plaintiffs' Proposed Finding No. 27:**

In 1996, Belco Oil & Gas Corp. ("Belco") paid approximately $60,000,000 in mineral lease bonuses to mineral owners in the Austin Chalk trend in Louisiana. Pls. Opp'n Ex. 47, Fife Dep. p. 11)

**Defendant's Response To Plaintiffs' Proposed Finding No. 27:**

Defendant lacks sufficient knowledge to respond.