**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 27:**

The exact testimony of Belco representative Mel Fife was as follows:

A. . . . And in that year, the year that I had those brokers over here, we spent roughly $60,000,000.00 in the Austin chalk in Louisiana acquiring leases.

Pls. Opp'n Ex. 47, Fife Dep. p. 11.

**Plaintiffs' Proposed Finding No. 28:**

Belco wanted to drill on Group C lands. (Pls. Opp'n Ex.47, Fife Dep. pp. 12, 15, 21, 28)

**Defendant's Response To Plaintiffs' Proposed Finding No. 28:**

Defendant lacks sufficient knowledge to respond.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 28:**

The deposition testimony of Belco representative Mel Fife speaks for itself.

**Plaintiffs' Proposed Finding No. 29:**

Commencing March, 1996, Plaintiffs negotiated with Belco to lease 20,295 acres of Group C. Plaintiffs reached agreement with Belco as to the terms of a lease; but because the United States Army denied Belco access to Group C surface, Belco did not execute a lease with Plaintiffs. Pls. Opp'n Ex. 47, Fife Dep. pp. 12, 15, 33; Pls. Opp'n Ex. 43, Drost Dep. pp. 107, 108.

**Defendant's Response To Plaintiffs' Proposed Finding No. 29:**

Defendant agrees that there is no evidence Belco executed a lease for the Group C lands with Plaintiffs. Defendant disagrees that the United States Army even denied Belco access to the surface of Group C. Belco, not being a lessee, was never in a position to request access.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 29:**

Plaintiffs stand by Proposed Finding No. 29. Plaintiffs' agreement with Belco called for a lease bonus of $300 per acre. The 20,295 acre lease would have cost Belco $6,088,500.00, *i.e.*, 20,295 X $300 = $6,088,500.00. Belco made a business decision to determine if it could obtain access prior to paying for the lease. Counsel for Defendant examined Belco representative Mel Fife on this issue:

Q. Now, if the goal was just to kind of break up Chesapeake's leases, why not just lease it anyway?

A. Well, you're not going to pay that much money for a lease if you're not going to dig it.

. . .

Q. You were considering purchasing the lease?

A. Yeah. And they were - - you know, the Lawtons were aware that we weren't just going to do it, that we were going to be reasonably intelligent about it and go make sure that we could get access before we paid them whatever it was, 4 or $5 million.

. . .

Q. How did the discussion transpire? Did Mr. Belfer - - did he consider the option of taking the lease anyway and fighting the Army or - -

A. No, I don't think that that was ever an option. There were too many other good leases to buy without having to jack around with the Army, you know. And by the time you get - - by the time you got through all the red tape it would have cost you a fortune, you know. And I think that that was pretty obvious to he and I both. And the people in Washington told him the same thing, it's just not going to happen.

Pls. Opp'n Ex. 54, Fife Dep. pp. 19, 43, 44.

The facts forming the basis for Plaintiffs' Proposed Finding No. 29 are uncontradicted in the record.

**Plaintiffs' Proposed Finding No. 30:**

If the United States Army would have allowed Belco access to the property, Belco would have leased the entirety of Group C from Plaintiffs. Pls. Opp'n Ex.47, Fife Dep. pp. 16 - 17, 25, 28-29, 33, 34; Pls. Opp'n Ex. 47, Fife Dep. Ex. 2; Pls. Opp'n Ex. 50, Minaldi Dep. pp. 45, 79; Pls Opp'n Ex.43, Drost Dep. pp. 34-35, 46, 49-50, 73, 74, 105, 107, 108.

**Defendant's Response To Plaintiffs' Proposed Finding No. 30:**

Defendant objects to the extent this statement suggests the United States Army ever denied Belco access to Group C.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 30:**

Plaintiffs stand by Proposed Finding No. 30. The denial of access to Group C lands to Belco is uncontradicted in the record. The deposition testimony of Belco representative Mel Fife, as conducted by counsel for Defendant, is as follows:

A. . . . we rolled out our maps. "This is the area that we want." And they said, "Yeah, that's the one area that you can't have. It's an old artillery range."

