IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **CENTRAL PINES LAND COMPANY, ET AL.,** ) | |
| **Plaintiffs,** ) | **No. 98-314 L** |
| **versus** ) | **Chief Judge Edward J. Damich** |
| **THE UNITED STATES,** ) | |
| **Defendant** ) | |

# PLAINTIFFS' SUR-REPLY TO DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant of Rule 7.2(b) of the United States Court of Federal Claims, Central Pines Land Company, L.L.C., Jack E. Lawton, Sr., Jack E. Lawton, Jr., Tower Minerals Company, L.L.C., William B. Lawton Company, L.L.C., Linda Lew Lawton Drost, Evelyn Gay Lawton Duhon, D, S & T, Inc. and Drost & Brame, Inc., (collectively "Plaintiffs") respectfully respond as follows to Defendant's Reply In Support of Motion For Summary Judgment ("Defendant's Reply"):

In addition to this Reply, Plaintiffs' filing includes Plaintiffs' Reply To Defendant's Response To Plaintiffs' Proposed Findings Of Uncontroverted Fact In Opposition To Defendant's Motion For Summary Judgment and additional supporting exhibits, including deposition excerpts.

# (A) TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. Plaintiffs' "De Facto Moratorium" Arguments Are Not Barred . . . . . . . . . . . . . . . . . . . . . 1

II. Plaintiffs' "De Facto Moratorium" Arguments Do Not Fail As A Matter of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III. Plaintiffs' Allegations Regarding "Dangerous" and "Contaminated" Conditions Do Not Fail To State A Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV. Plaintiffs' Allegations Regarding The United State's Claim Of Ownership Do Not Fail To State A Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## (B) TABLE OF AUTHORITIES

Federal Cases:

*Alliance of Descendants of Texas Land Grants v. United States*,
27 Fed.Cl. 837 (1993) . . . . . . . . . . 1

*Boling v. United States*,
220 F.3d 1365 (Fed. Cir. 2000) . . . . . . . . . . 1, 2

*Brown Park Estates - Fairfield Dev. Co. v. United States*,
127 F.3d 1449, 1455 (Fed.Cir.1997) . . . . . . . . . . 2

*Caldwell v. United States*,
391 F.3d 1226 (Fed.Cir.2004) . . . . . . . . . . 2

*Central Pines Land Co., et al v. United States*,
No. 2:96-2000, slip op. W. D. La. July 28, 2000),
*aff'd*, 274 F.3d 881 (5th Cir. 2001), *cert denied*, 537 U.S. 822 (2002) . . . . . . . . . . 10

*Clearfield Trust Co. v. United States*,
318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943) . . . . . . . . . . 7

*L.E. Cooke Corp. v. United States*,
27 Fed.Cl. 753, 754 (1993) . . . . . . . . . . 4

*Dalles Irrigation District v. United States*,
71 Fed. Cl. 344 (2006) . . . . . . . . . . 2

*Duncan Energy Co. v. United States Forest Serv.*,
50 F.3d 584 (8th Cir. 1995) . . . . . . . . . . 7

*Friedman v. United States*,
159 Ct.Cl.1, 310 F.3d 381 (Fed. Cir. 1963) . . . . . . . . . . 5

*Hatter v. United States*,
2003 F.3d 795 (Fed. Cir. 2000) . . . . . . . . . . 2

*Hopland Band of Pomo Indians v. United States*,
855 F.2d 1573, 1577 (FedCir.1988) . . . . . . . . . . 4

*Japanese War Notes Claimants Ass'n, Inc. v. United States*,
178 Ct.Cl. 630, 632, 373 F.2d 356, 358, *cert. denied*,
389 U.S. 971, 88 St.Ct. 466, 19 L.Ed.2d 461 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Mitchell v. United States*,
10 Cl. Ct. 63, *as modified*, 10 Cl.Ct. 787 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*M.R.K. Corp. v. United States*,
15 Cl.Ct. 538, 544-45 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Walker v. United States*,
69 Fed. Cl. 222 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

State Cases:

*Gailey v. McFarlain*,
193 So. 570 (La. 1940), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Gayoso Co. v. Arkansas Natural Gas Corp.*
145 So. 677 (La. 1933), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Louisiana Statutes

La. R.S. 31: 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Introduction:**

Defendant's Motion For Summary Judgment And Memorandum In Support was deficient since it did not include a Statement Of Questions Involved as required by RCFC 5.2(a)(1) nor a Statement Of The Case as required by RCFC 5.2(a)(1). In accordance with RCFC 5.2 (a)(2), Plaintiffs' Opposition To Defendant's Motion For Summary Judgment included both. Defendant's Reply did not cure the previous deficiency and did not comment on Plaintiff's statements.

