IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **CENTRAL PINES LAND COMPANY, ET AL.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | No. **98-314 L** |
| **versus** | ) | |
| | ) | **Edward J. Damich** |
| **THE UNITED STATES,** | ) | **Chief Judge** |
| | ) | |
| **Defendant** | ) | |
| | ) | |

# PLAINTIFFS' BRIEF PURSUANT TO SEPTEMBER 5, 2007 ORDER

Pursuant to Order of this Court dated September 5, 2007, Central Pines Land Company, L.L.C., Jack E. Lawton, Sr., Jack E. Lawton, Jr., Tower Minerals Company, L.L.C., William B. Lawton Company, L.L.C., Linda Lew Lawton Drost, Evelyn Gay Lawton Duhon, D, S & T, Inc. and Drost & Brame, Inc., (collectively "Plaintiffs") respectfully respond to the following question:

> Between 1978 and the filing of this case, what events constituted a final administrative action that precluded Plaintiffs from deriving economic benefits from the Group C lands, thereby causing a taking to occur?

The question is to be answered in accordance with the following standard announced in *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 191 (1985):

> [F]actors [crucial to determining whether a taking has occurred, such as the extent to which a government action has interfered with investment-backed expectations,] simply cannot be evaluated until the administrative agency has arrived at a final,

> definitive position regarding how it will apply the regulation at issue to the particular land in question.

In answering the question, Plaintiffs understand that they are to submit a list of events and the dates they took place.

**Introduction and Perspective:**

Plaintiffs' ownership of minerals under Group C lands is a permanent mineral servitude not subject to prescription:

> A mineral servitude is the right of enjoyment of land belonging to another for the purpose of exploring for and producing minerals and reducing them to possession and ownership.[1]

As compared to the surface estate, the mineral servitude is dominant. The mineral servitude owner is entitled to use "so much of the land as is reasonably necessary to conduct his operations."[2] The owner is vested with the right to develop minerals on all or any part of the land burdened by the servitude. *Patton v. Frost Lumber Industries*, 176 La. 916, 147 So.33 (La. 1933). The Louisiana Mineral Code makes it clear that the mineral servitude owner has the right to conduct operations:

> The owner of a mineral servitude may conduct his operations with the freedom and subject to the restrictions that apply to a landowner. He may protect his right against interference or damage by all of the means available to a landowner.[3]

Based on these principles, Plaintiffs have and had the absolute right to go on Group C lands and conduct mineral operations.

Between 1950 and 1978, through a series of condemnation proceedings, the United States

---

[1] La.R.S.31:21.

[2] La.R.S.31:22. The mineral owner is only obligated to restore the surface at the earliest reasonable time. *See,* La.R.S.31:22.

[3] La.R.S.31:23.

maintained a mineral moratorium preventing Plaintiffs and their ancestors in title from entering Group C lands. (Def.'s Uncontroverted No. 4) The moratorium formally ended on March 31, 1978. (Def.'s Uncontroverted No. 6)

Termination or lifting of the moratorium was simply that. After March 31, 1978, there was no longer a legal prohibition against Plaintiffs accessing their Group C lands. A taking occurs when an owner is deprived of use of his property.[4] In this case, the exact opposite occurred. By permitting the moratorium to terminate, the United States did not deprive Plaintiffs of use of their property. The United States granted Plaintiffs legal access which had been previously denied.

Prior to the moratorium terminating on March 31, 1978, the United States considered various contingency plans to prevent, impede or limit mineral development on Group C lands after termination of the moratorium. (Pls. Uncontroverted No. 1) The contingency plans included putting up signs saying "keep out" and deciding to "let them sue" (Pls. Opp'n Ex. 2); prohibit drilling, purchase minerals or "deny any type of entry" (Pls. Opp'n Ex. 4); lifting the moratorium in "selected areas" (Pls. Opp'n Ex. 9); countering a demand to drill a well on a particular site with a "mini-moratorium" (Pls. Opp'n Ex.12); and refuse drilling, force mineral owners to sue in court of claims, or negotiate drilling program (Pls. Opp'n Ex. 13).

