THE GRAY LAW FIRM
A PROFESSIONAL LAW CORPORATION
ONE LAKESHORE DRIVE, SUITE 110
POST OFFICE BOX 1467
LAKE CHARLES, LOUISIANA 70602-1467

FACSIMILE
(318) 494-0697

TELEPHONE
(318) 494-0694

November 9, 1995

Mr. Mike Cruse
Deputy General Counsel
Office of General Counsel
United States Department of Agricultural
Room 3201
Federal Building
Little Rock, Ark 72203

Re: **Imprescriptible Mineral Interests of Tower Minerals Company, Inc. and Central Pines Land Company Under Portions of the Kisatchie National Forest in Vernon Parish, Louisiana**

Dear Mike:

Several months ago you took the time to talk to me on the telephone concerning the interests of Tower Minerals Company, Inc. and Central Pines Land Company in minerals under portions of the Kisatchie National Forest in Vernon Parish, Louisiana. Thank you.

Tower Minerals Company, Inc. is a wholly owned subsidiary of William B. Lawton Company, Inc. Central Pines Land Company is a wholly owned subsidiary of Jack Lawton, Inc. The Lawton entities are closely held corporations owned by the William B. Lawton family and the Jack E. Lawton family respectively.

In mid-May 1995, Lawton representatives learned that the United States Bureau of Land Management had granted mineral leases on property in Vernon Parish, Louisiana, the surface of which belongs to the United States, but upon which the minerals were reserved by ancestors-in-title to the Lawton entities (hereinafter referred to generally as the "Lawton Mineral Title"). The attached Exhibit "A" is an inventory of such leases which cloud the Lawton mineral title. A "Leasehold" map is included with the materials transmitted with this letter to graphically show the location of the leases (Exhibit "B" to this letter).

As you suggested in our previous telephone conversation, the purpose of this letter is to familiarize you with pertinent title documents, condemnation proceedings, land use

EXHIBIT
5

---

records and legal principles to determine whether an amicable resolution to the problem can be reached. To assist you in understanding the situation I enclose several volumes containing pertinent documents. This volumes of documents accompany this letter as Exhibit "C".

All of the lands under consideration were part of a tract of land of over 100,000 acres owned by Gulf Lumber Company in the 1920's. In 1929, Gulf Lumber Company conveyed 100% of the minerals in the property to S. H. Fullerton.[1] By two (2) separate transactions in 1933 and 1936, the United States acquired by conventional deed from Gulf Lumber Company the lands shown as Tracts A and B on the map attached hereto as Exhibit "D",[2] subject to the outstanding mineral ownership of S. H. Fullerton. Tracts A and B cover lands now within the Kisatchie National Forest (said lands being sometimes hereinafter referred to as the "Kisatchie situation"). In 1937, Wm. T. Burton[3] acquired all of the minerals underlying the Kisatchie situation lands[4] and full title to the lands shown as Tract C on the map attached hereto as Exhibit "D". In 1943, the United States acquired Tract C by expropriation subject to an express reservation of all of the minerals underlying said tract in favor of Wm. T. Burton.[5] Tract C covers lands now within the artillery range of Fort Polk (said lands being sometimes referred to as the "artillery range situation").

By subsequent conveyances, Tower Minerals Company, Inc. and Central Pines Land Company have acquired all of the mineral rights of Wm. T. Burton in the Kisatchie situation (Tracts A and B) and in the artillery range situation (Tract C). A graphic summary of relevant transactions in the chain of title to Tracts A, B and C is attached hereto as Exhibit "E".

Under a memorandum agreement with the Forest Service, the Department of

---

1 See Document Nº 1, Mineral Deed dated December 24, 1929 from Gulf Lumber Company to S. H. Fullerton.

2 See Document Nº 2, Deed dated December 29, 1933 from Gulf Lumber Company to United States of America and Document Nº 3, Deed dated March 14, 1936 from Gulf Lumber Company to United States of America.

3 Mr. Burton was the grandfather of William B. Lawton and Jack Edward Lawton.

4 See Document Nº 5, Mineral Deed dated April 26, 1937 from Fullerton Minerals Company to Wm. T. Burton.

5 See Document Nº 8, Judgment of Taking dated May 15, 1943. Mr. Burton had acquired the property from Gulf Lumber Company by deed dated April 26, 1937, see Document Nº 4.

---

Defense has the right to intensively use most (approximately 2/3rds) of the land covered by the Kisatchie situation for small arms firing ranges, tank firing ranges, artillery range impact areas, bombing ranges, maneuver areas, and other related military facilities. The balance of the land[6] (approximately 1/3rd) in the Kisatchie situation is presently designated as a "limited use area" under an agreement between the Forest Service and the Department of Defense.

A portion[7] of the surface in the "artillery range" situation acquired from Mr. Burton by condemnation in 1943 for military purposes was, in 1975, transferred from the Department of Defense to the Forest Service for surface management. Most of these lands are included in the "Intensive Use Area." The balance of these lands are in the "Limited Use Area" whereby the Department of Army may enter upon to conduct tactical exercises simulating conditions of war.

Between 1943 and 1978, the United States imposed a drilling and operations moratorium on William T. Burton and his successors in title relative to portions of the lands in both the Kisatchie situation and Artillery Range situation through a series of expropriations of the mineral owner's right to utilize the surface of the lands for oil and gas exploration purposes. The basic condemnation documents are included in Exhibit "C".

Apparently, most of the Lawton properties subject to Forest Service jurisdiction (*i.e.*, most of the lands in the Kisatchie situation) were declared by the Forest Service as being available for mineral leasing based upon legal opinions of the Office of General Counsel, United States Department of Agricultural. While those opinions have not been made available to Lawton representatives, it is assumed that they are based upon ***United States v. Little Lake Misere Land Company***, 412 U.S. 580, 37 L.Ed.2d 187, 93 S.Ct. 2389 (1973). Under the facts of that case, the United States Supreme Court declined to apply Louisiana legislative Act 315 of 1940 to a reservation of minerals for a specific term in a land transaction completed before the passage of the act.

As will be shown in detail below, there is sound legal authority for application of Act 315 of 1940 to the Lawton minerals. Additionally, both the "Kisatchie" fact situation as well as the "artillery range" fact situation can be distinguished from the facts of ***Little Lake Misere.***

---

6 With the exception of the lands included in the Fullerton Lake National Historic Site.

7 Sections 15,16,17,20,21,29,32 and 33 of T1N-R5W and Section 5 of T1S-R5W.

As to both situations, even if the mineral servitude is prescriptible, such prescription has been interrupted or suspended by actions of the United States in preventing mineral operations on the property. The actions of the United States constitute an obstacle as contemplated by Article 59 of the Louisiana Mineral Code.

