IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CENTRAL PINES LAND COMPANY, ET AL., Plaintiffs, | ) | No. 98-314 L |
| vs. | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' SUPPLEMENTAL BRIEF**

Pursuant to the Court's Order of September 5, 2007 (Doc. 106), Defendant United States submits this response to Plaintiffs' Brief (Doc. 107) (hereinafter referred to as Plaintiffs' "Supplemental Brief").

I. Introduction and Summary

In the remaining claim in this case, Plaintiffs allege a taking of their mineral servitude in the "Group C" lands. First Amended Complaint, Count II. This claim continues to evolve as Plaintiffs seek to avoid dismissal of those claims as either time-barred or on the merits.

In Count II of their First Amended Complaint, Plaintiffs allege that after the 1978 termination of a moratorium prohibiting access to the surface, the United States "*continued* to prohibit the mineral owner from using the surface of the lands for oil and gas exploration purposes, but made no payments for such takings." First Amended Compl. ¶ 33 (emphasis added). Plaintiffs allege that this continued denial of access to the Group C lands for mineral exploration occurred "through moratoriums, 'defacto' moratoriums, and military use of the Property inconsistent with mineral activities . . . ." Id., ¶ 39. In response to Defendant's motion

to dismiss as time-barred any takings claim that is premised on the allegation that Defendant has continued, since 1978, to deny Plaintiffs access to the Group C lands, Plaintiffs have relied on the continuing claim doctrine and have argued that their complaint is timely at least as to the federal actions which occurred since 1992. Pls.' Summ. Judg. Opp. at 25-26.

The events and evidence cited by Plaintiffs in their Supplemental Brief confirm that – contrary to the allegations in their First Amended Complaint – there is no continuing moratorium or defacto moratorium that prohibits access to any minerals on the Group C lands, nor has Defendant otherwise denied Plaintiffs access to the Group C lands for the purposes of mineral development or exploration at any time since 1978. In fact, Plaintiffs concede that "[t]here were simply no dealings between the Plaintiffs and the United States between 1978 and 1995." Pls.' Suppl. Brief at 4. In addition, Plaintiffs are unable to cite any final agency action that constitutes a denial of access at any point in time since 1995. Instead, Plaintiffs' takings claim now appears to be based – not on any actual denial of access – but instead on actions taken by Defendant as the owner of the land that is subject to Plaintiffs' mineral servitude. The actions relied upon by Plaintiffs include Defendant's assertion of title and leasing of certain portions of the Group C lands, and the fact that Defendant, in its reasonable management and use of the surface estate, may impose conditions on access for exploration and development of minerals. As set forth below and in the summary judgment briefs previously filed with the Court, none of these actions denied Plaintiffs access to their mineral rights or otherwise precluded Plaintiffs from deriving economic benefits from the Group C lands. Defendant's motion for summary judgment as to Count II should therefore be granted.

II. Response Argument

The Court's Order of September 5, 2007, requests supplemental briefing or documentation to assist in the consideration of Defendant's pending motion for summary judgment. The Order instructs Plaintiffs to submit a brief on the following question: "Between 1978 and the filing of this case [April 3, 1998], what events constituted a final administrative action that precluded Plaintiffs from deriving economic benefits from the Group C lands, thereby causing a taking to occur?" Order of Sept. 5, 2007, at 2. A review of the events identified by Plaintiffs reveals that Plaintiffs have never sought access to the Group C lands for mineral exploration or development, nor has the United States taken any final administrative action to deny Plaintiffs access to the minerals or otherwise preclude them from deriving economic benefit from their interest in the Group C lands.

Despite the allegation that the United States has "continued to prohibit" Plaintiffs from using the surface of the Group C lands for oil and gas exploration purposes since the moratorium was lifted in 1978, Plaintiffs have produced no evidence of any denial of access for such purposes at any time since 1978. In their Supplemental Brief, Plaintiffs concede – as they have in prior filings – that "between 1978 and 1992, no event or events constituted a final administrative action precluding Plaintiffs from deriving economic benefits from Group C lands." Pls.' Suppl. Brief at 4. In addition, Plaintiffs assert that "'[t]here were simply no dealings between the Plaintiffs and the United States between 1978 and 1995 . . ." Id. These statements are consistent with Plaintiffs' prior admission that "the United States took no action to prevent, impede or limit Plaintiffs' access to Group C lands or to otherwise prevent Plaintiffs from developing minerals on Group C lands" between 1978 and 1991, Pls.' Proposed Findings

of Uncontroverted Fact ¶ 3, and that "no Plaintiff in these proceedings attempted to develop minerals on Group C lands or to otherwise access Group C lands between 1978 and 1995." Pls.' Ex. 41 (Affidavit of A.J. Gray, III, dated Feb. 13, 2007, at 2).

