# In the United States Court of Federal Claims

### No. 98-314L

### (Filed September 30, 2008)

```
* * * * * * * * * * * * * * * * * * * * * * * * * * *
CENTRAL PINES LAND COMPANY, et al.,    *
                                       *
                     Plaintiffs,       *
                                       *
        v.                             *
                                       *
THE UNITED STATES,                     *
                                       *
                     Defendant.        *
* * * * * * * * * * * * * * * * * * * * * * * * * * *
```

## OPINION

Plaintiffs own a mineral servitude on a parcel of land in Vernon Parish, Louisiana. Defendant United States ("Defendant") owns the parcel's surface. Plaintiffs allege that a series of actions by the United States Army ("Army") impeded Plaintiffs' access to the mineral servitude thereby constituting a compensable taking of their mineral rights. Such allegations include (a) the Government's erroneous assertion of title to, and leasing of, Plaintiff's mineral interests, (b) a "de facto" moratorium by the Army prohibiting such access in a "secret policy," manifested by the loss of Plaintiffs' leasing and drilling opportunities to third-party operators as a consequence of obstacles set up by the Army, and (c) military operations on, and contamination of the surface and subsurface by the Army.

Defendant has moved this Court for summary judgment, pursuant to Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC"). The Court ordered supplemental briefing and heard oral argument on the motion.[1] Defendant argues that Plaintiffs' takings claims are barred by the six-year statute of limitations, 28 U.S.C. § 2051, or otherwise fail to state a claim.

---

[1] Defendant's also moved to strike a series of exhibits submitted by Plaintiff during supplemental briefing. As explained in more detail below, the Court did not consider such exhibits in ruling on Defendant's motion for summary judgment. Hence the motion is deemed moot.

Plaintiffs' claims are, in many important respects, difficult to discern and constitute moving targets. Plaintiffs' briefing papers resemble the game of "52 Card Pickup" because they submitted, with minimal explanation, a series of documents pertaining to events from which the Court was required to discern possibly viable takings claims that could withstand Defendant's summary judgment motion. Nonetheless, with justice and equity foremost in mind, the Court has carefully reviewed Plaintiffs' motion papers and finds that they have alleged sufficient material facts to survive Defendant's motion for summary judgment with respect to some of their takings claims that are predicated upon events that transpired after 1992, namely, takings claims predicated upon the Government's leasing of mineral rights pursuant to an erroneous claim of title and takings claims predicated upon military operations. In all other respects, Plaintiffs have failed to present sufficient material facts to state a claim for a taking predicated upon a supposed "de facto" moratorium by the Army that prevented them and potential third-party lessees from accessing and drilling the mineral servitude. The Court also holds that Plaintiffs have effectively conceded that the statute of limitations applies to any pertinent act of the Government prior to 1992. Accordingly, the Court GRANTS IN PART and DENIES IN PART Defendant's motion for summary judgment.

## I. BACKGROUND[2]

### A.    General Overview Of Plaintiffs' Takings Claims

This takings case, which has a very long and extensive history, originally involved subsurface interests ("mineral servitude" or "mineral rights") in oil, gas, and other mineral deposits beneath three parcels of land, which the parties have designated as "Group A," "Group B," and "Group C." Am. Compl. ¶ 1. These parcels encompassed approximately 100,000 acres. *Id.* at ¶ 5(b); *see also Central Pines Land Co. v. United States* ("*Central Pines III*"), 61 Fed. Cl. 527, 529 (2004). According to Plaintiffs, the parcels included lands now within the Kisatchie National Forest, a national forest managed by the United States Forest Service ("Forest Service"), which is a branch of the United States Department of Agriculture ("USDA"), and Fort Polk, a facility of the United States Army ("Army"). Am. Compl. ¶ 11. After a quiet title action that confirmed the Government's ownership of the Group A and B mineral rights, only the mineral rights concerning Group C remain at issue. *See Central Pines III*, 61 Fed. Cl. at 529, 536-40.

Plaintiffs include the Central Pines Land Company, D, S & T, Inc., Drost & Brame, Inc., Linda Lew Lawton Drost, Evelyn Gay Lawton Duhon, Jack E. Lawton, Jr., Tower Minerals Company, LLC, Jack E. Lawton, Sr., and William B. Lawton Company, LLC. Pls' Opp'n Ex. 42

---

[2]  This background is derived from Plaintiffs' Amended Complaint, Defendant's motion for summary judgment, Plaintiff's opposition to Defendant's motion for summary judgment, supplemental briefing, and oral argument.

(Pls.' Resp. to Def.'s First Set of Interrogs). ("Pls.' Interrog. Resp.") No. 7.  In 1929, Gulf Lumber Company, the owner of the three parcels of land, conveyed rights to the underlying minerals to S.H. Fullerton, thereby creating a servitude that allowed Fullerton to conduct mineral exploration and extraction activities (e.g., drilling). Am. Compl. ¶ 5 (b).  Fullerton conveyed these rights to the Fullerton Minerals Company one year later.  *Id*. at ¶ 5 (c).  Thereafter, between 1933 and 1938, the Forest Service acquired Groups A and B through four separate transactions, subject to the Fullerton Mineral Company's servitude.  *Central Pines Land Co. v. United States* ("*Central Pines II*"), 274 F.3d 881, 885 (5th Cir. 2001), *cert. denied*, 537 U.S. 822 (2002).  The Forest Service, in turn, granted the Army all of Groups A and B for use as military training grounds between 1941 and 1952.  *Id.*

William T. Burton Industries ("Burton") acquired the mineral rights in Groups A and B from the Fullerton Minerals Company in 1937.  *Central Pines III*, 61 Fed. Cl. at 529-30.  Burton also acquired title to both the surface and subsurface rights in Group C that same year.  *Central Pines II*, 274 F.3d at 885.  Defendant then obtained the surface rights to Group C in a series of transactions between 1942 and 1981, subject to Burton's servitude.  *Id.*; Am. Compl. ¶ 5 (a-r).

Defendant, through a series of condemnation proceedings between 1952 and 1970, instituted a mineral moratorium on all Group C lands. [3]  *Central Pines Land Co. v. United States* ("*Central Pines I*"), No. 2:96-2000, slip op. at 4 (W.D. La. 2000) (contained in Def.'s Mot. Ex. B); Def.'s Proposed Finding of Uncontroverted Fact ("DPFUF") No. 4.  The Army, in 1967, commenced using a part of the land subject to the moratorium for artillery and bombing practice operations.  *Central Pines II*, 274 F.3d at 886.  Defendant compensated Burton on a per acre basis for the minerals that were inaccessible as a result of the moratorium.  *Id.*; DPFUF 5.

The official moratorium ended on March 31, 1978.  *Id.*; DPFUF 6.  Ten years later, Plaintiffs acquired Burton's mineral rights in all three parcels through a series of mesne conveyances.  Am. Compl. ¶ 5(s); *Central Pines III*, 61 Fed. Cl. at 530.  But the last drilling operation conducted on either of the parcels had occurred in 1964.  *Central Pines II*, 274 F.3d at 886.  The record documents no drilling operations by any party between 1978 and 1992.  *See id.*

In 1992, the United States Department of the Interior's Bureau of Land Management ("BLM") began granting mineral leases allowing for the exploitation of minerals under Groups A and B.  *Id.* at 886, 896.  Plaintiffs, however, did not learn of the BLM's actions until 1995.  *Central Pines I*, slip op. at 5-6.  The record also indicates that Defendant was engaging in mineral leasing activities concerning Group C in early 1996.  *See* Pls.' Supp. Br. at 11; Pls.'

---

[3]  The official moratorium affected all of Group B and C lands, but the extent to which ingress and egress was prevented over Group A lands is uncertain.  *Central Pines I*, slip op. at 4.

Opp'n at 12-13, Ex. 24; Pls.' Proposed Findings of Uncontroverted Fact ("PPFUF") No. 24; Pls.' Interrog. Resp. No. 1.

### B.     Government's Assertion of Title and Mineral Right Leasing Activities

According to Plaintiffs, Group C encompassed 21,118.2 acres, including land now within the Fort Polk Army base. Am. Compl. ¶¶ 2, 11. On October 9, 1992, Plaintiffs allege that agents of Defendant received a title opinion stating that Defendant could "claim ownership where drilling ha[d] not occurred in a ten-year period."[4] Pls.' Supp. Br. at 3; PPFUF No. 6; Pls.' Interrog. Resp. No. 1; *see also* Pls.' Opp'n Ex. 20. Pursuant to this title opinion, Charles E. Steele, a USDA official, circulated internally a memorandum, dated October 7, 1993, stating that lands, including portions of Group C, were available for mineral leasing.[5] *See* Pls.' Opp'n Ex. 20; Pls.' Supp. Br. at 9-10; Pls.' Opp'n at 10, 27; PPFUF No. 7; Pls.' Interrog. Resp. No. 1.

