# In the United States Court of Federal Claims

### No. 98-314L
### (Filed: December 20, 2010)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * | * |
| | * |
| **CENTRAL PINES LAND** | * |
| **COMPANY, et al.,** | * |
| | *  **Mineral Servitude; Temporary** |
| Plaintiffs, | *  **Physical Taking; Fair Rental Value as** |
| | *  **Just Compensation; Permanent** |
| v. | *  **Physical Taking; Statute of** |
| | *  **Limitations** |
| **THE UNITED STATES,** | * |
| | * |
| Defendant. | * |
| | * |
| * * * * * * * * * * * * * * * * * * * | * |

*A. J. Gray, III*, Lake Charles, LA, for plaintiff.

*Kristine S. Tardiff,* United States Department of Justice, Washington, DC, with whom was *Ignacia S. Moreno,* Assistant Attorney General, for defendant. *Julie S. Thrower*, United States Department of Justice, Washington, DC, *Dennis Daugherty* and *Wendy Dorman*, United States Department of the Interior, Washington, DC and *Lt. Col. Scott Walter*, United States Army, Arlington, VA, of counsel.

### O P I N I O N

**FIRESTONE**, *Judge*.

This decision follows a trial on the plaintiffs' claims of a Fifth Amendment taking without just compensation of their mineral servitude, known as "Group C," in Vernon Parish, Louisiana. The mineral servitude involves land owned by the United States, occupied by Fort Polk and the Kisatchie National Forest. Many of the issues regarding

ownership of the mineral servitude and the nature of the subject taking were resolved in

earlier decisions by this court, the United States District Court for the Western District of

Louisiana, and the United States Court of Appeals for the Fifth Circuit.[1]

---

[1]The plaintiffs filed a quiet title suit with regard to their mineral rights in the Western District of Louisiana on August 22, 1996. The decisions of that court clarifying the nature and ownership of the mineral servitude may be found at Central Pines Land Co. v. United States, No. 2:96-2000 (W.D. La. Apr. 7, 1999) ("Central Pines I"), aff'd, 274 F.3d 881 (5th Cir. 2001) ("Central Pines II"). In those cases, the Fifth Circuit affirmed that trial court's conclusion that the plaintiffs retained mineral interests in only the lands designated as Group C. The plaintiffs' interests in Groups A and B had prescribed to the government because of non-use under Louisiana law.

The plaintiffs filed the present case on April 4, 1998, alleging a taking of their mineral interests. The case was stayed pending resolution of the quiet title dispute. Two previous opinions in this court have narrowed the issues remaining in this case. In Central Pines Land Co. v. United States, 61 Fed. Cl. 527 (2004) ("Central Pines III"), Judge Yock dismissed claims based on mineral interests that had been determined to be owned by the government rather than the plaintiffs in the quiet title action. Judge Yock also determined that certain claims were barred by the statute of limitations. The case was transferred to Judge Damich, who in Central Pines Land Co. v. United States, No. 98-314 (Fed. Cl. Sept. 30, 2008) ("Central Pines IV"), held that the government's mere assertion of title with regard to the Group C lands was not enough to effect a taking and held that the plaintiffs must show that the government did "something more" in order to establish a taking. Central Pines IV, slip. op. at 17. He determined that there were disputed facts as to whether the government's leasing activities with regard to the Group C minerals constituted "something more." The court also held that genuine issues of material fact existed as to whether military use and surface contamination frustrated the plaintiffs' leasing opportunities and constituted a taking of the plaintiffs' entire Group C mineral interests–not just the leased minerals. However, the court granted summary judgment to the government with respect to the plaintiffs' claims that the government had taken their property rights by denying potential lessees protective leases, denying access to the surface, or instituting a de facto moratorium on mineral exploration, holding that there was no evidence of final agency action and the claims were largely based on contingent future harms. The court further held that no specific facts had been alleged regarding the plaintiffs' claim that the government had unlawfully subordinated the plaintiffs' interest in mineral exploration and development to the government's military mission.

The case was transferred to this judge for trial. In preparation for trial, the court issued an order on the government's motions in limine, clarifying the scope of the remaining issues to be resolved at trial. With respect to the plaintiffs' claims based on the government's alleged limitation of surface access to extract the mineral interests, the court held:

The claims that were heard at trial include a permanent physical takings claim premised on a denial of access to portions of the Group C lands by the United States Army, which the plaintiffs claim prevents access to their mineral servitude.  The court also heard testimony and received evidence regarding the plaintiffs' claim that their mineral interests were temporarily taken during a five-year period in which the United States claimed title to the entirety of plaintiffs' mineral servitude.  The plaintiffs argue that during this five-year period the United States leased portions of their mineral servitude without paying just compensation and interfered with the plaintiffs' ability to lease the rest of their mineral servitude, for which they are also owed just compensation.

Prior to trial, the parties entered into extensive joint stipulations of fact.  Those stipulated facts are summarized below, in Part I.  In Part II, the court summarizes the evidence introduced at trial both through testimony in court and through depositions in connection with the court's findings and conclusions on the plaintiffs' temporary taking

---

Unless or until the plaintiffs have formally asked for and been denied access to lands on Fort Polk for mineral exploration or development purposes, their claims based on interference with their right to access under the Louisiana Mineral Code both during and after resolution of the title question are not ripe and must be dismissed.
. . .
To the extent that the plaintiffs' access to certain areas in Group C is permanently precluded because of military operations in the area, the plaintiffs' permanent physical takings claims based on lost access are properly before the court.  Where access to mineral exploration and development is lost because of military activities that prevent, rather than merely restrict, access, the court could find that the plaintiffs' right to extract its minerals has be[en] taken.

Order on Def.'s Mots. in Limine at 5-6, Aug. 10, 2010, ECF No. 167 (emphasis in original).

claim.  In Part III, the court summarizes the evidence received and its findings and

conclusions with regard to the plaintiffs' permanent taking claim.

## I.     STIPULATED FACTS

The following stipulated facts detail the history of the plaintiffs' acquisition of the

mineral servitude at issue in this dispute, the quiet title litigation over ownership of the

mineral servitude, the efforts made by the plaintiffs to lease the subject mineral servitude,

and the efforts by oil and gas companies to develop the minerals in Group C.[2]

### A.     History of the Mineral Servitude and Moratoriums

In 1929, Gulf Lumber Company conveyed all oil, gas, and minerals under

approximately 100,000 acres of land in Vernon Parish, Louisiana to S.H. Fullerton.  The

warranty mineral deed executed by Gulf Lumber Company created a mineral servitude

that allowed S.H. Fullerton to explore and develop the minerals covered by the deed.

In 1930, S.H. Fullerton transferred these mineral interests to Fullerton Minerals

Company, and, in 1937, Fullerton Minerals Company conveyed the same mineral interests

to William T. Burton.  By four separate transactions in 1933, 1936, and 1938, the United

States acquired by deed or by expropriation certain lands from Gulf Lumber Company

subject to the outstanding mineral servitude held by Mr. Burton after 1937.  These lands

are referred to in this litigation and in the related quiet title action as the "Group A" and

---

[2]The court has not included all of the stipulated facts in this opinion.  It has not repeated facts that were also discussed by witnesses.  The court has also eliminated facts that it has determined are not relevant to the issues remaining before the court.

"Group B" lands.  In 1937, Mr. Burton also acquired complete title to certain lands in

Vernon Parish which included lands that have come to be known as the "Group C" lands

in these proceedings.[3]

Between 1942 and 1981, the United States acquired title to the Group C lands

subject to the Burton mineral servitude; these lands make up part of Fort Polk and the

adjacent Kisatchie National Forest.  Group C consists of approximately 21,118 acres,

some of which are contiguous, and some of which are separate from the bulk of the

acreage, arranged in a checkerboard fashion.[4]

The plaintiffs are the owners in indivisibly of all of the oil, gas, and other mineral

interests in Group C.  Plaintiffs Central Pines Land Company ("Central Pines") and

Tower Minerals Company, L.L.C. ("Tower Minerals") own, in equal undivided

proportions, the mineral servitudes relating to Group C lands.[5]  Plaintiffs Jack E. Lawton,

Sr., Jack E. Lawton, Jr., William B. Lawton Company, L.L.C., Linda Lew Lawton Drost,

Evelyn Gay Lawton Duhon, D, S & T, Inc., and Drost & Brame, Inc. own only mineral

royalty interests that burden the mineral servitudes owned by Central Pines and Tower

Minerals.  The plaintiffs acquired their property interests in Group C by mesne

---

[3]Attached to this opinion are one map showing the location of the Group C servitude and the boundaries of Fort Polk and the Kisatchie National Forest, see App. A, and a second map showing the portions of Group C leased by the plaintiffs and the United States, see App. B.

[4]See App. A.

[5]The owners of Central Pines and Tower Minerals are descendants of William Burton.

conveyances, from and through Mr. Burton.  Subject to the plaintiffs' mineral servitudes and royalty interests, the United States owns title to the Group C lands.

Approximately 16,000 acres of Group C are located within Fort Polk, a military facility of the United States Department of Army, and approximately 5100 acres of Group C are located within the adjacent Kisatchie National Forest.  The approximately 16,000 acres of Group C within Fort Polk are located within the Fort's "Main Post,"[6] and the approximately 5100 acres of Group C within the Kisatchie National Forest are located within the "Intensive Use Area" of the Kisatchie National Forest.[7]

Between 1943 and 1978, the United States imposed a series of drilling and operations moratoriums on Mr. Burton and his successors-in-title relative to Group C through a series of expropriations.  These mineral moratoriums prevented the owners of the mineral servitude covered by the moratorium from entering lands owned by the United States for the purposes of exploring or developing those minerals.  Approximately 31,295 acres of mineral interests owned by Mr. Burton and his successors were covered by the mineral moratoriums.

---

[6]Fort Polk consists of the Fort Polk "Main Post" and Peason Ridge.  The Main Post includes approximately 67,459 acres of land owned by the Army.  Peason Ridge contains approximately 33,000 acres, wholly separate and to the north of the Main Post.  Peason Ridge is not shown on the map attached to this opinion.

[7]Under a special use permit from the Forest Service, the Army uses approximately 39,565 acres of adjacent Kisatchie National Forest lands that are designated as the "Intensive Use Area," and approximately 44,779 acres of Kisatchie National Forest lands that are designated as the "Limited Use Area."

Between 1978 (when the moratoriums were lifted) and January 1, 1995, the plaintiffs did not attempt to exercise mineral rights on Group C.  In the early 1980s there were efforts made to do some seismic testing at Fort Polk, but the efforts were dropped, allegedly due to risks inherent in going on to the Fort to conduct the testing.

From 1995 to the present, no plaintiff has made an oral or written request to the U.S. Army or the U.S. Forest Service to access and use the surface of Group C for the purpose of oil and gas exploration.  Since the mineral moratoriums ended in 1978, the United States has taken no formal action to deprive the plaintiffs of access to Group C minerals.

B.      Leasing Activities

On October 7, 1993, Charles E. Steele, Director of Lands and Minerals for the Forest Service, which is within the U.S. Department of Agriculture ("USDA"), issued a memorandum to the Bureau of Land Management ("BLM") that advised that the minerals underlying certain lands, including some Group C lands administered by the Forest Service, were available for leasing by the United States based on the Louisiana law of prescription.[8]  The USDA memorandum states, "[A]n October 9, 1992 title opinion [provides that] under the Louisiana statute on prescription, the U.S. can now claim mineral ownership where drilling has not occurred for a ten-year period regardless of the

---

[8]The Louisiana law of prescription provides that a mineral servitude will expire if there has not been any drilling to exploit the resource within ten years of acquiring the servitude.  La. Rev. Stat. Ann. § 31:27 (2000).

date of acquisition by the U.S."  The memorandum identified some Group C lands, and included "Controlled Surface Use Stipulation #1," which applied to any federal leases issued in the Intensive Use Area of the Kisatchie National Forest.  On March 22, 1993, the Army issued a Memorandum for Distribution relating to Oil and Gas Leasing Stipulations.