Q. What did they mean, you can't have access to it?

A. Can't have access to it. It's an old artillery range. And I remember because I'd done basic training at Fort Polk in 1968 and that was out in the area where you have to crawl on your stomach and they shoot live rounds of ammunition over your head and bombs go off and this and that and the other. And they just said that there was a lot of unexploded ordnance out there and that we could not go.

. . . And so we proposed that, "Wait a minute. We can do it in an acre and a half." And, you know, "Can't we go out there and run a mine sweep or a metal detector or something over just an acre and a half and y'all come clean it up and then we can drill our well?" No, that wasn't acceptable.

. . .

A. And the Army said absolutely not about coming on the place itself.

. . .

Q. Okay. And was it your understanding that the folks that you were meeting with would be the ones making the decision regarding access?

A. Yeah.

Q. And how did you know that?

A. Patton Boggs.

Q. Patton Boggs said these are the guys - -

A. You know, they had contacted the general. The general had said, "These are the people that you need to talk to.

Q. Yeah.

A. And so those were the people that we talked to.

Q. Okay. And tell me again, you sat down with them and they basically told you you're not allowed in?

A. Right.

Q. Did they give you a firm no and said, "We're not giving you access"?

A. Yeah.

Q. Yes?

A. Yes. And, like I said, we had several proposals - - proposals to them.

Q. You brought those proposals to the meeting?

A. Yes.

Q. And then - -

A. Now, I don't know that they were in writing. They were just ideas that were being exchanged during the meeting, you know, what if we did or what if we did that or what if we did something else. "What if we assumed full responsibility. I mean, if something blows up out there then we're responsible. The Army has nothing to do with it. Let us go under those conditions."

"No, you can't go out there."

Pls. Opp'n Ex.47, Fife Dep. pp. 16 - 17, 19, 31-32.

The facts forming the basis for Plaintiffs' Proposed Finding No. 30 are uncontradicted in the record.

**Plaintiffs' Proposed Finding No. 31:**

Commencing April 24, 1996, Plaintiffs negotiated with Sonat Exploration Company ("Sonat") in an effort to lease approximately 9,798.44 acres of Group C. Pls. Opp'n Ex.48, Hamilton Dep. pp.70-71, 72, 73; Hamilton Dep. Ex. 3; Hamilton Dep. Ex. 4; Hamilton Dep. Ex. 5; Opposition Ex. 43, Drost Dep. p. 107.

**Defendant's Response To Plaintiffs' Proposed Finding No. 31:**

Defendant objects that this statement is not supported by the cited documents.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 31:**

Plaintiffs stand by Proposed Finding No. 31. Sonat representative David Hamilton testified as follows:

Q. Well, let's deal with it.

Your offer dealt with how many acres, sir?

A. 8,271.58.

Q. And how many acres is in the Lawton counterproposal, which is the May 1 letter?

A. 9,798.44.

. . .

Q. Was this lease concluded, to your knowledge?

A. No. sir.

Pls. Opp'n Ex.48, Hamilton Dep. pp.70-71, 72, 73.

The correspondence between Plaintiffs and Sonat concerning the negotiations appear in the record as Pls Opp'n Ex. 27 and Ex. 28. The facts forming the basis for Plaintiffs' Proposed Finding No. 31 are uncontradicted in the record.

**Plaintiffs' Proposed Finding No. 32:**

The United States withdrew the property sought to be leased by Sonat from its proposed lease sale. Without the possibility of a "protective" lease, Plaintiffs were unable to lease the 9,798.44 acres to Sonat. Pls. Opp'n Ex. 48, Hamilton Dep. p. 77.

**Defendant's Response To Plaintiffs' Proposed Finding No. 32:**

Defendant objects that this statement is not supported by the cited documents.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 32:**

Defendant is correct. The cited documents do not connect all of the dots. The record does reflect that the United States put a portion of Group C up for a lease sale; that Sonat offered to lease the property from Plaintiffs; the United States withdrew the property from the lease sale; and Sonat did not conclude its lease with Plaintiffs.

**Plaintiffs' Proposed Finding No. 33:**

By Hydrocarbon Lease dated July 1, 1996, Plaintiffs leased approximately 28,668.93 acres of property contiguous with and partially including Group C to Sonat. Pls Opp'n Ex.48, Hamilton Dep. 67; Hamilton Dep. Ex. 2; Pls Opp'n Ex.43, Drost Dep. p. 107.