Defendant's Reply asserts arguments not previously before the Court and fails to address most of the questions actually involved. Throughout Defendant's Reply, Defendant asserts various "factual" statements for which there is no support in the record.

In this Reply, Plaintiffs will attempt to address Defendant's arguments in the order presented.

**I. Plaintiffs' "De Facto Moratorium" Arguments Are Not Barred:**

Starting on page 2 of Defendant's Reply, the Defendant contends that the statute of limitations has run and bars Plaintiffs' claims.

A plaintiff must sue in this Court within six years after the claim first accrues. *Hatter v. United States*, 203 F.3d 795 (Fed. Cir. 2000); *Alliance of Descendants of Texas Land Grants v. United States*, 27 Fed.Cl. 837, 842 (1993). A claim first accrues when all events have occurred which fix the alleged liability of the government and entitle the plaintiff to institute an action. *Walker v. United States*, 69 Fed. Cl. 222 (2005); *Baskett v. United States*, 2 Cl. Ct. 356 (1983); *Alliance*, supra., both citing *Japanese War Notes Claimants Ass'n, Inc. v. United States*, 178 Ct.Cl. 630, 632, 373 F.2d 356, 358, *cert. denied*, 389 U.S. 971, 88 St.Ct. 466, 19 L.Ed.2d 461 (1967).

According to *Boling v. United States,* 220 F.3d 1365 (Fed.Cir. 2000), the continuing claims doctrine is applicable when the government owes a continuing duty to the plaintiffs. In such cases,

each time the government breaches that duty, a new cause of action arises. *See, Hatter v. United States*, 203 F3d 795, 797-98 (Fed.Cir.2000) The continuing claims doctrine, however, does not apply in cases where a single governmental action causes a series of deleterious effects, even though those effects may extend long after the initial government breach. *Boling*, supra. at 1373.

Termination or lifting of the moratorium was simply that. After March 31, 1978, there was no longer a legal prohibition against Plaintiffs accessing their Group C lands. A taking occurs when the owner is deprived of use of the property. *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed.Cir.2004); *Walker v. United States*, 69 Fed. Cl. 222 (2005). In this case, the exact opposite occurred. By permitting the moratorium, which previously prevented access to Group C lands to terminate, the United States did not deprive Plaintiffs of use of their property. The United States granted Plaintiffs legal access which had been previously denied.

By the same token, Plaintiffs had no obligation to attempt to access Group C merely because, after termination of the moratorium, they had the right to do so. The statute of limitations does not run on Plaintiffs rights to access. The statute only relates to activity of the United States in limiting access.

On March 31, 1978, the date the moratorium terminated, no events had "occurred which fix the liability of the Government and entitle the claimant to institute an action" and terminating the moratorium was not a "single distinct event, which may have continued ill effects later on." *Dalles Irrigation District v. United States*, 71 Fed. Cl. 344 (2006), quoting from *Brown Park Estates - Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1455 (Fed.Cir.1997).

Stated simply: no cause of action accrued on March 31, 1978. No statute of limitations began to run.

Prior to the moratorium terminating on March 31, 1978, the United States considered various contingency plans to prevent, impede or limit mineral development on Group C lands after termination of the moratorium. (Pls. Uncontroverted No. 1) The contingency plans included putting up signs saying "keep out" and "let them sue" (Pls. Opp'n Ex. 2); prohibit drilling, purchase minerals or "deny any type of entry" (Pls Opp'n Ex. 4); lifting the moratorium in "selected areas" (Pls.Opp'n Ex.9); countering a demand to drill a well on a particular site with a "mini-moratorium" (Pls. Opp'n Ex.12); and refuse drilling, force mineral owners to sue in court of claims, or negotiate drilling program (Pls. Opp'n Ex.13).