The United States took no action on its contingency plans. Instead, the United States took a "calculated risk" that Plaintiffs would not attempt to access Group C lands. (Pls. Uncontroverted No. 4) The term "calculated risk" was not coined by Plaintiffs. The term appears in the documents of the United States as it developed its "alternative" or "contingency" plans. Both Pls. Opp'n Ex. 2, Disposition Form dated January 19, 1967 by Darwin L. Wilder and Tom Adams, and Pls. Opp'n

4 *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed.Cir.2004); *Walker v. United States*, 69 Fed. Cl. 222 (2005).

Ex. 18, Memo dated June 22, 1977 to HQDA, Wash. D.C. from M.R. Long, Acting Chief, Real Estate Division, use the term "calculated risk" in describing the planned action of the United States. References to the United States taking a "risk" or that a "risk be taken" also appear in Pls. Opp'n Ex. 16, Memo dated June 17, 1977 to Division Engineer, Southwestern from Michael B. Cottrell and in Pls. Opp'n Ex. 11, Disposition Form dated March 18, 1977 by Darwin L. Wilder. The facts forming the basis for Plaintiffs' Proposed Finding No. 4 are uncontradicted in the record.

**Chronological List Of Events Possibly Relevant To Determining Whether A Final Administrative Action Precluded Plaintiffs From Deriving Economic Benefit From Group C Lands:**

There were simply no dealings between the Plaintiffs and the United States between 1978 and 1995 when Plaintiffs learned that the United States was claiming title to minerals relating to Group C lands. (Pls. Uncontroverted No. 8) To Plaintiffs' knowledge, between 1978 and 1992, no event or events constituted a final administrative action precluding Plaintiffs from deriving economic benefits from Group C lands.

Plaintiffs filed the Prior Lawsuit[5] on August 22, 1996. This action was filed April 3, 1998. Exhaustive discovery was conducted in connection with the Prior Lawsuit. Materials discovered by Plaintiffs reflect events which could have relevance to determining whether a final administrative action precluded Plaintiffs from deriving economic benefit from Group C lands.

Plaintiffs submit that prior to 1992, no event or series of events reflect a final administrative action. Out of abundance of caution and in strict accordance with this Court's September 5, 2007 Order, Plaintiffs present the following chronological list of events with possible relevance. In connection with this brief, Plaintiffs are also filing Plaintiffs' Supplemental Appendix In Support

[5] *Central Pines Land Co. v. United States*, 274 F.3d 881, 896 (5th Cir. 2001).

Of Opposition To Defendant's Motion For Summary Judgment. Each of the additional or supplemental documents were discovered by Plaintiffs in the Prior Lawsuit and has been exchanged in discovery in these proceedings:

(A) Memorandum For Record dated October 3, 1978 by Vance Johnson (a real estate specialist at Fort Polk) documenting a telephone conversation with Mr. Wilder with the U.S. Army Corp of Engineers in Fort Worth: According to the memorandum the following four part procedure was to be followed in the event of a request to drill at the Leesville Artillery Range[6]: (1) Wait for a request from a major oil company which has the right to drill; (2) Determine time and location that Ft. Polk will allow the drilling and inform the major oil company of the stipulations for drilling; (3) If the major oil company agrees, no problem. If the major oil company disagrees, "refuse to allow the drilling." (4) Let them sue. The Army would rather be a defendant than a plaintiff.

This event reflects contingency planning by the Army; but does not constitute a final administrative action. By use of the term "major oil company which has the right to drill" the document assumes that the major oil company has obtained a mineral lease from the owner of the minerals.

(B) Letter dated December 6, 1979 to District Engineer, Fort Worth from Charles M. Blackard, Chief, Real Estate Division: Blackard concurs in the decision to "show" title to minerals in the United States notwithstanding the fact that title may be contested in the future. The Office of Chief Engineers plans to defer further action pending a decision by the Secretary of the Defense relative to leasing minerals at another military installation in the area.

"By deferring further action," the event documented by the letter reflects that the Army has

---

6 Portions of Group are located within the Leesville Artillery Range.

not taken a final administrative action.

(C) Letter dated after July 8, 1980 to Shell Oil Company from Commanding General at Fort Polk granting a seismic permit for a portion of the area requested and advising that coordination must be maintained with military training requirements having priority over seismic operations.

This event reflects that within geographic areas agreed to by the Army and on its terms, the Army will permit seismic activity at Fort Polk. The letter does not reflect a final administrative action.