## Legal Principles

***Frost-Johnson Lumber Co. v. Salling's Heirs***[8] established the principle that Louisiana law, contrary to common law jurisdictions, does not permit creation of a mineral estate distinct or separate from ownership of land. Regardless of the form of the transaction, a landowner who sells or reserves minerals in property, merely creates a mineral servitude. A mineral servitude is a right of enjoyment of land belonging to another for the purpose of exploring for and producing minerals and reducing them to possession and ownership. A mineral servitude may be extinguished by prescription resulting from nonuse for ten years (hereinafter referred to as ten year liberative prescription of nonuse), confusion, and other methods not relevant to our discussion. When the mineral servitude terminates, it ceases to be a burden on the full ownership of the land. It is sometimes said that the servitude returns to the title out of which it was created, *i.e.*, the minerals "return" to the owner of the surface.

Prescription on a mineral servitude may be interrupted by mineral operations on or production from the lands subject to the mineral servitude or by acknowledgment by the owner of the land subject to the servitude. If interrupted, the ten year liberative prescription begins to run anew from the date of the last act of interruption. Thus, the good faith drilling of a well on lands affected by the mineral servitude interrupts prescription and extends the servitude for an additional ten years beyond the date of last operations on the well. Prescription can also be suspended if the mineral servitude owner is prevented from using the servitude by an obstacle that he can neither prevent nor remove. Prescription does not run as long as the obstacle exists. A mineral servitude may also be created for a specifically contractually agreed term of less than ten years. When this occurs, the rules relating to liberative prescription do not apply.[9] This scheme of mineral ownership is unique to Louisiana.

In the 1930's, "new deal" legislation passed by the United States Congress required the acquisition of vast lands in various states to accomplish the purposes of the federal

---

8 150 La. 756, 91 So. 207 (1922).

9 Exhibit "F" accompanying this letter contains relevant articles from the Louisiana Mineral Code.

programs enacted. Some Louisiana landowners voluntarily parted with their lands under the belief that liberative prescription on the mineral interests created would not run since the lands were acquired by the federal government. Other landowners resisted federal acquisition to the utmost, thus making administration of the federal programs more difficult and costly.

In most common law jurisdictions, a reservation of minerals in an act of sale or expropriation created a perpetual separate mineral estate, or real right. Thus, a reservation of minerals in such transactions in other states meant that the government would **never** become the owner of the minerals without a separate acquisition or expropriation procedure. Assuming the laws relative to liberative prescrisption applied, landowners in other states enjoyed a more favorable position vis-a-vis retaining minerals in transfers to the United States under the various federal programs. Desiring to assist the federal government by making it easier for Louisiana citizens to voluntarily participate in the various federal acquisitions and to remove doubt with respect to the issue of whether liberative prescription applied to servitudes created in transfers to the United States or in existence on the date of the transfer to the United States, the Louisiana legislature enacted a series of laws carving out an exception to the general rule of prescriptibility of mineral servitudes by giving landowners imprescriptible mineral servitudes when lands were acquired by the government either with a reservation of minerals or subject to an outstanding mineral servitude.

Two legislative acts passed in 1938[10] dealt with the subject of imprescriptible mineral servitudes. They applied to acquisitions by the state government as well as by the federal government. Act 315 of 1940 repealed the earlier acts and provided as follows:

> When land is acquired by conventional deed or contract, condemnation or expropriation proceedings by the United States of America, or any of its subdivisions or agencies, from any person, firm or corporation and by the act of acquisition, verdict or judgment, oil, gas and/or other minerals or royalties are reserved, or the land so acquired is by the act of acquisition conveyed subject to a prior sale or reservation of oil, gas and/or other minerals or royalties, still in force and effect, said rights so reserved or previously sold shall be imprescriptible.

10 Acts 68 and 151 of 1938. Act 68 was limited to "spillway or floodway" properties and Act 151 applied to "public works or improvements."

---

In ***Whitney National Bank v. Little Creek Oil Co.***[11] the Louisiana Supreme Court applied the act retroactively and found imprescriptible a mineral servitude created in 1932. This ruling was consistent with the Louisiana jurisprudence establishing that laws relating to prescription which has not yet accrued are considered remedial, and not substantive, changes in the law and therefore are to be applied retroactively unless otherwise specified in the act. ***United States v. Nebo Oil Co.***[12] was decided after the ***Whitney*** case but involved the same transactions as ***Whitney***. The litigation involved certain tracts of land which were subject to mineral servitudes created in 1932. The lands, covered by the previously existing mineral servitude, were acquired, in connection with the creation of the Kisatchie National Forest, by the federal government in 1936, expressly subject to the outstanding mineral servitude. The servitude was still in existence, since prescription had not yet accrued, when Act 315 of 1940 was enacted into law. After a lapse of more than ten years, the United States sued for a judgment declaring that the mineral servitude had terminated by ten year liberative prescription. The United States Fifth Circuit Court of Appeal ruled that retroactive application of the act was constitutional. The United States Supreme Court denied writs.

In ***Nebo***, the court reasoned that since the expectancy of a landowner in the extinction of an outstanding mineral servitude was not a vested right, a change in the prescriptive period, being remedial, did not interfere with substantive rights. This holding was consistent with prior Louisiana jurisprudence relating to changes in unaccrued prescriptive periods. The district court also held, in the alternative to the holding above, that Louisiana law of liberative prescription had been pre-empted by federal law, and, therefore, was not applicable where land was acquired by the United States under the Weeks Forestry Act.

As will be seen below, the factual situation in ***Nebo*** is closely analogous to the facts of the Kisatchie situation. Both ***Nebo*** and the Kisatchie situation involve retroactive application of Act 315 of 1940 to a mineral servitude burdening a tract on the date the tract was acquired by the United States. The same federal land acquisition act - the Weeks Forestry Act - and the same national forest - Kisatchie - are involved. The language describing the prior sales and reservations in ***Nebo*** is virtually identical to that in the sale from Gulf Lumber Company to the United States. In virtually all respects, the ***Nebo*** case is indistinguishable from the servitude in the Lawton Kisatchie situation. Because of the expressly limited language contained in the ***Little Lake Misere*** case discussed below,

---

11 212 La. 949, 33 So. 2d 693 (1947).