Plaintiffs' Supplemental Brief also includes a chronological list of events "with possible relevance." Pls.' Suppl. Brief at 4-9. Each of the listed "events" that occurred prior to 1992 relates to one of fifteen new exhibits that Plaintiffs are submitting for the first time in this case in a Supplemental Appendix filed with their Brief. Defendant objects to the submission of new evidence at this late date in the summary judgment proceedings. Plaintiffs had a full and fair opportunity to present all evidence that they believed to be relevant to Defendant's motion for summary judgment at the time they filed their opposition brief seven months ago. The Court's Order of September 5, 2007, instructed Plaintiffs to file a brief containing a list of the events that the Plaintiffs contend constitutes a final administrative action in this case. However, that Order did not grant Plaintiffs leave to supplement the record with new evidence that was part of the discovery record and available to Plaintiffs when they filed their opposition brief, but that Plaintiffs chose not to rely on until now.[1/] For these reasons, Defendant respectfully requests that the Court strike the following new exhibits from Plaintiffs' Supplemental Appendix: Exhibits A - O and Exhibit V.[2/]

---

[1/]Plaintiffs state that "[e]ach of the additional or supplemental documents were discovered by Plaintiffs in the Prior Lawsuit and has been exchanged in discovery in these proceedings." Pls.' Suppl. Brief at 5.

[2/]Defendant has no objection to the following exhibits, which were previously filed by Plaintiffs as part of their summary judgment appendix: Supplemental Exhibit Q (Pls. Ex. 20); Supplemental Exhibit S (Pls. Ex. 23); Supplemental Exhibit T (Pls. Ex. 24); Supplemental Exhibit U (Pls. Ex. 26); and Supplemental Exhibit W (Pls. Ex. 31).

Alternatively, in the event that the Court allows the newly submitted exhibits to remain part of the record, Defendant notes that Exhibits A – O confirm that there has been no taking of Plaintiffs' mineral interest in the Group C lands. Those fifteen exhibits are documents related to events that occurred between October 3, 1978 (Suppl. Ex. A) and April 16, 1984 (Suppl. Ex. O). However, Plaintiffs appear to have abandoned any claim that they were denied access to the Group C lands, or that the United States took any other final administrative action that resulted in a taking, between 1978 and at least 1995. See Pls.' Suppl. Brief at 4-9 (repeatedly stating that the documents in question do "not reflect a final administrative action."). Even in the absence of such a concession by Plaintiffs, the new exhibits included in Plaintiffs' Supplemental Appendix demonstrate that Defendant was willing to provide access to its lands for exploration and development of the mineral estate. See, e.g., Suppl. Ex. F (letter dated December 17, 1980, granting permission to access certain Fort Polk lands, including lands "within the impact area of an artillery range" for the purpose of performing a seismograph study); Suppl. Ex. K, ¶ 3 (Information Paper dated July 16, 1982, stating that "MG Steel advised Mr. Camp [the Executive Director of Burton Industries][3/] that Fort Polk's position in the search for minerals (oil and gas) was of total cooperation with the mineral owner and his intent to schedule training and firing so that mineral owners can explore in all areas of the range where safe to do so."); Suppl. Ex. O (letter dated April 16, 1984, to Shell Western E&P Inc. regarding seismic permit, stating that "[t]he period of early August through October 1984 will be a time when seismic activities can be accommodated; specific dates will be determined and coordinated with Shell's Permit Agent within the next 2-3 weeks."). Accordingly, the new exhibits submitted by Plaintiffs confirm that

[3/] "Mr. Camp was an attorney for Plaintiffs' ancestors in title." Pls.' Suppl. Brief at 8.

after the 1978 termination of a moratorium prohibiting access to the surface, the United States did not "continue[] to prohibit the mineral owner from using the surface of the lands for oil and gas exploration purposes, but made no payments for such takings." First Amended Complaint ¶ 33. Nor did the United States continue to deny Plaintiffs access to the Group C lands "for mineral exploration through moratoriums, 'defacto' moratoriums, and military use of the Property inconsistent with mineral activities." Id., ¶ 39.