Plaintiffs learned about Defendant's assertion of title to the mineral rights in Group C in the spring of 1995 during the negotiation of a mineral lease on other property nearby. Pls.' Interrog. Resp. No. 1; Pls.' Opp'n Ex. 23 at 1. Consequently, Plaintiffs' counsel wrote a letter to USDA attorney Mike Cruse, dated November 9, 1995, presenting a legal analysis in defense of Plaintiffs' claim to the Group C mineral rights, along with the pertinent title documents and land use records. Pls.' Opp'n Ex. 23 at 1; *see also* Pls.' Supp. Br. at 10; Pls.' Opp'n at 12; PPFUF ¶ 23; Pls.' Interrog. Resp. No. 1. Mr. Cruse referred Plaintiffs to USDA attorney Jeffrey Eisenberg. Plaintiffs' counsel then learned of a proposed mineral lease sale of Group C lands scheduled for March 28, 1996. This apparently prompted Plaintiffs' counsel to write a letter to Mr. Eisenberg, dated February 29, 1996, asserting title to Group C mineral rights and specifically requesting that Group C mineral rights be withdrawn from the proposed sale. Pls.' Opp'n Ex. 24; Def.'s Resp. to Pls.' Proposed Findings of Undisputed Facts ("DRPPFUF") Nos. 24-25. Plaintiffs' counsel's February 29, 1996 letter to Mr. Eisenberg challenged the Government's proposed lease of mineral rights located in "Township 1 North, 5 West, Vernon Parish" scheduled for March 28, 1996. *Id.*

Upon Mr. Eisenberg's request, Plaintiffs' counsel, on March 11, 1996, submitted a dispute settlement proposal. *See* Pls.' Opp'n Ex. 25 *see also* Pls.' Interrog. Resp. No. 1; DRPPFUF No. 26. Mr. Eisenberg declined this offer on August 6, 1996. Pls.' Opp'n Ex. 31; *see also* Pls.' Supp. Br. at 13; PPFUF No. 35; Pls.' Interrog. Resp. No. 1.

---

[4]  Plaintiffs aver that a request for a copy of this title opinion pursuant to the Freedom of Information Act was denied. PPFUF ¶ 6.

[5]  Nonetheless, in their amended complaint, Plaintiffs claimed that, based on this action, Defendant had effected a taking of the *entire* Group C servitude. *See* Am. Compl. ¶¶ 31-40.

Defendant does not dispute Plaintiffs' assertion that at least 5,300 acres of Group C lands were included in the proposed mineral sale scheduled for March 28, 1996. DRPPFUF No. 25. However, the parties do not explicitly indicate whether this sale eventually occurred or which government agency was specifically involved in this activity. The Court, however, has been able to piece together from Defendant's description at oral argument and from Plaintiffs' visual exhibit at oral argument that the lease sale identified in February 29, 1996 letter occurred in the form of eight of nine mineral leases that BLM granted to Chesapeake Operating, Inc.[6] ("Chesapeake") and Union Pacific Resources Company ("Union Pacific") which presumably were to take effect in 1997.[7] The exhibit points out that these eight mineral leases overlapped with the land described in Plaintiffs' counsel's first letter to Mr. Eisenberg – 5,300 acres of properties located in "Township 1 North, 5 West, Vernon Parish." See Pls.' Opp'n Ex. 24. Specifically, the exhibit illustrates that all but one lease encompassed land in an area labeled "T1N R5W," which stands for "Township 1 North, Range 5 West." Oral Ar. Ex.; Am. Compl. Ex. A at 5. The leases in this area, according to the Oral Argument Exhibit, encompass 5292.73 acres, almost equal to the approximately 5,300 acres of land Plaintiffs' counsel described in his

_____

[6] Chesapeake is a Fortune 500 company, publicly traded on the New York Stock Exchange, that is engaged in oil and gas exploration and natural gas production. PPFUF Nos. 11-13.

[7] Defendant describes how the BLM granted the following ten-year mineral leases of portions of Group C to specified mineral exploration companies in 1997: (1) three leases, numbered 47572, 47574, and 47750 to Union Pacific and (2) six leases, numbered 48555, 48556, 48557, 48558, 48559, and 48560, to Chesapeake. DRPPFUF No. 43; " Oral Argument Transcript ("Oral Ar. Tr.") 76:22- 77:12. Plaintiffs also presented a visual exhibit during oral argument entitled Federal and Lawton Entity Leases Covering Group C, depicting lands subject to Defendant's mineral leases. Plaintiffs' Oral Argument Exhibit (Oral Ar. Ex.").

This exhibit, however, indicates (1) three leases, numbered 48555, 48556, and 48557, totaling 2,545.08 acres, to Union Pacific and (2) six leases, numbered 48558, 48559, 48560, 48561, 48562, and 48563, totaling 2,771.30 acres, to Chesapeake, thereby contradicting the description to which both parties stipulated earlier. Compare id. with DRPPFUF No. 43; see also Pls.' Supp. Br. At 10; Pls.' Opp'n at 15; Pls.' Interrog. Resp. No. 1. Specifically, the numbers of the leases the display identifies do not correspond with those listed in Plaintiffs' Proposed Findings of Uncontroverted Fact and Defendant's response thereto (e.g. three leases granted to Union Pacific, 47572, 47574, and 47750, documented in the Proposed Findings, are listed as 48555, 48556, and 48557). Compare Oral Ar. Ex. with PPFUF No. 43; DRPPFUF No. 43; see also Pls.' Supp. Br. at 10; Pls.' Opp'n at 15; Pls.' Interrog. Resp. No. 1. The oral argument exhibit is also the only document that quantifies the area the leases encompass. Oral Ar. Ex.

5

letter to Mr. Eisenberg.  Oral Ar. Ex.; Pls.' Opp'n Ex. 24.  According to the oral argument exhibit, one lease to Chesapeake, numbered 48563, encompassed 124.65 acres on an adjoining area labeled as "T1S R5W" which stands for "Township 1 South, Range 5 West." Oral Ar. Ex.; Am Compl. Ex. A at 5.

### C.  Procedural History

#### 1.  Related District Court Quiet Title Action

Pursuant to the dispute over the claim of title to mineral rights between Plaintiffs and the Government, on August 22, 1996, Plaintiffs filed a quiet title action regarding all three parcels' mineral rights in the United States District Court for the Western district of Louisiana.  At issue in that case was whether the mineral servitude under each parcel of land prescribed to the Government under Louisiana prescription law, which, under certain circumstances, provided that "a mineral servitude is extinguished by 'prescription resulting from nonuse for ten years.'" *Central Pines I*, slip op. at 12 (quoting La. Rev. Stat. Ann. § 31:27(1) (West 2000)).  The court ruled in the Government's favor with regard to the mineral interests in Groups A and B, but in Plaintiffs' favor as to the mineral interests in Group C.  *Central Pines I*, slip op. at 3 n.4, 12-33 – a decision that was ultimately affirmed by the United States Court of Appeals for the Fifth Circuit ("the Fifth Circuit").[8]  *Central Pines II*, 274 F.3d at 887-97.

#### 2.  Takings Action; Motion to Dismiss and Motion for Judgment on the Pleadings

On April 3, 1998, while the quiet title proceedings were pending, Plaintiffs also filed a two-count takings claim before the United States Court of Federal Claims.[9]  *The first count* alleges that Defendant's actions constituted a permanent taking of the mineral rights in Groups A and B.  Am. Compl. ¶¶ 1-3; *see also* Complaint ("Compl.") ¶¶ 1-3.[10]  The second count, which

---

[8]  For a detailed description of the law surrounding the quiet title dispute and how the district court and the Fifth Circuit applied that law, *see Central Pines II*, 274 F.3d at 887-97; *Central Pines I*, slip op. at 12-33.

[9]  This case was stayed pending resolution of the quiet title action.  Order Staying Case (Oct. 8, 1998).  Upon denial of certiorari by the U.S. Supreme Court, the Court lifted the stay. Order Lifting Stay (Nov. 12, 2002).  Plaintiffs subsequently filed an amended complaint on January 6, 2003.

[10]  Subsequently, on October 12, 2004, the Court dismissed Count I pursuant to the Fifth Circuit's decision.  *See Central Pines III*, 61 Fed. Cl. at 531 (citing *Central Pines II*, 274 F.3d at

(continued...)

relates to Group C alleges a "temporary use" taking of the rights of Group C. *Id*. As stated in the Amended Complaint, Plaintiffs contend, in general, that the Government continued the official moratorium on mineral rights that officially ended in 1978 through a "de facto" moratorium thereafter that prohibited Plaintiffs from using the surface of the Group C lands to access the minerals. Am. Compl. ¶¶ 33-39. In particular, it claims: (1) that the Government placed restrictions on the use of the surface that were equivalent to the prohibition; (2) that the Government prevented Plaintiffs from leasing the mineral rights to certain companies by informing them of "almost insurmountable requirements" to obtain access; and (3) that "actions of the [Government] in claiming ownership of the Property" and "military use of the Property" were "inconsistent with mineral activities." *Id*. ¶¶ 34-35, 39. In their prayer for relief, Plaintiffs ask for just compensation for the unconstitutional taking of the use of Group C *and* for the Plaintiffs' *loss of the opportunity* to grant mineral leases on Group C. *Id*. Prayer for Relief III-IV.