By letter dated April 6, 1995, Union Pacific Resources Company ("UPRC") offered to lease from the plaintiffs 30,789.76 acres in Vernon and Rapides Parishes, Louisiana.  This offer included approximately 7944.80 acres in Township 1 North, Range 5 West, in Vernon Parish that are part of the Group C lands.  By letter dated April 12, 1995, UPRC revised its prior lease offer to include 25,066.98 acres in Rapides and Allen Parishes to be leased on the following terms: $50 per acre bonus, delay rentals of $50 per acre in years two and three and $75 per acre in years four and five, royalty of 20% escalating to 25% after payout on a well-by-well basis, and a primary term of five years.[9] The plaintiffs did not enter into a lease with UPRC for the minerals described in the letters of April 6, 1995, and April 12, 1995.  By a hydrocarbon lease dated effective August 1, 1995, the corporate parents of Central Pines and Tower Minerals leased to Chesapeake Operating Co. ("Chesapeake") approximately 33,607 acres of land

---

[9]Mineral leases typically include a first-year bonus payment, royalty rates, and delay rental rates that are paid only in the event royalties are not paid.  At the end of the first year, a lessee will owe a rental payment to maintain the lease unless, prior to that time, the lessee has drilled one or more wells.  If the lessee does not pay the delay rental for each year that it has not drilled a well, it will lose the lease.  See Donohue Aff. at 13.

contiguous to, but not included within, the Group C lands.  Chesapeake drilled a number

of wells under its 33,607-acre lease with the plaintiffs.

In 1995, representatives of Sonat Exploration Company ("Sonat") met with Army

representatives regarding mineral development at Fort Polk.  On August 16, 1995, Sonat

submitted an application for a permit to drill for the Scobee 34-1 well[10] in Section 34,

Township 1 North, Range 6 West.  By letter dated August 17, 1995 from Gary Collipp,

Sonat forwarded two permits for drilling two wells, the Scobee 34-1 and the U.S.A. 35-1.

In March 1996, the plaintiffs commenced negotiations with Belco Oil & Gas

Corporation ("Belco") to lease 20,295 acres of the Group C mineral interest.  By letter to

Belco, dated March 21, 1996, the plaintiffs extended a non-exclusive offer to lease

approximately 20,295 acres of minerals for a three-year primary term, with a bonus

payment of $300 per acre, annual rentals of $300 per acre and a royalty of 27.5%.  The

letter stated that "[t]his offer may be revoked at any time but under no circumstances shall

extend beyond 5:00 p.m., Friday, March 29, 1996."  On June 18, 1996, representatives of

Belco met with representatives of Fort Polk.  A June 19, 1996 Fort Polk memorandum for

Colonel Prosch regarding the meeting reported, "Belco Mtg. After 2 hr. session they are

willing to locate wells to reduce impacts on training.  They will get back with us after the

test well is drilled and is a producer, Jan-Feb.  If it's a dry hole, they plan no drilling on

---

[10]Wells are generally referred to by the mineral owner's name, the section in which they
are located, and a well number.  Thus, "Scobee 34-1" refers to a well drilled into minerals owned
by Scobee, located in a section number 34, and designated as well number 1 in that section.

our training areas."

An "Info Paper" prepared at Fort Polk and dated March 7, 1996, on the subject of "Oil Exploration," describes a meeting between Sonat and Fort Polk personnel regarding Sonat's future plans for oil exploration on lands associated with Fort Polk.  In a memorandum dated March 12, 1996, on the subject of "Oil Exploration and Production Activities," Ronald N. Tomas, Senior Advisor at Fort Polk, describes a meeting with Sonat representatives on March 6, 1996.  This memorandum states that "[a]greement was reached . . . to assemble a team from the installation to work with mineral owners and oil exploration companies planning to drill on intensive use area in 1997 and beyond."  The memorandum also lists the objectives of the team.

In a memorandum dated April 1, 1996, from Mr. Collipp of Sonat to Herb Carter Deputy Director of Public Works at Fort Polk, Mr. Collipp stated, "Sonat would like to begin drilling within the box in early 1997."  The memorandum includes a suggested agenda for a meeting scheduled for April 2, 1996.  A sign-in sheet from that meeting lists attendees from Sonat and Fort Polk in attendance.  By letter dated April 11, 1996, Mr. Collipp provided Mr. Carter "a map showing the first four well locations which Sonat would like to survey during the upcoming 4/28-5/8 window."  This map shows well locations for wells labeled as U.S.A. 17, U.S.A. 22, U.S.A. 19, and U.S.A. 31.

By letter dated April 24, 1996, Sonat expressed an interest in leasing approximately 8271.58 acres of the plaintiffs' "Tract C" minerals.  The area is described

in the letter as the "lands which the BLM recently nominated and then removed from the most recent lease sale, and which Sonat believes will be included in its development plan as either drillsite or unit acreage for the drilling of horizontal Austin Chalk wells." The letter contains a description of the acreage in question and the lease terms proposed by Sonat. The plaintiffs responded by letter dated May 1, 1996, rejecting Sonat's offer. In this letter, the plaintiffs informed Sonat that they "are negotiating with others for a lease on the entirety of our Tract C. However, based on your assertion that a portion of our Tract C falls within the development plan of Sonat [] for other Lawton acreage, we see a benefit in leasing it to Sonat." The plaintiffs' letter contains a nonexclusive offer to Sonat to lease 9798.44 acres on terms set forth in that letter. By letter dated May 9, 1996, Sonat responded to the plaintiffs' letter, and declined to accept the lease offer set forth in that letter. Sonat's letter includes a counteroffer to lease the same 9,798.44 acres on terms set forth in that letter. Central Pines and Tower Minerals finally entered into a mineral lease with Sonat that was effective July 1, 1996. The Sonat lease encompassed approximately 28,668.93 acres of property, including approximately eighty acres of Group C minerals. The remaining acreage included Groups A and B.

Approximately 5300 acres of mineral interests underlying Group C lands were included in a BLM issued Notice of Competitive Lease Sale for Oil and Gas to be held on March 28, 1996. Mike Cruse, Deputy General Counsel at USDA, referred the plaintiffs to Jeffery D. Eisenberg, also in Office of General Counsel at USDA. By letter dated

February 29, 1996 to Mr. Eisenberg, the plaintiffs again asserted title to Group C

minerals.  By this time, portions of Group C minerals were being offered for lease by the

United States.  The plaintiffs requested that the properties be withdrawn from the

proposed federal lease sale.  Pursuant to Mr. Eisenberg's request, by letter dated March

11, 1996, the plaintiffs submitted a settlement proposal relating to Groups A, B, and C

whereby, in exchange for recognizing the plaintiffs' title, the United States would be

compensated for mineral production.  By letter dated August 6, 1996, Mr. Eisenberg

responded to the plaintiffs' letter of March 11, 1996 and rejected the proposed

"settlement to the Forest Service for a division of revenue that may be generated from oil

and gas deposits for which your clients claim ownership."  On August 22, 1996, the

plaintiffs filed a lawsuit for declaratory judgment pursuant to 28 U.S.C. § 2201 and to

quiet title pursuant to 28 U.S.C. § 2409a.  The plaintiffs sought recognition of their title to

the Group A, B, and C mineral servitudes.  See Central Pines I, No. 2:96-2000; Central

Pines II, 274 F.3d 881.

On September 11, 1996, Sonat submitted its Application for Permit to Drill for the

U.S.A. 21-1.  In a Sonat memorandum dated September 19, 1996, David Davas sent Mr.

Collipp and others a copy of a Surface Use and Operational Plan Agreement used by

Sonat in the drilling of a well at Fort Chaffee in Arkansas.  The memo states that the

Agreement "is a good base for us to begin drafting our Surface Use Agreement with Fort

Polk."  On September 26, 1996, Sonat representatives met with Fort Polk staff regarding

-12-

the company's "Fort Polk Military Reservation Development Plan."  At this meeting,

Sonat provided a permit and drilling schedule or timeline for five wells: U.S.A. 21-1,

U.S.A. 31-1, U.S.A. 26-1, U.S.A. 19-1, and U.S.A. 17-1.  On September 30, 1996, Mr.

Carter rendered a Memorandum for Deputy Garrison Commander reporting on the

September 26, 1996 meeting.  By letter dated October 9, 1996, Mr. Collipp wrote to Betty

Higgins of the Kisatchie National Forest-Vernon District, to "request[] permission to

proceed with surveying of a well location on the section line between sections 15 and 16

in Township 1N, Range 6W."  The letter further asks for permission to meet and identify

potential well locations for four other well locations highlighted on an attached map, all

in Township 1 North, Range 6 West.

By letter dated September 23, 1996, Chesapeake offered to lease from the

plaintiffs approximately 4383.67 acres of land in Township 1 North, Range 5 West and

Township 1 South, Range 5 West, in Vernon Parish, Louisiana.  The then-pending

dispute over the ownership of the mineral rights between the plaintiffs and the United

States is noted in this letter.  In offering to lease these mineral interests, Chesapeake states

in this letter that it agrees "not to take a position contrary to the [plaintiffs] in the pending

lawsuit," but also "expressly reserves the right to seek protection leases from the United

States covering the leased lands."  The letter of September 23, 1996, from Chesapeake to

the plaintiffs further states:

> As a condition of this offer, lessors must agree not to interfere with
> Chesapeake's attempt to secure a protection lease from the U.S.A.. . . .

Additionally, as you know, the U.S.A. is contemplating excluding the subject acreage from the October 24, 1996 federal lease sale due to a perceived threat that Central Pines et al. will seek a temporary restraining order to block the leasing of these lands. However, they have assured me the acreage will not be stricken from the sale if Central Pines et al. will confirm in writing that no such TRO will be sought with regard to this acreage. Therefore, this offer is further contingent upon Central Pines et al. providing such written assurance as will satisfy the S.A. in order to allow the federal lease sale to proceed as scheduled on these lands.

In a letter dated September 26, 1996, to Henry Hood of Chesapeake, from Thad D. Minaldi and William Lawton, the plaintiffs clarified the acreage for lease. In a letter dated September 26, 1996, to Henry Hood, Chesapeake, from Mr. Minaldi and Mr. Lawton, the plaintiffs agreed to take no action to prevent the proposed federal lease sale through which Chesapeake sought to acquire protective leases.[11]

On September 26, 1996, effective September 15, 1996, the plaintiffs entered into a mineral lease with Chesapeake covering 4822.10 acres of Group C.[12] The plaintiffs on September 26, 1996 advised Mr. Eisenberg of the Forest Service, that the plaintiffs had entered into this hydrocarbon lease, "which property is included in the captioned lawsuit [the quiet title action], as well as is the subject of a proposed mineral lease sale by the United States of America, currently scheduled for October 24, 1996." By this letter, the

---

[11]A "protective" or "protection" lease is used in the situation where ownership of the asset to be leased is disputed. The lessee obtains leases for the same property from all parties to the ownership dispute, often containing a clause that once ownership is resolved, the non-owner will repay all bonuses, rent, and royalties paid by the lessee. See Pepper Aff. at 21-22.

[12]The location of this lease, and the other leases affecting Group C, is shown in a map attached to this opinion. See App. B.

-14-

plaintiffs advised "that no plaintiff in the captioned case will attempt to upset or otherwise interfere with the scheduled mineral lease sale through restraining order, injunction or other judicial proceedings."

By a memorandum dated September 27, 1996, the Forest Service reported to BLM regarding its consent to lease certain lands listed in the October 24, 1996 Competitive Lease Sale Notice.  The memorandum states that Parcels ES-034 through ES-043 "have not been cleared to lease and will require deletion from the sale notice" and that Parcels ES-024 through ES-033 can remain in the sale.

By letter dated October 9, 1996, United States Department of Justice attorney Bret Birdsong advised the plaintiffs that additional Group C acreage may be included in subsequent scheduled lease sales by the United States and requested that the plaintiffs agree to not attempt to upset the sales with regard to the additional acreage.  The plaintiffs acquiesced and by letter dated October 9, 1996 complied with the request.

On October 24, 1996, the United States answered the plaintiffs' complaint in the quiet title action, denying the plaintiffs' allegation that the plaintiffs were owners of mineral interests to the Group A, B, and C lands.[13]  By letter dated November 9, 1996 to Mr. Cruse at USDA, the plaintiffs supplied Mr. Cruse with pertinent title documents, land use records, and legal principles to support the plaintiffs' ownership claim as to the

---

[13]The government's position in the quiet title action was that all of the minerals, including those in Group C, had prescribed under Louisiana law.

mineral interests in Group C lands.[14]

In a letter dated November 1, 1996, Belco's attorney advised Mr. Carter at Fort Polk that Belco "no longer intends to pursue permission to conduct drilling opportunities on Fort Polk in the foreseeable future. The success of Belco operations in other parts of Louisiana has been such that they have decided to concentrate their operations in those areas."