**Defendant's Response To Plaintiffs' Proposed Finding No. 33:**

Defendant objects that this statement is not supported by the cited documents.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 33:**

Plaintiffs stand by Proposed Finding No. 33. The property included in the 28,000 acre lease with Sonat is clearly and specifically contiguous with, and partially includes Group C.

**Plaintiffs' Proposed Finding No. 34:**

If Sonat had been able to obtain a protective mineral lease and access, it would have drilled on Fort Polk. Pls Opp'n Ex.48, Hamilton Dep. pp. 33, 34-35.

**Defendant's Response To Plaintiffs' Proposed Finding No. 34:**

Defendant lacks sufficient information to respond, but notes that several companies made business decisions not to drill in the area of Fort Polk. This business decisions were based on the drilling of dry holes and unrelated to the United States Army.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 34:**

Plaintiffs stand by Proposed Finding No. 34. The deposition testimony of Sonat representative David Hamilton, as taken by counsel for Defendant, was as follows:

Q. Why?

A. Because I know for a fact that we wanted to drill wells on Fort Polk.

. . .

Q. Uh-hun. And why weren't there wells drilled on the fort?

A. I believe that well - - wells weren't drilled on the fort because of the - - the - - what's the right word - - the the restrictions of access and the restrictions of use of the surface and the many, many things where we would have to comply with on trying to get in there and drill wells. . .

Pls Opp'n Ex.48, Hamilton Dep. pp. 33, 34-35.

The facts forming the basis for Plaintiffs' Proposed Finding No. 34 are uncontradicted in the record.

**Plaintiffs' Proposed Finding No. 35:**

By letter dated August 6, 1996, Eisenberg responded to Plaintiffs' proposal by rejecting the settlement. Pls. Opp'n Ex.31.

**Defendant's Response To Plaintiffs' Proposed Finding No. 35:**

Defendant agrees.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 35:**

Agreed, no reply necessary.

**Plaintiffs' Proposed Finding No. 36:**

On August 22, 1996, Plaintiffs filed civil action number CV96-2000 on the docket of the United States District Court, Western District of Louisiana against the United States for declaratory judgment pursuant to 28 U.S.C.§2201 and to quiet title to real estate pursuant to 28 U.S.C. §2409a. In their Complaint, Plaintiffs sought recognition of their title to Group C. See, *Central Pines Land Co., et al v. United States*, No. 2:96-2000, slip op. W. D. La. July 28, 2000), *aff'd*, 274 F.3d 881 (5th Cir. 2001), *cert denied*, 537 U.S. 822 (2002).

**Defendant's Response To Plaintiffs' Proposed Finding No. 36:**

Defendant agrees.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 36:**

Agreed, no reply necessary.

**Plaintiffs' Proposed Finding No. 37:**

The United States answered Plaintiffs suit, denying that Plaintiffs were the owners of minerals relating to Group C. In the course of the litigation, the United States consistently asserted ownership of Group C minerals. See, *Central Pines Land Co., et al v. United States*, No. 2:96-2000,

slip op. W. D. La. July 28, 2000), *aff'd*, 274 F.3d 881 (5th Cir. 2001), *cert denied*, 537 U.S. 822 (2002).

**Defendant's Response To Plaintiffs' Proposed Finding No. 37:**

Defendant agrees.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 37:**

Agreed, no reply necessary.

**Plaintiffs' Proposed Finding No. 38:**

By letter dated September 24, 1996, Chesapeake, Plaintiffs' lessee under the 33,000 acre lease, offered to lease from Plaintiffs approximately 4,383.67 acres of Group C minerals (ultimately the lease covered 4,822 acres). Because of the competing title claim to Group C minerals by the United States, Chesapeake specifically conditioned its offer to Plaintiffs upon being permitted to obtain "protection leases from the United States" and required Plaintiffs to agree "not to interfere with Chesapeake's attempt to secure a protection lease from the U.S.A." Chesapeake conditioned its offer upon Plaintiffs agreeing to confirm in writing to the United States "in a form acceptable to the Justice Department" that Plaintiffs would not attempt to upset any proposed lease sale by the United States of the same mineral property. Pls. Opp'n Ex. 32; Pls. Opp'n Ex. 49, Hood Dep. p. 14, 26, 31, Hood Dep. Ex. 2; Pls Opp'n Ex. 46, Dunlap Dep. Ex. 5.; Pls. Opp'n Ex.44, Denny Dep. Ex. 7.