Plaintiffs and the Defendant both recognize that the United States took no action on its contingency plans, at least not until after 1992. Instead, the United States decided to take a "calculated risk" that Plaintiffs would not attempt to access Group C lands. (Pls. Uncontroverted No. 4) Between 1978 and 1992, the United States took no action to prevent, impede or limit Plaintiffs' access to Group C lands or to otherwise prevent Plaintiffs from developing minerals on Group C lands. (Pls. Uncontroverted No. 5)

Plaintiffs submit that contingency plans of the United States to deal with possible attempts by Plaintiffs to access Group C lands for drilling does not constitute a taking which would trigger the statute of limitations.

Notwithstanding Defendant's arguments to the contrary, Paragraphs 16, 32, 33 and 39 of Plaintiffs' First Amended And Restated Complaint are not inconsistent with the above analysis. None of those paragraphs allege conduct of the United States occurring prior to 1992. Plaintiffs fully understand that any claim they may have had against the United States for a taking prior to 1992 are time barred. This litigation deals with actions of the United States subsequent to 1992.

Starting on page 5 of Defendant's Reply, Defendant argues Plaintiffs must have had knowledge prior to 1992 because of the allegations in Plaintiffs' First Amended And Restated Complaint. Plaintiffs filed the Prior Lawsuit on August 22, 1996. This action was filed April 3, 1998 and was promptly stayed by order filed May 15, 1998. Exhaustive discovery was conducted in connection with the Prior Lawsuit. The documents ultimately supporting the "de facto moratorium" allegations were all discovered by Plaintiffs in connection with the Prior Lawsuit. (Pls. Uncontroverted No. 2) Plaintiffs' original Complaint in these proceedings did not contain allegations of a de facto moratorium. Such allegations appear for the first time in Plaintiffs' Amended Complaint, Count II, paragraph 39, which was filed January 6, 2003 after conclusion of the Prior Lawsuit. The entirely of the allegation is as follows:

> Except for the actions of the United States of America in claiming ownership of the Property, and denying plaintiffs access to the property for mineral exploration through moratoriums, "defacto" moratoriums, and military use of the Property inconsistent with mineral activities, plaintiffs could have and would have granted mineral leases affecting "Group C" to persons or entities interested in leasing the property and exploring for oil and gas.

This Court has made it clear that the limitations period first accrues or begins to run when a potential plaintiff knows or reasonably should know of all the events which fix the government's alleged liability. *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (FedCir.1988). If an injury is clear but its source unknown, the six-year period starts when the plaintiff has reason to know the cause of the injury. *L.E. Cooke Corp. v. United States*, 27 Fed.Cl. 753, 754 (1993); *M.R.K. Corp. v. United States*, 15 Cl.Ct. 538, 544-45 (1988).

There were simply no dealings between the Plaintiffs and the United States between 1978 and 1995 when Plaintiffs learned that the United States was claiming title to Group C lands. (Pls.

Uncontroverted No. 8)

Starting on page 6 of Defendant's Reply In Support Of Motion For Summary Judgment, Defendant argues that Plaintiffs' knowledge of military operations on the property are evidenced by the fact that a former attorney for Mr. Burton was given a tour of Fort Polk in 1977.

Plaintiffs point out that in 1977 the moratorium was in effect. In footnote 3 on page 7 of Defendant's Reply, Defendant argues that even though the moratorium was in effect, "Mr. Camp's visit to Fort Polk does establish Plaintiffs' knowledge of potential issues regarding access to Group C and belies Plaintiffs' assertions that they learned of these issues for the first time in 1996."

"Potential issues" regarding access to Group C do not constitute a taking.