(D) Undated (November 19, 1980?) Report of Availability for Seismic Survey (Hunt Exploration, Inc.): Impact area of Fort Polk periodically swept for surface decontamination from explosives/ordnance outside of contaminated impact area; but no guarantee made since overall area has been used for firing live ordnance since commencement of World War II; land to be made available for short periods of time; must obtain permit from mineral owner; Fort Polk Commander reserving right to approve dates of entry and routes.

(E) Disposition Form dated November 19, 1980 by Samuel C. Remble to Commander FORSCOM: Approval of Hunt Exploration Seismic Survey; Commander Fort Polk reserves approval of survey line and route of ingress; stipulations protect military use of property; area may contain subsurface unexploded ordnance; overall area has been used for firing live ordnance since commencement of World War II.

The above two events reflect that within geographic areas agreed to by the Army and on its terms, the Army will permit seismic activity at Fort Polk. The documents do not reflect a final administrative action.

(F) Letter dated December 17, 1980 to Terry Monso, Hunt Exploration, Inc. from

Michael B. Cottrell: Seismograph survey granted subject to conditions that only rights of the United States are being considered; entry on property coordinated by Director of Facilities Engineering, Fort Polk; impact area of artillery range may be contaminated by unexploded bombs, shells, rockets, mines, charges and/or other explosives on or below the surface; United States not responsible, etc.; must have permission from mineral owners.

This event reflects that the Army recognizes that the United States does not own the minerals and that Hunt Exploration, Inc. must obtain permission from the mineral owners for seismic activities. The document does not reflect a final administrative action.

(G) Handwritten note dated January 8, 1981 by Vance Johnson stating that Hunt is unable to complete 2 miles of line in the range; seismic survey in range is "postponed indefinitely and possibly dropped entirely."

Interesting document; but no final administrative action.

(H) Letter dated April 23, 1982 to Amerada Hess Corporation from W. E. Kellenberger: Advises of the Army stipulations for drilling; that there will be limited mineral exploration pursuant to standard operating procedures; if well is commercially productive, Installation Commander of Fort Polk would at that time evaluate any reasonable request to drill additional wells.

Again, this is an interesting document; but it does not reflect final administrative action.

(I) Disposition Form dated May 6, 1982 by Ronald N. Tomas, Ph.D, Chief, Environmental and Energy, Control Division RE: Generic Environmental Evaluation with Standard Operating Procedures for Exploratory and Field Development Drilling of Oil/Gas Wells.

This document reflects planning in the event drilling could be conducted at Fort Polk. The document does not reflect a final administrative action.

(J) Letter dated June 10, 1982 to Fort Polk from Amerada Hess Corporation RE: request for seismic permit, "if we would be prohibited from drilling a well, we would not be interested in shooting the proposed seismic lines."

This event does not reflect a final administrative action.

(K) Information Paper dated July 16, 1982, Subject: Status of Mineral Rights: As to Leesville Artillery Range, the document discusses a meeting between Mr. Camp and General Steele which took place on July 1, 1977 (prior to termination of the moratorium) in which General Steele advised Mr. Camp that the Army would cooperate with mineral development where "safe" to do so.

This is an important event. Mr. Camp was an attorney for Plaintiffs' ancestors in title. He visited Fort Polk prior to termination of the moratorium. The document reflects that in 1982 the Army considered the minerals to be owned by Plaintiffs' ancestors in title. The letter does not reflect a final administrative action.

(L) Telephone or Verbal Conversation Record dated October 3, 1983 by Vance Johnson: Request by Shell Oil for extensive seismic survey; will not determine location until meeting to determine "off limits" areas.

This event reflects continued interest in Fort Polk by major oil companies; but it does not reflect a final administrative action.

(M) Handwritten note dated October 17, 1983 by Vance Johnson: Petty-Ray "cancelled out."

This document reflects continued interest in Fort Polk by major oil companies; but it does not reflect a final administrative action.

(N) Telephone or Verbal Conversation Record dated October 17, 1983 by Vance Johnson:

Petty-Ray cancelled requirement for access to range --- "client has decided not to risk going into the Range."

This document reflects continued interest in Fort Polk by major oil companies; but it does not reflect a final administrative action.

(O) Letter dated April 16, 1984 by Col. Allen D. Smith (Vance Johnson): Meeting with Shell Oil concerning requested seismic shoot; area not available until after October, 1984; specific dates must be coordinated.

This document reflects continued interest in Fort Polk by major oil companies; but it does not reflect a final administrative action.