12 190 F.2d 1003 (5th Cir. 1951).

***Nebo*** is still good law today.

***Leiter Minerals, Inc. v. United States***[13] involved protracted litigation in both state and federal courts. The mineral rights in question were established in a deed dated December 21, 1938 from Thomas Leiter conveying land to the United States. The instrument contained a "reservation" of the "right to mine and remove" oil and gas which was specifically stipulated to expire on April 1, 1945. The reservation contained additional terms and conditions under which the mineral reservation could be extended. While the reservation was in effect, the Louisiana Legislature passed Act 315 of 1940. Ultimately the terms of the reservation were not met and no minerals were produced by Leiter. The United States leased the property to others with The California Company successfully drilling more than eighty wells.

The issue in ***Leiter*** was whether Act 315 of 1940 made the minerals imprescriptible. However, the threshold issue in the case was whether, by language of the reservation, the parties intended to create a mineral interest with a contractually stipulated, definite term, subject to extension under only certain contractually agreed upon circumstances, (and therefore, the rules relating to liberative prescription and the interruption thereof would not apply) or whether the parties intended to merely contractually alter the ten year liberative prescription of 10 years to 7 years, but with all other rules relating to prescription applying.

Leiter sued in state court and the United States sued in federal court. Before the matter was resolved both the United States Supreme Court[14] and the Louisiana Supreme Court[15] rendered decisions. The final decision[16] was by the United States Fifth Circuit Court of Appeal which ruled only a contractual alteration of the normal ten year liberative prescription period to seven years was intended, that all other rules relating to prescription applied. Therefore, Act 315 of 1940 applied and rendered the minerals imprescriptible. On appeal to the Unites States Supreme Court, the case was dismissed as moot due to a settlement by the parties.

---

13 329 F.2d 85 (5th Cir. 1964).

14 ***Leiter Minerals v. United States***, 352 U.S. 220, 77 S.Ct. 287 (1957).

15 ***Leiter Minerals, Inc. v. California Co.***, 241 La. 915, 132 So.2d 845 (1961).

16 ***Leiter Minerals, Inc. v. United States***, 329 F.2d 85 (5th Cir. 1964).

---

***United States v. Little Lake Misere Land Company, Inc.***[17] involved minerals under land in Cameron Parish, Louisiana acquired by the United States as part of the Lacassine Wildlife Refuge. Two separate parcels were acquired, one by purchase in 1937 and one by condemnation in 1939. The property was acquired pursuant to the Migratory Bird Conservation Act. Both the 1937 act of sale and the 1939 judgment of condemnation reserved to Little Lake Misere Land Company, Inc. minerals for the specific period of ten years from the date title vested in the United States. The reservations contained a 60 day continuous operations clause which provided for the maintenance of the servitude beyond ten years. This provision is completely different from statutory requirements for maintenance of a servitude and interruption of liberative prescription. **Both instruments recited that at the end of ten years, "the right to mine, produce and market said oil, gas, sulphur or other mineral shall terminate . . . and the complete fee title to said lands shall thereby become vested in the United States."** (emphasis added)

A simple reading of the provisions in the instruments in question in the ***Little Lake Misere case*** reveal that the mineral reservation was clearly a reservation for a **contractually limited term** which term could be extended only by satisfaction of the detailed requirements of the reservation. Such a limited term mineral estate could also have been created in common law jurisdictions in an acquisition under the Weeks Forestry Act.

The United States Supreme Court ruled as follows in holding that the minerals prescribed:

> Under Louisiana's Act 315, land acquisitions of the United States, explicitly authorized by the Migratory Bird Conservation Act, are made subject to a rule of retroactive imprescriptibility, **a rule that is plainly hostile to the interests of the United States. As applied to a consummated land transaction under a contract with specifically defined conditions for prolonging the vendor's mineral reservation, retroactive application of Act 315 to the United States deprives it of bargained-for contractual interests.**[18]

In reaching the decision, Justice Burger of the Supreme Court was careful not to declare

---

17 412 U.S. 580, 37 L.Ed.2d 187, 93 S.Ct. 2389 (1973).

18 412 U.S. at p. 596, 93 S.Ct. at p. 2399, emphasis added.

---

the Louisiana act unconstitutional[19] or to otherwise rule that it was not applicable in appropriate circumstances.

The Court recognized the argument that under some circumstances (presumably the Kisatchie situation), the federal government might be bound by changes in Louisiana's prescriptive scheme:

> Were the terms of the mineral reservation at issue here less detailed and specific, it might be said that the Government acknowledged and intended to be bound by unforeseeable changes in state law. But the mineral reservations before us are flatly inconsistent with the respondents's suggestion that the United States in fact expected that these reservations would be wholly subject to retroactive modifications.[20]

There have been no further reported cases involving the application of Act 315 of 1940 where the United States was a party. However, Act 315 of 1940 has been applied prospectively by Louisiana courts since the ***Little Lake Misere*** decision. In ***Heirs of Viator v. Tri-Parish Investors, Ltd.***[21] the Louisiana Third Circuit Court of Appeal applied Act 315 of 1940 to a mineral reservation contained in an expropriation judgment in favor of the United States in 1956. The mineral servitude was held imprescriptible.

Exhibit "F" accompanying this letter contains relevant articles from the Louisiana Mineral Code.

**United States Position**

**Kisatchie Situation:**

On June 20, 1986 the Office of General Counsel rendered an opinion to the United States Department of Agriculture, Forest Service, Kisatchie National Forest that property covered by the December 29, 1933 conveyance from Gulf Lumber Company to the United States was available for mineral leasing. Apparently, an additional opinion was rendered October 9, 1992. Attempts to obtain the opinions through the Freedom of Information Act

---

19 It should be noted that the Fifth Circuit Court of Appeal decision specifically held that Act 315 is not unconstitutional. See ***United States v. Little Lake Misere Land Company***, 453 F.2d 360 (1971).

20 412 U.S. 602, 93 S.Ct. 2402.

21 618 So.2d 36 (La. App. 3rd Cir. 1993).

have been denied. However, based upon telephone conversations with Delia Jaquette of the Forest Service it is apparent that the ***Little Lake Misere*** decision is the basis for the opinions. The analysis of the government appears to be simply that since Act 315 applies only to the United States and attempts to treat acquisitions by the United States differently than acquisitions by other governmental entities in Louisiana, the act is "hostile" to the interest of the United States and therefore does not apply to the United States.