In addition, Plaintiffs cite no action by the government since 1992 that constitutes a final administrative action denying Plaintiffs the right to access the Group C lands for the purpose of developing oil and gas resources.[4/] See Pls.' Suppl. Brief at 9-13. Instead, the "events" cited by Plaintiffs as constituting a final administrative action that allegedly precluded them from deriving economic benefits from the Group C lands are the government's assertion that, under Louisiana's prescription law, the mineral servitude expired after ten years of nonuse and reverted to the government as the surface owner. Id. at 9-13; see also First Amended Compl. ¶ 39. Plaintiffs contend that this taking "continued until final judgment" in the quiet title action. Def. SJ Ex. F at 4. Plaintiffs also assert that the government's leasing of some Group C lands constitutes a taking of their mineral servitude. Id. at 10. However, neither of these actions constituted a taking of Plaintiffs' mineral servitude.

As this Court explained in its prior decision in this case:

---

[4/] Plaintiffs allege that the United States Army denied one of its potential lessee's access to the Group C lands. The evidence relied upon by Plaintiffs does not support a finding that access was denied. To the contrary, the memorandum submitted by Plaintiffs as Supplemental Exhibit V documents a 1996 meeting with between Belco and the Army stating that Belco is "willing to locate wells to reduce impact on training." That memorandum reflects cooperation between Defendant and a potential lessee so that reasonable use can be made of both the surface estate and the mineral estate, not a denial of access.

> A taking occurs only when the Government "exercises its rights as sovereign to acquire property from the rightful owner for the public good." J & E Salvage Co. v. United States, 36 Fed. Cl. 192, 195 (1996) (quoting DSI Corp. v. United States, 228 Ct. Cl. 299, 302, 655 F.2d 1072, 1074 (1981)). In contrast, the Government is not liable for a taking when it acquires property "in a judicial proceeding [that] is neither eminent domain nor regulatory in nature * * *." Ultimate Sportsbar, Inc. v. United States, 48 Fed. Cl. 540, 549 (2001); accord DSI Corp., 228 Ct. Cl. at 302, 655 F.2d at 1074. One rationale for this distinction is to put the Government on equal footing with private parties when it is acting as a market participant rather than as a sovereign. See Ultimate Sportsbar, 48 Fed. Cl. at 549. When the Government is acting as a landowner, it is entitled to avail itself of the judicial system in order to clarify or protect its right to title of property in which it owns a stake. See DSI Corp., 228 Ct.Cl. at 302, 655 F.2d at 1074. Any reasonable landowner would defend its property rights in a quiet title action, and the Government cannot be held liable for any taking when it obtains additional property in such an action. See id.

Central Pines Land Co. v. United States, 61 Fed. Cl. 527, 531 (2004). The claim resulting from the government's assertion of title in this case is not a constitutional one; instead, the proper claim was a quiet title claim, which Plaintiffs did pursue in federal district court. As a result of the claims filed by Plaintiffs in federal district court, that court quieted title in favor of the government with respect to the Group A and B lands, holding that the Plaintiffs had lost their mineral rights in those lands by prescription after ten years of nonuse. Central Pines Land Co. v. United States, No. 2:96-2000, slip op. (W.D. La. 2000), aff'd, 274 F.3d 881, 895 (5th Cir. 2001), cert. denied, 537 U.S. 822 (2002). The court also quieted title in favor of the Plaintiffs with respect to the Group C lands, holding that Plaintiffs' mineral rights were imprescriptible under Louisiana law. 274 F.3d at 892. The fact that the government did not prevail in the quiet title action with respect to the Group C lands does not convert its assertion of title from an act taken as a landowner (here, as the owner of the surface estate), to a regulatory or physical act taken by

the government as the sovereign that may give rise to a takings claim. To the contrary, as this Court already held with respect to the Group A and B lands, the government's mere assertion of its property rights with respect to a portion of the Group C lands is not a taking.[5/] Central Pines, 61 Fed. Cl. at 531. See also Def.'s Summ. Judg. Mem. at 26-27 (Doc. 89-1); Def.'s Summ. Judg. Reply at 13-15 (Doc. 92).