With respect to Plaintiffs' Group C claims, Defendant moved for judgment on the pleadings, contending that the statute of limitations barred Plaintiffs' complaint because Plaintiffs had averred that access to Group C was initially denied when the moratorium ended in 1978. *See Central Pines III*, 61 Fed. Cl. at 536-40; Am. Compl. ¶ 33. This Court would not have had jurisdiction to hear any takings claim that accrued prior to April 3, 1992, since Plaintiffs' filed their complaint in the Court of Federal Claims on April 3, 1998. 28 U.S.C. § 2501 (prescribing a six-year statute of limitations period for actions in the United States Court of Federal Claims). Plaintiffs countered that the statute did not apply because of the "continuing claim" doctrine, whereby Defendant's alleged wrongful acts within the statute of limitations period were related to other wrongful acts that occurred outside the statute of limitations period.

However, Judge Robert J. Yock denied Defendant's motion for judgment on the pleadings with respect to Count II, which alleged a taking of Plaintiffs' mineral rights in Group C. He noted that these particular rights had not prescribed to Defendant according to the Fifth Circuit and Louisiana district court decisions, thereby making a takings claim possible. *See id*. 536-40 (citations omitted).

Judge Yock noted that, although Plaintiffs had offered few specific facts in support of their case (e.g. not clarifying which alleged wrongful acts occurred within the statute of limitations period), "the procedural posture of this case require[d] the Court to assume the truth of the [P]laintiffs' allegations and grant all reasonable inferences in their favor." *Id*. at 539. As a

---

[10](...continued)
895). The Court held that Defendant had not taken Plaintiffs' Group A and B mineral rights because these rights reverted to Defendant by operation of Louisiana prescription law and that such claims were not filed within the six-year statute of limitations under 28 U.S.C. § 2501.

result, Judge Yock denied Defendant's motion for judgment on the pleadings and allowed discovery to proceed.  *Id.* at 539-540.

On October 19, 2004, Plaintiffs' action was reassigned to the undersigned.  Order Reassigning Case (Oct. 19, 2004).  Discovery was completed on August 4, 2006.  *See* Joint Status report (Aug. 21, 2006).

### 3.      Instant Motion for Summary Judgment and Supplemental Briefing

Defendant's motion for summary judgment, filed on December 15, 2006, renews its argument that Plaintiffs' Group C claims are barred by the statute of limitations. 28 U.S.C. § 2501.  *See* Def.'s Mot. at 1.  In the alternative, Defendant argues that Plaintiffs have failed to state a claim for a taking because "the record shows that Plaintiffs never attempted to access the surface of Group C."  *Id.* at 20.  Specifically, Defendant argues that: (1) there is no firm evidence that potential lessees were denied access; (2) although some of Group C was used for military operations, other portions were leased by Plaintiffs; (3) the mere incorrect assertion of ownership by the Government is not a taking; and (4) the leasing of mineral rights by the Government during the title dispute is not a taking when Plaintiffs also leased the mineral rights during the same period.  *Id*. at 20-22, 26-27.

In their opposition brief, Plaintiffs depicted a series of specific events that allegedly evidenced a taking, but failed to relate them to the analytical framework of takings law.  Pls.' Opp'n at 9-18.  For example, the Amended Complaint averred that Defendant's actions hampered Plaintiffs' mineral leasing attempts.  *See* Am. Compl. ¶ 35.  But Plaintiffs' opposition brief only described these lost leasing opportunities in further detail and cited to absolutely no law or advisory materials that showed why these events could support a takings claim.  *See* Pls.' Opp'n at 31-34.

Moreover, in its opposition to Defendant's motion, Plaintiffs appeared to have conceded, at least in part, Defendant's statute of limitations argument.  While the amended complaint alleged that Defendant had denied access to Group C since the moratorium ended in 1978, Am. Compl. ¶ 33, Plaintiffs' stated in their opposition that Defendant had not taken their Group C rights at any time before 1992, when the statute of limitations on the complaint in this case began to run and admitted that they had sought no access to the minerals between 1978 and 1991.  *See* Pls.' Opp'n at 1, 4, 9-10; *see also* PPFUF No. 3; Pls.' Interrog. Resp. Nos. 1, 2.

Faced with the vague allegations and the *ad hoc* quality of the evidence that Plaintiffs presented, the Court began to consider the possibility that considerations of ripeness could be the proper framework for resolving Defendant's motion.  Thus, in order to clarify and sharpen Plaintiffs' arguments, the Court ordered supplemental briefing on September 5, 2007.  *See* Order for Supplemental Briefing (Sept. 5, 2007) ("Order for Supp. Br.").  The order directed: "Between

1978 and the filing of this case, what events constituted a final administrative action that precluded Plaintiffs from deriving economic benefits from the Group C lands, thereby causing a taking to occur?"  *Id*. at 1.  In this way, the Court sought to focus the Plaintiffs on the statute of limitations issue ("[b]etween 1978 and the filing of this case") and on the general elements of proving a takings claim ("events," "final administrative action," "economic benefits").  The Court's reference to "final administrative action" was designed to suggests to the parties that a ripeness analysis could be a proper basis for resolving Defendant's argument that Plaintiffs had failed to state a claim on which relief could be granted.  The Court sought to give further guidance by citing to *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985).

Plaintiffs' supplemental brief, submitted on September 18, 2007, stated that after the moratorium ended in 1978, Defendant "did not deprive Plaintiffs of use of their property" and "granted Plaintiffs legal access which had previously been denied."  Pls.' Supp. Br. at 3. Moreover, Plaintiffs admitted that "[t]here were simply no dealings between the Plaintiffs and the United States between 1978 and 1995, when Plaintiffs learned that the United States was claiming title to minerals related to Group C lands."  *Id.*  More specifically, Plaintiffs stated that, "[t]o Plaintiffs' knowledge, between 1978 and 1992, no event or events constituted a final administrative action precluding Plaintiffs from deriving economic benefits from Group C lands."  *Id.*[11]

In its response to Plaintiffs' supplemental brief, filed on October 3, 2007, Defendant argued that Plaintiffs had conceded the statute of limitations issue.  Def.'s Resp. to Pls.' Supp. Br. at 3-6.  Defendant also argued that "Plaintiffs cit[ed] no action by the [G]overnment since 1992 that constitutes a final administrative action denying Plaintiffs the right to access the Group C lands."  *Id.* at 6.

However, the briefing still did not relate with adequate particularity the alleged facts to the framework of takings law, particularly with respect to ripeness, which was implicated by that part of Defendant's motion that raised the issue of failure to state a claim.  Simply stated, the briefing remained too vague and ad hoc in nature to be of much assistance.  Therefore, the Court

---

[11]  Despite this concession, however, Plaintiffs, in their supplemental brief still referred to occurrences prior to 1992 as relevant to their case and submitted fifteen corresponding new exhibits.  *See* Pls.' Suppl Br. at 5-9, Ex. A-O.  Defendant moved to strike these exhibits on the ground that Plaintiffs did not produce them during principal briefing.  Def.'s Opp'n to Pls.' Supp. Br at 4.  The Court simply did not examine these exhibits since they related to events and a period of time that were no longer relevant.  *See Powell v. McCormack*, 395 U.S. 486, 496-97 (1969) (finding that an issue is moot when it is no longer "live" and "the parties lack a legally cognizable interest in the outcome") (citation omitted).

ordered oral argument on February 29, 2008.  Order for Oral Argument (Feb. 29, 2008).  The order sought to: (1) identify the kind of taking that Plaintiffs were alleging in the context of tests that the U.S. Supreme Court had established, (2) determine whether the mere assertion of title, and activity based on such an assertion, could be a taking, (3) clarify which portions of Group C were in dispute, (4) determine what mineral extractions had taken place and by whom, (5) ascertain in which instances final administrative action occurred, and (6) clarify the impact of military activity and contamination on Group C.  *Id.*  Oral argument was held on March 27, 2008.