On November 12, 1996, Chesapeake filed an application with the Louisiana Office of Conservation to drill the Lawton 4-1 well. The requested permit was issued on November 15, 1996. By memorandum dated November 21, 1996, the Forest Service reviewed BLM Leasing Alternatives. By letter dated January 9, 1997, Tom Price of Chesapeake wrote to Ted Hammersmith [sic] at Fort Polk in reference to their "previous conversation regarding the interest of Chesapeake Energy Corporation in coordinating its potential oil and gas exploration efforts with Fort Polk offices to ensure future access to the base to prosecute our drilling activities on a reasonable and timely basis[.]" The letter includes a list of issues for "discussion and resolution" and requests the opportunity to meet with Fort Polk officials.

An Army document dated January 22, 1997, captioned "Standard Operating Procedures for the Exploration and Development of Oil and Gas Resources, 22 January

---

[14]The letter also included information regarding the plaintiffs' mineral interest in Group A and B lands, which were eventually titled to the United States. See Central Pines II, 274 F.3d 881.

1997," was sent to a distribution list with note to "Please Review and Return to: Cindy
Carter, DPW."

By letter dated February 7, 1997, Mr. Hood of Chesapeake provided the plaintiffs
with a copy of the Louisiana lands scheduled for a BLM lease sale on March 20, 1997.  In
this letter, Chesapeake states that "[t]he majority of these tracts in Vernon Parish are also
included in the Central Pines lease to Chesapeake" and that Chesapeake "plan[s] to bid on
these tracts at the BLM sale."  In this letter, Chesapeake also states that "[w]e are
encouraged by the BLM's action and believe this will expedite the development of lands
covered by the Central Pines lease."

In a Memorandum for the Deputy Director of Public Works at Fort Polk dated
February 24, 1997, R. Ellis Smith of the  Engineering Plans and Services Division
provided information about "a typical production plat of an oil producing site."  The
memorandum also describes a decision made "in a past meeting with SONAT to allow
products to be trucked from Well 19-1, Well 26-1 and Well 31-1 and piped from Well 19-
1 south to Well 31-1."

In a memorandum dated February 26, 1997, from Mr. Collipp of Sonat to Ms.
Carter at Fort Polk, Mr. Collipp provided "a list of the main topics of interest to Sonat"
for a meeting to be scheduled between Sonat and Fort Polk "in the next few weeks."  By a
memorandum dated February 27, 1997, Fort Polk representatives were invited to a
meeting with Sonat representatives on March 11, 1997, to discuss a number of issues

related to Sonat's drilling plans.  During this meeting at Fort Polk with representatives from Sonat, UPRC, Fort Polk, and the Forest Service, BLM discussed the federal mineral lease sale scheduled for March 20, 1997, which included some Group C lands.

As a result of the March 20, 1997 federal mineral lease sale, BLM entered into nine leases containing a total of 5316.38 acres of Group C lands: Leases LAES 48558, 48559, 48560, 48561, 48562, and 48563 were executed with Chesapeake, effective May 1, 1997.  These six leases, covering 2771.30 acres, had a primary term of ten years and were leased for $100 to $101 per acre bonus.  Leases LAES 48555, 48556, and 48557 were executed with UPRC, effective May 1, 1997.  These three leases, covering 2545.08 acres, had a primary term of ten years and were leased for $12 per acre bonus.  On March 27, 1997, Chesapeake proposed an Agenda for Fort Polk Meeting to be held April 1, 1997, at which representatives of Chesapeake met with representatives of Fort Polk and the Forest Service.

On June 12, 1997, Sonat filed an application with the Louisiana Office of Conservation to drill Well 21-1 in the previously created production unit AUS C RA SUJ.[15]  The requested permit was issued on June 16, 1997.  The unit in which Well 21-1 was located encompassed one of the forty-acre Group C satellite tracts included in the plaintiffs' lease to Sonat.[16]  The Well 21-1 well was drilled as a dry hole.  Swift Energy

_____

[15]The unit naming convention is such that "AUS C" refers to "Austin Chalk," "RA" refers to "Reservoir A," and "SUJ" refers to "Sand Unit J."  See Tr. 62:17-63:5.

[16]The well itself was not on Group C acreage.

-18-

purchased assets from Sonat and thereafter assumed operations of the previous Sonat wells in Vernon Parish effective September 1, 1998.

In 1997, the United States considered offering other lands for mineral lease sale. By memorandum dated July 15, 1997, Rory A. Salimbene, LTC, EN, Director of Public Works requested comments on offers to lease. By memorandum dated July 23, 1997, Stephen M. Sittnick, LTC, IN, G3/DPTMS commented on requests to lease. On March 12, 1998, BLM rendered a decision rejecting a lease offer for LAES 29965.

On July 23, 1997, Chesapeake submitted an application to BLM for a permit to drill the Reickers 5-1 well in Section 5 Township 1 North, Range 5 West in Vernon Parish. That application was approved on August 15, 1997. By facsimile dated September 2, 1997, Chesapeake provided notice to Ms. Carter at Fort Polk that it was scheduled to commence drilling of the well on September 3, 1997, stating, "Due to the proximity of this wellsite to the Fort Polk Intensive Use Area, as a courtesy we are notifying you of the commencement of actual drilling operations."

The northmost three of Chesapeake's six federal Group C leases, LAES 48558, 48559, and 48560, were terminated after one year for the non-payment of rent. UPRC's federal Group C leases LAES 48555, 48556, and 48557 were terminated after two years for the non-payment of rent.

On April 7, 1999, the District Court for the Western District of Louisiana entered a summary judgment decision in the quiet title action. The court held that the Group C

mineral servitudes, which were created after 1940, were imprescriptable under Louisiana

law.  On July 28, 2000, the court rendered judgment, granting the United States' motion

for summary judgment and dismissing the plaintiffs' complaint with prejudice as to

Groups A and B.  The court reasoned that, unlike Group C, the Group A and B mineral

servitudes were subject to prescription under Louisiana state law and that those mineral

servitudes had prescribed for non-use.  The plaintiffs appealed the court's decision as to

the Group A and B mineral servitudes, and the United States cross-appealed as to the

Group C mineral servitudes.  On November 28, 2001, the United States Court of Appeals

for the Fifth Circuit issued a decision affirming the district court's decision.  Central

Pines II, 274 F.3d 881.

        Other than the lease entered into with Sonat (effective July 1, 1996 for eighty

acres) and the lease entered into with Chesapeake (effective September 15, 1996 for

4822.10 acres), the plaintiffs have not entered into any other mineral leases affecting

Group C.  There has been no actual drilling on Group C.  Relatively small portions at the

extreme south end of Group C were included in two producing units, the wells for which

are not located on Group C–as to Group C, these wells would be considered "off tract unit

production wells."  The producing units were the AUS C RA SUF Rieckers 5 well in the

Pitkin Field, the last reported production for which was in November 2007, and the AUS

C RA SUC Lawton 4-1 and 4-2 wells in the West Masters Creek Field, the last reported

production for which was in November 2007.  Both units produced pursuant to the

Chesapeake lease.  Since all of the wells ceased to produce in November 2007, the

Chesapeake Lease has terminated by its own terms.  One of Sonat's "satellite" forty-acre

Group C tracts was unitized in AUS C RA SUJ in the Fullerton Field.  The unit well,

Central Pines 21-1, was drilled as a dry hole.  As to Group C, the Sonat satellite lease is

now terminated.  As of July 20, 2009, the plaintiffs had no current plans for drilling for

oil and gas on the Group C lands.

A Land Utilization Requirement Study for Joint Readiness Training Center and

Fort Polk, Louisiana was issued on April 1, 2005.  By a document dated January 1, 2007,

the Fort Polk modified its Army Range and Training Land Program and published a

document related to its Analysis of Alternative Study.

## II.   TEMPORARY TAKING CLAIM

### A.   Testimony: Liability and Damages

The plaintiffs presented live testimony from seven witnesses and deposition

testimony from an additional six witnesses to show that the government's decision to

offer and lease portions of the plaintiffs' Group C minerals during the period of the quiet

title action discussed above resulted in a temporary taking of the plaintiffs' mineral

servitude.[17]  The plaintiffs presented evidence to show that during the period of the quiet

title action the government leased portions of the plaintiffs' minerals without providing

---

[17]Direct testimony in this case was submitted by affidavit.  Live testimony at trial was limited to cross-examination, redirect, and rebuttal.  Many witnesses' testimony was related to both the plaintiffs' temporary and permanent takings claims.

them with just compensation.  In addition, the plaintiffs presented evidence to show that the plaintiffs would have been able to lease <u>all</u> of their Group C minerals but for the government's competing title claim and the risk faced by potential lessees that they would not be able to secure protective leases from the United States.[18]  The plaintiffs contend that recovery should extend from 1995, when the plaintiffs first learned of the government's competing claim, to 2001, when the Fifth Circuit upheld the district court's ruling on the extent of the plaintiffs' mineral interest.  The plaintiffs also presented testimony and evidence on the amount of just compensation they argue they are owed for the period of the temporary taking, both for the minerals actually leased by the government and for the other minerals the plaintiffs claim would have been leased from the plaintiffs but for the government's actions.  The plaintiffs seek a total of $42,619,500 (or $6,088,500 per year) for the alleged taking of the entire 21,118 acres of their Group C minerals, including those that were not leased by the government, with a deduction for the lease bonus the plaintiffs actually received from Chesapeake.[19]  If recovery is limited to

---

[18]The plaintiffs also argued that the government's undisputed decision not to allow access to certain surface areas on Fort Polk resulted in a permanent taking of a portion of their mineral servitude.  The permanent taking claim is addressed <u>infra</u> Part III.  As noted <u>supra</u> note 1, the court has previously determined that the plaintiffs' taking claim based on the "conditions" the Army has imposed on oil and gas production and development on Fort Polk are not ripe.  In particular, the court ruled that because there is no evidence to show that any lessees of the plaintiffs' mineral servitude on Fort Polk or within the Kisatchie National Forest were ever denied access by the Army for oil or gas exploration or development a taking claim based on potential denials of access in the future are not ripe for review.  <u>See</u> Order on Def.'s Mots. <u>in Limine</u> at 5-6, Aug. 10, 2010, ECF No. 167; <u>Central Pines IV</u>, No. 98-314.

[19]Based on the plaintiffs' contention that the taking of their mineral interests began in 1995 and encompassed the entirety of Group C, they agree that the first-year bonus they received

the 5316.58 acres of Group C minerals that were leased by the government, the plaintiffs seek an award of $11,164,818 ($1,594,947 per year) as just compensation.

The government presented direct testimony from five witnesses and deposition testimony of an additional four witnesses to rebut the plaintiffs' temporary taking claim and assertions regarding just compensation.[20]   The government presented evidence to show that the government's leasing activities during the period of the quiet title action did not interfere with the plaintiffs' ability to lease their Group C minerals at fair market value and thus nothing was "taken" by the government when it issued leases on portions of the Group C minerals during the quiet title litigation.   The government also presented evidence to show that there was no taking of the Group C minerals that were not leased by the plaintiffs or the government during the period of the quiet title action.   Government witnesses testified that the reason the plaintiffs were not able to lease the vast majority of their Group C mineral interests was not because of the government's ownership claim or leasing activities, but because potential oil and gas lessees had determined, based on available data from existing wells and nearby seismic testing, that most of Group C did not contain sufficient oil and gas potential to warrant the cost of the leases.[21]

---

from Chesapeake in 1996 should be deducted from the total damages they seek.  Pls. Post-Trial Br. 16.

[20]Like the plaintiffs' witnesses, many of the government's witnesses' testimony related to both the temporary and permanent takings claims.

[21]The government presented evidence, in the alternative, regarding the potential value of leases for Group C minerals if the court were to find a temporary taking.

Much of the evidence introduced at trial by both the plaintiffs and the government was from geologists and petroleum engineers who testified regarding the mineral potential of the plaintiffs' mineral servitude and the reasons for the limited leasing of the Group C mineral servitude.