**Defendant's Response To Plaintiffs' Proposed Finding No. 38:**

Defendant agrees that Chesapeake leased approximately 4,800 acres of Group C from Plaintiffs. Defendant objects to the remainder of this statement as not supported by the cited documents.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 38:**

Plaintiffs stand by Proposed Finding No. 38. The cited documents speak for themselves.

**Plaintiffs' Proposed Finding No. 39:**

In an effort to promote mineral development of Group C, Plaintiffs acquiesced to Chesapeake's limitations. On September 26, 1996, Plaintiffs entered into a mineral lease with Chesapeake. The lease covered 4,822.10 acres of Group C. Pls Opp'n Ex. 33; Pls Opp'n Ex. 46, Dunlap Dep. Ex. 2; Pls. Opp'n Ex.44, Denny Dep. Ex. 3.

**Defendant's Response To Plaintiffs' Proposed Finding No. 39:**

Defendant agrees that Chesapeake leased approximately 4,800 acres of Group C from Plaintiffs. Defendant objects to the remainder of this statement as not supported by the cited documents.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 39:**

Plaintiffs stand by Proposed Finding No. 39. The cited documents speak for themselves.

**Plaintiffs' Proposed Finding No. 40:**

By letter dated September 26, 1996, Plaintiffs advised the United States through its counsel, Eisenberg, of the lease and confirmed that no plaintiff would attempt to upset or otherwise interfere with the scheduled mineral lease sale. Pls Opp'n Ex. 34; Pls Opp'n Ex.49, Hood Dep. Ex. 5.; Pls Opp'n Ex. 46, Dunlap Dep. Ex. 7.

**Defendant's Response To Plaintiffs' Proposed Finding No. 40:**

Defendant objects that the cited documents do not support this statement.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 40:**

Plaintiffs stand by Proposed Finding No. 40. The cited documents speak for themselves.

**Plaintiffs' Proposed Finding No. 41:**

United States Department Of Justice attorney, Bret Birdsong, advised Plaintiffs that additional Group C acreage may be included in a scheduled lease sale and requested that Plaintiffs agree to not attempt to upset the sale with regard to the additional acreage. In an effort to promote mineral development of Group C, Plaintiffs acquiesced and by letter dated October 9, 1996 complied with the request of the United States Department Of Justice. Pls Opp'n Ex. 35; Pls Opp'n Ex.46, Dunlap Dep. Ex. 8.

**Defendant's Response To Plaintiffs' Proposed Finding No. 41:**

Defendant agrees that Plaintiffs sent the referenced letter on October 9, 1996. Defendant objects that the cited documents do not support the remainder of this statement.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 41:**

Plaintiffs stand by Proposed Finding No. 41. The cited documents speak for themselves.

**Plaintiffs' Proposed Finding No. 42:**

Because the United States claimed title to Group C, Plaintiffs' lessees and prospective lessees were required to obtain protection leases from the United States on acreage leased from Plaintiffs. The protection lease requirement put Plaintiffs' lessees and potential lessees at risk that a competitor would obtain the lease from the United States at public bidding, thus precluding development of the property. Pls. Opp'n.Ex. 49, Henry Hood Dep. p. 35-36.

**Defendant's Response To Plaintiffs' Proposed Finding No. 42:**

Defendant disagrees. The United States claimed title only to the Forest Service portion of Group C and Plaintiffs did, in fact, lease a majority of the Forest Service portion of Group C.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 42:**

First, the United States did assert title to the entirety of Group C lands in the Prior Lawsuit. Second, as alleged in paragraph 5(n) of Plaintiffs First Amended and Restated Complaint, the Group C mineral servitude was created in 1943 when the United States acquired the surface of the lands through expropriation. As a consequence, Plaintiffs' title is uniform across the entirety of the tract acquired in 1943. Action of the United States in claiming title to a portion of the property on the basis of a "lack drilling for a ten-year period" affects the entirety of the tract. Third, Group C is composed of 21,118.2 acres. Plaintiffs leased 4,822 acres.