Starting on page 4 of Defendant's Reply, Defendant argues that *Mitchell v. United States*, 10 Cl. Ct. 63, *as modified* 10 Cl. Ct. 787 (1986), is not applicable. Plaintiffs do rely on *Mitchell.* In this case, conduct of the United States in preventing use of Group C lands by plaintiffs did not occur once and then cease. *Mitchell* involved alleged mishandling of timber sales by the United States on lands allotted to Indians. The Indian allottees asserted that the wrong was continuing and that therefore the statute of limitations had not commenced to accrue. This Court rejected their argument, but found that the "continuing claim" doctrine was applicable:

> In this court's view, a better approach is to view the continuing wrong as a series of actionable wrongs, and allow plaintiff to sue for those wrongs which have occurred during the limitations period. This approach would prevent the defendant from escaping all liability and hence "acquiring a right" to continue its wrongdoing, while also retaining intact the six-year statute of limitations which Congress has enacted for this court. The jurisprudence of this court endorses such an approach; it is referred to as the "continuing claim" doctrine. *See Friedman v. United States*, 159 Ct.Cl. 1, 6-8, 310 F.2d 381, 384-85 (1962), *cert. denied*, 373 U.S. 932, 83 S.Ct. 1540, 10 L.Ed.2d 691 (1963).

*Id.* at 75.

The facts of the instant case establish separate and distinct actions of the United States in asserting title to Group C lands and issuing mineral leases on Group C lands all while prohibiting access, imposing unreasonable restrictions and otherwise refusing to cooperate with Plaintiffs and Plaintiffs' mineral lessees.

## II. Plaintiffs' "De Facto Moratorium" Arguments Do Not Fail As A Matter Of Law:

Starting on page 7 of Defendant's Reply, Defendant argues that Plaintiffs' "De Facto Moratorium" arguments fail as a matter of law.

Defendant argues that meetings with the Army by Plaintiffs' lessees and potential lessees were informal. To the contrary, Chesapeake representatives thought the meeting was official:

> Q. Okay. Let me back up because that's a fair objection. Was there an official request made of the Army by Chesapeake?
>
> A. We thought the official request had been made at the meeting, that that was what the meeting was all about, that we wanted to have their consent to working with us on an operational basis.
>
> Q. And that was your understanding, that that meeting was an official request?
>
> A. Yes.[1]

At the meeting, Chesapeake was represented by its Vice-President of Corporate Development, its Senior Vice-President of Operations, its Senior Drilling Engineer, its Manager of Business Development, a landman and a consultant. [2] On the United States side, there were not less than 14 representatives of the Army and Forest Service attending the meeting. Plaintiffs respectfully submit that the meeting was official and that Chesapeake was there exactly as Mr. Dunlap testified "to have

---

1 Pls. Opp'n Ex.46, Dunlap Dep. p. 21.

2 Pls. Opp'n Ex.44, Denny Dep. pp. 42-43.

their consent to working with us on an operational basis."

On page 9 of Defendant's Reply, Defendant argues that because Chesapeake was not a lessee when its representative met with the Army, it "was not in a position to make any formal request to access Fort Polk. Defendant's theory is not supported by the facts. On September 26, 1996, Chesapeake leased 4,822.10 acres of Group C land from Plaintiffs. Pls Oppn't Ex. 33. Chesapeake met with the Army to obtain access to the fort on April 3, 1997. Pls. Oppn't Ex. 36.

Starting on page 9 of Defendant's Reply, Defendant argues that because the Army was operating pursuant to a federal regulation, Louisiana law was not controlling. Defendant cites *Duncan Energy Co. v. United States Forest Serv.*, 50 F.3d 584 (8th Cir. 1995). Plaintiffs have no quarrel with *Duncan*. *Duncan* was decided under the National Environmental Policy Act. Under the *Clearfield Trust* doctrine[3] the "national" interest under NEPA preempts the "state" interest. The actual holding of *Duncan* is extremely narrow:

> The only issue before us is the Forest Service's ability to regulate surface access to outstanding mineral rights.[4]
>
> If North Dakota law is read to allow a developer unrestricted access after twenty days' notice, North Dakota law is pre-empted or falls under choice-of-law principles.[5]

In this case, Defendant does not rely on NEPA; rather Defendant relies on Army regulations. Defendant cites Department of Defense Directive No. 4700.3 which Defendant attaches as Exhibit S to its filing. A simple reading of Directive Nol 4700.3 establishes that it is not applicable to Group C:

---

3 See *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943).

4 *Duncan v. United States Forest Service*, 50 F.3d 584, 589 (8th Cir. 1995).