(P) October 9, 1992 title opinion rendered to the United States which, as to Group C lands, stated, according Charles E. Steele, Director of Lands And Minerals, United States Department Of Agriculture, Forest Service that the United States "can now claim mineral ownership where drilling has not occurred for a ten-year period regardless of the date of acquisition by the U.S." (Pls.' Uncontroverted No. 6)

This is a very important event.[7] Plaintiffs submit that October 9, 1992 is the earliest possible date the United States took Group C lands. Because of the uniformity of Plaintiffs' title across the tract, the entirety of Group C was affected by the taking. This document is the triggering event by which the United States claimed title to Group C lands. Plaintiffs understand that the document states that the United States "can now claim mineral ownership where drilling has not occurred for a ten-year period regardless of the date of acquisition by the U.S." Together, this document and the following document constitute a final administrative action.

[7] Plaintiffs have been unable to obtain a copy of the document through either the Freedom of Information Act or through discovery in these proceedings or in the Prior Lawsuit.

(Q) Memorandum dated October 7, 1993, by Charles E. Steele, Director of Lands And Minerals, United States Department Of Agriculture, Forest Service. In this document the Director of Lands And Minerals, United States Department Of Agriculture, Forest Service refers to the October 9, 1992 title opinion above and declares that portions of Group C lands are available for mineral leasing. Together, this document and the preceding document constitute a final administrative action.

(R) Commencing in 1992, unknown to Plaintiffs, the United States Bureau of Land Management granted a the following series of oil and gas leases covering Group C lands: Lease Nos. 47572, 47574, and 47750 to Union Pacific Resources Company and Lease Nos. 48555, 48556, 48557, 48558, 48559 and 48560 to Chesapeake Operating, Inc. All of the leases contained ten year terms terminating April 30, 2007. Granting of these mineral leases constitutes a taking of Plaintiffs' property.

The actual granting of mineral leases covering Group C lands reflect a final administrative action that precluded Plaintiffs from deriving economic benefits from the Group C lands.

In the spring of 1995, while Plaintiffs were negotiating a mineral lease on Plaintiffs' private property in the area of, but not within, Group C lands, Plaintiffs first learned from a potential lessee that the United States was claiming title to Group C lands. (Pls.' Uncontroverted No. 8)

(S) Letter dated November 9, 1995[8], addressed to Mike Cruse, Deputy General Counsel, Office of General Counsel, United States Department of Agriculture, Room 3201, Federal Building, Little Rock, Arkansas: Plaintiffs informed the United States of America that its granting of oil and gas leases slandered Plaintiffs' mineral title and that any operations under the mineral leases would

[8] Document 23, Plaintiffs' Appendix In Support Of Opposition To Defendant's Motion For Summary Judgment.

be considered a trespass.

Plaintiffs' first step in protecting their mineral rights.

(T) Letter dated February 29, 1996 from A. J. Gray, III to Mr. Jeff Eisenberg, Office of General Counsel, United States Department of Agriculture.[9] Portions of Group C lands were included by the United States in a proposed mineral lease sale scheduled for March 28, 1996. (Pls. Uncontroverted No. 25) While the proposed lease sale included approximately 5,300 acres of Group C lands, because Plaintiffs' title is uniform for the full tract, the action of the United States effectively took the entirety of Group C. In this letter, Plaintiffs' requested that United States withdraw portions of Group C lands from mineral leasing activity.

(U) Letter dated March 11, 1996 by Kim G. Mayhall and A. J. Gray, III to Mr. Jeff Eisenberg[10] making settlement proposal covering entirety of Tracts A and B and that portion of Tract C included in the Joint Order Interchanging Administrative Jurisdiction of Department of the Army Lands and National Forest Lands.

The fact that Plaintiffs were forced to make settlement offers to the United States in an effort to avoid litigation reflects that the United States had taken a final administrative action to claim title and to deprive Plaintiffs of their property.

(V) Memo For Col. Prosold dated June 19, 1996 from Herbert M. Carter, Office of Deputy Director of Public Works, Joint Readiness Training Center and Fort Polk: Copy of updated slide showing possible Belco well locations; "after two hour session they are willing to locate wells to reduce impacts on training."

---

[9] Document 24, Plaintiffs' Appendix In Support Of Opposition To Defendant's Motion For Summary Judgment.

[10] Document 25, Plaintiffs' Appendix In Support Of Opposition To Defendant's Motion For Summary Judgment.