Consistent with the opinions of its counsel, mineral leases have been granted by the United States on virtually all of Tracts A and B. The "Leasehold" map reflects leases held by Texaco, Sonat, Helmerich & Payne, and others.

**Artillery Range Situation**:

A letter dated August 5, 1988, [Nº **24**] from Danny W. Britt, Forest Supervisor to Regional Forester concerning the "Tract V-10 Mineral Status"[22] tracts the history of the acquisition of the property and of the moratorium payments and takes the position that the minerals are still in private ownership. The letter stated "we have no legal opinion on any lands acquired by the U.S. after January 1, 1940. For these reasons, I have no basis to presume the minerals on Tract V-10 are currently U. S. owned."

A subsequent letter dated November 7, 1991 [Nº **25**], from Charles E. Steele, Director of Lands and Minerals, United States Department of Agriculture, Forest Service to Acting Deputy State Director, Operations, Eastern States Office again reviews the history of the property and concludes that the lands are not available for mineral leasing. The letter refers to the fact that the expropriation judgment excepted minerals, ingress/egress for exploration was denied, and the tracts are located on an active military base. The letter concluded as follows:

> We are denying consent to lease these lands until such time as we can obtain title information regarding the actual mineral ownership at the time the War Department acquired the lands. We will request OGC provide a title opinion as to what effect the continual denial of the ingress/egress right may have had on any term mineral reservations in existence at the time the lands were acquired. It is possible these reservations may have been extended by the federal government denying the rights.

22 Area managed by Forest Service for Department of Army or "owned" by Forest Service by virtue of exchange with Department of Army which was included in 1943 condemnation from Mr. Burton.

---

As of June 15, 1992 the opinion of the Office of General Counsel had not been obtained.

**Lawton Position**

**Kisatchie Situation:**

**A. Act 315 of 1940 is applicable to the reservation in the 1929 Mineral Deed; *Little Lake Misere* is distinguishable from *Nebo* and, therefore, the Kisatchie situation is controlled by *Nebo.***

There is no question that the reservation in the 1929 Mineral Deed from Gulf Lumber Company to S. H. Fullerton is "less detailed and specific" than the mineral reservation at issue in ***Little Lake Misere***. Additionally, as opposed to ***Little Lake Misere***, in the Lawton Kisatchie situation, the United States was not a party to the 1929 Mineral Servitude, but instead, took the properly expressly subject thereto and also subject to the general laws relating to same. Therefore, Lawton Kisatchie situation, like ***Nebo***, falls within the language limiting the ***Little Lake Misere*** case quoted on page 9 above and, therefore, could be subject to retroactive changes in the law of prescription, provided prescription had not yet accrued.

A reading of ***Little Lake Misere*** leaves no doubt that the Supreme Court believed that the parties in that case intended a significant modification of the ten year prescription of nonuse and that this was a bargained for element in the transaction. It is significant that ***Little Lake Misere*** states that "In the ***Leiter Minerals*** litigation, retrospective application of Act 315 to a detailed, conditional mineral reservation was at issue for the first time" (emphasis added). Thus, the Court impliedly distinguished ***Nebo***, which dealt with different facts (and facts which are much more closely analogous to the Lawton situation). The negative import of this statement is that ***Nebo*** did not deal with "the retrospective application of Act 315 to a detailed, conditional mineral reservation." The ***Little Lake Misere*** Court seems to have carefully avoided questioning, even implicitly, the holding in ***Nebo.*** It could be argued that, by so carefully distinguishing ***Nebo***, the ***Little Lake Misere*** Court implicitly approved it.

Unlike the ***Little Lake Misere*** situation, the reservation of minerals in the Lawton situations were "forever". None of the Lawton reservations contemplated that, at the end of a specific time, "complete title" would vest in the United States. The United States never bargained for nor paid for any Lawton minerals. Under no circumstances can the United States argue that it contemplated receiving Lawton minerals.

The reservation in ***Little Lake Misere*** was particular and specific, and, therefore, constituted the law between the parties. Since the reservation in the Kisatchie situation is general and unrestricted, if termination of the servitude would have been controlled by the general law of Louisiana relating to the ten year prescription of nonuse, the legislature was free to alter the prescriptive period. In 1940, when Act 315 was adopted, the claim of the United States relative to the minerals was, at best, based upon a mere expectation or hope that the prescriptive period would not be interrupted or changed. The argument that a person has a vested right in a statute of limitations or period of prescription which was in force when a contract was made, or cause of action arose, has been repeatedly rejected by both the Louisiana and federal courts.[23] This well established jurisprudence should have no less validity merely because the United States could be affected by a change in prescription.

The United States might claim that Act 315 of 1940 is unenforceable against it under the ***Little Lake Misere*** decision because its implementation is hostile to the United States in that it would interfere with the purposes for which the government purchased the land in question. This argument was rejected by the trial court in ***Nebo***, supra. In ***Nebo***, the trial court found that not only had the National Forest Reservation Commission repeatedly found and determined that acquisition of lands for forest purposes under the Weeks Act with permanent reservations of minerals did not interfere with the use of the lands for forest purposes, but that such mineral reservations were actually beneficial to good forest management because certain practices of mineral operations assisted in fire prevention and establishment of local markets for timber.

The minutes of the meeting of the National Forest Reservation Commission proved conclusively that the Commission authorized the acquisition of millions of acres of land subject to the reservation of mineral rights in perpetuity and repeatedly authorized the acquisition of tracts where the mineral rights were outstanding in third persons. Today, the Forest Service holds title to millions of acres in other jurisdictions, many of which are subject to permanent separate mineral ownership in favor of third parties. It is unlikely that the Forest Service could now argue that laws of other jurisdictions providing that sales of minerals or reservations of minerals in sales of land creating perpetual, separate mineral estates are "hostile" to the interests of the United States, and, therefore, are inapplicable in order that the United States can now gain title to the minerals.

In addition, far from harboring the expectation that the Forest Service would one day acquire full title to the minerals underlying Louisiana lands acquired under the Weeks

23 ***U.S. v. Nebo***, 90 F.Supp. 73 (E.D. La. 1950); ***Terry v. Anderson***, 95 U.S. 628.