Moreover, as explained in Defendant's previous submissions, the leasing of certain portions of the Group C lands for mineral development purposes also does not constitute a taking of Plaintiffs' mineral servitude. Def.'s Mot. for Summ. Judg. at 27-28; Def.'s Summ. Judg. Reply at 13-15. In fact, it is undisputed that while the quiet title action involving the United States and Plaintiffs was pending, Plaintiffs were able to lease portions of their Group C, with their lessees also securing protective leases from the United States because of the title dispute, which is a common practice when title to mineral interests is in dispute.[6/] In addition, as of May 2006, Plaintiffs reported the receipt of over $2 million in income from their Group C lands since

[5/]The Group C lands consist of approximately 21,000 acres, 16,000 of which are located within Fort Polk and 5,100 of which are part of the Kisatchie National Forest. Defendant's claim of ownership by prescription and its related leasing activity involved only that portion of the Group C lands located within the Kistachie National Forest, which represent less than 25% of the total acreage for the Group C lands. The United States neither claimed ownership of, offered to lease, or leased any of the portions of the Group C lands within Fort Polk for mineral development purposes. See Def.'s Summ. Judg. Brief at 6-7 n.3 and 26 n.12 (Doc. 89-1); Def.'s Reply at 13-14 n.10 (Doc. 92).

[6/]The fact that Plaintiffs were able to segregate out and lease only 4,822.10 acres of Group C to Chesapeake Operating Company out of the approximately 21,000 acres of Group C lands contradicts their assertion in this case that the government's actions with respect to one portion of Group C necessarily effects a taking of all of Group C. See Pls.' Suppl. Brief at 11 ("While the proposed lease sale included approximately 5,300 acres of Group C lands, because Plaintiffs' title is uniform for the full tract, the action of the United States effectively took the entirety of Group C.").

1978. Def. SJ Ex. J (Pls.' Resp. to Interrog. No. 20). Accordingly, the leasing of those portions of Group C that were the subject of the prior title dispute between the parties did not preclude Plaintiffs from deriving economic benefits from the Group C lands and did not constitute a taking of Plaintiffs' mineral servitude as to the entire 21,000 acres of Group C lands. Def.'s Summ. Judg. Mem. at 27-28 (Doc. 89-1); Def.'s Summ. Judg. Reply at 13-15 (Doc. 92).

Finally, Plaintiffs continue to allege that they have an "absolute right" to access the minerals on the Group C lands as a matter of Louisiana state law, making any restrictions on such access a taking. Pls.' Suppl. Brief at 13-15. This argument, which is simply a variation of Plaintiffs' "defacto moratorium" argument, fails for two reasons. First, the argument is based on the erroneous premise that Plaintiffs have an "absolute right" to access the minerals without regard to Defendant's ownership of the land and use of the surface. Louisiana law provides otherwise. See La. Rev. Stat. Ann. § 31:11(A) ("The owner of land burdened by a mineral right or rights and the owner of the mineral right must exercise their respective rights with reasonable regard for those of the other."); see also Def.'s Summ. Judg. Reply at 7-12. Second, the evidence cited to by Plaintiffs does not demonstrate that access to the minerals in question has been denied. The meetings between the Army and potential mineral lessees are an appropriate starting point for balancing the exercise of the government's rights as the landowner with "reasonable regard" for the rights of the owner of the mineral rights. Such meetings do not, however, represent a final agency action regarding the exercise of those mineral rights. In short, Plaintiffs have not requested access for the purpose of pursuing a specific mineral exploration or development project, nor has access been denied. Accordingly, there has been no taking of Plaintiffs' mineral rights at any time since 1978 when the moratorium was lifted.

III. Conclusion

For the reasons set forth above, in Defendant's Motion for Summary Judgment and Supporting Memorandum (Doc. 89-1), and in Defendant's Reply Brief in support of that motion (Doc. 92), Defendant respectfully requests that the Court grant Defendant's motion for summary judgment as to the takings claims asserted in Count II of Plaintiffs' First Amended Complaint.

Dated: October 3, 2007

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

s/ Kristine S. Tardiff
KRISTINE S. TARDIFF
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
TEL (603) 230-2583
FAX (603) 225-1577
E-MAIL kristine.tardiff@usdoj.gov

OF COUNSEL:
CAPT. JAMES N. HEWITT
Litigation Attorney
U.S. Army Environmental Law Division
901 N. Stuart Street, Suite 400
Arlington, VA 22203-1837

MATTHEW A. TILDEN, ESQ.
Office of the General Counsel
U.S. Department of Agriculture
1718 Peachtree Road, NW - Suite 576
Atlanta, GA 30309-2409

DENNIS DAUGHERTY
U.S. Department of the Interior
Office of the Solicitor
Division of Mineral Resources
1849 C St., NW, Room 6312
Washington, DC 20240