Based upon the briefing received, it is evident that Plaintiffs concede that the statute of limitations barred any takings claim that may have accrued on events that occurred prior to 1992, which is the date that the statute of limitations began to run.  Plaintiffs instead are relying on events that took place within the statute of limitations as the basis for their takings claims – specifically events that took place after the spring of 1995 when Plaintiffs allegedly learned about Defendant's assertion of title to mineral rights in Group C.  Thus, that portion of Defendant's motion for summary judgment pertaining to the statute of limitations is effectively moot.[12] However, the portion of Defendant's motion for summary judgment arguing that Plaintiffs have failed to state a takings claim remains.  Thus, after extensive briefing and oral argument, the Court must decide whether *vel non* Plaintiffs have presented sufficient facts to conclude that any of their takings claims are ripe for adjudication or have raised genuine issues of material fact that preclude summary judgment for Defendant.

---

[12]  During oral argument, Plaintiffs' counsel agreed with the Court's conclusion that "we're only talking from 1992 on because of the statute of limitations issue." Oral Ar. Tr. 81:10-15.

## II.     DISCUSSION

### A.     Standard of Review

In its motion for summary judgment, Defendant characterizes Plaintiffs' Amended
Complaint as having failed to state a claim upon which relief may be granted.  Normally, such a
motion is resolved under the standards set forth in RCFC 12(b)(6).  However, because facts
outside the pleadings were presented and considered in connection with the motion, the motion is
properly disposed of as provided in RCFC 56 standards and not RCFC 12(b)(6).  "If matters
outside the pleadings are presented to and not excluded by the court on a motion to dismiss for
failure to state a claim upon which relief can be granted, then 'the motion shall be treated as one
for summary judgment and disposed of as provided in RCFC 56....'"  *Am. Contractors Indem.
Corp. v. United States*, 81 Fed. Cl. 682, 686 (2008) (quoting RCFC 12(b)); *Nicholson v. United
States*, 77 Fed. Cl. 605, 613-14 (2007).

Summary judgment is appropriate when there are no genuine issues of material fact and
the moving party is entitled to judgment as a matter of law.  RCFC 56(c); *see also Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The court must render summary judgment "if the
pleadings, depositions, answers to interrogatories, and admissions on file, together with the
affidavits, if any," support the movant's arguments to this effect.  RCFC 56(c).  Consequently,
the movant needs to indicate specific portions of the record that show the absence of any material
factual issue or evidence that would justify continuing proceedings in a case.  *See Celotex v.
Catrett*, 477 U.S. 317, 323-34 (1986).  The court's function is not to weigh the evidence, but
rather to determine whether there is a genuine issue as to a material fact – that is, one that would
change the outcome of the litigation.  *Anderson*, 477 U.S. at 248-49.

Such a genuine issue exists if the evidence is such that a reasonable trier of fact could
find for the nonmovant.  *Id.* at 242.  The movant has the initial burden of proof and must
demonstrate the absence of any genuine issue of material fact.  *Celotex*, 477 U.S. at 325.
However, this burden may be discharged if the moving party demonstrates that there is an
absence of evidence to support the non-moving party's case.  *Id.*  ("[T]he burden on the moving
party may be discharged by showing – that is, point out to the district court – that there is an
absence of evidence to support the non-moving party's case.").  If the moving party makes such a
showing, the burden then shifts to the non-moving party to demonstrate that a genuine factual
dispute exists.  *Id.* at 322.

The nonmovant must not "rest upon the mere allegations or denials" of the movant's
pleadings, but must go beyond the pleadings and, through the use of affidavits or depositions,
answers to interrogatories, and admissions on file, designate "specific facts" highlighting a
genuine issue for trial.  RCFC 56(e).  The fact that a nonmovant may not provide extensive legal
analysis is inconsequential because a nonmovant can defeat a motion for summary judgment

11

merely by providing a counterstatement of specific facts.  *See Processed Plastics Co. v. United States*, 473 F.3d 1164, 1170 (Fed. Cir. 2006) (citation omitted).  Moreover, in considering motions for summary judgment, the Court resolves all reasonable inferences in the light most favorable to the non-moving party.  *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  But a court must grant summary judgment for a movant if the nonmovant fails to make a showing sufficient to establish an element essential to his case and upon which he will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 323-34.  "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient [to withstand a summary judgment motion]; there must be evidence on which a [finder of fact] could reasonably find for the nonmovant."  *Anderson*, 477 U.S. at 252.

## B.    The Takings Law to be Applied

Plaintiffs have presented an extensive array of facts and factual allegations to support their claim that Defendant took their mineral rights in Group C beginning in 1995 or 1996.  But they still have not clearly related these facts to the framework of takings law, despite the Court's efforts to compel them to do so.  Neither has Defendant devoted much briefing to law applicable to the question of whether any events after 1992, the date when the statute of limitations ran, evidenced a taking.  Therefore, as a preliminary matter, the Court sets forth its understanding of the legal framework of takings law as related to the facts of this case.

The Takings Clause of the Fifth Amendment provided that private property shall not "be taken for public use, without just compensation."  U.S. Const. Amend. V.  Thus, the Constitution does not prohibit government interference with property rights for public use, but instead "places a condition on the exercise of that power" by guaranteeing compensation "in the event of otherwise proper interference amounting to a taking."  *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 536-37 (2005) (quoting *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles* (*"First English"*), 482 U.S. 304, 314-15 (1987)).

In considering a takings claim, a plaintiff must possess a valid interest in the property affected by government action that, according to the plaintiff, constituted a taking.  *Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir. 2000).  If so, the court then decides if a taking actually occurred.  *Id.*  Subsequent government actions will not eliminate the rights of a property owner affected by a taking to just compensation.  *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 800 (Fed. Cir. 1993) (citing *First English*, 482 U.S. at 321).

A direct government appropriation or physical invasion of private property constitutes a taking in its most basic, or "paradigmatic," form.  *Lingle*, 544 U.S. at 537 (citing *United States v. Pewee Coal Co.*, 341 U.S. 114 (1951) (concluding that the Federal Government's seizure and operation of a coal mine to prevent a coal miners' strike constituted a taking); *United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945) (finding that the Federal Government's occupation of a

private warehouse amounted to a taking)).  But ever since its 1922 decision in *Pa. Coal Co. v. Mahon*, the Supreme Court has held that government regulation of private property may sometimes be so burdensome "that its effect is tantamount to a direct appropriation or ouster." *Lingle*, 544 U.S. at 537-38 (citing *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). Consequently, a taking does not necessarily entail an actual physical invasion or physical restraint.  *See Yuba Goldfields, Inc. v. United States ("Yuba I")*, 723 F.2d 884, 887 (Fed. Cir. 1983) (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978)).

As with all legal actions, judicial review of a takings claim is only appropriate when the claim is ripe–when the harm asserted has matured to a degree warranting judicial intervention. *See Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975).  To ascertain ripeness, a court must consider an issue's fitness for judicial decision and the hardship the parties will suffer if the court withholds review.  *Nat'l Park Hospitality Ass'n v. Dept. of Interior*, 538 U.S. 803, 807-08 (2003).  A claim is not ripe for adjudication if the claim stems from contingent future events that may not occur as anticipated, if at all.  *Texas v. United States*, 523 U.S. 296, 300 (1998).

Thus, a takings claim's ripeness depends upon whether a government authority has both affected a taking and denied the affected property owner just compensation.  *See San Remo Hotel, L.P. v. City and County of San Francisco*, 545 U.S. 323, 338 (2005) (citing *Williamson County*, 473 U.S. at 195).  Further clarifying what constitutes ripeness in regard to regulatory takings, the Supreme Court has stated the following:  "[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue."  *Williamson County*, 473 U.S. at 186.

## C.    Analysis

Despite the voluminous briefing and despite oral argument, the Plaintiffs' contentions and argument remain opaque.  Indeed, in opposition to Defendant's motion, Plaintiffs have alleged numerous takings claims that are either duplicative or intertwined.  In an effort to simplify matters, while at the same time giving due regard to Plaintiffs' arguments, the Court has determined that Plaintiffs' alleged takings claims can be placed into four distinct categories: (1) the Government's assertion of title to Group C lands and its leasing of the mineral rights in portions of them consistent with the Government's assertion of title; (2) the Government's denial of leases and lost drilling opportunities on, and denial of access to, Group C lands because of contamination and related military use; (3) certain additional actions of the Government, including denial of protection leases, which allegedly frustrated the attempts of Plaintiffs to lease mineral rights in Group C lands, resulting in lost leasing and drilling opportunities in, or loss of access to, portions of Group C lands; and (4) a takings claim predicated upon certain permitting requirements of the Army.  With regard to (1), the Court holds that the Government's mere

assertion of title in this specific case is not in itself a taking, but the Court cannot make a decision on the Government's actual leasing activities due to genuine issues of material fact. With regard to (2), the Court finds that Plaintiffs have presented genuine issues of material fact with respect to takings claims based upon military activities and contamination upon the surface and/or subsurface of Group C lands.  With regard to (3) and (4), the Court holds that Plaintiffs have not demonstrated that it has presented takings claims that are ripe for adjudication.