The plaintiffs' experts, Michael Veazey, a petroleum engineer,[22] and Frank Harrison, Jr., a petroleum geologist,[23] both testified that they believed the plaintiffs' Group C servitude had significant mineral potential.  Both experts recognized that there is no performance data for Group C because there has not been any oil and gas developed from Group C.[24]  Nonetheless, using the "analogy approach" to determining oil and gas reserves, they opined that the plaintiffs' mineral servitude would likely produce as much oil or gas as the average producing well in and around Group C.  According to Mr.

_____

[22]Mr. Veazey received a B.S. and M.S. in Petroleum Engineering from Louisiana State University ("LSU") in 1966 and 1968, respectively.  He has thirty-eight years of experience as a Registered Professional Engineer; his expertise is largely reservoir engineering.  He has taught numerous courses at LSU, published numerous papers, and now works for a petroleum consulting engineering firm.  His testimony as an expert in petroleum engineering was not objected to.

[23]Mr. Harrison received his B.S. in Petroleum Geology from LSU in 1950.  He worked for Union Production Company as a geological scout in Mississippi and Louisiana in 1950 to 1951.  He then worked for the U.S. Army as an Ordnance Officer from 1951 to 1953.  From 1954 to 1959 he worked as an exploration geologist for Seaboard Oil Company, Trans-Tex Drilling Company, and American Natural Gas Production Company.  In 1959, he left the latter company and began his independent consulting and independent Louisiana oil and gas development activities.  He has been the manager of Optimistic Energy, LLC since 2004; he has also been the president of Optimistic Oil Company since 1983, of which he is also the sole owner.  His testimony as an expert in petroleum geology was not objected to.

[24]As discussed above, portions of Group C are within units that have produced oil, but none of the producing wells are located in Group C.

Veazey, if the government had not thwarted the plaintiffs' leasing efforts by claiming title and thereby forcing potential lessees to obtain protective leases, the plaintiffs would have been able to lease all of their Group C interests.  Mr. Vezeay testified that had it not been for the government's interference, lessees would have been able to drill twenty-one Austin Chalk[25] wells and would have expected production in commercial quantities from seventeen wells with an average total production of 363,000 barrels of oil per well.[26] While Mr. Veazey factored in an estimated four dry holes into his twenty-one-well proposed program, he assumed that the drilling of a dry hole would not lead a lessee to discontinue its drilling program.  He also assumed that a lessee would complete the entire twenty-one well program.

In addition, Mr. Veazey rendered an opinion as to the value of the producing minerals based on either a working interest or royalty interest, depending on whether the

---

[25]The Austin Chalk is an upper Cretaceous geologic formation in the Gulf Coast region that extends from Texas, across Louisiana, and into Mississippi.  The formation is made up of limestone and shale and is found at depths from approximately 10,800 to 12,800 feet.  A typical Austin Chalk well involves drilling down to a certain depth and then drilling two laterals, which extend horizontally around 5000 feet each.  The horizontal laterals are used in the Austin Chalk because the formation is naturally fractured; the laterals increase the chances of tapping one or more fractures, in which hydrocarbons may be found.

[26]Mr. Veazey arrived at the 363,000 barrel figure by averaging the production from certain Austin Chalk wells in surrounding areas.  During cross-examination, however, he was unable to recall why he excluded from or included in this average certain wells.  He acknowledged that there was not much production data from the units adjacent to or close to Group C and that production in the Austin Chalk varies considerably.  He also agreed on cross-examination that it appears from a map prepared by government expert Don Bazer showing cumulative production in the area that the productivity of wells generally reduces moving north towards Group C.

plaintiffs would have been directly involved in development or simply received a royalty.

Mr. Harrison, a geologist, supported Mr. Veazey's conclusions regarding the mineral potential of the Group C lands based on his review of the hydrocarbon potential of the formations that make up the Group C mineral servitude.  Mr. Harrison testified that the area where the plaintiffs' Group C mineral servitude is located has several formations that would likely yield commercial quantities of oil or gas.  He testified that the primary formation is the Austin Chalk, but that the Wilcox formation could also likely have significant reserves.[27]  He explained that in his opinion Group C is "highly prospective" for the Austin Chalk, meaning "there is a 95% chance of producing if a well was drilled . . . ."  Harrison Aff. at 35.  He opined that a Wilcox well would have a success rate of 33% to 40%.  Id. at 36.  Using the same "analogy approach" as Mr. Veazey used, Mr. Harrison testified that his expert investigation revealed that valuable Austin Chalk reserves likely rest in the middle of Fort Polk.  According to Mr. Harrison, his studies show that the most prolific reserves in the Austin Chalk lie just seaward/south of the Lower Cretaceous shelf edge, which, according to Mr. Harrison, runs east-west across the middle of Fort Polk. Mr. Harrison testified that he had reached this conclusion based on a variety of data, including oil development to the west, east, and south of Fort Polk.  To the west, the prolific North Burr Ferry field extends north of where Mr. Harrison believes the shelf edge lies.

---

[27]He explained that production from other geological horizons, such as the Tuscaloosa, Edwards Reef, and Glen Rose formations, would be unlikely.

Mr. Harrison was not persuaded by the map produced by government expert Louis Gilbert showing that the most productive wells lie well south of where Mr. Harrison drew the edge of the Lower Cretaceous shelf.  Mr. Harrison opined that without 3D seismic testing, which has not been done for Group C and likely cannot be done due to surface conditions on parts of Fort Polk, it is not possible to determine the precise location of potential reserves beneath the Fort.

The plaintiffs next called Patrick Donohue, a certified petroleum landman,[28] to testify regarding his assessment of whether the plaintiffs would have been able to lease the Group C lands and the value of Group C for oil and gas leasing.  Mr. Donohue testified that if the Group C acreage had been available for drilling during the period of the title dispute, "one would expect numerous companies bidding for it," driving the price up.  Donohue Aff. at 12.  Mr. Donohue testified that in his opinion, a mineral lease on Group C would have commanded at least $300 per acre per year–a $300 bonus, plus a $300 yearly delay rental thereafter–from 1995 until 2001.  He explained that he arrived at those conclusions "by researching the public records of Vernon Parish . . . reviewing and knowing my past history in Austin Chalk leasing in [a neighboring] Parish, knowing how the Austin Chalk trend 'exploded' in Vernon Parish, and knowing the amount that major landowners have leased for in the past."  Id. at 11.  He based this conclusion in part on

---

[28]Mr. Donohue received a B.S. in Economics and Finance from the University of Southwestern Louisiana.  He has been either an in-house or independent landman since 1975 and has substantial experience valuing oil and gas properties.  His testimony as an expert landman was not objected to.

Group C's proximity to a "very good" Occidental Petroleum Corporation well twelve or thirteen miles to the east in the Masters Creek field.  He also noted that his $300 per acre figure is lower than the $350 per acre Chesapeake agreed to in its lease for 4800 acres of Group C.

Mr. Donohue testified that he did not believe that the drilling of dry holes would have changed the going rate for Group C leases over time.  He testified that the drilling of a non-productive well does not necessarily lead to a loss of interest in the area.  Rather, he explained that in a trend play like the Austin Chalk, companies would be willing to "take all of the acreage" and possibly willing to pay a high price for all 21,000 acres of Group C.  Id. at 16.  Mr. Donohue presented a map showing a range of thirty-two leases, which had bonuses and rents in the area ranging from $10 to $1200.  Ex. 352.  The leases at the lower end of this range were those granted by BLM on Group C, while the higher end leases are small–less than 100-acre–parcels to the south and/or west of Group C.  Mr. Donohue testified that he gave some of these thirty-two leases more weight than others, but that he weighed most heavily the $350 bonus that Chesapeake paid to the plaintiffs for 4800 acres of Group C.

In response to the plaintiffs, the government presented evidence to show that the plaintiffs' case was based on a mistaken understanding regarding the location of the productive limits of the Austin Chalk and thus the mistaken belief that all of the Group C lands had mineral potential.  The government introduced the testimony of Louis Gilbert, a

geologist,[29] Russell John Pepper, III, a petroleum engineer,[30] and Michael McKenzie, also

a petroleum engineer,[31] to rebut Mr. Vezeay's and Mr. Harrison's testimony and expert

conclusions.  Mr. Gilbert testified that the Group C acreage has "a very low hydrocarbon

potential and the chances of encountering hydrocarbons in commercial quantities is

highly unlikely."  Gilbert Aff. at 9.  He testified that while he agreed with Mr. Harrison

that the mineral potential of the Austin Chalk lies on the margin of the Lower Cretaceous

shelf, he disagreed with Mr. Harrison about the location of the shelf edge.  In particular,

---

[29]Mr. Gilbert received his B.S. in Geology from Millsaps College in 1982.  He has worked in the field of petroleum geology for the past twenty-eight years, beginning at Ted Hoz & Associates evaluating hydrocarbon accumulations in Louisiana and surrounding areas.  He founded his own company, Louis Gilbert & Associates, in 1994, and in that regard is involved in prospect screening, field studies, 3D seismic interpretation, property appraisals, and production auditing.  He has served on several industry committees, having been appointed by the state Commissioner of Conservation.  His testimony as an expert in petroleum geology was not objected to.

[30]Mr. Pepper received his B.S. in Petroleum Engineering from the University of Missouri at Rolla in 1972.  He received an M.B.A. from the University of Houston in 1991, and a M.S. in Petroleum Engineering in 1998.  He is a licensed professional engineer in Texas and Louisiana.  Mr. Pepper worked as a production engineer and drilling engineer for Shell Oil Company and Bass Enterprises Production Company in Louisiana, Mississippi, Texas, and offshore from 1972 to 1978.  He then worked for a engineering consulting firm specializing in hydraulic fracturing projects and a separate operating company that drilled and produced Austin Chalk wells.  Beginning in 1980 he worked for Langham Petroleum Exploration, and in 1999 created Langham, Pepper & Associates; both of these are independent oil companies active in the Austin Chalk and many other areas.  He is also involved in a separate minerals acquisition company, Russell T. Rudy Energy, LLC.  His testimony as an expert in petroleum engineering was not objected to.

[31]Mr. McKenzie received his B.S. and M.S. in Petroleum Engineering from LSU in 1972 and 1974, respectively.  He was owner and president of D-O-R Engineering, Inc. from 1986 until 2009, during which time he was involved in all aspects of the firm's consulting services, which concerned hydrocarbon reserve determinations.  He has experience with the Austin Chalk based on an extensive study of the geographic limits of the formation in Vernon Parish and to the east.  His testimony as an expert in petroleum engineering was not objected to.

Mr. Gilbert testified based on his examination of extensive well data–well over 100 well logs–and 2D seismic data that was available for the area on and around Group C that the productive Austin Chalk reserves lie south of Fort Polk and south of the Group C lands. He produced a map that showed a line of productive wells that form a general east-west line just south of where he had designated the location of the Lower Cretaceous shelf; the map also shows wells north of his shelf margin that were not productive.  "[T]here is a clear trend of wells producing less oil and gas going from south to north." Id. at 15.  He also explained that he is able to pinpoint the location of the Lower Cretaceous shelf based on the presence of limestone in certain wells near to the southern part of Fort Polk.  Mr. Gilbert explained that as one moves south, and limestone is no longer present in wells, there is the increased potential for hydrocarbons, which accumulate in fractures on the slope seaward of the shelf edge.  He explained that Mr. Harrison's placement of the shelf edge far to the north of wells containing limestone from the shelf does not make sense, because the presence of this limestone indicates the well's location on the shelf, rather than seaward/south of the shelf edge.

Mr. Gilbert testified that his study of available seismic data confirmed his conclusion as to the location of mineral reserves in the area of Group C and led him to conclude that the geology underlying Group C itself is "not favorable for the accumulation [of] hydrocarbons in commercially sufficient quantities . . . ." Id. at 25.  He further testified that his studies showed that the geologic setting underlying Group C is

relatively stable, meaning it is unlikely to contain the sorts of traps necessary for the accumulation of hydrocarbons. It is these data and these findings that formed the basis of his opinion that the plaintiffs' Group C mineral servitude does not likely contain commercial quantities of oil and gas.

Mr. Gilbert also challenged Mr. Harrison's statements regarding the significance of producing wells in areas to the west and east of Fort Polk. Mr. Gilbert explained that rather than the Lower Cretaceous shelf edge, it is the Sabine uplift, a separate geologic feature occurring just north of the North Burr Ferry field, that is the geologic feature that causes the Austin Chalk fractures associated with production in that field. He also explained that wells to the east of Fort Polk have not been productive. Rather, Mr. Gilbert explained and demonstrated with a map that commercial quantities of oil and gas have been found only to the south of Fort Polk, as would be predicted from the geologic evidence regarding the location of the shelf.