**Plaintiffs' Proposed Finding No. 43:**

The United States granted the following mineral leases affecting Group C properties: Lease Nos. 47572, 47574, and 47750 to Union Pacific Resources Company and Lease Nos. 48555, 48556, 48557, 48558, 48559 and 48560 to Chesapeake Operating, Inc. All of the leases contained ten year terms terminating April 30, 2007. Pls. Opp'n Ex. 42.

**Defendant's Response To Plaintiffs' Proposed Finding No. 43:**

Defendant agrees.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 43:**

Agreed, no reply necessary.

**Plaintiffs' Proposed Finding No. 44:**

Because the United States asserted title to Group C, potential mineral lessees of Plaintiffs would not execute mineral leases with Plaintiffs unless reasonably assured that "protection" leases could be obtained from the United States. In the summer of 1997, the Bureau Of Land Management

received offers to lease parcels within Group C from Plaintiffs' lessees or persons acting on their behalf. Stephen M. Sittnick, LTC, IN, G3/DPTMS responded to an internal inquiry with memorandum AFZX-GT dated July 23, 1997. The response included the following:

> a. By definition, this impact area is, and has been, off limits to personnel and/or vehicle surface activities. Additionally, no digging in that zone is allowed due to unexploded ordnance (surface and subsurface). RLIA was established o/a 1977, and all types of dud producing munitions have been filed into that area. Any effort to surface and subsurface clear that zone for oil exploration would be extremely unsafe, and expensive.
>
> b. Any oil exploration activities in or around the RLIA zone would close a number of ranges/training areas that have Surface Danger Zones (SDZ's) oriented into RLIA. This would severely impact the training and readiness of assigned units and supported Reserve Component units. Additionally, oil exploration activities on or near RLIA would seriously impact Operations Group's use of the Zion Hills area as rotational unit maneuver space and/or Live Fire area.
>
> Pls Opp'n Ex. 38.

**Defendant's Response To Plaintiffs' Proposed Finding No. 44:**

Defendant disagrees. The cited documents do not support this statement. The United States did not assert title to all of Group C. Plaintiffs leased a majority of the Forest Service portion of Group C.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 44:**

Plaintiffs stand by Proposed Finding No. 44. The document speaks for itself. The United States did assert title to the entirety of Group C lands in the Prior Lawsuit. As the record of this case reflects, the Group C mineral servitude was created in 1943 when the United States acquired the surface of the lands through expropriation. As a consequence, Plaintiffs' title is uniform across the entirety of the tract acquired in 1943. Action of the

United States in claiming title to a portion of the property on the basis of a "lack drilling for a ten-year period" affects the entirety of the tract. Group C is composed of 21,118.2 acres. Plaintiffs leased 4,822 acres.

**Plaintiffs' Proposed Finding No. 45:**

A substantial portion of Group C land is, in fact, subject to military operations including bombing practice, artillery practice, small arms fire and troop maneuvers by the United States Army and Air Force. Unexploded bombs are found and disposed of from Group C. Portions of Group C include artillery impact areas for howitzer, heavy artillery and tank gunnery practice. Pls Opp'n Ex. 38; Pls. Opp'n Ex. 51, Price Dep. Ex. 3.

**Defendant's Response To Plaintiffs' Proposed Finding No. 45:**

Defendant agrees that a substantial portion of Group C land is subject to military operations. Defendant disagrees that unexploded bombs are found and disposed of.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 45:**

Plaintiffs stand by Proposed Finding No. 45. The July 23, 1997 MEMORANDUM FOR DPW concerning "Offers to Lease Government Property" by Stephen M. Sittnick, LTC, IN, G3/DPTMS specifically includes the following:

> . . . Additionally, no digging in that zone is allowed due to unexploded ordnance (surface and subsurface). RLIA was established o/a 1977, and all types of dud producing munitions have been filed into that area. Any effort to surface and subsurface clear that zone for oil exploration would be extremely unsafe, and expensive.