5 *Duncan*, 50 F.3d at p. 591.

> 2. <u>APPLICABILITY AND SCOPE</u>
>
> 2.1. This Directive applies to the Office of the Secretary of Defense and the Military Departments (including their National Guard and Reserve components).
>
> 2.2. It applies to DoD-controlled lands acquired or withdrawn from the public domain (including Army civil works lands) within the United States and its territories and possessions **for which the minerals rights are owned by the United States,** (Emphasis added.)

Group C minerals are not owned by the United States. They are owned by Plaintiffs. The Army regulations are not applicable. Louisiana law has not been preempted. The Louisiana Mineral Code makes it clear that the mineral servitude owner has the right to conduct operations:

> The owner of a mineral servitude may conduct his operations with the freedom and subject to the restrictions that apply to a landowner. He may protect his right against interference or damage by all of the means available to a landowner.[6]

Based on these legal principles, Plaintiffs, as owners of the mineral servitude burdening Group C lands, have and had the absolute right to go on the land and conduct operations. No Army regulations affect these rights.

## III. Plaintiffs' Allegations Regarding "Dangerous" and "Contaminated" Conditions Do Not Fail To State A Claim:

Starting on page 12 of Defendant's Reply, Defendant argues that Plaintiffs allegations regarding "dangerous" and "contaminated" conditions fail to state a claim. Defendant argues that the claims are barred by the statute of limitations and that the fact that portions of the Group C lands are inaccessible, does not constitute a denial of assess so long as other portions of the servitude remain available.

As to the statute of limitations, Defendant confuses the dates of facts plead by Plaintiffs in

6 La.R.S.31:23.

their First Amended And Restated Complaint with when Plaintiffs learned the facts. The fact that Plaintiffs plead that beginning in 1942, the United States began using portions of Group C for small arms firing ranges, tank firing ranges, etc., does not mean that Plaintiffs knew prior to 1992 that such activities would preclude access to the property for mineral operations in 1997.

The actions Plaintiffs complain of are separate and specific. For example, in the Summer of 1997, Plaintiffs' potential lessee requested that the United States offer a portion of Group C for leasing. Because of the claim of the United States, Plaintiffs' potential lessee required protection leases. Stephen M. Sittnick, LTC, IN, G3/DPTMS responded to an internal inquiry with memorandum AFZX-GT dated July 23, 1997. The response included the following:

> a. By definition, this impact area is, and has been, off limits to personnel and/or vehicle surface activities. Additionally, no digging in that zone is allowed due to unexploded ordnance (surface and subsurface). RLIA was established o/a 1977, and all types of dud producing munitions have been filed into that area. Any effort to surface and subsurface clear that zone for oil exploration would be extremely unsafe, and expensive.
>
> b. Any oil exploration activities in or around the RLIA zone would close a number of ranges/training areas that have Surface Danger Zones (SDZ's) oriented into RLIA. This would severely impact the training and readiness of assigned units and supported Reserve Component units. Additionally, oil exploration activities on or near RLIA would seriously impact Operations Group's use of the Zion Hills area as rotational unit maneuver space and/or Live Fire area.

In the above situation, in 1997, the protective lease could not be obtained, and, thus, Plaintiffs were unable to lease their property. No statute of limitations has run on this claim.

Similarly, military operations in 1996 and 1997 resulted in Plaintiffs' mineral lessees, Sonat and Chesapeake, and Plaintiff's potential mineral lessee Belco not being able to access Group C for drilling. No statute of limitations has run on these claims.

Starting on page 13 of Defendant's Reply, the Defendant argues that the fact that a portion of the servitude is inaccessible, does not constitute a denial of access so long as other portions remain available. Defendant cites a decision in the Prior Lawsuit, *Central Pines Land Co. v. United States*, 274 F.3d 881, 896 (5th Cir. 2001). Defendant misinterprets the decision.