This document does not reflect a final administrative action. However, when taken in light of the testimony of Belco representative, Mel Fife, it is clear that Belco would take a mineral lease from Plaintiffs and drilled on Group C lands had Bel been able to obtain access. Counsel for Defendant examined Belco representative Mel Fife on this issue:

> Q. Now, if the goal was just to kind of break up Chesapeake's leases, why not just lease it anyway?
>
> A. Well, you're not going to pay that much money for a lease if you're not going to dig it.
>
> . . .
>
> Q. You were considering purchasing the lease?
>
> A. Yeah. And they were - - you know, the Lawtons were aware that we weren't just going to do it, that we were going to be reasonably intelligent about it and go make sure that we could get access before we paid them whatever it was, 4 or $5 million.
>
> . . .
>
> Q. How did the discussion transpire? Did Mr. Belfer - - did he consider the option of taking the lease anyway and fighting the Army or - -
>
> A. No, I don't think that that was ever an option. There were too many other good leases to buy without having to jack around with the Army, you know. And by the time you get - - by the time you got through all the red tape it would have cost you a fortune, you know. And I think that that was pretty obvious to he and I both. And the people in Washington told him the same thing, it's just not going to happen.[11]

Commencing March, 1996, Plaintiffs negotiated with Belco to lease 20,295 acres of Group C lands. Plaintiffs reached agreement with Belco as to the terms of a lease; but because the United States Army denied Belco's access to Group C surface, Plaintiffs' lease was not executed. (Pls. Uncontroverted No. 29)

Had the United States Army allowed Belco access to the property, Belco would have leased the entirety of Group C lands from Plaintiffs. (Pls. Uncontroverted No. 30)

---

[11] Pls. Opp'n Ex. 54, Fife Dep. pp. 19, 43, 44.

The events surrounding the proposed Belco transaction constitute a final administrative action precluding Plaintiffs from deriving economic benefits from the Group C lands.

(W) Letter dated August 6, 1996 from Jeffrey D. Eisenberg, Attorney, Natural Resources Division, Office of the General Counsel, United States Department of Agriculture, Washington, D.C. 20250-1400:[12] The United States denied the claim of Plaintiffs and asserted a claim to ownership of the minerals adverse to that of Plaintiffs.

This letter is an extremely important event. After receiving the letter in which the United States denied plaintiffs ownership of the minerals, Plaintiffs instituted the Prior Lawsuit. The document constitutes a final administrative action.

In their original Plaintiffs' Opposition To Defendant's Motion For Summary Judgment, Plaintiffs argued that a series of events concerning Chesapeake Operating, Inc., Sonat Exploration Company and Belco resulted in a loss of leasing opportunity for Plaintiffs, and, thus, constituted takings of Group C. Plaintiff's submit that each of these separate series of events constitute final administrative actions.

Plaintiffs anticipate that Defendant will argue that the events concerning Belco, Chesapeake and Sonat were informal and not "official." To the contrary, the oil companies each though they were having official meetings with the Army to obtain access. For example, Chesapeake representatives thought the meeting was official:

> Q. Okay. Let me back up because that's a fair objection. Was there an official request made of the Army by Chesapeake?
>
> A. We thought the official request had been made at the meeting, that that was what the meeting was all about, that we wanted to have their consent to working with us on

---

[12] Document 31, Plaintiffs' Appendix In Support Of Opposition To Defendant's Motion For Summary Judgment.

an operational basis.

Q. And that was your understanding, that that meeting was an official request?

A. Yes.[13]

At the meeting, Chesapeake was represented by its Vice-President of Corporate Development, its Senior Vice-President of Operations, its Senior Drilling Engineer, its Manager of Business Development, a landman and a consultant. [14] On the United States side, there were not less than 14 representatives of the Army and Forest Service attending the meeting. Plaintiffs respectfully submit that the meeting was official and that Chesapeake was there exactly as Mr. Dunlap testified "to have their consent to working with us on an operational basis."

Defendant has argued that because Chesapeake was not a lessee when its representative met with the Army, it thus, "was not in a position to make any formal request to access Fort Polk. Defendant's theory is not supported by the facts. On September 26, 1996, Chesapeake leased 4,822.10 acres of Group C land from Plaintiffs. Pls Oppn't Ex. 33. Chesapeake met with the Army to obtain access to the fort on April 3, 1997. Pls. Oppn't Ex. 36.