---

Forestry Act as a result of the operation of liberative prescription, the evidence in ***Nebo*** established that while buying vast lands in Louisiana subject to perpetual mineral servitudes, agents of the United States were advising prospective vendors that Louisiana law of prescription did not apply to lands purchased by the United States. As noted in ***Nebo***, this fact was supported by a memorandum dated May 29, 1935, issued by the Alexandria, Louisiana, Office of the Forestry Service which memorandum specifically declared that Articles 789 and 3546 of the Louisiana Civil Code did not apply to lands sold to the United States for national forest purposes.

The policy statements and subsequent actions taken consistent therewith by the National Forest Reservation Commission appear entirely consistent with the intent of Congress in allowing acquisition of lands under the Weeks Forestry Act subject to perpetual mineral interests. It is indisputable that the majority rule in this country in the various states is that a grant or reservation of minerals creates a separate mineral estate in perpetuity (in the absence of a contractual stipulation to the contrary). Therefore, Congress must be considered to have intended that acquisitions under the Weeks Forestry Act could be made subject to such perpetual mineral reservations. The Louisiana legislature passed Act 315 of 1940 to remove all doubt with respect to the issue of whether the law of liberative prescription applied to existing mineral interests or mineral interests created in transfers to the United States. This Act merely clarified and guaranteed that Louisiana citizens in other states vis-a-vis transfers to the United States. In situations where the government desired to acquire minerals rights, it could have (and in some cases did) negotiate a contractually limited term on the mineral reservations. (See ***Lieter***, supra., and ***Little Lake Misere***, supra.)

In the absence of such a contractual limitation, in light of clear congressional intent and the clear statements of policy by the National Forest Reservation Commission, there is no basis for concluding that the government had any intention, or expectancy, with respect to the acquisition of minerals. Considering the clear congressional intent that acquisitions of land under the Weeks Forestry Act could be made subject to perpetual mineral rights, there is no basis for a court to hold that application of Act 315 of 1940 to the Kisatchie situation is "hostile" to the interests of the United States. It is plainly not "hostile" to said "interest" because the government never intended to acquire any interests in minerals in the Kisatchie situation.

Under the circumstances, it would be inconsistent for the government to claim that (1) Act 315 of 1940 deprives it of a substantive right it thought existed on the date of the acquisition of the Kisatchie situation lands (2) application of the Act is "hostile" to its contractually bargained for expectations or (3) same interferes with the use of the property for the purposes intended under the Act. When applied to general, nonspecific

---

reservations of minerals, Act 315 of 1940 does no more than support the position of the United States in entering into the Louisiana acquisitions with reservations of minerals as was stated by the Solicitor of the Department of Agriculture in an Opinion dated March 25, 1944:

> This statute (Act 315 of 1940) is in harmony with the view of the law expressed in Acting Solicitor Boyle's opinion and is consistent with the government's carrying out the contract which the vendor entered into relying upon the good faith of the United States.[24]

**B. In the alternative, if Act 315 of 1940 is inapplicable, Louisiana law relating to prescriptibility of mineral interests is wholly inapplicable to the Kisatchie situation.**

In the alternative, even if a court should determine Act 315 of 1940 is inapplicable, such a finding likely will not assist the government in this case. In the ***Little Lake Misere*** case, the court declined to apply Act 315 of 1940 but, instead, held the language of the particular reservation in the contract to be applicable:

> Since Act 315 is plainly not in accord with the federal program implemented by the 1937 and 1939 land acquisitions, State law is not a permissible choice here. The choice of law merges with the constitutional demands of controlling federal legislation; we turn away from State law by default. Once it is clear that Act 315 has no application here, **we need not choose between "borrowing" some residual state rule of interpretation or formulating an independent federal "common law" rule**; neither rule is the law of Louisiana yet either rule resolves this dispute in the government's favor. **The contract itself is unequivocal** ... [respondents] interest in ... minerals terminated ... no later than July 23, 1947 and August 30, 1949. (emphasis added)[25]

The court did not have to determine whether Louisiana law or federal law applied since the

---

24 90 F.Supp. at p. 92.

25 93 S.Ct at p. 2403.

language of the contract provided the law between the parties. Thus, State law was **irrelevant** and the court enforced the express language of the contract. In the Kisatchie situation, the language of the contract provides that the acquisition was made subject to the prior conveyance of minerals to S. H. Fullerton. The mineral deed to S. H. Fullerton provided that the minerals were transferred to Fullerton "forever". Thus, if one strictly applies the rationale of ***Little Lake Misere*** to the Kisatchie situation, while Act 315 of 1940 may not be applicable, the language of the contract, insofar as it accurately reflects the intention of the parties, is the law between the parties and should be enforced as written. The original grant in the 1929 mineral deed to S.H. Fullerton provided:

> To have and to hold said minerals and especially said oil, gas, coal, petroleum, sulphur, salt, iron, lignite and all other minerals in, under and upon said land unto the said S. H. Fullerton, his heirs and assigns **forever**. (emphasis added)[26]

The 1933 Sale to the United States from Gulf Lumber Company provided with reference to the prior reservation:

> Excepting, however, from this sale, all of the minerals, including oil, gas, petroleum, sulphur, iron, lignite, salt and any other minerals in, on, or under the lands herein conveyed, **as conveyed** to S. H. Fullerton of St. Louis, Missouri, by Gulf Lumber Company by instrument dated the 24th day of December, 1929, and of record in conveyance record 84, Page 537 et. seq. of the records of Vernon Parish, Louisiana. (emphasis added)[27]

The interpretation that the United States intended to acquire the land subject to a perpetual outstanding mineral servitude in favor of S. H. Fullerton is:

1. In accord with the language of the contract;

2. Consistent with the express intent and expectations of the parties as evidenced by

26 See Document Nº 1, Mineral Deed dated December 24, 1929 from Gulf Lumber Company to S. H. Fullerton.

27 See Document Nº 2, Deed dated December 29, 1933 from Gulf Lumber Company to United States of America.

---

representations by government agents and the position of the National Forest Reservation Commission during of the period of the acquisition;

3. In harmony with, as opposed to hostile to, the congressional scheme relative to land acquisitions under the Weeks Forestry Act as evidenced by the official position of the National Forest Reservation Commission at that time; and

4. In accord with apparent congressional and Louisiana legislative intent that Louisiana law of prescription would not apply to mineral reservations in sales to the United States, or to mineral rights in existence as to lands transferred to the United States, but, rather, that said reservations or previously existing rights would be enforceable in accordance with the terms of the contracts creating them.