### 1.	The Government's Assertion of Title and Mineral Leasing Activity

As explained above, in its order directing supplemental briefing, the Court requested that Plaintiffs set forth the events which constituted final administrative action that precluded Plaintiffs from deriving economic benefits from the Group C lands, thereby causing a taking to occur.  In their supplemental brief, Plaintiffs argue that the following actions of the Government constituted or evidenced the final administrative action necessary to support a takings claim:

- •	Mr. Steele's memorandum of October 7, 1993, stating that portions of Group C were available for mineral leasing, "together" with the title opinion, dated October 9, 1992, upon which the memorandum was based.  *See* Pls.' Supp. Br. at 9-10; *see also* Pls.' Opp'n Ex. 20.

- •	Plaintiffs' settlement offer to Defendant, dated March 11, 1996, which itself "reflects that the United States had taken a final administrative action to claim title and to deprive Plaintiffs of their property," as well as Mr. Eisenberg's letter, dated August 6, 1996, rejecting this settlement offer.  *See* Pls.' Supp. Br. at 11, 13; *see also* Pls.' Opp'n Exs. 25, 31.

For purposes of clarity, the Court will consider separately the issue of whether the Government's mere assertion of title to Group C mineral rights constitutes a taking and the issue of whether the Government's leasing of Group C mineral rights pursuant to an assertion of title constitutes a taking.

### a.	The Government's Assertion of Title to Group C Lands

In defense of its actions, Defendant first argues that a mere good faith assertion of title can never amount to a taking, because such an assertion is the exercise of the Government's rights as a property owner and not the exercise of its rights as a sovereign.  Defendant supports this argument by pointing to language in Judge Yock's earlier decision in this case.  *See* Def.'s Opp'n to Pls.' Supp. Br. at 7-8 (citing *Central Pines III*, 61 Fed. Cl. at 531 (citations omitted)); Def.'s Mot. at 26-27; Def.'s Reply at 13-15.  The fact that the Government was wrong and the Louisiana federal district court and the Fifth Circuit ruled that the Government did not have ownership of the mineral rights in Group C, Defendant argues, did not convert this claim of title

14

to a taking.  Second, Defendant argues that its mineral leasing activities purportedly could not have amounted to a taking because Plaintiffs themselves were still able to lease portions of Group C to which Defendant claimed title.  Def.'s Opp'n to Pls.' Supp. Br. at 8; Def.'s Mot. at 27-28; Def.'s Reply at 13-15; *see also* PPFUF Nos. 38, 42; DRPPFUF Nos. 39.  For example, Defendant notes that Plaintiffs were able to lease the mineral rights in 4,822.10 acres to Chesapeake in the midst of the quiet title dispute.

With respect to its first argument, Defendant overstates Judge Yock's holding.  The text from which it cites comes from a section of the decision addressing Plaintiffs' takings claims in regard to the mineral rights in *Groups A and B*, rights that Defendant had acquired by prescription and, therefore, could not "take."  *See Central Pines III*, 61 Fed. Cl. at 530-31. In the context of Groups A and B, he opined that the Government was merely acting as any other landowner would in defending its title in court; therefore, there was no taking as the Government was acting in its proprietary capacity.  "Any reasonable landowner would defend its property rights in a quiet title action, and the Government cannot be held liable for any taking *when it obtains additional property in such an action*."  *Id.* at 531 (emphasis added).  Judge Yock's analysis, then, is inapposite in the context where, as here, the Government is accused of leasing the same property that Plaintiffs undoubtedly own, namely, the mineral rights in Group C.

Morever, in *Yuba I*, 723 F.2d at 889-90, the Federal Circuit explicitly rejected the proprietary-sovereign distinction in a case where the facts are similar to those of the case at bar. In 1901, a landowner quitclaimed the subject property to the United States, reserving to himself underlying mineral interests.  *Id.* at 885.  The right to extract these minerals was later conveyed to Yuba.  *Id.*  In 1975 and 1976, the United States Army Corps of Engineers wrote Yuba officials stating that Yuba had no extraction rights and that removal of any minerals was prohibited, a prohibition that would be enforced.  *Id.* at 885-86.  After successfully pursuing a quiet title claim in federal district court, Yuba filed a takings claim in the Claims Court, this Court's predecessor. *Id.* at 886.  The Claims Court granted the Government's motion for summary judgment as to whether the Corps had effected a taking, holding that there was no taking, in part because the Government acted in a proprietary rather than a sovereign capacity.  *Id.* (citing *Yuba Goldfields, Inc. v. United States*, 1 Cl. Ct. 421, 424-25 (1983) (citation omitted)).  But the Federal Circuit reversed the Claims Court and vacated the finding of summary judgment.  *Id.* at 891.  The Federal Circuit stated:

15

> In whatever other context it may be useful, moreover, determination of whether the United States has acted in a proprietary or governmental-sovereign capacity is of little, if any, use in Fifth Amendment-just compensation analysis.  The purpose and function of the Amendment being to secure citizens against governmental expropriation, and to guarantee just compensation for the property taken, what counts is not what government said it was doing, or what it later says its intent was, or whether it may have used the language of a proprietor.  What counts is what the government did.

*Yuba I*, 723 F.2d at 889-90 (citing *Hughes v. Washington*, 389 U.S. 290, 298 (Stewart, J., concurring) (1967)).  Moreover, the Federal Circuit also noted that neither physical invasion nor physical restraint are prerequisites for a taking.  *See Yuba I*, 723 F.2d at 887 (citing *Penn Cent. Transp. Co.*, 438 U.S. at 104).[13]  Additionally, the fact that the Government acts under a good faith belief that it owns the property in question is not controlling in takings jurisprudence since denial of property use is a question of fact.  *Id.* at 889; *see also Pi Elec. Corp. v. United States*, 55 Fed. Cl. 279, 287-88 (2003) (citations omitted).  Thus, following *Yuba I*, the mere fact that the Government made a good-faith assertion of title cannot serve as a basis for summary judgment in favor of the Government.

However, at the same time, to the extent that Plaintiffs argue that the mere assertion of erroneous title by the Government against Plaintiffs' rightful ownership of the mineral servitude itself constitutes a taking, *Yuba I* precludes such a contention.  Yuba argued that the Government's wrongful assertion that it owned Yuba's mineral rights constituted a taking–a contention that the Federal Circuit rejected:

> Though Yuba makes much of the determination that what the government did was based on an invalid claim, nothing of record other than its failure to seek judicial determination indicates that the United States had any reason to doubt the validity of its claim. . . .  If the United States' claim had been valid, Yuba would have had no property subject to taking and no taking could therefore have occurred.  Thus, the mere invalidity of the United States claim is not relevant in determining whether a taking took place in this case.

---

[13]   Indeed, a taking occurs when a government authority physically occupies a property, destroys a property interest, or excessively regulates a property's use.  *Boyle v. United States*, 200 F.3d 1369, 1374 (Fed. Cir. 2000).

*Yuba I*, 723 F.2d at 890.  Accordingly, standing alone, the mere assertion of title by the Government in this case does not in of itself constitute action that directly harms Plaintiffs' property interest and consequently does not support Plaintiffs' takings claim without taking into account what the Government actually did in connection with its assertion of title.  In other words, assertion of title plus something more is required for a takings claim.

> **b.**    **Government's Leasing of Group C Mineral Rights Pursuant To Its Claim of Title**

Although mere assertion of title in good faith does not, in and of itself, constitute a taking, Plaintiffs allege that "something more" than an erroneous assertion of title effected a taking, namely, the Government's grant of mineral leases in Group C lands to third parties in accordance with its assertion of title.  Plaintiffs held a valid property interest in the Group C mineral rights.  *See, e.g., Central Pines II*, 274 F.3d at 887-97.  Neither party specifically indicates that Defendant's leasing activities took place pursuant to some sort of regulation.  *See, e.g.,* Am. Compl. ¶ 35.  In contrast, a title opinion apparently led Defendant to believe that it rightfully owned the Group C mineral rights it eventually leased to Chesapeake and Union Pacific.  *See* Pls.' Opp'n Exs. 20, 24; DRPPFUF Nos. 24-25.  Thus, the appropriate analysis would be the law concerning physical takings.  *See Pettro v. United States*, 47 Fed. Cl. 136, 146 (2000) (where the plaintiff did not indicate that an alleged taking occurred in a regulatory context and the defendant filed a quiet title suit seeking to validate its ownership of the plaintiff's sand and gravel rights, which the defendant had also precluded the plaintiff from accessing, the court analyzed the actions at issue according to physical takings law).