Mr. Pepper testified next for the government. Based on his reading of Mr. Gilbert's expert report, other reports by both the plaintiffs' and the government's experts, and his own experience in the area as a petroleum engineer, he testified that it was his opinion that most of the plaintiffs' Group C mineral servitude was not leased because of its poor mineral potential. He explained that this was established by the number of dry holes and poorly-producing wells found around the Group C location. He explained that the proximity of the Scobee 34-1 and Central Pines 21-1 wells was especially

illuminating.  Both wells are located in the Kisatchie National Forest,[32] south of Fort Polk

and west of nearly all of the Group C acreage in the National Forest.  He explained that

the Scobee well, completed in 1997, was a marginal producer with disappointing

performance, while the Central Pines well was plugged and abandoned within months of

its 1997 completion.  He testified:

> This combination of drilling results is significant, in my opinion, because the
> plugging of a well along with the relatively poor production performance of
> the Scobee 34-1 well[] established a northern boundary of the productive
> Austin Chalk within this area of Group C.  Prior to this point in time,
> companies may have believed that the productive area would extend further
> north[,] as evidenced by Sonat and Chesapeake's leasing of the 4902 acres of
> Group C lands in 1996, but once the results of these two wells were known,
> the picture changes.

Pepper Aff. at 18.  He further testified, "The poor results of the wells along the northern

edge of production condemned or at least severely impaired the portion of the Group C

lands that had not yet been drilled for future Austin Chalk exploration and development."

Id. at 25.  Mr. Pepper also explained that it was poor mineral potential, and not the

existence of the Fort, that explained the lack of interest in most of Group C.  He testified

that the challenges presented by exploring and developing oil and gas on a military

installation would not deter oil and gas operators that believed significant quantities of oil

and gas were present.  He testified that oil and gas operators often face many challenges

due to geography and the need for cooperation with conflicting land uses, just as would

---

[32]The Scobee well is in the Limited Use Area, and the Central Pines well is two miles to
the north, in the Intensive Use Area.

an operator on Fort Polk.  However, he testified that "[i]f experienced oil and gas operators believed that the Group C lands were commercially prospective, they would lease it and drill it."  Id. at 33.

Mr. Pepper also testified regarding the fair rental value of the Group C minerals during the period of the quiet title action.  He explained that the fair value of the Group C minerals was enhanced by the 1996 Sonat and Chesapeake leases of 4902 acres of Group C's southern acreage.  Mr. Pepper calculated the rental value of the Group C minerals by taking the average of the bonuses provided for in these leases–$100 per acre for the Sonat lease and $350 per acre for the Chesapeake lease.  He divided this figure, $225 per acre, in half in order to reach a value for the remaining Group C lands that remained unleased, arriving at a value of $113 per acre for the beginning of 1997.  However, he testified that after 1997 several facts would have led to a significant drop in the value of leases on Group C lands.  These include the expiration of the Central Pines-Chesapeake lease on September 15, 1997, three of the six United States-Chesapeake leases in 1998, and all three United States-UPRC leases in 1999.  He also explained that the marginal production from the Scobee 34-1 well and the abandonment of the Central Pines 21-1 dry hole, both in 1997, would have also depressed the value of Group C leases.  He explained that after these events a number of units established nearby were never drilled.  He testified that 1999 marked the end of the majority of drilling activity in the Austin Chalk in Vernon Parish, as developers focused their efforts to the east in Rapides Parish.  Mr. Pepper

explained that, in his opinion, after the Chesapeake lease expiration in 1997, the value of the Group C leases would have dropped by half, to $57 per acre.  Once the Central Pines 21-1 well was drilled as a dry hole and other wells in the area were found to be only marginally productive, he testified that the lease value should be halved again, becoming $28 per acre.  After 1999 and the end of most drilling in Vernon Parish, he testified that Group C leases would be worth at most $10 per acre.  Mr. Pepper's report and testimony make clear that after determining what he found to be the fair rental value of Group C, he deducted from that the amount that the plaintiffs had received in the form of bonuses and royalties for relevant portions of Group C.  Mr. Pepper explained that in addition to the bonus the plaintiffs received for the portion of Group C that they were able to lease, the plaintiffs also received $398,036 from the approximately 458-acre portion of Group C that was within the productive AUS C RA SUC and AUS C RA SUF between early 1997 and the Fifth Circuit's quiet title decision.[33]

Mr. McKenzie, a petroleum engineer with thirty-five years of experience, provided

---

[33]Although the unit wells were not on Group C, because some Group C acreage was within those productive units, the plaintiffs received a share of the royalties for these units.  The plaintiffs' lease with Chesapeake with respect to these acres continued to be "held by production," even while Chesapeake declined to pay delay rentals with respect to the balance of its Group C acreage leased from the plaintiffs.

As discussed above, the court agrees that these amounts, which the plaintiffs have not deducted from the damages they seek, must be deducted from the amount of just compensation owed to the plaintiffs because, like the bonus paid to the plaintiffs, these royalties are compensation received by the plaintiffs for the mineral interest taken.

his direct testimony through affidavit and was not cross-examined by the plaintiffs.[34]  He

concurred with the findings of Mr. Gilbert and Mr. Pepper, stating:

> Based on my review of the information available, I believe that the lack of
> development outside of the trend . . . is a result of oil and gas companies
> delineating the commercial limits of the Austin Chalk reservoir or reservoirs
> in this area over time through the selective horizontal drilling of certain
> locations and the subsequent results of that drilling.  For example Sonat
> initially planned to drill several wells on or near the Intensive Use Area in
> 1996 and 1997.  Sonat drilled several locations, one of which was the Central
> Pines 21 Well No. 1 in the Intensive Use Area.  That well was a dry hole.
> Sonat subsequently ceased operations in the Intensive Use Area, leaving
> several established and proposed units undrilled.
> . . .
>    It is my opinion that a number of non-commercial wells and the dry
> hole drilled by Sonat in this area condemned the commercial viability of the
> Austin Chalk formation underlying most of the Group C lands, both within
> Fort Polk and in the Intensive Use Area.

McKenzie Aff. at 18-19.  He also testified that had oil and gas companies felt that the

Group C minerals underlying Fort Polk were likely to be productive, at least some of the

Group C mineral servitude could and would have been exploited using horizontal drilling,

which allows accumulations to be accessed from a mile away or more.

**B.      Findings and Conclusions: Liability**

As the court has previously ruled, the government's mere assertion of title does not

constitute a taking.  Central Pines III, 61 Fed. Cl. at 531; Central Pines IV, 98-314, slip.

op. at 17.  As the court explained, "When the Government is acting as a landowner, it is

entitled to avail itself of the judicial system in order to clarify or protect its right to title of

---

[34]Because the plaintiffs opted not to cross-examine Mr. McKenzie, his testimony, in the
form of his affidavit, was never questioned.

property in which it owns a stake." Central Pines III, 61 Fed. Cl. at 531 (citing DSI Corp. v. United States, 655 F.2d 1072, 1074 (Ct. Cl. 1981)). In order to establish a taking, something more than the mere assertion of title is required. Yuba Goldfields, Inc. v. United States, 723 F.2d 884 (Fed. Cir. 1983) ("Yuba I"). The plaintiffs contend that the government's rejection of the plaintiffs' claim of title, issuing of mineral leases for portions of Group C, and interference with leasing of other parts of Group C constitute a taking of the entirety of Group C. The plaintiffs assert that the taking began in 1995 and continued until the Fifth Circuit affirmed the trial court's quiet title decision confirming the plaintiffs' ownership of Group C seven years later.

The court finds, however, that the government's only action constituting "something more" than mere assertion of title was its issuance of mineral leases for a limited portion of Group C for a limited period of time. The evidence established that the government did not interfere with development of the plaintiffs' Group C mineral interest with respect to the unleased areas. Rather, the government cooperated with potential lessees that requested acreage for mineral lease; the evidence did not support the plaintiffs' claim that potential lessees requested and were denied the leasing of Group C minerals other than those the government actually leased in 1997. Further, the evidence established that the reason potential lessees did not approach the government about leasing minerals under Fort Polk was because of the limited mineral potential of those areas. It is for these reasons, as discussed below, that the court finds that the plaintiffs'

have established a temporary taking only for the portion of Group C for which the

government issued leases, and only for the period during which those leases were in

effect.

The undisputed evidence established that under BLM lease procedures oil and gas

companies identified the areas they wanted the government to offer for lease.[35]  Federally-

owned minerals may be leased when the mineral parcel is placed on a notice of

competitive lease, or when a person or entity requests the land be put up for bid or files a

non-competitive lease offer.  As discussed below, during the relevant quiet title period,

BLM received requests and leased certain tracts of land in Vernon Parish, Louisiana that

are part of the Group C acreage.  The Army never received requests regarding the rest of

the Group C servitude, however, and so that acreage was never leased, nor did the Army

ever deny leases to potential interested lessees.

The evidence established that the reason for companies' lack of interest in the

majority of Group C was its low potential for commercial oil and gas production.  Based

on the evidence admitted, the court finds convincing the testimony of Mr. Gilbert, Mr.

Pepper, and Mr. McKenzie regarding the location of the Lower Cretaceous shelf edge, the

corresponding location of the Austin Chalk, and the limited commercial mineral potential

of the reserves in Group C for both the areas that were leased and the areas that were not

---

[35]As discussed supra, n. 11, protective leases are recognized under Louisiana law as leases involving minerals where title is in dispute and arrangements are made to resolve title and payment once the title dispute is resolved.

leased in Group C.  These government witnesses relied on unchallenged well, production, and seismic data to reach their conclusions regarding the lack of productive hydrocarbon potential in Group C and provided a reliable explanation for why certain areas were or were not leased in Vernon Parish.

These data were largely ignored by the plaintiffs' experts, who testified that dry holes and poorly-performing wells would not be relevant considerations for potential lessees.  The plaintiffs' experts testified that without additional seismic testing, potential lessees would have simply presumed that Group C had the same mineral value as areas with known oil and gas reserves in the vicinity of Group C.  The plaintiffs' expert conclusions were not consistent with leasing activity in the area, the well data, or with the geologic evidence.  Accordingly, the court does not find these opinions by the plaintiffs' witnesses to be persuasive.

Mr. Harrison's opinion that the Lower Cretaceous shelf edge (which would indicate the location of Austin Chalk hydrocarbons) crosses through the middle of Fort Polk was refuted by the available well data and seismic data that Mr. Gilbert examined and persuasively explained.  The court also found that Mr. Gilbert persuasively demonstrated that Mr. Harrison's reliance on the productive area to the west of Fort Polk to show the oil and gas potential of the Group C was mistaken, as the North Burr Ferry field's productivity is produced because of a separate geologic structure that would not be found underlying Fort Polk.

The testimony of Mr. Gilbert, Mr. McKenzie, and Mr. Pepper established that the reason most of the wells have been drilled to the south of Fort Polk is because the Lower Cretaceous shelf edge–and, correspondingly, the slope that supports the fractures containing Austin Chalk hydrocarbons–is situated to the south of Fort Polk, and thus the Fort itself is unlikely to have paying quantities of oil and gas.

Indeed, as Mr. McKenzie pointed out, the actions–and inaction–of lessees in the area confirmed the government's expert evidence.  The various maps introduced demonstrated that oil and gas companies in the areas moved their drilling activities south of the line drawn by Mr. Gilbert, suggesting that these companies agreed that it was to the south, rather than on the Fort or immediately to its east or west, where oil and gas reserves are likely to be found.

Although the plaintiffs presented the testimony of Mr. Minaldi and some of the plaintiffs to suggest that they were told that several oil and gas companies, including Belco, were interested in leasing "all" of the mineral interests in Group C at some time, these claims were contradicted by other statements from representatives of these same companies.  For example, the plaintiffs rely extensively on the deposition testimony of Mel Fife, a landman with Belco, who stated that he believed that Belco would have leased all of Group C but for the limitations the Army placed on drilling on the Fort.  However, his statement is inconsistent with and refuted by Belco's November 1996 letter to the Army, which stated that Belco made a business decision to focus its resources where it

had producing wells:

> This is to inform you and the Command that my client, Belco Oil and Gas Corp., no
> longer intends to pursue permission to conduct drilling operations on Fort Polk in the
> foreseeable future.  The success of Belco operations in other parts of Louisiana has
> been such that they have decided to concentrate their operations in those areas.
> . . .
> It has been a real pleasure working with you and I hope to have the opportunity to do
> so again in the future.