Dr. Ronald N. Tomas, Fort Polk Deputy Garrison Commander, testified in the Prior Lawsuit. His testimony concerning unexploded ordnance on Group C is as follows:

> A. . . . Artillery and the mortars are the ones that produce most of the dun-producing ordnance. That's why we have the Redleg Artillery Impact area and it is full of unexploded ordnance, very dangerous to go in there. . .
>
> The bulk of - - if there is ordnance that we find in others - - and we stumble across stuff periodically - - it's from way - - times past.
>
> . . . And there are places where you will find erosion just from rain, will sometimes wash up an old round. When we find them, we sent people out. They mark it. Our EOD specialists go out and they look at it and they say "it's an inert round" or "it's a dud." If it's a dud they blow it up right there.

Pls Opp'n Ex.55, Tomas Dep. pp. 69-70.

**Plaintiffs' Proposed Finding No. 46:**

At some date, unknown to Plaintiffs, portions of Group C became too contaminated and/or dangerous for mineral operations. Plaintiffs do not know the geographic extent of this area. The dangerous or contaminated condition of portions of Group C constitutes a taking of Plaintiffs property.

**Defendant's Response To Plaintiffs' Proposed Finding No. 46:**

Defendant objects to Plaintiffs' legal conclusion. Defendant further asserts that Fort Polk's use for military operations and the alleged conditions complained of were known to Plaintiffs prior to 1978 and Plaintiffs have acknowledged this during discovery.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 46:**

Plaintiffs stand by Proposed Finding No. 46. Defendant cites no documentation nor evidence supporting its objection.

**Plaintiffs' Proposed Finding No. 47:**

United States established Standard Operating Procedures For Exploration And Field Development Drilling of Oil/Gas Wells, SOP No. 32X-2, which contain procedures and restrictions

on mineral development on Group C. Pls. Opp'n Ex. 40.

**Defendant's Response To Plaintiffs' Proposed Finding No. 47:**

Defendant disagrees. The document Plaintiffs cite to is an unsigned draft. Army policy regarding mineral exploration and development is set forth in Army Regulation 405-30.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 47:**

Plaintiffs stand by Proposed Finding No. 47. The document, Standard Operating Procedures For Exploration And Field Development Drilling of Oil/Gas Wells, SOP No. 32X-2 (Pls Opp'n Ex. 40), is not a draft. It was obtained in the Prior Lawsuit.

At his deposition, the Swift Energy representative Darin Zanovich produced "Special Stipulations Fort Polk, Louisiana" which contain virtually the same terms as the subject document. Zanovich testified that the document was presented to Swift Energy during a visit to Fort Polk. See, Pls Oppn't Ex. 39 which is also Zanovich Dep. Ex. 6.

Army Regulation 405-30 has no relevance to this litigation. It is limited to military lands "for which the mineral rights are owned by the United States." Group C minerals are not owned by the United States.

**Plaintiffs' Proposed Finding No. 48:**

Prior to drilling a well within Group C, Plaintiffs' lessees (all of whom had acquired "protective" leases from the United States) were required to submit a detailed Application For Permit To Drill Or Deepen to the Bureau Of Land Management. Within Group C, the procedure also required the filing of a Final Environmental Assessment and the ultimate issuance of "Conditions Of Approval For Oil And Gas Exploration."

**Defendant's Response To Plaintiffs' Proposed Finding No. 48:**

Defendant disagrees. The BLM requirements applied only to the Forest Service portion of Group C. Army policy regarding mineral exploration and development is set forth in Army Regulation 405-30.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 48:**

Plaintiffs stand by Proposed Finding No. 48. The fact that portions of Group C fall under BLM requirements and portions are under the exclusive jurisdiction of the Army is not relevant to Plaintiffs. Plaintiffs' lessees were still required to deal with the regulations.

**Plaintiffs' Proposed Finding No. 49:**

By letter dated January 9, 1997, Plaintiffs' mineral lessee, Chesapeake, wrote Ted Hammerschmidt, Deputy Director, Directorate of Engineering & Housing, Fort Polk, to determine procedures for access to Group C and to determine operating parameters for mineral operations.

**Defendant's Response To Plaintiffs' Proposed Finding No. 49:**

Defendant objects that there is no document supporting this statement as required by RCFC 56(h).

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 49:**

Perhaps Defendant is correct. The January 9, 1997 letter was exchanged in discovery; but Plaintiffs have simply misplaced the document.