The Prior Lawsuit dealt with three portions of property which the parties characterized as Groups A, B and C. As to Groups A and B, the Prior Lawsuit determined that the Louisiana rules of ten year liberative prescription were applicable. Having determined that Plaintiffs' minerals under Groups A and B were prescriptible, the issue before the court was whether an obstacle created by the United States suspended the running of prescription. In the decision cited by Defendant (reported at 274 F.3d 881, 896), the court ruled an obstacle on a portion of the Groups A and B lands did not suspend the running of prescription on the remainder of Group A and Group B.

As to Group C, the Prior Lawsuit determined that Plaintiffs' minerals were imprescriptible. That being the case, rules concerning the running of prescription and obstacles suspending the running of prescription are not relevant. Simply stated, Plaintiffs are entitled to access to the entirety of Group C. The existence of an obstacle on only a portion of the property is not relevant.

Oil wells are drilled at locations determined by geological standards. The fact that Defendant may be willing to find some isolated spot on a 21,118.2 acre tract where Plaintiffs can place a drilling rig is of no moment if such a location is not an appropriate geological location for a well. Specific drilling locations sought by Plaintiffs' potential lessee Belco were rejected by the Army. By the same token, Plaintiffs lessee Chesapeake (which obtained a protection lease from Defendant) was, nevertheless, unable to drill a single well on Group C lands. These types of claims are not barred by any statute of limitations.

**IV. Plaintiffs' Allegations Regarding The United States's Claim Of Ownership Do Not Fail To State A Claim:**

Starting on page 13 of Defendant's Reply, Defendant argues that Plaintiffs have no claim for Defendant having asserted title to Group C. Defendant's argument is based on an improper interpretation of slip opinion dated July 28, 2000 in the Prior Lawsuit and (upon a fundamental misunderstanding of Louisiana mineral law.

The Prior Lawsuit dealt with parcels of land delineated by the parties as Groups A, B and C. Plaintiffs contended that as to all three parcels, the Louisiana ten-year liberative prescription period did not run. On April 7, 1999 the district court ruled in Plaintiffs favor as to Group C and against Plaintiffs as to Groups A and B.

Thereafter, as to Groups A and B, the Defendant moved for summary judgment on the grounds that prescription having run, the previous mineral servitude terminated and the Defendant owned the minerals. Group C lands were not involved in Defendant's motion. Plaintiffs responded by arguing, among other matters, that actions of the United States constituted an "obstacle" under Louisiana mineral law which prevented the running of prescription. By slip opinion dated July 28, 2000, the district court ruled that, as to Groups A and B, prescription had run. In reaching its decision, the district court ruled that the running of prescription was not suspended by any obstacle. One of the obstacles urged by Plaintiffs was the fact that the United States had granted mineral leases as to Group A and B lands. In footnote 23 appearing on page 33 of the slip opinion, the district court noted that "The surface owner's leasing of the minerals underlying his land to someone other than the servitude owner does not in and of itself constitute an obstacle." The district court cited *Gayoso Co. v. Arkansas Natural Gas Corp.*, 145 So. 677 (La.1933), and *Gailey v. McFarlain*, 193 So. 570

(La. 1940).

The slip opinion dated July 28, 2000, cited by Defendant and attached as Defendant's Exhibit B, has no application to Group C lands. The motion and opinion were limited to the running of prescription on Group A lands and Group B lands.

In these proceedings, Plaintiffs do not contend that mineral leasing by the United States of Group C lands constitutes an obstacle. Possible obstacles to the running of prescription are not relevant in situations, as with Group C lands, where the mineral rights are not subject to the rules of prescription.

In these proceedings, as to Group C, Plaintiffs contend that, but for the action of the United States in claiming title to the Group C lands, Plaintiffs would have granted mineral leases on Group C. Specifically, Plaintiffs claim lost leasing opportunities to Chesapeake, Sonat and Belco as a direct result of the United States claiming title to Group C. Without "protective" leases from the United States, those parties would not lease from Plaintiffs.

On page 15 of Defendant's Reply, Defendant argues that Plaintiffs leased a "majority" of the "Forest Service" portion of Group C lands. The fact that subsequent to acquiring the entirety of Group C lands the United States moved a portion from the jurisdiction of the Army to the jurisdiction of the Forest Service, is not relevant to Plaintiffs' mineral servitude. Plaintiffs' mineral servitude applies to the whole tract and was not divided by the action of Defendant.