The same situation exists with Sonat. On July 1, 1996, Plaintiffs entered into the 28,000 acre lease with Sonat. (Pls. Uncontroverted No. 33) Sonat representatives made it clear that if they could have obtained leases and access from the United States, they would have leased the entirety of Group C lands from Plaintiffs. (Pls Opp'n Ex.48, Hamilton Dep. 33, 34-35)

In their original Plaintiffs' Opposition To Defendant's Motion For Summary Judgment, Plaintiffs argued that a recurring theme of controlled use stipulations, standard operating procedures,

---

13 Pls. Opp'n Ex.46, Dunlap Dep. p. 21.

14 Pls. Opp'n Ex.44, Denny Dep. pp. 42-43.

permits, conditions of approval and special stipulations is that "the military mission of Fort Polk supersedes all other land uses" constitute takings. Plaintiffs do not contend that, as a matter of national security, the military mission should not be paramount. Plaintiffs merely contend that under clear Louisiana law, the mineral servitude is the dominant estate and by making the military mission supersede all other uses, the United States violates Plaintiffs' rights. Such action constitutes a taking of Plaintiffs' property. In this situation, the United States Army had no legal right to restrict Plaintiffs' access or to impose any controlled use stipulations, standard operating procedures, permits, conditions of approval and special stipulations. By doing so, the United States took Plaintiffs' property rights. These takings are unrelated to termination of the moratorium on March 31, 1978. These are separate independent takings which occurred within the statute of limitations.

## CONCLUSION

As mineral owners, Plaintiffs are entitled to unrestricted access to Group C lands for mineral operations. On March 31, 1978, the date the moratorium terminated, no events "occurred which fix the liability of the Government and entitle the claimant to institute an action" and terminating the moratorium was not a "single distinct event, which may have continued ill effects later on." Plaintiffs submit that there being no taking, there could be no "seminal event" triggering the statute of limitations.

Prior to the moratorium terminating on March 31, 1978, the United States considered various contingency plans to prevent, impede or limit mineral development on Group C lands after termination of the moratorium. There is no evidence that the United States acted on its contingency plans, at least not until after 1992. Instead, the United States decided to take a "calculated risk" that Plaintiffs would not attempt to access Group C lands. Between 1978 and 1992, the United States

took no action to prevent, impede or limit Plaintiffs' access to Group C lands or to otherwise prevent Plaintiffs from developing minerals on Group C lands.

Defendant's "calculated risk" is not a final administrative action. Defendant's "calculated risk" does not even rise to the level of a threat of condemnation which this court has previously ruled "does not provide a basis for finding that a taking has occurred."

Plaintiffs learned of Defendant's contingency plans and its calculated risk in connection with the Prior Lawsuit. Even if such events had triggered the statute of limitations, the statute was tolled until Plaintiffs learned of the situations.

None of the actions of the United States constituted a final administrative action until 1992.

The facts of the instant case establish separate and distinct actions of the United States in asserting title to Group C lands and issuing mineral leases on Group C lands all while prohibiting access, imposing unreasonable restrictions and otherwise refusing to cooperate with Plaintiffs and Plaintiffs' mineral lessees.

None of the separate takings relate to termination of the moratorium in 1978. All occurred after 1992, well within the statute of limitations.

Respectfully submitted,

**THE GRAY LAW FIRM (APLC)**

BY: /S/ A. J. GRAY, III

**A. J. GRAY, III** (La. Bar #6253)
P. O. Box 1467
Lake Charles, LA 70602-1467
Telephone: (337) 494-0694
Facsimile: (337) 494-0697

Of Counsel:

Thomas C. McKowen, IV
STRAIN, DENNIS, & BATES, L.L.P.
318 St. Charles Street
Baton Rouge, LA 70802
Telephone: (225) 343-0100
Facsimile : (225) 343-0344

**CERTIFICATE OF SERVICE**

I hereby certify that copies of the foregoing PLAINTIFFS' BRIEF PURSUANT TO SEPTEMBER 5, 2007 ORDER was served on the following counsel of record by first class mail, postage prepaid:

Kristine S. Tardiff
United States Department Of Justice
Environmental And Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301

THUS DONE AND SIGNED on this 18th day of September, 2007.

/s/ A. J. GRAY, III
**A. J. GRAY, III**