A review of the above factors makes it evident that application of the rationale of the ***Little Lake Misere*** decision means that the Louisiana law of liberative prescription would not apply and that the mineral reservation in the 1929 mineral deed would be applied as the law between the parties and enforced according to its terms.

**1. The language of the contract**: The 1929 mineral reservation is "forever". The United States agreed to accept the transfer of the Kisatchie situation lands excepting the minerals "as conveyed" to S. H. Fullerton. There is nothing ambiguous about the terms "forever" or "as conveyed" when used in the context of these agreements. S. H. Fullerton was president of Gulf Lumber Company in 1933, the date of the transfer to the United States. Because of his obvious interest in continuing the 1929 mineral servitude in existence, it is clear that Fullerton intended to require that the government honor the strict terms of the prior mineral grant.

**2. The intent or expectation of the parties**: Far from harboring the expectation that the Forestry Service would one day acquire full title to the minerals underlying Louisiana lands acquired under the Weeks Forestry Act as a result of operation of liberative prescription, the evidence in ***Nebo*** established that while buying vast lands in Louisiana subject to perpetual mineral servitudes, agents of the United States were

advising prospective vendors that the Louisiana law of prescription did not apply to lands purchased by the United States.[28] As noted in ***Nebo***, this fact was supported by a memorandum dated May 29, 1935, issued by the Alexandria, Louisiana, Office of the Forestry Service which specifically declared that Articles 789 and 3546 of the Louisiana Civil Code did not apply to lands sold to the United States for national forest purposes. According to the ***Nebo*** court, minutes of the National Forest Reservation Commission established that long before the 1935 sale in ***Nebo*** to the United States (and also long before the 1933 Gulf Lumber Company sale to the United States), the Commission had taken the position that Louisiana laws of prescription did not apply to lands sold to the United States.[29] It had also taken the position that, as a matter of policy, the Commission would not approve the purchase of mineral rights with funds which had been appropriated under the Weeks Forestry Act for acquisition of lands for forest purposes. In a memorandum dated September 4, 1935, C. W. Boyle, an Assistant Solicitor of the Department of Agriculture rejected the opinion of a Mr. McGregor and concluded that Louisiana laws of prescription were not applicable to lands purchased under the Weeks Forestry Act.

It is clear from the records of the National Forest Reservation Commission that, consistently from 1931 through at least 1947, the Commission believed that Louisiana law of prescription would not apply where property was acquired under the Weeks Forestry Act by the United States, either with a reservation of minerals or subject to a previous reservation of minerals, and that any such reservation would be binding upon the United States according to its terms. Therefore, the government cannot today argue, as in ***Little Lake Misere***, that it had any expectation or bargained for contractual interest in the minerals being subject to termination. To the contrary, it fully expected, represented and re-affirmed that the laws of prescription in Louisiana were not applicable to transfers to it under the Weeks Forestry Act and that the United States was bound by the terms of mineral reservations to which its acquisitions were subject.

**3. Permanent Reservations are in harmony with, not hostile to, the congressional scheme of land acquisition under the Weeks Law:**

The court noted in ***Little Lake Misere*** relative to the possible application of State law that:

---

28 ***U.S. v. Nebo***, 90 F.Supp. 73, 87.

29 ***U.S. v. Nebo***, supra p.90.

> However, in a setting in which the rights of the United States are at issue in a contract to which it is a party and the "issue's outcome bears some relationship to a federal program, no rule may be applied which would not be wholly in accord with that program."[30]

The Court in ***Little Lake Misere*** held that since the contract was unequivocal, and presumably not "hostile" to the federal program, it was the applicable law between the parties to the transaction. Thus, it was by operation of the contract - not operation of Louisiana law of liberative prescription - that the mineral interest was deemed terminated. The rule should be no less so where the contact by its terms happens to favor the vendor or a third party rather than the United States. The enforcement of such a provision is consistent with, not hostile to, the federal land acquisition program under the Weeks Forestry Act. As noted in the excerpt quoted above at page 12, the Secretary of Agriculture and the National Forest Reservation Commission had adopted the policy of purchasing lands under the Act subject to reservations of minerals in perpetuity.

The District Court concluded in ***Nebo*** that the evidence conclusively proved that "the Commission had authorized the acquisition of millions of acres of land subject to the reservation of mineral rights **in perpetuity** (emphasis added) and had repeatedly authorized the acquisition of tracts where the mineral rights were outstanding in third persons on the ground that "such mineral rights will not interfere with the use of the land for national forest purposes or diminish the value of the land." [31]

The government cannot now in good faith suggest that enforcement of the mineral reservation as written, understood and interpreted by the parties is inconsistent with, or hostile to, the implementation of the Act. Therefore, the contract should be enforced as the law between the parties.

**4. Neither Congress nor the Louisiana Legislature intended that the Louisiana law of prescription would apply to reservations contained in, or existing previously to, acquisition by the U.S. government under the Weeks Law:**

It is uncontradicted that the ***Frost-Johnson*** decision relating to mineral servitudes and prescription relating thereto posed a serious obstacle to implementation of the Weeks

---

30 93 S.Ct. at p. 2402-3.

31 ***U.S. v. Nebo***, supra at 87.

---

Forestry Act in Louisiana. The ***Nebo*** District Court noted this as follows:

> It is a matter of common knowledge that the acquisition of tracts for these and other similar federal purposes were seriously hampered and impeded by the Louisiana laws of prescription. The difficulties encountered by the Department of Agriculture in the acquisition of lands for national forest purposes because of the Louisiana laws of prescription are repeatedly stated in the records of the National Forest Reservation Commission and the Department of Agriculture.[32]

In the "Act of Consent" enacted by the Louisiana Legislature authorizing the United States to acquire lands in Louisiana for national forest purposes, the State gave to the United States "power ... to pass such laws as it may deem necessary to the acquisition as herein provided for incorporation in said forests covered or cut over lands lying in Louisiana as in the opinion of the Federal Government may be needed." (La. Act No. 90 of 1922 as amended by Act No. 71 of 1924). Section 9 of the Weeks Forestry Act, as amended in 1913, provides that:

> Such acquisition by the United States should not be defeated because of located or defined rights of way, easements and reservations which, from their nature will, in the opinion of the National Forest Reservation Commission and the Secretary of Agriculture, in no manner interfere with the use of the lands so incumbent for the purposes of the Weeks Act.