Here, Defendant erroneously claimed ownership of Group C mineral rights and consequently granted nine mineral leases to third parties.  *See* DRPPFUF ¶¶ 24-25, 43; Pls.' Interrog. Resp. No. 1; Oral Ar. Ex.; *Central Pines III*, 61 Fed. Cl. at 536 (citing *Central Pines II*, 274 F.3d at 881.  Defendant argues that the fact that some of these leases that the Government granted overlapped with a lease that Plaintiff had granted of approximately 4,800 acres worth of mineral rights to Chesapeake invalidates Plaintiffs' takings claims.  However, Defendant's leasing activities could still have constituted a taking even though Plaintiffs were still able to lease some mineral rights.  *See Yuba I*, 723 F.2d at 887 (citing *Penn Cent.*, 438 U.S. at 104).  The dispositive issue in regard to the nine leases, then, is whether Defendant damaged Plaintiffs' property interest in Group C to a degree that warrants just compensation.  In other words, what was the effect of Defendant's mineral leasing activities on the value of Plaintiffs' mineral servitude during the title dispute involving Group C lands?  *Yuba Natural Res., Inc. v. United States*, 904 F.2d 1577, 1580-81 (Fed. Cir. 1990) (citing *First English*, 482 U.S. at 319).

The parties have not developed the factual record in regard to these events to a degree that enables the Court to decide this question.  In the context of a motion for summary judgment, where Plaintiffs are the non-moving party, in the absence of any specific evidence disputing

whether Plaintiffs' property interest in Group C was damaged through a decline in the value of the use of the mineral rights while the quiet title dispute was pending, the Court must assume that such damage occurred.  *See Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Moreover, statements made during oral argument added a further wrinkle to the issue of whether the Government's leases constitute a taking.  Because of the Defendant's claim of title, Plaintiffs' lessees had to obtain protection leases[14] from the Government in order to be secure in their rights to extract minerals.  Defendant's counsel averred that once the quiet title dispute was resolved, the "protection leases that were issued in connection with the [G]overnment's belief that those interests had prescribed and that [the Government] owned them were canceled."  Oral Ar. Tr. 77:9-12.  She also noted that "any proceeds the [G]overnment got from those leases [were] then returned to the party who was found to be the owner of those, so these leases [were] not in effect."  *Id.* 77:14-19.  These statements indicate that Defendant provided some form of compensation to the lessees against whom it had wrongly asserted competing title claims.  But Defendant's counsel did not explain this contention further.  She was not sure evidence of these events was "part of the record," but she stated that such evidence was "established" and "probably not disputed."  Oral Ar. Tr. 77:1-4.  Plaintiffs' counsel seemed not to dispute this contention:  "We accept what she said . . . [and] didn't know that they had canceled [sic] the leases."  *Id.* at 77:20-22.  However, reimbursing the lessees does not necessarily mean that loss in value to the Plaintiffs' property interest was made whole.  For example, if Plaintiffs had to accept less payment for the mineral lease because of the Government's competing claim, reimbursement to the lessees would not make up for the Plaintiffs' loss.  In other words, the Plaintiffs' lessees may have been made whole but not necessarily the Plaintiffs themselves.

As a result, Plaintiffs have nine possibly viable takings claims based on the ten-year mineral leases Defendant admits granting to Chesapeake and Union Pacific.[15]  *See* Pls.' Opp'n Ex. 24; DRPPFUF Nos. 24-25, 43.  Accordingly, the Court denies Defendant's motion for

---

[14]  A protection lease is a second mineral lease on the same property taken by a mineral lessee from one asserting a competing ownership interest against the first or primary mineral lessee.  *See* DRPPFUF No. 21 (Defendant states that a party might take a protection lease for other reasons as well); Pls.' Opp'n Ex. 44.

[15]  *See* RCFC 8(e)(2) ("A party may set forth two or more statements of a claim . . . alternately or hypothetically, either in one count . . . or in separate counts . . . [and] [w]hen two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements.").

summary judgment with respect to the Government's leasing activity pursuant to an erroneous assertion of title.

### 2.     Frustration of Plaintiffs' Leasing and Drilling Opportunities As a Result of Military Use and/or Contamination

In addition to the Government's leasing of mineral rights in Group C pursuant to an erroneous claim of title, Plaintiffs allege that Defendant frustrated their attempts to lease Group C mineral rights to three oil exploration companies – Chesapeake, Sonat Exploration Company ("Sonat") and Belco Oil and Gas Corporation ("Belco") – as a result of military operations, including contamination of Group C due to unexploded surface and subsurface. See Pls.' Opp'n at 40 ("the decision to not offer portions of Group C lands for leasing was based on the fact that the property contained unexploded ordnance (surface and subsurface)" and that unknown to them, "portions of Group C became too contaminated and/or dangerous for mineral operations."). These conditions, along with the related military operations, allegedly constituted "separate taking[s] of Plaintiffs' property." *Id.* at 40-41. Defendant admits that a "substantial portion of Group C is subject to military operations," but denies that "unexploded bombs [were] found and disposed of." DRPPFUF No. 45.

In support of its takings claims predicated upon military operations and contamination, Plaintiffs point to evidence dated after 1992. Pls.' Opp'n Ex. 38. This memorandum, dated July 23, 1997, was written by Lieutenant Colonel Stephen Sittnick in response to an internal inquiry concerning offers to lease government property. *Id.* According to Plaintiffs, the BLM received offers to lease parcels within Group C from "Plaintiffs' lessees or persons acting on their behalf." PPFUF No. 44. Sittnick's memorandum stated that "this impact area [presumably the Group C parcels to which the offers applied] [was]. . . off limits to personnel and/or vehicle activities." Pls.' Opp'n Ex. 38. Furthermore, "no digging in that zone [was] allowed due to unexploded ordnance (surface and subsurface)" and "[a]ny effort to surface and subsurface clear that zone for oil exploration would [have been] extremely unsafe." *Id.*

Plaintiffs present the Sittnick memorandum as the reason behind the actions by Army officials that allegedly compelled Chesapeake and Sonat to abandon mineral leasing discussions with Defendant. See Pls.' Opp'n at 37-41. The parties agree that meetings between Sonat and the Government took place on March 11, 1997, and between Chesapeake and the Government on April 1, 1997, and that access to, and mineral operation restrictions within Group C lands were discussed. DRPPFUF Nos. 50-52; Pls.' Opp'n Exs. 37, 51. In addition, Army officials expressed concern about wells located in a tank gunnery range and other safety issues in their discussions with Sonat and Chesapeake. DRPPFUF Nos. 50-52; Pls.' Opp'n Exs. 37, 51.

Plaintiffs also present testimony from officials with Sonat and Belco stating that military use and/or contamination prevented leases or drilling operations to move forward. For instance,

David Hamilton, a former employee of Sonat, testified that Sonat did not drill wells on Group C lands because of restrictions imposed by the Army.  Hamilton stated:

> I believe that. . .wells weren't drilled on the fort because of the. . .restrictions of use of the surface and the many, many things that we would have to comply with on trying to get in there and drill wells.  There - - and the safety factors.  There was lots - - you know, depending on where you are talking about.  You know, I know the war games area was an area that, personally, when I heard what we were going to have to do and the things involved and the, quote, unexploded gas canisters and whatever else is out there, that - - it was a quote from some of the people at Fort Polk that this was a very restrictive area with war games in there. So, I know, personally, I didn't want to be out there; but that wasn't my call.

Pls.' Opp'n Ex. 48 at 3-4 (Hamilton Dep.).

Likewise, Mel Fife of Belco testified that his company did not have access to Group C lands because it was an "old artillery range" and that they "can't have access to it."  Fife Dep. at 16.  He further testified that "they just said that there was a lot of unexploded ordnance out there and that we could not go."  *Id.*  His deposition testimony further refers to such statements by Army officials at a March 20, 1996 meeting as: "No, you can't go out there." *Id.* (Fife Dep. at 32).

There is contrary evidence, however, suggesting that the negotiations were not so definitely concluded.  This evidence consists of a handwritten memorandum to one Colonel Prosold from Fort Polk employee Herbert Carter.  Pls.' Supp. Br. Ex. V.   The memorandum, dated June 19, 1996, included a drawing of an updated slide showing possible locations on Group C for Belco wells and a notation that Belco was "willing to locate wells to reduce impacts on training" and interested in continuing discussions.  *Id.*; *see also* Oral Ar. Tr. 43:17-47:18.

Plaintiffs' counsel points to no later instance where Army officials spoke in the terms Mr. Fife described.  When asked during oral argument about whether Belco officials had met with Army personnel again, Plaintiffs' counsel reiterated that Mr. Fife testified about only one meeting.  Oral Ar. Tr. 44:9-21.  Nevertheless, as Defendant's counsel discussed the memorandum further, Plaintiffs' counsel suggested, albeit indirectly, that the memorandum indeed indicated that the meeting Mr. Fife had described had not been determinative as to Belco's access:

> THE COURT:  So your contention is then that Exhibit V says in it
> that there is an intention to continue negotiations?
>
> MS. TARDIFF:  On both sides, yes.
>
> THE COURT:  Okay.  All right.  Is that true, Mr. Gray?
>
> MR. GRAY:  The document says what it says.