Ex. 195 (emphasis added).  As this letter indicates, Belco's reason for deciding not to

pursue development at Fort Polk was based on its decision to explore and develop its oil

and gas leases elsewhere.  Thus, its decision was based on its desire to "concentrate on

their operations in [other] areas," rather than on concerns with restrictions the Army

might impose.

Similarly, the evidence established that Sonat strategically focused its efforts in

certain areas when it finally negotiated leases with the plaintiffs.  The same was true for

Chesapeake and UPRC.  All of these experienced oil and gas companies focused their

leasing activities in specific areas where they believed there was oil and gas potential.

They may have at some point considered leasing large tracts of land, including Group C,

but they ultimately targeted their leasing activities to specific areas where they believed

they would find oil and gas in commercial quantities.

Thus, contrary to the plaintiffs' contentions, the evidence did not establish that the

plaintiffs were unable to lease portions of Group C minerals because of interference by

the government.  To the contrary, the evidence established that the government never

refused a protective lease for Group C minerals.  The court is persuaded by the testimony of the government's witnesses that potential obstacles to developing oil and gas on lands on or near military operations at Fort Polk were not the basis for oil and gas companies deciding not to lease the minerals in these areas.  Rather, the evidence established that if oil and gas companies believed in the hydrocarbon potential of any area within Group C, they would have leased the area, regardless of conditions the Army may have placed on drilling.  As Mr. Pepper explained, oil and gas companies are willing to undertake drilling activities under extremely difficult conditions if they believe the reserves are sufficient to justify the complications created by geographic restraints and competing land uses.  Certainly, the fact that the plaintiffs were able to lease portions of their Group C interests in areas used by the Army on the Kisatchie National Forest demonstrates that Army restrictions were not the determinative factor in deciding whether to lease in Group C.  It is for all of these reasons that the court finds that there was not a temporary taking of the unleased portions of Group C during the period of the quiet title action.

While the court is persuaded that there was no temporary taking of the Group C lands that were not leased by the government because the government did not do anything more than assert title, the court is persuaded that there was a temporary taking of the plaintiffs' Group C mineral interests that were leased by the government.  The evidence established that Sonat, UPRC, and Chesapeake were interested the portion of Group C to the south of the Fort during the time that the government was asserting title and that these

companies negotiated with the plaintiffs regarding leasing this area.  Chesapeake was the

only company that entered into leases with the plaintiffs on this portion of Group C.  The

evidence established that UPRC also expressed an interest in leasing acreage in this area

from the plaintiffs, but it entered into leases with only the government.  As discussed

below, the court finds that the government's assertion of title together with that issuance

of leases to UPRC and Chesapeake of minerals belonging to the plaintiffs constituted a

temporary taking of their mineral interest during the time that the government leases were

in effect.

The evidence established that effective September 15, 1996, the plaintiffs entered

into a three-year lease with Chesapeake that included 4822.10 acres of Group C lands.[36]

The lease provided that the lessor plaintiffs would not interfere with Chesapeake's

attempt to secure a protective lease from the government.  In keeping with this

understanding, the government entered into nine ten-year leases for a total of 5316.38

acres with UPRC and Chesapeake.[37]   Leases LAES 48555, 48556, and 48557, which

covered 2545.08 acres, were executed with UPRC, effective May 1, 1997.  All three

UPRC leases expired in July 1999 for lack of payment.  Leases LAES 48558, 48559,

48560, 48561, 48562, and 48563, which covered 2771.30, acres were executed with

---

[36]Chesapeake allowed this lease to expire for non-payment of rent a year after it took
effect, except to the extent approximately 458 acres were held by production because of their
inclusion in productive units, for which the plaintiffs received the above-mentioned royalties.

[37]These leases are shown on the map found at Appendix B.  See also Ex. 356.

Chesapeake effective May 1, 1997.  The three northernmost of the Chesapeake leases, LAES 48558, 48559, and 48560, covering 1754.81 acres, expired on May 1, 1998 for lack of payment.  The three southernmost Chesapeake leases, LAES 48561, 48562, and 48563, covering 1016.49 acres, remained in effect until resolution of the quiet title action.

The court finds that the government's theory that its offering of leases enhanced, rather than inhibited, the plaintiffs' ability to lease its mineral interests was not borne out by the evidence.  Rather, the evidence established that once the government began offering Group C for lease, Chesapeake walked away from its lease with the plaintiffs, choosing to lease only from the government for a much lower price.  UPRC decided not to enter into a lease with the plaintiffs all together.  Had the government not offered the minerals to be leased, interested developers would have had to negotiate with the plaintiffs to secure a lease and prevent other companies from leasing that acreage. Because a lease from the government had the effect of removing acreage from the marketplace, developers did not obtain or retain leases with the plaintiffs once they received a government lease.  Thus, the plaintiffs did not receive a benefit from "protective leases" offered by the government as the government has alleged.  Rather, the government's leasing of plaintiffs' mineral interests deprived the plaintiffs of the benefit they otherwise would have received from a potential lessee during that period.[38]  That

_____

[38]As discussed in the section on just compensation, to the extent the plaintiffs received a bonus from Chesapeake or royalties from acreage also leased by the government, these amounts were compensation to the plaintiffs and must be deducted from the total owed by the government.

government action effected a temporary taking of the mineral interests leased for the period they were leased, for which the plaintiffs are entitled to just compensation. The measure and amount of that just compensation is discussed below.

### C.  Findings and Conclusions: Just Compensation for the Temporary Taking

The Fifth Amendment specifies that private property shall not be taken by the government without "just compensation." U.S. Const. amend. V. Thus, when the government is found to have taken property, just compensation must be paid as damages. In the context of a temporary taking, the proper measure of just compensation is generally recognized to be the rental value of the property (sometimes simply referred to as "fair rental value") over the period of time for which it was taken. Yuba Natural Res., Inc. v. United States ("Yuba III") 904 F.2d 1577, 1581 (Fed. Cir. 1990); see also Pettro, 47 Fed. Cl. at 138 (compensation for temporary taking is measured by fair market rental value of the property, but not lost profits); Heydt v. United States, 38 Fed. Cl. 286, 309 (1997) (proper measure of just compensation for a temporary taking is the fair market rental value of the property). Fair rental value is "the price a willing lessee would pay to a willing lessor, for the period of the [temporary] taking." Heydt, 38 Fed. Cl. at 309. The best evidence of fair rental value of the property taken is comparable rentals. Id.

In this case, the plaintiffs claim they are entitled to $11,164,818 for what they claim was a seven-year temporary taking of the Group C minerals that were leased by the

government during the period of the quiet title action.[39] This amount is based on the

testimony of Mr. Donohue, the plaintiffs' expert petroleum landman. Mr. Donohue

testified based on his research of public records in Vernon Parish, his knowledge of the

Austin Chalk play, and the history of drilling in the area that leases of Group C should be

valued at $300 per acre bonus, $300 rental, and 27.5% royalty from 1995 until 2001,

when the title dispute was finally resolved by the Fifth Circuit.[40]

    Mr. Pepper testified for the government regarding his assessment of Group C's fair

rental value during the relevant time. He began with a value based on halving the average

of the lease bonuses the plaintiffs were able to negotiate for Group C: $100 for the Sonat

lease and $350 for the Chesapeake lease. He then further halved his fair rental value

estimate twice more based on negative events, such as the drilling of the Central Pines 21

well in 1997 and the end of most drilling in Vernon Parish by 1999.

---

[39]The plaintiffs argue that the taking began in 1995 when they learned of the
government's assertion of title and did not end until the Fifth Circuit ruled on the title question.
The court disagrees. The applicable law (and law of the case) provides that mere assertion of
title is not enough to constitute a taking. As discussed above, the court finds that the only
affirmative act supporting a taking is the government's leasing of the plaintiffs' minerals, which
became effective on May 1, 1997. Thus, May 1, 1997 is the earliest date of a taking supported by
the record in this case.
    While a district court's decision is final and enforceable unless and until reversed on
appeal, the finality of the district court's decision in this case is of no moment because the
government apparently continued to accept rent for a portion of Group C after this decision. To
the extent the government's leases had not previously expired for nonpayment of rent, they ended
with the Fifth Circuit ruling on November 28, 2001. Thus, the government's taking ultimately
ended with this final decision of the Court of Appeals.

[40]Using this methodology, the plaintiffs claimed that they would be entitled to
$42,619,500 for the temporary taking of the entirety of the Group C mineral servitude.

The court finds that fair market annual rent for the temporary taking is $225 per acre based in part on both Mr. Donohue's and Mr. Pepper's analyses of the relevant leasing market. The court finds, as Mr. Pepper suggested, that both the Sonat and Chesapeake leases from the plaintiffs are relevant to determining fair value for the mineral servitude that was taken. The Sonat lease provided for a $100 per acre bonus and $75 per acre rental for approximately 28,000 acres; the Chesapeake lease provided for a $350 per acre bonus and $350 per acre rental for approximately 4800 acres. The court finds that $225 per acre, the average of the bonuses that the plaintiffs negotiated for their two adjacent and contemporary leases, is an appropriate measure of the bonus and rental that the plaintiffs would have been able to negotiate from a willing lessee but for the government's taking of the plaintiffs' mineral interest. The court does not agree with Mr. Pepper's methodology of reducing the fair rental value over time, which was not tied to any actual decrease in rental payments occurring in the surrounding area. Rather, the court accepts Mr. Donohue's conclusion that the rent for the areas that were leased from the government would have remained steady until the Fifth Circuit's decision. Thus, the plaintiffs are entitled to $225 per acre for the acreage leased by the government and for the duration that it was leased.

Further, the court agrees with both the plaintiffs and the government that the amount of just compensation to which the plaintiffs are now entitled must be reduced by the amount of compensation they received. Mr. Pepper used this methodology in

calculating fair rental value, deducting amounts the plaintiffs received through the bonus

from Chesapeake and royalties for the portion of Group C included in producing units.

The plaintiffs have proposed a similar approach, acknowledging, as noted above, that the

just compensation to which they are entitled is offset by the lease bonus they have

received.  Pls.' Post-Trial Br. 16.  The plaintiffs did not address deducting the amount

they received as royalties, but did not challenge Mr. Pepper's having done so in his

damages calculation at trial.

        The court finds that the plaintiffs received a bonus of $350 per acre for its leases

with Chesapeake that partially overlapped the acreage leased by the government.  The

court further finds that the plaintiffs received royalties totaling $398,036 from 1997 until

the Fifth Circuit's decision in 2001.  These royalties and the amount of the Chesapeake

bonus that is attributable to the period during which both the plaintiffs and government

were leasing the property must be deducted from the gross measure of fair market value

of the acreage leased by the government, as "[t]he proper measure of damages for a

temporary taking of a going business concern [is] the difference between the fair market

rent the owner could have earned, but for the taking, and the rent, if any, the owner

earned during the takings period." CCA Assocs. v. United States, 91 Fed. Cl. 580, 619

(2010) (citing, e.g. Kimball Laundry Co. v. United States, 338 U.S. 1, 7 (1949) ("the

proper measure of compensation is the rental that probably could have been obtained [but

for the taking]."); United States v. Petty Motor, 327 U.S. 372, 381 (1946) (just

compensation is measured by "the difference between the value of the use and occupancy of the leasehold for the remainder of the tenant's term, plus the value of the right to renew . . . less the agreed rent which the tenant would pay for such use and occupancy.")); see also Banks v. United States, 99 Fed. Cl. 665, 675 (2009) ("a plaintiff cannot be compensated for damage that it did not suffer").  Accordingly, the court will first determine the measure of just compensation to which the plaintiffs were entitled as a result of the government's taking, and then deduct from that total the amount that the plaintiffs received for the taken acreage during this period.