**Plaintiffs' Proposed Finding No. 50:**

On March 11, 1997, representatives of Plaintiffs' mineral lessee, Sonat, met with representatives of the United States to discuss possible access to, and mineral operations on, Group C lands. Pls. Opp'n Ex. 37; Pls. Opp'n Ex. 48, Hamilton Dep. 45) Not less than 18 representatives

of various Army and Forest Service agencies were in attendance at the meeting, which included the following discussion items:

> Sonat was admonished by Mr. Hammerschmidt, Fort Polk Deputy Director of Public Works, that a proposed well location was in an area referred to as "Ranges 40-43, the tank gunnery ranges." He explained that the tanks shoot "120 mm projectiles" and "will deliver about 6500 meters." He stated that he was concerned about a "vertical stack of valves", *i.e.* an oil well wellhead christmas tree, for a well at that location and "how we can successfully protect it so that we don't cause something problematic to occur." Hammerschmidt further advised that: "Inside this fan is considered an area which increases the possibility of an accident; wells 19-1, 31-1 and 21-1 are all within this fan area."
>
> Dr. Ron Tomas, Fort Polk Office of the Garrison Commander, commented on the "fan" as follows: "the fan is very conservative and the probability of something happening is very high."
>
> Hammerschmidt advised that the Army was "not willing to accept responsibility for people while training is ongoing."
>
> Hammerschmidt advised that wellheads in the area must be protected with "berming."
>
> Hammerschmidt advised that underground pipelines should be buried to 15 feet deep (industry standard is 36").
>
> The discussion specifically included safety issues relating to wells taking "a direct hit."
>
> Dr. Tomas stated that Sonat should consider moving its preferred location for well 31-1 "nearer Lookout Road." Tomas said that the range in question was used about 60 days per year and "reiterated if they don't move, there will be massive amounts of coordination required to get a truck to the site."

**Defendant's Response To Plaintiffs' Proposed Finding No. 50:**

Defendant agrees that representative of the Army met with representatives of Sonat on March 11, 1997 to discuss possible mineral operations on Group C lands. Defendant objects to Plaintiffs' characterizations of the meeting and the inferences Plaintiffs seeks to draw. Witnesses who were present at the meeting have testified that the meeting was informational and cooperative.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 50:**

Plaintiffs stand by Proposed Finding No. 50. Plaintiffs have not characterized the meeting and are not making inferences. Plaintiffs have merely quoted the minutes of the meeting as prepared by Army personnel. See, Pls. Opp'n Ex. 37; Pls. Opp'n Ex. 48, Hamilton Dep. 45.

**Plaintiffs' Proposed Finding No. 51:**

Despite Sonat personnel following up on several discussion items and actually filing for permits for drilling within Group C, Sonat never drilled any well with a physical location within the surface of Group C. Pls Opp'n Ex. 48, Hamilton Dep.

**Defendant's Response To Plaintiffs' Proposed Finding No. 51:**

Defendant agrees that Sonat never drilled any well with a physical location within the surface of Group C. Defendant objects that the remainder of this statement is not supported by the cited document.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 51:**

Agreed, no reply necessary.

**Plaintiffs' Proposed Finding No. 52:**

On April 1, 1997, representatives of Plaintiffs' lessee, Chesapeake, met with representatives of the United States to discuss access to, and mineral operation restrictions within, Group C. Not less than 14 representatives of the Army and Forest Service attended the meeting. The Chesapeake meeting was similar to the Sonat meeting with discussions focused on safety aspects of live fire, depth for placing pipelines, location of wells, placement of production facilities and the avoidance of "flares" which could be dangerous to night flying aircraft. Pls. Opp'n Ex. 51, Price Dep. Ex. 3.

**Defendant's Response To Plaintiffs' Proposed Finding No. 52:**

Defendant agrees that the referenced meeting took place and that access to, and mineral operation restrictions within, Group C were discussed. Defendant objects to Plaintiffs' characterization of the meeting as unsupported by the cited documents.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 52:**

Plaintiffs stand by Proposed Finding No. 52. See, Pls. Opp'n Ex. 51, Price Dep. Ex. 3.

**Plaintiffs' Proposed Finding No. 53:**

Chesapeake never drilled a well with a surface location within Group C. Pls. Opp'n Ex.44, Denny Dep. pp. 39, 54.