On page 15 of Defendant's Reply, Defendant argues that its claim of ownership of Group C minerals only resulted in potential mineral lessees being forced to obtain "protection" leases from the United States. In this case, as a factual matter, only one of Plaintiffs' lessees was able to obtain a protective lease. The others decided not to lease at all.

Plaintiffs' title to Group C lands is uniform across the entire tract. Once the United States asserted title to Group C lands, offered the portions of Group C lands for lease and subsequently granted mineral leases on portions of Group C lands, Plaintiffs' entire property was taken. No potential mineral lessee of Plaintiffs could operate on Group C lands without a "protection" lease from the United States. A "protection" lease is a second mineral lease on the same property taken by a mineral lessee from one asserting a competing ownership interest against the first or primary mineral lessee. (Pls. Uncontroverted No. 21)

## CONCLUSION

As mineral owners, Plaintiffs are entitled to unrestricted access to Group C lands for mineral operations. On March 31, 1978, the date the moratorium terminated, no events "occurred which fix the liability of the Government and entitle the claimant to institute an action" and terminating the moratorium was not a "single distinct event, which may have continued ill effects later on." Plaintiffs submit that there being no taking, there could be no "seminal event" triggering the statute of limitations.

Prior to the moratorium terminating on March 31, 1978, the United States considered various contingency plans to prevent, impede or limit mineral development on Group C lands after termination of the moratorium. There is no evidence that the United States acted on its contingency plans, at least not until after 1992. Instead, the United States decided to take a "calculated risk" that Plaintiffs would not attempt to access Group C lands. Between 1978 and 1992, the United States took no action to prevent, impede or limit Plaintiffs' access to Group C lands or to otherwise prevent Plaintiffs from developing minerals on Group C lands.

Defendant's "calculated risk" is not a "seminal event." Defendant's "calculated risk" does

not even rise to the level of a threat of condemnation which this court has previously ruled "does not provide a basis for finding that a taking has occurred."

Plaintiffs learned of Defendants contingency plans and its calculated risk in connection with the Prior Lawsuit. Even if such events had triggered the statute of limitations, the statute was tolled until Plaintiffs learned of the situations.

The facts of the instant case establish separate and distinct actions of the United States in asserting title to Group C lands and issuing mineral leases on Group C lands all while prohibiting access, imposing unreasonable restrictions and otherwise refusing to cooperate with Plaintiffs and Plaintiffs' mineral lessees.

None of the separate takings relate to termination of the moratorium in 1978. All occurred after 1992, well within the statute of limitations.

Plaintiffs respectfully submit that Defendants motion should be denied.

Respectfully submitted,

**THE GRAY LAW FIRM (APLC)**

BY: /S/ A. J. GRAY, III
**A. J. GRAY, III** (La. Bar #6253)
P. O. Box 1467
Lake Charles, LA 70602-1467
Telephone: (337) 494-0694
Facsimile: (337) 494-0697

Of Counsel:

Thomas C. McKowen, IV
STRAIN, DENNIS, & BATES, L.L.P.
318 St. Charles Street
Baton Rouge, LA 70802
Telephone: (225) 343-0100
Facsimile : (225) 343-0344

**CERTIFICATE OF SERVICE**

I hereby certify that copies of the foregoing PLAINTIFFS' SUR-REPLY TO DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT was served on the following counsel of record by first class mail, postage prepaid:

Alex Kriegsman
United States Department Of Justice
Environmental And Natural Resources Division
Natural Resources Section
601 D Street, N.W., Room 3814
Washington, D.C. 20004

Terry Petrie
Natural Resources Section
Environment And Natural Resources Division
U.S. Department of Justice
999 18th Street
Suite 945, North Tower
Denver, CO 80202

LTC Michael D. Graham
Litigation Attorney
U.S. Army Environmental Law Division
901 N. Stuart Street, Suite 400
Arlington, VA 22203-1837

THUS DONE AND SIGNED on this 28th day of March, 2007.

/s/ A. J. GRAY, III
**A. J. GRAY, III**