The District Court in ***Nebo*** reasoned that Louisiana law had been superseded by Federal law:

> It is evident from the foregoing statutes that Louisiana authorized the United States to enact such legislation as was necessary to the acquisition of lands for national forest purposes and that Congress, recognizing that lands could not be acquired unless they were purchased subject to outstanding mineral rights, has exercised the power granted to it by Louisiana and has specifically declared that the acquisition of lands for national forest purposes shall not be

---

32 ***U.S. v. Nebo***, supra at p. 97.

> defeated by mineral reservations which do not interfere with the use of the land for forest purposes. As Mr. Boyle points out in his opinions, however, the Louisiana laws of prescription were operating as an effective bar to the acquisition of lands in Louisiana for forest purposes. Landowners were unwilling to sell their lands because they ran a risk of losing their mineral rights in ten years, even though those rights had been reserved in perpetuity. This operation of the Louisiana laws of prescription, however, was directly contrary to the express provisions of Section 9 of the Weeks Law and completely nullified and frustrated the intent and purpose of that Section. Consequently, unless the Section is to be rendered meaningless, it must be held to have superseded the prescriptive provisions of the Louisiana Civil Code.[33]

We think the above is the correct analysis under ***Little Lake Misere***. In ***Little Lake Misere***, the court faced a **contractual term** mineral interest and whether that contractual term mineral interest could be altered by a subsequent Louisiana law. Such a contractual term mineral interest would have been enforceable irrespective of the applicability of underlying State law *i.e.* irrespective of whether the underlying scheme of law was that of mineral servitudes under Louisiana law or that of a common law jurisdiction recognizing a separate mineral estate. The court never got to the issue of whether Louisiana law relating to mineral servitudes and liberative prescription applied. If faced with an unrestricted contractual provision, providing that a mineral interest excepted was "forever", in a transfer to the United States under the Weeks Forestry Act, a court applying ***Little Lake Misere*** must necessarily inquire whether the provision should be enforced as the contract between the parties, whether the substantive law of Louisiana should be incorporated as part of the contract, or whether it should apply some "federal common law."

The Louisiana law of prescription of nonuse was plainly hostile to the implementation of the Weeks Forestry Act because it made land acquisitions by the United States difficult and more expensive. Thus acquisitions in Louisiana were more difficult and expensive than in other states with regimes allowing permanent separate estates in minerals. Such a scheme should be deemed "specifically aberrant or hostile," and, therefore, not an appropriate standard for federal law.

---

33 ***U.S. v. Nebo***, supra at p. 101.

---

That Louisiana law relating to liberative prescription applicable to mineral servitudes did not apply because it frustrated and interfered with land acquisitions under the Weeks Forestry Act was the official government position at the time of the sale to the United States by Gulf Lumber Company. The ***Nebo*** District Court found as follows:

> This interpretation of the applicable statutes was the official opinion of the Department of Agriculture prior to the enactment of Act No. 315 of 1940. In his opinion of March 4, 1935, Mr. Boyle, after pointing out that the Louisiana act of consent was enacted after Articles 789 and 3546 of the Louisiana Civil Code, stated:
>
>> "It was the intention of the State that the consent statute should give to the United States power to pass such laws as would be necessary to acquire the land and administer it. . . .The provisions of the State law as to nonuser of servitude appear to be an effective bar to the acquisition of lands in Louisiana for National Forest purposes if the State law applies to a deed conveying land to the United States.
>>
>> . . . .
>>
>> From the facts and law applicable thereto, I am of the opinion that the consent statute of Louisiana was intended to supersede any State law which may conflict with the acquisition by the United States of lands for National Forest purposes and to confer upon Congress power to pass such laws as are necessary to the acquisition; that Section 518, Title 16 U.S. C.A. makes reservations in deeds subject to rules and regulations of the Secretary of Agriculture; that the reservations and deeds in Louisiana would be subject to these rules and regulations; and that Articles 789 and 3546 of the Civil Code of

Louisiana would not apply."[34]

As a result, were a court to elect to not apply Act 315 of 1940, but, rather enter into the federal conflict of laws analysis required under ***Little Lake Misere***, the court would not elect to "borrow" State law since such borrowed law would also be hostile to the implementation of the federal law on the date of the transactions. The applicability of State law was not intended by the Congress or the Louisiana Legislature since such "applicability" tended to frustrate implementation of the Weeks Forestry Act in Louisiana. The Act, as interpreted, by the Secretary and the Commission, authorized acquisition of property subject to reservations of, or subject to previously existing, perpetual mineral interests. The terms of the Act, therefore, as well as the terms of the reservation, constitute the applicable law as between the Lawton entities and the United States government.

**Artillery Range Situation:**

With respect to the "Artillery Range" situation, there is no basis for the application of ***Little Lake Misere***. When the United States acquired the artillery range lands in 1943, and included a general, unrestricted, reservation of minerals in favor of the landowner, Act 315 of 1940 was the law in Louisiana. Hence, under the law in existence on the date of the transaction, the mineral servitude so created is imprescriptible. This rule resulted in a mineral reservation having the same effect vis-a-vis the United States as though the government had acquired land subject to a mineral reservation in any other State in the country. The Louisiana Third Circuit Court of Appeal has held that Act 315 of 1940 is applicable to acquisitions by the United States after the effective date of the act. ***Heirs of Viator v. Tri-Parish Investors, Inc.***, supra. As noted in our discussion above application of the rule of imprescriptibility after 1940 is clearly (a) consistent with the express language of the agreement; (b) consistent with the intent and expectation of the United States on the date of the transaction and (c) in no way interfered with, but in fact promoted, implementation of the Act. The 1944 reservation falls squarely within Justice Burger's suggestion that the statute would be applicable under certain circumstances:

> We do not depreciate Louisiana's concern with facilitating federal land acquisitions by removing uncertainty on the part of reluctant vendors over the duration of mineral reservations retained by them. From all appearances, this concern was a significant force behind the enactment of the 1940 Legislation. But today, we are not asked to consider Act 315 on

34 ***U.S. v. Nebo***, supra at p. 102.

Mr. Mike Cruse
November 9, 1995

the face, or as applied to transactions consummated after 1940. . .[35]

Clearly the United States government is bound by the law of imprescriptibility (Act 315 of 1940) which was in effect on May 15, 1943, the date of its acquisition of the artillery range tract.