Oral Ar. Tr. 45:14-45:23.  At this time, then, this Court has absolutely no specific indication as to the outcome of any further discussions between the Army and Belco that may have occurred.

Moreover, Plaintiffs do not allege that potential lessees saw the Sittnick memorandum which was written after the meetings with Sonat and Chesapeake.  However, as explained above, Plaintiffs have pointed to testimony that Army officials did tell potential lessees that, as a result of military activities and/or unexploded ordnance, access to the surface of Group C lands was restricted.  The Sittnick memo does not unequivocally state that lessees would be denied access to the mineral rights.  Nevertheless, drawing all reasonable inferences in favor of Plaintiffs, a trier of fact could infer from the memo, read together with the testimony offered above, that Group C lands were contaminated and that the Army restricted potential lessees access to the surface of Group C lands, thereby resulting in a taking of Plaintiffs' mineral rights.

Finally, there is yet a further wrinkle to Plaintiffs' takings claim predicated upon military use and/or contamination.  There is some evidence on the record reflecting the possibility that, notwithstanding restrictions on access to Group C lands as a consequence of military use and/or contamination, mineral rights underneath restricted lands might still be accessible from outside restricted areas via directional drilling.  Specifically, the Army implemented "Special Stipulations" ("Stipulations') which stated that Fort Polk's military mission "supersede[d] all other land uses" and that a servitude owner's "rights of mineral exploration and development are subordinate to the accomplishment of the military mission." Pls.' Opp'n Ex. 40.  These Stipulations further stated that Group C lands "may be explored and produced by directional drilling from outside the impact areas, and mineral rights and production under the impact area may be pooled or utilized."  At oral argument Plaintiffs admitted that such exploration was possible and had indeed been pursued.  When asked whether Defendant "was not prohibiting the extraction of minerals as long as doing that would not require the extractor to go onto Group C and compromise the military mission," Plaintiffs' counsel answered affirmatively.  Furthermore, Plaintiffs stated that the particular wells in the project, known as the Austin Chalk wells, required drilling to a depth of "a couple of miles" and then, by a process called "kicking," the wells "went horizontal."  Defendant's counsel then pointed to a map of Group A, B, and C lands that Plaintiffs had presented, showing two wells drilled from surface locations outside of Group C that enabled production from within Group C.

21

Thus, while denying access to the surface does not necessarily preclude access to subsurface mineral rights, the evidence presented to the Court so far is simply too sparse to indicate whether Plaintiffs were not, in fact, denied access to subsurface mineral rights in Group C lands, despite military operations on Group C lands and alleged contamination resulting therefrom.[16]  As a matter of common sense, the Army's military operations on the surface likely had *some* effect on Plaintiffs' mineral rights.  It is impossible to determine, however, on summary judgment, what that effect was and whether it amounted to a taking.  At the very least, the evidence presented at this stage of the litigation does not unequivocally indicate that a taking did not occur or could not have occurred as a result of such activities.

Accordingly, the Court finds that a genuine issue of material fact exists as to whether the Army in fact effected a taking of any of Plaintiffs' mineral rights as a consequence of military activities and/or contamination.

### 3. Frustration of Plaintiffs' Leasing and Drilling Activities; Denial of Protection Leases; Denial of Access; De Facto Moratorium

In addition to Plaintiffs' argument that they lost leasing and drilling activities as a consequence of military activities and contamination on the surface or subsurface of Group C lands, Plaintiffs further allege that Defendant took additional actions which frustrated their attempts to lease Group C mineral rights to Chesapeake, Sonat, and Belco.[17]  *See* Pls.' Supp. Br.

---

[16]  Moreover, as explained in further detail below, it is unclear from the record whether Chesapeake, Belco, or Sonat ever was presented with or aware of the Stipulations.

[17]  In their proposed findings of uncontroverted fact, Plaintiffs list one instance, in April 1995, where Union Pacific expressed an interest in a mineral lease, but provided no evidence that this interest was actively pursued or that this proposed lease overlapped with any of the three ten-year leases Union Pacific obtained in 1997.  PPFUF Nos. 9, 43.  Plaintiffs do not mention this episode in their supplemental brief and the Court will not consider it further because Plaintiffs allege no injury related to this event, nor clarify its relation to leases that were granted.  *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103 (1998) (requiring a plaintiff to allege a concrete harm in order to establish standing to sue).

Plaintiffs also vaguely describe events possibly concerning other potential lessees' decisions not to enter into a transaction, but neglect such specifics as who the lessees were and when related discussions with Defendant's agents took place.  *See, e.g.*, Pls.' Opp'n at 37 ("Plaintiffs' potential lessee requested that the United States offer a portion of Group C for leasing.")  Without more, however, the Court cannot consider these events further given

(continued...)

at 13-15; Pls.' Opp'n at 31-34; Pls.' Interrog. Resp. No. 1.  Defendant purportedly prevented these transactions from taking place when Army officials convinced these companies' representatives that access to the portion of Group C located on Fort Polk would be denied.  *See id.*; Am. Compl. ¶¶ 34-36, 39.  Plaintiffs argue that the Government denied protection leases to third parties which they allege constitutes a separate and distinct taking.  Plaintiffs also contend that the failure of these transactions caused lost drilling opportunities which constitute a separate and distinct taking from the lost leasing opportunity.  Pls.' Opp'n at 34.  Plaintiffs further contend that denying Belco access to drill constitute a separate taking.  *Id.*  Although they do not clearly state so, it appears that the Plaintiffs' allegations concerning the Government's frustration of Plaintiffs' leasing activities and their lost leasing activities is synonymous with their allegations that the Government had a policy of a "de facto" moratorium on mineral activities on Group C.

However, the facts that Plaintiffs present in their briefing papers for the purpose of showing that they have presented valid separate takings claims are very thin.  During oral argument, the Court questioned the parties extensively as to whether Plaintiffs' fruitless attempts to lease Group C mineral rights to Chesapeake, Sonat, and Belco could ripen a takings claim for adjudication.  *See* Oral Ar. Tr. 41:4-68:16; 70:21-85:8.  Defendant contended that Plaintiffs had provided no evidence that Army officials' statements and actions reflected final decisions as to whether Plaintiffs' potential lessees would be denied access to Group C.  *See id.* 42:8-14; 43:22-44:8; 45:5-12, 14-16, 20; 49:18-51:19; 67:3-68:16; 70:21-71:18; 78:20-81:3.  Accordingly, the Court concludes that, despite the fact that Plaintiffs argue that their lost leasing, drilling, denial of access, and denial of protection leases are separate and distinct takings claims, from an analytical point of view, such claims are intertwined.

A takings claim is not ripe for adjudication if it stems from contingent future events that may not occur as anticipated, if at all.  *See Texas*, 523 U.S. at 300.  Ripeness also not only depends on whether a government authority has effected a taking, but whether the authority has denied the affected property owner just compensation as well.  *See Williamson County*, 473 U.S. at 195.  As explained, seriatim, below, none of Plaintiffs' allegations concerning lost leasing opportunities, lost drilling opportunities, or loss of access with respect to Chesapeake, Sonat, or Belco, outside the context of their allegations concerning military use and/or contamination, satisfy these criteria.

---

[17](...continued)

Plaintiffs' lack of specificity.  *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [nonmovant's] position is not sufficient; there must be evidence on which a [finder of fact] could reasonably find for the nonmovant.").

a.      Chesapeake

On August 1, 1995, corporate parents of Plaintiffs' Central Pines Land Company and Tower Minerals Company leased approximately 33,607.5325 acres of land contiguous to, but not included within, Group C, to Chesapeake.  PPFUF No. 10.  Plaintiffs allege that in the course of negotiating this lease, Chesapeake expressed an interest in obtaining a mineral lease of Group C in its entirety.  PPFUF ¶¶ 16, 18.

Absent Defendant's claim of title and "issues concerning access," Plaintiffs claim, Chesapeake would have gone through with this lease.  *Id.* ¶ 19.  Additionally, Plaintiffs contend that Chesapeake would have conducted drilling operations on Group C had it been able to obtain a protection lease and "if the Army had permitted access" to the portion of Group C it controlled. PPFUF Nos. 21-22, 49, 52.

The deposition testimony Plaintiffs cite in support of their claim that the Army denied Chesapeake access to the portion of Group C at issue, however, simply does not support Plaintiffs' account.  One deponent, George L. Denny, a Chesapeake landman, stated that the meeting where the Army supposedly denied Group C access to Chesapeake entailed no formal request for such access and "was just a general discussion" where apparently no decisions were made.  Pls.' Opp'n Ex. 44 (Denny Dep. at 17, 21, July 18, 2006); Pls.' Interrog. Resp. No. 18. The other deponent, Chesapeake executive Thomas Price, testified that he had no knowledge of Chesapeake not purchasing leases because of the title dispute.  Pls.' Opp'n Ex. 51 (Price Dep. at 60, July 6, 2006); Pls.' Interrog. Resp. No. 18.