The government leased to UPRC 2545.08 acres of Group C pursuant to LAES 48555, 48556, and 48557, effective May 1, 1997 and expiring May 1, 1999.  For these leases, the plaintiffs are entitled to just compensation–$225 per acre for two years–amounting to $1,145,286.00.  Similarly, government leases LAES 48558, 48559, and 48560, effective May 1, 1997 and expiring May 1, 1998, covered 1754.81 acres.  For these leases, the plaintiffs are entitled to just compensation–$225 per acre for one year–amounting to $394,832.25.  Finally, government leases LAES 48561, 48562, and 48563, effective May 1, 1997, remained in effect until the Fifth Circuit's ruling in the quiet title action on November 28, 2001 and covered 1016.49 acres.  For these leases, the plaintiffs are entitled to just compensation–$225 per acre for the 4.6 years between May 1, 1997 and November 28, 2001–amounting to $1,052,067.15.  The total just compensation for the acreage leased by the government is thus $2,592,185.40 for the time

in which the nine government leases were in effect, resulting in the government's

temporarily taking the plaintiffs' mineral interest.

From this amount, the court must deduct the amount that the plaintiffs did receive

during the period of the taking.  The plaintiffs received a first-year lease bonus of $350

per acre from Chesapeake for its lease effective September 15, 1996; 4016.05 acres of

this lease overlapped with the acreage leased by the government to Chesapeake and

UPRC under leases effective May 1, 1997.  The portion of the plaintiffs' bonus

attributable to the 4.5 months of overlap for these 4016.05 acres is $527,106.54.

Additionally, approximately 458 acres of the relevant portion of Group C were included

in producing units; the plaintiffs received royalties for these units in the amount of

$398,036 through November 28, 2001.  Thus, the net amount of just compensation now

due to the plaintiffs is $2,592,185.40 less the $527,106.54 and $398,036 they received,

which amounts to $1,667,042.86.

## III.    PERMANENT TAKING CLAIM

### A.      Findings and Conclusions: Statute of Limitations

The court heard testimony at trial regarding the plaintiffs' claim of a permanent

physical taking of their mineral servitude based on the Army's concession that the

plaintiffs will not be given access to certain areas within Fort Polk that are subject to the

plaintiffs' mineral servitude.  These areas include the 5425-acre Redleg Impact Area

("RLIA"), plus a number of much smaller drop zones, landing strips, and impact areas.

The government argues that the plaintiffs' permanent taking claim is barred by the six year statute of limitations governing actions under the Tucker Act.  28 U.S.C. § 2501 (2006).  For the reasons that follow, the court agrees.

As set forth in the parties' joint stipulations, it is not disputed that for most of Fort Polk's early history there was a moratorium on drilling on the Fort, but after the moratorium was lifted in 1978, the plaintiffs were on notice that certain surface areas within Fort Polk would remain off limits for direct drilling.[41]   The parties have stipulated:

> By a letter dated January 20, 1976, Mr. John C. Camp, attorney for Wm. T. Burton Industries, Inc.[("Burton")], wrote to Mr. Darwin L. Wilder, Chief of Acquisition, Fort Worth District, Corps of Engineers, to summarize representations made on behalf of Burton at a recent meeting regarding an extension of the moratorium, ARCO's drilling and exploration activities and other matters.

Fact Stip. No. 42.  In this 1976 letter, Mr. Camp made clear that Burton was aware of the impact area and understood he would not be able to drill directly for minerals from that area:

> We, therefore, desire to negotiate some arrangement with your office that would permit the conduct of seismic work, and one or more strategically located exploratory wells, in the northerly and northwesterly portion of the Fort Polk Artillery range.  We are not contemplating activity in the impact portion of the range . . . .
> . . .
> The area of interest should be distinguished from the artillery range impact area, which would present unusual safety hazards to a mineral operation.

Ex. 66 (emphasis added).

---

[41]The parties have also stipulated that the historic impact area within the Leesville Artillery Range, which overlaps with the RLIA, was inaccessible from as early as 1955.

In addition, the parties have stipulated that these limitations on drilling remained

one year later:

> On February 16, 1977, Darwin L. Wilder, then Chief of the Acquisition
> Branch of the Real Estate Division of the U.S. Army Corps of Engineers, met
> with Burton representatives John Camp and Charles Carwile. At this meeting,
> Mr. Wilder furnished Mr. Camp and Mr. Carwile with a map "showing 25,800
> acres outlined in red where drilling would not be possible as this is the impact
> area."

Fact Stip. No. 46; see also Ex. 80 (Mr. Wilder's contemporaneous memorandum of this

meeting). The map provided to Mr. Camp and Mr. Carwile is not attached to the 1977

memorandum. However, using a map from that time period, Steven Chadwick from Fort

Polk explained in his direct testimony at trial that the area known as the Leesville

Artillery Range ("LAR")[42] was formed in approximately 1943 and consisted of

approximately 25,800 acres, including approximately 4107 acres of the 5425-acre

RLIA.[43] Mr. Chadwick explained further that much of the surface of the LAR was

cleared of unexploded ordnance during the mid to late 1970s in order to open up most of

that area for surface maneuvers; the portion that was not cleared makes up the portion of

the LAR that is now the RLIA, which was created around 1975.

Another small impact area possibly containing unexploded ordinance has also been

in existence for some time according to Mr. Chadwick's unchallenged testimony. Mr.

---

[42]The Leesville Artillery Range was later known as the Leesville Artillery Impact Area or
the Leesville Impact Area, but all are referred to here as "LAR."

[43]A small portion of the RLIA extends west of the bounds of the historic LAR.

Chadwick testified that this area is within the historic artillery range impact area as shown

on an exhibit that overlays a 1954 Leesville Artillery Range map, a current Fort Polk

map, and a map showing the location of the plaintiffs' Group C mineral servitude.  Ex.

360.  A small demolitions training impact area overlies a small portion of one section of

Group C and was not within the historic artillery range impact area, but Mr. Chadwick

testified that this area could possibly be relocated if necessary.  Other than the

demolitions area, only the Geronimo Drop Zone and Landing Strip appear to extend

beyond the historic impact area.  In addition, only a small portion of two sections of the

plaintiffs' Group C minerals extend under these areas.

These admitted facts and the unchallenged testimony of Mr. Chadwick establish

that the plaintiffs knew or should have known no later than 1977 that certain surface areas

within Fort Polk, including the RLIA, were unavailable for direct drilling.[44]  Accordingly,

any permanent physical takings claims premised on the existence of areas on Fort Polk

that are off limits from direct surface drilling accrued no later than 1977.

The plaintiffs admit in their pretrial brief that "the same situation exists today as it

did in 1977 when the plaintiffs' ancestor tried to gain access to drill."  Pls.' Pre-Trial

---

[44]The direct testimony of Jack E. Lawton, Jr. further supports the conclusion that
plaintiffs knew of issues regarding access and use of certain surface areas within Fort Polk in the
1970s.  Mr. Lawton testified,"I may have first learned about our problems with access to our Fort
lands back in the 1970[]s.  I mean the artillery range has been there forever."  Lawton Aff. at 7.
Mr. Lawton further testified that "[t]he impediments that the United States put in place that
prevented us from accessing our mineral rights in the mid-1990[]s were the same impediments
that were there in the 1970[]s.  The artillery shells–the impediments have been accumulating a
long time and continuing."  Id.

Mem. at 10.  Using the 1977 date, the six year statute of limitations for the plaintiffs'

permanent physical taking claim expired in 1983.

It is well settled that claims brought under the Tucker Act are "barred unless the

petition thereon is filed within six years after such claim first accrues."  28 U.S.C. § 2501.

The six-year statute of limitations "is a jurisdictional requirement attached by Congress as

a condition of the government's waiver of sovereign immunity, and, as such, must be

strictly construed."  Hopland Band of Pomo Indians v. United States, 855 F.2d 1573,

1576-77 (Fed. Cir. 1988) (citing Spannaus v. Dep't of Justice, 824 F.2d 52, 55 (D.C. Cir.

1987); Jones v. United States, 801 F.2d 1334, 1335 (Fed. Cir. 1986)); see also John R.

Sand & Gravel Co. v. United States, 552 U.S. 130, 140 (2008) (confirming that 28 U.S.C.

§ 2501 is jurisdictional and that the limitations period cannot be waived or tolled based on

equitable considerations).

The Federal Circuit has held that "[a] cause of action cognizable in a Tucker Act

suit accrues as soon as all events have occurred that are necessary to enable the plaintiff

to bring suit."  Boling v. United States, 220 F.3d 1365, 1370 (Fed. Cir. 2000) ("In

general, a takings claim accrues when 'all events which fix the government's alleged

liability have occurred and the plaintiff was or should have been aware of their

existence.'" (quoting Hopland, 855 F.2d at 1577)).  In this connection, "'[w]here the

actions of the government are open and notorious . . . [the] plaintiff is on inquiry as to its

possible injury," and the statute of limitations begins to run."  Ingrum v. United States,

560 F.3d 1311, 1315 (Fed. Cir. 2009) (quoting Coastal Petro. Co. v. United States, 228
Ct. Cl. 864, 867 (1981)).

The plaintiffs' complaint in this case was not filed until 1998, long after the statute
of limitations expired as to any physical takings claims based on the denial of access to
impact areas within the original LAR, including the smaller RLIA.[45]   The court thus lacks
jurisdiction over such claims and those claims should be dismissed on statute of
limitations grounds.

### B.       Findings and Conclusions in the Alternative: Failure to Prove a Permanent Physical Taking

Although for the reasons discussed above, the court finds that the statute of
limitations has run on the plaintiffs's permanent physical takings claim with respect to the
historic LAR, the court finds that the plaintiffs have failed to prove a permanent physical
taking in any case with respect to that area or the smaller areas outside the LAR.  In this
connection, the court stated in its pretrial rulings, that "[t]o the extent that the plaintiffs'
access to certain areas in Group C is permanently precluded because of military
operations in the area, the plaintiffs' permanent physical takings claims based on lost
access are properly before the court" for trial.  Order on Def.'s Mots. in Limine at 6, Aug.
10, 2010, ECF No. 167.  The court further explained that if the surface of the Group C
lands cannot be used for mineral exploration or development because past or present

---

[45]To the extent other areas that were identified by Mr. Chadwick were outside the historic
LAR, there was no evidence as to when the plaintiffs learned of those areas, and the court thus
finds that the statute of limitations has not run as to the plaintiffs' claims regarding these areas.

military operations render those surface areas too dangerous to enter, "and there are no

reasonable alternatives to exploration or development of the underlying mineral resources

from the surrounding area," the court could find that the plaintiffs' right to extract

minerals has been taken.  Id.  This holding was based on a series of a cases wherein the

Federal Circuit has recognized that the denial of complete access to one's property can

result in a physical taking.  For example, in Laney v. United States, 661 F.2d 145 (Ct. Cl.

1981), the Court of Claims examined the impact of government action that deprived a

property owner of physical access to his property.  In deciding the case, the Court of

Claims explained that only where the denial of access is complete is there a physical

taking.  The Court explained that substantial impairment of economic value is not

sufficient to establish a taking.[46]  Id. at 149.  More specifically, the Court of Claims held

that complete access must be denied to effect a taking, explaining that even where the

government takes away access from three sides of a city block leaving the owner with

access from only a single side, there is no physical taking.  Id. (citing 2 Julius L.

Sackman, Nichols on Eminent Domain § 36.32(2) (3d ed. 1980)); see also Palmyra Pac.

Seafoods, L.L.C. v. United States, 561 F.3d 1361, 1371 (Fed. Cir. 2009) (acknowledging

---

[46]The court has previously determined that the plaintiffs' claims based on allegations that
the Army's interference with access amounts to a regulatory taking are not ripe for review
because the plaintiffs have not sought and been denied access to this portion of their mineral
servitude.  As the Federal Circuit recently explained in Casitas Mun. Water Dist. v. United
States, 543 F.3d 1276 (Fed. Cir. 2008), regulatory takings analysis properly applies to claims
characterized by a restriction of use, whereas a physical taking analysis applies to claims
involving physical appropriation.  Casitas, 543 F.3d at 1294.

that complete bar of access to island would be a taking, but finding that plaintiffs had not

disputed government's assertion that plaintiffs had never actually asked for and been

denied access).  Based on this ruling on the motion in limine, the court agreed to hear

evidence regarding the plaintiffs' claim that the government's denial of access to certain

portions of Fort Polk resulted in a permanent physical taking of certain portions of the

mineral servitude.