**Defendant's Response To Plaintiffs' Proposed Finding No. 53:**

Defendant agrees.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 53:**

Agreed, no reply necessary.

**Plaintiffs' Proposed Finding No. 54:**

Representatives of Plaintiffs' potential lessee, Belco, met with representatives of the United States to obtain access to Group C lands. Representatives of the United States Army specifically denied Belco's request. Pls. Opp. Ex. 47, Fife Dep. pp. 15-17, 28-29, 31-32, 38-39.

**Defendant's Response To Plaintiffs' Proposed Finding No. 54:**

Defendant disagrees. Belco was not a lessee and therefore had no standing to request access. Access was not denied by the United States.

**Plaintiffs' Reply To Defendant's Response To Proposed Finding No. 55:**

Plaintiffs stand by Proposed Finding No. 55. The denial of access to Group C lands to Belco is uncontradicted in the record. The deposition testimony of Belco representative Mel Fife, as conducted by counsel for Defendant, is as follows:

> A. . . . we rolled out our maps. "This is the area that we want." And they said, "Yeah, that's the one area that you can't have. It's an old artillery range."
>
> Q. What did they mean, you can't have access to it?
>
> A. Can't have access to it. It's an old artillery range. And I remember because I'd done basic training at Fort Polk in 1968 and that was out in the area where you have to crawl on your stomach and they shoot live rounds of ammunition over your head and bombs go off and this and that and the other. And they just said that there was a lot of unexploded ordnance out there and that we could not go.
>
> . . . And so we proposed that, "Wait a minute. We can do it in an acre and a half." And, you know, "Can't we go out there and run a mine sweep or a metal detector or something over just an acre and a half and y'all come clean it up and then we can drill our well?" No, that wasn't acceptable.
>
> . . .
>
> A. And the Army said absolutely not about coming on the place itself.
>
> . . .
>
> Q. Okay. And was it your understanding that the folks that you were meeting with would be the ones making the decision regarding access?
>
> A. Yeah.
>
> Q. And how did you know that?
>
> A. Patton Boggs.
>
> Q. Patton Boggs said these are the guys - -
>
> A. You know, they had contacted the general. The general had said, "These are the people that you need to talk to.
>
> Q. Yeah.

A. And so those were the people that we talked to.

Q. Okay. And tell me again, you sat down with them and they basically told you you're not allowed in?

A. Right.

Q. Did they give you a firm no and said, "We're not giving you access"?

A. Yeah.

Q. Yes?

A. Yes. And, like I said, we had several proposals - - proposals to them.

Q. You brought those proposals to the meeting?

A. Yes.

Q. And then - -

A. Now, I don't know that they were in writing. They were just ideas that were being exchanged during the meeting, you know, what if we did or what if we did that or what if we did something else. "What if we assumed full responsibility. I mean, if something blows up out there then we're responsible. The Army has nothing to do with it. Let us go under those conditions."

"No, you can't go out there."

Pls. Opp'n Ex.54, Fife Dep. pp. 43-44.

Respectfully submitted,

**THE GRAY LAW FIRM (APLC)**

BY: /S/ A. J. GRAY, III

**A. J. GRAY, III** (La. Bar #6253)
P. O. Box 1467
Lake Charles, LA 70602-1467
Telephone: (337) 494-0694
Facsimile: (337) 494-0697

Of Counsel:

Thomas C. McKowen, IV
STRAIN, DENNIS, & BATES, L.L.P.
318 St. Charles Street
Baton Rouge, LA 70802
Telephone: (225) 343-0100
Facsimile : (225) 343-0344

# CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT was served on the following counsel of record by first class mail, postage prepaid:

Alex Kriegsman
United States Department Of Justice
Environmental And Natural Resources Division
Natural Resources Section
601 D Street, N.W., Room 3814
Washington, D.C. 20004

Terry Petrie
Natural Resources Section
Environment And Natural Resources Division
U.S. Department of Justice
999 18th Street
Suite 945, North Tower
Denver, CO 80202

LTC Michael D. Graham
Litigation Attorney
U.S. Army Environmental Law Division
901 N. Stuart Street, Suite 400
Arlington, VA 22203-1837

THUS DONE AND SIGNED on this 21st day of March, 2007.

/s/ A. J. GRAY, III
**A. J. GRAY, III**