**Kisatchie and Artillery Situations:**

Court documents have consistently recognized Lawton minerals as being "reserved permanently." For more than thirty-five years the government has made court filings recognizing that Mr. Burton and his successors were owners of the minerals in question. These court filings were made after enactment of Act 315 of 1940 and both before and after rendition of the ***Little Lake Misere*** decision. However, even if it would be established by the government that Act 315 of 1940 does not apply to either or both the Kisatchie or artillery situations and that the laws of prescription does apply to the mineral interests to which the government acquisitions were subject, such a finding would not materially advance the government's claim to the minerals. Even if the rules of prescription are applicable, prescription has been continually suspended or interrupted by the government through various expropriation proceedings and military use of the property preventing the exercise of the servitudes.

By virtue of the various expropriation procedures which were filed between 1948 and 1973 Mr. Burton and his successors have been prevented from exercising their right to explore for their minerals on the lands under discussion. The expropriation of the right of the mineral owner to use the surface in these various proceedings constitutes an obstacle which the Lawtons could not prevent or remove. Therefore, same suspended prescription on the mineral servitudes affected thereby.

Since 1943, a substantial portion of the property has been, in fact, continuously subject to bombing practice and artillery practice by the United States Army and Air Force. According to personnel in the ordinance disposal section at Fort Polk, over 400 unexploded bombs are found and disposed of each year by UXB teams, approximately half coming from Tracts A, B and C. Fort Polk, for many years, was the home to two (2) armored divisions. In connection with the U. S. Air Force use of Tracts A, B and C, unexploded 2,000 pound bombs have been found at various inactive ranges. An officer at the explosive ordinance disposal section stated that because much of the recently discovered grenades, shells, and bombs are more than 20 years old (WWII, Korean &

35 ***United States v. Little Lake Misere Land Company, Inc.,*** supra., 93 S.Ct. at p. 2400.

---

Vietnam era), they can become more unstable (depending on the type of fuse and/or explosive) with the passage of time and "should be treated with extraordinary caution." On portions of Tract A and C lies the Redleg 1 Artillery Impact Area, the currently active impact are for 155MM howitzer, heavy artillery and tank gunnery practice. On the surface of Tract A is a bazooka range, a rifle grenade range, and numerous other small arms impact areas including a TOW missile range.

According to an officer at the explosive ordinance disposal department, chemical weapons were once unearthed. There are numerous abandoned ranges all over Tracts A, B and C where, with regularity, unexploded bombs are found after rains. In addition to the problem a driller or producer might confront with unexploded ordinance, there is the problem that almost the entirety of Tracts A, B and C are presently used by the JRTC for parachute jumps, maneuvers, bivouacs, live fire, and night training exercises.

One area on Tract A contains a simulated village used for training in house-to-house combat. On Tract A is situated a 700 acre site (as measured from a "base map" furnished by range control officials at Fort Polk) designed as the Explosives Ordinance Disposal Area. We understand that this is the area where, for approximately fifty years, defective and unexploded munitions have been dumped.

Several officials at Fort Polk's Range Control Department pointed out that no oil and gas operations would be allowed at night [because of regular exercises involving highly sensitive night optical equipment (known as "night-ops")] or while maneuvers simulating war conditions are being conducted.

There can be no question that the above activities have constituted and continue to constitute an obstacle, in fact, to exploration by Mr. Burton and the Lawton entities. If the rules relating to prescription were to be deemed to apply, prescription has been, and continues to be, suspended as to all lands affected by the above military use and operations.

## Conclusion

The Lawton family feels strongly that the Bureau of Land Management, in executing mineral leases affecting the lands discussed above, has slandered its mineral title. Further, your lessees should be advised that any attempt by them to exercise rights under the mineral eases will be considered a trespass and all appropriate remedies against said parties will be pursued. Mr. Cruse, after you have had an opportunity to study this letter and the accompanying materials, please give me a call. I would like to discuss this situation with you. We would like to avoid litigation; but, at the same time, we feel that the

Mr. Mike Cruse
November 9, 1995

---

Lawton family has a strong position that it is currently the owner of one hundred (100%) percent of the minerals underling lands in both the Kisatchie situation and artillery range situation, and that said mineral interests are imprescriptible.

Yours very truly,

**STRAIN, DENNIS, MAYHALL & BATES, L.L.P**

By: ______________________
Kim G. Mayhall
318 St. Charles Street
Baton Rouge, Louisiana 70802

**THE GRAY LAW FIRM (APLC)**

By: ______________________
A. J. GRAY, III

Is your RETURN ADDRESS completed on the reverse side?

**SENDER:**

**SENDER:**
- Complete items 1 and/or 2 for additional services.
- Complete items 3, and 4a & b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write "Return Receipt Requested" on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):
1. ☐ Addressee's Address
2. ☐ Restricted Delivery

Consult postmaster for fee.

3. Article Addressed to:
MR. MIKE CRUSE
DEPUTY GENERAL COUNSEL
OFFICE OF GENERAL COUNSEL
U. S. DEPARTMENT OF AGRICULTURE
ROOM 3201
FEDERAL BUILDING
LITTLE ROCK, AR 72203

NOV 15 199[illegible]

4a. Article Number
P-309-099-907

4b. Service Type
☐ Registered ☐ Insured
☒ Certified ☐ COD
☐ Express Mail ☐ Return Receipt for Merchandise

7. Date of Delivery
11-13-95

5. Signature (Addressee)

8. Addressee's Address (Only if requested and fee is paid)

6. Signature (Agent)
J Wineger

PS Form 3811, December 1991 ★U.S. GPO: 1993—352-714 **DOMESTIC RETURN RECEIPT**

Thank you for using Return Receipt Service.

P 309 099 907

**Receipt for Certified Mail**
No Insurance Coverage Provided
Do not use for International Mail
(See Reverse)

UNITED STATES POSTAL SERVICE

MR. MIKE CRUSE, DEPUTY GENERAL COUNSEL, OFFICE OF GENERAL COUNSEL, U.S. DEPT OF AGRICULTURE ROOM 3201, FEDERAL BUILDING LITTLE ROCK, AR 72203

| | |
|---|---|
| Postage | $ 6.95 |
| Certified Fee | 1.10 |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | 1.10 |
| Return Receipt Showing to Whom, Date, and Addressee's Address | |
| TOTAL Postage & Fees | $ 9.15 |

Postmark or Date
NOVEMBER 9, 1995
NOV - 9 1995

PS Form 3800, June 1991

**Fold at line over top of envelope to the right of the return address**

**CERTIFIED**
P 309 099 907
**MAIL**