Despite their claims, however, Plaintiffs admit that they were able, on September 24, 1996, to lease approximately 4,800 acres of mineral rights to Chesapeake.[18]  DRPPFUF Nos. 39; *see also* Pls.' Opp'n Exs. 32-33.  According to Plaintiffs' Oral Argument Exhibit, this lease extensively overlapped with the nine mineral leases Defendant admits granting.  Pls.' Oral Ar. Ex.  Thus, as Plaintiffs filed their quiet title action in Louisiana federal district court on August 22, 1996, both Plaintiffs and Defendant continued to engage in mineral leasing or related activities.

The undisputed fact that most weakens Plaintiffs' claim concerning Chesapeake, however, is how, on September 24, 1996, Chesapeake entered into a lease of mineral rights encompassing approximately 4,800 acres of Group C from Plaintiffs.  DRPPFUF No. 39.  This lease extensively overlapped with seven mineral leases Defendant admits granting to Union Pacific, as well as Chesapeake.  Oral Ar. Ex.  Plaintiffs argue that the lease was premised on the

---

[18]  The 4,800-acre lease to Chesapeake, according to the Oral Argument Exhibit, occurred on September 15, 1996, as opposed to September 24, 1996.  Oral Ar. Ex.

condition that they not interfere with Chesapeake's attempt to secure a protection lease from Defendant. PPFUF No. 38. This requirement supposedly "put Plaintiffs' lessees and potential lessees at risk that a competitor would obtain the lease from the United States at public bidding, thus precluding development of the property." *Id.* ¶ 42.

But Plaintiffs ignore case law holding that the mere risk of an event occurring simply does not ripen a claim for adjudication. *See Texas*, 523 U.S. at 300 (1998). Accordingly, Plaintiffs have failed to allege sufficient facts that the Government undertook final administrative action with respect to Chesapeake, excepting military use and contamination on Group C lands, that would ripen into a valid takings claim.

### b.     Sonat

Plaintiffs allege that commencing on April 24, 1996, they negotiated with Sonat, a natural gas concern, in an effort to lease Group C mineral rights encompassing approximately 9,798.44 acres. PPFUF No. 31. These negotiations were supposedly unsuccessful because Sonat could not obtain a protection lease from Defendant. *Id.* No. 32. While Sonat did lease 28,668.93 acres of property contiguous with and partially including Group C on July 1, 1996, its inability to obtain a protection lease and Army officials' concerns over drilling operations allegedly convinced Sonat's management not to pursue drilling operations on that land. PPFUF Nos. 33, 50-51.

To support these contentions, Plaintiffs submitted excerpts from the July 19, 2006, deposition testimony of David Hamilton, a former Sonat land manager. Pls.' Opp'n Ex. 48 (Hamilton Dep. at 33-35); Pls.' Interrog. Resp. No. 18. Mr. Hamilton stated that he "believe[d]" that wells were not being drilled on the portion of Group C at issue because of Army restrictions. Pls.' Opp'n Ex. 48 (Hamilton Dep.). But Plaintiffs also presented records of a meeting on March 11, 1997, which reflected ongoing negotiations between Sonat and Army officials concerning possible mineral operations on Group C lands. Pls.' Opp'n Ex. 37.

The record, then, illustrates absolutely no definitive statement by any Army official or agent of Defendant as to the issue of Group C access. *Id.* Sonat's failure to obtain a protection lease also does not support a takings claim for the same reason outlined in the Court's discussion regarding Chesapeake–the lack of authority supporting that contention. Excepting possible harms predicated upon military use and contamination of Group C lands, Plaintiffs, then, fail to show any harm in relation to their dealings with Sonat that is cognizable under takings law. *See Warth*, 422 U.S. at 499 n.10.

c.      Belco

Commencing in March 1996, Plaintiffs negotiated with Belco for a mineral lease of 20,295 acres.  Because the Army allegedly "denied Belco access to the surface of Group C," however, the negotiations were unsuccessful.  PPFUF Nos. 29-30, 54.  According to Belco land manager Mel Fife, during the negotiations Army officials explicitly told him that Belco could not have access to the portion of Group C it sought.  Pls.' Opp'n Ex. 47 (Fife Dep. at 15-17, 28-29, 31-32, 38-39).

As explained above, while a trier of fact might find that military use or contamination might have prevented Plaintiffs from leasing Group C mineral rights to Belco, Plaintiffs have provided no other basis for any lost leasing or drilling opportunities or denial of access with respect to Belco other than vague generalities.  To defeat Defendant's summary judgment motion, Plaintiffs must set forth "specific facts" by affidavit or other evidence, instead of mere allegations.  RCFC 56(e); *see also Celotex*, 417 U.S. at 322 (absence of evidence to support the nonmovant's case favors movant's burden of proof).  Accordingly, excepting their claims concerning military use and contamination, the Court finds that Plaintiffs have not presented sufficient facts showing that any such takings claims have ripened.

4.      **Permit Requirements**

Plaintiffs allege that the Army's express policy of subordinating mineral exploration and development to Fort Polk's military mission discouraged potential lessees of Plaintiffs.  Plaintiffs support their allegation by referring to Stipulations, discussed above, which state that Fort Polk's military mission "supersede[d] all other land uses" and that a servitude owner's "rights of mineral exploration and development are subordinate to the accomplishment of the military mission."  *See* Pls.' Supp. Br. at 15 (citing Pls.' Opp'n Ex. 40); *see also* Pls.' Opp'n at 35 (citations omitted); PPFUF No. 47; Pls.' Interrog. Resp. No. 1).  Darin Zanovich, a representative of Sonat's successor, Swift Energy Company, was purportedly presented with these requirements when he inquired about drilling at Fort Polk.  Pls.' Opp'n at 35 (citing Pls.' Opp'n Ex. 52) (Zanovich Dep. at 41); *see also* Oral Ar. Tr. 14:7-13.  Mr. Zanovich, whom the Plaintiffs "*believed* to have knowledge of efforts by Swift to obtain access to Fort Polk for drilling," stated that "these special stipulations" would pose a nearly insurmountable obstacle for companies interested in drilling on Group C.  Pls.' Interrog. Resp. No. 1; Pls.' Opp'n Ex. 52 (Zanovich Dep. at 41) (emphasis added).

However, under questioning during oral argument, Plaintiffs' counsel admitted that he, in fact, could not "identify an incident" where Army officials presented the Stipulations to representatives of Chesapeake, Sonat, or Belco.  Oral Ar. Tr. 26:9-12.  Neither did he ever specifically allege that the Stipulations were ever presented to any other party after this admission.  Plaintiffs' counsel only stated that he "fe[lt]" that receipt of knowledge about the

Stipulations by Chesapeake, Sonat, and Belco representatives was "very clear" and proceeded to present the arguments in regard to each company described previously.  Oral Ar. Tr. 26:13-16.

Plaintiffs, then, basically have no independent evidence upon which to base a takings claim regarding the Stipulations.  Again, in a motion for summary judgment, a party cannot depend upon "mere allegations or denials," but must designate "specific facts" highlighting a genuine issue of material fact for trial.  RCFC 56(e); *Celotex*, 477 U.S. at 324.  Plaintiffs have no specific evidence that Sonat, Chesapeake, or Belco had knowledge of the Stipulations.  Mr. Zanovich's statement boils down to:  "A potential lessee who knew about the Stipulations would not be interested in leasing."  Furthermore, Mr. Zanovich has no direct connection with Sonat, Chesapeake, or Belco and is only "believed" to have knowledge of Swift's leasing activity.  Therefore, a takings claim based on the Stipulation is not ripe for adjudication.[19]

## IV.   CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's motion for summary judgment with respect to the nine ten-year leases of Group C mineral rights that Defendant granted under erroneous claim of title to Chesapeake and Union Pacific, as well as any takings claim predicated upon military use and contamination.  In all other respects, however, Defendant's motion is GRANTED.  The Court hereby instructs the parties that, as the matter proceeds, it will accept no arguments or evidence that do not directly pertain to these leases or to military operations and contamination.

s/ Edward J. Damich
EDWARD J. DAMICH
Chief Judge

---

[19]   Additionally, Plaintiffs argued that the Stipulations were contrary to Louisiana law because "the mineral servitude is the dominant estate and by making the military mission supersede all other uses, the United States violated Plaintiffs' rights" and effected a taking.  Pls.' Opp'n at 19, 35; *see also* Pls.' Supp. Br. at 14-15.  The Court does not need to concern itself with the interpretation of Louisiana law, since Plaintiffs' argument in this regard is premised on the Stipulations, which, as the Court has already noted, Plaintiffs have failed to link to the leasing activities of Chesapeake, Sonat, and Belco.