Because the government conceded that surface access to certain areas within Fort

Polk would be foreclosed, the bulk of the evidence presented regarding a permanent

physical taking claim came from government witnesses who testified that regardless of

whether the government has barred physical access to the surface of certain Group C

lands, the mineral servitude associated with those lands remains accessible.  The court

heard testimony and received evidence from Don Bazer, a petroleum engineer with

experience in the design of oil and gas wells using horizontal drilling techniques,[47]

regarding the plaintiffs' ability to access their mineral servitude from other areas within

and outside Fort Polk.  Mr. Bazer testified that because of new advances in horizontal

drilling, which allows an operator to drill lengthy horizontal laterals underground, the

plaintiffs' minerals are in fact accessible from areas outside the surface zones where the

---

[47]Mr. Bazer received a B.S. in Petroleum Engineering from LSU in 1960.  His over forty
years of experience drilling oil and gas wells includes selecting surface locations and planning
well paths using both directional and horizontal drilling.  He has worked in this capacity for
numerous oil companies in Louisiana and since 1991 has worked as a consultant for D-O-R
Engineering, Inc.

government has foreclosed access to mineral developers.

As explained by Mr. Bazer in his direct testimony and expert report, by 1994, using one or more horizontal lateral wells with horizontal reaches of 8000 to 9000 feet or more had become the accepted industry practice for developing the Austin Chalk.  Mr. Bazer further explained that the drilling units (sometimes called spacing or proration units) for the Austin Chalk production in the vicinity of Fort Polk are geographic in nature and range in size from 380 to 2290 acres, and that the average size of the units established in the Intensive Use Area within the Kisatchie National Forest is about 1500 acres.  Once these units are established, if a well is drilled within a particular unit, the production from that well is allocated among all of the owners of the minerals within the unit.

In his analysis of the accessibility of the plaintiffs' minerals that underlie the RLIA, in particular, Mr. Bazer utilized a proposed unit spacing pattern and well location map that had been prepared by the plaintiffs' expert, Val Miller.[48]  Mr. Miller had presented testimony regarding extending the unit spacing pattern existing to the south of Group C and then placing a well at the center of each proposed unit.[49]  Mr. Bazer

------

[48]Mr. Miller received his undergraduate degree in Business Administration and M.B.A. from Northeast Louisiana University in 1975.  He belongs to several professional landman organizations, has been a Certified Professional Landman since 1987, and has worked for numerous clients in that capacity, specifically in the oil and gas context in Louisiana and surrounding areas.

[49]The evidence established that in Louisiana, the development of the Austin Chalk is governed by Statewide Order No. 29-S, promulgated by the Louisiana Office of Conservation.

explained that only five of Mr. Miller's projected Group C surface well locations fall

within the RLIA.  The rest of the wells could be placed where Mr. Miller recommended

without issue.  Mr. Bazer explained that the inability to access the surface of the RLIA

would not preclude access to and development of any Group C oil and gas reserves that

might be found within these projected units.[50]  Mr. Bazer explained that each of these

prospective units could "easily be developed" by moving the surface location of the well

and adjusting the distance of the dual laterals (for Mr. Miller's Projected Unit V) or

drilling a horizontal well with a single lateral instead of dual laterals (for Mr. Miller's

Projected Units U, T, AA, and DD).[51]  Ex. 251.  Mr. Bazer stated that these proposed

horizontal wellpaths traverse at or near the exact center of each of the proposed units that

are affected by the RLIA and that these wells, if drilled, would adequately drain any

_____

Order 29-S permits the development of the Austin Chalk by the use of horizontal wells and
spacing rules that provide for the creation of geographic drilling units that are sized as follows:

> [A] subsequent Austin Chalk Formation horizontal well shall not be located so as to
> encroach into a rectangle formed by drawing north-south lines 3,000 feet east of the
> most easterly point and 3,000 feet west of the most westerly point and east-west lines
> 100 feet north of the most northerly point and 100 feet south of the most southerly
> point of any horizontal well completed in, drilling to, or for which a permit shall have
> been granted to drill to the Austin Chalk Formation.

La. Admin. Code, tit. 43 § 4305(A)(2)(a).

[50]Mr. Miller's proposed units were in the vicinity of 1300 acres each.  He confirmed
during cross-examination that his projected units could have been larger, which would have
allowed for a drilling plan involving fewer wells.

[51]Mr. Bazer acknowledged during cross-examination that the traditional design of Austin
Chalk wells includes two laterals, but stated that "[t]here are quite a few single laterals."  Tr.
571:4-5.

hydrocarbons that might be found in those units.  Although Mr. Bazer admitted during

cross-examination that three of the laterals he is proposing are longer than any currently

in existence in the area, Tr. at 569:17-23, in his direct testimony he stated that these

proposed wells "are well within the operational capability of the [oil and gas] industry,"

Bazer Aff. at 15.  "[I]f a company was interested in drilling for oil and gas in this

location, it can be done and the engineering of these wells is not all that different from

your more typical Austin Chalk wells in this area."[52]  Id.

Significantly, while the plaintiffs' counsel thoroughly cross-examined Mr. Bazer,

the plaintiffs presented no expert evidence to rebut Mr. Bazer's testimony regarding the

ability of operators to access Group C minerals from locations outside of the RLIA.

Rather, the plaintiffs' response to Mr. Bazer's testimony is that the surface conditions on

the RLIA are such that no reasonable or prudent operator would drill a well anywhere

near the RLIA or in the Intensive Use Area of the Kisatchie National Forest.  This

assertion by the plaintiffs was not supported by the government's evidence which

established that operators have conducted mineral development on Fort Polk and in the

Kisatchie National Forest.  For example, the stipulated facts establish that in 1996 and

---

[52]Bolstering Mr. Bazer's conclusions is the fact that Mr. Harrison, a geologist expert for the plaintiffs, proposed similar horizontal drilling techniques in his testimony regarding drilling for Group C minerals from locations outside of the Fort Polk boundaries.  Pls.' Pre-Trial Mem. at 99; Harrison Aff. at 44-45.  This testimony was presented by the plaintiffs' in the context of Mr. Harrison's assumption that no development could occur within Fort Polk.  Although that assumption is inconsistent the court's findings, Mr. Harrison's reasoning that certain minerals could be accessed from outside the Fort through the use of horizontal drilling is relevant to the RLIA issue.

1997, Sonat drilled a number of wells on Kisatchie National Forest land (or in some cases on private inholdings within the National Forest).  Sonat drilled the Scobee 34-1 from a privately-owned surface location within the Limited Use Area.  Sonat also stepped out to the north of the Scobee well and drilled the Central Pines 21-1 from a surface location within the Intensive Use Area.  The court also heard testimony from Courtney Aldridge of Aldridge Operating Company, L.L.C. ("Aldridge") regarding his company's mineral operation on Fort Polk.  Mr. Aldridge explained that he contacted Fort Polk in 2007 about reentering a previously plugged oil well on Peason Ridge.  In 2008, Fort Polk granted his company access to Peason Ridge and Aldridge reentered the well.  On June 4, 2008, Aldridge requested permission to construct a tank battery facility near the well.[53]  Fort Polk granted this request in writing on June 16, 2008.  Aldridge moved in equipment the next day and began work on the site.  Aldridge had a producing well and related facilities that are still in use today.  Aldridge Aff. at 1-4.  Mr. Aldridge also explained that his company has plans for further exploration at Fort Polk and recently received preliminary approval from Fort Polk to drill a wildcat well about one mile northeast of its current well on Peason Ridge.[54]  Aldridge Aff. at 6-7.

---

[53]This tank battery facility consists of an assemblage of tanks designed to hold oil or water.  The Aldridge facility includes three tanks that hold 16,800 gallons each, plus a separator and pressure vessel that separates the oil and water produced from the well and then sends the oil to the tanks and the water to a disposal well.  Aldridge Aff. at 4.

[54]Mr. Chadwick stated in his direct testimony that the currently producing Aldridge well is approximately two miles south of the Restricted Training Area on Peason Ridge, which contains three impact areas.  The proposed Aldridge well is approximately one mile south of the

Finally, to the extent the plaintiffs presented evidence to suggest that operation on portions of Fort Polk would be difficult or uneconomical because of the Army's operations there, that argument is irrelevant to the plaintiffs' physical takings claim.[55]  As discussed above, it is well settled that even where the government significantly limits the access to an owner's property, a taking has not occurred, "even if the economic fruitfulness of the [property] is substantially impaired."  Laney, 661 F.2d at 149; see also CRV Enterprises, Inc. v. United States, 86 Fed. Cl. 758 (2009) (holding that even government action depriving plaintiffs of sixty percent of frontage access to waterway would not constitute taking).  The court's analysis of the existence of a physical taking does not involve the question of "whether a physical appropriation . . . deprives the owner of all economically valuable use," as this is a question appropriate only for a regulatory takings analysis.  Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 323-24 (2002); see also Norman v. United States, 63 Fed. Cl. 231, 244 (2004); cf. Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1298 (Fed. Cir. 2008) ("When a government statute . . . is facially constitutional, the relevant takings question . . . ascertains the extent to which the government action interferes with the economic use of the property–a classic regulatory, not physical, takings problem.").  Similarly, to the

--------

Restricted Training Area.  Chadwick Aff. at 9.

[55]The restrictions the plaintiffs refer to, such as the depths at which pipes must be buried, restrictions on the frequency and duration of drilling operations, and limitations on the use of flares, could be relevant to a regulatory, rather than a physical, takings claim.

extent the plaintiffs' argue that it would be impossible for a developer to meet the Army's

restrictions for operations on the Fort, the plaintiffs have presented no evidence or

witnesses who testified regarding the specific regulations that would be imposed, so any

argument about the reasonableness of these regulations is purely speculative.  Moreover,

to the extent the plaintiffs make the assertion that government action has decreased the

productivity of their mineral servitude in an attempt to revive their regulatory takings

claims, the court defers to its earlier rulings that these claims are not ripe for review.[56]

The government acknowledges that the surface within the RLIA cannot be safely

accessed for drilling operations.  However, the inability to use the surface area within the

RLIA does not preclude or unreasonably impede the plaintiffs' ability to develop and

extract the Fort Polk Group C mineral servitude, because there are reasonable alternatives

available to the plaintiffs and their potential lessees for developing the Group C mineral

servitude either themselves or by leasing the mineral acreage to a company that believes

the acreage is commercially prospective.[57]

---

[56]As discussed above, the court has previously ruled more than once that the plaintiffs'
regulatory taking claims are not properly within the jurisdiction of this court because they are not
ripe for review.  Central Pines IV, No. 98-314, slip. op. at 23-26; Order on Def.'s Mots. in
Limine at 5, Aug. 10, 2010, ECF No. 167.

[57]With regard to the smaller areas outside the historic LAR in which the government also
acknowledges that surface use would not be allowed and for which the statute of limitations has
not run, the court reaches the same conclusion.  Based upon Mr. Bazer's testimony about the
technological capabilities of and flexibility afforded by the use of horizontal drilling and Mr.
Chadwick's testimony regarding the location of these smaller areas, the court finds that the denial
of access to these surface areas, like the denial of surface access to the much larger RLIA, does
not render the plaintiffs unable to access the mineral servitude underlying these areas.  Further,
none of the plaintiffs' projected well locations appear to be affected by any of these smaller

The court finds based on the testimony of Mr. Bazer and Mr. Chadwick that there are reasonable alternatives to exploration or development of the Group C mineral resources through the relocation of proposed well surface locations and the utilization of the horizontal drilling techniques that are commonly used in the drilling of Austin Chalk wells. Thus, the fact that there are some surface portions of the Fort Polk Group C lands where a well could not be located does not constitute a permanent physical taking of the plaintiffs' mineral servitude underlying those locations.[58]

## IV.    CONCLUSION

Based on the foregoing, the court concludes that the government's leasing of the plaintiffs' mineral servitude constituted a temporary taking of that servitude. To fulfill the mandate of the Fifth Amendment, the court awards the plaintiffs the amount of **$1,667,042.86**–representing the fair rental value of the servitude that was taken–plus compound interest from the date of the taking as a measure of just compensation. The plaintiffs shall file any claim for attorneys fees and costs pursuant to 42 U.S.C. § 4654(c) (2006) within thirty days from the filing of this opinion. The court shall enter judgment upon resolution of the plaintiffs' claim for fees and costs.

**IT IS SO ORDERED.**

———————————

areas.

[58]Because the court concludes that there has not been a taking of the acreage that the plaintiffs have not leased or of the areas where access is limited, the court does not have occasion to discuss or opine on the testimony of Mr. Veazey, who testified regarding the value of the Group C mineral servitude.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge